**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF TEXAS**

KINNIE MA INDIVIDUAL RETIREMENT
ACCOUNT, individually and on behalf of all others
similarly situated,

               Plaintiff,

    -v-

ASCENDANT CAPITAL, LLC; ASCENDANT
ALTERNATIVE STRATEGIES, LLC; GPB
CAPITAL HOLDINGS, LLC; AXIOM CAPITAL
MANAGEMENT, INC.; DJ PARTNERS LLC; MR
RANGER LLC; DAVID GENTILE; JEFFRY
SCHNEIDER; MARK D. MARTINO; GPB
HOLDINGS, LP; GPB HOLDINGS II, LP; GPB
AUTOMOTIVE PORTFOLIO, LP; GPB COLD
STORAGE, LP; GPB WASTE MANAGEMENT
FUND, LP; GPB HOLDINGS III, LP; GPB
HOLDINGS QUALIFIED, LP; GPB NYC
DEVELOPMENT, LP; RSM US LLP (f/k/a
McGLADREY LLP); PHOENIX AMERICAN
FINANCIAL SERVICES, INC.; ADVISORY
GROUP EQUITY SERVICES, LTD.; AEGIS
CAPITAL CORP.; AEON CAPITAL INC.;
AMERICAN CAPITAL PARTNERS, LLC;
ARETE WEALTH MANAGEMENT, LLC;
ARKADIOS CAPITAL; AUSDAL FINANCIAL
PARTNERS, INC.; AVERE FINANCIAL GROUP
LLC n/k/a PARSONEX CAPITAL MARKETS
LLC; BCG SECURITIES INC.; BRADLEY
WEALTH MANAGEMENT LLC; CABOT
LODGE SECURITIES LLC; CALTON &
ASSOCIATES, INC.; CAPE SECURITIES, INC.;
CAPITAL FINANCIAL SERVICES, INC.;
CAPITAL INVESTMENT GROUP, INC.;
CASCADE FINANCIAL MANAGEMENT, INC.;
CENTER STREET SECURITIES, INC.;
COASTAL EQUITIES, INC.; COLORADO
FINANCIAL SERVICE CORPORATION;
CONCORDE INVESTMENT SERVICES, LLC;
CROWN CAPITAL SECURITIES LP.; DAVID A.
NOYES & COMPANY; DAWSON JAMES
SECURITIES, INC.; DEMPSEY LORD SMITH,

Case No.  1:19-cv-01050

**CLASS ACTION COMPLAINT**

**JURY TRIAL DEMANDED**

LLC; DETALUS SECURITIES, LLC; DFPB INVESTMENTS, INC.; DH HILL SECURITIES, LLLP; DINOSAUR FINANCIAL GROUP, LLC; EMERSON EQUITY LLC; FINANCIAL WEST GROUP; FSC SECURITIES CORPORATION; GENEOS WEALTH MANAGEMENT, INC.; GREAT POINT CAPITAL LLC; GVC CAPITAL LLC; HIGHTOWER SECURITIES, LLC; IBN FINANCIAL SERVICES, INC.; INNOVATION PARTNERS LLC; INTERNATIONAL ASSETS ADVISORY, LLC; INVESTMENT ARCHITECTS, INC.; KALOS CAPITAL, INC.; KINGSBURY CAPITAL, INC.; LANDOLT SECURITIES, INC.; LEWIS FINANCIAL GROUP N/K/A DAI SECURITIES, LLC; LION STREET FINANCIAL, LLC; LOWELL & COMPANY, INC.; LUCIA SECURITIES, LLC; MADISON AVENUE SECURITIES, LLC; MCDONALD PARTNERS LLC; MCNALLY FINANCIAL SERVICES CORPORATION; MOLONEY SECURITIES CO., INC.; MONEY CONCEPTS CAPITAL CORP.; MORI HUSTON PARTNERS LLC; MSC-BD, LLC; NATIONAL SECURITIES CORPORATION; NEWBRIDGE SECURITIES CORPORATION; ORCHARD SECURITIES, LLC; PARITER SECURITIES, LLC; PRIVATE CLIENT SERVICES, LLC; PURSHE KAPLAN STERLING INVESTMENTS, INC.; ROYAL ALLIANCE ASSOCIATES, INC.; SAGEPOINT FINANCIAL, INC.; SANDLAPPER SECURITIES, LLC; SCF SECURITIES, INC.; SENTINUS SECURITIES LLC n/k/a SENTINUS HALO SECURITIES, LLC; STEPHEN A. KOHN & ASSOCIATES, LTD.; TITAN SECURITIES; TRIAD ADVISORS, LLC; UHLMANN PRICE SECURITIES, LLC; UNITED PLANNERS' FINANCIAL SERVICES OF AMERICA LP; VANDERBILT SECURITIES, LLC; VESTECH SECURITIES, INC.; WESTERN INTERNATIONAL SECURITIES, INC.; WESTPARK CAPITAL INC.; WHITEHALL-PARKER SECURITIES, INC.; WILMINGTON CAPITAL SECURITIES, LLC; WOODBURY FINANCIAL SERVICES, INC.; and JOHN DOE AUDITORS 1 THROUGH 10;

Defendants.

1.  Plaintiff Kinnie Ma Individual Retirement Account ("Plaintiff"), individually and on behalf of all other similarly situated persons who purchased or otherwise acquired securities issued by the GPB Funds (as defined below), by and through Plaintiff's undersigned counsel, brings this class action complaint (the "Complaint') against Ascendant Capital, LLC ("Ascendant Capital") and Ascendant Alternative Strategies, LLC ("Ascendant Strategies") (collectively, "Ascendant"), GPB Capital Holdings, LLC ("GPB" or "GPB Capital"), Axiom Capital Management, Inc. ("Axiom"), DJ Partners LLC ("DJ Partners"), MR Ranger LLC ("MR Ranger"), David Gentile ("Gentile"), Jeffry Schneider ("Schneider"), Mark D. Martino ("Martino"), GPB Holdings, LP, GPB Holdings Qualified, LP, GPB Holdings II, LP, GPB Automotive Portfolio, LP, GPB Cold Storage, LP, GPB NYC Development, GPB Waste Management, LP, and GPB Holdings III, LP (collectively referred to herein as the "GPB Funds," the "Funds" or the "Fund Defendants"), RSM US LLP (formally known as McGladrey LLP) ("RSM"), John Doe Auditors 1 through 10 (collectively, the "Auditor Defendants"), and Phoenix American Financial Services, Inc. ("Phoenix" or the "Fund Administrator"), as well as the various brokerage firms identified herein (collectively, the "Broker Defendants"). All defendants are collectively referred to herein as "Defendants." Plaintiff alleges the following upon information and belief, except as to those allegations concerning Plaintiff, which are based upon personal knowledge. Plaintiff's information and belief is based upon the investigation made by and through its attorneys, which included a review of public filings and statements Defendants made, court and regulatory filings, media articles, and other publicly available information.

## PRELIMINARY STATEMENT

2.  This class action arises out of Defendants' improper conduct in selling securities (in the form of limited partnership interests in the Funds) at the direction of GPB Capital, an

alternative asset management firm that is the general partner of each of the Funds, Ascendant Capital, GPB Capital's primary distribution agent, and their respective principals David Gentile and Jeffry Schneider. Defendants knowingly made numerous material misstatements and omitted material facts in their Private Placement Memorandum ("PPM") and other communications related to the offerings (collectively, the "Offering Materials"), or provided substantial assistance in connection with the issuance of such misstatements or omissions. Defendants sold, or materially assisted with the sale of, these securities through a series of massive improperly unregistered public offerings in which they paid themselves and a network of brokers exorbitant fees and falsely promised investors, including Plaintiff and the other members of the Class, prompt investment returns of 8% or more per annum.

3.      GPB, its affiliates Ascendant and Axiom, and their principals Gentile, Schneider, and Martino, as well as each of the remaining Defendants who participated, aided or substantially assisted in the GPB scheme, and acted with knowledge of the scheme because they knew or were reckless in not knowing that GPB would never succeed in generating any profits for limited partners through the ownership of operating businesses. GPB's "investment strategy" was destined to fail because it included exorbitant, **unprecedented** fees, which were not accurately described in its PPMs.

4.      The amount of such fees cannot be precisely determined from the various inconsistent statements made by Defendants, but based upon their disclosures, these fees were in the range of 17% to 20% of the **gross capital** investment of limited partners. Stated differently for each $1,000,000 gross investment, only approximately $800,000 was actually available for investment in underlying deals.

5.　　This fee structure made reasonable returns impossible, and Defendants knew or should have known that.　GPB, its affiliates, and their principals hid this fact through deliberately confusing disclosures.　Rather than acknowledging that investing only 80% of the committed capital would make market returns unlikely or impossible, they offered a chimerical 8% return. While the disclosure as to this 8% current monthly/quarterly return changed over time, it was always designed to cause investors to believe that it was being paid from returns of the underlying business that the GPB Funds operated or owned.　GPB and its affiliates described this 8% return as "fully covered from funds from operations" or from "healthy cash flows" or from "steady cash flows."

6.　　In fact, the 8% return was a trick devised to convince investors that they were receiving 8% from business operations, when in fact the 8% payout was merely a repayment of the capital invested.　Each time the Funds paid 8%, the capital account of an investor – the asset value of its investment – was reduced by this amount.　Although investors did not know it, and the monthly statements investors received from GPB, Gentile, and Phoenix did not reflect it, there was no underlying cash flow or profit from which to pay out the chimerical 8%.　It was a scam.　After payment of the previously described fees of up to 20%, the remainder of customer capital (approximately 80%) was not sufficient to generate profit or cash flow to pay the dividends. Instead, investors simply received back their own capital, effectively reducing the NAV (net asset value) of their investment while being deceived into believing they were receiving payment from underlying profits.　GPB was in fact operating a Ponzi scheme in which it was paying investors' money from their own (or other investors') accounts and describing such payments as investment returns.　Simple math shows the nature of Defendants' scam.　As only 80% of investor capital was actually invested (due to the exorbitant fees being paid), GPB would have had to earn a 35% return

on this amount in order to return to investors their initial investment, plus an 8% annual return. Defendants hid this essential economic fact from investors because disclosure would have revealed the nature of the scam and the inevitable failure of GPB. Instead, Defendants misled investors into believing their capital was secure and that they were earning 8% actual return from the operating businesses owned by the Funds.

7.     Fees paid out of investor funds included up to 11% paid to brokers who sold the securities (an unprecedented amount), and an additional 6% to 9% paid to GPB and its undisclosed affiliates on a regular and continuous basis. GPB also paid itself and its affiliates various other fees, which it has never quantified for its limited partners, including "tax indemnity" fees, operation and support fees, operational expenses, and "other expenses." Stated simply, GPB was created for one purpose and one purpose only: to make GPB and Ascendant (GPB's primary affiliate) and their respective principals, Gentile and Schneider, rich, while misleading investors into believing GPB was steadily earning an 8% return.

8.     While deceiving investors into believing they were earning 8% annual return, Defendants attempted to mask the inevitable failure of the partnership by telling the Class that they would receive on a regular and continuous basis payments "fully covered from funds from operations" and from "healthy cash flows" in an amount of 8% annualized. Indeed, as late as 2019, Defendants continued to represent that distributions were being based upon "performance results." This was all a lie. GPB played a game with the limited partners. Almost all (*i.e.*, more than 95%) of the distributions made to limited partners from GPB and its affiliates were simply returns of the limited partners' own capital. There was no 8% operational income, only losses hidden beneath Defendants' falsely described 8% return of investor capital.

9.      Far from being profitable, according to a now withdrawn audit (available in late 2017) prepared by defendant RSM US LLP, GPB lost a substantial amount in 2016.  Indeed, these audited financials show that GPB paid itself, Ascendant, Axiom, and other brokers more in commissions than the total revenue earned by the underlying Funds.  These financial statements have been withdrawn indicating that GPB's businesses (the Funds) were on the rocks as early as mid-2017.  Moreover, these financial statements clearly indicate that GPB, and the Funds for which it was acting as investment advisor, never earned sufficient profits to pay any distributions from the businesses which they owned.  GPB was, based upon its own financial information, a Ponzi scheme.  GPB was taking money from limited partners (for investment in the Funds) at a clip of approximately 20% on each dollar that such limited partners contributed, and then paying them back fictious distributions, which in fact were simply repayments from their own capital contributions to the partnership.

10.      Much of the truth has now come out and RSM, the auditor who prepared the 2015 and 2016 financials for at least certain of the GPB Funds, has withdrawn those financials and has failed to provide restated audited financials.  GPB has stated that investors can no longer rely upon these financials.  Moreover, GPB **itself** has acknowledged that it overstated the values of two of its biggest funds (GPB Holdings II and Automotive Portfolio, LP) by between 25% and 50%, a loss to the Class of hundreds of millions of dollars.

11.      Furthermore, GPB and its affiliates who controlled GPB now have acknowledged that they operated the Funds in violation of federal disclosure laws for years.  Certain of the Funds operated and controlled by GPB, Gentile, and Schneider were, as of 2016 or early 2017, required to register certain share classes under section 12(g) of the Securities Exchange Act of 1934 (the "Securities Exchange Act" or the "1934 Act"), as their limited partnership interests were held by

5

more than 2,000 holders and were valued at well over $10 million.  Such Funds included at least GPB Holdings II, LP and GPB Automotive Portfolio, LP.  Each of the Defendants was, or should have been, aware of this failure to register the securities (the limited partnership interests), or was reckless in disregarding this failure as they knew the asset value of the Funds and that more than 80 brokers were selling the funds to small investors nationwide.  This failure to register the securities was highly consequential.

12.     Because they failed to register the securities under 12(g) of the 1934 Act, GPB could no longer legally operate these Funds.  Moreover, GPB was in violation of the Securities Exchange Act, because the requirement to register under 12(g) also imposed on GPB and its control persons the obligation to make public filings on a quarterly basis disclosing the financial condition and business management of the Funds and their holding company.  This disclosure would have necessarily included disclosure of the Ponzi scheme.

13.     Failure to comply with 12(g) is a gross breach of the Texas securities laws and the fiduciary duties owed to investors.  Stated simply, Defendants were obligated to make comprehensive financial disclosures consistent with the federal disclosure scheme imposed by the Securities Exchange Act and failed entirely to do so.  Had they done so, the scheme would have been disclosed and ended.

14.     Each of the aiders and abettors involved in this scheme and each of the Defendants who substantively participated in the scheme was or should have been aware of this gross disclosure failure, as they knew through underwriting agreements and their work for the Funds that GPB had engaged in a widespread offering of its limited partnership interests through more than **80** brokers across the country, and knew of the 8% return promised to limited partners, as well as the massive, red-flag commissions that made such returns to the limited partners effectively

impossible. Further, given the small denomination of investments (minimums of $50,000 or $100,000 each) made by investors, it is simply inconceivable that each of the Broker Defendants was unaware that there were 2,000 or more investors and that GPB was in violation of federal disclosure requirements. Indeed, the Form Ds that GPB filed with the SEC listed these brokers, the aggregate dollar amount invested in each Fund, and the number of separate investors in each Fund.

15. In addition to having failed to make required comprehensive disclosure under the Securities Exchange Act, Defendants, including the Broker Defendants, engaged in a massive unregistered public offering in violation of the Securities Act of 1933 (the "Securities Act" or the "1933 Act").

16. Although they used public advertising to sell limited partnership interests, defendants purported to rely upon an exemption from registration under Regulation D, Rule 506. But GPB, Ascendant, Axiom, and their principals (Schneider, Gentile and Martino) knew at all times that this exemption from registration was unavailable because the primary distributor of their securities (Ascendant Capital, with Axiom and Ascendant Strategies) and their control persons Schneider and Martino, were so called "bad actors" under the Rule.

17. Under Rule 506 these "bad acts" – suspensions by State securities regulators or the Financial Industry Regulatory Authority ("FINRA") (formerly the NASD) – were required to be *fully disclosed* to investors. They were not. Their primary role in the distribution of these limited partnership interests required comprehensive disclosure of Schneider's and Martino's prior violations of state and federal securities laws.

18. Defendants did not have the temerity to make this disclosure because they knew that once such prior securities infractions were disclosed to shareholders, the jig would be up, and

no one would participate in their offering or purchase GPB securities. Accordingly, Defendants illegally hid this information. Defendants' glaring failure to disclose Schneider's prior infractions when he was not only the owner of the primary distributor of the limited partnership interests, but also a co-owner of GPB Capital itself, rendered a Rule 506 registration exemption unavailable. Defendants' failure to disclose the prior infractions of Martino, CEO of the Ascendant broker dealer, also violated Rule 506. Consequently, the entire offering of securities by GPB was illegal, and all the purchasers of limited partnership interests, including Plaintiff and the remainder of the Class, are entitled to rescission under Texas law. Because GPB and the Funds had no valid Rule 506 exemption, GPB was required to file a registration statement under the Securities Act and fully disclose Defendants' fraudulent Ponzi scheme.

19. Finally, and perhaps most importantly, Defendants' scheme to bilk customers with fees of up to 20% on invested capital involved a hidden common control relationship between GPB Capital **and the lead broker dealers themselves**. Stated simply, although never clearly disclosed to the limited partners, GPB Capital, Axiom/Ascendant, Schneider, and Gentile, from the start commonly owned the entire revenue stream from organizing and operating the various limited partnership interests, *and* from brokering, selling, and underwriting them.

20. This created the most glaring conflict of interest that can exist in the securities business. The brokers offering the securities and purportedly offering independent objective advice were also secretly sharing in the massive profits earned by GPB Capital in connection with operating the limited partnerships themselves. The nature of this revenue sharing and co-control relationship was never fully disclosed as required under both Texas law and the 1933 and 1934 Acts to which the Funds were subject. The advice offered by Schneider, Ascendant and Axiom (as lead underwriters) was anything but objective. Their goal was to sell as much as they could

because they were profiting not only from the exorbitant broker commissions that they were receiving, but also from the excessive fees that were received by GPB Capital.

21.     Defendants never fully disclosed these relationships, but instead provided piecemeal misleading information through an ever-changing series of half-truths in the many subsequent amendments to their PPMs made in connection with their continuous unregistered offerings. But Defendants never told the whole truth: that the entire GPB business was operated and controlled by Gentile, Schneider and Ascendant, collectively, from the start.

22.     GPB, Ascendant, Axiom, Gentile and Schneider's attempts to cover over this gross, irremediable conflict through piecemeal misleading disclosures over the period of several years were improper. Parties investing in the limited partnership interests were entitled to know specifically and clearly that they were not receiving objective advice from the brokerage firm effecting the underwriting purportedly on behalf of GPB Capital. That primary underwriter (Ascendant, Axiom and Schneider) was anything but objective. Its primary hidden goal was to sell as much of the GPB Funds' interests as they could in order to earn a double income stream (from biased brokerage operations and from the operation of GPB Capital).

23.     As shown herein, Defendants GPB, Axiom and Ascendant could not have achieved their fraudulent goals alone. Various entities, in violation of Texas law, aided and abetted them, including: (1) auditors who recklessly prepared false and misleading audits and allowed their name and reputation to be used for salesmanship and marketing in connection with the sale of the underlying GPB limited partnership interests (GPB repeatedly referenced that their financials were audited as a part of their marketing scheme); and (2) more than 80 broker dealers (the Broker Defendants herein) who, among other things, were reckless in disregarding that Schneider and Martino were "bad actors" under Rule 506 and that GPB, therefore, failed to register its offering

under the Securities Act of 1933, and also failed to comply with the disclosure obligations under Section 12(g) of the Securities Exchange Act of 1934.

24. The Broker Defendants were, in effect, bribed. They were paid grossly excessive commissions (approximately 11%), more than double the industry average, to look the other way and to perpetuate the scheme by failing to disclose that their clients' investments were being used to pay distributions. These brokers, blinded by excessive commissions, were reckless in disregarding the fact that GPB could never actually achieve a legitimate 8% distribution rate when only approximately 80% of investor capital was actually being invested because of the exorbitant fees and expenses being paid upfront to brokers, GPB, Ascendant/Axiom, and their principals. The brokers simply disregarded the inevitable failure of the business model put forward by GPB in the face of excessive commissions. They also disregarded the fact that GPB and they were engaged in an unregistered public offering, and they also disregarded the clear fact that GPB failed to register under section 12(g) of the Securities Exchange Act and failed to make public disclosures in violation of federal securities laws. These actions render them jointly and severely liable under the Texas Securities Act.

25. At all times the brokers knew or were reckless in disregarding the factual underpinnings of these violations for multiple reasons: (1) they knew or should have known that the promised 8% return was impossible given the almost 20% fees taken off the top; (2) they knew or should have known that there were at least 2,000 investors in several of the GPB Funds, as GPB engaged 80 brokers to sell the products and the amounts individually invested were small; and (3) they knew or should have known that the offerings did not qualify for an exemption under Rule 506 as the lead underwriter was a bad actor with a long disqualifying disciplinary history

(information that was available on databases the Broker Defendants used) and that the limited partnership interests were thus being sold in violation of the Securities Act.

26.     RSM and the other Auditor Defendants who prepared audits for the GPB entities in 2015 and 2016 were similarly reckless and provided substantial assistance in perpetuating the scheme.  GPB itself has acknowledged that GPB Holdings II, LP's assets were overstated in the audit that RSM prepared by **more than 25%**, or hundreds of millions of dollars.  RSM's audit has been withdrawn, but GPB Capital's own acknowledgement that the assets on its balance sheet were grossly overstated shows that GPB's auditor was reckless and inaccurate in a material respect. The withdrawal of the audit, in the face of such gross inaccuracies, also reflects it was recklessly issued.

27.     The Fund Administrator, Phoenix American, also provided substantial, material assistance.  Fund administrators are charged with calculating net asset values of investments, processing distributions and informing investors of the current state of their investments.  Absent Phoenix American providing investors with false monthly statements containing the purported value of their holdings (which was inaccurate), the scheme would have failed.  These statements were false and misleading because they failed to reduce the respective investors' capital account value by the up to 11% paid "off the top" (in broker commissions) before investors funds were paid over to GPB.  Thus, the investors' statements were inflated by at least 11% and materially misrepresented the value of their investments.  This allowed the scheme to continue by failing to disclose losses and also allowed GPB to raise more funds.

28.     Yet, the Fund Administrator continued to regularly report "current cash distributions" and "total capital," which showed that limited partners were in fact earning money rather than losing money.  The Fund Administrator knew the high expense level associated with

the offering (*i.e.*, up to 20%), and knew *up front* that only approximately 80% of the Funds raised by GBP were actually credited to investor accounts. The Fund Administrator disregarded the fact that at the initiation of investors' investment in the Fund, they would have started with a capital account of no less than the capital they invested, and thus their "total capital invested" should have been reduced from the beginning. Instead, Defendants simply disregarded this fact and treated the capital accounts as if there was no deduction for the exorbitant brokerage fees. Nor did the statements produced and distributed by the Fund Administrator disclose that distributions being made were from *invested capital* not from any income generated by the Funds' operating subsidiaries. These were gross failures on the part of the Fund Administrator whose regular, continual assurance that the Funds were profitable enabled the Ponzi scheme to continue.

29. Following each offering, GPB, Ascendant Capital, Ascendant Strategies, Axiom, DJ Partners, MR Ranger and the Fund Defendants (the "GPB Defendants"), their respective principals, and the Fund Administrator maintained and perpetuated the scheme by failing to accurately report the true net asset value of Class members' investments in the various Funds, even though they knew or should have known that the stated numbers were inaccurate, and dramatically overstated the investors' interest in the Funds.

30. In sum, Defendants made highly material misrepresentations and omissions in the PPMs for the limited partnership interests purchased by the Class. Defendants' material misrepresentations and omissions in the offering of the GPB Funds included, *inter alia*, the following:

      a. **GPB's Business Was Destined to Fail.** The GPB Defendants, Schneider, Gentile, Martino, and the Broker Defendants' failed to disclose in the Offering Materials, or thereafter, that GPB's business model was built and destined to fail because the

Funds' cash flow would not be nearly sufficient to generate an actual 8% return per annum on investment given the exorbitant unprecedented commissions and other fees and expenses (totaling up to approximately 20% of invested capital) that the Broker Defendants and the GPB Defendants were collecting. Defendants should have disclosed that an 8% return would have necessitated an approximate 35% current return on the Class members' actual invested capital. In addition, Defendants failed to disclose that the GPB Defendants and their principals were, from the start, using new investment money collected from new investors and/or the investors' own capital to pay economically unattainable current distributions – effectively a Ponzi scheme;

b. **Gross Conflicts of Interest.** The GPB Defendants, Gentile and Schneider failed to disclose their irremediable conflicts of interests, including: (i) that Gentile, the managing member and control person of GPB, the Funds' general partner, who controlled each of the Funds, had a large undisclosed ownership interest in Ascendant, which served as the "lead" underwriter for the Funds. Thus, Gentile and GPB had an irremediable and gross conflict of interest – they were selling equity interests to investors in long-dated assets and contemporaneously (and without disclosure) receiving commissions on such sales. This was a material breach of the fiduciary duties of loyalty and full and fair disclosure that GPB and Gentile owed to investors, who were unaware that their fiduciary-investment advisor was receiving undisclosed commission kickbacks which incentivized these defendants to sell the Funds to Class members without concern as to the Funds' actual performance; (ii) that Schneider was a control person (and equity interest

owner) of GPB and the Funds, as was Ascendant, and was deeply involved in GPB's business and in structuring and developing the GPB Funds and the offerings to sell interests in these Funds. Stated differently, the lead underwriter/broker for the GPB Funds – who was obligated to offer objective financial advice under state law and industry (FINRA) standards – was conflicted in that he also was financially benefiting on an undisclosed basis from the underlying business enterprise; and (iii) that Gentile and Schneider had an undisclosed agreement to split the profits of both GPB and Ascendant and that they had formed a company, DJ Partners, LLC, to facilitate this. These fiduciary obligations could not be waived or be limited by GPB or the individual Defendants as they were Registered Investor Advisors, under the Investment Advisor Act;

c. **Undisclosed Prior Bad Acts.** The GPB Defendants' failed to disclose that Schneider, who controlled GPB on an undisclosed basis, previously had been *suspended* by FINRA and by a state regulator, and that Martino, the CEO of the broker-dealer directing these offerings (Axiom and Ascendant Strategies), had also previously been suspended by FINRA. Schneider and Martino, thus, were "bad actors" within the meaning of SEC Rule 506. As a result, a Rule 506 exemption was unavailable to GPB Capital and the Funds, because the PPMs for the Funds failed to disclose and explain these prior bad acts, thus requiring registration under the 1933 Act for each of the integrated GPB offerings;

d. **Failure to Register.** The GPB Defendants failed to make filings as required under the Securities Exchange Act of 1934, § 12(g), 15 U.S.C. § 78(l), given that investors in the GPB Automotive Portfolio, LP (also referred to herein as "Automotive") and

GPB Holdings II, LP (also referred to herein as "Holdings II") each totaled well over the $10 million and 2,000 investors, at which such registration under the 1934 Act is required; and thus that Defendants failed to register the offerings under the Securities Act of 1933 and the securities themselves under the Securities & Exchange Act of 1934; and

e. **Concealment of the Misconduct.** The GPB Defendants and Gentile were improperly concealing the fraud through a series of improper financial transactions (detailed below) and misrepresentations or misleading statements contained in Offering Materials and other communications with investors, (the Class Members herein) – all intended to advance, hide and maintain the scheme.

31.     Plaintiff asserts claims pursuant to the Texas Securities Act (the "TSA"), Tex. Rev. Civ. Stat. Ann. art. 581-33, and 581-7, and related state law, including fraud, breach of fiduciary duty, and the substantial assistance in the breach of such duties, and negligence. Claims are asserted on behalf of a putative class of investors who purchased or otherwise acquired interests in one of the GPB Funds between June 6, 2013 through the present (the "Class Period").

## FACTUAL BACKGROUND

32.     Beginning in or around 2013, Gentile, GPB Capital's CEO and managing member, together with, and at the suggestion of, Schneider (Ascendant's founder), developed the concept of using an alternative asset management firm, GPB Capital, to attract investments in a series of limited partnerships or funds by selling equity interests therein to investors. Gentile and Schneider agreed (but did not disclose to investors) that they would share the profits of GPB Capital and Ascendant, and formed DJ Partners, LLC to ensure their shared ownership.

33.     Defendants GPB Capital, Axiom, and Ascendant, under the direction of Gentile, Schneider, and Martino (CEO and President of Axiom and later CEO of Ascendant Strategies),

formed the GPB Funds and effectuated this secret co-ownership relationship. According to a FINRA BrokerCheck Report on Ascendant Strategies, Gentile and Schneider (through DJ Partners) and Martino (through MR Ranger) were each majority owners of Ascendant Strategies.

34.     The GPB Funds, under the control of GPB Capital, Gentile, and Schneider, and with the assistance of Axiom, Ascendant, and a network of independent brokerage firms (the Broker Defendants herein) offered to Plaintiff and the Class of similarly-situated investors limited partnership units in the Funds, which are "securities" under TSA § 581-4(A) and under federal law. Each GPB investor became a limited partner in one or more Funds, while GPB Capital (a registered investment advisor) acted as the Funds' general partner. GPB Capital then purported to use the funds raised from investors to invest in various operating businesses, and to pay itself and Ascendant huge fees.

35.     As the "lead" underwriter, Ascendant Capital (which acted as a branch of Axiom until forming Ascendant Strategies) sold, or arranged for the sale of, the limited partnership interests in the GPB Funds. Schneider, Gentile and Martino all had a controlling interest in Ascendant Strategies by virtue of their direct ownership and the ownership interests of DJ Partners (Gentile and Schneider) and MR Ranger (Martino).

36.     Schneider exercised control over Ascendant (as well as GPB) and directed the sale of the limited partnership interests. He employed, as directed through Ascendant, a large network of independent brokers (the Broker Defendants) located throughout the United States to actually sell the limited partnership interests to unsuspecting investors. Schneider and his affiliates advised on underwriting, entered into a selling or underwriting agreement with these brokers, communicated with these brokers, and held sales meetings with these brokers, who knew of or should have known of Schneider's tainted regulatory history. At these meetings, Schneider and

his affiliates emphasized the out-sized, extraordinary commissions being paid for the sale of the limited partnership interests.

37.     Plaintiff and the Class are asserting claims against the Broker Defendants for their key role in enabling this misconduct to proceed by utilizing misleading Offering Materials, selling unregistered public securities, funneling investors' money to the Funds and GPB Capital, while each of the Broker Defendants had actual knowledge about the outrageous commission structure of the subject transactions, and that the GPB Funds could never achieve the stated goals, and knew, or were reckless in not knowing, that the Offerings should have been registered under the 1933 Act. **Plaintiff and all of the members of the Class are <u>not</u> asserting claims against the specific Broker Defendant who directly sold the subject securities to such Plaintiff or that particular Class Member; they are suing only the remaining Broker Defendants for their substantial participation and assistance and/or aiding and abetting in the scheme, and in these unregistered public offerings.**

38.     In connection with the sale, the GPB Defendants, Gentile and Schneider, with the other Defendants' substantial assistance and participation, allowed the Funds to make material misstatements and omit material facts regarding the limited partnership interests. This enabled GPB to raise over $1.8 billion from Plaintiff and the other Class members who invested in the GPB Funds. GPB thereafter misused, converted and/or failed to safeguard the investors' money.

39.     In particular, the GPB Defendants, Gentile, Schneider, and Martino, *inter alia*: (a) failed to disclose that the business model for the Funds was a sham and destined to fail; (b) misrepresented the ability of the partnerships to generate 8% returns on the investment *after* payment of fees and expenses of up to 20%; (c) failed to clearly disclose that Class members' own capital, rather than income generated from the GPB Funds' operating companies, was being used

to pay limited partner distributions; (d) failed to disclose that Gentile and Schneider had irremediable conflicts because they secretly agreed to split the profits of GPB and Ascendant, and that Schneider, along with his company Ascendant, controlled GPB; (e) failed to disclose that Gentile, a principal of GPB had majority ownership interest in Ascendant, the lead underwriter and placement agent for the Offerings; (f) failed to disclose up front that Gentile had had an ownership interest in Gentile Pismeny & Brengel, LLP, the same accounting firm that GPB hired for advisory work and that Gentile was also receiving payouts from that firm; (g) failed to disclose in connection with the Offerings that Ascendant's principal, Schneider, had been suspended by FINRA and by the State of Illinois; (h) failed to disclose that Martino (Axiom's CEO and later Ascendant Strategies' CEO and a majority owner in Ascendant Strategies) also had been suspended by FINRA; (i) failed to register the securities, which they were obliged to register under the Securities Act; (j) engaged in serious financial misconduct that misrepresented the financial state of the GPB Funds; and (k) failed to register the GPB Funds' securities (*i.e.*, the limited partnership interests) as required under section 12(g) of the Securities Exchange Act.

40.     These misrepresentations, omissions, and misconduct were material to Plaintiff and the Class members' decisions to invest in the GPB Funds and remain invested in the GPB Funds and proximately caused such investments and subsequent losses.

41.     GPB, Gentile and Schneider caused the GPB Funds to continue to misrepresent and/or fail to disclose the material misconduct and irregularities regarding the GPB Funds' financial condition and operations. This conduct constituted a breach of GPB's fiduciary duties owed to Plaintiff and the members of the Class, given GPB's role as a general partner of the Funds and a Registered Investment Advisor under the Investment Advisor Act of 1940.

42.     For their part, the Broker Defendants eagerly disseminated the misleading Offering Materials, and subsequent communications about the investors' accounts, to Class members, funneling millions of dollars to GPB Capital, which kept the scheme afloat for years.  This money lined the pockets of the GPB Defendants, Gentile, Schneider and Martino, but also provided the lifeblood for the scheme – capital which GPB used to pay exorbitant fees and 8% distributions to investors, rather than investing in operating/portfolio companies.  These Broker Defendants knew, or were reckless in disregarding, that the returns of 8% or more being promised to investors were unattainable, especially since up to 20% of the invested capital was being used to fund exorbitant commissions, fees and expenses.

43.     The scheme was perpetrated with the substantial assistance and participation of RSM and the other Auditor Defendants, who were responsible for auditing the financials of certain of the GPB Funds.  These Auditor Defendants recklessly prepared false and/or misleading audits, while lending their name to the GPB Defendants for use in marketing the offerings to unsuspecting investors, Plaintiff and the Class members herein.  Indeed, GPB Capital has revealed that the audits of Holdings II by auditor RSM for fiscal 2015 and 2016 were materially inaccurate and can no longer be relied upon.

44.     At least as early as 2016, Automotive failed to file required audited financial statements with the Securities and Exchange Commission pursuant to section 12(g) of the Exchange Act.  GPB also failed to provide audited financial statements to their investors for fiscal years 2017 or 2018.

45.     In addition, the Fund Administrator, Phoenix, knew or should have known that the Current Distribution Statements it was providing to class members did not actually portray the

current or net value of Class members' interests in the GPB Funds, because they failed to account for the 11% commissions paid from the capital invested.

46.     The failures described herein, in turn, directly and proximately caused the values of the Plaintiff and the Class members' limited partnership units to decline and caused Plaintiff and the Class members to suffer losses.

47.     From March 2018 through June 2019, a series of third-party disclosures began to reveal significant malfeasances relating to the Funds. Specifically, as described more fully below, in March 2018, Patrick Dibre, a former dealer in GPB's network of automobile dealerships asserted serious allegations of financial misconduct against GPB Capital and other Defendants.

48.     In August 2018, GPB Capital and Gentile admitted that their accounting systems were not working, disclosing "material weaknesses in [the] internal controls" of Holdings II.

49.     GPB Capital explained that "[t]hese areas include controls over related party transactions and disclosures, the consolidation processes and audit oversight enhancements."

50.     In August 2018, GPB Capital further disclosed that its financial statements and independent accountants' reports for 2015 and 2016 "should no longer be relied upon" by investors. According to InvestmentNews, Gentile announced:

> We currently expect that the restatements will include adjustments to the 2015 and 2016 financial statements for items including reclassification of certain transactions and/or corrections in the timing and amounts of income recognition, and enhanced disclosure of certain related party transactions. In light of the above, we have concluded that certain material weaknesses in internal controls exist, and as a result these internal controls over the financial reporting processes will need to be revised and enhanced."[1]

51.     In August 2018, GPB Capital also announced that it was suspending Automotive and Holdings II's investor redemptions.

---

[1] https://www.investmentnews.com/article/20180824/FREE/180829944/top-private-placement-manager-gpb-to-restate-financial-statements-of.

52.     In September 2018, the Massachusetts Secretary of State announced that it was investigating broker-dealers who offered private placements sponsored by GPB Capital.

53.     In November 2018, GPB Capital announced that Crowe, LLP ("Crowe"), the auditor for certain of the portfolio operating companies of one or more of the Funds, including Holdings II, had resigned due to "perceived risks that Crowe determined fell outside of their internal risk tolerance parameters." GPB Capital attributed the delay in completing the 2017 audit of Holdings II to this development.

54.     In December 2018, media reports indicated that the Securities and Exchange Commission had commenced an investigation into GPB Capital, following the initiation of a similar investigation by the Massachusetts state securities regulators.

55.     Similarly, in February 2018 the media reported that the FBI and officials from the New York City Business Integrity Commission had raided GPB's New York office, as well as the office of Five Star Carting, a major private trash hauler that GPB owned.

56.     In a startling disclosure, GPB Capital admitted in a November 14, 2018 filing with the SEC that it had engaged in Ponzi-like conduct to generate distributions and give a false appearance of a successful operations. This disclosure made clear that "amounts that the [GPB] Companies distribute to Investors *have in the past* accordingly included, and may in the future accordingly include, invested capital and have not been, and may not in the future be, entirely comprised of income generated by the Portfolio Companies." (Emphasis added.) This disclosure made clear for the first time that GPB was in fact using new investor money or the investors' own capital to pay distributions to old investors, because its business holdings were not earning profits.

57.     On April 4, 2019, GPB Capital advised investors in Automotive and Holdings II that audits for the 2017 and 2018 fiscal years had not yet been completed, attributing the delay to

"several factors both internal and external."  GPB Capital further advised that it had "set the goal of issuing the 2017 audits for Holdings II, Auto[motive] Portfolio and GPB Holdings by June 30, 2019, with the 2018 audits for these Partnerships being issued thereafter, with a target date of completion of no later than September 30, 2019."  These audits have not yet been completed.

58.     In or about June 2019, GPB Capital, through the Broker Defendants, for the first time communicated to investors that the value of their investment in GPB Funds had declined between 25-70% in value, depending on the Fund.  In so doing, GPB Capital was effectively admitting it had prepared and distributed false and misleading financial information in its monthly asset value statements and financial statements.

59.     Additional information about GPB's misconduct has recently been revealed.  On July 19, 2019, David Rosenberg and related trusts, who were former business partners of GPB's various Funds relating to automobile dealerships sued GPB Capital and its affiliates.  As described herein, Rosenberg has asserted further serious detailed financial misconduct by GPB Capital.

## JURISDICTION AND VENUE

60.     This Court has subject matter jurisdiction under 28 U.S.C. § 1332(d)(2)(A) because the number of proposed class members exceeds 100, the amount in controversy exceeds the sum or value of $5,000,000, exclusive of interest and costs, and Plaintiff and other Class members are citizens of a different state than at least one of the Defendants.

61.     Venue is proper in this judicial district pursuant to 28 U.S.C. § 1391 because Ascendant maintains its principal place of business in this district, Schneider resides in this district, a substantial part of the events or omissions giving rise to the claims occurred in this district.

62.     This Court has personal jurisdiction over each Defendant because each Defendant, directly or through its directors, officers, employees, representatives, and/or agents sold the subject

investments throughout the United States, including in this judicial district, and has sufficient contacts with this state, discretely and as an agent of GPB and Ascendant.

## THE PARTIES

63.     In or about September 2015, Plaintiff Kinnie Ma Individual Retirement Account, through Kinnie Ma, a resident of California, purchased a $64,207 limited partnership interest in GPB Holdings II, LP from GPS Capital Management, LLC.

### The GPB Defendants

64.     Defendant Ascendant Capital, LLC ("Ascendant Capital") was organized in Texas and has a principal place of business in this district in Austin, Texas at 3811 Bee Cave Road, Suite 210, Austin, Texas 78746. Ascendant Capital is a "boutique alternative investment firm" that was the lead distribution partner for GPB and through which Gentile, Schneider and Martino structured, distributed, and offered, or arranged for the Broker Defendants to offer, the limited partnership interests in the GPB Funds. Ascendant Capital was founded in 2012 by Jeffry Schneider and, beginning in 2013, offered the GPB Funds' securities (the limited partnership units) as the Austin, Texas branch office of Axiom Capital Management, Inc., a broker-dealer. In or about 2016, Ascendant Capital and Schneider, along with Gentile and Martino, created Ascendant Alternative Strategies, LLC, a broker-dealer, through which (beginning in 2017) they offered, or arranged for the Broker Defendants to offer, the limited partnership interests in the GPB Funds.

65.     Defendant Ascendant Alternative Strategies, LLC ("Ascendant Strategies") was organized in Delaware in 2016, and has offices at 3811 Bee Cave Road, Suite 210, Austin, Texas 78746. It is a broker-dealer, providing capital markets and investment banking services. Ascendant Strategies is affiliated with both Ascendant Capital and GPB. Sometime in 2017, Ascendant Strategies became the vehicle through which Ascendant Capital offers securities to

investors. Ascendant Strategies was founded by Gentile, Schneider and Martino, its CEO. Schneider, Martino and Gentile are majority owners of Ascendant Strategies through DJ Partners (Gentile and Schneider) and MR Ranger (Martino).

66. Defendants Ascendant Capital and Ascendant Strategies are collectively referred to herein as "Ascendant."

67. Defendant GPB Capital Holdings, LLC ("GPB") is a Delaware limited liability company with a principal place of business in New York City. GPB is the general partner of the GPB Funds and was at all relevant times the control person, manager, and majority owner of the GPB Funds. GPB, therefore, effected the GPB Funds' securities offerings. GPB is an investment advisor registered under the Investment Advisers Act of 1940 ("IAA") and, as such, a fiduciary to Plaintiff and the Class members. Pursuant to the IAA, GPB may not waive nor seek the waiver of its fiduciary duties, and any such waiver would be unenforceable.

68. As the primary distribution partner for GPB, Ascendant materially participated in the preparation of the Offering Materials and subsequent communications relating to GPB and the Funds that were distributed to Plaintiff and other Class members.

69. Defendant Axiom Capital Management, Inc. ("Axiom") was incorporated in Delaware, has a principal place of business in New York, New York, and also has offices in Austin, Texas. Axiom is a licensed securities broker-dealer firm that has been affiliated with Schneider and Ascendant. Through Axiom's Austin, Texas branch (Ascendant), Axiom acted as the primary distribution partner of GPB from 2013 through at least 2016. During that time period, Axiom materially participated in the preparation and dissemination of the GPB Offering Materials and subsequent communications distributed to Plaintiff and other Class members.

70.     Defendant DJ Partners, LLC ("DJ") is a Delaware limited liability company with a principal place of business at 3811 Bee Cave Road, Suite 210, Austin, Texas 78746. It owns a majority interest in Ascendant Strategies. Upon information and belief, Gentile and Schneider jointly own and control DJ Partners LLC. This ownership was not disclosed in the Offering Materials.

71.     Defendant MR Ranger LLC ("MR") is a Delaware limited liability company with a principal place of business at 19 Colonial Road, White Plains, New York. It owns a majority interest in Ascendant Strategies. Upon information and belief, Mark D. Martino, the CEO of Ascendant Strategies, and former CEO at Axiom, owns and controls MR Ranger.

72.     Defendants GPB Holdings, LP, GPB Holdings II, LP, GPB Holdings III, LP, GPB Holdings Qualified, LP, GPB Automotive Portfolio, LP, GPB Cold Storage, LP, GPB NYC Development, LP, and GPB Waste Management Fund, LP are limited partnerships that were organized under the laws of Delaware for the purpose of investing each of the Funds' cash assets into operating businesses in various industries. GPB was the general partner for each of the Funds.

73.     GPB Holdings, LP, GPB Holdings II, LP, GPB Holdings III, LP, GPB Holdings Qualified, LP, GPB Automotive Portfolio, LP, GPB Cold Storage, LP, GPB NYC Development, LP, GPB Waste Management Fund, LP, and GPB Automotive Income Fund, Ltd., are collectively referred to herein as the "GPB Funds," the "Funds," or the "Fund Defendants."

74.     GPB, Ascendant, Axiom, DJ Partners, MR Ranger, and the Fund Defendants are collectively referred to herein as the "GPB Defendants."

**The Individual Defendants**

75.     Defendant David Gentile ("Gentile") is a New York resident and is the founder, Chief Executive Officer, and managing member of GPB. Prior to founding GPB, Gentile worked

at Gentile, Pismeny & Brengel, LLP, an accounting firm, where he provided financial and strategic advisory services. He is a majority owner of Ascendant Strategies through his interest in DJ Partners.

76. Defendant Jeffry Schneider ("Schneider") is an Austin, Texas resident and is the founder of Ascendant and co-founder of GPB. He prepared and distributed Offering Materials to brokers and customers out of his Austin, Texas office, first as a branch office of Axiom and, then, through Ascendant. Schneider and Ascendant controlled all of the Offerings and, therefore, all eight Offerings were effected from Texas. At all relevant times Schneider was a control person of GPB. Schneider was also a majority owner of Ascendant Strategies through his interest in DJ Partners.

77. Defendant Mark Martino ("Martino") is the CEO of Ascendant Strategies, and a majority owner (through MR Ranger LLC) of Ascendant Strategies. Martino co-founded Ascendant Strategies and has been "in control of it" since at least March 14, 2017. Prior to the creation of Ascendant, Martino worked for Axiom, where he served as CEO and President.

78. Gentile, Schneider, and Martino are collectively referred to herein as the "Individual Defendants."

**The Fund Administrator**

79. Defendant Phoenix American Financial Services, Inc. ("Phoenix, the "Fund Administrator" or the "Fund Administrator Defendant.") is a California corporation with its principal place of business in San Rafael, California. Phoenix provides registered transfer agent services, fund administration, fund accounting, corporate accounting and sales and marketing reporting services. At all times relevant hereto, Phoenix served as the fund administrator for private placement offerings of the GPB Funds and reported to limited partners the NAV for the Funds, including, but not limited to, Automotive, Holdings II, and GPB Holdings III, LP.

**The Auditor Defendants**

80.     RSM US LLP, formerly known as McGladrey LLP ("RSM"), is a limited liability partnership with its principal place of business in Chicago, Illinois, and with offices in this District. RSM styles itself as the leading U.S. provider of audit, tax and consulting services focused on the middle market.  RSM served as the outside auditor for certain of GPB Capital's Funds, including Holdings II.  It audited the financial statements of Holdings II for fiscal years 2015 and 2016 but its opinion regarding those audits has since been withdrawn.

81.     The John Doe Auditor Defendants are unidentified entities who served as auditors for the various GPB Funds from 2013 through the present and in so doing provided substantial and material assistance to the GPB Defendants in their wrongful conduct alleged herein, and with reckless disregard for the truth.  Plaintiff intends to seek leave to amend its complaint upon learning the identity of the John Doe Auditor Defendants, which, together with RSM, are referenced to herein as the "Auditor Defendants."

**The Broker Defendants**

82.     In connection with the limited partnership interest sales transactions described herein, each of the Broker Defendants described below directly, materially and substantially aided GPB Capital, the Individual Defendants, and the GPB Funds with reckless disregard for the falsity of the statements made by them in connection with such sales. The Broker Defendants distributed communications to investors, including the PPMs, that contained material misstatements and omitted material facts.  Each of the Broker Defendants substantially assisted the GPB Funds and the GPB Defendants in their efforts to offer limited partnership interests in the Funds by ensuring that these interests were widely offered to a large number of investors in the United States.  This provided the GPB Funds and GPB Capital with the capital to continue paying themselves

exorbitant fees, to continue operations, and to continue making distributions to prior investors in the various GPB Funds, which were operated as a Ponzi scheme.

83.     In addition, each of the Broker Defendants directly and substantially aided the GPB Funds and the GPB Defendants by participating in the illegal unregistered securities offerings being affected by GPB, which they knew or should have known were required to be registered. The Broker Defendants knew or should have known that the GPB Offerings did not qualify for an exemption under SEC Regulation D or SEC Rule 506. Each of the Broker Defendants knew from their role in the Offerings and from the size of the Offerings that GPB was required to register under the Exchange Act certain of its classes of shares. The Broker Defendants also knew, or should have known, the size of the Offerings from GPB's Form D filings with the SEC, which described for each Offering the brokers involved in the sales, the amount of investment raised, and the number of investors.

84.     The claims asserted against the Broker Defendants are limited in that Plaintiff and the Class members are not suing and have not sued the broker who sold them the GPB limited partnership interests, but *are only* suing each of the other brokers for promoting and sustaining the Ponzi scheme.

85.     The relevant Broker Defendants include:

   a. Defendant Advisory Group Equity Services, Ltd. ("Advisory Group"), which was incorporated in Massachusetts and has a principal place of business in Woburn, MA.

   b. Defendant Aegis Capital Corporation ("Aegis"), which was incorporated in New York and has a principal place of business in New York, NY.

c.  Defendant Aeon Capital Inc. ("Aeon"), which was incorporated in Wisconsin and has a principal place of business in Middletown, NJ.

d.  Defendant American Capital Partners, LLC ("American Capital"), which was incorporated in New York and has a principal place of business in Hauppauge, NY.

e.  Defendant Arete Wealth Management, LLC ("Arete"), which was incorporated in Illinois and has a principal place of business in Chicago, IL.

f.  Defendant Arkadios Capital ("Arkadios"), which was incorporated in Georgia and has a principal place of business in Atlanta, GA.

g.  Defendant Ausdal Financial Partners, Inc. ("Ausdal"), which was incorporated in Iowa and has a principal place of business in Davenport, IA.

h.  Defendant Avere Financial Group, LLC n/k/a Parsonex Capital Markets, LLC ("Avere"), which was incorporated in Delaware and has a principal place of business in Englewood, CO.

i.  Defendant BCG Securities, Inc. ("BCG"), which was incorporated in Pennsylvania and has a principal place of business in Cherry Hill, NJ.

j.  Defendant Bradley Wealth Management, LLC ("Bradley"), which was incorporated in California and has a principal place of business in San Diego, CA.

k.  Defendant Cabot Lodge Securities LLC ("Cabot"), which was incorporated in Delaware and has a principal place of business in New York, NY.

l.  Defendant Calton & Associates, Inc. ("Calton"), which was incorporated in Florida and has a principal place of business in Tampa, FL.

m.  Defendant Cape Securities, Inc. ("Cape"), which was incorporated in North Carolina and has a principal place of business in McDonough, GA.

n.  Defendant Capital Financial Services, Inc. ("Capital Financial"), which was incorporated in Wisconsin and has a principal place of business in Minot, ND.

o.  Defendant Capital Investment Group, Inc. ("Capital Investment"), which was incorporated in North Carolina and has a principal place of business in Raleigh, NC.

p.  Defendant Cascade Financial Management, Inc. ("Cascade"), which was incorporated in Colorado and has a principal place of business in Denver, CO.

q.  Defendant Center Street Securities, Inc. ("Center Street"), which was incorporated in Louisiana and has a principal place of business in Nashville, TN.

r.  Defendant Coastal Equities, Inc. ("Coastal"), which was incorporated in Massachusetts and has a principal place of business in Wilmington, DE.

s.  Defendant Colorado Financial Service Corporation ("Colorado"), which was incorporated in Colorado and has a principal place of business in Centennial, CO.

t.  Defendant Concorde Investment Services, LLC ("Concorde"), which was incorporated in Michigan and has a principal place of business in Livonia, MI.

u.  Defendant Crown Capital Securities L.P. ("Crown"), which was incorporated in Delaware and has a principal place of business in Orange, CA.

v.  Defendant David A. Noyes & Company ("Noyes"), which was incorporated in Illinois and has a principal place of business in Indianapolis, IN.

w.  Defendant Dawson James Securities, Inc. ("DJ"), which was incorporated in Florida and has a principal place of business in Boca Raton, FL.

x.  Defendant Dempsey Lord Smith, LLC ("Dempsey"), which was incorporated in Georgia and has a principal place of business in Rome, GA.

y.   Defendant Detalus Securities, LLC ("Detalus"), which was incorporated in Missouri and has a principal place of business in St. Louis, MO.

z.   Defendant DFPB Investments, Inc. ("DFPG"), which was incorporated in Utah and has a principal place of business in Sandy, UT.

aa.  Defendant DH Hill Securities, LLLP ("DH Hill"), which was incorporated in Texas and has a principal place of business in Kingwood, TX.

bb.  Defendant Dinosaur Financial Group, LLC ("Dinosaur"), which was incorporated in Delaware and has a principal place of business in New York, NY.

cc.  Defendant Emerson Equity LLC ("Emerson"), which was incorporated in California and has a principal place of business in San Mateo, CA.

dd.  Defendant Financial West Group ("Financial West"), which was incorporated in California and has a principal place of business in Reno, NV.

ee.  Defendant FSC Securities Corporation ("FSC"), which was incorporated in Delaware and has a principal place of business in Atlanta, GA.

ff.  Defendant Geneos Wealth Management, Inc. ("Geneos"), which was incorporated in Colorado and has a principal place of business in Centennial, CO.

gg.  Defendant Great Point Capital LLC ("Great Point"), which was incorporated in Delaware and has a principal place of business in Chicago, IL.

hh.  Defendant GVC Capital LLC ("GVC"), which was incorporated in Colorado and has a principal place of business in Greenwood Village, CO.

ii.  Defendant Hightower Securities, LLC ("Hightower"), which was incorporated in Illinois and has a principal place of business in Chicago, IL.

jj. Defendant IBN Financial Services, Inc. ("IBN"), which was incorporated in New York and has a principal place of business in Liverpool, NY.

kk. Defendant Innovation Partners LLC ("Innovation"), which was incorporated in North Carolina and has a principal place of business in Charlotte, NC.

ll. Defendant International Assets Advisory, LLC ("IA Advisory"), which was incorporated in Florida and has a principal place of business in Orlando, FL.

mm. Defendant Investment Architects, Inc. ("IA"), which was incorporated in California and has a principal place of business in Petaluma, CA.

nn. Defendant Kalos Capital, Inc. ("Kalos"), which was incorporated in Georgia and has a principal place of business in Alpharetta, GA.

oo. Defendant Kingsbury Capital, Inc. ("Kingsbury"), which was incorporated in Illinois and has a principal place of business in Evanston, IL.

pp. Defendant Landolt Securities, Inc. ("Landolt"), which was incorporated in Wisconsin and has a principal place of business in Oshkosh, WI.

qq. Defendant Lewis Financial Group n/k/a DAI Securities, LLC ("Lewis"), which was incorporated in Minnesota and has a principal place of business in Mankato, MN.

rr. Defendant Lion Street Financial, LLC ("Lion"), which was incorporated in Texas and has a principal place of business in Austin, TX.

ss. Defendant Lowell & Company, Inc. ("Lowell"), which was incorporated in Texas and has a principal place of business in Lubbock, TX.

tt. Defendant Lucia Securities, LLC ("Lucia"), which was incorporated in Delaware and has a principal place of business in San Diego, CA.

uu. Defendant Madison Avenue Securities, LLC ("Madison"), which was incorporated in Delaware and has a principal place of business in San Diego, CA.

vv. Defendant McDonald Partners LLC ("McDonald"), which was incorporated in Ohio and has a principal place of business in Cleveland, OH.

ww. Defendant McNally Financial Services Corporation ("McNally"), which was incorporated in Texas and has a principal place of business in San Antonio, TX.

xx. Defendant Moloney Securities Co., Inc. ("Moloney"), which was incorporated in Missouri and has a principal place of business in Manchester, MO.

yy. Defendant Money Concepts Capital Corporation ("MCC"), which was incorporated in Florida and has a principal place of business in Palm Beach Gardens, FL.

zz. Defendant Mori Huston Partners LLC ("Mori"), which was incorporated in Florida and has a principal place of business in Miami, FL.

aaa. Defendant MSC-BD, LLC ("MSC-BD"), which was incorporated in Florida and has a principal place of business in Cumming, GA.

bbb. Defendant National Securities Corporation ("NSC"), which was incorporated in Washington and has a principal place of business in Boca Raton, FL.

ccc. Defendant Newbridge Securities Corporation ("Newbridge"), which was incorporated in Virginia and has a principal place of business in Boca Raton, FL.

ddd. Defendant Orchard Securities, LLC ("Orchard"), which was incorporated in Utah and has a principal place of business in Pleasant Grove, UT.

eee. Defendant Pariter Securities, LLC ("Pariter"), which was incorporated in Puerto Rico and has a principal place of business in Guaynabo, PR.

fff. Defendant Private Client Services, LLC ("PCS"), which was incorporated in Kentucky and has a principal place of business in Louisville, KY.

ggg. Defendant Purshe Kaplan Sterling Investments, Inc. ("Purshe"), which was incorporated in New York and has a principal place of business in Albany, NY.

hhh. Defendant Royal Alliance Associates, Inc. ("Royal"), which was incorporated in Delaware and has a principal place of business in Jersey City, NJ.

iii. Defendant Sagepoint Financial, Inc. ("Sagepoint"), which was incorporated in Delaware and has a principal place of business in Phoenix, AZ.

jjj. Defendant Sandlapper Securities, LLC ("Sandlapper"), which was incorporated in South Carolina and has a principal place of business in Greenville, SC.

kkk. Defendant SCF Securities, Inc. ("SCF"), which was incorporated in Arizona and has a principal place of business in Fresno, CA.

lll. Defendant Sentinus Securities n/k/a Sentinus-Halo Securities, LLC ("Sentinus"), which was incorporated in Illinois and has a principal place of business in Oak Brook, IL.

mmm. Defendant Stephen A. Kohn & Associates, Ltd. ("Kohn"), which was incorporated in Colorado and has a principal place of business in Lakewood, CO.

nnn. Defendant Titan Securities ("Titan"), which was incorporated in California and has a principal place of business in Addison, TX.

ooo. Defendant Triad Advisors LLC ("Triad"), which was incorporated in Florida and has a principal place of business in Norcross, GA.

ppp. Defendant Uhlmann Price Securities, LLC ("Uhlmann"), which was incorporated in Illinois and has a principal place of business in Chicago, IL.

qqq. Defendant United Planners' Financial Services of America LP ("UPFSA"), which was incorporated in Arizona and has a principal place of business in Scottsdale, AZ.

rrr. Defendant Vanderbilt Securities, LLC ("Vanderbilt"), which was incorporated in New York and has a principal place of business in Woodbury, NY.

sss. Defendant Vestech Securities, Inc. ("Vestech"), which was incorporated in Kansas and has a principal place of business in St. Louis, MO.

ttt. Defendant Western International Securities, Inc. ("Western"), which was incorporated in Colorado and has a principal place of business in Pasadena, CA.

uuu. Defendant WestPark Capital, Inc. ("WestPark"), which was incorporated in Colorado and has a principal place of business in Los Angeles, CA.

vvv. Defendant Whitehall-Parker Securities, Inc. ("Whitehall"), which was incorporated in California and has a principal place of business in San Francisco, CA.

www. Defendant Wilmington Capital Securities, LLC ("Wilmington"), which was incorporated in New York and has a principal place of business in Garden City, NY.

xxx. Defendant Woodbury Financial Services, Inc. ("Woodbury"), which was incorporated in Minnesota and has a principal place of business in Oakdale, MN.

86. As noted, the brokerage firms set forth in the above paragraphs are collectively referred to herein as the "Broker Defendants."

**FACTUAL ALLEGATIONS**

**A.**     **Gentile and Schneider Embark on Their Scheme to Fraudulently Raise Money from Investors Employing a Secret Agreement to Share Profits**

87.     In or about 2012, Austin, Texas resident Schneider formed Ascendant as a provider of alternative investment solutions. In or about 2013, Schneider approached Gentile with the concept for GPB Capital: "partnering on an income-producing private equity fund." *Creating a Corporate Culture That Gives Back,* 30 Founding Austin (Sept. 19, 2017), http://www.foundingaustin.com/home/ascendantcap (publishing a Schneider interview). The pair set out to establish a mechanism whereby they could generate exceedingly large fees and commissions for themselves through a series of limited partnership vehicles, which owned illiquid assets. Out of this concept, Schneider and Gentile created GPB Capital, an alternative asset management firm based in New York. The pair agreed to split their profits from GPB and Ascendant, but did not property disclose this secret deal to investors.

88.     Schneider, working from Texas, was intricately involved in the business of GPB Capital. In fact, according to the above-referenced September 2017 interview, Schneider has admitted that he was the creator of the GPB structure "in 2013, [he] helped [Gentile] launch an income-producing private equity fund called GPB Holdings," which was the first of the GPB Funds.

89.     Apparently, realizing the huge fees that he could garner by his involvement in both operating the Funds, and acting as a broker in selling them, in 2015, Schneider "dedicated [his] company, Ascendant Capital, to structuring funds and raising capital exclusively for GPB."

90.     Gentile and Schneider used Schneider's Austin-based firm Ascendant, a branch office of Axiom, to act as the principal distribution agent of GPB's Offerings.

91.　　According to a March 28, 2015 Form ADV filed by GPB with the SEC, GPB describes itself as follows:

> GPB is an investment adviser that structures, manages, promotes, sponsors, and through itself and affiliate entities serves as the general partner and/or investment manager of various limited partnerships (the "Funds"). GPB was formed in March of 2013 and is owned by David Gentile.

92.　　Neither the PPMs nor the Form ADV filed by GPB disclosed Schneider's role as a co-founder and control person of GPB. Nor did they properly disclose that Gentile, the principal of the general partner of the issuer, had a majority ownership interest in the broker-dealer that was acting as the primary distribution agent for the GPB Funds. These material conflicts of interest were never fully disclosed throughout the GPB Ponzi scheme. Thus, investors did not know when they invested that Schneider and Ascendant, the lead broker for GPB securities, were conflicted by Schneider's financial interest in GPB or that Gentile and GPB were conflicted by their interest in the broker selling GPB limited partnership interests.

93.　　As noted above, Ascendant, the Austin-based primary distribution agent for GPB, *initially* operated as a branch office of Axiom. In or about 2017, Ascendant began operating through its own broker-dealer, Ascendant Strategies.

94.　　The 2019 FINRA BrokerCheck Report for Ascendant Strategies explains its business. It is "a broker or dealer selling tax shelters or limited partnerships in primary distributions," and also offers "private placement of securities." Ascendant Strategies is also engaged in:

> Acting as a wholesaling BD selling interests in various types of direct investments including, private real estate investment programs and operating businesses as well as making intros of financial intermediaries and investors to mutual funds. Serving as a financial advisor in connection with buy-side/sell-side mergers, acquisitions, sales of businesses or assets corp. divestitures or other corp. restructurings. Providing fairness opinions and detailed valuation of a co. in connection with M&A transactions.

95.     While not disclosed in the Offering Materials for the GPB Funds or elsewhere, the post-offering 2019 FINRA BrokerCheck Report on Ascendant Strategies admits that "GPB Capital Holdings LLC is under common control with the firm," and that Gentile is a "common control person."

96.     According to the 2019 BrokerCheck Report, Gentile has as direct ownership interest in Ascendant Strategies and, through DJ Partners, a *majority* ownership interest in that firm.  Further, as explained above, Schneider was involved in the creation and direction of GPB Capital and is a control person of GPB and the Funds.  Despite this conflict-ridden relationship, during the entire GPB offering period, GPB, Gentile, Schneider, and the various Fund Defendants did not clearly disclose to limited partner investors or the Class members herein, that Gentile had a majority ownership interest in Ascendant Strategies since April 2016, and that Schneider controlled GPB.

**B.     GPB Capital's Destined to Fail Business Model**

97.     As described in its promotional materials, GPB followed a "private equity" structure for its asset management.  In that framework, the asset manager (in this case GPB) set up a fund, organized as a limited partnership.  GPB then marketed and sold limited partnership interests in the fund to investors.  The investors purchased limited partnership interests, and the asset manager, acting as the general partner and investment manager, invested the fund's cash assets in portfolio or operating businesses, in various industries, including automotive, waste management and cold storage businesses.

98.     GPB's investments were illiquid and had no clear ascertainable value.  GPB acted as the general partner of the various Funds, overseeing the Funds and drawing substantial fees from the money invested.  Gentile was the managing member of the general partner, GPB.  At all relevant times, GPB was a registered Investment Advisor under the IAA.

99. GPB and Ascendant marketed the Funds to individual investors through a huge network of independent broker-dealers around the country. These Broker Defendants were incentivized by an assortment of exorbitant unprecedent fees and commissions totaling up to 11% of the capital invested. These commissions were paid by the investor, not GPB. Such an arrangement put the Broker Defendants on notice. First, commissions on such securities are usually borne not by investors, but by the issuer, so this was certain to raise red flags to any Broker Defendant selling these securities. Second, the 11% brokerage commission fee structure was extraordinarily high, and should have constituted yet another red flag to the Broker Defendants.

100. GPB itself also chased an assortment of other fees. Including such additional fees, customers paid fees, expenses and commissions to the GPB Defendants and the Broker Defendants of between 15% and 20% of the capital invested. For example, the Automotive PPM lists the following eight (8) possible sets of fees/commissions/expenses: selling commissions (up to 7%), due diligence fees (1%), placement and marketing support fees (1.75%), wholesaling fees (up to 1.25%), organizational expenses (up to 1.25%), managerial assistance fees (2.0% of capital contributions), acquisition fees (between 1.75% and 2.75% of the price of assets acquired), and partnership expenses.

101. Similarly, the Offering Materials for Holdings II included selling commissions of up to 11%, acquisition fees of either 1.75% of the enterprise value or 2.75% of the asset purchase price, managerial assistance fees of 2% of capital contributions, organizational expenses of up to 1.25% of the gross proceeds received from the Offering, and partnership expenses.

102. In addition to the above assortment of fees and expenses, GPB stood to receive management and performance fees, which are typically 20% of the profits made by a Fund.

103.     GPB developed a marketing scheme with Schneider and Gentile to market its limited partnership interests using false promises.   This scheme involved creating the false appearance of substantial profitability by distributing a large (8%) annual dividend to investors, even though the underlying investments were not profitable and instead were losing money. Defendants utilized this dividend to trick investors into believing that the underlying businesses were doing well and generating cash flow when they were not.   Indeed, GPB routinely falsely disclosed to investors that it was generating cash flow to pay the dividend.   Instead, the GPB Defendants simply paid this large dividend from other people's money – the money of new investors in the limited partnerships, or from the investors' own capital.

104.     No legitimate business continuously pays out 8% dividends when consistently losing money.  To do so is to assure bankruptcy, unless the issuers and their agents can raise enough money (fraudulently) to put off that inevitable failure, while they continue earning fees.

105.     Notwithstanding the above panoply of fees, GPB and the Funds regularly promised and paid investors a preferred return of 8%, beginning only three months after the investors' initial subscription – a result that was clearly unachievable, given the huge upfront fees being paid from investor capital, and the time period it would take to invest and make returns on the remaining customer capital actually invested.  Purportedly, the payouts were to occur based on the cash flow of the underlying portfolio operating businesses, but Defendants knew this could never be the case, and failed to make this clear to investors.

106.     Defendants misrepresented the source of these distributions.   For example, the Automotive PPM advised that "we will make distributions based on cash flow we have received from Dealerships" (*i.e.*, the portfolio operating companies).   In fact, the dividends were not paid from cash flow, but from other people's money.

107.    In a December 24, 2015 GPB Capital letter to Holdings II investors, which attached

a December 15, 2015 Supplemental PPM, the GPB Defendants also falsely advised Plaintiff and

other Class members:

> It is our pleasure to announce that GPB Holdings II, LP (the "Fund") is
> performing well.  With 9 assets generating healthy cash flow to the Fund,
> **GPB continues to pay all distributions at the stated rate of 8% fully
> covered from funds from operations.**  More so, we recently announced a
> special distribution of 1.5% that will be payable on April 30, 2016 to all
> investors who are admitted to the Fund by December 31, 2015.

(Emphasis added).

108.    In fact, such statements were false and misleading.  They failed to disclose that

GPB was actually using new investor capital to pay distributions to existing investors in the Funds,

and the underlying assets were generally not profitable.

109.    GPB did not rely on the Funds' portfolio companies' cash flow to make

distributions, as it falsely told investors in the Offering Materials.  In a series of belated

communications with investors, the GPB Defendants, Gentile, and Schneider provided piecemeal

but misleading "disclosures" to class members that GPB "might" make distributions from investor

capital, but never said it did so, and continued to tout the success of its underlying investments.

110.    For example, GPB stated that it *could use* investor capital to make distributions but

had not yet done so.  This too was false, because use of investor capital to pay investor distributions

was the GPB Defendants' game plan and practice from the start.  In a March 7, 2016 GPB Holdings

II Amended PPM, at p. 25 (emphasis added), GPB stated:

> **No Assurance of Distributions**. The process of identifying, screening and
> successfully acquiring and operating private companies is difficult and
> risky. We can provide no assurances that we will be able to generate
> operating cash flow sufficient to make distributions to LPs. Thus, there is
> no guarantee that we will pay any particular amount of distributions, if at
> all. Furthermore, **while we have no present plans to do so, we could
> include LPs' invested capital in amounts we distribute to LPs, which
> may reduce the amount of capital available to acquire and operate**

**Portfolio Companies and make other permitted acquisitions, as well as, negatively impact the value of the LPs' investments, especially if a substantial portion of our distributions are paid from our LPs' invested capital.**

111. Likewise, a March 30, 2017 Form ADV, filed with the SEC reported, at p. 13 (emphasis added):

> *No Assurance of Distributions.* The process of identifying, screening and successfully acquiring and operating private companies is difficult and risky. The Companies can provide no assurances that they will be able to generate operating cash flow sufficient to make distributions to Investors. Thus, there is no guarantee that the Companies will pay any particular amount of distributions, if at all. Furthermore, **while the Companies have no present plans to do so, the Companies could include Investors' invested capital in amounts distributed to Investors, which may reduce the amount of capital available to acquire and operate Portfolio Companies and make other permitted acquisitions as well as negatively impact the value of Investors' investments, especially if a substantial portion of the Companies' distributions are paid from Investors' invested capital.**

112. These disclosures were false as at that time, GPB was paying dividends from investor capital and new investor monies.

113. Finally, GPB revealed in SEC filings in late 2018 and May 2019, that it had in fact regularly used investors' "invested capital," not underlying capital profits, to make investor distributions. These disclosures were not included in the PPMs that had been provided to investors, but were contained in GPB's filings with the SEC. For example, the filings provided:

**November 14, 2018 Form ADV**:

> *No Assurance of Distributions.* The process of identifying, screening and successfully acquiring and operating private companies is difficult and risky. GPB can provide no assurances that the Companies will be able to generate operating cash flow sufficient to continue to make distributions to Investors. Thus, there is no guarantee that the Companies will pay any particular amount of distributions, if at all. To the extent that any of the Companies do pay regular distributions to Investors, GPB may unilaterally determine to reduce the size of, or terminate the payment altogether of, any future distributions by any one or more of the Companies. Any distributions can be paid out of any available working capital, which includes Investor's

invested capital in the Company. **Amounts that the Companies distribute to Investors have in the past accordingly included, and may in the future accordingly include, invested capital and have not been, and may not in the future be, entirely comprised of income generated by the Portfolio Companies.** Such a reduction of available working capital reduces the amount of working capital available to acquire and operate Portfolio Companies and make other permitted acquisitions and investments and may also negatively impact the value of Investors' investments in the Company, especially when a substantial portion of a Company's distributions are paid from Investors' invested capital.

(Emphasis added).

### May 1, 2019 Form ADV:

*No Assurance of Distributions.* Any distributions can be paid out of any available working capital, which includes Investor's invested capital in the Company. **Amounts that the Companies distribute to Investors have in the past accordingly included, and may in the future accordingly include, invested capital and have not been, and may not in the future be, entirely comprised of income generated by the Portfolio Companies.** Such a reduction of available working capital reduces the amount of working capital available to acquire and operate Portfolio Companies and make other permitted acquisitions and investments and may also negatively impact the value of Investors' investments in the Company, especially when a substantial portion of a Company's distributions are paid from Investors' invested capital. There can be no assurance that the Companies will be able to generate sufficient returns to pay their operating expenses and make satisfactory distributions to their Investors from income generated by the Portfolio Companies, or any distributions at all.

(Emphasis added).

114.     GPB, in effect, acknowledged in the SEC filings in late-2018 and 2019 (but not in PPMs to investors) that it was running a Ponzi scheme from the start.

115.     The GPB scheme was particularly insidious.  On top of the material omissions and misrepresentations described above, GPB, Ascendant, and Axiom and their principals (Gentile, Schneider and Martino), as well as the Broker Defendants and the Fund Administrator, advanced and maintained the scheme by preparing and disseminating monthly account statements that hid the fact that the investors' *own capital* was being used to make distributions.

116.    Instead of disclosing that the amount of investor capital was declining as a result of the distributions, these statements regularly reported "Total Capital" as unchanged from the Class members' initial investment.  Thus, investors were misled that the distributions came from profits when they did not.

117.    GPB and the Fund Administrator disseminated and prepared these statements. Further, each Broker Defendant was listed on, and received such monthly statements.

118.    As explained below, the GPB Defendants also hid from investors the financial misconduct that was generating huge losses in the GPB Funds.  *See* Section H, below.

**C.    Defendants Failed to Disclose "Bad Acts" Precluding Their Reliance on Rule 506**

119.    Gentile, Schneider, GPB and the Funds concealed numerous material conflicts and SEC Rule violations from Plaintiff and other members of the Class.

120.    GPB co-founders Gentile and Schneider met years before launching the GPB Funds. As described above, Schneider developed the business concept for the Funds, and Schneider boasted that he was the one who had the idea for the Funds and convinced Defendant Gentile to launch GPB.

121.    But Schneider's relationship with Gentile was more than a business advisor. Schneider had an ownership interest in GPB, just as Gentile had an ownership interest in Ascendant.  The Offering Materials failed to disclose Gentile's ownership interest in Ascendant, a fact which placed him in an uncurable conflict as the managing member of GPB.  As shown herein, Schneider and Gentile's undisclosed co-ownership of the issuer and the underwriter, respectively, were pervasive. Such conflicts were not subject to waiver by limited partners under federal law. Indeed, in June of this year, the SEC reiterated its long-held policy that Investment Advisors may not waive or seek waiver of their fiduciary duties under the IAA.  Any attempt by Defendants to

seek waiver or partial waiver of their fiduciary duties would be ineffective under federal and state law.

122.     Schneider's company, Ascendant, became the exclusive underwriter and placement agent for the GPB Funds. As such, Schneider and Ascendant were instrumental in growing GPB and the Funds, attracting investors by (a) offering investment opportunities in the Funds directly to investors, first, as a branch office of Axiom, and later through Ascendant, and (b) creating a nationwide network of independent brokers—the Broker Defendants—to sell limited partnership interests in GPB.

123.     Thus, Schneider and Ascendant played a substantial role in developing, orchestrating, organizing, executing, and overseeing the GPB Funds and the Offerings, selling securities in the Funds to investors, and arranging for further sales through the Broker Defendants. Without Schneider's involvement, the Funds would not have raised money from investors.  In short, Schneider, the lead broker and underwriter for GPB, was at all times a control person of the Funds, a fact which was not disclosed to investors.

124.     Defendants' failures to disclose to prospective GPB investors that Schneider and Ascendant were control persons of GPB and the Funds, and that Schneider's professional background included numerous violations of state and federal securities laws and rules, constituted material omissions.

125.     Moreover, because Schneider was a "bad actor" under SEC Rule 506(d), and because his "bad acts" were not disclosed in the PPMs, GPB could not employ an exemption from registration under Regulation D and Rule 506, which provides:

> "*Bad Actor" disqualification.* (1) No exemption under this section shall be available for a sale of securities if the issuer; any predecessor of the issuer; any affiliated issuer; any director, executive officer, other officer participating in the offering, general partner or managing member of the

issuer; any beneficial owner of 20% or more of the issuer's outstanding voting equity securities, calculated on the basis of voting power; any promoter connected with the issuer in any capacity at the time of such sale; any investment manager of an issuer that is a pooled investment fund; any person that has been or will be paid (directly or indirectly) remuneration for solicitation of purchasers in connection with such sale of securities; any general partner or managing member of any such investment manager or solicitor; or any director, executive officer or other officer participating in the offering of any such investment manager or solicitor or general partner or managing member of such investment manager or solicitor:

(vi) Is suspended or expelled from membership in, or suspended or barred from association with a member of, a registered national securities exchange or a registered national or affiliated securities association for any act or omission to act constituting conduct inconsistent with just and equitable principles of trade.

17 C.F.R. § 230.506(d)(1)(vi).

126.     Here, Schneider (a) was the subject of at least eight customer disputes seeking nearly $1,000,000 in damages, most of which were settled in exchange for significant amounts of money; (b) was the subject of two instances of employment separation after allegations of misconduct; and (c) was the subject of two regulatory actions, by NASD and Illinois state securities regulators, respectively, one of which resulted in a $15,000 fine and suspension and the other one in a 2-year ban from being licensed in Illinois.  Gentile, GPB and the Funds failed to disclose any of Schneider's prior misdeeds to investors.

127.     Martino was involved in offering investments in the Funds as a broker and CEO at Axiom and later as an owner and CEO of Ascendant Strategies.  Martino was also a "bad actor" under SEC Rule 506(d) because he (a) has been the subject of three customer disputes seeking in excess of $1,000,000 in aggregate damages, which were settled in exchange for significant amounts of money (totaling over $900,000 in the aggregate), and (b) received a supervisory suspension from the NASD (FINRA) in 2003 for sixty days and was fined $15,000 for failing to adequately supervise the activities of registered representatives.  Early in his career, Martino was

discharged from Shearson Lehman Hutton, Inc. for purchasing stock in his own account for a friend employed with another firm. Defendants' failure to disclose any of this was a violation of Rule 506.

128.     Pursuant to SEC Rule 506(e), the GPB Defendants were required to disclose in each Fund's PPM these "bad acts," that Schneider and Martino committed, of which the GPB Defendants were clearly on notice. The GPB Defendants' failure to make these disclosures rendered a Rule 506 registration exemption unavailable to GPB. Thus, each Offering violated the Securities Act of 1933 because such Offerings were not exempt from registration thereunder. Each Broker Defendant substantially assisted in the unregistered Offerings in violation of federal and Texas law, and knew or should have known of these "bad acts," as they were disclosed in databases commonly available to the Broker Defendants, and because the Broker Defendants had a business relationship with the "bad actors."

**D.      Defendants Failed to Make Required 1934 Act Filings and the Broker Defendants Substantially Assisted in the Violation of the 1934 Act by Distributing the Securities**

129.     Section 12(g) of the Exchange Act requires issuing companies to register a class of securities with the SEC if such shares are issued by an entity with more than $10,000,000 in assets and are owned by 2,000 or more equity holders.

130.     At some point in 2016, GPB knew that it had sold classes of shares in certain of the Funds to more than 2,000 investors. Each of the Broker Defendants knew this as well, because they knew that each investor was investing relatively small amounts and GPB raised hundreds of millions of dollars.

131.     In particular, GPB's Form D filings, and amendments, demonstrated that, at a minimum, GPB's Holdings II and Automotive Funds had met the Section 12(g) thresholds for

requiring registration. The Broker Defendants were named in such filings, and knew, or should have known, of their contents.

132. Despite this knowledge, GPB *never* registered any class of shares under the 1934 Act and thus never made the extensive public filings required thereunder, including quarterly and annual financial statements. By issuing shares without such filings, GPB, with substantial assistance from the Broker Defendants, repeatedly violated the Exchange Act and failed to provide required financial information to investors.

**E. The Auditors Acted Recklessly and Provided Substantial Assistance in the Illegal Offerings Described Herein**

133. GPB and the Funds represented to investors that they had engaged independent auditors to audit the Funds' financial statements. These auditors included RSM for Holdings II and the John Doe Auditor Defendants for the other Funds. RSM and the other Auditor Defendants allowed their names and reputations to be used to sell the Funds. Without the participation of the auditors listed in the PPMs, GPB and the Broker Defendants would not have been able to sell the Funds to Plaintiff and the Class.

134. RSM also substantially assisted the fraud by publishing and allowing GPB to distribute to investors audited Holdings II financials for fiscal years 2015 and 2016. On August 17, 2018, GPB announced that the previously issued financial statements for Holdings II for 2015 and 2016 (which had been audited by RSM) would need to be restated. GPB further stated that these audited financials should no longer be relied upon, thereby acknowledging that they were materially misstated. These audited financials were so materially incorrect that they have been withdrawn. Ultimately, in April 2019, RSM resigned or was replaced as the independent auditor for Holdings II.

135.     Moreover, on June 21, 2019, GPB acknowledged that the value of its Funds had declined between 25% and 73%. Specifically, GPB reported that Holdings II's value had fallen 25.4%, Automotive's by 39%, and GPB's five remaining Funds had declined between 25% and 73% in value.

136.     Without RSM and the John Doe Auditor Defendants, the GPB Ponzi scheme could not have continued. Recklessly overstating the financial results of GPB gave it the appearance of profitability and financial success and hid the fact that it was a Ponzi scheme. RSM's and the John Doe Auditor Defendants' participation in the scheme was vital to its perpetuation.

137.     RSM and the John Doe Auditor Defendants failed to uncover or report any of the related-party transactions and other irregularities in GPB's books and records described below.

138.     These auditors gave substantial assistance to the other Defendants' violation of the Texas Securities Act by adding their names, reputations and work to the GPB Offerings and did so knowingly, or at least recklessly, because they knew or should have known that achieving an 8% return after paying approximately 20% in commissions, fees and expenses was not feasible.

**F.     The Broker Defendants Substantially Assisted the Scheme and Knowingly or Recklessly Disregarding GPB's Violations of the 1933 and 1934 Acts**

139.     The Broker Defendants played a critical role in the GPB scheme. These Defendants provided substantial assistance by providing GPB Capital with widespread access to thousands of investors throughout the United States. The monies that they collected from Class members – the investors' capital – provided the fuel for the scheme, enabling the GPB Defendants to continue to pay large distributions to investors *from newly-invested capital*. This encouraged investors to maintain their investment in GPB's Funds or to participate in further GPB Offerings.

140.     The Broker Defendants had subjective actual knowledge of the fraud. They knew that producing an 8% or higher return on Class members investment was unattainable, especially

because GPB would only have approximately 80% of invested capital to put to work (after payment of exorbitant commissions and other fees, as described herein).

141. The Broker Defendants knew or were reckless in disregarding:

a. that the size of these commissions (up to 11%) and other fees and expenses (totaling up to 20%, including the 11% commissions) made earning a sizeable return (*e.g.*, 8%) impossible;

b. that GPB's monthly account statements, which the Broker Defendants received on a regular basis, failed to reduce the "Total Capital Invested" by the 11% in commissions paid from such capital, giving the false impression that 100% of investor capital was being put to work, which the Broker Defendants knew was untrue;

c. that Ascendant/Axiom and Schneider, working with GPB and Gentile, as well as Martino, had constructed a huge network of more than 80 brokerage firms. The Broker Defendants, thus, also knew that the GPB Offerings were being sold to thousands of investors;

d. that GPB and the Funds were required to file periodic financial statements pursuant to the 1934 Act, under Section 12(g), and failed to do so, rendering their Offerings illegal;

e. that Ascendant's principals, Schneider and Martino, were "bad actors" as defined under Rule 506 of Regulation D, which the GPB Funds were required to disclose in their Offering Materials. Their failure to do so rendered these Funds ineligible for exemption, so they were required to register the Funds' securities under the 1933 Act. Thus, the Broker Defendants thus knew or were

reckless in disregarding that they were actually participating in an unregistered public offering.

**G.    The Fund Administrator Breached Its Direct Duties to the Class and Substantially Assisted the Offering**

142.    Throughout the Class Period, GPB utilized Phoenix as the Fund Administrator in two or more of the Funds.

143.    According to the Automotive and Holdings III PPMs, GPB engaged Phoenix to provide administrative services, including "Full Service Investor Administration" (*i.e.*, new business processing, bank account management, electronic document management, database & file management, electronic and physical data storage, confirmation letters, and investor/rep access to records through customized web portal) and "Investor Relations" (*i.e.*, distributions, redemptions, account summary, commission calculation, tax reporting, and OFAC compliance).

144.    Upon information and belief, GPB engaged the Fund Administrator to provide similar services for each of the other Offerings.

145.    The Fund Administrator owed duties to Plaintiff and the Class members to comply with the law and with industry standards of conduct, and to possess the skills held by experienced fund administrators. However, rather than report accurately to investors, the Fund Administrator recklessly provided false values for the investors' accounts at GPB. The Fund Administrator knew (because it received the investors' investment amounts and was responsible for the commission calculation) that at least 11% of such amounts was transferred from such accounts to Broker Defendants as commissions. Thus, from the start, the customer accounts were reduced by 11%.

146.    However, the Fund Administrator in its monthly statements to investors did not reflect this reduction, thus causing investors and potential investors to rely upon recklessly inflated account values.

147. Had the Fund Administrator correctly reflected customer accounts values, investors would have known that they were losing money and that distributions were not derived from profits – as GPB wanted them to believe – but from their own capital or from other investors' money. In sum, the Fund Administrator's reckless reporting of false customer values on a monthly basis – which showed profits when there were none, and which hid the Ponzi scheme -- was both negligent and substantially assisted the Ponzi scheme.

**H.    GPB and the Funds Were Plagued by Undisclosed Financial Misconduct, by which Defendants Breached Their Fiduciary Duty**

148. Two recent lawsuits by and against GPB have shined a light on Defendants' financial misconduct in connection with the Funds. GBP and the Funds failed to timely and accurately disclose the nature of this misconduct. Moreover, the misconduct described below enabled Defendants to conceal their scheme from Class members and maintain it for years.

**1.    The *Dibre* Litigation Revealed Serious Financial Misconduct**

149. GPB engaged in litigation with a former senior executive of GPB, Patrick Dibre ("Dibre"), in an action titled *GPB Capital Holdings, LLC, et al. v. Dibre,* Index No. 606417/17 (N.Y. Sup. Ct., Nassau Co.). The verified pleadings in that action assert that the GPB Defendants fraudulently prepared the GPB financials, misled investors, and paid themselves large fees to which they were not entitled. The verified pleadings include Dibre's allegations that:

a.   Gentile and Schneider were, through GPB, running a complicated Ponzi scheme;

b.   Gentile and Schneider paid themselves undisclosed kickbacks in connection with purchasing automobile dealerships;

c.   Gentile and Schneider paid themselves kickbacks from funds created by GPB in connection with reinsurance and manufacturer rebates;

      d.   Gentile and Schneider improperly expensed to GPB Funds significant personal expenses, including luxury cars and jet airplanes;

      e.   as alleged herein, GPB paid commissions, fees and expenses from investors monies amounting to up to 20% of the investment proceeds;

      f.   Gentile and Schneider intentionally falsified Holdings II's and Automotive's financials by inflating purported cash flows and failing to account for expenses; and

      g.   Gentile and Schneider acknowledged to Dibre that the GPB Funds were "deceptive" from the start and designed solely to generate excessive brokerage fees for GPB, Schneider and Gentile in a Ponzi-type arrangement.

150.    In addition, Dibre alleged that GPB Holdings One Fund and GPB made improper payments to an accounting firm controlled by Gentile's father, and that the funds were subsequently funneled from this accounting firm to Gentile's family trust.

151.    Dibre claimed that GPB was unable to fund the purchase of car dealerships that Dibre owned or identified, not because of any action that Dibre took, but rather because the funds GPB should have had in place to complete the purchase had been diverted, Ponzi scheme style, to pay returns to earlier investors.

152.    Dibre also alleged an even broader scheme perpetrated by GPB. Dibre claimed that GPB set up the structure of having individual funds issue non-public securities, because it was "designed from inception to generate significant brokerage fees to GPB and its related, but undisclosed, captive broker-dealer, Ascendant Alternative Strategies, LLC." He then claimed that the plan was to siphon off profits from any car dealerships it actually did buy, and finally to use "new investor funds to pay for the promised returns to the earlier investors" in Ponzi fashion.

153.    Dibre also alleged that once it took control of an auto dealership, GPB, through its control persons Gentile and Schneider, manipulated the dealership's financial statements to falsify (meaning inflate) their results and engaged in conflicted transactions.  For example:

a.   Gentile and Schneider, through an entity they separately controlled, agreed to purchase from Dibre *the property* upon which Dibre's Nissan of Richmond dealership was located. The dealership then agreed to pay rent to this entity, for their personal gain. This was not disclosed to investors.

b.   Gentile and Schneider had the dealerships they acquired pay them personal stipends, reducing the dealerships' profitability. This too was not disclosed to investors.

c.   Even though the dealerships GPB acquired were to distribute revenue only from their net cash flow to GPB, in 2014 alone GPB caused them to over-distribute more than $1.8 million to GPB. These distributions were disguised as returns of capital in order to entice new investors with the appearance of greater returns.

d.   When this 2014 over-distribution was discovered as part of a year-end review, GPB put the money back into the dealerships as funding for alleged capital improvements rather than re-state the fraudulent financial statements, as required.

e.   GPB caused dealerships to engage in the same over-distribution fraud in 2015. These amounts were used to fund a "special distribution" that GPB used to raise more investment in Automotive.

f.   Gentile and Schneider created an entity they called LSG to which they directed more than $4 million from reinsurance funds and manufacturer rebates, funds

that should have gone to the dealerships and ultimately GPB investors, but which were stolen by Gentile and Schneider.

g.  Gentile engaged his father's accounting firm to be paid $100,000 each month for alleged work. The firm's bills were paid by GPB, and then those funds were funneled back to Gentile's family trust. Upon information and belief, the firm did not perform the work it billed for, or the work completed was not worth $100,000 per month.

h.  Whenever there was a cash shortfall for distributions to existing investors, and records indicated that the car dealerships had not generated enough cash to meet those payments, cash from new investors or from borrowing was used to pay off the older investors, and to pay distributions.

i.  To hide financial issues, Gentile and Schneider would, among other things, transfer funds from GPB Holdings One to Automotive, and vice versa, to bolster returns if a Fund was lagging behind. Thus, they routinely comingled funds among the purportedly separate Funds to bolster their fraud and hide it.

154.    Defendants did not disclose the above misconduct to Plaintiff and the Class because Defendants wanted to ensure that these investors maintained their investment in the Funds, and wanted to attract new investments in the Funds.

## 2.    *Rosenberg v. GPB Prime Holdings, LLC* **Reveals the Ponzi Scheme**

155.    Recently, GPB became involved in another lawsuit, titled *David Rosenberg, et al. v. GPB Prime Holdings LLC, et al*., No. 19-0925, (Sup. Ct. Mass., Norfolk Cty.), commenced by David Rosenberg and two Rosenberg-related trusts. Rosenberg and certain entities related to him or his family owned and operated car dealerships in and around Massachusetts for decades. Prior to 2017, Rosenberg was the owner of Prime Motor Group ("Prime"), a large automotive dealership

group located in New England. In 2017, GPB made a significant investment in Prime, and asked Rosenberg to oversee the various dealerships GPB had acquired. Rosenberg became CEO of a network of GPB dealerships doing business as the Prime Automotive Group ("PAG"). As of July 2019, PAG is one of GPB's largest investments.

156. According to Rosenberg, on or about May 12, 2017, GPB and an affiliate, GPB Prime (which is beneficially owned by certain GPB funds, including Holdings II and Automotive), executed a Purchase and Sale Agreement ("P&S Agreement"). Under the terms of the P&S Agreement, GPB, through GPB Prime, obtained a passive majority interest in Prime for approximately $235 million. After the transaction, Rosenberg (either directly or through the family trusts) was to continue to hold a material ownership interest in the Prime and continue to operate its dealerships.

157. GPB Funds could only be passive investors in the Prime dealerships because GPB did not have either the expertise to run dealerships or, more importantly, the necessary reputation and track record with manufacturers to be approved as a dealer-operator. Although dealerships are independently owned and operated, manufacturers retain the ability to terminate dealership franchises if they do not approve of the dealership owners or operators. Rosenberg alleges that he has a lengthy track record of successfully running automotive dealerships and is one of the most respected executives in the industry. According to the *Rosenberg* complaint, GPB's principals, including Gentile, had no experience, and Jeff Lash, the individual who had been running GPB's dealerships before the Prime investment did not have either a track record or a good reputation with manufacturers.

158. After GPB's Prime investment closed, GPB asked Rosenberg to replace Lash as head of the GPB Funds' entire automotive portfolio, which included not only the Prime

dealerships, but also dealerships in New York and elsewhere in which GPB had previously invested.

159.     Rosenberg agreed to operate the entire portfolio. He was given the title of CEO and President of the Prime Automotive Group, a d/b/a that covered the various dealerships in which GPB had invested.

160.     Rosenberg's complaint alleges that in his capacity as CEO of the GPB Funds' combined automotive portfolio, he had to become familiar with the historical finances of the non-Prime GPB dealerships.

161.     Rosenberg further alleges that in the course of running the combined automotive portfolio, Rosenberg and his management team encountered information and documents showing that GPB had engaged in financial misconduct beginning at least as far back as 2014. This misconduct took many forms, but Rosenberg alleges that in general it included (a) the fabrication of revenue through the use of fictitious contracts, (b) self-dealing transactions on the part of GPB principals, including Gentile; and (c) undisclosed related-party transactions that benefitted Lash. Upon information and belief, GPB and Gentile engaged in this conduct for essentially two reasons: (a) to make it appear to investors that profits from the automotive investments were higher than they actually were (and, correspondingly, to conceal the truth that investors were receiving distributions from the capital other investors had contributed); and (b) to misappropriate investor funds for their own personal purposes.

162.     Rosenberg's complaint alleges specific examples of GPB's financial misconduct:

       a.   By way of example, Rosenberg saw two contracts entitled, "Performance
            Guaranty," purporting to show that in February 2014, Lash had personally
            guaranteed the 2014 performance of two Volkswagen dealerships acquired by

GPB, and had agreed to pay any deficiency if the dealership's net profit for the year were below $450,000 and $150,000, respectively. GPB issued letters addressed to Lash dated March 18, 2015, noting a deficiency and seeking payment totaling $1,136,201. The 2014 year-end financial statements for Holdings I, issued on April 30, 2015, reported that for the year ended December 31, 2014, "approximately $1,100,000 was paid... into the dealerships" on the basis of the Performance Guaranties with Lash and similar agreements with a different dealer-operator.

b.  According to Rosenberg, however, Lash never guaranteed the performance of the two Volkswagen dealerships, GPB never expected him to pay, and indeed, he never paid the guaranteed amount.  Ultimately, most of the supposed debt was waived.

c.  Rosenberg also saw documents showing that in April 2016, GPB had used a similar stratagem to invent over $1 million of net profit for 2015 in order to boost the profit GPB could report.  Specifically, Rosenberg saw documents showing that as GPB was preparing documents for the 2015 year-end audit, it was over $1 million short in revenue it had planned for.

d.  The documents showed that GPB personnel, including Gentile, weighed different options to "manufacture" profit, including the return of management fees paid to Gentile.  Eventually, Gentile and other GPB executives decided to fabricate another contract with Lash. The fabricated contract, which GPB again called a "Performance Guaranty," was created, upon information and belief, in April 2016, but was back-dated to January 1, 2015 to make it appear that it had

been in place for the entirety of 2015.  The Performance Guaranty purported to have Lash "guarantee" a certain amount of profit from a certain dealership for 2015.

e.  Rosenberg and his staff, all of whom are alleged to have extensive experience in the automotive dealership business, had never seen such a document before, inasmuch as it purported to show Lash personally guaranteeing revenues for a dealership he had never owned. Upon further review, Rosenberg and his staff were unable to find any evidence that Lash had ever paid any guarantee or ever had any ability or intent to pay any guarantee. Lash eventually told a member of Rosenberg's executive team that the contract was "fictitious" and "was never supposed to be paid back."

f.  In April 2016, GPB had one of its subsidiaries wire $700,000 to an account associated with Lash. That same day, the same Lash account deposited $1,050,000 in an account for one of the Funds.  Rosenberg alleges, upon information and belief, that the purpose of the transfer to the Lash account was to provide Lash with most of the funds to pay the fictitious "performance guaranty."

g.  Rosenberg also saw documents showing a form of "round tripping," which is an improper technique to inflate revenue. Rosenberg and his executive team saw documents showing that, in 2016, the head of a dealership group owned by one of the Funds (Holdings I) sent a payment of $3,200,000 to that Fund that was recorded as revenue for 2015, but on that very same day that same Fund sent $2,100,000 to the head of that same dealership group as "working capital."

Upon information and belief, the purpose of this "round-trip" transaction was to conceal the fact that the dealership group was not truly generating $3,200,000 in operating revenue for distribution.

h.  Rosenberg also alleges he saw documents showing that Gentile and Lash had funneled nearly $2,000,000 in revenue to entities they controlled, including some under the guise of "management fees."  For the year 2015, $201,706 was transferred to Emdykycol, Inc., and $201,706 was transferred to Jachirijo, Inc.  Upon information and belief, Emdykycol, Inc. is owned by Lash and Jachirijo, Inc. is owned by Gentile.  Dealership funds have also been siphoned off to LSG Auto Wholesale, an entity whose name, LSG, stands for Lash, Schneider, and Gentile.  Upon information and belief, the payments described were kickbacks that served no legitimate business purpose and were not disclosed to investors.

i.  In several instances, vehicles belonging to dealerships were provided to third parties, including professional athletes and an investor in the Funds.  Upon information and belief, no business purpose existed for the provision of those vehicles.  The status of the vehicles was not properly accounted for and the cost for use of the vehicles ultimately fell on the dealerships.

j.  In another transaction that Rosenberg alleges upon information and belief had no legitimate business purpose, GPB purchased a Ferrari for $355,000 through one of the Funds' dealerships in December 2014.  The vehicle was subsequently transferred to another Fund dealership and sold for a loss of $183,000 three years later, with only 1700 miles driven in the interim. The purpose of this

transaction remains unclear, but it certainly was not for any legitimate business purpose, and the resulting loss was borne by the Funds' investors.

k.  In another instance, Rosenberg's alleges upon information and belief that Lash improperly drew, on a dealership's behalf, an advance of $750,000 that he labelled a "retention bonus," and then distributed to himself and several others.

l.  Rosenberg further alleges upon information and belief that, following the close of a dealership purchase, Lash and others who worked on the automotive portfolio inexplicably received approximately $100,000 worth of sporting vehicles and equipment in an apparent kickback arrangement.

163.    Rosenberg also alleges in his complaint that he learned that GPB, its executives and its principals (including Gentile) were engaged in extensive efforts to cover-up the misconduct in order to lull the Funds' investors into thinking that their investments were safe and that any losses were due to legitimate business events rather than GPB's and the Funds' misconduct.

164.    Rosenberg alleges that in or about the summer of 2018, GPB Capital's audit firm, Crowe Horvath ("Crowe") ceased its work auditing certain of GPB's companies and informed GPB Capital that it would not be able to provide a clean audit opinion for 2017 and that it was withdrawing its previous clean opinions for 2015 and 2016. GPB did not promptly advise Class members of this development.  Crowe stated that those earlier financial statements should not be relied upon.  Crowe eventually resigned completely from the engagement.

165.    Rosenberg alleges that he thereafter observed several efforts on the part of GPB and its principals and agents to mislead third parties, including GPB's own investors, about the true nature of the misconduct:

a.  In September 2018, for example, GPB and Ascendant representatives spoke to several brokers who had expressed concerns about the announcement that Crowe had stopped working on the audit. Rosenberg attended the call, which was recorded. According to the *Rosenberg* complaint, on that call GPB and Ascendant personnel made a series of materially misleading and outright false statements about the circumstances of Crowe's withdrawal. They also falsely reported that a second firm, Stoneturn Group LLC, had completed a full forensic audit of GPB and given GPB a clean bill of health. Rosenberg, who participated in the call, demanded after the call that GPB and Ascendant correct their misstatements. Rosenberg alleges that, as of the date of his complaint, no correction had been made.

b.  Rosenberg describes another example of GPB's efforts to lull and mislead its investors during the fall of 2018 and continuing into the winter and spring of 2019.  GPB is required to perform a quarterly valuation of the dealerships. Rosenberg and his staff consistently informed GPB that the valuations GPB had been reporting to investors were inflated because the Funds' financial reports carried the dealerships at their purchase prices, which, in ensuing years, did not accurately represent their value. Rosenberg and his staff consistently reported information to GPB regarding the true valuation of the dealerships. GPB, however, refused to adjust the valuation.  It was not until June 21, 2019, Rosenberg alleges upon information and belief, after Fidelity Investments informed GPB that Fidelity would no longer carry GPB's investments on its

platform, that GPB announced that it was cutting the valuation of its automotive dealership investments dramatically.

166.    Rosenberg alleges other examples that relate to the efforts GPB has taken to conceal material information about the Funds' automotive dealerships from the dealerships' auditors, previously Crowe and more recently EisnerAmper LLP, the audit firm that replaced Crowe:

    a.    In March 2018, a GPB employee who had worked closely with Lash on all matters relating to the automotive portfolio, quit his job. In connection with his departure, the employee provided Rosenberg and his staff with information relating to prior misconduct at the legacy (pre-Prime) GPB dealerships.

    b.    Upon information and belief, when Gentile learned of the information the employee provided, he did not attempt to address or remedy any of the issues the employee had identified. Instead, he attempted to suppress the information, to ensure, in particular, that the information was withheld from Crowe.

    c.    Later, following Crowe's resignation, GPB retained EisnerAmper to perform the audit work that Crowe refused to perform. Upon information and belief, one of the crucial issues that had emerged during the Crowe audit was the revelation that there had been numerous undisclosed and inappropriate related-party transactions.

    d.    In May 2019, Rosenberg received a "Related Party Questionnaire" that he was to answer as part of the audit. Rosenberg alleges, upon information and belief, that EisnerAmper required this questionnaire to be answered as part of the audit. The Questionnaire contained questions regarding transactions that did not appear to have a legitimate business purpose. Rosenberg, who was aware of

the information set forth above, including the fictitious performance guarantees, provided that information in his response and sent it to GPB and EisnerAmper.

    e.   A short time later, on May 21, 2019, Rosenberg received a threatening letter from GPB's outside counsel. The letter claimed, falsely, that Rosenberg's responses were not properly called for by the Questionnaire. It then alleged that it was somehow "inappropriate" for Rosenberg to provide the auditors with the correct information. GPB's outside counsel also asserted that Rosenberg's Questionnaire responses were somehow not "accepted," and therefore a nullity.

167.    On June 4, 2019, Rosenberg, along with members of his executive team, presented the information he had learned about GBP's financial misconduct to the board of managers of the dealership holding company, Automile Parent Holdings LLC ("Automile Board"). Rosenberg informed them that GPB Capital's misconduct had put the dealerships at risk.

168.    At the same time, Rosenberg noted that GPB's actions had placed the dealerships at risk of losing their business relationships with two critical stakeholders in the dealership business, manufacturers and lenders. Due to GPB's inability to complete the audit, the dealerships were in default on their loan covenants. The lenders had entered into forbearance agreements at substantial cost to the dealerships as a condition of extending the credit relationships. In addition, some manufacturers sent notices of termination as a consequence of GPB's failure to complete the audit, among other things. Withdrawal of lender and manufacturer support would be disastrous for the dealerships, making them essentially worthless. But the Automile Board, which Rosenberg alleges is controlled by Gentile (who can unilaterally remove and replace board members), refused to take any corrective action.

169.     Rosenberg further alleges that in response to the information Rosenberg provided, the Automile Board informed him that it had hired a new "asset manager." Two days after a June 5, 2019 Board meeting, this new "asset manager" (Kevin Westfall) demanded to be provided access to all of Prime's operations. Westfall further claimed that he was entitled to be involved and have control over Prime's operations. This was in direct violation of the dealerships' relevant operating and manufacturer agreements, which provide that Rosenberg was to have all control of dealership operations. Upon information and belief, this measure was intended as retaliation against Rosenberg for reporting Defendants' improprieties to the SEC.

170.     Rosenberg says that he communicated with GPB about Westfall's actions. GPB informed Rosenberg that GPB intended Westfall's role to remain at the GPB level only and that he was not going to be involved in dealership operations. Rosenberg alleges that the Automile Board refused to take any further action to protect the value of the dealerships, and this inaction not only harmed Rosenberg's interest in Automile Parent Holdings, LLC, but also the investors whose money GPB had used for the investments.

171.     The *Rosenberg* complaint alleges that, on June 11, 2019, Rosenberg and members of his executive team submitted to the SEC the information that Rosenberg had provided to the Automile Board in June 2019. Rosenberg simultaneously notified GPB's outside counsel of the submission.

172.     Defendants did not disclose the above financial improprieties to Plaintiff and other Class members, in order to ensure that Class members would maintain their investment with the Funds and to attract new investments in the Funds.

## I.     Defendants Raise Over $1.8 Billion from Investors for the GPB Funds

173.    Employing material misstatements and omissions as described herein, and in violation of the federal securities laws, Defendants, with the substantial assistance of the Broker Defendants, raised over $1.8 billion dollars from thousands of investors nationwide for the Funds.

174.    Specifically, Defendants raised money for the GPB Funds, namely:  GPB Holdings LP; GPB Holdings Qualified; GPB Automotive Portfolio, LP; GPB Holdings II, LP; GPB Cold Storage, LP; GPB NYC Development; GPB Waste Management Fund, LP; and GPB Holdings III, LP.  GPB's Form D filing with the SEC provided some details about the amounts of investments (both minimums and the aggregate), the number of total investors, and the brokerage firms involved in each offering:

### 1.     GPB Holdings LP

175.    In or about June 2013, GPB Capital, Gentile and Schneider, through Ascendant and Axiom, began offering to investors $150 million in limited partnership units in GPB Holdings LP. According to a Form D signed by David Gentile as managing member of GPB Holdings and filed with the SEC on June 6, 2013, the $150 million in Holdings units would generate an offering estimate of $16,500,000 in sales commissions and finders' fees expenses.  The Form D listed Axiom as the associated broker and reported that the minimum investment accepted from outside investors was $50,000.  Finally, GPB Holding claimed a federal registration exemption under SEC Rule 506.

### 2.     GPB Holdings Qualified, LP

176.    In or about June of 2013, GPB, Gentile and Schneider, through Ascendant and Axiom, began offering potential investors $150 million of limited partnership units in GPB Holdings Qualified, LP ("Holdings Qualified").  On June 10, 2013, Holdings Qualified filed a Form D with the SEC projecting that the $150 million offering would generate an estimated

$16,500,000 in sales commissions. According to the filing, the minimum investment accepted from outside investors was $50,000 and the brokerage firm associated with the offering was Axiom Capital Management, Inc.  Holdings Qualified claimed a federal registration exemption under SEC Rule 506.

### 3.    GPB Automotive Portfolio, LP

177.    In or about June of 2013, GPB, Gentile and Schneider, through Ascendant and Axiom, began offering potential investors participation in $150 million of limited partnership interests in Automotive.  On June 10, 2013, Automotive filed a Form D with the SEC disclosing that the $50 million offering would generate an estimated $5,500,000 in sales commissions. According to the filing, the minimum investment accepted from outside investors was $100,000, and the brokerage firm associated with the offering was Axiom Capital Management, Inc. Automotive claimed a federal registration exemption under SEC Rule 506.

178.    By the time Automotive filed an Amended Form D filed on March 27, 2015, Automotive had sold $32,000,000 (with $218,000,000 remaining to be sold) in limited partnership interests to 303 investors, with estimated sales commissions of $27,500,000.

179.    According to a further Amended Form D filed on May 19, 2016, the total amount sold had risen $176,110,533 and 1,869 investors with estimated sales commissions of $19,372,158. Soon thereafter, GPB was in violation of the 1934 Act, Section 12(g), and never registered the equity interests thereunder.

180.    A further Amended Form D filed on May 18, 2017, reported that the total investment amount sold had grown to $369,234,443, purchased by 3,851 investors, with estimated sales commissions of $43,385,047. The associated brokerage firms were Axiom Capital Management, Inc. and Ascendant Alternative Strategies LLC.

181.     A final Amended Form D filed on May 14, 2018, reported that the total amount sold was $622,143,273 of Automotive units to 6,353 investors with estimated sales commissions of $52,204,671.  The associated brokerage firms selling these units included:  Axiom Capital Management, Inc.; Ascendant Alternative Strategies, LLC; Accelerated Capital Group; Advisory Group Equity Services Ltd.; Aegis Capital Corp.; American Capital Partners, LLC; Arete Wealth Management, LLC; Arkadios Capital; Ausdal Financial Partners, Inc.; Avere Financial Group, LLC; BCG Securities, Inc.; Benjamin & Jerold Brokerage I, LLC; Cabot Lodge Securities LLC; Calton & Associates, Inc.; Cape Securities, Inc.; Capital Investment Group, Inc.; Center Street Securities, Inc.; Coastal Equities, Inc.; Concorde Investment Services, LLC; Crystal Bay Securities Inc.; Emerson Equity LLC; Geneos Wealth Management, Inc.; McNally Financial Services Corporation; Kalos Capital, Inc.; IBN Financial Services, Inc.; Crown Capital Securities, L.P.; Money Concepts Capital Corp., National Securities Corporation; Orchard Securities, LLC; Pariter Securities, LLC; Sandlapper Securities, LLC; Vestech Securities, Inc.; Stephen A. Kohn & Associates, Ltd.; Western International Securities, Inc.; International Assets Advisory, LLC; Hightower Securities, LLC; Innovation Partners LLC; Kingsbury Capital, Inc.; Sentinus Securities LLC; Vanderbilt Securities, LLC; Westpark Capital, Inc.; Colorado Financial Service Corporation; David A. Noyes & Company; Dawson James Securities, Inc.; Dempsey Lord Smith, LLC; DFPG Investments, Inc.; Dinosaur Financial Group, LLC; FSC Securities Corporation; Great Point Capital LLC; Landolt Securities, Inc.; Lewis Financial Group, L.C.; Lowell & Company, Inc.; Madison Avenue Securities, Inc.; McDonald Partners LLC; Moloney Securities Co., Inc.; MSC-BD, LLC; Newbridge Securities Corporation; Purshe Kaplan Sterling Investments, Inc.; Royal Alliance Associates, Inc.; Sagepoint Financial, Inc.; SCF Securities, Inc.; Silber

Bennett Financial, Inc.; Triad Advisors LLC; Uhlmann Price Securities, LLC; Whitehall-Parker Securities, Inc.; Windsor Street Capital, LP; and Woodbury Financial Services, Inc.

182.    The various Automotive Portfolio Form D filings are summarized in the following chart:

| GPB Automotive Portfolio | | | | | | | |
|---|---|---|---|---|---|---|---|
| | **Date** | **Brokerage Firms** | **Total Offering** | **Min for Investors** | **Total Sold** | **# Investors** | **First Date of Sale** |
| Initial | 6/10/2013 | Axiom | $50 M | $100,000 | NA | NA | |
| Amended | 3/27/2015 | Axiom | $250 M | $100,000 | $32 M | 303 | 8/1/2013 |
| Amended | 5/19/2016 | Axiom | Undisclosed | $100,000 | $176 M | 1,869 | 8/1/2013 |
| Amended | 5/18/2017 | Axiom and Ascendant | Undisclosed | $100,000 | $369 M | 3,505 | 8/1/2013 |
| Amended | 5/14/2018 | Many | Undisclosed | $100,000 | $622 M | 6,353 | 8/1/2013 |

### 4.    GPB Holdings II, LP

183.    In or about April of 2015, GPB, Gentile and Schneider, through Ascendant and Axiom, began offering potential investors $500 million of limited partnerships interests in Holdings II.  On April 28, 2015, Holdings II filed a Form D with the SEC that the $500 million would generate an estimated $55,000,000 in sales commissions.  According to the filing, the minimum investment accepted from outside investors was $50,000 and the brokerage firm associated with the offering was Axiom Capital Management, Inc.  Holdings II claimed a federal securities registration exemption under SEC Rule 506.

184.    According to an Amended Form D filed on May 19, 2016, Holdings II had sold $76,017,028 of units to 899 investors with estimated sales commissions of $8,361,873.  The associated brokerage firm was listed as Axiom.

185.    According to a further Amended Form D filed on May 18, 2017, Holdings II sold $364,072,884 of limited partnership interests to 3,505 investors with estimated sales commissions

of $42,778,564. According to the filing, the associated brokerage firms were Axiom Capital Management, Inc. and Ascendant Alternative Strategies LLC. At this point, GPB was already in violation of the 1934 Act, Section 12(g), but never registered the equity interests thereunder.

186. By the time Holdings II filed its final Amended Form D filed on May 16, 2018, the following associated brokers had sold $645,813,889 of units to 6,095 investors with estimated sales commissions of $47,914,143: Axiom Capital Management, Inc.; Ascendant Alternative Strategies, LLC; Accelerated Capital Group; Advisory Group Equity Services Ltd.; Aegis Capital Corp.; Ausdal Financial Partners, Inc.; Center Street Securities, Inc.; Arkadios Capital; Aeon Capital, Inc.; Avere Financial Group, LLC; BCG Securities, Inc.; Financial West Group; Cabot Lodge Securities LLC; Calton & Associates, Inc.; Lion Street Financial, LLC; Capital Investment Group, Inc.; IBN Financial Services, Inc.; Coastal Equities, Inc.; Crown Capital Securities, L.P.; Crystal Bay Securities Inc.; Emerson Equity LLC; Geneos Wealth Management, Inc.; Pariter Securities, LLC; Sandlapper Securities, LLC; Vestech Securities, Inc.; Stephen A. Kohn & Associates, Ltd.; Western International Securities, Inc.; National Securities Corporation; Orchard Securities, LLC; International Assets Advisory, LLC; Capital Financial Services, Inc.; Cascade Financial Management, Inc.; D.H. Hill Securities, LLP; Detalus Securities, LLC; Hightower Securities, LLC; Innovation Partners LLC; Kingsbury Capital, Inc.; Private Client Services, LLC; Royal Alliance Associates, Inc.; Vanderbilt Securities, LLC; Westpark Capital, Inc.; United Planners' Financial Services of America LP; David A. Noyes & Company; Wilmington Capital Securities, LLC; Dempsey Lord Smith, LLC; DFPG Investments, Inc.; Dinosaur Financial Group, LLC; FSC Securities Corporation; Great Point Capital LLC; Landolt Securities, Inc.; Lowell & Company, Inc.; Investment Architects, Inc.; McDonald Partners LLC; Moloney Securities Co., Inc.; MSC-BD, LLC; Kalos Capital, Inc.; Newbridge Securities Corporation; Purshe Kaplan

Sterling Investments, Inc.; Sagepoint Financial, Inc.; Money Concepts Capital Corp; Silber Bennett Financial, Inc.; Uhlmann Price Securities, LLC; Whitehall-Parker Securities, Inc.; and Woodbury Financial Services, Inc.

187.    The various Holdings II Form D filings are summarized in the following chart:

| GPB Holdings II | | | | | | | |
|---|---|---|---|---|---|---|---|
| | Date | Brokerage Firms | Total Offering | Min for Investors | Total Sold | # Investors | First Date of Sale |
| Initial | 4/28/2015 | Axiom | $500 M | $50,000 | NA | NA | |
| Amended | 5/19/2016 | Axiom | Undisclosed | $50,000 | $76 M | 899 | 8/11/2015 |
| Amended | 5/18/2017 | Axiom and Ascendant | Undisclosed | $50,000 | $364 M | 3,505 | 8/11/2015 |
| Amended | 5/16/2018 | Many | Undisclosed | $50,000 | $646 M | 6,095 | 8/11/2015 |

## 5.    GPB Cold Storage, LP

188.    In or about August of 2015, GPB Capital, Gentile and Schneider, through Ascendant and Axiom, began offering potential investors interests in GPB Cold Storage.  On August 26, 2015, GPB Cold Storage filed its Initial Form D with the SEC regarding its offering of Cold Storage units.  While the Initial Form D, which was filed 15 days after the first sale, declined to disclose the total amount of the offering, it disclosed $8,565,580 had been sold to 26 investors with estimated sales commissions of $5,857.  According to the filing, the minimum investment accepted from outside investors was $100,000, and the associated brokerage firms were Mori Huston Partners LLC and Landolt Securities, Inc.  GPB Cold Storage claimed a federal registration exemption under the Investment Company Act § 3(c)(1).

189.    According to an Amended Form D filed on December 18, 2015, the following brokers sold $35,901,575 of GPB Cold Storage limited partnership interests to 268 investors with estimated sales commissions of $3,521,027: Landolt Securities, Inc.; Axiom Capital Management, Inc.; Bradley Wealth Management; Cascade Financial Management, Inc.; Coastal Equities, Inc.;

Dempsey Lord Smith, LLC; International Assets Advisory, LLC; IBN Financial Services, Inc.; Kingsbury Capital, Inc.; Moloney Securities Co., Inc.; Pariter Wealth Management Group LLC; and RP Capital LLC.

190.     The various Cold Storage Form D filings are summarized in the following chart:

| GPB Cold Storage | | | | | | | |
|---|---|---|---|---|---|---|---|
| | Date | Brokerage Firms | Total Offering | Min for Investors | Total Sold | # Investors | First Date of Sale |
| Initial | 8/26/2015 | Mori Huston and Landolt | Undisclosed | $100,000 | $8.5 M | 26 | 8/11/2015 |
| Amended | 12/18/2015 | Many | Undisclosed | $100,000 | $35 M | 268 | 8/11/2015 |

### 6.     GPB NYC Development, LP

191.     In or about May of 2016, GPB, Gentile and Schneider, through Axiom and Ascendant, began offering potential investors participation in a $40 million offering of limited partnership units in GPB NYC Development.  On May 12, 2016, GPB NYC Development filed a Form D with the SEC projecting that $40 million offering would generate an estimated $4,700,000 in sales commissions.  As of the filing of that Initial Form D, which was six days after the first sale, $1,400,000 had been sold to three (3) investors. According to the filing, the minimum investment accepted from outside investors was $50,000.  The associated brokerage firms were Axiom Capital Management, Inc.; Moloney Securities Co, Inc.; and Dempsey Lord Smith, LLC. GPB NYC Development claimed a federal registration exemption under SEC 506(b).

192.     GPB NYC Development filed an Amended Form D on May 18, 2017, reporting a total amount of $41,547,150 of NYC Development units sold to 369 investors, with estimated sales commissions of $4,881,790.  The associated brokerage firms were Axiom Capital Management, Inc. and Ascendant Alternative Strategies, LLC.

### 7.     GPB Waste Management Fund, LP

193.     In or about August of 2016, GPB, Gentile and Schneider, through Axiom and Ascendant, began offering potential investors interests in GPB Waste Management.  On August 30, 2016, GPB Waste Management Fund LP filed its Initial Form D with the SEC reporting an offering for an undisclosed amount, and a minimum investment requirement of $50,000 from outside investors. The filing contained no estimate of sales commissions. According to the filing, the associated brokerage firms were Axiom Capital Management, Inc.; BCG Securities, Inc.; Moloney Securities Co., Inc.; Whitehall-Parker Securities, Inc.; and Dempsey Lord Smith, LLC. GPB Waste Management Fund claimed a federal registration exemption under SEC Rule 506(b).

194.     By the time Waste Management field its Amended Form D on August 30, 2017, the following brokers had sold a total of $76,295,381 units of Waste Management to 801 investors with estimated sales commissions of $6,186,733: Axiom Capital Management, Inc.; BCG Securities, Inc.; Moloney Securities Co., Inc.; Whitehall-Parker Securities, Inc.; Dempsey Lord Smith, LLC; Ausdal Financial Partners, Inc.; Center Street Securities, Inc.; Coastal Equities, Inc.; Concorde Investment Services, LLC; Crystal Bay Securities, Inc.; Emerson Equity LLC; Financial West Group; Geneos Wealth Management, Inc.; McNally Financial Services Corporation; Lion Street Financial, LLC; Kalos Capital, LLC; IBN Financial Services, Inc.; IMS Securities, Inc.; Crown Capital Securities, LP; Money Concepts Capital Corporation; National Securities Corporation; Orchard Securities, LLC; Pariter Securities, LLC; Sandlapper Securities LLC; Vestech Securities, Inc.; Stephen A. Kohn & Associates, Ltd.; Western International Securities, Inc.; Aegis Capital Corp.; Advisory Group Equity Services Ltd.; and International Assets Advisory LLC.

195.     As of an Amended Form D filed on April 25, 2018, the following brokers had sold a total of $135,012,605 units of GPB Waste Management to 1,414 investors with estimated sales

commissions of $10,828,655: Axiom Capital Management, Inc.; BCG Securities, Inc.; Moloney Securities Co., Inc.; Whitehall-Parker Securities, Inc.; Dempsey Lord Smith, LLC; Ausdal Financial Partners, Inc.; Center Street Securities, Inc.; Coastal Equities, Inc.; Concorde Investment Services, LLC; Crystal Bay Securities, Inc.; Emerson Equity LLC; Financial West Group; Geneos Wealth Management, Inc.; McNally Financial Services Corporation; Lion Street Financial, LLC; Kalos Capital, Inc.; IBN Financial Services, Inc.; IMS Securities, Inc.; Crown Capital Securities, L.P.; Money Concepts Capital Corp.; National Securities Corporation; Orchard Securities, LLC; Pariter Securities, LLC; Sandlapper Securities, LLC; Vestech Securities, Inc.; Stephen A. Kohn & Associates, Ltd.; Western International Securities, Inc.; Aegis Capital Corp.; Advisory Group Equity Services Ltd.; International Assets Advisory, LLC; Arkadios Capital; Ascendant Alternative Strategies, LLC; Cabot Lodge Securities LLC; GVC Capital LLC; Hightower Securities, LLC; Innovation Partners LLC; Kingsbury Capital, Inc.; Lucia Securities, LLC; Sentinus Securities LLC; Titan Securities; Vanderbilt Securities, LLC; and Westpark Capital, Inc.

196.    The various Waste Management Form D filings are summarized in the following chart:

| GPB Waste Management Fund | | | | | | | |
|---|---|---|---|---|---|---|---|
| | Date | Brokerage Firms | Total Offering | Min for Investors | Total Sold | # Investors | First Date of Sale |
| Initial | 8/30/2016 | Axiom, BCG, Moloney, Whitehall, Dempsey | Undisclosed | $50,000 | NA | NA | NA |
| Amended | 8/30/2017 | Many | Undisclosed | $50,000 | $76 M | 801 | 9/1/2016 |
| Amended | 4/25/2018 | Many | Undisclosed | $50,000 | $135 M | 1,414 | 9/1/2016 |

**8.      GPB Holdings III, LP**

197.    In or about January of 2018, GPB, Gentile and Schneider, through Axiom and Ascendant, began offering potential investors participation in a $1.5 billion offering of interests in Holdings III. On January 26, 2018, Holdings III LP filed its Initial Form D with the SEC disclosing

an offering for an undisclosed amount and an estimated $193,369 in sales commissions. The minimum investment accepted from outside investors was $50,000. The Form D reported that Ascendant Alternative Strategies had sold $6,430,000 of Holdings III units to two (2) investors.

198.    As of late 2018, GPB Capital, Gentile, Schneider and the other GPB Defendants and Broker Defendants had raised more than $1.8 billion from investors across the country for the GPB-sponsored and -managed Funds, through the Broker Defendants.

199.    As more fully detailed herein, Defendants' success in raising this considerable amount of money rested upon their failure to disclose in the GPB Funds' PPMs and other Offering Materials, in violation of Texas and federal securities laws, material – indeed, crucial – information regarding the Funds' self-dealing and misuse of investor funds and corporate assets by GPB senior executives and control persons, and an undisclosed control person of the GPB Defendants, who had a tainted background.

**J.    GPB's Scheme Begins to Unravel**

200.    As described above, in July 2017, GPB filed a Complaint against former senior executive Dibre and filed an amended Complaint in February 2018.

201.    As described above, in his March 2018 Answer and Counterclaim to the Amended Complaint, Dibre asserted that GPB engaged in deceptive and illegal conduct, including, *inter alia*:

     a.    Charging its investors, without adequate disclosure, almost 20% in upfront fees, yet promising an 8% annual return on their investment;

     b.    Manipulating financial statements of dealership in order to cover up transactions that personally benefitted GPB, Gentile, or Schneider at the expense of the dealerships;

     c.    Failing to disclose kickbacks that GPB caused dealerships to pay Gentile and Schneider; and

d. Recording the purchase price of dealerships at several million dollars more than the combined actual purchase price, closing expenses, and working capital investment, and then funneling such excess monies back to Gentile and Schneider, or entities in which they held as interest, as "acquisition fees."

202. GPB's two largest Funds, Holdings II and Automotive, were required to file financial statements with the SEC pursuant to SEC Regulation 12g-1 because their assets exceeded $10 million and they had more than 2,000 individual investors.

203. By July 2018, GPB still had not filed the required financial statements for Holdings II and Automotive, and thus was operating in direct violation of the Securities Exchange Act.

204. GPB represented in July 2018 that it was working to finalize the required financials.

205. On or about August 17, 2018, GPB made several key announcements: First, GPB said that it would be taking a break from raising new capital in order to fix the accounting and financial statements for Holdings II and Automotive. Second, GPB announced that it would be suspending investor redemptions from the Funds until the audited financial statements were completed and filed with the SEC. And third, GPB disclosed that it would be restating the 2015 and 2016 financial statements of certain Funds as part of an accounting review.

206. In particular, in an August 17, 2018 letter to Holdings II investors, Gentile announced that GPB had determined that previously issued financial statement for the years ended December 31, 2015 and 2016 would need to be restated and the "independent accountants' reports thereon should no longer be relied upon."

207. In the following month, September 2018, Massachusetts Secretary of the Commonwealth, William Galvin, announced that Massachusetts regulators were investigating sixty-three (63) independent broker-dealers who offered private placements sponsored by GPB.

208.    The Massachusetts Securities Division requested information from these broker-dealers about the extent of sales activity, investor suitability, and disclosure and marketing documents provided to investors.

209.    On the heels of the Massachusetts investigation, in November 2018, GPB's auditor, Crowe, resigned, reportedly due to perceived risks that fell outside their internal risk tolerance parameters.

210.    In particular, Crowe had been engaged to audit Prime, one of the portfolio companies in which Holdings II had invested.  In a November 9, 2018 letter to Holdings II investors, Gentile reported that the audit of Prime was necessary for RSM to complete its own 2017 audit of Holdings II, however, Crowe had "elected to resign as auditor of Prime ... due to perceived risks that fell outside their internal risk tolerance parameters."  Gentile reported that GPB had engaged another audit firm, EisnerAmper, to replace Crowe.

211.    In December 2018, InvestmentNews reported that FINRA and the SEC had also launched investigations into the broker-dealers selling private placements sponsored by GPB, and announced that the SEC had started investigating GPB, including the accuracy of its disclosures to investors, the performance of various funds, and the distribution of capital to investors.

212.    On February 28, 2019, the FBI and officials from the New York City Business Integrity Commission raided GPB's New York office and the office of Five Star Carting, a major private trash hauler that GPB owns.

213.    In June 2019, GPB announced that the asset value of Holdings II and Automotive had declined in value 25.4% and 39%, respectively, and its five other smaller funds had declined in value between 25 and 73%.  GPB thus admitted that its financial disclosure had been false and misleading.

214. While the GPB investment value dropped tremendously, the broker-dealers who sold such investments were collectively paid *$167 million* in fees and commissions.

215. On June 21, 2019, GPB disclosed to Holdings II investors that RSM, the independent auditor of the Holdings' II financials, had been replaced effective April 22, 2019 (*i.e.*, two months earlier).

216. On July 19, 2019, one of GPB's business partners, Rosenberg filed his lawsuit against GPB in Massachusetts State Court.

217. As described above, Rosenberg, who was the CEO of Prime, one of GPB's investments, alleged that GPB tried to oust him after he provided GPB's auditors with information and documents showing that GPB had engaged in serious financial misconduct. Rosenberg later provided the same information to the SEC.

218. As of the date of this filing, GPB and the GPB Individual Defendants have suspended redemptions from the following Funds and have failed to provide updated financial information regarding these Funds:

- GPB Holdings

- GPB Automotive Portfolio

- GPB Holdings II

- GPB Holdings III

- GPB Holdings Qualified

- GPB Cold Storage

- GPB NYC Development

- GPB Waste Management Fund

### K. Defendants Made Numerous Materially False and Misleading Statements and Omissions

219. Throughout the Class Period, the GPB Defendants, Schneider, Gentile and Martino prepared, issued, and, with the assistance of the Broker Defendants, distributed PPMs and other Offering Materials to Plaintiff and Class members.

220. These materials were false and misleading for at least the following reasons:

    a. The GPB Defendants, Gentile, Schneider and Martino misrepresented the Funds' business objectives and did not disclose that they were destined to fail. First, they misrepresented the nature of the anticipated return. It was not feasible that the Funds would pay out an 8% return to investors, typically within three months of investment, as the Funds were incurring upfront costs approaching 20%. Second, returns from underlying portfolio companies could not reasonably be expected in such a short period of time;

    b. The GPB Defendants, Gentile, and Schneider misrepresented or omitted to disclose their incurable non-waivable conflicts and breaches of fiduciary duty: Schneider's involvement in GPB and the Funds as a control person, Schneider's ownership interest in the profits of GPB, Gentile's ownership interest in Ascendant, and Schneider and Gentile's agreement to run GPB and Ascendant jointly and split the proceeds without disclosure of this profit sharing;

    c. GPB and the Funds omitted to disclose that Schneider and Ascendant were control persons of the GPB Corporate Defendants and that Schneider and Martino each had a tainted background;

    d. GPB and the Funds represented that they were entitled to an exemption from registration under the 1934 Act when they were not so entitled because they had

sold securities in offerings to more than 2,000 investors who had invested more than $10 million in assets.  In addition, GPB and the Funds were required to register under the 1933 Act, as they had not disclosed the bad acts of Schneider, including the fact that Schneider had been suspended by the NASD/FINRA and an Illinois state regulator, or the bad acts of Martino, the CEO of Ascendant Strategies, including the fact that he had been suspended by NASD/FINRA. These non-disclosures rendered Regulation D registration exemption unavailable to GPB;

e.  GPB and the Funds misrepresented the GPB Defendants' skill and expertise in managing businesses they were to acquire with investor money, by not disclosing that the Funds' results were being obtained through other wrongful conduct, as alleged herein;

f.  GPB and the Funds omitted to disclose that GPB, the Funds, Ascendant and Schneider had engaged in or were aware of serious financial misconduct, including, without limitation, misuse and misrepresentation of investor money;

g.  GPB and the Funds omitted to disclose that the 2015 and 2016 financial statements for the GPB Defendants' two largest Funds, Automotive and Holdings II, as well as other communications to investors on these and other Funds, contained highly material financial misrepresentations and/or omissions and should not have been relied upon by investors; and

h.  GPB and the Funds knowingly overstated the value of fund assets knowing investors would rely thereon.  The GPB Individual Defendants engaged in

undisclosed conversion of assets belonging to the Funds and did not disclose such breaches of fiduciary duty.

221. In addition to the above, the Broker Defendants, the Auditor Defendants, and the Fund Administrator provided substantial assistance to the other Defendants in the commission of these wrongs. These Defendants provided material assistance in the wrongdoing alleged herein by knowingly or recklessly disseminating documents containing material misrepresentations or failing to disclose material information to investors. This included misrepresenting or not disclosing the information regarding the true value of Class members' investments, the need for registration under the Securities Exchange Act and Securities Act, and prior bad acts of control persons of GPB.

222. Such misrepresentations and omissions were material, indeed crucial to Plaintiffs and the other GPB investors' evaluation of the GPB Funds, and the decision to invest in them.

223. Defendants knew that the prospective GPB investors, including Plaintiffs, would rely to their detriment upon such misrepresentations and omissions in the Offering Materials, and indeed intended for such investors and Plaintiffs to rely on those misrepresentations and omissions in order to invest in the Funds.

224. Plaintiffs and the other investors were reasonable in relying upon the misrepresentations and omissions in the Offering Materials.

## CLASS ACTION ALLEGATIONS

225. Plaintiff brings this action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(2) and/or (b)(3) on behalf of herself and a nationwide class consisting of:

> All investors who purchased or otherwise acquired limited partnership interests in one or more of the GPB Funds between June 6, 2013 and the present (the "Class Period"), and have been damaged by the conduct alleged herein (the "Class"). No plaintiff or class member is suing or asserting

claims against the Broker who directly sold to them the limited partnership interests which they purchased.

226.     The Class excludes Defendants and any entity in which any Defendant has a controlling interest, and their officers, directors, legal representatives, successors, and assigns.  All members of their immediate families are also excluded from the Class.

227.     The Class is so numerous that joinder of all members is impracticable.  The Class includes thousands of investors that purchased or otherwise acquired interests in the GPB Funds nationwide.

228.     Plaintiff's claims are typical of the claims of the Class insofar as Plaintiff similarly purchased or acquired an interest in the GPB Funds and was harmed by the same wrongful activity.

229.     Plaintiff will fairly and adequately protect the interests of the Class and does not have any claims that are antagonistic to those of the Class.  Plaintiff has retained counsel experienced in complex nationwide class actions, including securities litigation.  Plaintiff's counsel will fairly, adequately, and vigorously protect the interests of the Class.

230.     Common questions of law and fact predominate over any questions affecting individual Class members, including, but not limited to, the following:

     a.     Whether the Offering Materials contained material misrepresentations and/or omissions of material fact;

     b.     Whether GPB violated the Texas Securities Act;

     c.     Whether the Broker Defendants and Fund Administrators aided and abetted or substantially assisted violations of the Texas Securities Act and GPB's breach of fiduciary duty;

     d.     Whether the sale of the limited partnership interests was required to be registered under the 1933 Act and Texas Securities Act;

  e.  Whether GPB and its affiliates breached their fiduciary duties to Plaintiff and the Class; and

  f.  Whether Plaintiff and the Class members were damaged as a result of Defendants' conduct.

231. A class action is superior to other available methods for the fair and efficient adjudication of this controversy. There will be no difficulty in the management of this action as a class action.

<b>EQUITABLE TOLLING AND DISCOVERY OF THE WRONGDOING</b>

232. As a result of Defendants' conduct, Plaintiff and the Class Members were not aware of Defendants' misconduct and were prevented from learning of the facts necessary to commence an action against Defendants for the wrongful conduct alleged in this Complaint until litigation involving the GPB Funds revealed the extent of Defendants' wrongdoing. The facts necessary for Plaintiff to formulate the basis of a complaint and satisfy applicable pleading standards were within the exclusive control of Defendants, as well as the individuals and entities that aided and abetted Defendants.

233. Plaintiff and the members of the Class have acted diligently in seeking to bring their claims promptly. Because of Defendants' active steps – including, but not limited to, failing to disclose various conflicts of interest, failing to disclose until recently that GPB was making investor distributions using investor capital rather than profits from capital, and providing investors monthly account statements that did not reveal the accurate value of their investment – Plaintiff asserts the applicable statute of limitations for Plaintiff's claims were tolled, and Defendants are equitably estopped from asserting any statute of limitations defense.

234. Defendants are equitably estopped from asserting that any otherwise applicable period of limitations has run.

235. In addition, as a result of Defendants' breaches of fiduciary duties and other wrongdoing, and concealment of the same (as described herein), Plaintiff and the Class members were prevented from discovering their claims against Defendant until recently.

236. Accordingly, the discovery rule also applies to toll the statute of limitations in this case.

## CAUSES OF ACTION

### Count I
### Violation of the Texas Securities Act,
### Tex. Rev. Civ. Stat. Ann. art. 581-33
### (Against GPB and the GPB Funds)

237. Plaintiff incorporates by reference the preceding paragraphs as if set forth in full herein.

238. Section 33(A)(2) of the TSA provides:

> A person who offers or sells a security (whether or not the security or transaction is exempt under Section 5 or 6 of this Act) by means of an untrue statement of a material fact or an omission to state a material fact necessary in order to make the statements made, in light of the circumstances under which they are made, not misleading, is liable to the person buying the security from him, who may sue either at law or in equity for rescission, or for damages if the buyer no longer owns the security.

239. Section 4(A) defines "security" to include "any limited partner interest in a limited partnership."

240. GPB and the GPB Funds offered the limited partnership interests in the GPB Funds that Plaintiff and the Class members purchased.

241. In connection with offering the limited partnership interests, GPB and the GPB Funds made material untrue statements of material fact to investors, including Plaintiff and the Class, and omitted material facts, as described herein.

242.    Accordingly, Plaintiff and the Class members are entitled to rescission or damages in an amount to be proven at trial.

## Count II
### Aiding and Abetting Violations of the Texas Securities Act,
### Tex. Rev. Civ. Stat. Ann. art. 581-33
### (Against the Broker Defendants, GPB Defendants (Other Than the Funds), Gentile, Schneider, Martino, Phoenix, RSM, and the Accounting Defendants)

243.    Plaintiff incorporates by reference the preceding paragraphs as if set forth in full herein.

244.    Section 33(F)(2) of the TSA states:

> A person who directly or indirectly with intent to deceive or defraud or with reckless disregard for the truth or the law *materially aids* a seller, buyer, or issuer of a security is liable under Section 33A, 33B, or 33C jointly and severally with the seller, buyer, or issuer, and to the same extent as if he were the seller, buyer, or issuer.

245.    As set forth above, GPB and the GPB Funds violated TSA Section 33A by making material misstatements and omitting material facts in offering the limited partnership interests.

246.    As pled herein, each of the Defendants against whom this count is asserted, with reckless disregard for the truth of the representations made by GPB and the GPB Funds or the law, materially aided GPB and the Funds in the sale of the subject securities.

247.    Accordingly, the Defendants against whom this count is asserted are jointly and severally liable with GPB and the GPB Funds, and Plaintiff and the Class members are entitled to rescission or damages in an amount to be proven at trial.

## Count III
### Control Person Violations of the Texas Securities Act,
### Tex. Rev. Civ. Stat. Ann. art. 581-33
### (Against Gentile, Schneider, Martino, MR Ranger, DJ Partners, Ascendant Capital, Ascendant Strategies, and GPB)

248.    Plaintiff incorporates by reference the preceding paragraphs as if set forth in full herein.

249. Section 33(A)(2) provides:

A person who offers or sells a security (whether or not the security or transaction is exempt under Section 5 or 6 of this Act) by means of an untrue statement of a material fact or an omission to state a material fact necessary in order to make the statements made, in light of the circumstances under which they are made, not misleading, is liable to the person buying the security from him, who may sue either at law or in equity for rescission, or for damages if the buyer no longer owns the security.

250. Section 4(A) defines "security" to include "any limited partner interest in a limited partnership."

251. Section 33(F)(1) states:

A person who directly or indirectly controls a seller, buyer, or issuer of a security is liable under Section 33A, 33B, or 33C jointly and severally with the seller, buyer, or issuer, and to the same extent as if he were the seller, buyer, or issuer, unless the controlling person sustains the burden of proof that he did not know, and in the exercise of reasonable care could not have known, of the existence of facts by reason of which the liability is alleged to exist.

252. Gentile, Schneider, Martino, MR Ranger, DJ Partners, Ascendant, and GPB are "control persons" in that they had actual power or influence over the and/or the Funds and induced or controlled GPB and the Funds' limited partnership offerings, as well as the materials disseminated in connection with the offerings.

253. As set forth above, Gentile, Schneider, Martino, MR Ranger, DJ Partners, Ascendant, and GPB violated TSA Section 33F by controlling the Funds, which violated Section 33A of the TSA by making material misstatements and omitting material facts in offering the limited partnership interests.

254. Accordingly, the Defendants against whom this count is asserted are jointly and severally liable with the Funds, and Plaintiff and the Class members are entitled to rescission or damages in an amount to be proven at trial.

**Count IV**
**Violations of the Texas Securities Act,**
**Tex. Rev. Civ. Stat. Ann. art. 581-7 and 581-33(A)(1)**
**(Against GPB and the Funds)**

255.     Plaintiff incorporates by reference the preceding paragraphs as if set forth in full herein.

256.     TSA Section 33(A)(1) provides that "[a] person who offers or sells a security in violation of Section 7 . . . of this Act is liable to the person buying the security from him, who may sue either at law or in equity for rescission or for damages if the buyer no longer owns the security."

257.     TSA Section 7(A) provides "No dealer or agent shall sell or offer for sale any securities . . . except those which have been registered . . . and except those which come within the classes enumerated in Section 5 [(Exempt Transactions)] or Section 6[(Exempt Securities)] of this Act, until the issuer of such securities or a dealer registered under the provisions of this Act shall have been granted a permit by the Commissioner . . . ."

258.     The transactions and securities described herein do not qualify as exempt under TSA Sections 5 or 6.  Thus, as described herein, Defendants were required to register the securities that they sold and offered for sale to Plaintiff and the members of the Class, and their failure to do so violated Section 7 of the TSA.

259.     As discussed above, the sale of the securities was not exempt from registration under TSA Section 7, as it was not exempt under the Securities Act of 1933.

260.     GPB and the Funds failed to the register the limited partnership interests which were sold and offered for sale to Plaintiff and the members of the Class.

261.     Accordingly, Plaintiff and the Class members seek to rescind their purchase of the securities described herein, or, in the alternative, seek to recover the damages allowed pursuant to TSA Section 33(D).

**Count V**
**Aiding and Abetting Violations of the Texas Securities Act,**
**Tex. Rev. Civ. Stat. Ann. art. 581-7 and 581-33(A)(1)**
**(Against Broker Defendants, GPB Defendants (Other Than the Funds), Gentile, Schneider,**
**Martino, MR Ranger, DJ Partners, and Fund Administrator)**

262.     Plaintiff incorporates by reference the preceding paragraphs as if set forth in full herein.

263.     As shown, the transactions and securities described herein do not qualify as exempt under TSA Sections 5 and 6. Thus, pursuant to Section 7 of the TSA, GPB and the Funds were required to register the securities that they sold to Plaintiff and the Class members.

264.     Further, as discussed above, the sale of the securities was not exempt from registration under TSA Section 7, as it was not exempt under the Securities Act of 1933.

265.     GPB and the Funds failed to the register the limited partnership interests that they sold and offered for sale to Plaintiff and the Class members and, as set forth above, are, therefore, liable under TSA Section 33A(1).

266.     The Defendants against whom this claim is asserted recklessly disregarded the fact that GPB failed to register the sale of the limited partnership interests and materially aided the Funds in the sale of the subject securities.

267.     Accordingly, Plaintiff and the Class members seek to rescind their purchase of the securities described herein, or, in the alternative, seek to recover the damages allowed pursuant to TSA Section 33(D), for which the Defendants against whom this count is asserted are jointly and severally liable.

**Count VI**

**Control Person Violations of the Texas Securities Act,**
**Tex. Rev. Civ. Stat. Ann. art. 581-7 and 581-33(A)(1)**
**(Against Gentile, Schneider, Martino, MR Ranger, DJ Partners, Ascendant Capital and**
**Ascendant, and GPB)**

268.     Plaintiff incorporates by reference the preceding paragraphs as if set forth in full herein.

269.     As discussed above, the sale of the securities was not exempt from registration under TSA Section 7, as it was not exempt under the Securities Act of 1933.

270.     The transactions and securities described herein do not qualify as exempt under TSA Sections 5 or 6.  Thus, GPB and the Funds were required to register the securities that they sold, as described herein.

271.     GPB and the Funds failed to the register the limited partnership interests that it sold and offered for sale to Plaintiff and the Class members and, as set forth above, are liable under TSA Section 33A(1).

272.     Gentile, Schneider, Martino, MR Ranger, DJ Partners, Ascendant, and GPB are "control persons" to the extent that they had actual power or influence over the Funds and/or GPB and induced or controlled the Funds' limited partnership offerings complained of herein.

273.     As set forth above, Gentile, Schneider, Martino, MR Ranger, DJ Partners, Ascendant, and GPB violated TSA Section 33F by controlling the Funds and/or GPB, which violated TSA Section 33A(1) by failing to the register the limited partnership interests that they sold and offered for sale to Plaintiff and the Class members.

274.     Accordingly, Plaintiff and the Class members seek to rescind their purchase of the securities described herein, or, in the alternative, seek to recover the damages allowed pursuant to

TSA Section 33(D), for which the Defendants against whom this count is asserted are jointly and severally liable.

**Count VII**
**Fraud**
**(Against GPB Defendants, Gentile, Schneider, and Martino)**

275. Plaintiff incorporates by reference the preceding paragraphs as if set forth in full herein.

227. The GPB Defendants, Gentile, Schneider, and Martino knowingly made materially false representations and omissions regarding the limited partnership interests that Plaintiff and Class members purchased, as alleged herein.

228. The GPB Defendants, Gentile, Schneider, and Martino knew these representations and omissions were false when made.

229. The GPB Defendants, Gentile, Schneider, and Martino made the false representations and omitted material facts intending to induce Plaintiff and the Class members to rely on the representations and purchase the limited partnership interests.

230. Plaintiff and the Class members justifiably relied on The GPB Defendants, Gentile, Schneider, and Martino's false representations and non-disclosures and, as a result, were injured insofar as their limited partnership interests have declined in value materially.

231. Accordingly, Plaintiff and the Class members seek damages in an amount to be proven at trial.

**Count VIII**
**Substantially Assisting in Commission of Fraud**
**(Against the GPB Defendants (Other Than the Funds), Fund Administrator,**
**and Broker Defendants)**

227. Plaintiff incorporates by reference the preceding paragraphs as if set forth in full herein.

228. As set forth above, the GPB Defendants (other than the Funds) committed fraud by knowingly making false material misrepresentations and omissions regarding the limited partnership interests.

229. For the reasons discussed herein, the GPB Defendants, Fund Administrator, and Broker Defendants knew that GPB engaged in the fraud because they knew, among other things, that the Funds and GPB's business was destined to fail because they were paying out excessive commissions and other fees which made distributions of 8% unsustainable; Class members' account statements did not accurately disclose that distributions were *not* being paid from Fund portfolios, but from invested capital; Gentile and Schneider had huge conflicts of interests; and the Funds were required to register under the 1934 Act and the 1933 Act, as well as the TSA.

230. As described herein, the GPB Defendants (other than the Funds), Fund Administrator, and Broker Defendants substantially assisted GPB, the Funds, and Ascendant in committing fraud by, *inter alia*, facilitating the sale, and offering for sale, of the limited partnership interests, through use of false and misleading offering documents in violation of Texas law.

231. Accordingly, Plaintiff and the Class members are entitled to damages in an amount to be proven at trial.

## Count IX
### Breach of Fiduciary Duty
### (Against GPB Capital and Gentile)

232. Plaintiff incorporates by reference the preceding paragraphs as if set forth in full herein.

233. Defendant GPB was, and is, a general partner of the GPB Funds at all times relevant hereto. GPB was also a registered investment advisor under the IAA. Gentile was GPB's managing member.

234.     As such, GPB and Gentile owed fiduciary duties to the limited partners of the Funds.  Under the IAA, these fiduciary duties could not be waived or otherwise contractually eliminated.

235.     Plaintiff and the Class members were and are limited partners of the Funds, to whom GPB and Gentile owed fiduciary duties.  By law, these Defendants could not limit or seek waiver of such fiduciary duties.

236.     As described herein, GPB and Gentile breached their fiduciary duties.  Gentile had serious undisclosed conflicts of interest in that he owned interests in both GPB and the lead broker or underwriter that was selling the GPB Funds' securities.  In addition, GPB and Gentile did not disclose the material financial improprieties involving GPB and the Funds' business and that the account statements being provided to Class members did not accurately reflect the status of their investment.

237.     As a direct and proximate result of Gentile's and GPB's breach of their fiduciary duties, Plaintiff and the Class members were damaged.

238.     Accordingly, Plaintiff and the other Class members are entitled to damages in an amount to be proven at trial.

## Count XI
### Substantially Assisting in the Breach of Fiduciary Duty
### (Against Fund Administrator, Broker Defendants, GPB Defendants, Schneider and Martino)

232.     Plaintiff incorporates by reference the preceding paragraphs as if set forth in full herein.

233.     As set forth above, GPB and Gentile owed fiduciary duties to Plaintiff and the members of the Class because they were the general partner and managing member, respectively, of the Funds in which they invested and registered with Investment Advisors.

234.    The Defendants named in this cause of action knew that GPB was a general partner of the Funds, a registered Investment Advisor, and knew of Gentile's role therein. Thus, these Defendants knew of GPB and Gentile's fiduciary relationship with Plaintiff and the members of the Class. Each such Defendant knew that GPB and Gentile breached their fiduciary duty as discussed herein.

235.    As described herein, these Defendants provided substantial assistance to GPB in breaching its fiduciary duties by, *inter alia*, facilitating the sale, and offering for sale, of the limited partnership interests, without disclosing: 1) the serious conflicts of interest Gentile possessed; 2) the financial improprieties involving GPB and the Funds' business; and/or 3) the truth about the value of Class members investment in the Funds, and 4) in the case of the Broker Defendants and the Fund Administrator by providing false and misleading financial information to the Class members as described herein and providing substantial assistance to GPB in breaching its fiduciary duties.

236.    These Defendants all knew of the fiduciary relationship. They also knew that they were participating in a breach of GPB's and Gentile's fiduciary relationship as follows: the GPB Defendants were involved in or had knowledge of the serious conflicts of interests; the Broker Defendants and Fund Administrator knew or should have known that the information they were disseminating about the investors' account was false.

237.    As a direct and proximate cause of the Fund Administrator, Broker Defendants, and GPB Defendants' substantial assistance alleged herein, Plaintiff and the other Class members were damaged and are entitled to damages in the amount to be proven at trial.

**Count XII**
**Negligence**
**(Against Fund Administrator, RSM and Auditor Defendants)**

238.     Plaintiff incorporates by reference the preceding paragraphs as if set forth in full herein.

239.     RSM and the other Auditor Defendants owed a duty to the limited partners to correctly audit the Funds' financial statements.  Instead, the Auditor Defendants prepared clean audit opinions for financials which were materially incorrect, which audit opinions were later withdrawn.  RSM and the other Auditor Defendants failed to comply with applicable accounting standards and were negligent in preparing their audit opinions.

240.     The Fund Administrator also owed a duty to the limited partners to correctly advise them of the value of their holdings in the Funds.  The Fund Administrator breached this duty by negligently reporting the incorrect value of such limited partners' capital accounts on a monthly basis.  As such, the Fund Administrator failed to comply with applicable industry standards.

241.     As a direct and proximate result of the Fund Administrator, RSM, and Auditor Defendants' negligence and role in the sale of the limited partnership interests, Plaintiff and the members of the Class were damaged in an amount to be proven at trial.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff prays for judgment and relief as follows:

A.     Determining that this action is a proper class action under Rule 23 of the Federal Rules of Civil Procedure, appointing Plaintiff as Class representative and Plaintiff's counsel as Class counsel;

B.      Awarding compensatory damages to Plaintiff and the Class against all Defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing in an amount to be determined at trial;

C.      Awarding Plaintiff and the Class pre-judgment and post-judgment interest to the extent permitted by law;

D.      Rescinding the transaction or granting a rescissory measure of damages to Plaintiff and the Class, or granting Plaintiff and the Class money damages;

E.      Awarding Plaintiff and the Class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees;

F.      Granting Plaintiff and the Class appropriate equitable relief; and

G.      Granting such other and further relief as the Court may deem just and proper.

### JURY TRIAL DEMANDED

Plaintiff hereby demands a trial by jury on all issues so triable.


Dated:  October 25, 2019                     **BROPHY, EDMUNDSON, SHELTON & WEISS, PLLC**


By:  */s/ Ryan Shelton*
       Ryan Shelton, Esq.
       SBN: 24037484
       Jesse Z. Weiss, Esq.
       SBN: 24013728
210 Barton Springs Rd., Suite 500
Austin, Texas 78704
Telephone:  (512) 596-3622
Facsimile:   (512) 532-6637
Email:  ryans@beswlaw.com
           jesse@beswlaw.com

**KIRBY McINERNEY LLP**
Peter S. Linden
250 Park Avenue, Suite 820
New York, New York 10177
Telephone:  (212) 371-6600
Facsimile:  (212) 751-2540
Email:  plinden@kmllp.com


**BLACKNER STONE & ASSOCIATES, P.A.**
Richard L. Stone
123 Australian Avenue
Palm Beach, Florida 33480
Telephone:   (561) 804-9569
Email:  rstoneesq@aol.com

*Attorneys for Plaintiff*