**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS**

| | |
|---|---|
| KINNIE MA INDIVIDUAL RETIREMENT ACCOUNT, DEAN CROOKS, JEFFERY S. GRAMM INDIVIDUAL RETIREMENT ACCOUNT, STACY GREASOR INDIVIDUAL RETIREMENT ACCOUNT, CORRI RENE EDEN, CATHERINE KOMINOS, KAREN LOCH, ROBERT A. STONE LIVING TRUST, SHIRLEY STONE LIVING TRUST, VICTOR WADE INDIVIDUAL RETIREMENT ACCOUNT, KAZUE M. BELL, individually and on behalf of all others similarly situated, | Case No. 19 Civ. 1050-LY **SECOND AMENDED CLASS ACTION COMPLAINT** **JURY TRIAL DEMANDED** |
| Plaintiffs, | |
| -v- | |
| ASCENDANT CAPITAL, LLC, et al., | |
| Defendants. | |

1.      Plaintiffs Kinnie Ma IRA, Dean Crooks, Jeffery S. Gramm IRA, Stacy Greasor IRA, Corri Rene Eden, Catherine Kominos, Karen Loch, Robert A. Stone Living Trust, Shirley Stone Living Trust, Victor Wade IRA, and Kazue M. Bell (collectively, "Plaintiffs"), individually and on behalf of all other similarly situated persons who purchased or otherwise acquired securities issued by the GPB Funds (as defined below), by and through Plaintiffs' undersigned counsel, brings this class action complaint (the "Complaint") against Ascendant Capital, LLC ("Ascendant Capital") and Ascendant Alternative Strategies, LLC ("Ascendant Alternative Strategies" or "Ascendant Strategies") (collectively, "Ascendant"), GPB Capital Holdings, LLC ("GPB" or "GPB Capital"), Axiom Capital Management, Inc. ("Axiom"), DJ Partners LLC ("DJ Partners"), MR Ranger LLC ("MR Ranger"), David Gentile ("Gentile"), Jeffry Schneider ("Schneider"), Mark D. Martino ("Martino"), GPB Holdings, LP ("GPB Holdings" or "Holdings"), GPB

Holdings Qualified, LP ("GPB Holdings Qualified" or "Holdings Qualified"), GPB Holdings II, LP ("GPB Holdings II" or "Holdings II"), GPB Automotive Portfolio, LP ("GPB Automotive" or "Automotive"), GPB Cold Storage, LP ("GPB Cold Storage" or "Cold Storage"), GPB NYC Development, LP ("GPB NYC Development" or "NYC Development"), GPB Waste Management, LP (also known as Armada Waste Management LP) ("GPB Waste Management" or "Waste Management"), and GPB Holdings III, LP ("GPB Holdings III" or "Holdings III") (collectively referred to herein as the "GPB Funds," the "Funds" or the "Fund Defendants"), RSM US LLP (formally known as McGladrey LLP) ("RSM"), Crowe Horwath LLP ("Crowe"), CohnReznick LLP ("CohnReznick"), EisnerAmper LLP ("EisnerAmper"), Margolin Winer & Evens LLP ("Margolin"), and Withum Smith+ Brown, PC ("Withum") (collectively, the "Auditor Defendants"), Phoenix American Financial Services, Inc. ("Phoenix" or the "Fund Administrator"), Deloitte Transactions and Business Analytics LLP and Morrison, Brown, Argiz & Ferra, LLC (collectively, the "Valuation Defendants"), Gentile Pismeny & Brengel LLP (now known as Gentile Brengel & Lin, LLP), as well as the various brokerage firms identified herein (collectively, the "Broker Defendants"). All defendants are collectively referred to herein as "Defendants." Plaintiffs allege the following upon information and belief, except as to those allegations concerning Plaintiffs, which are based upon personal knowledge. Plaintiffs' information and belief is based upon the investigation made by and through its attorneys, which included, among other things, a review of public filings and statements Defendants made, court and regulatory filings, media articles, and other publicly available information as well as substantial voluntary disclosure made by brokerage firms and other individuals who participated in the distribution of GPB securities, pursuant to an improperly unregistered public offering.

## PRELIMINARY STATEMENT

2.      This class action arises out of Defendants' improper conduct in offering and selling limited partnership interests in the GPB-sponsored Funds (also referred to herein as the "Securities") at the direction of Ascendant Capital, an alternative asset management firm that was secretly acting as the general partner of each of the Funds. Ascendant Capital, GPB's primary distribution agent, and GPB itself, were in fact both "commonly controlled" by their principals, David Gentile and Jeffry Schneider. However, neither GPB, nor Ascendant, nor their principals made disclosure of this co-ownership and common control to investors in the offering materials for the Securities or otherwise. The failure to disclose this gross conflict of interest — that the issuers of GPB securities and the purportedly independent agent selling these securities were commonly controlled—rendered the offerings of these Securities illegal. Moreover, the other Defendants, unlike the purchasers of the Securities (Plaintiffs and the other Class members herein), were in fact *aware* of or should have been aware of this undisclosed conflict at all relevant times.

3.      Defendants also knowingly made numerous material misstatements and omitted material facts in their Private Placement Memoranda ("PPM"), Forms D, and other communications related to the offerings of the Securities (collectively, the "Offering Materials"), and/or provided substantial assistance in connection with the issuance of such misstatements or omissions and the sales of the Securities. Defendants sold and/or materially assisted with the sale of the Securities through a massive series of improperly unregistered public offerings (the "Offerings") in which they paid themselves and a network of brokers exorbitant fees and falsely promised investors, including Plaintiffs and the other members of the Class, prompt dividends of 8% or more per annum from "operating profits," and an expected net Internal Rate of Return ("IRR") of 15%. Defendants were actually aware of material misrepresentations and omissions in

the Offering Materials but effected the Offerings nevertheless—because of their greed. Indeed, Defendants received extensive due diligence reports ("DD Reports") from at least *five* third parties informing them of the material misrepresentations and omissions, which were hidden from investors. Indeed, the DD Reports, disseminated by Ascendant Capital to the Broker Defendants and other Defendants—but not to Plaintiffs or Class members—warned those recipients not to divulge the secret and damaging contents of the DD Reports.

4.      GPB, Ascendant (and its predecessor Axiom), and their principals Gentile, Schneider, and Martino, as well as each of the remaining Defendants aided and substantially assisted in the GPB scheme, acted with knowledge of the scheme because they knew of the material misrepresentations and omissions in the Offering Materials, and that GPB would never succeed in generating any profits for limited partners through the ownership of operating/portfolio businesses. GPB's "investment strategy" was destined to fail because it included exorbitant, **unprecedented** fees, which were not accurately described in its PPM. As described below, Defendants received non-public DD Reports and other information or were otherwise made aware of the fraudulent and material misrepresentations and omissions at issue.

5.      The Enforcement Section of the Massachusetts Securities Division of the Office of the Secretary of the Commonwealth (hereinafter, "Massachusetts") has recently commenced an adjudicatory proceeding against GPB Capital for violations of Massachusetts law asserting that GPB Capital, in connection with the offer or sale of securities, directly or indirectly to Massachusetts investors, (a) made untrue statements of material fact or omitted to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they are made, not misleading, and (b) engaged in an act, practice, or course of business which operated or would operate as a fraud or deceit upon such investors.

6.     In its administrative complaint against GPB Capital, Massachusetts alleged that GPB Capital and Ascendant essentially operated as a single company and were "one-and-the same":

> GPB Capital paid Ascendant Alternative Strategies and Ascendant Capital millions of dollars in connection with marketing GPB Capital funds and in connection with acquisitions made by GPB Capital. **Publicly, GPB Capital and Ascendant Capital sought to appear as two distinct companies, but in reality, they were one-and-the-same. Schneider was intimately involved in GPB Capital's strategy and direction, and served as Gentile's top confidant. The line between Gentile, Schneider, GPB Capital, and Ascendant Alternative Strategies and Ascendant Capital is blurred beyond recognition. The firms even share office space in Austin, Texas. The only difference between GPB Capital and the Ascendant entities is the e-mail addresses used.** Gentile profited directly whenever GPB Capital paid Ascendant Alternative Strategies selling commissions.

Massachusetts Administrative Complaint at 4 (emphasis added).

7.     The total amount of fees paid to the Broker Defendants cannot be precisely determined from the various inconsistent statements made by Defendants, but based upon their disclosures, these fees were in the range of **16% to 20% of the gross capital** investment of limited partners.   Stated differently, for each $1,000,000 of gross investment, only approximately $800,000 was actually available for investment.

8.     This fee structure made reasonable investment returns impossible, let alone the distributions of 8% or more per annum, and expected net IRR of 15%, promised by GPB, Ascendant, and the Broker Defendants. Defendants knew that this unprecedent fee payout, which was not accurately disclosed in the Offering Materials, made it impossible for GPB to perform as promised. The GPB Funds, GPB, Ascendant, their affiliates, and their principals (Axiom, DJ Partners, MR Ranger, Gentile, Schneider, Martino) hid this fact through deliberately confusing disclosures. Rather than acknowledging that investing only 80% of the committed capital would

make the promised market returns extremely unlikely or impossible, they offered a chimerical 8% return. While the monthly disclosure of this 8% current annual return changed over time, it was always designed to cause investors to believe that it was being paid from returns and/or profits of the underlying businesses that the GPB Funds operated or owned. The GPB Funds, GPB, Ascendant Capital, and their affiliates and principals repeatedly described this 8% return as "fully covered from funds from operations" or from "healthy cash flows" or from "steady cash flows." These statements in the Offering Materials and in other written communications to the Class were false and the Broker Defendants, Phoenix, Gentile Pismeny, the Valuation Defendants and the Auditor Defndants were aware of this falsity.

9.      The promised 8% return was a trick devised to convince investors that they were receiving 8% from business operations, when in fact the 8% was merely a repayment of the capital invested. Each time the Funds paid 8%, the capital account of an investor—the value of its investment—was reduced by this amount. Although investors did not know it, and the monthly statements investors received from GPB, Gentile, and Phoenix did not reflect it, there was no underlying cash flow or profit funding the 8% dividend.  It was a scam. The Broker Defendants were aware of this scam as the DD Reports they received made clear that GPB was using investors' monies to pay this 8% purported dividend. After payment of the previously described fees of up to 20%, the remainder of customer capital (approximately 80%) was not sufficient to generate profit or cash flow to pay the purported dividends. Instead, investors simply received back their own capital, effectively reducing the NAV (net asset value) of their investment while being deceived into believing they were receiving payment from underlying profits.

10.     GPB was operating a Ponzi scheme in which it was paying investors money from their own (or other later investors') accounts and describing such payments as investment returns.

Defendants hid this essential economic fact from investors because disclosure would have revealed the nature of the scam and the inevitable failure of GPB. Instead, Defendants misled investors into believing their capital was secure and intact and that they were earning an actual 8% return from the operating businesses owned by the Funds.

11.     Fees paid out of investor funds included at least 8-11% paid to brokers who sold the Securities (an unprecedented amount), and an additional 5% to 9% paid to GPB and its (undisclosed) affiliates on a regular and continuous basis. The DD Reports provided to the Defendants made clear that certain of the brokers or agents, including Ascendant Capital and Axiom, also received additional fees and that such compensation was not disclosed to investors. GPB also paid itself and its affiliates, including Axiom and Ascendant Capital, as well as Broker Defendants, various other fees, which it has never quantified for its limited partners, including "tax indemnity" fees, operation and support fees, operational expenses, managerial expense fees, acquisition fees, and lending fees. Stated simply, GPB was created for one purpose and one purpose only: to make GPB and Ascendant Capital (the primary distributor of the Securities) and their respective principals, Gentile and Schneider, rich, while misleading investors into believing GPB was steadily earning an 8% current return from operations, and should expect a net return, or net IRR, of 15%.

12.     While deceiving investors into believing they were earning an 8% current return, Defendants attempted to mask the inevitable failure of the Funds by telling the Class that they would receive payments (distributions), on a regular and continuous basis, "fully covered from funds from operations" and from "healthy cash flows," in an amount of 8% annualized.  Indeed, as late as 2019, Defendants continued to represent that distributions were being based upon "performance results." This was all a lie. GPB played a game with the limited partners. The

distributions made to limited partners were simply returns of the limited partners' own (or other limited partners') capital. There was no 8% in operational income, only losses hidden beneath Defendants' falsely described 8% return of investor capital.

13.     Far from being profitable, as demonstrated by a now withdrawn audit (available in late 2017) prepared by defendant RSM US LLP for GPB Holdings II, LP, GPB lost a substantial amount in 2016. Indeed, these audited financials show that GPB paid itself, Ascendant, Axiom, and other brokers more in commissions than the total revenue earned by the underlying Fund. These financial statements indicate that GPB's businesses (the Funds) were on the rocks as early as mid-2017 and that RSM and the Broker Defendants who received these audited financials knew it. Moreover, these financial statements clearly indicate that GPB, and the Funds for which it acted as investment advisor, never earned sufficient profits to pay distributions from the businesses which they owned. GPB was, based upon its own financial information, a Ponzi scheme. GPB was taking money from limited partners (ostensibly for investment in the Funds) at a clip of approximately 20% on each dollar that such limited partners contributed, and then paying them back fictious distributions which in fact were simply repayments from their own capital contributions to the partnerships, or from the capital contributions of other limited partners.

14.     Much of the truth has now come out and RSM (the auditor who prepared the 2015 and 2016 audited financials for at least GPB Holdings II, LP) and Crowe (the auditor who prepared the 2016 audited financials for GPB Automotive Portfolio, LP and GPB Holdings, LP) have withdrawn their respective audit opinions regarding those financials and GPB has failed to provide restated audited financials.  GPB has stated that investors can no longer rely upon its prior financials. Moreover, GPB **itself** has acknowledged that it overstated the NAV of two of its biggest funds (GPB Holdings II and GPB Automotive Portfolio, LP) by between 25% and 50%, an

acknowledged loss to the Class of hundreds of millions of dollars. GPB has also revealed that its five other Funds had declined in value between 25% and 73%. In total, GPB has admitted that it has overstated the value of assets in its Funds by approximately $750,000,000.

15.     Furthermore, GPB and its affiliates who controlled GPB now have acknowledged that they operated the Funds in violation of federal disclosure laws for years. Certain of the Funds operated and controlled by GPB, Ascendant, Gentile, and Schneider were, as of late 2016, required to register certain share classes under section 12(g) of the Securities Exchange Act of 1934 (the "Securities Exchange Act" or the "1934 Act"), because their limited partnership interests were held by more than 2,000 holders and were valued at well over $10 million. Such Funds included at least GPB Holdings II, LP and GPB Automotive Portfolio, LP. Each of the Defendants that sold those Funds, as identified herein, was aware of this failure to register the Securities, as they knew the true asset value of the Funds and that scores of brokers were selling the funds to small investors nationwide. Moreover, as shown herein, each of the Broker Defendants knew that 12(g) registration would be necessary early on as the DD Reports prepared by third parties and made available to them by Ascendant made this clear. These DD Reports were not made available to investors. This illegal failure to register the Securities was highly consequential.

16.     Because it failed to register the securities under 12(g) of the 1934 Act, GPB could no longer legally operate these Funds. Moreover, GPB was in violation of the Securities Exchange Act, because the requirement to register under 12(g) also imposed on GPB and its control persons the obligation to make extensive public filings on a quarterly basis disclosing the financial condition and business management of the Funds and GPB itself. These disclosures would necessarily have included disclosure of the Ponzi scheme. And, because it failed to prepare such filings and provide them to investors, GPB could not rely upon the registration exemption provided

under Regulation D, which requires delivery of such quarterly reports to investors. Because it could not rely on the exemption provided in Regulation D, GPB was in continuous violation of the Texas Securities Act (the "TSA"), as it was offering and selling unregistered securities in a public offering without any federal or state exemption.

17.     GPB's failure to comply with 12(g) was a gross breach of both the Texas Securities Act and the fiduciary duties GPB and Gentile, GPB's managing member, owed to investors. GPB and Gentile were was obligated to make comprehensive financial disclosures consistent with the federal and Texas disclosure scheme imposed by the Securities Exchange Act and the TSA, respectively, and failed entirely to do so, and GPB, as well as Ascendant Capital, and their principals was obligated not to offer these Securities until that was accomplished. Had they made such disclosures, the fraudulent scheme would have been disclosed and investors would not have purchased hundreds of millions of dollars worth of the overvalued GPB Securities.

18.     Each of the aiders and abettors involved in this scheme and each of the Defendants who substantively participated and assisted in it was aware of this gross disclosure failure, because they knew through underwriting agreements and their work for the Funds that GPB had engaged in a widespread offering of the Securities through more than **80** brokers (as well as additional registered investment advisors) across the country. Further, given the small denomination of investments (minimums of $50,000 or $100,000 each) made by investors, it is inconceivable that any of the Broker Defendants was unaware that there were 2,000 or more investors and that GPB was in violation of federal disclosure requirements. Moreover, as shown herein, the Broker Defendants were provided with DD Reports that made this 12(g) violation clear, and this information was also made available to them through GPB's Form D filings. The Fund Administrator, Auditor Defendants and Valuation Defendants (as defined herein) were also aware

of this 1934 Act violation as they were provided with, and were actually working with, GPB financial information showing the exact number of investors and the value of each Fund.

19.     In addition to having failed to make required comprehensive disclosure under the Securities Exchange Act, GPB and Ascendant Capital, and their affiliates and principals (Ascendant Strategies, Axiom, DJ Partners, MR Ranger, Gentile, Schneider, Martino), as well as the Broker Defendants, also knowingly engaged in a massive unregistered public offering in violation of both the Securities Act of 1933 (the "Securities Act" or the "1933 Act") and the Texas Securities Act.

20.     Although they used public promotion and marketing to sell the Securities, Defendants purported to rely upon an exemption from registration under Regulation D, Rule 506 (17 CFR § 230.506). But GPB, Ascendant, Axiom, and their principals (Schneider, Gentile and Martino) knew at all times that this exemption was unavailable: (i) because the primary distributor of the Securities (Ascendant Capital and, previously, Axiom) and their control persons (Schneider and Martino) were so-called "bad actors" under Rule 506; (ii) because they failed to make required disclosures in their Regulation D or the PPMs filings that Schneider, Martino, Ascendant, and Axiom were "promoters" of the Offerings; and (iii) because they did not describe their respective roles as "promoters" in the Regulation D filings or the PPMs. GPB's public filings also failed to comply with Regulation D by failing to disclose the full amount of the compensation paid to the Broker Defendants and promotors for distributing the Securities.  Each of the Broker Defendants, the Fund Administrator, and the Auditor Defendants knew of these material violations of Regulation D, and thus of the illegality of the unregistered public offerings, because of their work for GPB and/or because the status of these individuals and entities as "promoters" and the full amount of their compensation was disclosed in the DD Reports provided to these Defendants. The

Fund Administrator knew of these violations because it processed payments to such Broker Defendants directly and dealt directly with Schneider, Ascendant, and Axiom and thus knew their status as undisclosed "promoters".  The Auditor Defendants knew of these violations because they reviewed each fiscal year the fees Ascendant Capital and Axiom received as "promotors" in connection with their audit review.

21.     Under Rule 506 these "bad acts"—suspensions by State securities regulators or the Financial Industry Regulatory Authority ("FINRA") (formerly the "NASD")—were required to be *fully disclosed* to investors for any registration exemption to be effective. But the "bad acts" were not disclosed. Schneider's and Martino's primary role in the distribution of the Securities required comprehensive disclosure of their prior violations of state and federal securities laws, *i.e.*, "bad acts". Instead, these violations were hidden, rendering Rule 506 unavailable, and the failure to register the Securities illegal under both federal and Texas law.

22.     Defendants lacked the temerity to make these "bad acts" disclosures because they knew that once such prior securities infractions were disclosed to investors the jig would be up and no one would purchase the Securities. Accordingly, Defendants illegally hid this information from investors (and federal and Texas regulators). Defendants' glaring failure to disclose Schneider's prior infractions when he was not only the owner of the primary distributor of the Securities, but also (unbeknownst to investors) a co-owner of GPB Capital itself, rendered a Rule 506 registration exemption unavailable. Defendants' failure to disclose the prior infractions of Martino, the CEO of Axiom and later the CEO of the Ascendant broker dealer (Ascendant Alternative Strategies), also violated Rule 506. Consequently, the Offerings were illegal and all the purchasers of the Securities, including Plaintiffs and the other Class members, are entitled to rescission under Texas law. Because GPB and the Funds had no valid Rule 506 exemption, GPB

was required to file a registration statement under the Securities Act and fully disclose Defendants' fraudulent Ponzi scheme. The Offerings also failed to qualify for a Regulation D exemption for the other reasons set forth herein.

23.     Finally, and perhaps most importantly, Defendants' scheme to bilk investors with fees of up to 20% on invested capital involved a hidden common control relationship between GPB Capital **and the lead broker dealers themselves**. Although never clearly disclosed to the limited partners, GPB Capital, Axiom/Ascendant, Schneider, and Gentile, from the start *commonly owned* the entire revenue stream from organizing, managing and operating the various limited partnership interests, *and* from brokering, selling, and underwriting them. The Broker Defendants—but not the investors—were fully aware of this gross conflict because it was disclosed to them in the DD Reports provided or made available by Ascendant.

24.     This created the most glaring conflict of interest that can exist in the securities business: the brokers offering the Securities and purportedly providing independent, objective advice were also secretly sharing in the massive fees earned by GPB Capital in connection with operating the limited partnerships themselves. The nature of this revenue sharing and co-control relationship was never fully disclosed as required under both Texas law and the 1933 and 1934 Acts to which the Funds were subject. The advice offered by Schneider, Martino, Ascendant, and Axiom (as lead underwriters of the Offerings) was accordingly anything but objective. Their goal was to sell as much as they could because they were personally profiting not only from the exorbitant broker commissions that they were receiving, but also from the excessive (and not fully disclosed) fees that were received by GPB.

25.     Defendants never fully disclosed these relationships to investors, but instead provided misleading information in a piecemeal fashion through an ever-changing series of half-

truths in the many subsequent amendments to their PPMs made in connection with their continuous unregistered Offerings. Defendants never told the whole truth: that the entire GPB business was operated and controlled by Gentile, Schneider, and Ascendant Capital, collectively, from the start.

26.     GPB's, Ascendant's, Axiom's, Gentile's, Schneider's, and Martino's attempts to cover up this gross, irremediable conflict through piecemeal misleading disclosures over the period of several years were improper and legally ineffective. Investors in the Securities were entitled to know specifically and clearly that they were not receiving objective advice from the brokerage firm effecting the underwriting and that the primary underwriter (Ascendant Capital, Axiom, Schneider, and Martino, collectively) was anything but objective.  Its primary hidden goal was to sell as many Securities as possible in order to earn a double income stream (from biased brokerage operations and from the operation of GPB).

27.     As shown herein, Defendants GPB, Axiom, and Ascendant could not have achieved their fraudulent goals alone. Various other Defendants, in violation of Texas law, aided and abetted and substantially assisted them in their wrongdoing, including:

>     a.   the Auditor Defendants, which negligently prepared false and misleading audits, reviewed, approved and authorized the dissemination of false and misleading financial statements for the Funds, and allowed their names and reputations to be used for salesmanship and marketing in connection with the sale of the Securities (GPB repeatedly referenced that their financials were audited by RSM (respecting GPB Holdings II, LP), Crowe (respecting GPB Automotive Portfolio, LP and Holdings, LP), CohnReznick (respecting Waste Management), and Margolin (respecting GPB Capital, Automotive, Holdings Qualified, Holdings and NYC Development), EisnerAmper (respecting Automotive, Holdings, and Holdings II),

14

and Withum (respecting Waste Management/Armada Waste, Cold Storage, Holdings III and NYC Development) as a part of their marketing of the Offerings);

b.   more than 60 broker dealers (the Broker Defendants herein) which, among other things, (i) knew that the Offerings were unregistered public offerings; (ii) knew that GPB was required to but failed to register under 12(g) of the Securities Exchange Act and to prepare and distribute quarterly and annual financial documents to investors; and (iii) were aware of numerous red flags with respect to the Offerings, including excessive compensation, lack of track record, prior poor performance, inter-company conflicts of interest, and commingling of assets among ostensibly separate GPB Funds, as well as that Schneider and Martino were undisclosed "bad actors" under Rule 506 and that GPB, therefore, was required to register the Offerings under the Securities Act. As shown below, much of this red-flag information was provided to the Broker Defendants directly through the DD Reports which were hidden from the investors;

c.   the Valuation Defendants, which provided inflated valuations of GPB's assets. Such valuations were necessary because most if not all of the assets held by such Funds were not publicly traded and had no reported market value.  Thus, Deloitte and MBAF knew that such valuations were essential to the financial reports prepared by the Funds and their auditors and to investors and prospective investors who relied upon such financial reporting to determine the performance of the relevant Funds.  Indeed, because the assets owned had no reported market value, these valuations were a primary constituent of the financial results provided to investors and prospective investors and thus a primary factor by which the GPB

Defendants, the Individual Defendants, and the Broker Defendants touted investment in the GPB Funds and on which investors relied in their respective investment decisions;

28.     The Broker Defendants were, in effect, bribed.[1] They were paid grossly excessive commissions (approximately 11%)—more than double the industry average—to look the other way and to perpetuate the scheme by failing to disclose that their clients' investments were being used to pay other investors' distributions, and by failing to disclose the numerous red flags of which they were aware, which indicated that the GPB Offerings were highly risky and illegal in many respects. These Broker Defendants, blinded by excessive commissions, were reckless in disregarding the fact that GPB could never actually achieve a legitimate 8% current distribution rate when approximately only 80% of investor capital was actually being invested and, because of the exorbitant fees and expenses being paid upfront to the Broker Defendants, GPB, Ascendant/Axiom, and their principals. The Broker Defendants also recklessly disregarded the inevitable failure of the business model put forward by GPB and the many red flags in the face of excessive commissions. They also recklessly disregarded the fact that GPB, Ascendant Capital, *and the Broker Defendants themselves* were engaged in unregistered public offerings, and that GPB improperly failed to register under section 12(g) of the Securities Exchange Act and failed to make public disclosures in violation of federal securities laws. These actions render them jointly and severely liable under the Texas Securities Act.

29.     At all times the Broker Defendants knew the factual underpinnings of these misrepresentations and securities laws violations for multiple reasons:  (1) they were specifically advised of the 12(g) issue in the DD Reports; (2) they knew that the promised 8% current cash

---

[1] As a registered investment advisor, Defendant Bradley Wealth, LLC, would not have received these high commissions but would have had knowledge of such commissions.

return was impossible given the almost 20% in fees taken off the top; (3) they knew that there were at least 2,000 investors in several of the Funds, because GPB engaged more than 80 brokers and additional registered investment advisors to sell the Securities and the amounts individually invested were small, and because the Forms D disclosed the number of investors and the aggregate amount invested; and (4) they knew that the Offerings did not qualify for a registration exemption under Rule 506 because the lead underwriter was a "bad actor" with a long disqualifying disciplinary history (information that was available on databases the Broker Defendants used, including the FINRA database), and that GPB had otherwise failed to comply with Regulation D by failing to disclose its promoters and their entire compensation, facts which were revealed to the Broker Defendants in the DD Reports, and thus that the Securities were being sold in violation of the Securities Act.  Moreover, the Auditor Defendants had direct knowledge of undisclosed co-ownership of GPB as they had access to the financial records of GPB reflecting payments made by GPB to Ascendant and its affiliates.  They also had direct knowledge of the financial performance of the GPB investments and knew that they were not generating 8%, and thus the 8% purported dividend was in fact not a dividend but repayment of invested capital.

30.     RSM, Crowe, CohnReznick, Margolin, Withum, and EisnerAmper who prepared audits for the GPB entities, , reviewed and passed upon financials or conducted reviews for the GPB Funds were similarly reckless and provided substantial assistance in perpetuating the fraudulent scheme. GPB has acknowledged that GPB Holdings II, LP's assets were overstated in the audit that RSM prepared by **more than 25%**, or hundreds of millions of dollars. RSM's audit opinion has been withdrawn, but GPB's own acknowledgement that the assets on this Fund's balance sheet were grossly overstated shows that GPB's auditor was reckless and its opinion was materially inaccurate. Crowe's audits of the 2016 financials of GPB Automotive Portfolio, LP and

GPB Holdings, LP also had to be withdrawn.  Similarly, in June 2019, GPB acknowledged that GPB Automotive Portfolio, LP's assets were overstated by 39% and that GPB's five remaining Funds had declined between 25% and 73% in value. The withdrawal of the audit opinions, in the face of such gross inaccuracies, also reflects that they were negligently or recklessly issued.  RSM, Crowe, and the other Auditor Defendants aided and abetted and provided substantial assistance to the illegal Offerings by allowing their names to be used in the PPMs as part of the marketing of the Securities, while they were subjectively aware of the red flags as described herein.

31.     The Fund Administrator, Phoenix, also provided substantial, material assistance in effecting and perpetuating the scheme. Fund administrators are charged with calculating investment NAVs, processing distributions, and informing investors of the current state of their investments, and Phoenix agreed to perform these functions for GPB limited partners, *i.e.*, Plaintiffs and the other Class members. It also served as the paymaster for the Funds, and thus had knowledge of who received payments from GPB and that Ascendant and its affiliates shared in GPB's profits. If Phoenix had not provided investors with false monthly statements containing the purported value of their holdings, the scheme would have failed. These statements were false and misleading because they failed to reduce the respective investors' capital account value by the up to 11% paid "off the top" (in broker commissions) before investors funds were paid over to GPB. Thus, the investors' statements were inflated by at least 11% and materially misrepresented the value of the Class members' investments. Phoenix thus allowed the scheme to continue by failing to disclose losses and also allowed GPB to raise more funds. Phoenix was aware of these falsehoods as it processed the Broker payments and received customer subscription amounts, and thus knew that only approximately 80% of controlled capital was actually employed in the GPB investments.

32.     Nevertheless, the Fund Administrator continued to regularly report to investors "current cash distributions" and "total capital" on monthly statements which showed that limited partners were in fact earning money rather than losing money and which failed to reflect reductions in capital accounts due to these distributions of capital. The Fund Administrator, who handled limited partner payments to GPB, knew the high total expense level associated with the Offerings (*i.e.*, up to 20%), and knew *up front* that only approximately 80% of the investment dollars raised by GBP were actually credited to investor accounts. The Fund Administrator disregarded the fact that at the initiation of investors' investment in the Funds, they would have started with a capital account worth far less than the capital they invested, and thus their "total capital invested" should have been reduced from the beginning. Instead, Phoenix simply disregarded this fact and treated the capital accounts as if there was no deduction for the exorbitant (and insufficiently disclosed) brokerage fees. Nor did the statements which were produced and distributed by the Fund Administrator disclose that distributions being made were from *invested capital,* not from any income generated by the Funds' operating subsidiaries. Characterizing these payments as distributions was false, as they were entirely returns of investors' own capital. These were gross failures on the part of the Fund Administrator that kept the scheme alive.

33.     The Valuation Defendants also provided substantial, material assistance in effecting and perpetuating the scheme and had knowledge of the fraudulent nature of the GPB scheme and of their role therein.  The Valuation Defendants had access to the GPB financials and thus knew that: (1) GPB was not generating current returns sufficient to pay the proposed 8% current dividend; (2) as described herein, GPB was engaged in large undocumented intercompany loans and undocumented co-investments, whereby one Fund paid obligations of other Funds, but did not document these financial transactions in the Funds' respective books; (3) Ascendant and

Schneider were receiving compensation not disclosed in the PPMs or otherwise in connection with GPB transactions and were in effect acting as managers of GPB, not just brokers; (4) GPB was routinely abusing its non-public positions; (5) as described in paragraphs 153 through 155, GPB was intentionally overpaying for assets with the expectation that some of that overpayment would be kicked back to GPB or its principals, or held in "reserve" for payment of that 8% dividend; and (6) as described in paragraph 175, GPB was buying assets from Gentile in a conflict ridden fashion without express approval, bringing into question the legitimacy of its entire asset buying program.

34.     GPB, Ascendant Capital, and the Fund Defendants (the "GPB Defendants"), their respective principals, and the Fund Administrator maintained and perpetuated the scheme by failing to accurately report the true NAV (net asset value) of Class members' investments in the various Funds, even though they knew that the stated numbers were inaccurate and dramatically overstated the investors' interest in the Funds.

35.     The GPB Defendants made highly material misrepresentations and omissions in the PPMs for the Securities purchased by the Class. The Broker Defendants, while aware of these misrepresentations and omissions, nevertheless distributed these PPMs to investors. Defendants' material misrepresentations and omissions in the Offerings included, *inter alia*, the following (collectively, "the Material Misrepresentations and Omissions"):

a.  **GPB's Business Was Destined to Fail.**  The GPB Defendants, The GPB Affiliated Defendants, Schneider, Gentile, Martino, and the Broker Defendants failed to disclose in the Offering Materials, or thereafter, that GPB's business model was built and destined to fail because the Funds' cash flow would not be nearly sufficient to generate an actual 8% current return per annum on investment given the exorbitant and unprecedented commissions and other fees and expenses

20

(totaling up to approximately 20% of invested capital) that the Broker Defendants and the GPB Defendants were collecting. Defendants should have disclosed that an 8% current return would have necessitated a return *much* higher than a market-based return on the Class members' actual invested capital. In addition, Defendants failed to disclose that the GPB Defendants and their principals were, from the start, in fact using new investment money collected from new investors and/or the investors' own capital to pay economically unattainable current distributions—effectively a Ponzi scheme. The Broker Defendants were each aware of this Ponzi scheme because they knew from the DD Reports that GPB could not pay out from profits 8% annually and in fact simply held large sums of money (investor capital) "in limbo" to make such payments, rather than making them from operating profits as represented by GPB. The Valuation Defendants and the Auditor Defendants were also aware of these facts as they had access to GPB financials;

b. **Gross Conflicts of Interest.** The GPB Defendants, Gentile, Schneider, and Ascendant failed to disclose their irremediable conflicts of interests, including: (i) that Gentile, the managing member and control person of GPB, the Funds' general partner, who controlled each of the Funds, had a large undisclosed ownership interest in Ascendant Capital, which served as the "lead" underwriter for the Funds, and Ascendant Strategies. Thus, Gentile and GPB were selling equity interests to investors in long-dated assets and contemporaneously (and without disclosure) receiving above-market commissions on such sales. This was also a material breach of the fiduciary duties of loyalty and full and fair disclosure that GPB and Gentile owed to investors, who were unaware (i) that their fiduciary-investment advisor

was receiving undisclosed commission kickbacks which incentivized these Defendants to sell the Funds to Class members without concern as to the Funds' actual performance; (ii) that Schneider was a control person (and equity interest owner) of GPB (as was Ascendant Capital), and was deeply involved in GPB's business and in structuring and developing the GPB Funds and the offerings to sell partnership interests in these Funds. Stated differently, the lead underwriter/broker for the GPB Funds—who was obligated to offer objective financial advice under state law and industry (FINRA) standards—was conflicted in that he also was financially benefiting on an undisclosed basis from the underlying business enterprise; (iii) that Gentile and Schneider had an undisclosed agreement to split the profits of both GPB and Ascendant and that they had formed a company, Defendant DJ Partners, LLC, to facilitate this. These fiduciary obligations could not be waived or be limited by GPB or the Individual Defendants because they were registered investor advisors, under the Investment Advisers Act of 1940. The Broker Defendants, Phoenix, the Auditor Defendants, and the Valuation Defendants were aware of this gross conflict, which was disclosed to the Broker Defendants in the DD Reports, and which the Auditor Defendants, Phoenix, and the Valuation Defendants knew of because they either processed payments to the conflicted parties or reviewed and/or audited GPB financial records reflecting these payments; and (iv) that Gentile had an ownership interest in Gentile Pismeny, LLP, the same accounting firm that GPB hired for advisory work, and that Gentile was also receiving payouts from that firm;

c. **Undisclosed Prior Bad Acts and Other Failures to Disclose Which Made Regulation D Unavailable.** The GPB Defendants failed to disclose that Schneider controlled GPB and previously had been *suspended* by FINRA and by a state regulator, and that Martino, the CEO of the Axiom and Ascendant Strategies, had also previously been suspended by FINRA. Schneider and Martino, thus, were "bad actors" within the meaning of SEC Rule 506. As a result, a Rule 506 exemption was unavailable to GPB Capital and the Funds, because the PPMs for the Funds failed to disclose and explain these prior bad acts, thus requiring registration under the 1933 Act for each of the integrated Offerings. The Broker Defendants were aware of this disqualifying information which was available to them on FINRA databases they regularly accessed as part of their business. The Rule 506 registration exemption was also unavailable because GPB failed to make full and complete disclosure of the role of Schneider as a promoter, and the full compensation paid to Schneider and Ascendant. These facts, substantiating Schneider's and Ascendant Capital's role as promoters, were also disclosed to the Broker Defendants and other Defendants in the DD Reports;

d. **Failure to Register the Offerings in Texas and Federally.** The GPB Defendants failed to make filings as required under the Securities Exchange Act of 1934, § 12(g), 15 U.S.C. § 78(l), and Tex. Rev. Civ. Stat. Ann. art. 581-7 given that assets in the GPB Automotive Portfolio, LP and GPB Holdings II, LP each totaled well over $10 million and each had at least 2,000 investors, requiring such registration under the 1934 Act. Thus, Defendants improperly failed to register the Offerings under the Securities Act of 1933 and the Securities themselves under the Securities

Exchange Act of 1934. The Broker Defendants were aware of this failure to register under the 1934 Act because the DD Reports disclosed this risk at least by 2016 or early 2017 and because they knew the amount of assets raised in the relevant Offerings and knew that given the small amount of each individual investment that thousands of investors had invested.  Phoenix too was aware of this failure to register as it processed each investor purchase. The Auditor Defendants and Valuation Defendants were also aware of this failure as they were in possession of GPB financial data providing the relevant information as to assets held and the number of limited partners;

e.  **Concealment of Payments to Underwriters/Brokers.** GPB made millions of dollars of undisclosed payments to Broker Defendants, as well as Ascendant Capital and Schneider in consideration for their services as brokers.  These fees included at least millions of dollars in so-called Acquisition Fees and "Managerial Assistance Fees" which were disguised brokerage commissions. These brokerage commissions were not disclosed in the GPB Regulation D filings in violation of Regulation D, rendering Regulation D registration exemption unavailable to GPB. The Broker Defendants were aware of this violation as these undisclosed payments were described in detail in the DD Reports. The Auditor Defendants and Phoenix knew about these payments from their oversight of the Funds' financial accounts;

f.  **Failure to Disclose Other Material Conflicts and Commingling of Fund Assets.** GPB engaged in numerous other material undisclosed conflicts:  GPB commingled assets and investor capital among the ostensibly separate GPB Funds, exposing investors in one Fund to the risks of the others; GPB sold assets between and among

Funds when it was otherwise unable to obtain market prices or liquidity for such assets;  GPB used assets of its largest Funds (Holdings I and II) to lend money at non-market rates to other GPB Funds, which could not obtain such loans in the marketplace—indeed, as of 2017, Holdings had "loaned" $68.4 million to other GPB Funds without the approval of its investment committee and without marking these loans to market. These loans and inter-company sales show that Holdings was in fact treating all of its Funds as one commingled pool and was not properly accounting for its assets. This information was not disclosed in the Offering Materials.  The Auditor Defendants and the Valuation Defendants were aware of this undisclosed fraudulent conduct, which directly affected the value of GPB assets and liabilities, as they had access to GPB financials;

g.  **Concealment of Conflicted Purchases.** GPB also engaged in highly conflicted material purchases of assets from Gentile himself. Indeed, "the first two [car] dealerships that GPB Holdings invested in were partly owned by Gentile." GPB also purchased private companies owned at least in part by Gentile, including Alphaserve Technologies and Jachiraga Inc., without disclosing the conflicts to limited partners. These purchases were not approved by the GPB investment committee and were *ultra vires*. GPB also failed to disclose at least $40 million in "loans" made by Gentile to car dealerships owned by the GPB partnerships that provided him with a first lien on dealership assets. None of these gross conflicts of interest and insider dealings were disclosed to investors, but they were disclosed to the Broker Defendants and Phoenix in the DD Reports and were known to the

Auditor Defendants and the Valuation Defendants who reviewed the GPB financials;

h. **Concealment of Poor Prior Performance.** GPB also failed to disclose that its commitment to pay 8% current distributions and to achieve a 15% net IRR to investors was completely inconsistent with its previous returns of between 5% to 9% in total, as disclosed in the DD Reports. Had GPB disclosed this highly material prior performance, investors would have known that the promise to pay 8% from current income and a net IRR of 15% in total to investors was not credible. Indeed, the DD Reports made clear to the Broker Defendants that the commitment to pay 8% current income was materially false, because GPB failed to disclose to investors its poor prior performance in similar funds and transactions which showed *total* returns of between 5% and 6%—making an 8% current distribution impossible; and

i. **Concealment of the Misconduct.** The GPB Defendants and Gentile were improperly concealing the fraud through a series of improper financial transactions (detailed below) and misrepresentations or misleading statements contained in Offering Materials and other communications with investors—the Class Members herein—all intended to advance, hide, and maintain the scheme.

36.    Plaintiffs assert claims pursuant to the Texas Securities Act (the "TSA"), Tex. Rev. Civ. Stat. Ann. art. 581-33, and 581-7, and related state law, including fraud, breach of fiduciary duty, the other Defendants' substantial assistance in the breach of such duties, and negligence. Claims are asserted on behalf of a putative class of investors who purchased or otherwise acquired interests in one of the GPB Funds between June 6, 2013 through the present (the "Class Period").

## FACTUAL BACKGROUND

37.     Beginning in or around 2013, Austin, Texas resident Schneider (Ascendant Capital's founder) developed the concept of using an alternative asset management firm to attract investments in a series of limited partnerships or funds by selling equity interests therein to investors. According to Schneider, he "approached [Gentile] with the idea of partnering on an income-producing private equity fund." Together with Schneider from Texas, Gentile formed GPB Capital and became its CEO and managing member. Schneider has also stated that, in "2013, [he] helped [Gentile] launch an income-producing private equity fund called GPB Holdings." Ultimately, Schneider dedicated his company, Ascendant Capital, based in Austin, Texas, to structuring funds and raising capital exclusively for GPB. Gentile and Schneider agreed (but did not disclose to investors) that they would share the profits of GPB Capital and Ascendant, and formed DJ Partners, LLC to ensure their shared ownership.

38.     Defendants GPB Capital, Axiom, and Ascendant Capital, under the direction of Gentile, Schneider, and Martino (CEO and President of Axiom and later CEO of Ascendant Strategies), formed the GPB Funds and effectuated this secret co-ownership relationship. According to a later-filed FINRA BrokerCheck Report on Ascendant Strategies, Gentile and Schneider (through DJ Partners) and Martino (through MR Ranger) were each majority owners of Ascendant Strategies.

39.     The GPB Funds, under the control of GPB Capital, Ascendant Capital, Gentile, and Schneider, and with the assistance of Axiom, Ascendant Strategies, and a network of independent brokerage firms (the Broker Defendants herein) offered to Plaintiffs, and the Class of similarly-situated investors, limited partnership units in the Funds, which are "securities" under Section 581-4(A) of the Texas Securities Act and under federal law. Each GPB investor became a limited partner in one or more Funds, while GPB Capital (a registered investment advisor) acted as the

Funds' general partner. GPB Capital then purported to use the funds raised from investors to invest in various operating businesses, and to pay itself, Axiom and Ascendant and the Broker Defendants huge fees.

40.     As the "lead" underwriter for GPB's Offerings, Ascendant Capital (which acted as a branch of Axiom until the formation of Ascendant Strategies) sold, or arranged for the sale of, the limited partnership interests in the GPB Funds. Schneider, Gentile and Martino all had a controlling interest in Ascendant Strategies by virtue of their direct ownership of DJ Partners (Gentile and Schneider) and MR Ranger (Martino).

41.     Schneider exercised control over Ascendant Capital (as well as over GPB) and directed the sale of the Securities. He also materially participated in the drafting of the Offering Materials and marketing materials for the Securities in and from Texas and employed, from Texas, a sales (or capital markets) team to promote the Funds to investors and to the Broker Defendants and registered investment advisors ("RIAs").  Schneider engaged, as directed through Ascendant Capital, a large network of these independent brokers (the Broker Defendants and RIAs) located throughout the United States to actually sell the Securities to unsuspecting investors. These Broker Defendants had no relationship with GPB other than transacting with Ascendant as selling brokers. Schneider and his affiliates, including Ascendant, also entered into a selling or underwriting agreement with the Broker Defendants and RIAs, and regularly communicated with them.  The Broker Defendants were provided with access to the DD reports described herein.

42.     Schneider and his affiliates, including Ascendant Capital, also advised the Broker Defendants on underwriting, and held sales and due diligence meetings primarily in Austin, Texas with these brokers, who knew of or should have known of Schneider's tainted regulatory history. Schneider and his affiliates, including Ascendant Capital, also conducted webinars for Broker

Defendants and RIAs, primarily from Austin, Texas. In all, Schneider and Ascendant Capital conducted dozens of meetings and webinars for Broker Defendants in Texas. Broker Defendants attended such meetings and Ascendant Capital often paid for their travel and accommodations. At these meetings, Schneider and his affiliates emphasized the out-sized, extraordinary commissions being paid for the sale of the Securities and acknowledged that these commissions were much higher than industry norms.

43.     Schneider himself drafted a large portion of the PPMs, which do not identify any counsel's participation in their drafting. Schneider and Ascendant Capital also prepared marketing materials and due diligence materials, including Due Diligence Questionnaires ("DDQs") in Texas for use by the Broker Defendants and RIAs. Schneider and Ascendant Capital also arranged for five separate firms to prepare purportedly independent "Due Diligence" reports (the DD Reports) on GPB and the Offerings, each of which was made available to, and provided to, the Broker Defendants and RIAs.

44.     The DD Reports provided to the Broker Defendants were prepared by: (a) FactRight; (b) Snyder Kearney; (c) Buttonwood Investment Services; (d) Mick & Associates; and (e) Mercer.

45.     Each of the DD Reports was prepared at the direction of and with the assistance of Schneider and Ascendant Capital in and from Austin, Texas, and contained a detailed description of the risks and business prospects of the GPB Funds and GPB itself. The common theme of these four lengthy reports was that GPB was a start-up with a limited and weak track record and that it was riddled with significant conflicts due to the common ownership of Ascendant and GPB. The DD Reports detailed the many material misrepresentations and omissions described herein, and were provided or made available to the Broker Defendants. Indeed, the DD Reports were prepared

at Schneider's direction, expressly because Ascendant Capital was conflicted and not an independent broker under the FINRA rules and, in fact, could not provide independent advice as to the Offerings.  Thus, Ascendant Capital and the Broker Defendants knew of Schneider's conflict and that Ascendant was materially conflicted. From Texas, Schneider and Ascendant Capital provided the information to third parties used in preparing the DD Reports and the authors of the reports travelled to Texas in connection with the preparation of such reports.

46.     Plaintiffs and the Class are asserting claims against the Broker Defendants for their key role in enabling this misconduct to proceed by knowingly distributing misleading Offering Materials, selling unregistered public securities, and funneling investors' money to the Funds and GPB Capital while each of the Broker Defendants had *actual knowledge* from the DD Reports and otherwise about the Material Misrepresentations and Omissions, including: (1) omissions and misrepresentations in the PPMs; (2) the outrageous commission structure of the subject transactions, and that the GPB Funds could never achieve the stated financial goals, and (3) that the Offerings were required to be registered under the 1933 Act and that the Securities were required to be registered under the 1934 Act. **Each Plaintiff and member of the Class is <u>not</u> asserting claims against the specific Broker Defendant who directly sold the subject Securities to such Plaintiff or that particular Class Member; they are suing only the remaining Broker Defendants for their substantial participation and assistance and/or aiding and abetting in the scheme, and in these illegally unregistered public offerings.**

47.     In connection with the sale of the Securities, the GPB Defendants, Gentile and Schneider, with the other Defendants' substantial assistance and participation, allowed the Funds to make the Material Misrepresentations and Omissions regarding the Securities. This enabled

GPB to raise over $1.8 billion from Plaintiffs and the other Class members who invested in the Funds. GPB thereafter misused, converted and/or failed to safeguard the investors' money.

48.     In particular, the GPB Defendants, Gentile, Schneider, and Martino made Material Misrepresentations and Omissions, including the, *inter alia*: (a) failure to disclose that the business model for the Funds was a sham and destined to fail; (b) misrepresentation as to the ability of the partnerships to generate 8% current returns on the investment *after* payment of fees and expenses of up to 20%; (c) failure to clearly disclose that Class members' own capital, rather than income generated from the Funds' operating companies, was being used to pay limited partner distributions; (d) failure to disclose that Gentile and Schneider had irremediable conflicts because they secretly agreed to split the profits of GPB and Ascendant, and that Schneider, along with his company Ascendant Capital, controlled GPB; (e) failure to disclose that Gentile, a principal of GPB, had majority ownership interest in Ascendant, the lead underwriter and placement agent for the Offerings; (f) failure to disclose numerous material conflicts of interests in connection with the purchase of assets owned by Gentile by GPB; (g) failure to disclose commingling of assets between the various GPB Funds; (h) failure to disclose the full compensation paid to Brokers to sell the GPB interests; (i)  failure to disclose up front that Gentile had had an ownership interest in Gentile Pismeny & Brengel, LLP, the same accounting firm that GPB hired for advisory work, and that Gentile was also receiving payouts from that firm; (j) failure to disclose in connection with the Offerings that Ascendant's principal, Schneider, had been suspended by FINRA and by the State of Illinois; (k) failure to disclose that Martino (Axiom's CEO and later Ascendant Strategies' CEO and a majority owner in Ascendant Strategies) also had been suspended by FINRA; (l) failure to register the securities, which they were obliged to register under the Securities Act, because they failed in numerous material ways to comply with Regulation D; (m) engagement in serious

financial misconduct and misrepresented the financial state of the Funds; and (n) failure to register the Securities as required under section 12(g) of the Securities Exchange Act and the Texas Securities Act.

49.     These misrepresentations, omissions, and misconduct were material to Plaintiffs' and the Class members' decisions to invest in the Funds and remain invested in the Funds and proximately caused their investment losses.

50.     In its communications with investors, GPB's motto was "Vision, Value, Trust." GPB failed miserably to live up to that standard. GPB, Gentile, and Schneider caused the Funds to continue to misrepresent and/or fail to disclose the material misconduct and irregularities regarding the Funds' financial condition and operations. This conduct constituted a breach of GPB's fiduciary duties owed to Plaintiffs and other Class members, given GPB's role as a general partner of the Funds and a Registered Investment Advisor under the Investment Advisers Act of 1940.

51.     For their part, the Broker Defendants eagerly disseminated the misleading Offering Materials, and subsequent false communications about the investors' accounts, to Class members, funneling hundreds of millions of dollars to GPB Capital, which kept the scheme afloat for years. This money lined the pockets of the GPB Defendants, Gentile, Schneider and Martino, but also provided the lifeblood for the scheme – capital which GPB used to pay exorbitant brokerage fees and 8% distributions to investors (with investors' own capital), rather than investing in successful operating/portfolio companies.  These Broker Defendants knew that the returns of 8% or more being promised to investors were unattainable and unsustainable, especially since up to 20% of the invested capital was being used to fund exorbitant commissions, fees and expenses.  As shown herein, the Broker Defendants also knew of the material misrepresentations and omissions and fraud outlined herein from the DD Reports and otherwise.

52.     The scheme was perpetrated with the substantial assistance and participation of Auditor Defendants RSM, Crowe, CohnReznick, Margolin, Withum and EisnerAmper, who were responsible for auditing the financials of certain of the GPB Funds.  These Auditor Defendants recklessly prepared false and/or misleading audits, which overstated the value of the Fund by at least 750,000,000, while lending their name to the GPB Defendants for use in marketing the offerings to unsuspecting investors, Plaintiffs and the Class members herein.  GPB Capital has revealed that the audits of GPB Holdings, LP and GPB Automotive Portfolio, LP by auditor Crowe for fiscal 2016, and of GPB Holdings II, LP by auditor RSM for fiscal 2015 and 2016, were materially inaccurate and can no longer be relied upon.  The Auditor Defendants also knew of the Material Misrepresentations and Omissions outlined herein from the DD Reports, their review of the GPB Funds' books, and otherwise, as they reviewed the payments to Broker Defendants and Ascendant, and thus knew of the undisclosed co-ownership relationship between Ascendant and GPB and the undisclosed payments to Ascendant.

53.     The Valuation Defendants also provided substantial assistance to the scheme and had knowledge of the fraudulent nature of the GPB scheme and of their role therein.  The Valuation agents had access to the GPB financials and thus knew that: (1) GPB was not generating 8% current returns sufficient to pay the proposed 8% current dividend; (2) as described herein, GPB was engaged in large undocumented intercompany loans and undocumented co-investments, whereby one fund paid obligations of other funds, but did not document these financial transactions in their respective books; (3) Ascendant and Schneider were receiving compensation not disclosed in the PPMs or otherwise in connection with GPB transactions and were in effect acting as managers of GPB, not just brokers; (4) GPB was routinely abusing its non-public positions; (5) as described in paragraphs 153 through 155, GPB was intentionally overpaying for assets with the expectation

that some of that overpayment would be kicked back to GPB or its principals, or held in "reserve" for payment of that 8% dividend; and (6) as described in paragraph 175, GPB was buying assets from Gentile in a conflict ridden fashion without expressed approval, carrying into question the legitimacy of its entire asset buying program.

54.    At least as early as 2016, GPB Automotive Portfolio, LP and GPB Holding II, LP failed to file required audited financial statements with the Securities and Exchange Commission pursuant to Section 12(g) of the Exchange Act. GPB also failed to provide audited financial statements to their investors for fiscal years 2017, 2018, or 2019.

55.    In addition, the Fund Administrator, Phoenix, knew that the "Current Distribution Statements" it was providing to class members did not actually portray the current or net value of Class members' interests in the GPB Funds, because they failed to account for the large commissions and upfront payments from the capital invested.   Specifically, Phoenix falsely informed investors of the amount of their "Total Capital Invested."   Phoenix routinely overstated this amount by not deducting from it the exorbitant upfront commissions and expenses paid upfront, which reduced the amount of the investor's capital invested.   Thus, Phoenix, as part of the fraud, deliberately overstated the actual amount of capital each partner had invested in their capital account.   This had the effect of hiding the exorbitant expenses and commissions charged and their effect on the performance of the investment.   Attached hereto as Exhibit A are sample Account Statements issued by Phoenix and GPB to investors for the various GPB Funds (These Account Statements have been redacted to omit personal or banking information.).

56.    The failures described herein, in turn, directly and proximately caused the values of the Plaintiffs and the Class members' limited partnership units to decline and caused Plaintiffs and the Class members to suffer losses, and to overpay.

57.     From March 2018 through June 2019, a series of third-party disclosures began to reveal significant malfeasances relating to the Funds.  Specifically, as described more fully below, in March 2018, Patrick Dibre, a former dealer in GPB's network of automobile dealerships asserted serious allegations of financial misconduct against GPB Capital and other Defendants.

58.     In August 2018, GPB Capital and Gentile admitted that their accounting systems were not working, disclosing "material weaknesses in [the] internal controls" of Holdings II.

59.     GPB Capital explained that "[t]hese areas include controls over related party transactions and disclosures, the consolidation processes and audit oversight enhancements."

60.     In August 2018, GPB Capital further disclosed that its financial statements and independent accountants' reports for 2015 and 2016 "should no longer be relied upon" by investors.  According to InvestmentNews, Gentile announced:

> We currently expect that the restatements will include adjustments to the 2015 and 2016 financial statements for items including reclassification of certain transactions and/or corrections in the timing and amounts of income recognition, and enhanced disclosure of certain related party transactions. In light of the above, we have concluded that certain material weaknesses in internal controls exist, and as a result these internal controls over the financial reporting processes will need to be revised and enhanced."[2]

61.     In August 2018, GPB Capital further announced that it was suspending Automotive and Holdings II's investor redemptions. It also announced that the audits for Holdings, LP (for fiscal 2016) and for Automotive Portfolio, LP (for fiscal 2015 and 2016) would have to be restated and could no longer be relied upon

62.     In September 2018, the Massachusetts Secretary of State announced that it was investigating broker-dealers who offered investments sponsored by GPB Capital.

---

[2] https://www.investmentnews.com/article/20180824/FREE/180829944/top-private-placement-manager-gpb-to-restate-financial-statements-of.

63.     On November 9, 2018, GPB Capital announced that Crowe, the auditor for certain of the portfolio operating companies of one or more of the Funds and for at least one of the Funds, GPB Automotive Portfolio, LP (as well as for and GPB Holdings, LP), had resigned due to "perceived risks that Crowe determined fell outside of their internal risk tolerance parameters." GPB Capital attributed the delay in completing the 2017 audit of Automotive Portfolio to this development.

64.     In a startling disclosure, GPB Capital admitted in a November 14, 2018 filing with the SEC that it had engaged in Ponzi-like conduct to generate distributions and give a false appearance of successful operations.  This disclosure made clear that "amounts that the [GPB] Companies distribute to Investors *have in the past* accordingly included, and may in the future accordingly include, invested capital and have not been, and may not in the future be, entirely comprised of income generated by the Portfolio Companies."  (Emphasis added.)  This disclosure to the SEC made clear for the first time that GPB was in fact using new investor money or the investors' own capital to pay distributions to old investors, because its business holdings were not earning profits.

65.     In December 2018, media reports indicated that the Securities and Exchange Commission had commenced an investigation into GPB Capital, following the initiation of a similar investigation by the Massachusetts state securities regulators.

66.     Similarly, in February 2018 the media reported that the FBI and officials from the New York City Business Integrity Commission had raided GPB's New York office, as well as the office of Five Star Carting, a major private trash hauler that GPB owned.

67.     On April 4, 2019, GPB Capital advised investors in Automotive and Holdings II that audits for the 2017 and 2018 fiscal years had not yet been completed, attributing the delay to

"several factors both internal and external."  GPB Capital further advised that it had "set the goal of issuing the 2017 audits for Holdings II, Auto[motive] Portfolio and GPB Holdings by June 30, 2019, with the 2018 audits for these Partnerships being issued thereafter, with a target date of completion of no later than September 30, 2019."  These audits have not yet been completed.

68.     In or about June 2019, GPB Capital, through the Broker Defendants, for the first time communicated to investors that the value of their investment in GPB Funds had declined between **25-70%** in value, depending on the Fund, or at least $750,000,000 in total.  In so doing, GPB Capital was effectively admitting it had prepared and distributed false and misleading financial information in its monthly asset value statements and financial statements, that the Valuation Defendants had possibly miscalculated and misstated the values of the GPB assets, and that such gross miscalculations were incorporated into the financial information provided by GPB to the investors with the knowledge of the Valuation Defendants and the Auditor Defendants.

69.     Additional information about GPB's misconduct, confirming that GPB made material misrepresentations and omissions in the Offering Documents, has recently been revealed. On July 19, 2019, David Rosenberg and related trusts, who were former business partners of GPB's various Funds relating to automobile dealerships, sued GPB Capital and its affiliates.  As described herein, Rosenberg has asserted further serious detailed financial misconduct by GPB Capital.

70.     On October 29, 2019, GPB Capital sent a letter to investors in Automotive, Holdings, Holdings II, NYC Development, and Waste Management disclosing that its Chief Compliance Officer Michael Cohn had been indicted, based on allegations that while employed at the SEC, he had accessed and disclosed confidential information about the SEC's investigation of GPB Capital in connection with interviewing for a position at GPB Capital. This indictment caused GPB to hire a third-party law firm to investigate the circumstances surrounding Cohn's hiring.

71.     On November 22, 2019, GPB Capital sent a letter to investors in Automotive, Holdings, Holdings II, and Waste Management regarding an audit update and the indictment of GPB Capital's former Chief Compliance Officer Michael Cohn. Attributing the news to Cohn's indictment and "other matters," the letter explained "the Partnership's auditor has decided to suspend work on outstanding financial statement audits. In addition, the Audit Committee has elected to resign effective upon the earlier date of the completion of the Rosenberg investigation or by November 27, 2019. Pending the results of the Cohn and Rosenberg investigations, as well as the reconstitution of the Audit Committee, the Partnership's auditor will provide further guidance."

72.     On May 27, 2020, the Commonwealth of Massachusetts commenced an adjudicatory proceeding against GPB Capital for violations of Massachusetts law asserting that GPB Capital, in connection with the offer or sale of securities, directly or indirectly to Massachusetts investors, (a) made untrue statements of material fact or omitted to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they are made, not misleading, and (b) engaged in an act, practice, or course of business which operated or would operate as a fraud or deceit upon such investors. Massachusetts' complaint alleges that "[i]n order to keep up with distributions, GPB Capital began dipping into other sources of income, contrary to statements made in its private placement memoranda and marketing materials." Massachusetts also alleges that GPB "turned to investor contributions to meet the demands of the 8% monthly distributions, and the fund financials tell as much." GPB never disclosed to investors that Funds' distributions exceeded their net incomes.

73.     As of this filing, GPB has still not issued long overdue audited financial statements for prior fiscal years for its GPB Funds.

## JURISDICTION AND VENUE

74.    This Court has subject matter jurisdiction under 28 U.S.C. § 1332(d)(2)(A) because the number of proposed class members exceeds 100, the amount in controversy exceeds the sum or value of $5,000,000, exclusive of interest and costs, and Plaintiffs and other Class members are citizens of a different state than at least one of the Defendants.

75.    Venue is proper in this judicial district pursuant to 28 U.S.C. § 1391 because Ascendant Capital, DJ Partners, LLC, and Lion Street Financial, LLC each maintain their principal places of business in this District, Schneider resides in this District, many class members reside in this District, and a substantial part of the events or omissions giving rise to the claims occurred in this District.  The Offerings at issue were conducted from Texas and hundreds, if not thousands, of Texas residents bought limited partnership interests in the GPB Funds.   Schneider and Ascendant Capital's involvement in the Offerings was so pervasive that effectively all offerings and sales of GPB limited partnership interest ran through Ascendant Capital offices in Austin, Texas.

76.    This Court has personal jurisdiction over each Defendant because each Defendant, directly or through its directors, officers, employees, representatives, and/or agents sold (or aided in the sale of) the subject investments throughout the United States, including in this judicial district, and has sufficient contacts with this state, individually and as an agent of GPB and Ascendant.  Personal jurisdiction in class actions is viewed from the point of the named Plaintiffs only, and it is beyond dispute that there is personal jurisdiction in Texas over Defendants named in Plaintiffs' claims.

**I.      Additional Jurisdiction and Venue Allegations**

**A.      The Broker Defendants, Axiom and Ascendant Strategies**

77.      Venue and Jurisdiction in this District are appropriate with respect to each and every one of the Broker Defendants, because each such Broker Defendant, as well as Axiom and Asscent Capital, has consented in writing to both personal jurisdiction and venue in the State of Texas.  Specifically, each Broker Defendant,[3] as well as Axiom and Ascendant Strategies, has executed a Form BD-1 (Form BD") in connection with its registration as a Broker Dealer under the Securities and Exchange Act of 1934.  In such Forms BD, they each consented to Jurisdiction and Venue here.  The operative language of this consent is as follows:

> For the purposes of complying with the laws of the State(s) designated in Item 2 relating to either the offer or sale of securities or commodities, the undersigned and applicant hereby certify that the applicant is in compliance with applicable state surety bonding requirements and irrevocably appoint the administrator of each of those State(s) or such other person designated by law, and the successors in such office, attorney for the applicant in said State(s), upon whom may be served any notice, process, or pleading **in any action or proceeding against the applicant arising out of or in connection with the offer or sale of securities or commodities, or out of the violation or alleged violation of the laws of those State(s), and the applicant hereby consents that any such action or proceeding against the applicant may be commenced in any court of competent jurisdiction and proper venue within said State(s) by service of process upon said appointee with the same effect as if applicant were a resident in said State(s) and had lawfully been served with process in said State(s).**

A true and correct copy of the Form BD, Uniform Application For Broker-Dealer Registration is attached hereto as Exhibit B, at p. 1 (emphasis added).

78.      Accordingly, the Broker Defendants, as well as Axiom and Ascendant Strategies, have voluntarily consented in writing to both Jurisdiction and Venue in this District, as the claims asserted "aris[e] out of or in connection with the offer or sale of securities or commodities, or out

---

[3] Bradley Wealth, an RIA, did not execute a Form BD, but did file a Form ADV with the SEC stating that it is registered to transact business in Texas.

of the violation or alleged violation of the laws of those State(s) [designated in Item 2 of Form BD, including the State of Texas]." *Id.*

79.     As noted, all of the Broker Defendants, Axiom and Ascendant Strategies are registered as broker dealers in Texas. In addition, certain of the Broker Defendants have also subjected themselves to specific Jurisdiction and Venue in this District because they are operating brokerage businesses on a full-scale basis in this Jurisdiction, and the claims asserted arise from such brokerage business.  They have subjected themselves to specific Jurisdiction as the claims asserted herein arise in connection with the unregistered Offering through Ascendant Capital in Texas, arising from Defendants' purposeful acts in the State of Texas in connection with such Offerings.  See description of each Broker Defendant below at ¶117a-nnn.

80.     Further, a total of twenty-two (22) Broker Defendants employ brokers or have brokerage offices in Texas through which they offered, sold or participated in the offering and/or sale of the GPB limited partnership interests in Texas.  In addition, as virtually all Broker Defendants (except as noted above) were registered to sell securities in Texas, many of these Broker Defendants also offered, sold or participated in the offering and/or sale of the GPB limited partnership interests in Texas.

**B.     The Fund Administrator, Auditor Defendants and Valuation Defendants**

81.     This Court has specific jurisdiction over Phoenix and venue is proper here, because Fund Administrator Phoenix engaged in purposeful activities directly with hundreds of Texas residents, including two of the named Plaintiffs and numerous class members, in the State of Texas on a regular basis throughout the GPB Offerings.  This purposeful activity constituted a violation of the TSA, as well as a tort or multiple torts in the State of Texas.

82.     The specific contacts of Phoenix in the State of Texas consisted of its role in transacting the actual investment in the GPB Funds for, and its undertaking an administrator/client

relationship with (on information and belief), hundreds of Texas residents who were investors in the GPB Limited Partnerships.  In connection with such administration, Phoenix developed a privity-like relationship with each such Texas investor in GPB before such Texas investor was even admitted to the partnership, including named Plaintiffs Wade, Crooks and Bell.  Phoenix was given personal financial information with respect to such investor, including information concerning the amount of their investment in GPB limited partnership interests and other financial information with respect to their assets and financial background.  Phoenix was contractually bound to provide such investors with accurate information concerning their investments in GPB and the value of such investments on a regular monthly basis.  Indeed, GPB and Phoenix, on a regular and continuous basis, sent to hundreds of investors in the State of Texas at least 12 times a year a statement of their account which contained gross misrepresentations and falsities, which substantially contributed to the Texas Securities Act violations alleged herein with respect to GPB. The form of such NAV statements sent to investors in the State of Texas is annexed hereto as Exhibit A.

83.    Phoenix also regularly interacted with Austin, Texas-based Ascendant Capital to determine who had invested in the GPB Funds, to obtain the substance of the Class members' financial information and to complete these investments in the GPB Funds, and Phoenix also regularly provided Ascendant Capital in Texas with information regarding subscriptions, and interacted with Ascendant in Texas regularly and continuously concerning investments in the Fund.  As noted, Phoenix also prepared personalized information related to the investment activity and the value of the GPB limited Partnership interests owned by hundreds of Texas residents.  By sending such statements to hundreds of Texas investors on a regular and continuous basis for numerous years, and by falsely representing the value of such limited partners' interests in GPB,

Phoenix purposefully acted in the State of Texas, whereby it committed a tort in the State of Texas, rendering it liable and subject to personal jurisdiction. Phoenix also made continuous and regular payments to Brokers, including Ascendant in the State of Texas, over a multiyear period. Phoenix acted as paymaster for Ascendant and GPB and thus regularly paid Ascendant in Texas its secret share of GPB compensation from Fund activities. As such, it maintained the scheme in Texas directly by paying undisclosed excessive fees to Ascendant in Texas. Phoenix also regularly paid Brokers in Texas excessive compensation, at Ascendant's direction and as its agent, in connection with the Offerings made to such Brokers. In sum, Phoenix directly, and as Ascendant's Agent, regularly did business in Texas with Brokers effecting the GPB Offering and with owners of GPB securities in Texas.

84.     Phoenix's regular, continuous and purposeful activities in the State of Texas involving a direct privity relationship with hundreds of investors, pursuant to which it provided such investors with false and misleading financial information, and which aided, abetted and materially assisted in the Ponzi scheme described herein constitutes minimum contact sufficient under Texas law and federal law to subject them to specific jurisdiction with respect to such activity.

85.     This Court also has jurisdiction and venue with respect to the Auditor Defendants, RSM, Crowe, EisnerAmper and CohnReznick, because they each engaged, through one or more offices in the State of Texas, in regular and continuous business operations related to accounting, consulting and related services provided to Ascendant and GPB in Texas, and other related entities in and through the State of Texas. Similarly, Margolin and Withum also engaged in regular and continuous business operations related to accounting, consulting, valuation and related services to Ascendant and GPB, and other related entities in and through the State of Texas. GPB has a

permanent presence in the State of Texas, including in Austin, Texas, at offices it shares with Ascendant Capital.   On information and belief, these Auditor Defendants' offices in Texas conducted all or part of the work related to the claims, which are being addressed in connection with this litigation.

86.     Similarly, the Court has jurisdiction and venue with respect to the Valuation Defendants, Deloitte Transactions and Business Analytics LLP ("Deloitte") and Morrison, Brown, Argiz & Ferra, LLC, because they each have offices in the State of Texas and/or engaged in regular and continuous business operations related to accounting, advisory, consulting and related services to Ascendant, GPB and the GPB Funds, and other related entities in and through the State of Texas. On information and belief, these Valuation Defendants conducted all or part of the work related to claims, which are being addressed in connection with this litigation, in Texas and in this district. In particular, Deloitte has significant Texas offices in Austin and Dallas.

## THE PARTIES

### Plaintiffs

87.     On or about September 16, 2015, Plaintiff Kinnie Ma Individual Retirement Account ("Kinnie Ma IRA"), by and through Kinnie Ma, a resident of California, purchased a $64,207 limited partnership interest in GPB Holdings II, LP from GPS Capital Management, LLC. Plaintiff Kinnie Ma IRA has been damaged by the wrongful conduct alleged herein.

88.     In or about January 2016, Plaintiff Dean Crooks ("Crooks"), a resident of Texas, purchased a $100,000 limited partnership interest in GPB Holdings II, LP from IMS Securities Inc.  In or about June 2016, Plaintiff Crooks purchased a $50,000 limited partnership interest in GPB Automotive Portfolio, LP from IMS Securities Inc. Plaintiff Crooks has been damaged by the wrongful conduct alleged herein.

89.     On or about November 1, 2017, Plaintiff Jeffery S. Gramm Individual Retirement Account ("Gramm IRA"), by and through Jeffrey S. Gramm, a resident of Tennessee, purchased a $100,000 limited partnership interest in GPB Automotive Portfolio, LP and a $100,000 limited partnership interest in GPB Waste Management, LP, from Center Street Securities Inc. Plaintiff Gramm IRA has been damaged by the wrongful conduct alleged herein.

90.     On or about October 28, 2015, Plaintiff Stacy Greasor Individual Retirement Account ("Greasor IRA"), by and through Stacy Greasor, a resident of Colorado, purchased a $50,000 limited partnership interest in GPB Holdings II, LP from Geneos Wealth Management, Inc.  Plaintiff Greasor IRA has been damaged by the wrongful conduct alleged herein.

91.     On or about February 3, 2017, Plaintiff Corri Rene Eden ("Rene Eden"), a resident of Georgia, purchased a $50,000 limited partnership interest in GPB NYC Development, LP from Arkadios Capital Partners LLC.  Plaintiff Rene Eden has been damaged by the wrongful conduct alleged herein.

92.     On or about December 1, 2015, Plaintiff Catherine Kominos ("Kominos"), a resident of Virginia, purchased a $50,000 limited partnership interest in GPB Automotive Portfolio, LP from Hightower Advisors, LLC and HighTower Securities, LLC (Kominos was not admitted to GPB Automotive until April 8, 2016). Plaintiff Kominos has been damaged by the wrongful conduct alleged herein.

93.     In or about November 2017, Plaintiff Karen Loch ("Loch"), a resident of Georgia, purchased a $75,000 limited partnership interest in GPB Automotive Portfolio, LP from Royal Alliance Associates Inc. Plaintiff Loch has been damaged by the wrongful conduct alleged herein.

94.     On or about April 3, 2017, Plaintiff Victor Wade Individual Retirement Account ("Wade IRA"), through Victor Wade, a resident of Texas, purchased a $50,000 limited partnership

interest in GPB Holdings II, LP from SagePoint Financial.  Plaintiff Wade IRA has been damaged by the wrongful conduct alleged herein.

95.     On or about March 4, 2015, Plaintiff Robert A. Stone Living Trust, dated January 9, 1992, as amended May 24, 2005 ("Robert Stone Trust"), by and through Robert Stone, a resident of Colorado, purchased an $80,000 limited partnership interest in GPB Holdings, LP from International Assets Advisory, LLC.  Plaintiff Robert Stone Trust has been damaged by the wrongful conduct alleged herein.

96.     In or about April 2015, Plaintiff Shirley Stone Living Trust, dated January 9, 1992, as amended May 24, 2005 ("Shirley Stone Trust"), by and through Shirley Stone, a resident of Colorado, purchased a $100,000 limited partnership interest in GPB Holdings, LP. In addition, in or about October 2016, the Shirley Stone Trust, by and through Shirley Stone, purchased a $50,000 limited partnership interest in GPB Waste Management, LP, from International Assets Advisory, LLC. Plaintiff Shirley Stone Trust has been damaged by the wrongful conduct alleged herein.

97.     In or about August, 2016, Plaintiff Kazue M. Bell ("Bell"), a resident of Texas, purchased a $100,000 limited partnership interest in GPB Automotive Portfolio, LP from IMS Securities Inc. Plaintiff Bell has been damaged by the wrongful conduct alleged herein.

98.     Each of the Plaintiffs' purchases, described above, was not consummated until each Plaintiff was admitted to the limited partnership (the GPB Fund in which they purchased an interest), which occurred approximately 30 days or more after the above payments were made.

**The GPB Related Defendants**

99.     Defendant Ascendant Capital, LLC ("Ascendant Capital") was organized in Texas and has a principal place of business in this district in Austin, Texas at 3811 Bee Cave Road, Suite 210, Austin, Texas 78746.  Ascendant Capital is a "boutique alternative investment firm" that was

the lead distribution partner for GPB and through which Gentile, Schneider and Martino structured, distributed, and offered, or arranged for the Broker Defendants to offer, the limited partnership interests in the GPB Funds.  Ascendant Capital was founded in 2012 by Jeffry Schneider and, beginning in 2013, offered the GPB Funds' securities (the limited partnership units) as the Austin, Texas branch office of Axiom Capital Management, Inc., a broker-dealer.  In or about 2016, Ascendant Capital and Schneider, along with Gentile and Martino, created Ascendant Alternative Strategies, LLC, a broker-dealer, through which (beginning in 2017) they offered, or arranged for the Broker Defendants to offer, the limited partnership interests in the GPB Funds.

100.    Ascendant Capital, Schneider, and Axiom (prior to 2016), in and through their Texas offices, were responsible for the preparation, distribution, review and acceptance of the PPMs and subscription documents used to effect transactions in the GPB interests.  Texas was the "base of operations" for the Offerings.

101.    According to its own marketing materials, Ascendant Capital was in Texas involved in all aspects of the Offering process, namely:

a.    Product Development, including structuring, research, product management of product launch (including the PPMs, Offering Materials, "Sub Docs" (i.e., the subscription documents), and the Limited Partnership Agreement;

b.    Due Diligence, including third party reports (i.e., the DD Reports from Mick & Associates, FactRight, Mercer, Buttonwood and Snyder Kearney), Due Diligence Questionnaires, upfront and ongoing due diligence, and ongoing oversight;

c.    Compliance, providing an "additional layer of oversight" including "four Series 24 held[,] advertising oversight[,] and marketing materials oversight";

d.   Marketing, including preparing communications, messaging, copy, website, search engine optimization (SEO), Due Diligence/Marketing Events, public relations, and positioning and fulfillment;

e.   Sales, including distributions, education, and national accounts;

f.   Client Relations, including support, updates, platforms and custodians.

102.   On information and belief, Schneider in large part drafted the PPMs in Texas.   The FactRight and Snyder Kearney DD Reports specifically stated that Ascendant Capital reviewed, drafted and prepared the marketing materials in Texas.   Texas was the headquarters and base of operations for the distribution of the Securities, i.e., GPB limited Partnership interests, where:  (1) Ascendant Capital held numerous due diligence and sales meetings on a regular monthly or quarterly basis in Austin, Texas with out-of-state Brokers, i.e., the Broker Defendants, who were marketing the GPB limited Partnership interests; (2) Ascendant Capital and its employees presented numerous marketing and due diligence webinars from Austin, Texas to brokers throughout the United States; (3) at least 35 Texas-based Ascendant Capital personnel, comprising its marketing, sales and capital markets teams, were  involved solely in the distribution from Austin, were physically located or managed from there, and conducted sales efforts for Ascendant Capital from there; (4) Ascendant Capital received subscription documents that had been completed by investors which were faxed there for review and acceptance or rejection and according to an internal Ascendant Capital DDQ, was responsible for "processing of subscription documents and transfer requests"; (5) Ascendant Capital's Sales representatives or "Capital Markets Team" drafted and sent thousands of emails, as well as marketing and due diligence materials, from Ascendant Capital in Austin, Texas to brokerage firms, customers and potential customers in connection with facilitating the Offering.  In addition, Ascendant Capital employees

made hundreds of conference calls with brokers and customers from Texas.  Ascendant Alternative Strategies was not organized to sell the Securities in the subject Offerings.  Instead, it merely functioned as the "back office" for the Texas offices effecting the distribution.  In addition to having offices in and operating in Austin, Texas, Ascendant Capital and GPB located numerous companies for investment in Texas, and many of the portfolio companies in which the GPB Funds ultimately did invest were located in Texas.

103.    Defendant Ascendant Alternative Strategies, LLC ("Ascendant Strategies") was organized in Delaware in 2016, and has offices at 3811 Bee Cave Road, Suite 210, Austin, Texas 78746. Ascendant Strategies is affiliated with both Ascendant Capital and GPB.  Ascendant Strategies was founded by Gentile, Schneider and Martino, its CEO.  Schneider, Martino and Gentile are majority owners of Ascendant Strategies through DJ Partners (Gentile and Schneider) and MR Ranger (Martino).  Ascendant Strategies executed a Form BD indicating that it was registered to sell Securities in Texas and had consented to jurisdiction and venue in the courts in Texas.  Its affiliate, Ascendant Capital in Texas became the headquarters for the GPB Offerings as described in the preceding paragraph.  As noted, Ascendant Strategies provided the "back office" services and held brokerage licenses for Ascendant Capital in Austin, Texas which was affecting the distribution.

104.    Defendants Ascendant Capital and Ascendant Strategies are commonly controlled and are collectively referred to herein as "Ascendant."

105.    Defendant GPB Capital Holdings, LLC ("GPB") is a Delaware limited liability company with a principal place of business in New York City and with principal offices in Austin, Texas, where it shared office space with Ascendant.  GPB is the general partner of the GPB Funds and was at all relevant times the control person and manager of the GPB Funds.  GPB, therefore,

effected the GPB Funds' securities offerings. GPB is an investment advisor registered under the Investment Advisers Act of 1940 ("IAA") and, as such, is a fiduciary to Plaintiffs and the Class members. Pursuant to the IAA, GPB may not waive nor seek the waiver of its fiduciary duties, and any such waiver would be unenforceable.

106.    Defendant Axiom Capital Management, Inc. ("Axiom") was incorporated in Delaware, has a principal place of business in New York, New York, and also has offices in Austin, Texas. Axiom is a licensed securities broker-dealer firm that has been affiliated with Schneider and Ascendant Capital. Axiom executed a Form BD indicating that it was registered to sell Securities in Texas and had consented to jurisdiction and venue in the courts in Texas.  Axiom's Austin, Texas branch, Ascendant Capital, acted as the primary distribution partner of GPB from 2013 through at least 2016, as described herein.  During that time period, Axiom, through Ascendant Capital, materially participated in the preparation and dissemination of the Offering Materials and subsequent communications distributed to Plaintiffs and other Class members.

107.    Defendant DJ Partners, LLC ("DJ Partners") is a Delaware limited liability company with a principal place of business at 3811 Bee Cave Road, Suite 210, Austin, Texas 78746. It owns a majority interest in Ascendant Strategies. Upon information and belief, Gentile and Schneider jointly own and control DJ Partners LLC. This ownership was not disclosed in the Offering Materials but was disclosed in the DD Reports made available to the Broker Defendants, Phoenix, and the Auditor Defendants (but not to Plaintiffs and other Class members).

108.    Defendant MR Ranger LLC ("MR Ranger") is a Delaware limited liability company with a principal place of business at 19 Colonial Road, White Plains, New York. It owns a majority interest in Ascendant Strategies. Upon information and belief, Mark D. Martino, the CEO of Ascendant Strategies, and former CEO at Axiom, owns and controls MR Ranger.

109.     Defendants GPB Holdings, LP, GPB Holdings II, LP, GPB Holdings III, LP, GPB Holdings Qualified, LP, GPB Automotive Portfolio, LP, GPB Cold Storage, LP, GPB NYC Development, LP, and GPB Waste Management, LP are limited partnerships that were organized under the laws of Delaware for the purpose of investing each of the Funds' cash assets into operating businesses in various industries. GPB is the general partner for each of the Funds.

110.     GPB Holdings, LP, GPB Holdings II, LP, GPB Holdings III, LP, GPB Holdings Qualified, LP, GPB Automotive Portfolio, LP, GPB Cold Storage, LP, GPB NYC Development, LP, GPB Waste Management, LP, and GPB Automotive Income Fund, Ltd., are collectively referred to herein as the "GPB Funds," the "Funds," or the "Fund Defendants."

111.     GPB, Ascendant Capital, and the Fund Defendants are collectively referred to herein as the "GPB Defendants."

112.     Ascendant Strategies, Axiom, DJ Partners and MR Ranger are collectively referred to herein as the "GPB Affiliated Defendants."

**The Individual Defendants**

113.     Defendant David Gentile ("Gentile") is a New York resident and is the founder, Chief Executive Officer, and managing member of GPB. Prior to founding GPB, Gentile worked at Gentile, Pismeny & Brengel, LLP, an accounting firm, where he provided financial and strategic advisory services. He is a majority owner of Ascendant Strategies through his interest in DJ Partners.

114.     Defendant Jeffry Schneider ("Schneider") is an Austin, Texas resident and is the founder and CEO of Ascendant Capital and co-founder of GPB. He prepared and distributed the Offering Materials to brokers and customers out of his Austin, Texas office, first as a Texas branch office of Axiom and later through Ascendant Capital. Schneider and Ascendant controlled and

managed all of the Offerings and, therefore, all eight Offerings were affected from Texas. At all relevant times Schneider was a control person of GPB. Schneider was also a majority owner of Ascendant Strategies through his interest in DJ Partners.

115.    Defendant Mark Martino ("Martino") is the CEO of Ascendant Strategies, and a majority owner (through MR Ranger LLC) of Ascendant Strategies. Martino co-founded Ascendant Strategies and has been "in control of it" since at least March 14, 2017. Prior to the creation of Ascendant, Martino worked for Axiom, where he served as CEO and President.

116.    Gentile, Schneider, and Martino are collectively referred to herein as the "Individual Defendants."

**The Fund Administrator**

117.    Defendant Phoenix ("Phoenix" or the "Fund Administrator") is a California corporation with its principal place of business in San Rafael, California. Phoenix provides registered transfer agent services, fund administration, fund accounting, corporate accounting and sales and marketing reporting services. At all times relevant hereto, Phoenix served as the fund administrator for private placement offerings of the Funds and reported to limited partners the NAV for the Funds, and the amount of capital invested by each such limited partner for each Fund at issue, including, but not limited to, Automotive, Holdings II, and GPB Holdings III, LP. Phoenix was also the paymaster for GPB and Ascendant.  As described herein, Phoenix regularly took purposeful action in Texas by sending false financial information to hundreds of Texas investors at their home address on a monthly basis, thereby causing injury in the State of Texas. This false financial information enabled GPB to continue its Ponzi scheme by hiding the actual declining value of the limited partners' capital accounts.

**The Auditor Defendants**

118.    RSM US LLP, formerly known as McGladrey LLP ("RSM"), is a limited liability partnership with its principal place of business in Chicago, Illinois, and with offices in in Austin, Texas, as well as in Dallas, Houston, and San Antonio, and has over 700 employees in Texas. It is registered to do business in Texas according to the Texas Secretary of State.  On information and belief, these Texas-based employees performed services in connection with the audits referenced herein, and other RSM employees travelled to Texas as part of their audit. RSM styles itself as a leading U.S. provider of audit, tax and consulting services focused on the middle market.  RSM served as the outside auditor for certain of the Funds, including Holdings II. It audited the financial statements of GPB Holdings II for fiscal years 2015 and 2016 but its opinion regarding those audits has since been withdrawn.

119.    Defendant Crowe, LLP ("Crowe") is a limited liability partnership with its principal place of business in Chicago, Illinois, and  with offices in Dallas and Houston, Texas and at least 65 employees in Texas. It is registered to do business in Texas according to the Texas Secretary of State. Upon information and belief, Crowe's Texas-based employees performed services in connection with the audits referenced herein, and other Crowe employees travelled to Texas as part of their audit. Crowe styles itself as a leading U.S. provider of audit, tax and consulting services focused on the middle market. Defendant Crowe LLP was the auditor of GPB Capital Holdings and as the outside auditor for certain of the Funds, including at least GPB Automotive Portfolio, LP, GPB Holdings, LP and GPB Holdings Qualified, LP. Crowe audited the financial statements of GPB Automotive for fiscal years 2015 and 2016, the financial statements of GPB Holdings, LP for fiscal year 2016, and the financial statements of GPB Holdings Qualified for fiscal years 2016 and 2017.  It issued audit opinions for GPB Automotive for fiscal year 2016, for

GPB Holdings for fiscal year 2016, and for GPB Holdings Qualified for fiscal year 2016, each of which has since been withdrawn.

120.    CohnReznick LLP ("CohnReznick") is a limited liability partnership with its principal place of business in New York, New York, and with offices in Austin and Houston, Texas and at least four general partners in Texas as of September 9, 2020. It is registered to do business in Texas according to the Texas Secretary of State. Upon information and belief, CohnReznick's Texas-based employees performed services in connection with the audits and accounting services referenced herein, and other Cohn Reznick employees travelled to Texas as part of their audit. CohnReznick styles itself as one of the largest accounting, tax and business advisory firms in the United States. Defendant CohnReznick was the outside auditor for certain of the Funds, including at least GPB Waste Management, for fiscal years 2016, 2017 and 2018. CohnReznick audited and issued an audit opinion for the financial statements of Waste Management for fiscal year 2016.

121.    EisnerAmper LLP ("EisnerAmper") is a is a limited liability partnership with its principal place of business in New York, New York, and with a regional office in Dallas, Texas. It is registered to do business in Texas according to the Texas Secretary of State. One of EisnerAmper's principals is in charge of its Texas market. EisnerAmper's website boasts that "Our Dallas, Texas office has expertise serving clients in private equity, including fund sponsors and their portfolio companies."[4] Upon information and belief, these Texas-based employees performed services in connection with the auditing work referenced herein, and other EisnerAmper employees travelled to Texas as part of their audit work. Defendant EisnerAmper was the outside auditor for certain of the Funds, including at least GPB Automotive, for fiscal years 2016 through

---

[4] https://www.eisneramper.com/eisneramper-dallas-
tx/#:~:text=Dallas%2C%20TX&text=Our%20Dallas%2C%20Texas%20office%20has,%2C%20audit%2C%20and%20compliance%20challenges.

2019, GPB Holdings for fiscal years 2017 through 2019, and GPB Holdings Qualified for fiscal years 2017 through 2019.

122.    Margolin Winer & Evens LLP ("Margolin") is a limited liability partnership based in Princeton, New Jersey, with additional offices throughout the United States. Margolin is registered to do business in Texas according to the Texas Secretary of State. Upon information and belief, Margolin performed services in connection with the audits referenced herein, and other Margolin employees travelled to Texas as part of their audit. Margolin styles itself as one of the largest accounting and business advisory firms in the Northeast. It provides accounting, auditing, tax planning, tax strategies and advisory services. Defendant Margolin was the outside auditor for GPB Capital from at least 2013 through 2017 and for certain of the Funds, including at least GPB Automotive, GPB Holdings and GPB Holdings Qualified. Margolin audited the financial statements of GPB Capital for fiscal years 2014, 2015 and 2016, and of GPB Holdings for fiscal years 2013, 2014 and 2015, and of GPB NYC Developments for fiscal year 2018.

123.    Withum Smith+ Brown, PC ("Withum) is a professional corporation with offices in Long Island, New York, New York City, and Grand Cayman. Withum is registered to do business in Texas according to the Texas Secretary of State. Upon information and belief, Withum performed services in connection with the audits referenced herein, and other Withum employees travelled to Texas as part of their audit. Withum provides accounting, auditing, tax planning, tax strategies and advisory services. Defendant Withum was the outside auditor for GPB Waste Management (Armada Waste Management LP), GPB Cold Storage, GPB Holdings III and GPB NYC Development.  In particular, Withum audited the financial statements of GPB Cold Storage for fiscal years 2015, 2016, 2017 and 2018, GPB Holdings III for fiscal year 2019, and GPB NYC Developments for fiscal year 2018.

124.     RSM, Crowe, CohnReznick, EisnerAmper, Margolin and Withum are referenced herein collectively as the "Auditor Defendants."

**The Valuation Defendants**

125.     Defendant Deloitte Transactions and Business Analytics LLP ("Deloitte"):

    a.      is an accounting advisory and valuation firm which provides services to a variety of businesses and specializes in providing valuation, strategic financial planning, and other financial advisory services to businesses, including valuation services related to assets and ownership interests in private companies.  Deloitte holds itself out as skilled and experienced in such valuation services;

    b.      has offices in Dallas, San Antonio and Houston, Texas. Deloitte also has numerous principals and employees in Texas locations, including 67 general partners in Texas according to its filings with the Texas Secretary of State, and owns a material part of its business in and through Texas. Deloitte is registered to do business in Texas according to the Texas Secretary of State and regularly and continuously does business in Texas. Deloitte also regularly provides services to Texas based entities, including Ascendant and GPB.  Upon information and belief, Deloitte performed services in connection with the valuation referenced herein in Texas, and Deloitte employees travelled to Texas as part of their valuation work for GPB and Ascendant;

    c.      was retained by GPB and Ascendant during the period from approximately 2017 through June 2019 to provide valuations of otherwise difficult to value

assets held by the GPB Funds (other than GPB Holdings Qualified). It provided advice and recommendations in connection with the assessments of the fair values of certain non-publicly traded investments for financial reporting. Such valuations were necessary because most if not all of the assets held by such Funds were not publicly traded and had not traded at ascertainable market values. Thus, the valuations by Deloitte were essential to the financial reports prepared by the Funds and their auditors and to investors and prospective investors who relied upon such financial reporting to determine the performance of the relevant Funds. Indeed, because the assets owned had no market value, these Deloitte valuations were a primary constituent of the financial results provided to investors and prospective investors and thus a primary factor relied upon by them in their respective investment decisions. Deloitte allowed its name and reputation to be used in marketing the Funds. This was essential to such marketing, as investors could not rely upon GPB itself to value assets which had no trading market value because it was conflicted as to such values and received fees based upon such values;

d.      prepared valuations that were materially inaccurate—GPB has written down the value of such assets by at least $750 million;

e.      provided valuations, the write downs of which have resulted in the failure of the Funds and the loss of the majority of customer invested capital;

f.      Deloitte had general awareness of the GPB scheme for several reasons:

1. First, Deloitte's review of the GPB transactions uncovered that many of the Fund assets were in whole or in part purchased from insiders at GPB/Ascendant, like Gentile, raising red flags as to the legitimacy of such transactions.

2. Second, Deloitte's review of the GPB transactions showed that many of the assets on respective Fund's balance sheets were purchased with Funds from other separate GPB Funds, and the "loans" respecting such Funds were not properly recorded.

3. Third, Deloitte's review of the subject transactions uncovered that even when there were defaults in the GPB investments in debt or preferred stock issued by the seller, GPB did not mark down such assets purchased by them.

4. Fourth, Deloitte's review of the subject transactions uncovered that the GPB Funds were not generating enough cash flow from investments to pay the proposed 8% dividend and that GPB was thus misrepresenting its returns.

5. Fifth, many of the GPB transactions involved payment of otherwise undisclosed fees to Ascendant, Gentile and Schneider. These insider fees raised obvious concerns as to the testimony of the subject transactions and the adequacy of the PPM disclosure with respect thereto.

6. In sum, Deloitte's actual work in connection with such valuation would have disclosed to it the nature of the GPB scheme.

g.      approved materially false valuations for the GPB assets that provided cover for and substantial assistance in the services to the GPB Defendants.  By representing to investors that an international financial firm – Deloitte – was reviewing its asset valuations, GPB benefited from Deloitte's reputation and status as a skilled and independent valuation agent, who was allegedly providing an independent review of valuations.  In fact, such review was materially false and GPB assets were in fact overstated by at least $750 million. Deloitte's role in "passing on" these falsely inflated values enabled the scheme to proceed without detection.

126.    Defendant Morrison, Brown, Argiz & Farra, LLC ("MBAF"):

a.    is an accounting firm which provides accounting services to businesses, including primarily valuation services related to assets and ownership interests in private companies.  MBAF holds itself out as skilled and experienced in such valuation services;

b.    is headquartered at 1450 Brickell Avenue, 18th Floor, Miami, FL 33131, is registered to do business in Texas according to the Texas Secretary of State and has multiple principals who are licensed to do accounting work in Texas. Upon information and belief, MBAF performed services in connection with the valuation referenced herein in Texas, and MBAF employees travelled to Texas as part of their valuation work for GPB and Ascendant.

c.    MBAF was retained during the period from approximately 2016 through 2017 to provide valuations of otherwise difficult to value assets held by at least GPB Holdings II and GPB Automotive. It provided advice and recommendations in

connection with the assessments of the fair values of certain non-publicly traded investments for financial reporting. Such valuations were necessary because most if not all of the assets held by such Funds were not publicly traded and had not traded at ascertainable market values.   Thus, the valuations by MBAF were essential to the financial reports prepared by the Funds and their auditors and to investors and prospective investors who relied upon such financial reporting to determine the performance of the relevant Funds.  Indeed, because the assets owned had no market value, these MBAF valuations were a primary constituent of the financial results provided to investors and prospective investors and thus a primary factor relied upon by them in their respective investment decisions. MBAF allowed its name and reputation to be used in marketing the Funds.  This was essential to such marketing, as investors could not rely upon GPB itself to value assets which had no trading market value because it was conflicted as to such values and received fees based upon such values;

d.   provided valuations that were materially inaccurate—GPB has written down the value of such assets by at least $750 million;

e.   provided valuations, the write downs of which have resulted in the failure of the Funds and the loss of the majority of customer invested capital;

f.   had general awareness of the GPB scheme for several reasons:

1.   First, MBAF's review of the GPB transactions uncovered that many of the Fund assets were in whole or in part purchased from insiders at GPB/Ascendant. Like Gentile, raising red flags as to the legitimacy of such transactions.

2. Second, MBAF's review of the transactions showed that many of the assets on respective Fund's balance sheets were purchased with Funds from other separate GPB Funds, and the "loans" respecting such Funds were not properly recorded.

3. Third, MBAF's review of the subject transactions uncovered that even when there were defaults in the GPB investments in debt or preferred stock issued by the seller, that GPB did not mark down such assets purchased by them.

4. Fourth, MBAF's review of the subject transactions uncovered that the GPB Funds were not generating enough cash flow from investments to pay the proposed 8% dividend and that GPB was thus misrepresenting its returns.

5. Fifth, many of the GPB transactions involved payment of otherwise undisclosed fees to Ascendant, Gentile and Schneider. These insider fees raised obvious concerns as to the testimony of the subject transactions and the adequacy of the PPM disclosure with respect thereto.

6. In sum, MBAF's actual work in connection with such valuation would have disclosed to it the nature of the GPB scheme.

g. approved materially false valuations for the GPB assets that provided cover for and substantial assistance in the services to the GPB Defendants. By representing to investors that an expert financial firm – MBAF – was reviewing its asset valuations, GPB benefited from MBAF's reputation and status as a skilled and independent

61

valuation agent, who was allegedly providing an independent review of valuations. In fact, such review was materially false and GPB assets were in fact overstated by at least $750,000,000. MBAF's role in "passing on" these falsely inflated values enabled the scheme to proceed without detection.

127. Deloitte and MBAF are referenced collectively herein as the "Valuation Defendants".

**GPB's Accountant**

128. Gentile Pismeny & Brengel LLP, (now known as Gentile Brengel & Lin, LLP) (hereinafter, "Gentile Pismeny") is a full-service tax, accounting and business consulting firm with its principal place of business in Garden City, New York. Gentile Pismeny provided certain accounting, advisory and related services to GPB and Ascendant, based in Texas, and prepared the Schedules K-1 reporting limited partners' respective shares of the partnership's income, deductions, and credits, which it sends to GPB's limited partners (the Plaintiffs and class members herein). Mr. Gentile was a member of Gentile Pismeny until December 31, 2014, and continues to receive fixed payments pursuant to a buy-out agreement. Gentile and GPB did not disclose to Class members that Mr. Gentile, the managing member of the General Partner, had had an ownership interest in Gentile Pismeny the same accounting firm that GPB hired for advisory work, and that he was also receiving payouts from that firm. Mr. Gentile has indicated that the fixed payments from Gentile Pismeny account for more than 10% of his income, but says that they do not require a substantial amount of his time.

**The Broker Defendants**

129. In connection with the limited partnership sales transactions described herein, each of the Broker Defendants described below directly, materially and substantially aided GPB

Capital, the Individual Defendants, and the GPB Funds with actual knowledge of the falsity of the statements made by them in the Offering Materials used in connection with such sales. The Broker Defendants knowingly distributed materially false Offering Materials to investors, including the PPMs, that contained Material Misrepresentations and Omissions.  Each of the Broker Defendants substantially assisted the GPB Funds and the GPB Defendants in their efforts to offer limited partnership interests in the Funds by ensuring that these interests were widely offered to a large number of investors in the United States. This provided the Funds and GPB Capital with the capital to continue paying themselves exorbitant fees, continue operations, and continue making distributions to prior investors in the various Funds, which were operated as a Ponzi scheme.

130.    In addition, each of the Broker Defendants directly and substantially aided the Funds and the GPB Defendants by participating in the illegal unregistered Offerings being affected by GPB, which they knew were required to be registered under the TSA and the 1933 Act. The Broker Defendants knew that the Offerings did not qualify for an exemption under SEC Regulation D or SEC Rule 506. Each of the Broker Defendants knew from the DD Reports, their role in the Offerings, and the size of the Offerings that GPB was required to register certain of the Securities under the Securities Exchange Act. The Broker Defendants also knew the size of the Offerings from GPB's Form D filings with the SEC, which described for each Offering the brokers involved in the sales, the amount of investment raised, and the number of investors.

131.    The claims asserted against the Broker Defendants are limited in that Plaintiffs and the other Class members are not suing and have not sued the Broker who sold them the Securities, but *are only* suing each of the other Brokers for promoting, sustaining and materially aiding the Ponzi scheme by knowingly distributing false or misleading PPMs and by raising money from the scheme with knowledge that it was fraudulent.

132.   The relevant Broker Defendants include:

   a.   Defendant Advisory Group Equity Services, Ltd. ("Advisory Group"), which:

      i.    was incorporated in Massachusetts and has a principal place of business in Woburn, MA;

      ii.   executed a Form BD certifying that it consents to jurisdiction and venue in Texas and, in turn, in this Court, when it registered with the SEC and FINRA, as well as each time it made a required disclosure or amendment with the SEC and FINRA;

      iii.  promoted and sold the limited partnership interests in the GPB funds, including, without limitation, those of GPB Automotive Portfolio, LP, GPB Holdings II, LP, and GPB Waste Management, LP, and also promoted and/or sold such Securities in Texas, thereby providing Ascendant and the other GPB Defendants with the capital needed to continue the scheme described herein;

      iv.   attended Ascendant Capital's due diligence meetings in, or webinars from Texas, and/or received marketing materials, PPMs, other Offering Materials and other information relating to the Funds from Ascendant Capital in Texas, and submitted Class members' executed documentation to or through Ascendant Capital in Austin, Texas; and

      v.    was aware of the Material Misrepresentations and Omissions described herein from the DD Reports and/or other communications from Ascendant and GPB; repeated, distributed or promoted the Material Misrepresentations and Omissions to Class members through the Offering Materials; and

substantially assisted Ascendant and the GPB Defendants in furtherance of the misconduct alleged by such efforts and by using the proceeds of sales of Securities to fund the Ponzi scheme described herein.

b.   Defendant Aegis Capital Corporation ("Aegis"), which:

   i.   was incorporated in New York and has a principal place of business in New York, NY. It operates offices throughout the country with 400 employees, including one (1) office in Dallas, Texas;

   ii.   executed a Form BD certifying that it consents to jurisdiction and venue in Texas and, in turn, in this Court, when it registered with the SEC and FINRA, as well as each time it made a required disclosure or amendment with the SEC and FINRA;

   iii.   promoted and sold the limited partnership interests in the GPB funds, including Automotive Portfolio, LP; GPB Holdings II, LP; and GPB Waste Management, LP, thereby providing Ascendant and the GPB Defendants with the capital needed to continue the scheme described herein. In addition, Aegis offered, sold or participated in the offering and/or sale of the Securities in Texas;

   iv.   attended Ascendant Capital's due diligence meetings in, or webinars from Texas, and/or received marketing materials, PPMs, other Offering Materials and other information relating to the GPB Funds from Ascendant Capital in Texas, and submitted Class members' executed documentation to or through Ascendant Capital in Austin, Texas; and

v. was aware of the Material Misrepresentations and Omissions described herein from the DD Reports and/or other communications from Ascendant and GPB; repeated, distributed or promoted the Material Misrepresentations and Omissions to Class members through the Offering Materials; and substantially assisted Ascendant and the GPB Defendants in furtherance of the misconduct alleged by such efforts and by using the proceeds of sales of Securities to fund the Ponzi scheme described herein.

c. Defendant Aeon Capital Inc. ("Aeon"), which:

i. was incorporated in Wisconsin and has a principal place of business in Middletown, NJ;

ii. executed a Form BD certifying that it consents to jurisdiction and venue in Texas and, in turn, in this Court, when it registered with the SEC and FINRA, as well as each time it made a required disclosure or amendment with the SEC and FINRA;

iii. promoted and sold the limited partnership interests in the GPB funds, including without limitation, in GPB Automotive Portfolio, LP; GPB Holdings II, LP; and GPB Waste Management, LP, thereby providing Ascendant and the GPB Defendants with the capital needed to continue the scheme described herein;

iv. attended Ascendant Capital's due diligence meetings in, or webinars from Texas, and/or received marketing materials, PPMs, other Offering Materials and other information relating to the GPB Funds from Ascendant Capital in

Texas, and submitted Class members' executed documentation to or through Ascendant Capital in Austin, Texas; and

    v. was aware of the Material Misrepresentations and Omissions described herein from the DD Reports and/or other communications from Ascendant and GPB; repeated, distributed or promoted the Material Misrepresentations and Omissions to Class members through the Offering Materials; and substantially assisted Ascendant and the GPB Defendants in furtherance of the misconduct alleged by such efforts and by using the proceeds of sales of Securities to fund the Ponzi scheme described herein.

d. Defendant American Capital Partners, LLC ("American Capital"), which:

    i. was incorporated in New York and has a principal place of business in Hauppauge, NY. It operates four (4) offices in New York, Georgia, and Florida, with over 3750 employees;

    ii. executed a Form BD certifying that it consents to jurisdiction and venue in Texas and, in turn, in this Court, when it registered with the SEC and FINRA, as well as each time it made a required disclosure or amendment with the SEC and FINRA;

    iii. promoted and sold the limited partnership interests in the GPB funds, including without limitation, in GPB Automotive Portfolio, LP, thereby providing Ascendant and the GPB Defendants with the capital needed to continue the scheme described herein;

    iv. attended Ascendant Capital's due diligence meetings in, or webinars from Texas, and/or received marketing materials, PPMs, other Offering Materials

and other information relating to the Funds from Ascendant Capital in Texas, and submitted Class members' executed documentation to or through Ascendant Capital in Austin, Texas; and

v.   was aware of the Material Misrepresentations and Omissions described herein from the DD Reports and/or other communications from Ascendant and GPB; repeated, distributed or promoted the Material Misrepresentations and Omissions to Class members through the Offering Materials; and substantially assisted Ascendant and the GPB Defendants in furtherance of the misconduct alleged by such efforts and by using the proceeds of sales of Securities to fund the Ponzi scheme described herein.

e.   Defendant Arete Wealth Management, LLC ("Arete"), which:

i.   was incorporated in Illinois and has a principal place of business in Chicago, IL. It operates offices across the United States, including a brokerage office in Southlake, Texas;

ii.   executed a Form BD certifying that it consents to jurisdiction and venue in Texas and, in turn, in this Court, when it registered with the SEC and FINRA, as well as each time it made a required disclosure or amendment with the SEC and FINRA;

iii.   promoted and sold the limited partnership interests in the GPB funds, including without limitation, in GPB Automotive Portfolio, LP, thereby providing Ascendant and the other GPB Defendants with the capital needed to continue the scheme described herein. In addition, Arete offered, sold or

participated in the offering and/or sale of the GPB limited partnership interests in Texas;

    iv.   attended Ascendant Capital's due diligence meetings in, or webinars from Texas, and/or received marketing materials, PPMs, other Offering Materials and other information relating to the Funds from Ascendant Capital in Texas, and submitted Class members' executed documentation to or through Ascendant Capital in Austin, Texas; and

    v.   was aware of the Material Misrepresentations and Omissions described herein from the DD Reports and/or other communications from Ascendant and GPB; repeated, distributed or promoted the Material Misrepresentations and Omissions to Class members through the Offering Materials; and substantially assisted Ascendant and the other GPB Defendants in furtherance of the misconduct alleged by such efforts and by using the proceeds of sales of Securities to fund the Ponzi scheme described herein.

f.   Defendant Arkadios Capital ("Arkadios"), which:

    i.   was incorporated in Georgia and has a principal place of business in Atlanta, GA;

    ii.   executed a Form BD certifying that it consents to jurisdiction and venue in Texas and, in turn, in this Court, when it registered with the SEC and FINRA, as well as each time it made a required disclosure or amendment with the SEC and FINRA;

    iii.   promoted and sold limited partnership interests in the GPB Funds, including, without limitation, in GPB Automotive Portfolio, LP; GPB

Holdings II, LP; and GPB Waste Management, LP, thereby providing Ascendant and the GPB Defendants with the capital needed to continue the scheme described herein;

iv.  attended Ascendant Capital's due diligence meetings in, or webinars from Texas, and/or received marketing materials, PPMs, other Offering Materials and other information relating to the GPB Funds from Ascendant Capital in Texas, and submitted Class members' executed documentation to or through Ascendant Capital in Austin, Texas; and

v.  was aware of the Material Misrepresentations and Omissions described herein from the DD Reports and/or other communications from Ascendant and GPB; repeated, distributed or promoted the Material Misrepresentations and Omissions to Class members through the Offering Materials; and substantially assisted Ascendant and the GPB Defendants in furtherance of the misconduct alleged by such efforts and by using the proceeds of sales of GPB limited partnership interests to fund the Ponzi scheme described herein.

g.  Defendant Ausdal Financial Partners, Inc. ("Ausdal"), which:

i.  was incorporated in Iowa and has a principal place of business in Davenport, IA.  It operates one (1) office in Iowa and additional offices in Illinois, with advisors throughout the United States;

ii.  executed a Form BD certifying that it consents to jurisdiction and venue in Texas and, in turn, in this Court, when it registered with the SEC and

FINRA, as well as each time it made a required disclosure or amendment with the SEC and FINRA;

iii.   promoted and sold limited partnership interests in the GPB Funds, including, without limitation, in GPB Automotive Portfolio, LP; GPB Holdings II, LP; and GPB Waste Management, LP, thereby providing Ascendant and the GPB Defendants with the capital needed to continue the scheme described herein;

iv.   attended Ascendant Capital's due diligence meetings in, or webinars from Texas, and/or received marketing materials, PPMs, other Offering Materials and other information relating to the GPB Funds from Ascendant Capital in Texas, and submitted Class members' executed documentation to or through Ascendant Capital in Austin, Texas; and

v.   was aware of the Material Misrepresentations and Omissions described herein from the DD Reports and/or other communications from Ascendant and GPB; repeated, distributed or promoted the Material Misrepresentations and Omissions to Class members through the Offering Materials; and substantially assisted Ascendant and the GPB Defendants in furtherance of the misconduct alleged by such efforts and by using the proceeds of sales of GPB limited partnership interests to fund the Ponzi scheme described herein.

h.   Defendant BCG Securities, Inc. ("BCG"), which:

i.   was incorporated in Pennsylvania and has a principal place of business in Cherry Hill, NJ;

ii.  executed a Form BD certifying that it consents to jurisdiction and venue in Texas and, in turn, in this Court, when it registered with the SEC and FINRA, as well as each time it made a required disclosure or amendment with the SEC and FINRA;

iii.  promoted and sold limited partnership interests in the GPB Funds, including, without limitation, in GPB Automotive Portfolio, LP; GPB Holdings II, LP; and GPB Waste Management, LP, thereby providing Ascendant and the GPB Defendants with the capital needed to continue the scheme described herein;

iv.  attended Ascendant Capital's due diligence meetings in, or webinars from Texas, and/or received marketing materials, PPMs, other Offering Materials and other information relating to the GPB Funds from Ascendant Capital in Texas, and submitted Class members' executed documentation to or through Ascendant Capital in Austin, Texas; and

v.  was aware of the Material Misrepresentations and Omissions described herein from the DD Reports and/or other communications from Ascendant and GPB; repeated, distributed or promoted the Material Misrepresentations and Omissions to Class members through the Offering Materials; and substantially assisted Ascendant and the GPB Defendants in furtherance of the misconduct alleged by such efforts and by using the proceeds of sales of GPB limited partnership interests to fund the Ponzi scheme described herein.

i.  Defendant Bradley Wealth Management, LLC ("Bradley"), which:

i.   was incorporated in California and has a principal place of business in San Diego, CA.  It operates two (2) offices in San Diego, CA and Scottsdale, AZ;

ii.   is registered to do business in Texas as a registered investment advisor according to the Form ADV it filed with the SEC;

iii.   promoted and sold limited partnership interests in the GPB Funds, including, without limitation, in GPB Cold Storage, LP, thereby providing Ascendant and the GPB Defendants with the capital needed to continue the scheme described herein;

iv.   attended Ascendant Capital's due diligence meetings in, or webinars from Texas, and/or received marketing materials, PPMs, other Offering Materials and other information relating to the GPB Funds from Ascendant Capital in Texas, and submitted Class members' executed documentation to or through Ascendant Capital in Austin, Texas;

v.   was aware of the Material Misrepresentations and Omissions described herein from the DD Reports and/or other communications from Ascendant and GPB; repeated, distributed or promoted the Material Misrepresentations and Omissions to Class members through the Offering Materials; and substantially assisted Ascendant and the GPB Defendants in furtherance of the misconduct alleged by such efforts and by using the proceeds of sales of GPB limited partnership interests to fund the Ponzi scheme described herein;

vi. Bradley was a registered investment advisor and, thus, did not charge high commissions in connection with its sales of GPB Funds like the other Broker Defendants However, Bradley was aware of the inordinately high commissions that brokers were charging for selling GPB limited partnership.

j. Defendant Cabot Lodge Securities LLC ("Cabot"), which:

i. was incorporated in Delaware and has a principal place of business in New York, NY.   It operates one (1) office in New York with independent representatives located throughout the United States;

ii. executed a Form BD certifying that it consents to jurisdiction and venue in Texas and, in turn, in this Court, when it registered with the SEC and FINRA, as well as each time it made a required disclosure or amendment with the SEC and FINRA;

iii. promoted and sold limited partnership interests in the GPB Funds, including, without limitation, in GPB Automotive Portfolio, LP; GPB Holdings II, LP; and GPB Waste Management, LP, thereby providing Ascendant and the GPB Defendants with the capital needed to continue the scheme described herein;

iv. attended Ascendant Capital's due diligence meetings in, or webinars from Texas, and/or received marketing materials, PPMs, other Offering Materials and other information relating to the GPB Funds from Ascendant Capital in Texas, and submitted Class members' executed documentation to or through Ascendant Capital in Austin, Texas; and

     v.  was aware of the Material Misrepresentations and Omissions described herein from the DD Reports and/or other communications from Ascendant and GPB; repeated, distributed or promoted the Material Misrepresentations and Omissions to Class members through the Offering Materials; and substantially assisted Ascendant and the GPB Defendants in furtherance of the misconduct alleged by such efforts and by using the proceeds of sales of GPB limited partnership interests to fund the Ponzi scheme described herein.

k.  Defendant Calton & Associates, Inc. ("Calton"), which:

     i.  was incorporated in Florida and has a principal place of business in Tampa, FL;

     ii.  executed a Form BD certifying that it consents to jurisdiction and venue in Texas and, in turn, in this Court, when it registered with the SEC and FINRA, as well as each time it made a required disclosure or amendment with the SEC and FINRA;

     iii.  promoted and sold limited partnership interests in the GPB Funds, including, without limitation, in GPB Automotive Portfolio, LP and GPB Holdings II, LP, thereby providing Ascendant and the GPB Defendants with the capital needed to continue the scheme described herein;

     iv.  attended Ascendant Capital's due diligence meetings in, or webinars from Texas, and/or received marketing materials, PPMs, other Offering Materials and other information relating to the GPB Funds from Ascendant Capital in

Texas, and submitted Class members' executed documentation to or through Ascendant Capital in Austin, Texas; and

v.  was aware of the Material Misrepresentations and Omissions described herein from the DD Reports and/or other communications from Ascendant and GPB; repeated, distributed or promoted the Material Misrepresentations and Omissions to Class members through the Offering Materials; and substantially assisted Ascendant and the GPB Defendants in furtherance of the misconduct alleged by such efforts and by using the proceeds of sales of GPB limited partnership interests to fund the Ponzi scheme described herein.

l.  Defendant Capital Investment Group, Inc. ("Capital Investment"), which:

i.  was incorporated in North Carolina and has a principal place of business in Raleigh, NC.  It operates two (2) offices in Ohio and Maryland with at least 150 employees;

ii.  executed a Form BD certifying that it consents to jurisdiction and venue in Texas and, in turn, in this Court, when it registered with the SEC and FINRA, as well as each time it made a required disclosure or amendment with the SEC and FINRA;

iii.  promoted and sold limited partnership interests in the GPB Funds, including, without limitation, in GPB Cold Storage, LP, thereby providing Ascendant and the GPB Defendants with the capital needed to continue the scheme described herein;

     iv.   attended Ascendant Capital's due diligence meetings in, or webinars from Texas, and/or received marketing materials, PPMs, other Offering Materials and other information relating to the GPB Funds from Ascendant Capital in Texas, and submitted Class members' executed documentation to or through Ascendant Capital in Austin, Texas; and

     v.   was aware of the Material Misrepresentations and Omissions described herein from the DD Reports and/or other communications from Ascendant and GPB; repeated, distributed or promoted the Material Misrepresentations and Omissions to Class members through the Offering Materials; and substantially assisted Ascendant and the GPB Defendants in furtherance of the misconduct alleged by such efforts and by using the proceeds of sales of GPB limited partnership interests to fund the Ponzi scheme described herein.

m.  Defendant Cascade Financial Management, Inc. ("Cascade"), which:

     i.   was incorporated in Colorado and has a principal place of business in Denver, CO.  It operates five (5) offices throughout the United States, including one (1) in Frisco, Texas;

     ii.   executed a Form BD certifying that it consents to jurisdiction and venue in Texas and, in turn, in this Court, when it registered with the SEC and FINRA, as well as each time it made a required disclosure or amendment with the SEC and FINRA;

     iii.   promoted and sold limited partnership interests in the GPB Funds, including, without limitation, in GPB Cold Storage, LP and GPB Holdings

II, LP, thereby providing Ascendant and the GPB Defendants with the capital needed to continue the scheme described herein. In addition, Cascade offered, sold or participated in the offering and/or sale of the GPB limited partnership interests in Texas;

    iv.  attended Ascendant Capital's due diligence meetings in, or webinars from Texas, and/or received marketing materials, PPMs, other Offering Materials and other information relating to the GPB Funds from Ascendant Capital in Texas, and submitted Class members' executed documentation to or through Ascendant Capital in Austin, Texas; and

    v.  was aware of the Material Misrepresentations and Omissions described herein from the DD Reports and/or other communications from Ascendant and GPB; repeated, distributed or promoted the Material Misrepresentations and Omissions to Class members through the Offering Materials; and substantially assisted Ascendant and the GPB Defendants in furtherance of the misconduct alleged by such efforts and by using the proceeds of sales of GPB limited partnership interests to fund the Ponzi scheme described herein.

n.  Defendant Center Street Securities, Inc. ("Center Street"), which:

    i.  was incorporated in Louisiana and has a principal place of business in Nashville, TN.  It operates offices in Tennessee, Virginia, and Louisiana, with branch offices in over forty (40) states;

    ii.  executed a Form BD certifying that it consents to jurisdiction and venue in Texas and, in turn, in this Court, when it registered with the SEC and

FINRA, as well as each time it made a required disclosure or amendment with the SEC and FINRA;

iii. promoted and sold limited partnership interests in the GPB Funds, including, without limitation, in GPB Automotive Portfolio, LP; GPB Holdings II, LP; and GPB Waste Management, LP; hereby providing Ascendant and the GPB Defendants with the capital needed to continue the scheme described herein;

iv. attended Ascendant Capital's due diligence meetings in, or webinars from Texas, and/or received marketing materials, PPMs, other Offering Materials and other information relating to the GPB Funds from Ascendant Capital in Texas, and submitted Class members' executed documentation to or through Ascendant Capital in Austin, Texas; and

v. was aware of the Material Misrepresentations and Omissions described herein from the DD Reports and/or other communications from Ascendant and GPB; repeated, distributed or promoted the Material Misrepresentations and Omissions to Class members through the Offering Materials; and substantially assisted Ascendant and the GPB Defendants in furtherance of the misconduct alleged by such efforts and by using the proceeds of sales of GPB limited partnership interests to fund the Ponzi scheme described herein.

o. Defendant Coastal Equities, Inc. ("Coastal"), which:

i.  was incorporated in Massachusetts and has a principal place of business in Wilmington, DE.  It operates offices throughout the United States including a brokerage office in Dallas and in Austin, Texas;

ii.  executed a Form BD certifying that it consents to jurisdiction and venue in Texas and, in turn, in this Court, when it registered with the SEC and FINRA, as well as each time it made a required disclosure or amendment with the SEC and FINRA;

iii.  promoted and sold limited partnership interests in the GPB Funds, including, without limitation, in GPB Automotive Portfolio, LP; GPB Cold Storage, LP; GPB Holdings II, LP; and GPB Waste Management, LP, thereby providing Ascendant and the GPB Defendants with the capital needed to continue the scheme described herein. In addition, Coastal offered, sold or participated in the offering and/or sale of the GPB limited partnership interests in Texas;

iv.  attended Ascendant Capital's due diligence meetings in, or webinars from Texas, and/or received marketing materials, PPMs, other Offering Materials and other information relating to the GPB Funds from Ascendant Capital in Texas, and submitted Class members' executed documentation to or through Ascendant Capital in Austin, Texas; and

v.  was aware of the Material Misrepresentations and Omissions described herein from the DD Reports and/or other communications from Ascendant and GPB; repeated, distributed or promoted the Material Misrepresentations and Omissions to Class members through the Offering Materials; and

substantially assisted Ascendant and the GPB Defendants in furtherance of the misconduct alleged by such efforts and by using the proceeds of sales of GPB limited partnership interests to fund the Ponzi scheme described herein.

p.  Defendant Colorado Financial Service Corporation ("Colorado"), which:

  i.  was incorporated in Colorado and has a principal place of business in Centennial, CO.  It operates branch offices across the United States;

  ii.  executed a Form BD certifying that it consents to jurisdiction and venue in Texas and, in turn, in this Court, when it registered with the SEC and FINRA, as well as each time it made a required disclosure or amendment with the SEC and FINRA;

  iii.  promoted and sold limited partnership interests in the GPB Funds, including, without limitation, in GPB Automotive Portfolio, LP, thereby providing Ascendant and the GPB Defendants with the capital needed to continue the scheme described herein;

  iv.  attended Ascendant Capital's due diligence meetings in, or webinars from Texas, and/or received marketing materials, PPMs, other Offering Materials and other information relating to the GPB Funds from Ascendant Capital in Texas, and submitted Class members' executed documentation to or through Ascendant Capital in Austin, Texas; and

  v.  was aware of the Material Misrepresentations and Omissions described herein from the DD Reports and/or other communications from Ascendant and GPB; repeated, distributed or promoted the Material Misrepresentations

81

and Omissions to Class members through the Offering Materials; and substantially assisted Ascendant and the GPB Defendants in furtherance of the misconduct alleged by such efforts and by using the proceeds of sales of GPB limited partnership interests to fund the Ponzi scheme described herein.

q.  Defendant Concorde Investment Services, LLC ("Concorde"), which:

   i.  was incorporated in Michigan and has a principal place of business in Livonia, MI;

   ii.  executed a Form BD certifying that it consents to jurisdiction and venue in Texas and, in turn, in this Court, when it registered with the SEC and FINRA, as well as each time it made a required disclosure or amendment with the SEC and FINRA;

   iii.  promoted and sold limited partnership interests in the GPB Funds, including, without limitation, in GPB Automotive Portfolio, LP and GPB Waste Management, LP, thereby providing Ascendant and the GPB Defendants with the capital needed to continue the scheme described herein;

   iv.  attended Ascendant Capital's due diligence meetings in, or webinars from Texas, and/or received marketing materials, PPMs, other Offering Materials and other information relating to the GPB Funds from Ascendant Capital in Texas; submitted Class members' executed documentation to or through Ascendant Capital in Austin, Texas; and presented as a panelist at GPB Capital Holding's Due Diligence conference on November 8, 2017; and

v. was aware of the Material Misrepresentations and Omissions described herein from the DD Reports and/or other communications from Ascendant and GPB; repeated, distributed or promoted the Material Misrepresentations and Omissions to Class members through the Offering Materials; and substantially assisted Ascendant and the GPB Defendants in furtherance of the misconduct alleged by such efforts and by using the proceeds of sales of GPB limited partnership interests to fund the Ponzi scheme described herein.

r. Defendant Crown Capital Securities L.P. ("Crown"), which:

i. was incorporated in Delaware and has a principal place of business in Orange, CA;

ii. executed a Form BD certifying that it consents to jurisdiction and venue in Texas and, in turn, in this Court, when it registered with the SEC and FINRA, as well as each time it made a required disclosure or amendment with the SEC and FINRA;

iii. promoted and sold limited partnership interests in the GPB Funds, including, without limitation, in GPB Automotive Portfolio, LP; GPB Holdings II, LP; GPB Waste Management, LP, thereby providing Ascendant and the GPB Defendants with the capital needed to continue the scheme described herein;

iv. attended Ascendant Capital's due diligence meetings in, or webinars from Texas, and/or received marketing materials, PPMs, other Offering Materials and other information relating to the GPB Funds from Ascendant Capital in

Texas, and submitted Class members' executed documentation to or through Ascendant Capital in Austin, Texas; and

v.   was aware of the Material Misrepresentations and Omissions described herein from the DD Reports and/or other communications from Ascendant and GPB; repeated, distributed or promoted the Material Misrepresentations and Omissions to Class members through the Offering Materials; and substantially assisted Ascendant and the GPB Defendants in furtherance of the misconduct alleged by such efforts and by using the proceeds of sales of GPB limited partnership interests to fund the Ponzi scheme described herein.

s.   Defendant David A. Noyes & Company ("Noyes"), which:

i.   was incorporated in Illinois and has a principal place of business in Indianapolis, IN.  It operates five (5) offices in Illinois;

ii.   executed a Form BD certifying that it consents to jurisdiction and venue in Texas and, in turn, in this Court, when it registered with the SEC and FINRA, as well as each time it made a required disclosure or amendment with the SEC and FINRA;

iii.   promoted and sold limited partnership interests in the GPB Funds, including, without limitation, in GPB Automotive Portfolio, LP; and GPB Holdings II, LP, thereby providing Ascendant and the GPB Defendants with the capital needed to continue the scheme described herein;

iv.   attended Ascendant Capital's due diligence meetings in, or webinars from Texas, and/or received marketing materials, PPMs, other Offering Materials

and other information relating to the GPB Funds from Ascendant Capital in Texas, and submitted Class members' executed documentation to or through Ascendant Capital in Austin, Texas; and

v.   was aware of the Material Misrepresentations and Omissions described herein from the DD Reports and/or other communications from Ascendant and GPB; repeated, distributed or promoted the Material Misrepresentations and Omissions to Class members through the Offering Materials; and substantially assisted Ascendant and the GPB Defendants in furtherance of the misconduct alleged by such efforts and by using the proceeds of sales of GPB limited partnership interests to fund the Ponzi scheme described herein.

t.   Defendant Dawson James Securities, Inc. ("Dawson"), which:

i.   was incorporated in Florida and has a principal place of business in Boca Raton, FL.  It operates four (4) offices in Florida, New Jersey, New York, and Maryland, with over 60 employees;

ii.   executed a Form BD certifying that it consents to jurisdiction and venue in Texas and, in turn, in this Court, when it registered with the SEC and FINRA, as well as each time it made a required disclosure or amendment with the SEC and FINRA;

iii.   promoted and sold limited partnership interests in the GPB Funds, including, without limitation, in GPB Automotive Portfolio, LP, thereby providing Ascendant and the GPB Defendants with the capital needed to continue the scheme described herein;

    iv.  attended Ascendant Capital's due diligence meetings in, or webinars from Texas, and/or received marketing materials, PPMs, other Offering Materials and other information relating to the GPB Funds from Ascendant Capital in Texas, and submitted Class members' executed documentation to or through Ascendant Capital in Austin, Texas; and

    v.  was aware of the Material Misrepresentations and Omissions described herein from the DD Reports and/or other communications from Ascendant and GPB; repeated, distributed or promoted the Material Misrepresentations and Omissions to Class members through the Offering Materials; and substantially assisted Ascendant and the GPB Defendants in furtherance of the misconduct alleged by such efforts and by using the proceeds of sales of GPB limited partnership interests to fund the Ponzi scheme described herein.

u.  Defendant Dempsey Lord Smith, LLC ("Dempsey"), which:

    i.  was incorporated in Georgia and has a principal place of business in Rome, GA.  It operates offices in 13 states, including a brokerage office in Plano, Texas;

    ii.  executed a Form BD certifying that it consents to jurisdiction and venue in Texas and, in turn, in this Court, when it registered with the SEC and FINRA, as well as each time it made a required disclosure or amendment with the SEC and FINRA;

    iii.  promoted and sold limited partnership interests in the GPB Funds, including, without limitation, in GPB Automotive Portfolio, LP; GPB Cold

Storage, LP; GPB Holdings II, LP; GPB NYC Development, LP; GPB Waste Management, LP thereby providing Ascendant and the GPB Defendants with the capital needed to continue the scheme described herein. In addition, Dempsey offered, sold or participated in the offering and/or sale of the GPB limited partnership interests in Texas;

    iv.   attended Ascendant Capital's due diligence meetings in, or webinars from Texas, and/or received marketing materials, PPMs, other Offering Materials and other information relating to the GPB Funds from Ascendant Capital in Texas, and submitted Class members' executed documentation to or through Ascendant Capital in Austin, Texas; and

    v.   was aware of the Material Misrepresentations and Omissions described herein from the DD Reports and/or other communications from Ascendant and GPB; repeated, distributed or promoted the Material Misrepresentations and Omissions to Class members through the Offering Materials; and substantially assisted Ascendant and the GPB Defendants in furtherance of the misconduct alleged by such efforts and by using the proceeds of sales of GPB limited partnership interests to fund the Ponzi scheme described herein.

v.   Defendant Detalus Securities, LLC ("Detalus"), which:

    i.   was incorporated in Missouri and has a principal place of business in St. Louis, MO;

    ii.   executed a Form BD certifying that it consents to jurisdiction and venue in Texas and, in turn, in this Court, when it registered with the SEC and

FINRA, as well as each time it made a required disclosure or amendment with the SEC and FINRA;

iii. promoted and sold limited partnership interests in the GPB Funds, including, without limitation, in GPB Holdings II, LP, thereby providing Ascendant and the GPB Defendants with the capital needed to continue the scheme described herein;

iv. attended Ascendant Capital's due diligence meetings in, or webinars from Texas, and/or received marketing materials, PPMs, other Offering Materials and other information relating to the GPB Funds from Ascendant Capital in Texas, and submitted Class members' executed documentation to or through Ascendant Capital in Austin, Texas; and

v. was aware of the Material Misrepresentations and Omissions described herein from the DD Reports and/or other communications from Ascendant and GPB; repeated, distributed or promoted the Material Misrepresentations and Omissions to Class members through the Offering Materials; and substantially assisted Ascendant and the GPB Defendants in furtherance of the misconduct alleged by such efforts and by using the proceeds of sales of GPB limited partnership interests to fund the Ponzi scheme described herein.

w. Defendant DFPG Investments, Inc. ("DFPG"), which:

i. was incorporated in Utah and has a principal place of business in Sandy, UT. It operates two (2) offices in Utah and California with at least 50 employees;

ii.   executed a Form BD certifying that it consents to jurisdiction and venue in Texas and, in turn, in this Court, when it registered with the SEC and FINRA, as well as each time it made a required disclosure or amendment with the SEC and FINRA;

iii.   promoted and sold limited partnership interests in the GPB Funds, including, without limitation, in GPB Automotive Portfolio, LP and GPB Holdings II, LP, thereby providing Ascendant and the GPB Defendants with the capital needed to continue the scheme described herein;

iv.   attended Ascendant Capital's due diligence meetings in, or webinars from Texas, and/or received marketing materials, PPMs, other Offering Materials and other information relating to the GPB Funds from Ascendant Capital in Texas, and submitted Class members' executed documentation to or through Ascendant Capital in Austin, Texas; and

v.   was aware of the Material Misrepresentations and Omissions described herein from the DD Reports and/or other communications from Ascendant and GPB; repeated, distributed or promoted the Material Misrepresentations and Omissions to Class members through the Offering Materials; and substantially assisted Ascendant and the GPB Defendants in furtherance of the misconduct alleged by such efforts and by using the proceeds of sales of GPB limited partnership interests to fund the Ponzi scheme described herein.

x.   Defendant Dinosaur Financial Group, LLC ("Dinosaur"), which:

    i.  was incorporated in Delaware and has a principal place of business in New York, NY;

    ii.  executed a Form BD certifying that it consents to jurisdiction and venue in Texas and, in turn, in this Court, when it registered with the SEC and FINRA, as well as each time it made a required disclosure or amendment with the SEC and FINRA;

    iii.  promoted and sold limited partnership interests in the GPB Funds, including, without limitation, in GPB Automotive Portfolio, LP and GPB Holdings II, LP, thereby providing Ascendant and the GPB Defendants with the capital needed to continue the scheme described herein;

    iv.  attended Ascendant Capital's due diligence meetings in, or webinars from Texas, and/or received marketing materials, PPMs, other Offering Materials and other information relating to the GPB Funds from Ascendant Capital in Texas, and submitted Class members' executed documentation to or through Ascendant Capital in Austin, Texas; and

    v.  was aware of the Material Misrepresentations and Omissions described herein from the DD Reports and/or other communications from Ascendant and GPB; repeated, distributed or promoted the Material Misrepresentations and Omissions to Class members through the Offering Materials; and substantially assisted Ascendant and the GPB Defendants in furtherance of the misconduct alleged by such efforts and by using the proceeds of sales of GPB limited partnership interests to fund the Ponzi scheme described herein.

y.   Defendant Emerson Equity LLC ("Emerson"), which:

   i.   was incorporated in California and has a principal place of business in San Mateo, CA.  It operates offices across the United States including one (1) in Irving, TX;

   ii.   executed a Form BD certifying that it consents to jurisdiction and venue in Texas and, in turn, in this Court, when it registered with the SEC and FINRA, as well as each time it made a required disclosure or amendment with the SEC and FINRA;

   iii.   promoted and sold limited partnership interests in the GPB Funds, including, without limitation, in GPB Automotive Portfolio, LP; GPB Holdings II, LP; GPB Waste Management, LP thereby providing Ascendant and the GPB Defendants with the capital needed to continue the scheme described herein. In addition, Emerson offered, sold or participated in the offering and/or sale of the GPB limited partnership interests in Texas;

   iv.   attended Ascendant Capital's due diligence meetings in, or webinars from Texas, and/or received marketing materials, PPMs, other Offering Materials and other information relating to the GPB Funds from Ascendant Capital in Texas, and submitted Class members' executed documentation to or through Ascendant Capital in Austin, Texas; and

   v.   was aware of the Material Misrepresentations and Omissions described herein from the DD Reports and/or other communications from Ascendant and GPB; repeated, distributed or promoted the Material Misrepresentations and Omissions to Class members through the Offering Materials; and

substantially assisted Ascendant and the GPB Defendants in furtherance of the misconduct alleged by such efforts and by using the proceeds of sales of GPB limited partnership interests to fund the Ponzi scheme described herein.

z. Defendant FSC Securities Corporation ("FSC"), which:

    i. was incorporated in Delaware and has a principal place of business in Atlanta, GA. It operates offices throughout the United States including one (1) in Houston, TX;

    ii. executed a Form BD certifying that it consents to jurisdiction and venue in Texas and, in turn, in this Court, when it registered with the SEC and FINRA, as well as each time it made a required disclosure or amendment with the SEC and FINRA;

    iii. promoted and sold limited partnership interests in the GPB Funds, including, without limitation, in GPB Automotive Portfolio, LP and GPB Holdings II, LP thereby providing Ascendant and the GPB Defendants with the capital needed to continue the scheme described herein. In addition, FSC offered, sold or participated in the offering and/or sale of the GPB limited partnership interests in Texas;

    iv. attended Ascendant Capital's due diligence meetings in, or webinars from Texas, and/or received marketing materials, PPMs, other Offering Materials and other information relating to the GPB Funds from Ascendant Capital in Texas, and submitted Class members' executed documentation to or through Ascendant Capital in Austin, Texas; and

v.  was aware of the Material Misrepresentations and Omissions described herein from the DD Reports and/or other communications from Ascendant and GPB; repeated, distributed or promoted the Material Misrepresentations and Omissions to Class members through the Offering Materials; and substantially assisted Ascendant and the GPB Defendants in furtherance of the misconduct alleged by such efforts and by using the proceeds of sales of GPB limited partnership interests to fund the Ponzi scheme described herein.

aa. Defendant Geneos Wealth Management, Inc. ("Geneos"), which:

i.  was incorporated in Colorado and has a principal place of business in Centennial, CO.  It operates offices across the United States, including two (2) in Texas;

ii.  executed a Form BD certifying that it consents to jurisdiction and venue in Texas and, in turn, in this Court, when it registered with the SEC and FINRA, as well as each time it made a required disclosure or amendment with the SEC and FINRA;

iii.  promoted and sold limited partnership interests in the GPB Funds, including, without limitation, in GPB Automotive Portfolio, LP; GPB Holdings II, LP; and GPB Waste Management, LP thereby providing Ascendant and the GPB Defendants with the capital needed to continue the scheme described herein. In addition, Geneos offered, sold or participated in the offering and/or sale of the GPB limited partnership interests in Texas;

iv.  attended Ascendant Capital's due diligence meetings in, or webinars from Texas, and/or received marketing materials, PPMs, other Offering Materials and other information relating to the GPB Funds from Ascendant Capital in Texas, and submitted Class members' executed documentation to or through Ascendant Capital in Austin, Texas; and

v.  was aware of the Material Misrepresentations and Omissions described herein from the DD Reports and/or other communications from Ascendant and GPB; repeated, distributed or promoted the Material Misrepresentations and Omissions to Class members through the Offering Materials; and substantially assisted Ascendant and the GPB Defendants in furtherance of the misconduct alleged by such efforts and by using the proceeds of sales of GPB limited partnership interests to fund the Ponzi scheme described herein.

bb. Defendant Great Point Capital LLC ("Great Point"), which:

i.  was incorporated in Delaware and has a principal place of business in Chicago, IL.  It operates two (2) offices in Chicago, IL and Austin, TX;

ii.  executed a Form BD certifying that it consents to jurisdiction and venue in Texas and, in turn, in this Court, when it registered with the SEC and FINRA, as well as each time it made a required disclosure or amendment with the SEC and FINRA;

iii.  promoted and sold limited partnership interests in the GPB Funds, including, without limitation, in GPB Automotive Portfolio, LP and GPB Holdings II, LP thereby providing Ascendant and the GPB Defendants with

the capital needed to continue the scheme described herein. In addition, Great Point offered, sold or participated in the offering and/or sale of the GPB limited partnership interests in Texas;

iv.   attended Ascendant Capital's due diligence meetings in, or webinars from Texas, and/or received marketing materials, PPMs, other Offering Materials and other information relating to the GPB Funds from Ascendant Capital in Texas, and submitted Class members' executed documentation to or through Ascendant Capital in Austin, Texas; and

v.   was aware of the Material Misrepresentations and Omissions described herein from the DD Reports and/or other communications from Ascendant and GPB; repeated, distributed or promoted the Material Misrepresentations and Omissions to Class members through the Offering Materials; and substantially assisted Ascendant and the GPB Defendants in furtherance of the misconduct alleged by such efforts and by using the proceeds of sales of GPB limited partnership interests to fund the Ponzi scheme described herein.

cc.   Defendants HighTower Securities, LLC  ("HighTower Securities") and its affiliate HighTower Advisors, LLC ("HighTower Advisors") (collectively, "HighTower"), which:

i.   were incorporated or organized in Illinois and both have a principal place of business in Chicago, IL. They each operate offices throughout the United States, with an office in Houston, Texas. Hightower Securities is a broker

dealer and member FINRA, while Hightower Advisors is an SEC registered investment adviser;

ii.   executed a Form BD (through HighTower Securities) certifying that they consent to jurisdiction and venue in Texas and, in turn, in this Court, when they registered with the SEC and FINRA, as well as each time they made a required disclosure or amendment with the SEC and FINRA;

iii.   promoted and sold limited partnership interests in the GPB Funds, including, without limitation, in GPB Automotive Portfolio, LP; GPB Holdings II; and GPB Waste Management, LP thereby providing Ascendant and the GPB Defendants with the capital needed to continue the scheme described herein. In addition, Hightower offered, sold or participated in the offering and/or sale of the GPB limited partnership interests in Texas;

iv.   attended Ascendant Capital's due diligence meetings in, or webinars from Texas, and/or received marketing materials, PPMs, other Offering Materials and other information relating to the GPB Funds from Ascendant Capital in Texas, and submitted Class members' executed documentation to or through Ascendant Capital in Austin, Texas;

v.   were aware of the Material Misrepresentations and Omissions described herein from the DD Reports and/or other communications from Ascendant and GPB; repeated, distributed or promoted the Material Misrepresentations and Omissions to Class members through the Offering Materials; and substantially assisted Ascendant and the GPB Defendants in furtherance of the misconduct alleged by such efforts and by using the proceeds of sales

of GPB limited partnership interests to fund the Ponzi scheme described herein;

vi.   admitted (HighTower or its representatives), in a public filing in Delaware Chancery Court, that Hightower conducted operational due diligence on private alternative investments, including the GPB Funds, on a regular basis. Hightower admits that it is responsible for initially assessing, onboarding and regularly monitoring the operational infrastructure of private alternative investment products that are made available for Plaintiffs' advisory practice to invest within discretionary accounts. Hightower also provides other services including, but not limited to, performance reporting, client account billing, Compliance and Supervisory oversight, insurance coverage and legal support;

vii.  admitted (HighTower or its representatives) that since Hightower first onboarded the GPB product suite in 2015, they have conducted at least annual in-person operational due diligence assessments with GPB Capital through 2017 and have made regular inquiries with GPB Capital management regarding pending litigation, regulatory issues, valuation questions, service provider changes, and key personnel updates;

viii. according to HighTower, placed the GPB Funds on "Watch" on June 22, 2018, after discovering that GPB Capital's CFO had resigned and based on continued negative press and legal action being brought against GPB Capital. It was at this point that Plaintiffs began to suspect possible wrongdoing at GPB Capital;

ix.   provided information, through Mathew Andrulot, Hightower Advisor's
chief investment officer and Executive Director, to the authors of one or
more of the DD Reports for use in the report, including a March 7, 2017
Snyder Kearney Report which provided HighTower and other Broker
Defendants with details of GPB's many conflicts and other misconduct
described in the Material Misrepresentations and Omissions;

x.   continued selling investment in the GPB Funds despite the above due
diligence and awareness of problems with respect to GPB and its Funds;

xi.   on October 13, 2020, through HighTower Advisors' Chief Risk Officer,
Jared Schwartz, wrote to the CEO of GPB's Prime Automotive Group, as
well as to GPB's CEO (Gentile), General Counsel, Chief Financial Officer
and Managing Director for Communications, conceding that the GPB Funds
were launched as "income producing private equity" funds that invest in a
variety of underlying assets including automotive dealerships.   Schwartz
further admitted that:

When GPB and Ascendant marketed these strategies to investors, specific
emphasis was placed on the expected distribution yield of the portfolio
(8.7% per annum, delivered monthly), the expected investment horizon (3-
5 years) and the 'lack of a J-curve' due to income generation from day one
of a client's investment. GPB's marketing to investors also noted a 'defined
and profitable exit strategy'. Moreover, each Fund's limited partnership
agreement is specifically geared towards distributions of income and
mandates in Article 8.1 that GPB may not withhold any distribution of funds
to investors which would violate GPB's fiduciary duty under Delaware law.

To say that GPB has fallen short of these statements understates the perilous
situation you have placed the financial interests of your limited partners.
Through mismanagement, misdirection, secrecy and alleged fraud, you
have squandered the value of the portfolio assets built over the last five
years, together with any remaining goodwill. Investors have lost all
confidence in GPB's role as a fiduciary over the Funds' assets, particularly

with continued reports of regulatory investigations into GPB and its business, and a decided lack of regular reporting and transparency to investors.

dd. Defendant IBN Financial Services, Inc. ("IBN"), which:

    i.  was incorporated in New York and has a principal place of business in Liverpool, NY.  It operates offices throughout the United States;

    ii.  executed a Form BD certifying that it consents to jurisdiction and venue in Texas and, in turn, in this Court, when it registered with the SEC and FINRA, as well as each time it made a required disclosure or amendment with the SEC and FINRA;

    iii.  promoted and sold limited partnership interests in the GPB Funds, including, without limitation, in GPB Automotive Portfolio, LP; GPB Cold Storage, LP; GPB Holdings II; and GPB Waste Management, LP, thereby providing Ascendant and the GPB Defendants with the capital needed to continue the scheme described herein;

    iv.  attended Ascendant Capital's due diligence meetings in, or webinars from Texas, and/or received marketing materials, PPMs, other Offering Materials and other information relating to the GPB Funds from Ascendant Capital in Texas, and submitted Class members' executed documentation to or through Ascendant Capital in Austin, Texas; and

    v.  was aware of the Material Misrepresentations and Omissions described herein from the DD Reports and/or other communications from Ascendant and GPB; repeated, distributed or promoted the Material Misrepresentations and Omissions to Class members through the Offering Materials; and

substantially assisted Ascendant and the GPB Defendants in furtherance of the misconduct alleged by such efforts and by using the proceeds of sales of GPB limited partnership interests to fund the Ponzi scheme described herein.

ee. Defendant Innovation Partners LLC ("Innovation"), which:

    i. was incorporated in North Carolina and has a principal place of business in Charlotte, NC;

    ii. executed a Form BD certifying that it consents to jurisdiction and venue in Texas and, in turn, in this Court, when it registered with the SEC and FINRA, as well as each time it made a required disclosure or amendment with the SEC and FINRA;

    iii. promoted and sold limited partnership interests in the GPB Funds, including, without limitation, in GPB Automotive Portfolio, LP; GPB Holdings II; and GPB Waste Management, LP, thereby providing Ascendant and the GPB Defendants with the capital needed to continue the scheme described herein;

    iv. attended Ascendant Capital's due diligence meetings in, or webinars from Texas, and/or received marketing materials, PPMs, other Offering Materials and other information relating to the GPB Funds from Ascendant Capital in Texas, and submitted Class members' executed documentation to or through Ascendant Capital in Austin, Texas; and

    v. was aware of the Material Misrepresentations and Omissions described herein from the DD Reports and/or other communications from Ascendant

and GPB; repeated, distributed or promoted the Material Misrepresentations and Omissions to Class members through the Offering Materials; and substantially assisted Ascendant and the GPB Defendants in furtherance of the misconduct alleged by such efforts and by using the proceeds of sales of GPB limited partnership interests to fund the Ponzi scheme described herein.

ff. Defendant International Assets Advisory, LLC ("IA Advisory"), which:

    i. was incorporated in Florida and has a principal place of business in Orlando, FL;

    ii. executed a Form BD certifying that it consents to jurisdiction and venue in Texas and, in turn, in this Court, when it registered with the SEC and FINRA, as well as each time it made a required disclosure or amendment with the SEC and FINRA;

    iii. promoted and sold limited partnership interests in the GPB Funds, including, without limitation, in GPB Automotive Portfolio, LP; GPB Cold Storage, LP; GPB Holdings II; and GPB Waste Management, LP, thereby providing Ascendant and the GPB Defendants with the capital needed to continue the scheme described herein;

    iv. attended Ascendant Capital's due diligence meetings in, or webinars from Texas, and/or received marketing materials, PPMs, other Offering Materials and other information relating to the GPB Funds from Ascendant Capital in Texas, and submitted Class members' executed documentation to or through Ascendant Capital in Austin, Texas; and

    v.  was aware of the Material Misrepresentations and Omissions described herein from the DD Reports and/or other communications from Ascendant and GPB; repeated, distributed or promoted the Material Misrepresentations and Omissions to Class members through the Offering Materials; and substantially assisted Ascendant and the GPB Defendants in furtherance of the misconduct alleged by such efforts and by using the proceeds of sales of GPB limited partnership interests to fund the Ponzi scheme described herein.

gg. Defendant Kalos Capital, Inc. ("Kalos"), which:

    i.  was incorporated in Georgia and has a principal place of business in Alpharetta, GA;

    ii.  executed a Form BD certifying that it consents to jurisdiction and venue in Texas and, in turn, in this Court, when it registered with the SEC and FINRA, as well as each time it made a required disclosure or amendment with the SEC and FINRA;

    iii.  promoted and sold limited partnership interests in the GPB Funds, including, without limitation, in GPB Automotive Portfolio, LP; GPB Holdings II; and GPB Waste Management, LP, thereby providing Ascendant and the GPB Defendants with the capital needed to continue the scheme described herein;

    iv.  attended Ascendant Capital's due diligence meetings in, or webinars from Texas, and/or received marketing materials, PPMs, other Offering Materials and other information relating to the GPB Funds from Ascendant Capital in

Texas; submitted Class members' executed documentation to or through Ascendant Capital in Austin, Texas; presented as a panelist at GPB Capital Holding's Due Diligence conference on November 8, 2017; and

v. was aware of the Material Misrepresentations and Omissions described herein from the DD Reports and/or other communications from Ascendant and GPB; repeated, distributed or promoted the Material Misrepresentations and Omissions to Class members through the Offering Materials; and substantially assisted Ascendant and the GPB Defendants in furtherance of the misconduct alleged by such efforts and by using the proceeds of sales of GPB limited partnership interests to fund the Ponzi scheme described herein.

hh. Defendant Kingsbury Capital, Inc. ("Kingsbury"), which:

i. was incorporated in Illinois and has a principal place of business in Evanston, IL;

ii. executed a Form BD certifying that it consents to jurisdiction and venue in Texas and, in turn, in this Court, when it registered with the SEC and FINRA, as well as each time it made a required disclosure or amendment with the SEC and FINRA;

iii. promoted and sold limited partnership interests in the GPB Funds, including, without limitation, in GPB Automotive Portfolio, LP; GPB Holdings II; and GPB Waste Management, LP, thereby providing Ascendant and the GPB Defendants with the capital needed to continue the scheme described herein;

iv.   attended Ascendant Capital's due diligence meetings in, or webinars from Texas, and/or received marketing materials, PPMs, other Offering Materials and other information relating to the GPB Funds from Ascendant Capital in Texas, and submitted Class members' executed documentation to or through Ascendant Capital in Austin, Texas; and

v.   was aware of the Material Misrepresentations and Omissions described herein from the DD Reports and/or other communications from Ascendant and GPB; repeated, distributed or promoted the Material Misrepresentations and Omissions to Class members through the Offering Materials; and substantially assisted Ascendant and the GPB Defendants in furtherance of the misconduct alleged by such efforts and by using the proceeds of sales of GPB limited partnership interests to fund the Ponzi scheme described herein.

ii.   Defendant Landolt Securities, Inc. ("Landolt"), which:

i.   was incorporated in Wisconsin and has a principal place of business in Oshkosh, WI;

ii.   executed a Form BD certifying that it consents to jurisdiction and venue in Texas and, in turn, in this Court, when it registered with the SEC and FINRA, as well as each time it made a required disclosure or amendment with the SEC and FINRA;

iii.   promoted and sold limited partnership interests in the GPB Funds, including, without limitation, in GPB Automotive Portfolio, LP; GPB Holdings II; and GPB Waste Management, LP, thereby providing

Ascendant and the GPB Defendants with the capital needed to continue the scheme described herein;

    iv.   attended Ascendant Capital's due diligence meetings in, or webinars from Texas, and/or received marketing materials, PPMs, other Offering Materials and other information relating to the GPB Funds from Ascendant Capital in Texas, and submitted Class members' executed documentation to or through Ascendant Capital in Austin, Texas; and

    v.   was aware of the Material Misrepresentations and Omissions described herein from the DD Reports and/or other communications from Ascendant and GPB; repeated, distributed or promoted the Material Misrepresentations and Omissions to Class members through the Offering Materials; and substantially assisted Ascendant and the GPB Defendants in furtherance of the misconduct alleged by such efforts and by using the proceeds of sales of GPB limited partnership interests to fund the Ponzi scheme described herein.

jj.  Defendant Lewis Financial Group n/k/a DAI Securities, LLC ("Lewis"), which:

    i.   was incorporated in Minnesota and has a principal place of business in Mankato, MN;

    ii.   executed a Form BD certifying that it consents to jurisdiction and venue in Texas and, in turn, in this Court, when it registered with the SEC and FINRA, as well as each time it made a required disclosure or amendment with the SEC and FINRA;

    iii.  promoted and sold limited partnership interests in the GPB Funds, including, without limitation, in GPB Automotive Portfolio, LP, thereby providing Ascendant and the GPB Defendants with the capital needed to continue the scheme described herein;

    iv.  attended Ascendant Capital's due diligence meetings in, or webinars from Texas, and/or received marketing materials, PPMs, other Offering Materials and other information relating to the GPB Funds from Ascendant Capital in Texas, and submitted Class members' executed documentation to or through Ascendant Capital in Austin, Texas; and

    v.  was aware of the Material Misrepresentations and Omissions described herein from the DD Reports and/or other communications from Ascendant and GPB; repeated, distributed or promoted the Material Misrepresentations and Omissions to Class members through the Offering Materials; and substantially assisted Ascendant and the GPB Defendants in furtherance of the misconduct alleged by such efforts and by using the proceeds of sales of GPB limited partnership interests to fund the Ponzi scheme described herein.

kk. Defendant Lion Street Financial, LLC ("Lion"), which:

    i.  was incorporated in Texas and has a principal place of business in Austin, TX.  It operates offices in 37 states, including 21 offices in Texas;

    ii.  executed a Form BD certifying that it consents to jurisdiction and venue in Texas and, in turn, in this Court, when it registered with the SEC and

FINRA, as well as each time it made a required disclosure or amendment with the SEC and FINRA;

iii.  promoted and sold limited partnership interests in the GPB Funds, including, without limitation, in GPB Holdings II and GPB Waste Management, LP thereby providing Ascendant and the GPB Defendants with the capital needed to continue the scheme described herein. In addition, Lion offered, sold or participated in the offering and/or sale of the GPB limited partnership interests in Texas;

iv.  attended Ascendant Capital's due diligence meetings in, or webinars from Texas, and/or received marketing materials, PPMs, other Offering Materials and other information relating to the GPB Funds from Ascendant Capital in Texas, and submitted Class members' executed documentation to or through Ascendant Capital in Austin, Texas; and

v.  was aware of the Material Misrepresentations and Omissions described herein from the DD Reports and/or other communications from Ascendant and GPB; repeated, distributed or promoted the Material Misrepresentations and Omissions to Class members through the Offering Materials; and substantially assisted Ascendant and the GPB Defendants in furtherance of the misconduct alleged by such efforts and by using the proceeds of sales of GPB limited partnership interests to fund the Ponzi scheme described herein.

ll.  Defendant Lowell & Company, Inc. ("Lowell"), which:

i. was incorporated in Texas and has a principal place of business in Lubbock, TX;

ii. executed a Form BD certifying that it consents to jurisdiction and venue in Texas and, in turn, in this Court, when it registered with the SEC and FINRA, as well as each time it made a required disclosure or amendment with the SEC and FINRA;

iii. promoted and sold limited partnership interests in the GPB Funds, including, without limitation, in GPB Automotive Portfolio, LP and GPB Holdings II thereby providing Ascendant and the GPB Defendants with the capital needed to continue the scheme described herein. In addition, Cascade offered, sold or participated in the offering and/or sale of the GPB limited partnership interests in Texas;

iv. attended Ascendant Capital's due diligence meetings in, or webinars from Texas, and/or received marketing materials, PPMs, other Offering Materials and other information relating to the GPB Funds from Ascendant Capital in Texas, and submitted Class members' executed documentation to or through Ascendant Capital in Austin, Texas; and

v. was aware of the Material Misrepresentations and Omissions described herein from the DD Reports and/or other communications from Ascendant and GPB; repeated, distributed or promoted the Material Misrepresentations and Omissions to Class members through the Offering Materials; and substantially assisted Ascendant and the GPB Defendants in furtherance of the misconduct alleged by such efforts and by using the proceeds of sales

of GPB limited partnership interests to fund the Ponzi scheme described herein.

mm.     Defendant Lucia Securities, LLC ("Lucia"), which:

i.   was incorporated in Delaware and has a principal place of business in San Diego, CA;

ii.  executed a Form BD certifying that it consents to jurisdiction and venue in Texas and, in turn, in this Court, when it registered with the SEC and FINRA, as well as each time it made a required disclosure or amendment with the SEC and FINRA;

iii. promoted and sold limited partnership interests in the GPB Funds, including, without limitation, in GPB Waste Management, LP, thereby providing Ascendant and the GPB Defendants with the capital needed to continue the scheme described herein;

iv.  attended Ascendant Capital's due diligence meetings in, or webinars from Texas, and/or received marketing materials, PPMs, other Offering Materials and other information relating to the GPB Funds from Ascendant Capital in Texas, and submitted Class members' executed documentation to or through Ascendant Capital in Austin, Texas; and

v.   was aware of the Material Misrepresentations and Omissions described herein from the DD Reports and/or other communications from Ascendant and GPB; repeated, distributed or promoted the Material Misrepresentations and Omissions to Class members through the Offering Materials; and substantially assisted Ascendant and the GPB Defendants in furtherance of

the misconduct alleged by such efforts and by using the proceeds of sales of GPB limited partnership interests to fund the Ponzi scheme described herein.

nn. Defendant Madison Avenue Securities, LLC ("Madison"), which:

i. was incorporated in Delaware and has a principal place of business in San Diego, CA;

ii. executed a Form BD certifying that it consents to jurisdiction and venue in Texas and, in turn, in this Court, when it registered with the SEC and FINRA, as well as each time it made a required disclosure or amendment with the SEC and FINRA;

iii. promoted and sold limited partnership interests in the GPB Funds, including, without limitation, in GPB Automotive Portfolio, LP, thereby providing Ascendant and the GPB Defendants with the capital needed to continue the scheme described herein;

iv. attended Ascendant Capital's due diligence meetings in, or webinars from Texas, and/or received marketing materials, PPMs, other Offering Materials and other information relating to the GPB Funds from Ascendant Capital in Texas, and submitted Class members' executed documentation to or through Ascendant Capital in Austin, Texas; and

v. was aware of the Material Misrepresentations and Omissions described herein from the DD Reports and/or other communications from Ascendant and GPB; repeated, distributed or promoted the Material Misrepresentations and Omissions to Class members through the Offering Materials; and

substantially assisted Ascendant and the GPB Defendants in furtherance of the misconduct alleged by such efforts and by using the proceeds of sales of GPB limited partnership interests to fund the Ponzi scheme described herein.

oo. Defendant McDonald Partners LLC ("McDonald"), which:

   i. was incorporated in Ohio and has a principal place of business in Cleveland, OH.  It operates three (3) offices in Ohio and Michigan with over 40 employees;

   ii. executed a Form BD certifying that it consents to jurisdiction and venue in Texas and, in turn, in this Court, when it registered with the SEC and FINRA, as well as each time it made a required disclosure or amendment with the SEC and FINRA;

   iii. promoted and sold limited partnership interests in the GPB Funds, including, without limitation, in GPB Automotive Portfolio, LP and GPB Holdings II, thereby providing Ascendant and the GPB Defendants with the capital needed to continue the scheme described herein;

   iv. attended Ascendant Capital's due diligence meetings in, or webinars from Texas, and/or received marketing materials, PPMs, other Offering Materials and other information relating to the GPB Funds from Ascendant Capital in Texas, and submitted Class members' executed documentation to or through Ascendant Capital in Austin, Texas; and

   v. was aware of the Material Misrepresentations and Omissions described herein from the DD Reports and/or other communications from Ascendant

and GPB; repeated, distributed or promoted the Material Misrepresentations and Omissions to Class members through the Offering Materials; and substantially assisted Ascendant and the GPB Defendants in furtherance of the misconduct alleged by such efforts and by using the proceeds of sales of GPB limited partnership interests to fund the Ponzi scheme described herein.

pp.  Defendant McNally Financial Services Corporation ("McNally"), which:

    i.  was incorporated in Texas and has a principal place of business in San Antonio, TX.  It operates offices in Texas, California, Florida, and Nevada, including one (1) office in San Antonio, Texas;

    ii.  executed a Form BD certifying that it consents to jurisdiction and venue in Texas and, in turn, in this Court, when it registered with the SEC and FINRA, as well as each time it made a required disclosure or amendment with the SEC and FINRA;

    iii.  promoted and sold limited partnership interests in the GPB Funds, including, without limitation, in GPB Automotive Portfolio, LP and GPB Waste Management, LP thereby providing Ascendant and the GPB Defendants with the capital needed to continue the scheme described herein. In addition, McNally offered, sold or participated in the offering and/or sale of the GPB limited partnership interests in Texas;

    iv.  attended Ascendant Capital's due diligence meetings in, or webinars from Texas, and/or received marketing materials, PPMs, other Offering Materials and other information relating to the GPB Funds from Ascendant Capital in

Texas, and submitted Class members' executed documentation to or through Ascendant Capital in Austin, Texas; and

v. was aware of the Material Misrepresentations and Omissions described herein from the DD Reports and/or other communications from Ascendant and GPB; repeated, distributed or promoted the Material Misrepresentations and Omissions to Class members through the Offering Materials; and substantially assisted Ascendant and the GPB Defendants in furtherance of the misconduct alleged by such efforts and by using the proceeds of sales of GPB limited partnership interests to fund the Ponzi scheme described herein.

qq. Defendant Moloney Securities Co., Inc. ("Moloney"), which:

i. was incorporated in Missouri and has a principal place of business in Manchester, MO. It operates offices throughout the United States with over 100 employees, including three (3) offices and four (4) brokers in Kerrville, Fort Worth, and Cleburne, Texas;

ii. executed a Form BD certifying that it consents to jurisdiction and venue in Texas and, in turn, in this Court, when it registered with the SEC and FINRA, as well as each time it made a required disclosure or amendment with the SEC and FINRA;

iii. promoted and sold limited partnership interests in the GPB Funds, including, without limitation, in GPB Automotive Portfolio, LP; GPB Cold Storage, LP; GPB NYC Development, LP; GPB Holdings II; and GPB Waste Management, LP thereby providing Ascendant and the GPB

Defendants with the capital needed to continue the scheme described herein. In addition, Moloney offered, sold or participated in the offering and/or sale of the GPB limited partnership interests in Texas;

iv.   attended Ascendant Capital's due diligence meetings in, or webinars from Texas, and/or received marketing materials, PPMs, other Offering Materials and other information relating to the GPB Funds from Ascendant Capital in Texas, and submitted Class members' executed documentation to or through Ascendant Capital in Austin, Texas; and

v.   was aware of the Material Misrepresentations and Omissions described herein from the DD Reports and/or other communications from Ascendant and GPB; repeated, distributed or promoted the Material Misrepresentations and Omissions to Class members through the Offering Materials; and substantially assisted Ascendant and the GPB Defendants in furtherance of the misconduct alleged by such efforts and by using the proceeds of sales of GPB limited partnership interests to fund the Ponzi scheme described herein.

rr.  Defendant Money Concepts Capital Corporation ("MCC"), which:

i.   was incorporated in Florida and has a principal place of business in Palm Beach Gardens, FL;

ii.   executed a Form BD certifying that it consents to jurisdiction and venue in Texas and, in turn, in this Court, when it registered with the SEC and FINRA, as well as each time it made a required disclosure or amendment with the SEC and FINRA;

iii. promoted and sold limited partnership interests in the GPB Funds, including, without limitation, in GPB Automotive Portfolio, LP; GPB Holdings II; and GPB Waste Management, LP, thereby providing Ascendant and the GPB Defendants with the capital needed to continue the scheme described herein;

iv. attended Ascendant Capital's due diligence meetings in, or webinars from Texas, and/or received marketing materials, PPMs, other Offering Materials and other information relating to the GPB Funds from Ascendant Capital in Texas, and submitted Class members' executed documentation to or through Ascendant Capital in Austin, Texas; and

v. was aware of the Material Misrepresentations and Omissions described herein from the DD Reports and/or other communications from Ascendant and GPB; repeated, distributed or promoted the Material Misrepresentations and Omissions to Class members through the Offering Materials; and substantially assisted Ascendant and the GPB Defendants in furtherance of the misconduct alleged by such efforts and by using the proceeds of sales of GPB limited partnership interests to fund the Ponzi scheme described herein.

ss. Defendant MSC-BD, LLC ("MSC-BD"), which:

i. was incorporated in Florida and has a principal place of business in Cumming, GA;

ii. executed a Form BD certifying that it consents to jurisdiction and venue in Texas and, in turn, in this Court, when it registered with the SEC and

FINRA, as well as each time it made a required disclosure or amendment with the SEC and FINRA;

iii. promoted and sold limited partnership interests in the GPB Funds, including, without limitation, in GPB Automotive Portfolio, LP and GPB Holdings II, thereby providing Ascendant and the GPB Defendants with the capital needed to continue the scheme described herein;

iv. attended Ascendant Capital's due diligence meetings in, or webinars from Texas, and/or received marketing materials, PPMs, other Offering Materials and other information relating to the GPB Funds from Ascendant Capital in Texas, and submitted Class members' executed documentation to or through Ascendant Capital in Austin, Texas; and

v. was aware of the Material Misrepresentations and Omissions described herein from the DD Reports and/or other communications from Ascendant and GPB; repeated, distributed or promoted the Material Misrepresentations and Omissions to Class members through the Offering Materials; and substantially assisted Ascendant and the GPB Defendants in furtherance of the misconduct alleged by such efforts and by using the proceeds of sales of GPB limited partnership interests to fund the Ponzi scheme described herein.

tt. Defendant Newbridge Securities Corporation ("Newbridge"), which:

i. was incorporated in Virginia and has a principal place of business in Boca Raton, FL.  It operates eleven (11) offices in Florida, New York, Arizona,

Illinois, New Jersey, and Louisiana, with over 100 employees, with brokers in eight (8) additional states, including Texas;

ii. executed a Form BD certifying that it consents to jurisdiction and venue in Texas and, in turn, in this Court, when it registered with the SEC and FINRA, as well as each time it made a required disclosure or amendment with the SEC and FINRA;

iii. promoted and sold limited partnership interests in the GPB Funds, including, without limitation, in GPB Automotive Portfolio, LP and GPB Holdings II thereby providing Ascendant and the GPB Defendants with the capital needed to continue the scheme described herein. In addition, Newbridge offered, sold or participated in the offering and/or sale of the GPB limited partnership interests in Texas;

iv. attended Ascendant Capital's due diligence meetings in, or webinars from Texas, and/or received marketing materials, PPMs, other Offering Materials and other information relating to the GPB Funds from Ascendant Capital in Texas, and submitted Class members' executed documentation to or through Ascendant Capital in Austin, Texas; and

v. was aware of the Material Misrepresentations and Omissions described herein from the DD Reports and/or other communications from Ascendant and GPB; repeated, distributed or promoted the Material Misrepresentations and Omissions to Class members through the Offering Materials; and substantially assisted Ascendant and the GPB Defendants in furtherance of the misconduct alleged by such efforts and by using the proceeds of sales

of GPB limited partnership interests to fund the Ponzi scheme described herein.

uu.   Defendant Orchard Securities, LLC ("Orchard"), which:

i.   was incorporated in Utah and has a principal place of business in Pleasant Grove, UT;

ii.   executed a Form BD certifying that it consents to jurisdiction and venue in Texas and, in turn, in this Court, when it registered with the SEC and FINRA, as well as each time it made a required disclosure or amendment with the SEC and FINRA;

iii.   promoted and sold limited partnership interests in the GPB Funds, including, without limitation, in GPB Automotive Portfolio, LP; GPB Holdings II; and GPB Waste Management, LP, thereby providing Ascendant and the GPB Defendants with the capital needed to continue the scheme described herein;

iv.   attended Ascendant Capital's due diligence meetings in, or webinars from Texas, and/or received marketing materials, PPMs, other Offering Materials and other information relating to the GPB Funds from Ascendant Capital in Texas, and submitted Class members' executed documentation to or through Ascendant Capital in Austin, Texas; and

v.   was aware of the Material Misrepresentations and Omissions described herein from the DD Reports and/or other communications from Ascendant and GPB; repeated, distributed or promoted the Material Misrepresentations and Omissions to Class members through the Offering Materials; and

substantially assisted Ascendant and the GPB Defendants in furtherance of the misconduct alleged by such efforts and by using the proceeds of sales of GPB limited partnership interests to fund the Ponzi scheme described herein.

vi.

vv. Defendant Purshe Kaplan Sterling Investments, Inc. ("Purshe"), which:

i. was incorporated in New York and has a principal place of business in Albany, NY. It operates 388 offices throughout the United States with over 1000 employees, including fifteen (15) offices in Texas;

ii. executed a Form BD certifying that it consents to jurisdiction and venue in Texas and, in turn, in this Court, when it registered with the SEC and FINRA, as well as each time it made a required disclosure or amendment with the SEC and FINRA;

iii. promoted and sold limited partnership interests in the GPB Funds, including, without limitation, in GPB Automotive Portfolio, LP and GPB Holdings II thereby providing Ascendant and the GPB Defendants with the capital needed to continue the scheme described herein. In addition, Purshe offered, sold or participated in the offering and/or sale of the GPB limited partnership interests in Texas;

iv. attended Ascendant Capital's due diligence meetings in, or webinars from Texas, and/or received marketing materials, PPMs, other Offering Materials and other information relating to the GPB Funds from Ascendant Capital in

Texas, and submitted Class members' executed documentation to or through Ascendant Capital in Austin, Texas;

v.  was aware of the Material Misrepresentations and Omissions described herein from the DD Reports and/or other communications from Ascendant and GPB; repeated, distributed or promoted the Material Misrepresentations and Omissions to Class members through the Offering Materials; and substantially assisted Ascendant and the GPB Defendants in furtherance of the misconduct alleged by such efforts and by using the proceeds of sales of GPB limited partnership interests to fund the Ponzi scheme described herein; and

vi.  was also made aware of many of the Material Misrepresentations and Omissions as early as 2016, when a compliance executive at Purshe raised concerns to Purshe senior management about GPB Capital Holdings.  In particular, in connection with a review of Holdings II, that Purshe executive provided written support that members of senior management at GPB Capital were utilizing investor funds to monetize personal business interests.  Accordingly, the executive did not recommend that Holdings II be approved for the Purshe platform. Despite this, Purshe continued to promote, offer and sell GPB limited partnership interests to investors.

ww.  Defendant Royal Alliance Associates, Inc. ("Royal"), which:

i.  was incorporated in Delaware and has a principal place of business in Jersey City, NJ.  It operates offices in 41 states with over 3,000 employees, including ten (10) offices in Texas;

ii. executed a Form BD certifying that it consents to jurisdiction and venue in Texas and, in turn, in this Court, when it registered with the SEC and FINRA, as well as each time it made a required disclosure or amendment with the SEC and FINRA;

iii. promoted and sold limited partnership interests in the GPB Funds, including, without limitation, in GPB Automotive Portfolio, LP and GPB Holdings II thereby providing Ascendant and the GPB Defendants with the capital needed to continue the scheme described herein. In addition, Royal offered, sold or participated in the offering and/or sale of the GPB limited partnership interests in Texas;

iv. attended Ascendant Capital's due diligence meetings in, or webinars from Texas, and/or received marketing materials, PPMs, other Offering Materials and other information relating to the GPB Funds from Ascendant Capital in Texas, and submitted Class members' executed documentation to or through Ascendant Capital in Austin, Texas; and

v. was aware of the Material Misrepresentations and Omissions described herein from the DD Reports and/or other communications from Ascendant and GPB; repeated, distributed or promoted the Material Misrepresentations and Omissions to Class members through the Offering Materials; and substantially assisted Ascendant and the GPB Defendants in furtherance of the misconduct alleged by such efforts and by using the proceeds of sales of GPB limited partnership interests to fund the Ponzi scheme described herein.

xx. Defendant SagePoint Financial, Inc. ("SagePoint"), which:

    i. was incorporated in Delaware and has a principal place of business in Phoenix, AZ. It operates offices throughout the country with over 1400 advisors and over 7,000 affiliated advisors and has over a dozen brokerage offices in Texas, including in this District;

    ii. executed a Form BD certifying that it consents to jurisdiction and venue in Texas and, in turn, in this Court, when it registered with the SEC and FINRA, as well as each time it made a required disclosure or amendment with the SEC and FINRA;

    iii. promoted and sold limited partnership interests in the GPB Funds, including, without limitation, in GPB Automotive Portfolio, LP and GPB Holdings II, thereby providing Ascendant and the GPB Defendants with the capital needed to continue the scheme described herein. In addition, SagePoint offered, sold or participated in the offering and/or sale of the GPB limited partnership interests in Texas;

    iv. sold interests in GPB limited partnerships in Texas, including to Plaintiff Wade;

    v. attended Ascendant Capital's due diligence meetings in, or webinars from Texas, and/or received marketing materials, PPMs, other Offering Materials and other information relating to the GPB Funds from Ascendant Capital in Texas, and submitted Class members' executed documentation to or through Ascendant Capital in Austin, Texas; and

vi.   was aware of the Material Misrepresentations and Omissions described herein from the DD Reports and/or other communications from Ascendant and GPB; repeated, distributed or promoted the Material Misrepresentations and Omissions to Class members through the Offering Materials; and substantially assisted Ascendant and the GPB Defendants in furtherance of the misconduct alleged by such efforts and by using the proceeds of sales of GPB limited partnership interests to fund the Ponzi scheme described herein.

yy.   Defendant SCF Securities, Inc. ("SCF"), which:

i.   was incorporated in Arizona and has a principal place of business in Fresno, CA;

ii.   executed a Form BD certifying that it consents to jurisdiction and venue in Texas and, in turn, in this Court, when it registered with the SEC and FINRA, as well as each time it made a required disclosure or amendment with the SEC and FINRA;

iii.   promoted and sold limited partnership interests in the GPB Funds, including, without limitation, in GPB Automotive Portfolio, LP, thereby providing Ascendant and the GPB Defendants with the capital needed to continue the scheme described herein;

iv.   attended Ascendant Capital's due diligence meetings in, or webinars from Texas, and/or received marketing materials, PPMs, other Offering Materials and other information relating to the GPB Funds from Ascendant Capital in

Texas, and submitted Class members' executed documentation to or through Ascendant Capital in Austin, Texas; and

v.  was aware of the Material Misrepresentations and Omissions described herein from the DD Reports and/or other communications from Ascendant and GPB; repeated, distributed or promoted the Material Misrepresentations and Omissions to Class members through the Offering Materials; and substantially assisted Ascendant and the GPB Defendants in furtherance of the misconduct alleged by such efforts and by using the proceeds of sales of GPB limited partnership interests to fund the Ponzi scheme described herein.

zz. Defendant Sentinus Securities n/k/a Sentinus-Halo Securities, LLC ("Sentinus"), which:

i.  was incorporated in Illinois and has a principal place of business in Oak Brook, IL;

ii.  executed a Form BD certifying that it consents to jurisdiction and venue in Texas and, in turn, in this Court, when it registered with the SEC and FINRA, as well as each time it made a required disclosure or amendment with the SEC and FINRA;

iii.  promoted and sold limited partnership interests in the GPB Funds, including, without limitation, in GPB Automotive Portfolio, LP and GPB Waste Management, LP, thereby providing Ascendant and the GPB Defendants with the capital needed to continue the scheme described herein;

    iv.  attended Ascendant Capital's due diligence meetings in, or webinars from Texas, and/or received marketing materials, PPMs, other Offering Materials and other information relating to the GPB Funds from Ascendant Capital in Texas, and submitted Class members' executed documentation to or through Ascendant Capital in Austin, Texas; and

    v.  was aware of the Material Misrepresentations and Omissions described herein from the DD Reports and/or other communications from Ascendant and GPB; repeated, distributed or promoted the Material Misrepresentations and Omissions to Class members through the Offering Materials; and substantially assisted Ascendant and the GPB Defendants in furtherance of the misconduct alleged by such efforts and by using the proceeds of sales of GPB limited partnership interests to fund the Ponzi scheme described herein.

aaa.    Defendant Stephen A. Kohn & Associates, Ltd. ("Kohn"), which:

    i.  was incorporated in Colorado and has a principal place of business in Lakewood, CO;

    ii.  executed a Form BD certifying that it consents to jurisdiction and venue in Texas and, in turn, in this Court, when it registered with the SEC and FINRA, as well as each time it made a required disclosure or amendment with the SEC and FINRA;

    iii.  promoted and sold limited partnership interests in the GPB Funds, including, without limitation, in GPB Automotive Portfolio, LP; GPB Holdings II; and GPB Waste Management, LP, thereby providing

Ascendant and the GPB Defendants with the capital needed to continue the scheme described herein;

iv. attended Ascendant Capital's due diligence meetings in, or webinars from Texas, and/or received marketing materials, PPMs, other Offering Materials and other information relating to the GPB Funds from Ascendant Capital in Texas, and submitted Class members' executed documentation to or through Ascendant Capital in Austin, Texas; and

v. was aware of the Material Misrepresentations and Omissions described herein from the DD Reports and/or other communications from Ascendant and GPB; repeated, distributed or promoted the Material Misrepresentations and Omissions to Class members through the Offering Materials; and substantially assisted Ascendant and the GPB Defendants in furtherance of the misconduct alleged by such efforts and by using the proceeds of sales of GPB limited partnership interests to fund the Ponzi scheme described herein.

bbb. Defendant Titan Securities ("Titan"), which:

i. was incorporated in California and has a principal place of business in Addison, TX;

ii. executed a Form BD certifying that it consents to jurisdiction and venue in Texas and, in turn, in this Court, when it registered with the SEC and FINRA, as well as each time it made a required disclosure or amendment with the SEC and FINRA;

iii. promoted and sold limited partnership interests in the GPB Funds, including, without limitation, in GPB Waste Management, LP, thereby providing Ascendant and the GPB Defendants with the capital needed to continue the scheme described herein. In addition, Titan offered, sold or participated in the offering and/or sale of the GPB limited partnership interests in Texas;

iv. attended Ascendant Capital's due diligence meetings in, or webinars from Texas, and/or received marketing materials, PPMs, other Offering Materials and other information relating to the GPB Funds from Ascendant Capital in Texas, and submitted Class members' executed documentation to or through Ascendant Capital in Austin, Texas; and

v. was aware of the Material Misrepresentations and Omissions described herein from the DD Reports and/or other communications from Ascendant and GPB; repeated, distributed or promoted the Material Misrepresentations and Omissions to Class members through the Offering Materials; and substantially assisted Ascendant and the GPB Defendants in furtherance of the misconduct alleged by such efforts and by using the proceeds of sales of GPB limited partnership interests to fund the Ponzi scheme described herein.

ccc. Defendant Triad Advisors LLC ("Triad"), which:

i. was incorporated in Florida and has a principal place of business in Norcross, GA.  It operates one office in Georgia, with branches across the country, and over 550 employees;

ii.  executed a Form BD certifying that it consents to jurisdiction and venue in Texas and, in turn, in this Court, when it registered with the SEC and FINRA, as well as each time it made a required disclosure or amendment with the SEC and FINRA;

iii.  promoted and sold limited partnership interests in the GPB Funds, including, without limitation, in GPB Automotive Portfolio, LP, thereby providing Ascendant and the GPB Defendants with the capital needed to continue the scheme described herein;

iv.  attended Ascendant Capital's due diligence meetings in, or webinars from Texas, and/or received marketing materials, PPMs, other Offering Materials and other information relating to the GPB Funds from Ascendant Capital in Texas, and submitted Class members' executed documentation to or through Ascendant Capital in Austin, Texas; and

v.  was aware of the Material Misrepresentations and Omissions described herein from the DD Reports and/or other communications from Ascendant and GPB; repeated, distributed or promoted the Material Misrepresentations and Omissions to Class members through the Offering Materials; and substantially assisted Ascendant and the GPB Defendants in furtherance of the misconduct alleged by such efforts and by using the proceeds of sales of GPB limited partnership interests to fund the Ponzi scheme described herein.

ddd.  Defendant Uhlmann Price Securities, LLC ("Uhlmann"), which:

i.   was incorporated in Illinois and has a principal place of business in Chicago, IL;

ii.  executed a Form BD certifying that it consents to jurisdiction and venue in Texas and, in turn, in this Court, when it registered with the SEC and FINRA, as well as each time it made a required disclosure or amendment with the SEC and FINRA;

iii. promoted and sold limited partnership interests in the GPB Funds, including, without limitation, in GPB Automotive Portfolio, LP and GPB Holdings II, thereby providing Ascendant and the GPB Defendants with the capital needed to continue the scheme described herein;

iv.  attended Ascendant Capital's due diligence meetings in, or webinars from Texas, and/or received marketing materials, PPMs, other Offering Materials and other information relating to the GPB Funds from Ascendant Capital in Texas, and submitted Class members' executed documentation to or through Ascendant Capital in Austin, Texas; and

v.   was aware of the Material Misrepresentations and Omissions described herein from the DD Reports and/or other communications from Ascendant and GPB; repeated, distributed or promoted the Material Misrepresentations and Omissions to Class members through the Offering Materials; and substantially assisted Ascendant and the GPB Defendants in furtherance of the misconduct alleged by such efforts and by using the proceeds of sales of GPB limited partnership interests to fund the Ponzi scheme described herein.

eee.   Defendant United Planners' Financial Services of America LP ("UPFSA"), which:

    i.  was incorporated in Arizona and has a principal place of business in Scottsdale, AZ;

    ii.  executed a Form BD certifying that it consents to jurisdiction and venue in Texas and, in turn, in this Court, when it registered with the SEC and FINRA, as well as each time it made a required disclosure or amendment with the SEC and FINRA;

    iii.  promoted and sold limited partnership interests in the GPB Funds, including, without limitation, in GPB Holdings II, thereby providing Ascendant and the GPB Defendants with the capital needed to continue the scheme described herein;

    iv.  attended Ascendant Capital's due diligence meetings in, or webinars from Texas, and/or received marketing materials, PPMs, other Offering Materials and other information relating to the GPB Funds from Ascendant Capital in Texas, and submitted Class members' executed documentation to or through Ascendant Capital in Austin, Texas; and

    v.  was aware of the Material Misrepresentations and Omissions described herein from the DD Reports and/or other communications from Ascendant and GPB; repeated, distributed or promoted the Material Misrepresentations and Omissions to Class members through the Offering Materials; and substantially assisted Ascendant and the GPB Defendants in furtherance of the misconduct alleged by such efforts and by using the proceeds of sales

of GPB limited partnership interests to fund the Ponzi scheme described herein.

fff.  Defendant Vanderbilt Securities, LLC ("Vanderbilt"), which:

    i.  was incorporated in New York and has a principal place of business in Woodbury, NY.  It employs over 150 brokers across 46 states, including one (1) office in Plano, Texas;

    ii.  executed a Form BD certifying that it consents to jurisdiction and venue in Texas and, in turn, in this Court, when it registered with the SEC and FINRA, as well as each time it made a required disclosure or amendment with the SEC and FINRA;

    iii.  promoted and sold limited partnership interests in the GPB Funds, including, without limitation, in GPB Automotive Portfolio, LP; GPB Holdings II; and GPB Waste Management, LP, thereby providing Ascendant and the GPB Defendants with the capital needed to continue the scheme described herein. In addition, Vanderbilt offered, sold or participated in the offering and/or sale of the GPB limited partnership interests in Texas;

    iv.  attended Ascendant Capital's due diligence meetings in, or webinars from Texas, and/or received marketing materials, PPMs, other Offering Materials and other information relating to the GPB Funds from Ascendant Capital in Texas, and submitted Class members' executed documentation to or through Ascendant Capital in Austin, Texas; and

v.   was aware of the Material Misrepresentations and Omissions described herein from the DD Reports and/or other communications from Ascendant and GPB; repeated, distributed or promoted the Material Misrepresentations and Omissions to Class members through the Offering Materials; and substantially assisted Ascendant and the GPB Defendants in furtherance of the misconduct alleged by such efforts and by using the proceeds of sales of GPB limited partnership interests to fund the Ponzi scheme described herein.

ggg. Defendant Vestech Securities, Inc. ("Vestech"), which:

i.   was incorporated in Kansas and has a principal place of business in St. Louis, MO;

ii.   executed a Form BD certifying that it consents to jurisdiction and venue in Texas and, in turn, in this Court, when it registered with the SEC and FINRA, as well as each time it made a required disclosure or amendment with the SEC and FINRA;

iii.   promoted and sold limited partnership interests in the GPB Funds, including, without limitation, in GPB Automotive Portfolio, LP; GPB Holdings II; and GPB Waste Management, LP, thereby providing Ascendant and the GPB Defendants with the capital needed to continue the scheme described herein;

iv.   attended Ascendant Capital's due diligence meetings in, or webinars from Texas, and/or received marketing materials, PPMs, other Offering Materials and other information relating to the GPB Funds from Ascendant Capital in

Texas, and submitted Class members' executed documentation to or through Ascendant Capital in Austin, Texas; and

v. was aware of the Material Misrepresentations and Omissions described herein from the DD Reports and/or other communications from Ascendant and GPB; repeated, distributed or promoted the Material Misrepresentations and Omissions to Class members through the Offering Materials; and substantially assisted Ascendant and the GPB Defendants in furtherance of the misconduct alleged by such efforts and by using the proceeds of sales of GPB limited partnership interests to fund the Ponzi scheme described herein.

hhh. Defendant Western International Securities, Inc. ("Western"), which:

i. was incorporated in Colorado and has a principal place of business in Pasadena, CA. It operates over 40 offices throughout the country including at least three (3) in Texas;

ii. executed a Form BD certifying that it consents to jurisdiction and venue in Texas and, in turn, in this Court, when it registered with the SEC and FINRA, as well as each time it made a required disclosure or amendment with the SEC and FINRA;

iii. promoted and sold limited partnership interests in the GPB Funds, including, without limitation, in GPB Automotive Portfolio, LP; GPB Holdings II; and GPB Waste Management, LP, thereby providing Ascendant and the GPB Defendants with the capital needed to continue the

scheme described herein. In addition, Western offered, sold or participated in the offering and/or sale of the GPB limited partnership interests in Texas;

iv. attended Ascendant Capital's due diligence meetings in, or webinars from Texas, and/or received marketing materials, PPMs, other Offering Materials and other information relating to the GPB Funds from Ascendant Capital in Texas, and submitted Class members' executed documentation to or through Ascendant Capital in Austin, Texas; and

v. was aware of the Material Misrepresentations and Omissions described herein from the DD Reports and/or other communications from Ascendant and GPB; repeated, distributed or promoted the Material Misrepresentations and Omissions to Class members through the Offering Materials; and substantially assisted Ascendant and the GPB Defendants in furtherance of the misconduct alleged by such efforts and by using the proceeds of sales of GPB limited partnership interests to fund the Ponzi scheme described herein.

iii. Defendant WestPark Capital, Inc. ("WestPark"), which:

i. was incorporated in Colorado and has a principal place of business in Los Angeles, CA.  It operates one (1) office in California, with three (3) offices in Florida, New York, and California, and locations in Shanghai, China; Hong Kong; Taipei, Taiwan; and Istanbul, Turkey;

ii. executed a Form BD certifying that it consents to jurisdiction and venue in Texas and, in turn, in this Court, when it registered with the SEC and

FINRA, as well as each time it made a required disclosure or amendment with the SEC and FINRA;

iii. promoted and sold limited partnership interests in the GPB Funds, including, without limitation, in GPB Automotive Portfolio, LP; GPB Holdings II; and GPB Waste Management, LP, thereby providing Ascendant and the GPB Defendants with the capital needed to continue the scheme described herein;

iv. attended Ascendant Capital's due diligence meetings in, or webinars from Texas, and/or received marketing materials, PPMs, other Offering Materials and other information relating to the GPB Funds from Ascendant Capital in Texas, and submitted Class members' executed documentation to or through Ascendant Capital in Austin, Texas; and

v. was aware of the Material Misrepresentations and Omissions described herein from the DD Reports and/or other communications from Ascendant and GPB; repeated, distributed or promoted the Material Misrepresentations and Omissions to Class members through the Offering Materials; and substantially assisted Ascendant and the GPB Defendants in furtherance of the misconduct alleged by such efforts and by using the proceeds of sales of GPB limited partnership interests to fund the Ponzi scheme described herein.

jjj. Defendant Whitehall-Parker Securities, Inc. ("Whitehall"), which:

i. was incorporated in California and has a principal place of business in San Francisco, CA;

ii.  executed a Form BD certifying that it consents to jurisdiction and venue in Texas and, in turn, in this Court, when it registered with the SEC and FINRA, as well as each time it made a required disclosure or amendment with the SEC and FINRA;

iii.  promoted and sold limited partnership interests in the GPB Funds, including, without limitation, in GPB Automotive Portfolio, LP; GPB Holdings II; and GPB Waste Management, LP, thereby providing Ascendant and the GPB Defendants with the capital needed to continue the scheme described herein;

iv.  attended Ascendant Capital's due diligence meetings in, or webinars from Texas, and/or received marketing materials, PPMs, other Offering Materials and other information relating to the GPB Funds from Ascendant Capital in Texas, and submitted Class members' executed documentation to or through Ascendant Capital in Austin, Texas; and

v.  was aware of the Material Misrepresentations and Omissions described herein from the DD Reports and/or other communications from Ascendant and GPB; repeated, distributed or promoted the Material Misrepresentations and Omissions to Class members through the Offering Materials; and substantially assisted Ascendant and the GPB Defendants in furtherance of the misconduct alleged by such efforts and by using the proceeds of sales of GPB limited partnership interests to fund the Ponzi scheme described herein.

kkk.  Defendant Woodbury Financial Services, Inc. ("Woodbury"), which:

    i.   was incorporated in Minnesota and has a principal place of business in Oakdale, MN.  It operates 14 offices throughout the country with over 1600 employees, including one (1) office and two (2) brokers in Addison, Texas;

   ii.   executed a Form BD certifying that it consents to jurisdiction and venue in Texas and, in turn, in this Court, when it registered with the SEC and FINRA, as well as each time it made a required disclosure or amendment with the SEC and FINRA;

  iii.   promoted and sold limited partnership interests in the GPB Funds, including, without limitation, in GPB Automotive Portfolio, LP and GPB Holdings II, thereby providing Ascendant and the GPB Defendants with the capital needed to continue the scheme described herein. In addition, Woodbury offered, sold or participated in the offering and/or sale of the GPB limited partnership interests in Texas;

  iv.   attended Ascendant Capital's due diligence meetings in, or webinars from Texas, and/or received marketing materials, PPMs, other Offering Materials and other information relating to the GPB Funds from Ascendant Capital in Texas, and submitted Class members' executed documentation to or through Ascendant Capital in Austin, Texas; and

   v.   was aware of the Material Misrepresentations and Omissions described herein from the DD Reports and/or other communications from Ascendant and GPB; repeated, distributed or promoted the Material Misrepresentations and Omissions to Class members through the Offering Materials; and substantially assisted Ascendant and the GPB Defendants in furtherance of

the misconduct alleged by such efforts and by using the proceeds of sales

of GPB limited partnership interests to fund the Ponzi scheme described

herein.

133.    As noted, the brokerage firms set forth in the above paragraphs are collectively

referred to herein as the "Broker Defendants."

## FACTUAL ALLEGATIONS

**A.    Gentile and Schneider Embark on Their Scheme to Fraudulently Raise Money from Investors Employing a Secret Agreement to Share Profits**

134.    In or about 2012, Austin, Texas resident Schneider formed Ascendant as a provider

of alternative investment solutions. In or about 2013, Schneider approached Gentile with the

concept for GPB Capital: "partnering on an income-producing private equity fund." *Creating a*

*Corporate Culture That Gives Back,* 30 Founding Austin (Sept. 19, 2017),

http://www.foundingaustin.com/home/ascendantcap (publishing a Schneider interview). The pair

set out to establish a mechanism whereby they could generate exceedingly large fees and

commissions for themselves through a series of limited partnership vehicles which owned illiquid

assets. Out of this concept, Schneider and Gentile created GPB Capital, an alternative asset

management firm based in New York. The pair agreed to split their profits from GPB and

Ascendant, but did not disclose this secret deal to investors.

135.    Schneider, working from Texas, was intricately involved in the business of GPB

Capital and was a "promoter" as defined in Regulation D. In fact, according to the above-

referenced September 2017 interview, Schneider has admitted that he was the creator of the GPB

structure and "in 2013, [he] helped [Gentile] launch an income-producing private equity fund

called GPB Holdings," which was the first of the Funds. On information and belief, Schneider in

Texas was a primary draftsman of the GPB PPMs.

136.     Apparently realizing the huge fees that he could garner by his involvement in both operating the Funds and acting as a broker in selling them, in 2015, Schneider "dedicated [his] company, Ascendant Capital, to structuring funds and raising capital exclusively for GPB."

137.     Gentile and Schneider used Schneider's Austin-based firm Ascendant, a branch office of Axiom, to act as the principal distribution agent of the Offerings.

138.     According to a March 28, 2015 Form ADV filed by GPB with the SEC, GPB describes itself as follows:

> GPB is an investment adviser that structures, manages, promotes, sponsors, and through itself and affiliate entities serves as the general partner and/or investment manager of various limited partnerships (the "Funds"). GPB was formed in March of 2013 and is owned by David Gentile.

139.     Neither the PPMs nor the Forms ADV filed by GPB disclosed Schneider's role as a promoter, co-founder and control person of GPB. Nor did they properly disclose that Gentile, the principal of the general partner of the issuer, had a majority ownership interest in Ascendant. These material conflicts of interest were never fully disclosed to investors throughout the GPB Ponzi scheme. Thus, unlike the Defendants, including the Broker Defendants, Phoenix and the Auditor Defendants, investors did not know when they invested that Schneider and Ascendant, the lead broker for the distribution of the Securities, were conflicted by Schneider's financial interest in GPB, or that Gentile and GPB were conflicted by their interest in the broker selling the Securities.

140.     The PPMs and Forms ADV filed by GPB also did not disclose Ascendant Capital's outsized role in the offering of the GPB Funds.

141.     Ascendant Capital, according to its own website, focuses on "Bringing Alternative Investments to Financial Advisors." It claims that:

Ascendant Capital is a leading provider of alternative product solutions for advisors. We focus on bringing what were once institutional-only investment offerings to retail investors. At Ascendant Capital, we are committed to understanding the needs of the market. We both source and partner with high-quality investment managers to create differentiated strategies to meet client needs. We consult, structure, market, and service these offerings, working to ensure that our relationships receive a high-level of investment quality and service.

142.    But even this did not adequately describe Schneider or Ascendant Capital's role in the Offerings.   In a March 2018 Due Diligence Questionnaire (DDQ), provided to Broker Defendants, Ascendant Capital described all of the services it provides (from Texas) to GPB, broker dealers and RIAs, and investors:

*Sales Support, Client Services and Operations*

### 60. Who is Ascendant Capital, and what is the relationship between Ascendant [Capital] and GPB?

Ascendant Capital is GPB's exclusive third-party capital markets organization. With over 50 employees, Ascendant [Capital] has more than a decade of capital markets experience in the independent broker/dealer space and has specialists from the independent broker/dealer, RIA and institutional marketplace. Ascendant [Capital]'s current sales team consists of nine external and seven internal salespersons, as well as a six-member

National Accounts team. Ascendant Capital wholesales, markets and educates broker/dealers and RIAs to sell and service the Funds. Ascendant Capital is an affiliate of and offers Securities through Ascendant Alternative Strategies, LLC, a broker/dealer registered with the SEC and member of FINRA/SIPC.

**What services does Ascendant Capital provide for GPB, broker/dealers and RIAs, and investors?**

In addition to the sales support functions described above, Ascendant Capital also provides the following services:

*Product Development and Due Diligence*

- Fund structuring and preliminary research on investment strategy
- Managing the construction of offering materials including the PPM and supplements
- Ongoing maintenance of the secure virtual data room
- Liaising with all selling group members to complete initial and ongoing due diligence requests

- Working with third-party due diligence firms to provide information for initial and ongoing third-party reports
- Assistance with underwriting and financial modeling
- Performing supporting research and oversight of Fund performance
- Assessment of regulatory environment and impact of current and future proposed regulation

*Marketing Services*

- Creation of investor sales kits and additional marketing materials
- Marketing communications to all selling group members
- Ongoing investor communication, including quarterly reports and investor letters
- Coordination of due diligence events
- Sales support and educational materials

*Client Relations*

- Providing investor and advisor support
- Establishment of custodial relationships
- Assistance obtaining investor statements, tax forms and other documents
- Processing of subscription documents and transfer requests
- Assistance with commission payments

143.    Plaintiffs and the other Class members herein were not aware of the above described material involvement by Ascendant Capital in the Offerings or Schneider and Ascendant Capital's many conflicts.

144.    As noted above, Ascendant Capital, the Austin-based primary distribution agent for GPB, initially operated as an affiliate of Axiom. In or about 2017, Ascendant Capital started its own broker-dealer, Ascendant Strategies.

145.    While not disclosed in the Offering Materials for the GPB Funds, the *post-offering* 2019 FINRA BrokerCheck Report on Ascendant Strategies admits that "GPB Capital Holdings LLC is under common control with the firm," and that Gentile is a "common control person."

146.    According to the 2019 BrokerCheck Report, Gentile has a direct ownership interest in Ascendant Strategies and, through DJ Partners, a *majority* ownership interest in that firm.

Further, as explained above, Schneider was involved in the creation and direction of GPB Capital and is a control person of GPB and the Funds. Despite this conflict-ridden relationship, during the entire GPB offering period, GPB, Gentile, Schneider, and the various Fund Defendants did not clearly disclose to limited partner investors or the Class members herein that Gentile had a majority ownership interest in Ascendant Strategies since April 2016, and that Schneider controlled GPB.

### B.  GPB Capital's Destined-to-Fail Business Model

147.  As described in its promotional materials, GPB followed a "private equity" structure for its asset management. In that framework, the asset manager (in this case GPB) set up a fund, organized as a limited partnership. GPB then marketed and sold through Ascendant and other brokers (the Broker Defendants herein as well as RIAs) limited partnership interests in the Funds (the Securities). The investors purchased the Securities, and the asset manager, acting as the general partner and investment manager, invested the fund's cash assets in portfolio or operating businesses in various industries, including automotive, waste management and cold storage businesses.

148.  GPB's investments were illiquid and had no clear ascertainable value. Thus, GPB needed to retain third party valuation agents to "price" its investments for financial reporting to investors. These valuations were essential to the scheme as GPB itself could not objectively value its own private investments.  GPB acted as the general partner of the various Funds, overseeing the Funds and drawing substantial fees from the money invested. Gentile was the managing member of the general partner, GPB.  At all relevant times, GPB was a registered investment advisor under the IAA.

149.  Ascendant marketed the Funds to individual investors through a huge network of independent broker-dealers and RIAs around the country. The Broker Defendants (other than Bradley) were incentivized by an assortment of exorbitant *unprecedented* upfront fees and

commissions totaling up to 11% of the capital invested.[5] These commissions were paid by the investor, not GPB. Such an arrangement put the Broker Defendants on notice that the Offerings were highly unusual and unlikely to achieve their investment goals, because the commissions were twice the nominal commissions paid in similar deals. First, sales commissions on such securities are often not paid by investors, but by the issuer, so this was certain to raise red flags to any Broker Defendant selling these securities. Second, the 11% brokerage commission fee structure was extraordinarily high, twice the industry standard, and constituted yet another red flag to the Broker Defendants. As described herein, the Brokers were aware of numerous other red flags described in the DD Reports made available to them.

150.    GPB itself also received an assortment of other fees. Including such additional fees, customers paid fees, expenses, and commissions to the GPB Defendants and the Broker Defendants of between *15%* and *20%* of the capital invested. For example, the Automotive PPM lists the following eight (8) possible sets of fees/commissions/expenses:  selling commissions (up to 7%), due diligence fees (1%), placement and marketing support fees (1.75%), wholesaling fees (up to 1.25%), organizational expenses (up to 1.25%), managerial assistance fees (2.0% of capital contributions), acquisition fees (between 1.75% and 2.75% of the price of assets acquired), and partnership expenses.

151.    Similarly, the Offering Materials for Holdings II included selling commissions (up to 11%), acquisition fees (either 1.75% of the enterprise value or 2.75% of the asset purchase price), managerial assistance fees (2% of capital contributions), organizational expenses (up to 1.25% of the gross proceeds received from the Offering), and partnership expenses.

---

[5] Industry standard compensation is less than 5% and industry practice requires independent third party valuation.

152.    The Offering Materials for the other GPB Funds included similar commissions and fees.

153.    In addition to the above assortment of fees and expenses, GPB stood to receive performance fees, which were 20% of the profits made by the relevant Fund.

154.    GPB developed a marketing scheme with Schneider and Gentile to market the Securities from Austin, Texas using false promises. This scheme involved creating the false appearance of substantial profitability by distributing a large (8%) annual "dividend" to investors, even though the underlying investments were not profitable and instead were losing money. Defendants utilized this "dividend" to trick investors into believing that the underlying businesses were doing well and generating cash flow when they were not. Indeed, GPB routinely falsely disclosed to investors that it was "generating cash flow" to pay the dividend.  Instead, the GPB Defendants simply paid this large dividend from other people's money – the money of new investors in the limited partnerships, or from the investors' own capital.  Each of the non-GPB Defendants was aware of this fundamental misrepresentation as to the phantom dividend which put them on notice of the Ponzi scheme, as each had access to GPB financials showing that GPB did not generate 8% current cash from its investments.

155.    The PPMs and related correspondence from GPB and Ascendant to investors stated that the 8% distributions "were fully covered with funds from operations" and were paid from "operating cash." For example, in discussing the targeted 8% annual return, a March 6, 2015 Automotive PPM at 6 stated "we will make distributions based on cash flow we have received from Dealerships." These were gross falsehoods communicated to investors to induce their GPB purchases. In fact, GPB, Schneider, Gentile, and the other Defendants knew that the 8% distribution was not paid from operating cash flow but was merely a return of investor capital or

the capital invested by other investors. Indeed, GPB secretly held money (investor capital) in "reserve" to cover such 8% distributions, rather than from operating cash flow. This reserve was a "slush fund" held off the books designed to cover up the lack of operating cash flow. Each of the non-GPB Defendants, who had access to GPB financials, was aware of this accounting trick, which enabled the fraud to succeed. GPB and Ascendant also structured asset purchases by "overpaying for assets" and then contractually requiring repayment of this overpayment to be used to pay the distribution. This deception had the effect of hiding the material fact that the operating businesses were not generating profits, and that the distributions were merely returns of investors' own capital. Again, this financial chicanery was known to the non-GPB Defendants.

156.    No legitimate business continuously pays out 8% dividends when consistently losing money. To do so is to assure bankruptcy, unless the issuers and their agents can raise enough money (fraudulently) to put off that inevitable failure, while they continue earning fees. This is the nature of a Ponzi scheme

157.    Notwithstanding the above panoply of fees, GPB and the Funds regularly promised and paid investors a "dividend" of 8%, beginning only three months after the investors' initial subscription—a result that was clearly unachievable given the huge upfront fees being paid from investor capital and the time period it would actually take to invest and make returns on the remaining customer capital actually invested. Purportedly, the payouts were to occur based on the cash flow of the underlying portfolio operating businesses, but Defendants knew this could never be the case, and therefore lied about it. The sophisticated non-GPB Defendants also knew this excessive 8% dividend was financially impossible.

158.    Defendants misrepresented the source of these distributions. For example, the Automotive PPM advised that "we will make distributions based on cash flow we have received

from Dealerships" (*i.e.*, the portfolio operating companies). In fact, the dividends were not paid from cash flow, but from other people's money.

159.    In a December 24, 2015 GPB Capital letter to Holdings II investors, which attached a December 15, 2015 supplemental PPM, the GPB Defendants also falsely advised Plaintiffs and other Class members:

> It is our pleasure to announce that GPB Holdings II, LP (the "Fund") is performing well. With 9 assets generating healthy cash flow to the Fund, **GPB continues to pay all distributions at the stated rate of 8% fully covered from funds from operations.** More so, we recently announced a special distribution of 1.5% that will be payable on April 30, 2016 to all investors who are admitted to the Fund by December 31, 2015.

(Emphasis added).

160.    In fact, such statements were false and misleading. They failed to disclose that GPB was actually using new investor capital to pay distributions to existing investors in the Funds, and the underlying assets were generally not profitable.

161.    GPB did not rely on the Funds' portfolio companies' cash flow to make distributions, as it falsely told investors in the Offering Materials. In a series of belated communications with investors, the GPB Defendants, Gentile, and Schneider provided piecemeal but misleading "disclosures" to class members that GPB "might" make distributions from investor capital, but never said it did so, and continued to falsely tout the success of its underlying investments.

162.    For example, GPB stated that it *could use* investor capital to make distributions *but had not yet done so*. This too was false, because use of investor capital to pay investor distributions was the GPB Defendants' game plan and practice from the start.  In a March 7, 2016 GPB Holdings II Amended PPMs, (for Class A and Class B units) at p. 25 (emphasis added), GPB stated:

> **No Assurance of Distributions**. The process of identifying, screening and successfully acquiring and operating private companies is difficult and

146

risky. We can provide no assurances that we will be able to generate operating cash flow sufficient to make distributions to LPs. Thus, there is no guarantee that we will pay any particular amount of distributions, if at all. Furthermore, **while we have no present plans to do so, we could include LPs' invested capital in amounts we distribute to LPs, which may reduce the amount of capital available to acquire and operate Portfolio Companies and make other permitted acquisitions, as well as, negatively impact the value of the LPs' investments, especially if a substantial portion of our distributions are paid from our LPs' invested capital.**

163.    Likewise, a March 30, 2017 Form ADV, filed with the SEC reported, at p. 13

(emphasis added):

> *No Assurance of Distributions*. The process of identifying, screening and successfully acquiring and operating private companies is difficult and risky. The Companies can provide no assurances that they will be able to generate operating cash flow sufficient to make distributions to Investors. Thus, there is no guarantee that the Companies will pay any particular amount of distributions, if at all. Furthermore, **while the Companies have no present plans to do so, the Companies could include Investors' invested capital in amounts distributed to Investors, which may reduce the amount of capital available to acquire and operate Portfolio Companies and make other permitted acquisitions as well as negatively impact the value of Investors' investments, especially if a substantial portion of the Companies' distributions are paid from Investors' invested capital.**

164.    Substantially similar language appeared in other PPMs issued by GPB, including the June 12, 2016 Second Amended GPB Holdings II PPMs for Class A and Class B, pp, 24 and 32, respectively; the January 2018 Third Amended GPB Holdings II PPMs for Class A and Class B, pp, 31 and 32, respectively; a June 30, 2016 GPB Automotive PPM, at p. 29; an April 16, 2018 GPB Waste Management PPM, at p. 26; and a December 2016 Holdings Qualified PPM, at p. 34.

165.    These disclosures were false at that time, as GPB was paying, and had paid, dividends from investor capital and new investor capital.

166.     Finally, under regulatory pressure, GPB revealed in SEC filings in late 2018 and May 2019 that it had in fact regularly used investors' "invested capital," not underlying capital profits, to make investor distributions.  These disclosures were not included in the PPMs or other documents that had been provided to investors, but were contained in GPB's filings with the SEC. For example, the filings provided:

**November 14, 2018 Form ADV**:

*No Assurance of Distributions*. The process of identifying, screening and successfully acquiring and operating private companies is difficult and risky. GPB can provide no assurances that the Companies will be able to generate operating cash flow sufficient to continue to make distributions to Investors. Thus, there is no guarantee that the Companies will pay any particular amount of distributions, if at all. To the extent that any of the Companies do pay regular distributions to Investors, GPB may unilaterally determine to reduce the size of, or terminate the payment altogether of, any future distributions by any one or more of the Companies. Any distributions can be paid out of any available working capital, which includes Investor's invested capital in the Company. **Amounts that the Companies distribute to Investors have in the past accordingly included, and may in the future accordingly include, invested capital and have not been, and may not in the future be, entirely comprised of income generated by the Portfolio Companies.** Such a reduction of available working capital reduces the amount of working capital available to acquire and operate Portfolio Companies and make other permitted acquisitions and investments and may also negatively impact the value of Investors' investments in the Company, especially when a substantial portion of a Company's distributions are paid from Investors' invested capital.

(Emphasis added).

**May 1, 2019 Form ADV:**

*No Assurance of Distributions*. Any distributions can be paid out of any available working capital, which includes Investor's invested capital in the Company. **Amounts that the Companies distribute to Investors have in the past accordingly included, and may in the future accordingly include, invested capital and have not been, and may not in the future be, entirely comprised of income generated by the Portfolio Companies.** Such a reduction of available working capital reduces the amount of working capital available to acquire and operate Portfolio Companies and make other permitted acquisitions and investments and may also negatively impact the value of Investors' investments in the Company, especially when a substantial portion of a Company's distributions are paid from Investors'

invested capital. There can be no assurance that the Companies will be able to generate sufficient returns to pay their operating expenses and make satisfactory distributions to their Investors from income generated by the Portfolio Companies, or any distributions at all.

(Emphasis added).

167. GPB, in effect, acknowledged only in the SEC filings in late-2018 and 2019 (but not in PPMs to investors) that it was running a Ponzi scheme from the start.

168. The GPB scheme was particularly insidious. On top of the Material Misrepresentations and Omissions described herein, GPB, Ascendant, and Axiom and their principals (Gentile, Schneider, and Martino), as well as the Broker Defendants and the Fund Administrator, advanced and maintained the scheme by preparing and disseminating monthly account statements that hid the fact that the investors' *own capital* was being used to make distributions (see Ex. A).

169. Instead of disclosing that the amount of investor capital was declining as a result of the distributions, these statements regularly reported "Total Capital" as unchanged from the Class members' initial investment. These monthly statements also failed to account for the large upfront fees and commissions paid from Customer Capital. Thus, investors were misled that the distributions came from profits when they did not.

170. GPB and the Fund Administrator at Ascendant's direction disseminated and prepared these statements monthly and directly mailed them to investors at their addresses. Further, each Broker Defendant was listed on, and received, such monthly statements.

171. As explained below, the GPB Defendants also hid from investors the financial misconduct that was generating huge losses in the GPB Funds. *See* Section I, below.

172. The PPMs also contained numerous other material misstatements and omissions. The PPMs failed to disclose that Gentile, the managing member and control person of GPB, the

Funds' general partner, had a large ownership interest (33%) in Ascendant, which served as the primary underwriter for the Funds.

173.    The PPMs failed to disclose that GPB, the general partner of the Funds, was owned and controlled by Ascendant and Schneider, the primary distribution agents for the Funds. Failure to disclose this co-ownership to investors in the Offering Materials for the Funds tainted the entire set of Offerings, as the Funds' general partner, a registered investment advisor and fiduciary under federal and state law was benefitting from each and every sale without disclosing this secret relationship. Schneider, Ascendant, and Gentile thus had gross conflicts of interest which were undisclosed to investors, but known to the other Defendants

174.    The PPM and the Offering Materials falsely claimed that the Funds were estimated to return 15% net to investors.  These statements were false and misleading as a net 15% return to investors would have required a gross investment return of at least 23% on each deal, given the exorbitant upfront fees. In fact, GPB, and its control persons, including, without limitation, Schneider and Ascendant, knew this projection was absurd and false because their prior transaction results *returned on average less than 8%, as disclosed in the DD Reports to those who sold the deals, the Broker Defendants, and RIAs* (but not to the Class). Thus, GPB and its affiliates failed to disclose their actual track record of less than 8% which would have made clear that their PPM marketing projection of a 23% gross return—three times their historic performance—was nonsense.

175.    The PPMs failed to disclose gross conflicts of interest and conflict-ridden transactions which would have warned investors of the improper conduct engaged in by GPB in the Funds. Among these undisclosed conflicts were:

a. That the "first two dealerships that GPB Holdings invested in were partially owned by Gentile." Thus, this GPB Fund had a serious undisclosed conflict that it was purchasing material assets from its control person;

b. That GPB Holdings purchased equity interests in at least 3 private companies owned by Gentile;

c. That Gentile personally guaranteed (and was paid for such guarantees) the "Floor Plan Loans" of up to $45 million undertaken by dealerships purchased by certain Funds. These guarantees provided Gentile with an undisclosed first security interest in each such dealership; and

d. That the Funds as described herein engaged in improper and conflicted unsecured inter-company loans, not independently approved and not disclosed to investors.

176.    In their respective PPMs, the Funds failed to inform investors of the fact that, because of the size of the Offerings and the small amount invested by each investor, the Funds would clearly be required to register under the 1934 Act and would be required to prepare comprehensive quarterly and annual filings under the 1934 Act. Indeed, in the DD Reports, the Funds acknowledged that they would be required to prepare such filings under section 12(g) and that such filings would be expensive and difficult to prepare. The DD Reports made clear that 12(g) registration would be required early on. Moreover, the Funds failed to inform investors of their actual failure to make such 12(g) filings when they were required to make such filings under the federal securities laws.

177.    Defendants Gentile and Schneider, as shown herein, failed to disclose critical material information in connection with their fillings of documents with the SEC related to their Offerings.  Specifically, the GPB Defendants failed to make material disclosures in their Form D

filings made as part of the process by which they purportedly became exempt from registration requirements for their Offerings of the Funds. As a result, the GPB Defendants *knew* that they had not complied with Regulation D, which required the distribution of such 1934 Act filings, and thus were not engaging in exempt offerings. Defendants nevertheless lied knowingly to investors in the PPMs claiming that the filings were exempt from registration under the 1933 Act and Texas law.

178.    Defendants did not comply with Regulation D or Rule 506 and thus the GPB Offerings were not exempt from registration under the 1933 Act or Texas law. GPB and its related entities who purported to file on Form D in connection with a purported exemption from registration under Regulation D and Rule 506 of the 1933 Act in fact failed to comply with the rules and regulations applicable to such exemption and made Material Misrepresentations and Omissions in connection with their completion of their filings on Form D, and therefore the exemption provided under Regulation D was unavailable to them for any of the Offerings, each of which constituted one integrated Offering under applicable rules.

179.    First, Defendants failed to properly complete Item 3 in Regulation D: **Related Persons**. The Securities Act defines *related persons* as persons who fill the role as executive officers of the Offeror and persons who are "promotors of the offeror". Ascendant, Martino, and Schneider were promotors of GPB as creators of the GPB Offerings, and given their control of GPB, within the meaning of this Regulation. Accordingly, their names, addresses, compensation, and multiple roles in connection with the Offerings were required to be disclosed in Form D, and they were not, rendering the Regulation D exemption unavailable to GPB.  Obviously, Defendants had an improper motive in failing to disclose Schneider, Martino, or Ascendant as *related persons* because doing so would have required disclosure of the nature of their scheme, and if done investors would have realized that GPB, the Offeror of the Securities, and Ascendant, the

purportedly independent underwriter, were in fact one group that controlled both GPB and the underwriter.

180.    Second, Defendants failed to comply with Sections 12 and 13 of Form D, which require full and complete disclosure of sales compensation, sales commissions, and finders' fees paid in connection with any such Offering. Defendants knowingly and intentionally failed to disclose the full compensation, as is required pursuant to these sections, that was paid to Martino, Schneider, and Ascendant, the purported independent underwriters and control persons of GPB. In fact, undisclosed was the fact that Ascendant, Schneider, and Martino received at least 4% of the total Offering proceeds in addition to that which was disclosed in the Form D by GPB.  This 4% consisted of 1.25% of the Offering amount described nominally as "Offering Expenses" paid directly to Ascendant, and up to 2.75% of all amounts paid in connection with acquisitions made by the GPB Funds, a fee nominally known as the acquisition fee. Nowhere in the Form D or elsewhere did GPB disclose to investors that in addition to the outrageous upfront commissions paid to Ascendant, Martino, and Schneider, they were, "under the table," also receiving an additional 4% —as much as $75 million —in payments in the form of acquisition fees and so-called Offering expenses.

181.    The DD Reports provided to Brokers disclosed an array of additional fees, which were accordingly thereto also split with Ascendant and Schneider. These fees too were not disclosed in the Form D and thus rendered Regulation D unavailable to GPB.

182.    Third, Defendants made material misrepresentations in connection with their filings on Form D by failing to properly complete Item 16:  **Use of Proceeds**.  Item 16 requires the Offeror and related parties, including promotors, like Schneider and Ascendant, to disclose the amount of the Offering proceeds that has been or is proposed to be used for, including in the future, paying

any such persons (*i.e.*, executive officers, directors, or promotors). Here, GPB failed to disclose the acquisition fees and Offering expenses used to pay Ascendant or otherwise required to be disclosed pursuant to Item 16. GPB also failed to disclose the fact that a portion of the commissions that were being paid to Ascendant as ordinary commissions pursuant to the PPM and were also being shared with GPB and Gentile directly because Gentile (undisclosed to investors) owned one-third of Ascendant and therefore one-third of its income. For multiple reasons, Defendants misrepresented the information that was required to be disclosed in Item 16 and rendered Regulation D unavailable to them in connection with their purported exempt transaction.

### C.   Defendants Also Failed to Disclose "Bad Acts," Precluding Their Reliance on Rule 506 or Regulation D

183.   Gentile, Schneider, GPB and the Funds concealed numerous material conflicts and SEC Rule violations from Plaintiffs and other members of the Class.

184.   GPB co-founders Gentile and Schneider met years before launching the GPB Funds. As described above, Schneider developed the business concept for the Funds, and Schneider boasted that he was the one who had the idea for the Funds and convinced Gentile to launch GPB.

185.   But Schneider's relationship with Gentile was more than a business advisor. Schneider had an ownership interest in GPB, just as Gentile had an ownership interest in Ascendant. The Offering Materials failed to disclose Gentile's ownership interest in Ascendant, a fact which placed him in an uncurable conflict as the managing member of GPB. As shown herein, the conflicts arising from Schneider's and Gentile's undisclosed co-ownership of the issuer and the underwriter, respectively, were pervasive. Such conflicts were not subject to waiver by limited partners under federal law. Indeed, in June of 2019, the SEC reiterated its long-held policy that Investment Advisors may not waive or seek waiver of their fiduciary duties under the IAA. Any

154

attempt by Defendants to seek waiver or partial waiver of their fiduciary duties would be ineffective under federal and state law.

186.    Schneider's company, Ascendant Capital, became the exclusive underwriter and placement agent for the GPB Funds. As such, Schneider and Ascendant Capital were instrumental in growing GPB and the Funds, attracting investors by (a) offering investment opportunities in the Funds directly to investors, first as a branch office of Axiom, and later through Ascendant, and (b) creating a nationwide network of independent brokers—the Broker Defendants—to sell limited partnership interests in GPB.

187.    Thus, Schneider and Ascendant Capital in Texas played a substantial role in developing, orchestrating, organizing, executing, and overseeing the GPB Funds and the Offerings, selling securities in the Funds to investors, and arranging for further sales through the Broker Defendants. In short, Schneider, the lead broker and underwriter for GPB, was at all times a control person of the Funds, a fact which was not disclosed to investors.

188.    Defendants' failure to disclose to prospective GPB investors that Schneider and Ascendant were control persons of GPB and the Funds, and that Schneider's professional background included numerous violations of state and federal securities laws and rules, constituted material omissions.

189.    Moreover, because Schneider was a "bad actor" under SEC Rule 506(d), and because his "bad acts" were not disclosed in the PPMs, GPB could not employ an exemption from registration under Regulation D and Rule 506, which provides:

> "*Bad Actor" disqualification.* (1) No exemption under this section shall be available for a sale of securities if the issuer; any predecessor of the issuer; any affiliated issuer; any director, executive officer, other officer participating in the offering, general partner or managing member of the issuer; any beneficial owner of 20% or more of the issuer's outstanding voting equity securities, calculated on the basis of voting power; any

promoter connected with the issuer in any capacity at the time of such sale; any investment manager of an issuer that is a pooled investment fund; any person that has been or will be paid (directly or indirectly) remuneration for solicitation of purchasers in connection with such sale of securities; any general partner or managing member of any such investment manager or solicitor; or any director, executive officer or other officer participating in the offering of any such investment manager or solicitor or general partner or managing member of such investment manager or solicitor:

(vi) Is suspended or expelled from membership in, or suspended or barred from association with a member of, a registered national securities exchange or a registered national or affiliated securities association for any act or omission to act constituting conduct inconsistent with just and equitable principles of trade.

17 C.F.R. § 230.506(d)(1)(vi).

190. Here, Schneider (a) was the subject of at least eight customer disputes seeking nearly $1,000,000 in damages, most of which were settled in exchange for significant amounts of money; (b) was the subject of two instances of employment separation after allegations of misconduct; and (c) was the subject of two regulatory actions, by the NASD and Illinois state securities regulators, respectively, one of which resulted in a $15,000 fine and suspension and the other one in a 2-year ban from being licensed in Illinois. Gentile, GPB and the Funds failed to disclose any of Schneider's prior misdeeds to investors.

191. Martino was involved in the fraudulent scheme relating to the Funds as a broker and CEO at Axiom and later as an owner and CEO of Ascendant Strategies. Martino was also a "bad actor" under SEC Rule 506(d) because he (a) has been the subject of three customer disputes seeking in excess of $1,000,000 in aggregate damages, which were settled in exchange for significant amounts of money (totaling over $900,000 in the aggregate), and (b) received a supervisory suspension from the NASD (FINRA) in 2003 for sixty days and was fined $15,000 for failing to adequately supervise the activities of registered representatives. Early in his career, Martino was discharged from Shearson Lehman Hutton, Inc. for purchasing stock in his own

account for a friend employed with another firm. Defendants' failure to disclose any of this was a violation of Rule 506.

192.     Pursuant to SEC Rule 506(e), the GPB Defendants were required to disclose in each Fund's PPM these "bad acts" that Schneider and Martino committed. The GPB Defendants' failure to make these disclosures rendered a Rule 506 registration exemption unavailable to GPB. Thus, each Offering violated the Securities Act of 1933 because such Offerings were not exempt from registration thereunder. Each Broker Defendant substantially assisted in the unregistered Offerings in violation of federal and Texas law, and knew of these "bad acts," as they were disclosed in databases commonly available to the Broker Defendants, and because the Broker Defendants had a business relationship with the "bad actors."

**D.     Defendants Failed to Make Required 1934 Act Filings and the Broker Defendants Substantially Assisted in the Violation of the 1934 Act by Distributing the Securities**

193.     Section 12(g) of the Exchange Act requires issuing companies to register a class of securities with the SEC if such shares are issued by an entity with more than $10,000,000 in assets and are owned by 2,000 or more equity holders.

194.     At some point in 2016, GPB knew that it had sold classes of shares in certain of the Funds to more than 2,000 investors. Each of the Broker Defendants knew this as well, because they knew that each investor was investing relatively small amounts and that GPB raised hundreds of millions of dollars, and because the DD Reports specifically stated that 12(g) registration would be required early on and would be difficult to affect.

195.     In particular, GPB's Form D filings and amendments demonstrated that, at a minimum, GPB's Holdings II and Automotive Funds had met the Section 12(g) thresholds for requiring registration. The Broker Defendants were named in such filings, and knew, or should have known, of their contents. *See* Section J, below.

196.    Despite this knowledge, GPB *never* registered any class of shares under the 1934 Act and thus never made the extensive public filings required thereunder, including quarterly and annual financial statements. By issuing shares without such filings, GPB, with substantial assistance from the Broker Defendants, repeatedly violated the Exchange Act and failed to provide required financial information to investors.

**E.    The Auditor Defendants Provided Substantial Assistance in the Illegal Offerings Described Herein**

197.    GPB and the Funds represented to investors that they had engaged a stable of independent auditors to audit the Funds' financial statements. GPB and Ascendant touted the engagement of those firms as the Funds' auditors in PPMs and marketing materials. These auditors included (depending on the year): RSM for Holdings II; Crowe for Automotive; CohnReznick for Waste Management; Margolin for Automotive, Holdings, Holdings Qualified, and NYC Development; EisnerAmper for Automotive, Holdings, Holdings II, and Holdings Qualified; and Withum for Waste Management   (Armada Waste), Cold Storage, Holdings III, and NYC Development.   RSM, Crowe, CohnReznick, Margolin, EisnerAmper and Withum allowed their names and reputations to be used to sell the Funds.   Without the participation of the auditors listed in the PPMs, GPB and the Broker Defendants would not have been able to sell the Funds to Plaintiffs and the Class—given that GPB lacked any substantial track record absent audited financials, it could not have affected the Offerings.

198.    RSM also substantially assisted the fraud by publishing and allowing GPB to distribute to investors materially false audited Holdings II financials for fiscal years 2015 and 2016 as well as RSM's faulty audit opinion for each financial statement that such financials complied with Generally Accepted Accounting Principles ("GAAP"). On August 17, 2018, GPB announced that the previously issued financial statements for Holdings II for 2015 and 2016 (which had been

audited by RSM) would need to be restated.  GPB further stated that these audited financials should no longer be relied upon, thereby acknowledging that they were materially misstated.  These audited financials were so materially incorrect that they have been withdrawn. Ultimately, in April 2019, RSM resigned or was replaced as the independent auditor for Holdings II.

199.    Similarly, Crowe also substantially assisted the fraud by publishing and allowing GPB to distribute to investors materially false audited GPB Automotive financials for fiscal year 2016 as well as a faulty audit opinion that such financials complied with GAAP. In particular, on May 1, 2017 Crowe issued its Independent Auditor's Report stating:  "In our opinion, the consolidated financial statements referred to above present fairly, in all material respects, the financial position of GPB Automotive Portfolio, LP and Subsidiaries as of December 31, 2016, and the results of their operations and their cash flows for the year then ended in accordance with accounting principles generally accepted in the United States of America."

200.    On August 17, 2018, a letter from Gentile of GPB to limited partners of GPB Automotive Portfolio LP disclosed that it had "determined that the previously issued financial statements as of and for the years ended December 31, 2015 and 2016 will need to be restated." The letter further disclosed that "the Company's 2015 and 2016 financial statements and the independent accountants' reports [Crowe prepared the 2016 report] thereon should no longer be relied upon. We currently expect that the restatements will include adjustments to the 2015 and 2016 financial statements for items including reclassification of certain transactions and/or corrections in the timing and amounts of income recognition, and enhanced disclosure of certain related party transactions."  GPB further acknowledged that it had "concluded that certain material weaknesses in internal controls exist and as a result these internal controls over the financial reporting processes will need to be revised and enhanced.  At that point, Crowe was still engaged

as auditor for Automotive 2017 financials. Then, in a November 9, 2018 letter to Automotive Limited Partners, GPB advised that "Crowe notified GPB Capital that it elected to resign as the auditor for the Company. We were informed that the resignation was **due to perceived risks they determined fell outside of their internal risk tolerance parameters**." (Emphasis added.)

201.    Crowe also issued audit opinions for GPB Holdings for fiscal year 2016, and for GPB Holdings Qualified for fiscal year 2016. The Holdings audit has since been withdrawn. By issuing such opinions and reports, Crowe substantially assisted the scheme alleged herein by publishing and allowing GPB to distribute to investors materially false financials for these Funds for fiscal year 2016, as well as a faulty audit opinion that such financials complied with GAAP.

202.    Moreover, on June 21, 2019, GPB acknowledged that the value of its Funds audited by RSM and Crowe had declined between 25% and 73%.  Specifically, GPB reported that Holdings II's value had fallen by 25.4% and Automotive's by 39%.  GPB further reported that its five remaining Funds, named herein, had declined between 25% and 73% in value.  These disclosures make clear that the GPB financials reviewed or audited by the Auditor Defendants were materially inaccurate.

203.    Without RSM, Crowe, CohnReznick, Margolin, Withum and EisnerAmper, the GPB Ponzi scheme could not have continued.  Recklessly overstating the financial results of GPB gave it the appearance of profitability and financial success and hid the fact that it was a Ponzi scheme.   RSM's, Crowe's, CohnReznick's, Margolin's, EisnerAmper's and Withum's participation in the scheme was vital to its perpetuation.  By reviewing financial statements, issuing audits and reporting that they were working on audits for a number of years, and by allowing their names to be used in PPMs and in marketing materials, these Auditor Defendants conveyed to

investors, including the Class members herein, that their investments in the GPB Funds were legitimate and that the Funds had met or were meeting their financial reporting obligations.

204.    RSM, Crowe, CohnReznick, Margolin, EisnerAmper and Withum failed to uncover or report any of the related-party transactions and other irregularities in GPB's books and records described below.

205.    Among the material failures in the RSM, Crowe, CohnReznick, Margolin, EisnerAmper and Withum's audits or auditing work were: (1) the failure to disclose and address the numerous and material conflicted transactions described herein; (2) the failure to disclose and address the GPB practice of "reserving" Funds off brokerage statements to pay the 8% distribution while claiming this was paid from operating profits; (3) the failure to properly account for inter-fund loans and co-ownership of assets; and (4) the failure to properly account for defaults in underlying GPB investments which were not marked to market, but instead kept at purchase value, even when the likelihood of repayment was materially decreased.

206.    These auditors gave substantial assistance to the other Defendants' violation of the Texas Securities Act by adding their names, reputations, and work to the GPB Offerings and did so with knowledge of the unregistered status of the Offerings and the other material misrepresentations and omissions outlined herein.

### F.    The Broker Defendants Substantially Assisted the Scheme

207.    The Broker Defendants played a critical role in the GPB scheme. These Defendants provided substantial assistance by providing GPB Capital with widespread access to thousands of investors throughout the United States. The monies that they collected from Class members—the investors' capital—provided the fuel for the scheme, enabling the GPB Defendants to continue to pay large distributions to investors *from newly-invested capital*. This encouraged investors to maintain their investment in GPB's Funds and to participate in further GPB Offerings. The Brokers

also distributed to thousands of investors the PPMs and related materials which they knew from the DD Reports contained multiple falsehoods. Had the Broker Defendants disclosed these falsehoods and stopped selling, the Ponzi scheme would have ended.

208.    The Broker Defendants had *subjective, actual knowledge* of the fraud. They knew that producing an 8% cash return on Class members' investments within three months of investment was unattainable, especially because GPB would only have approximately 80% of invested capital to put to work (after payment of exorbitant commissions and other fees, as described herein).

209.    Indeed, the prior performance of other funds managed by GPB was disclosed to Broker Defendants in the DD Reports and such performance on average was a total of less than 8%. Accordingly, given that GPB's prior funds' *total performance* was less than the purported cash payments that they were going to make 8% within three months of their receipt of investor cash, the Broker Defendants were aware that this purported cash distribution from operating profits was farcical and non-realistic, as outlined herein:

   a.   Each of them also knew from experience as brokers in connection with private equity deals that in order to generate cash flow, GPB would need sufficient time to find investors, effect due diligence on investments, document the acquisition, finalize the acquisition, and then grow the business efficiently to pay 8% current income. They knew that this could not occur within three months of receipt of monies from investors, which was reduced by 20% in the form of commissions and other payments upon investors' monies, and thus the 8% dividend was not realistic or possible;

b.  The Broker Defendants knew that the GPB statement that it had "modeled" and projected a 15.5% net IRR total performance to investors from its Funds was materially false and omitted to state material facts.  Specifically, the DD Reports provided to the Brokers explained that GPB's prior transactions had yielded a *total net performance* of less than 8%.  Accordingly, Defendants knew that GPB's promised performance of 15% (almost 200% of its prior performance) was unrealistic and omitted to state the fact that its prior similar transactions had a net return to investors of only half of this "projected" amount;

c.  The Broker Defendants were subjectively aware that GPB had failed to disclose that its control person (Gentile) was a one-third owner of the equity in the principal underwriter of the GPB Offerings, Ascendant. While this information was not disclosed to any investor, it was specifically disclosed in detail to the Broker Defendants in the DD Reports.  Indeed, in the DD Reports, the authors made clear that not only was this fact important, but also that it resulted in a material conflict of interest. In addition, it also rendered Ascendant's role as the lead underwriter conflicted. Stated differently, the DD Reports made clear that because Ascendant had a conflict with the cross-ownership with Gentile, and because its role as underwriter was also conflicted, it was unable to give independent and objective advice with respect to the merits of the transaction to customers and other Brokers who participated in the transaction. This information was specifically disclosed to Brokers and other Defendants but was withheld from investors;

d.  The Broker Defendants knew from the DD Reports about the conflicts of interest outlined herein, including: (a) tens of millions of dollars of improperly documented

and undercollateralized inter-company loans; (b) loans by Gentile to GPB-owned businesses pursuant to which he obtained a security interest prior to that of GPB upon the underlying assets; and (c) comingling of the assets among the various GPB Funds without proper documentation or independent approvals.  These conflicts were specifically disclosed to the Broker Defendants in the DD Reports, but were withheld from investors.  The Auditor Defendants and the Valuation Defendants were also aware of these financial misdeeds as they had access to GPB financials;

e.  The DD Reports made clear that the total amount of fees disclosed by GPB in its PPMs was incorrect. Indeed, the DD Reports prepared by third parties specifically addressed the total amount of fees payable by GPB in connection with each Offering and concluded that such amount was actually 3% higher than that disclosed to investors in the PPMs prepared by GPB and Ascendant.  The Broker Defendants were aware of this material misrepresentation, but investors were not;

f.  The DD Reports specifically disclosed to the Broker Defendants that Ascendant was receiving payments, which were not disclosed on the Form D filed by GPB or otherwise to investors in the form of transactional fees and organizational fees, totaling 3% of the total amount raised by GPB.  Stated differently, the Brokers knew that Ascendant (the conflicted lead underwriter) was receiving 3% of the total amount raised on an undisclosed basis in violation of the disclosure requirements imposed under the Securities Act of 1933, voiding any Rule 506 exemption.  RSM, Crowe, and the other Auditor Defendants, as well as Phoenix, were also aware of this because Phoenix effected such payments and the auditors reviewed such payments in connection with its audit;

g. The Broker Defendants knew that the lead underwriter for the GPB Offerings, Ascendant, was not an "independent underwriter" as defined in FINRA rules or otherwise. They knew this because the DD Reports specifically disclosed this, and made clear that in light of the undisclosed payments made to Ascendant, and in light of its common ownership with GPB, and in light of Gentile's one-third ownership of Ascendant, that Ascendant was conflicted. It could not serve as an independent underwriter, and therefore each Broker Defendant would be required to do its own due diligence;

h. Each of the Broker Defendants knew that the total amount of the fees paid or payable in connection with the offerings were extraordinarily high—at least two times higher than that of an ordinary private placement—because the DD Reports made the extraordinary nature of these payments entirely clear;

i. Each of the Broker Defendants also knew that GPB would promptly, after the initial Offering and sales efforts by the Broker Defendants involved in the underwriting, have to register the Securities under the 1934 Acts, specifically section 12(g). They also knew that this process would be time consuming and expensive because it entailed finalizing the audit and requiring GPB to then make regular quarterly filings disclosing its financials and balance sheet, and that it would be difficult for a company with a small management team, such as that of GPB, to effect such registration and to maintain such registration on a regular basis. The Broker Defendants also knew that at some point in 2016 GPB failed to file under 12(g) when it was required to do so, and that this too voided any possibility of their employing Rule 506 or Regulation D, because an entity that is required to register

under 12(g) must in connection with any offering be registered under Regulation D, and distribute to each investor, including accredited investors, a copy of its filings required pursuant to 12(g).  Each of the Broker Defendants knew given the small amount invested by each investor in GPB Offerings, and the enormous size of the underwriting syndicate, as well as the information disclosed in Form D, that GPB was very soon after its initial Offering required to register under 12(g) and failed to do so.  *See* Section J, below. They continued to participate in the Offering knowing that it was in violation of the Securities Act of 1933 and the Securities Act of 1934 as well as Texas law. The DD Reports specifically disclosed this 12(g) issue;

j.  Each of the Broker Defendants also knew from the DD Reports that GPB and its management team had a very limited track record prior to their efforts to raise more than a billion dollars through the Offerings at issue in this matter. The DD Reports make clear that the GPB entity was so thinly capitalized that it raised questions as to its viability and that it had an insufficient track record "from which to base any conclusion" as to the management's ability to manage such a large sum of money. Despite the lack of track record, despite the conflicts of interest, despite the unprecedented large fees, and despite their knowledge of the violation of both the 1933 and 1934 Acts, the Broker Defendants continued to feed the Ponzi scheme with objective and subjective knowledge that the Offering Materials used by GPB contained material omissions and material misstatements; and

k.  Finally, each of the Broker Defendants knew that GPB was hiding salient and material information from investors. Specifically, the DD Reports pointed out that

GPB refused to provide them with the service agreements between Ascendant, Axiom, Schneider, and GPB. The DD Reports made clear that their preparers requested this information so that they could further evaluate the conflicted relationship between these parties but were denied access. Knowing that there was a clear conflict of interest, the Broker Defendants simply should not have gone ahead with selling this transaction, especially given the clear evidence that GPB was hiding from its own due diligence preparers the full nature of its relationship with Ascendant, Axiom and Schneider.

G.   **The Fund Administrator Breached Its Direct Duties to the Class and Substantially Assisted the Violations of the TSA**

210.   Throughout the Class Period, GPB and Ascendant utilized Phoenix as the Fund Administrator for the Funds.

211.   According to the Automotive and Holdings III PPMs, for example, GPB engaged Phoenix to provide administrative services, including "Full Service Investor Administration" (*i.e.*, new business processing, bank account management, electronic document management, database and file management, electronic and physical data storage, confirmation letters, and investor/rep access to records through customized web portal) and "Investor Relations" (*i.e.*, distributions, redemptions, account summary, commission calculation, tax reporting, and OFAC compliance).

212.   Phoenix also was the paymaster for each of the GPB Funds, charged with the distribution to all recipients of such Fund monies payable by GPB or any of the Funds. According to the DD Reports, Phoenix, as Fund Administrator, received a 20% commission on the amount of each such payment. This financial arrangement was unprecedented and highly unusual, and put Phoenix on notice that GPB was a fraud and using Phoenix to perpetuate its scheme.

213.     Upon information and belief, Ascendant in Texas engaged the Fund Administrator to provide similar services for each of the GPB Funds and Offerings.

214.     The Fund Administrator owed duties to Plaintiffs and the Class members to comply with the law and with industry standards of conduct, and to possess the skills held by experienced fund administrators.  However, rather than report accurately to investors, the Fund Administrator knowingly provided false information to the investors concerning their accounts at GPB.  The Fund Administrator knew (because it received the investors' investment amounts and was responsible for the commission calculation) that up to 20% of such amounts was transferred from such accounts to Broker Defendants as commission and to GPB as fee income.  Thus, from the start, the customer capital accounts were reduced materially.

215.     However, the Fund Administrator, in its monthly statements to investors, did not reflect this reduction, thus causing investors and potential investors to rely upon recklessly inflated account values.

216.     Had the Fund Administrator correctly reflected customer accounts values, investors and potential investors would have known that they were losing money and that distributions were not derived from profits—as GPB wanted them to believe —but from their own capital.  In sum, the Fund Administrator's reporting of false customer values on a monthly basis – which reflected profits when there were none, and which hid the Ponzi scheme – both was negligent and substantially assisted the Ponzi scheme.

217.     Phoenix sent each investor in the GPB Funds, including hundreds in Texas, the "Admit Confirmation" advising that investor that they had been admitted as a limited partner and setting out the specifics of their investment. Thus, beginning before each partner was admitted to the GPB Fund as a limited partner, Phoenix had a direct privity relationship with each Class

member and was provided with personal financial information as to each Class member, including personal financial information contained in the Subscription Documents and each Class member's name and address.   Each month the Fund Administrator provided Class members with false information as to the value of their respective capital accounts. This information failed to reflect actual declines in capital account values and falsely led investors to believe that the "distributions" they received were from profits in GPB investments.

218.   Phoenix was aware that the monthly statements it sent directly to investors were false as it controlled the payment flows relating to customer investments in GPB and oversaw third party payments from customer accounts. Thus, Phoenix *knew* that the monies paid to investors were in fact simply returns of capital and not from operating profits and misrepresented this fact.

219.   Indeed, the DD Reports make clear that Phoenix was aware of such payments from customer accounts and was in fact paid 20% of such third-party payments as a fee, according to such DD Reports.   Thus, Phoenix knowingly made false statements to Class members, many in Texas, and had a direct fiduciary relationship with them.

220.   Phoenix was also aware of other misrepresentations and omissions in the PPMs and related documents as it processed payments to third parties. Thus, Phoenix was subjectively aware that:

a.   Ascendant was receiving payments denominated as acquisition fees and organizational expenses of up to 4% of monies invested and yet this was not disclosed in the PPMs, the Subscription Documents or Form D filed by GPB;

b.   Gentile was a part owner of Ascendant because payments to Ascendant were in part paid to him; and

c.   GPB had exceeded 2,000 investors and thus was subject to filing requirements under 12(g) as Phoenix knew each investor by name and amount invested and was experienced in fund administration and thus knew when 12(g) applied.

221.   Moreover, Phoenix has had substantial experience in administrating Private Equity Funds and thus knew that the commissions and related fees being paid upfront and its fee of *20%* on all third-party payments were highly unusual and suspicious. Indeed, the 20% fee paid to Phoenix was unprecedented and upon information and belief designed to cause Phoenix to participate in hiding the true nature of the 8% distributions and the fraud.

**H.   The Auditor Defendants Were Aware of the Fraud at GPB.**

222.   The Auditor Defendants had actual knowledge of the fraud and the PPMs misrepresentations and omissions. First, they had access to the GPB payment records, and thus knew GPB was not earning the 8% it paid as a "dividend" but instead was using financial trickery to account for such cash and was falsely discounting such fraudulent conduct.  The Auditor Defendants also knew that Ascendant and Schneider were being paid acquisition fees and organizational expenses, totaling 3% of the Funds raised, even though Ascendant did not work on acquisitions, and that Ascendant was not described as performing such functions in the PPMs and such fees were not disclosed to investors. The Auditor Defendants knew of the undisclosed conflicting transactions described herein as they reviewed and audited the books of GPB. Third, because the Auditor Defendants participated in the preparation of tax information for investors, they also knew that GPB had exceeded 2,000 limited partners and was required to register under Section 12(g). The Auditor Defendants and RSM also knew of the undisclosed co-ownership of Ascendant and GPB because they had access to each Company's records and made payments in the form of fees to each Company. Finally, being among the largest accounting firms dealing with private equity issuers, RSM and Crowe knew that the GPB commission and fee structures were

170

extraordinary and unprecedented and that the transactions could not succeed in achieving market-based returns. RSM's, Crowe's, and the Auditor Defendants' audit reports for the GPB Funds were negligently prepared because, as GPB has acknowledged, their financial statements were not consistent with GAAP and Generally Accepted Auditing Standards and dramatically overstated the value of each respective Fund's private equity investments.

I.    **GPB and the Funds Were Plagued by Undisclosed Financial Misconduct, by which Defendants Breached Their Fiduciary Duty; the Allegations of Fraud Made Herein are Substantiated by Recent Lawsuits Filed Against GPB and Related Parties**

223.   Two recent lawsuits by and against GPB have shined a light on Defendants' financial misconduct and misrepresentations in connection with the Funds and confirmed many of the Material Misrepresentations and Omissions alleged herein. GBP and the Funds failed to timely and accurately disclose the nature of this misconduct. Moreover, the misconduct described below enabled Defendants to conceal their scheme from Class members and maintain it for years, making equitable tolling appropriate.

224.   GPB is engaged in litigation with a former senior executive of GPB, Patrick Dibre ("Dibre"), through an action titled *GPB Capital Holdings, LLC, et al. v. Dibre,* Index No. 606417/17 (N.Y. Sup. Ct., Nassau Co.). The verified pleadings in that action assert that the GPB Defendants fraudulently prepared the GPB financials, misled investors, and paid themselves large fees to which they were not entitled. The verified pleadings include Dibre's allegations that:

    a.   Gentile and Schneider were, through GPB, running a complicated Ponzi scheme;

    b.   Gentile and Schneider paid themselves undisclosed kickbacks in connection with purchasing automobile dealerships;

    c.   Gentile and Schneider paid themselves kickbacks from funds created by GPB in connection with reinsurance and manufacturer rebates;

d.  Gentile and Schneider improperly expensed to GPB Funds significant personal expenses, including luxury cars and jet airplanes;

e.  as alleged herein, GPB paid commissions, fees and expenses from investors monies amounting to up to 20% of the investment proceeds;

f.  Gentile and Schneider intentionally falsified Holdings II's and Automotive's financials by inflating purported cash flows and failing to account for expenses;

g.  Gentile and Schneider acknowledged to Dibre that the GPB Funds were "deceptive" from the start and designed solely to generate excessive brokerage fees for GPB, Schneider and Gentile in a Ponzi-type arrangement;

h.  GPB Holdings I Fund and GPB made improper conflicted payments to an accounting firm controlled by Gentile's father, and that such funds were subsequently funneled from this accounting firm to Gentile's family trust;

i.  GPB was unable to fund the purchase of car dealerships that Dibre owned or identified, not because of any action that Dibre took, but rather because the funds GPB should have had in place to complete the purchase had been diverted, Ponzi scheme style, to pay cash returns to earlier investors;

j.  GPB set up the structure of having individual funds issue non-public securities, because it was "designed from inception to generate significant brokerage fees to GPB and its related, but undisclosed, captive broker-dealer, Ascendant Alternative Strategies, LLC."  Dibre then claimed that the plan was to siphon off profits from any car dealerships it actually did buy, and finally to use "new investor funds to pay for the promised returns to the earlier investors" in Ponzi fashion;

k.  once GPB took control of an auto dealership, through its control persons Gentile and Schneider, it manipulated the dealership's financial statements to falsify (meaning inflate) their results and engaged in conflicted transactions; and

l.  to hide financial issues, Gentile and Schneider would, among other things, transfer funds from GPB Holdings I to Automotive, and vice versa, to bolster returns if a Fund was lagging behind.  Thus, they routinely comingled funds among the purportedly separate Funds to bolster their fraud and hide it.

225.  Recently, GPB became involved in another lawsuit, titled *David Rosenberg, et al. v. GPB Prime Holdings LLC, et al.*, No. 19-0925, (Sup. Ct. Mass., Norfolk Cty.), commenced by David Rosenberg and two Rosenberg-related trusts. The pleading in that action also confirms Plaintiffs' allegations of misconduct here.  Rosenberg and certain entities related to him or his family owned and operated car dealerships in and around Massachusetts for decades.  Prior to 2017, Rosenberg was the owner of Prime Motor Group ("Prime"), a large automotive dealership group located in New England.  In 2017, GPB made a significant investment in Prime, and asked Rosenberg to oversee the various dealerships GPB had acquired. Rosenberg became CEO of a network of GPB dealerships doing business as the Prime Automotive Group ("PAG"). As of July 2019, PAG was one of GPB's largest investments.

226.  According to Rosenberg, on or about May 12, 2017, GPB and an affiliate, GPB Prime (which is beneficially owned by certain GPB funds, including Holdings II and Automotive), executed a Purchase and Sale Agreement ("P&S Agreement").

227.  After GPB's Prime investment closed, GPB asked Rosenberg to replace Jeff Lash (who had been running GPB's auto dealership) as head of the GPB Funds' entire automotive portfolio, which included not only the Prime dealerships, but also dealerships in New York and

elsewhere in which GPB had previously invested. Rosenberg's complaint alleges that in his capacity as CEO of the GPB Funds' combined automotive portfolio, he had to become familiar with the historical finances of the non-Prime GPB dealerships.

228.     Rosenberg alleges that in the course of running the combined automotive portfolio, Rosenberg and his management team encountered information and documents showing that GPB had engaged in financial misconduct beginning at least as far back as 2014. This misconduct took many forms, but Rosenberg alleges that in general it included (a) the fabrication of revenue through the use of fictitious contracts, (b) self-dealing transactions on the part of GPB principals, including Gentile; and (c) undisclosed related-party transactions that benefitted Lash. Upon information and belief, GPB and Gentile engaged in this conduct for essentially two reasons: (a) to make it appear to investors that profits from the automotive investments were higher than they actually were (and, correspondingly, to conceal the truth that investors were receiving distributions from the capital other investors had contributed); and (b) to misappropriate investor funds for their own personal purposes.

229.     Rosenberg's complaint alleges specific examples of GPB's financial misconduct that also confirms Plaintiffs' allegations of Material Misrepresentations and Omissions, including, among others:

>     a.   evidence of a form of "round tripping," which is an improper technique to inflate revenue. Rosenberg and his executive team saw documents showing that, in 2016, the head of a dealership group owned by one of the Funds (Holdings I) sent a payment of $3,200,000 to that Fund that was recorded as revenue for 2015, but on that very same day that same Fund sent $2,100,000 to the head of that same dealership group as "working capital." Upon information and belief, the purpose of

this "round-trip" transaction was to conceal the fact that the dealership group was not truly generating $3,200,000 in operating revenue for distribution; and

b.  documents showing that Gentile and Lash had funneled nearly $2,000,000 in revenue to entities they controlled, including some under the guise of "management fees."   For the year 2015, $201,706 was transferred to Emdykycol, Inc., and $201,706 was transferred to Jachirijo, Inc. Upon information and belief, Emdykycol, Inc. is owned by Lash and Jachirijo, Inc. is owned by Gentile. Dealership funds have also been siphoned off to LSG Auto Wholesale, an entity whose name, LSG, stands for Lash, Schneider, and Gentile.  Upon information and belief, the payments described were kickbacks that served no legitimate business purpose and were not disclosed to investors.

230.     Rosenberg also alleges in his complaint that he learned that GPB, its executives and its principals (including Gentile) were engaged in extensive efforts to cover-up the misconduct in order to lull the Funds' investors into thinking that their investments were safe and that any losses were due to legitimate business events rather than GPB's and the Funds' misconduct.

231.     Rosenberg alleges that in or about the summer of 2018, GPB Capital's audit firm, Crowe Horvath ("Crowe") ceased its work auditing certain of GPB's companies and informed GPB Capital that it would not be able to provide a clean audit opinion for 2017 and that it was withdrawing its previous clean opinions for 2015 and 2016. GPB did not promptly advise Class members of this development. Crowe stated that those earlier financial statements should not be relied upon. Crowe eventually resigned completely from the engagement.

232.     Rosenberg alleges that he thereafter observed several efforts on the part of GPB and its principals and agents to mislead third parties, including GPB's own investors, about the

true nature of the misconduct that further confirms Plaintiffs' allegations of Material Misrepresentations and Omissions:

    a.   In September 2018, for example, GPB and Ascendant representatives spoke to several brokers who had expressed concerns about the announcement that Crowe had stopped working on the audit. Rosenberg attended the call, which was recorded. According to the *Rosenberg* complaint, on that call GPB and Ascendant personnel made a series of materially misleading and outright false statements about the circumstances of Crowe's withdrawal. They also falsely reported that a second firm, Stoneturn Group LLC, had completed a full forensic audit of GPB and given GPB a clean bill of health. Rosenberg, who participated in the call, demanded after the call that GPB and Ascendant correct their misstatements. Rosenberg alleges that, as of the date of his complaint, no correction had been made.

    b.   Rosenberg describes another example of GPB's efforts to lull and mislead its investors during the fall of 2018 and continuing into the winter and spring of 2019. GPB is required to perform a quarterly valuation of the dealerships. Rosenberg and his staff consistently informed GPB that the valuations GPB had been reporting to investors were inflated because the Funds' financial reports carried the dealerships at their purchase prices, which, in ensuing years, did not accurately represent their value. Rosenberg and his staff consistently reported information to GPB regarding the true valuation of the dealerships. GPB, however, refused to adjust the valuation. It was not until June 21, 2019, Rosenberg alleges upon information and belief, after Fidelity Investments informed GPB that Fidelity would no longer carry GPB's

investments on its platform, that GPB announced that it was cutting the valuation of its automotive dealership investments dramatically.

233.    Rosenberg alleges other examples that relate to the efforts GPB has taken to conceal material information about the Funds' automotive dealerships from the dealerships' auditors, previously Crowe and more recently EisnerAmper LLP, the audit firm that replaced Crowe:

a.    In March 2018, a GPB employee who had worked closely with Lash on all matters relating to the automotive portfolio, quit his job.  In connection with his departure, the employee provided Rosenberg and his staff with information relating to prior misconduct at the legacy (pre-Prime) GPB dealerships.

b.    Upon information and belief, when Gentile learned of the information the employee provided, he did not attempt to address or remedy any of the issues the employee had identified. Instead, he attempted to suppress the information, to ensure, in particular, that the information was withheld from Crowe.

c.    Later, following Crowe's resignation, GPB retained EisnerAmper to perform the audit work that Crowe refused to perform. Upon information and belief, one of the crucial issues that had emerged during the Crowe audit was the revelation that there had been numerous undisclosed and inappropriate related-party transactions.

d.    In May 2019, Rosenberg received a "Related Party Questionnaire" that he was to answer as part of the audit. Rosenberg alleges, upon information and belief, that EisnerAmper required this questionnaire to be answered as part of the audit. The Questionnaire contained questions regarding transactions that did not appear to have a legitimate business purpose.  Rosenberg, who was aware of the information

set forth above, including the fictitious performance guarantees, provided that information in his response and sent it to GPB and EisnerAmper.

e.  A short time later, on May 21, 2019, Rosenberg received a threatening letter from GPB's outside counsel. The letter claimed, falsely, that Rosenberg's responses were not properly called for by the Questionnaire.  It then alleged that it was somehow "inappropriate" for Rosenberg to provide the auditors with the correct information. GPB's outside counsel also asserted that Rosenberg's Questionnaire responses were somehow not "accepted," and therefore a nullity.

234.   The above demonstrates that both GPB and EisnerAmper, the auditor for GPB Automotive, GPB Holdings and GPB Holdings II, were well aware of the above financial improprieties. Defendants did not disclose these financial improprieties to Plaintiffs and other Class members, in order to ensure that Class members would maintain their investment with the Funds and to attract new investments in the Funds.

### J.   Defendants Raised Over $1.8 Billion from Investors for the GPB Funds

235.   Employing material misstatements and omissions as described herein, and in violation of the federal securities laws and Texas securities laws, Defendants, with the substantial assistance of the Broker Defendants, Phoenix and the Auditor Defendants, raised over $1.8 billion dollars from thousands of investors nationwide for the Funds.

236.   Specifically, Defendants raised money for the GPB Funds, namely:  GPB Holdings LP; GPB Holdings Qualified; GPB Automotive Portfolio, LP; GPB Holdings II, LP; GPB Cold Storage, LP; GPB NYC Development; GPB Waste Management, LP; and GPB Holdings III, LP. GPB's Form D filing with the SEC provided details about the amounts of investments (both minimums and the aggregate), the number of total investors, and the brokerage firms involved in each offering:  because such Offerings were continuous, and because as shown herein, GPB

routinely comingled assets among the Funds, such Offerings were integrated and therefore treated as one.

### 1.   GPB Holdings, LP

237.   In or about June 2013, GPB Capital, Gentile and Schneider, through Ascendant and Axiom, began offering to investors $150 million in limited partnership units in GPB Holdings LP. According to a Form D signed by David Gentile as managing member of GPB Holdings and filed with the SEC on June 6, 2013, the $150 million in Holdings units would generate an offering estimate of $16,500,000 in sales commissions and finders' fees expenses. The Form D listed Axiom as the associated broker and reported that the minimum investment accepted from outside investors was $50,000. Finally, GPB Holding claimed a federal registration exemption under SEC Rule 506. The Form D filed and amendments thereto were not in compliance with Regulation D for the reasons stated herein.

### 2.   GPB Holdings Qualified, LP

238.   In or about June of 2013, GPB, Gentile and Schneider, through Ascendant and Axiom, began offering potential investors $150 million of limited partnership units in GPB Holdings Qualified, LP ("Holdings Qualified"). On June 10, 2013, Holdings Qualified filed a Form D with the SEC projecting that the $150 million offering would generate an estimated $16,500,000 in sales commissions. According to the filing, the minimum investment accepted from outside investors was $50,000 and the brokerage firm associated with the offering was Axiom Capital Management, Inc. Holdings Qualified claimed a federal registration exemption under SEC Rule 506. The Form D filed and amendments thereto were not in compliance with Regulation D for the reasons stated herein.

### 3.   GPB Automotive Portfolio, LP

239.    In or about June of 2013, GPB, Gentile and Schneider, through Ascendant and Axiom, began offering potential investors participation in $150 million of limited partnership interests in Automotive. On June 10, 2013, Automotive filed a Form D with the SEC disclosing that the $50 million offering would generate an estimated $5,500,000 in sales commissions. According to the filing, the minimum investment accepted from outside investors was $100,000, and the brokerage firm associated with the offering was Axiom Capital Management, Inc. Automotive claimed a federal registration exemption under SEC Rule 506. The Form D filed and amendments thereto were not in compliance with Regulation D for the reasons stated herein.

240.    By the time Automotive filed an Amended Form D filed on March 27, 2015, Automotive had sold $32,000,000 (with $218,000,000 remaining to be sold) in limited partnership interests to 303 investors, with estimated sales commissions of $27,500,000.

241.    According to a further Amended Form D filed on May 19, 2016, the total amount sold had risen to $176,110,533, purchased by 1,869 investors, with estimated sales commissions of $19,372,158.  Very soon thereafter, GPB was in violation of the 1934 Act, Section 12(g), and never registered the equity interests thereunder.  All other Defendants *were aware* that 12(g) requirements of full public compliance with Exchange Act filings were then incumbent upon GPB. Yet, they continued to assist in and promote the Offerings.

242.    A further Amended Form D filed on May 18, 2017, reported that the total investment amount sold had grown to $369,234,443, purchased by 3,851 investors, with estimated sales commissions of $43,385,047.  The associated brokerage firms were Axiom Capital Management, Inc. and Ascendant Alternative Strategies LLC.

243.    A final Amended Form D filed on May 14, 2018, reported that the total amount sold was $622,143,273 of Automotive units to 6,353 investors with estimated sales commissions

of $52,204,671.  The associated brokerage firms selling these units included:  Axiom Capital Management, Inc.; Ascendant Alternative Strategies, LLC; Accelerated Capital Group; Advisory Group Equity Services Ltd.; Aegis Capital Corp.; American Capital Partners, LLC; Arete Wealth Management, LLC; Arkadios Capital; Ausdal Financial Partners, Inc.; Avere Financial Group, LLC; BCG Securities, Inc.; Benjamin & Jerold Brokerage I, LLC; Cabot Lodge Securities LLC; Calton & Associates, Inc.; Cape Securities, Inc.; Capital Investment Group, Inc.; Center Street Securities, Inc.; Coastal Equities, Inc.; Concorde Investment Services, LLC; Crystal Bay Securities Inc.; Emerson Equity LLC; Geneos Wealth Management, Inc.; McNally Financial Services Corporation; Kalos Capital, Inc.; IBN Financial Services, Inc.; Crown Capital Securities, L.P.; Money Concepts Capital Corp., National Securities Corporation; Orchard Securities, LLC; Pariter Securities, LLC; Sandlapper Securities, LLC; Vestech Securities, Inc.; Stephen A. Kohn & Associates, Ltd.; Western International Securities, Inc.; International Assets Advisory, LLC; Hightower Securities, LLC; Innovation Partners LLC; Kingsbury Capital, Inc.; Sentinus Securities LLC; Vanderbilt Securities, LLC; Westpark Capital, Inc.; Colorado Financial Service Corporation; David A. Noyes & Company; Dawson James Securities, Inc.; Dempsey Lord Smith, LLC; DFPG Investments, Inc.; Dinosaur Financial Group, LLC; FSC Securities Corporation; Great Point Capital LLC; Landolt Securities, Inc.; Lewis Financial Group, L.C.; Lowell & Company, Inc.; Madison Avenue Securities, Inc.; McDonald Partners LLC; Moloney Securities Co., Inc.; MSC-BD, LLC; Newbridge Securities Corporation; Purshe Kaplan Sterling Investments, Inc.; Royal Alliance Associates, Inc.; Sagepoint Financial, Inc.; SCF Securities, Inc.; Silber Bennett Financial, Inc.; Triad Advisors LLC; Uhlmann Price Securities, LLC; Whitehall-Parker Securities, Inc.; Windsor Street Capital, LP; and Woodbury Financial Services, Inc.

244.   The various Automotive Portfolio Form D filings are summarized in the following chart:

| GPB Automotive Portfolio | | | | | | | |
|---|---|---|---|---|---|---|---|
| | **Date** | **Brokerage Firms** | **Total Offering** | **Min for Investors** | **Total Sold** | **# Investors[6]** | **First Date of Sale** |
| Initial | 6/10/2013 | Axiom | $50 M | $100,000 | N/A | N/A | |
| Amended | 3/27/2015 | Axiom | $250 M | $100,000 | $32 M | 303 | 8/1/2013 |
| Amended | 5/19/2016 | Axiom | N/A | $100,000 | $176 M | 1,869 | 8/1/2013 |
| Amended | 5/18/2017 | Axiom and Ascendant | N/A | $100,000 | $369 M | 3,505 | 8/1/2013 |
| Amended | 5/14/2018 | Many | N/A | $100,000 | $622 M | 6,353 | 8/1/2013 |

### 4.   GPB Holdings II, LP

245.   In or about April of 2015, GPB, Gentile and Schneider, through Ascendant and Axiom, and other Brokers, began offering potential investors $500 million of limited partnerships interests in Holdings II.  On April 28, 2015, Holdings II filed a Form D with the SEC stating that the $500 million would generate an estimated $55,000,000 in sales commissions.  According to the filing, the minimum investment accepted from outside investors was $50,000 and the brokerage firm associated with the offering was Axiom Capital Management, Inc.  Holdings II claimed a federal securities registration exemption under SEC Rule 506.

246.   According to an Amended Form D filed on May 19, 2016, Holdings II had sold $76,017,028 of units to 899 investors with estimated sales commissions of $8,361,873.  The associated brokerage firm was listed as Axiom.  All other Defendants *were aware* that 12(g) requirements of full public compliance with Exchange Act filings were then incumbent upon GPB as this was publicly acknowledged.  Yet, they continued to assist and promote the Offerings.

---

[6]  The information provided in this chart and the charts below reflect information gathered from GPB's Form D filings. However, Defendants had precise information on the number of investors in each Fund at any particular point in time.

247.    According to a further Amended Form D filed on May 18, 2017, Holdings II sold $364,072,884 of limited partnership interests to 3,505 investors with estimated sales commissions of $42,778,564.   According to the filing, the associated brokerage firms were Axiom Capital Management, Inc. and Ascendant Alternative Strategies LLC.   At this point, GPB was already in violation of the 1934 Act, Section 12(g), but never registered the equity interests thereunder.

248.    By the time Holdings II filed its final Amended Form D filed on May 16, 2018, the following associated brokers had sold $645,813,889 of units to 6,095 investors with estimated sales commissions of $47,914,143. The associated brokerage firms selling these units included: Axiom Capital Management, Inc.; Ascendant Alternative Strategies, LLC; Accelerated Capital Group; Advisory Group Equity Services Ltd.; Aegis Capital Corp.; Ausdal Financial Partners, Inc.; Center Street Securities, Inc.; Arkadios Capital; Aeon Capital, Inc.; Avere Financial Group, LLC; BCG Securities, Inc.; Financial West Group; Cabot Lodge Securities LLC; Calton & Associates, Inc.; Lion Street Financial, LLC; Capital Investment Group, Inc.; IBN Financial Services, Inc.; Coastal Equities, Inc.; Crown Capital Securities, L.P.; Crystal Bay Securities Inc.; Emerson Equity LLC; Geneos Wealth Management, Inc.; Pariter Securities, LLC; Sandlapper Securities, LLC; Vestech Securities, Inc.; Stephen A. Kohn & Associates, Ltd.; Western International Securities, Inc.; National Securities Corporation; Orchard Securities, LLC; International Assets Advisory, LLC; Capital Financial Services, Inc.; Cascade Financial Management, Inc.; D.H. Hill Securities, LLP; Detalus Securities, LLC; Hightower Securities, LLC; Innovation Partners LLC; Kingsbury Capital, Inc.; Private Client Services, LLC; Royal Alliance Associates, Inc.; Vanderbilt Securities, LLC; Westpark Capital, Inc.; United Planners' Financial Services of America LP; David A. Noyes & Company; Wilmington Capital Securities, LLC; Dempsey Lord Smith, LLC; DFPG Investments, Inc.; Dinosaur Financial Group, LLC; FSC Securities Corporation; Great Point

Capital LLC; Landolt Securities, Inc.; Lowell & Company, Inc.; Investment Architects, Inc.; McDonald Partners LLC; Moloney Securities Co., Inc.; MSC-BD, LLC; Kalos Capital, Inc.; Newbridge Securities Corporation; Purshe Kaplan Sterling Investments, Inc.; Sagepoint Financial, Inc.; Money Concepts Capital Corp; Silber Bennett Financial, Inc.; Uhlmann Price Securities, LLC; Whitehall-Parker Securities, Inc.; and Woodbury Financial Services, Inc.

249.   The various Holdings II Form D filings are summarized in the following chart:

| GPB Holdings II | | | | | | | |
|---|---|---|---|---|---|---|---|
| | Date | Brokerage Firms | Total Offering | Min for Investors | Total Sold | # Investors | First Date of Sale |
| Initial | 4/28/2015 | Axiom | $500 M | $50,000 | N/A | N/A | |
| Amended | 5/19/2016 | Axiom | N/A | $50,000 | $76 M | 899 | 8/11/2015 |
| Amended | 5/18/2017 | Axiom and Ascendant | N/A | $50,000 | $364 M | 3,505 | 8/11/2015 |
| Amended | 5/16/2018 | Many | N/A | $50,000 | $646 M | 6,095 | 8/11/2015 |

### 5.   GPB Cold Storage, LP

250.   In or about August of 2015, GPB Capital, Gentile and Schneider, through Ascendant and Axiom, began offering potential investors interests in GPB Cold Storage.   On August 26, 2015, GPB Cold Storage filed its Initial Form D with the SEC regarding its offering of Cold Storage units.   While the Initial Form D, which was filed 15 days after the first sale, declined to disclose the total amount of the offering, it disclosed that $8,565,580 had been sold to 26 investors with estimated sales commissions of $5,857.   According to the filing, the minimum investment accepted from outside investors was $100,000, and the associated brokerage firms were Mori Huston Partners LLC and Landolt Securities, Inc.   GPB Cold Storage claimed a federal registration exemption under the Investment Company Act § 3(c)(1).

251.   According to an Amended Form D filed on December 18, 2015, the following brokers sold $35,901,575 of GPB Cold Storage limited partnership interests to 268 investors with

estimated sales commissions of $3,521,027. The associated brokerage firms selling these units included: Landolt Securities, Inc.; Axiom Capital Management, Inc.; Bradley Wealth Management; Cascade Financial Management, Inc.; Coastal Equities, Inc.; Dempsey Lord Smith, LLC; International Assets Advisory, LLC; IBN Financial Services, Inc.; Kingsbury Capital, Inc.; Moloney Securities Co., Inc.; Pariter Wealth Management Group LLC; and RP Capital LLC.

252.    The various Cold Storage Form D filings are summarized in the following chart:

| GPB Cold Storage | | | | | | | |
|---|---|---|---|---|---|---|---|
| | Date | Brokerage Firms | Total Offering | Min for Investors | Total Sold | # Investors | First Date of Sale |
| Initial | 8/26/2015 | Mori Huston and Landolt | N/A | $100,000 | $8.5 M | 26 | 8/11/2015 |
| Amended | 12/18/2015 | Many | N/A | $100,000 | $35 M | 268 | 8/11/2015 |

### 6.    GPB NYC Development, LP

253.    In or about May of 2016, GPB, Gentile and Schneider, through Axiom and Ascendant, began offering potential investors participation in a $40 million offering of limited partnership units in GPB NYC Development.  On May 12, 2016, GPB NYC Development filed a Form D with the SEC projecting that $40 million offering would generate an estimated $4,700,000 in sales commissions.  As of the filing of that Initial Form D, which was six days after the first sale, $1,400,000 had been sold to three (3) investors. According to the filing, the minimum investment accepted from outside investors was $50,000.  The associated brokerage firms were Axiom Capital Management, Inc.; Moloney Securities Co, Inc.; and Dempsey Lord Smith, LLC. GPB NYC Development claimed a federal registration exemption under SEC 506(b).

254.    GPB NYC Development filed an Amended Form D on May 18, 2017, reporting a total amount of $41,547,150 of NYC Development units sold to 369 investors, with estimated sales

commissions of $4,881,790.  The associated brokerage firms were Axiom Capital Management, Inc. and Ascendant Alternative Strategies, LLC.

### 7. GPB Waste Management, LP

255.    In or about August of 2016, GPB, Gentile and Schneider, through Axiom and Ascendant, began offering potential investors interests in GPB Waste Management.  On August 30, 2016, GPB Waste Management, LP filed its Initial Form D with the SEC reporting an offering for an undisclosed amount, and a minimum investment requirement of $50,000 from outside investors. The filing contained no estimate of sales commissions. According to the filing, the associated brokerage firms were Axiom Capital Management, Inc.; BCG Securities, Inc.; Moloney Securities Co., Inc.; Whitehall-Parker Securities, Inc.; and Dempsey Lord Smith, LLC.  GPB Waste Management claimed a federal registration exemption under SEC Rule 506(b).

256.    By the time GPB Waste Management filed its Amended Form D on August 30, 2017, the following brokers had sold a total of $76,295,381 units of Waste Management to 801 investors with estimated sales commissions of $6,186,733. The associated brokerage firms selling these units included: Axiom Capital Management, Inc.; BCG Securities, Inc.; Moloney Securities Co., Inc.; Whitehall-Parker Securities, Inc.; Dempsey Lord Smith, LLC; Ausdal Financial Partners, Inc.; Center Street Securities, Inc.; Coastal Equities, Inc.; Concorde Investment Services, LLC; Crystal Bay Securities, Inc.; Emerson Equity LLC; Financial West Group; Geneos Wealth Management, Inc.; McNally Financial Services Corporation; Lion Street Financial, LLC; Kalos Capital, LLC; IBN Financial Services, Inc.; IMS Securities, Inc.; Crown Capital Securities, LP; Money Concepts Capital Corporation; National Securities Corporation; Orchard Securities, LLC; Pariter Securities, LLC; Sandlapper Securities LLC; Vestech Securities, Inc.; Stephen A. Kohn & Associates, Ltd.; Western International Securities, Inc.; Aegis Capital Corp.; Advisory Group Equity Services Ltd.; and International Assets Advisory LLC.

257.    As of an Amended Form D filed on April 25, 2018, the following brokers had sold a total of $135,012,605 units of GPB Waste Management to 1,414 investors with estimated sales commissions of $10,828,655. The associated brokerage firms selling these units included:  Axiom Capital Management, Inc.; BCG Securities, Inc.; Moloney Securities Co., Inc.; Whitehall-Parker Securities, Inc.; Dempsey Lord Smith, LLC; Ausdal Financial Partners, Inc.; Center Street Securities, Inc.; Coastal Equities, Inc.; Concorde Investment Services, LLC; Crystal Bay Securities, Inc.; Emerson Equity LLC; Financial West Group; Geneos Wealth Management, Inc.; McNally Financial Services Corporation; Lion Street Financial, LLC; Kalos Capital, Inc.; IBN Financial Services, Inc.; IMS Securities, Inc.; Crown Capital Securities, L.P.; Money Concepts Capital Corp.; National Securities Corporation; Orchard Securities, LLC; Pariter Securities, LLC; Sandlapper Securities, LLC; Vestech Securities, Inc.; Stephen A. Kohn & Associates, Ltd.; Western International Securities, Inc.; Aegis Capital Corp.; Advisory Group Equity Services Ltd.; International Assets Advisory, LLC; Arkadios Capital; Ascendant Alternative Strategies, LLC; Cabot Lodge Securities LLC; GVC Capital LLC; Hightower Securities, LLC; Innovation Partners LLC; Kingsbury Capital, Inc.; Lucia Securities, LLC; Sentinus Securities LLC; Titan Securities; Vanderbilt Securities, LLC; and Westpark Capital, Inc.

258.    The various Waste Management Form D filings are summarized in the following chart:

| GPB Waste Management | | | | | | | |
|---|---|---|---|---|---|---|---|
| | Date | Brokerage Firms | Total Offering | Min for Investors | Total Sold | # Investors | First Date of Sale |
| Initial | 8/30/2016 | Axiom, BCG, Moloney, Whitehall, Dempsey | N/A | $50,000 | N/A | N/A | N/A |
| Amended | 8/30/2017 | Many | N/A | $50,000 | $76 M | 801 | 9/1/2016 |
| Amended | 4/25/2018 | Many | N/A | $50,000 | $135 M | 1,414 | 9/1/2016 |

### 8.   GPB Holdings III, LP

259.    In or about January of 2018, GPB, Gentile and Schneider, through Axiom and Ascendant, began offering potential investors participation in a $1.5 billion offering of interests in Holdings III.  On January 26, 2018, Holdings III LP filed its Initial Form D with the SEC disclosing an offering for an undisclosed amount and an estimated $193,369 in sales commissions.  The minimum investment accepted from outside investors was $50,000.  The Form D reported that Ascendant Alternative Strategies had sold $6,430,000 of Holdings III units to two (2) investors.

260.    As of late 2018, GPB Capital, Gentile, Schneider and the other GPB Defendants and Broker Defendants had raised more than $1.8 billion from investors across the country for the GPB-sponsored and -managed Funds, through the Broker Defendants.

261.    As more fully detailed herein, Defendants' success in raising this considerable amount of money rested upon their failure to disclose in the GPB Funds' PPMs and other Offering Materials, in violation of Texas and federal securities laws, material – indeed, crucial – information regarding the Funds' self-dealing and conflicted ownership interests, and that undisclosed control persons of the GPB Defendants had a tainted background which was not properly disclosed.

### K.   GPB's Scheme Begins to Unravel

262.    As described above, in July 2017, GPB filed a Complaint against former senior executive Dibre and filed an amended Complaint in February 2018.

263.    As described above, in his March 2018 Answer and Counterclaim to the Amended Complaint, Dibre asserted that GPB engaged in deceptive and illegal conduct, including, *inter alia*:

> a.   Charging its investors, without adequate disclosure, almost 20% in upfront fees, yet promising an unachievable 8% annual return on their investment;

b.   Manipulating financial statements of dealerships in order to cover up transactions that personally benefitted GPB, Gentile, or Schneider at the expense of the dealerships;

c.   Failing to disclose kickbacks that GPB caused dealerships to pay Gentile and Schneider; and

d.   Recording the purchase price of dealerships at several million dollars more than the combined actual purchase price, closing expenses, and working capital investment, and then funneling such excess monies back to Gentile and Schneider, or entities in which they held as interest, as "acquisition fees."

264.   GPB's two largest Funds, Holdings II and Automotive, were required to file financial statements with the SEC pursuant to SEC Regulation 12g-1 because their assets exceeded $10 million and they had more than 2,000 individual investors.

265.   As of July 2018, GPB still had not filed the required financial statements for Holdings II and Automotive, and thus was operating in direct violation of the Securities Exchange Act.

266.   GPB represented in July 2018 that it was working to finalize the required financials.

267.   On or about August 17, 2018, GPB made several key announcements: First, GPB said that it would be taking a break from raising new capital in order to fix the accounting and financial statements for Holdings II and Automotive. Second, GPB announced that it would be suspending investor redemptions from the Funds until the audited financial statements were completed and filed with the SEC. And third, GPB disclosed that it would be restating the 2015 and 2016 financial statements of certain Funds as part of an accounting review.

268.    In particular, in an August 17, 2018 letter to Holdings II investors, Gentile announced that GPB had determined that previously issued financial statement for the years ended December 31, 2015 and 2016 would need to be restated and the "independent accountants' reports thereon should no longer be relied upon."

269.    In the following month, September 2018, Massachusetts Secretary of the Commonwealth William Galvin announced that Massachusetts regulators were investigating sixty-three (63) independent broker-dealers who offered PPMs sponsored by GPB.

270.    The Massachusetts Securities Division requested information from these broker-dealers about the extent of sales activity, investor suitability, and disclosure and marketing documents provided to investors.

271.     On the heels of the Massachusetts investigation, in November 2018, GPB's auditor, Crowe, resigned, reportedly due to perceived risks that fell outside its internal risk tolerance parameters.

272.    In particular, Crowe had been engaged to audit Prime, one of the portfolio companies in which Holdings II had invested.  In a November 9, 2018 letter to Holdings II investors, Gentile reported that the audit of Prime was necessary for RSM to complete its own 2017 audit of Holdings II, however, Crowe had "elected to resign as auditor of Prime ... due to perceived risks that fell outside their internal risk tolerance parameters." Gentile reported that GPB had engaged another audit firm, EisnerAmper, to replace Crowe.

273.    Similarly, on November 9, 2018, GPB Capital announced that Crowe, the auditor for certain of the portfolio operating companies of one or more of the Funds and at least three of the Funds, Automotive, Holdings, and Holdings Qualified, had also resigned due to "perceived

risks that Crowe determined fell outside of their internal risk tolerance parameters." GPB attributed the delay in completing the 2017 audit of Automotive Portfolio to this development.

274.    In December 2018, InvestmentNews reported that FINRA and the SEC had also launched investigations into the broker-dealers selling PPMs sponsored by GPB, and announced that the SEC had started investigating GPB, including the accuracy of its disclosures to investors, the performance of various funds, and the distribution of capital to investors.

275.    On February 28, 2019, the FBI and officials from the New York City Business Integrity Commission raided GPB's New York office and the office of Five Star Carting, a major private trash hauler that GPB owns.

276.    In June 2019, GPB announced that the asset value of Holdings II and Automotive had declined in value 25.4% and 39%, respectively, and its five other smaller funds had declined in value between 25 and 73%. GPB thus admitted that its financial disclosure had been false and misleading.

277.    While the GPB investment value dropped tremendously, the broker-dealers who sold such investments were collectively paid *$167 million* in fees and commissions.

278.    On June 21, 2019, GPB disclosed to Holdings II investors that RSM, the independent auditor of the Holdings' II financials, had been replaced effective April 22, 2019 (*i.e.*, two months earlier).

279.    On July 19, 2019, one of GPB's business partners, Rosenberg filed his lawsuit against GPB in Massachusetts State Court.

280.    Rosenberg, who was the CEO of Prime, one of GPB's investments, alleged that GPB tried to oust him after he provided GPB's auditors with information and documents showing

that GPB had engaged in serious financial misconduct.  Rosenberg later provided the same information to the SEC.

281.    As of the date of this filing, GPB and the GPB Individual Defendants have suspended redemptions from the following Funds and have failed to provide updated financial information regarding these Funds:

- GPB Holdings

- GPB Automotive Portfolio

- GPB Holdings II

- GPB Holdings III

- GPB Holdings Qualified

- GPB Cold Storage

- GPB NYC Development

- GPB Waste Management

**L.    Defendants Made Numerous Materially False and Misleading Statements and Omissions**

282.    Throughout the Class Period, the GPB Defendants, Schneider, Gentile, and Martino prepared, issued, and, with the assistance of the Broker Defendants, distributed PPMs and other Offering Materials to Plaintiffs and Class members.

283.    These materials were false and misleading for at least the following reasons and as further outlined herein:

a.    The GPB Defendants, Gentile, Schneider, and Martino misrepresented the Funds' business objectives and did not disclose that they were destined to fail.  First, they misrepresented the nature of the projected return.  It was not feasible that the Funds would pay out an 8% current cash return to investors within three months of

192

investment, as the Funds were incurring upfront costs approaching 20%.  Second, operating returns from underlying portfolio companies could not reasonably be expected in such a short period of time;

b.  The GPB Defendants, Gentile, and Schneider misrepresented or omitted to disclose their incurable non-waivable conflicts and breaches of fiduciary duty: Schneider's involvement in GPB and the Funds as a control person, Schneider's ownership interest in the profits of GPB, Gentile's ownership interest in Ascendant, and Schneider and Gentile's agreement to run GPB and Ascendant jointly and split the proceeds without disclosure of this profit sharing and control relationship;

c.  GPB and the Funds omitted to disclose that Schneider and Ascendant were control persons of the GPB Corporate Defendants and that Schneider and Martino each had a tainted background, which Defendants improperly failed to disclose in their Form D;

d.  GPB and the Funds represented that they were entitled to an exemption from registration under the 1934 Act when they were not so entitled because they had sold securities in offerings to more than 2,000 investors who had invested more than $10 million in assets.  In addition, GPB and the Funds were required to register under the 1933 Act, as they had not complied with Regulation D and therefore its exemption from registration was inapplicable;

e.  GPB and the Funds misrepresented the GPB Defendants' skill and expertise in managing businesses they were to acquire with investor money by not disclosing that the Funds' results were being obtained through other wrongful conduct, as alleged herein, and they failed to disclose their prior poor financial results, which

were less than 8% annualized and thus only a small portion of what they were telling investors they would receive from the new GPB Funds;

f.  GPB and the Funds omitted to disclose that GPB, the Funds, Ascendant and Schneider had engaged in or were aware of serious financial misconduct, including, without limitation, large conflicted transactions, and misuse and misrepresentation of investor money;

g.  GPB and the Funds omitted to disclose that the 2015 and 2016 financial statements for the GPB Defendants' two largest Funds, Automotive and Holdings II, as well as other communications to investors concerning these and other Funds, contained highly material financial misrepresentations and/or omissions and should not have been relied upon by investors; and

h.  GPB and the Funds knowingly overstated the value of fund assets knowing investors would rely thereon. Most of the GPB investments were in preferred stock and GPB refused to mark down such positions from cost, even when mark-downs were necessary.  The Individual Defendants engaged in undisclosed conversion of assets belonging to the Funds and did not disclose such breaches of fiduciary duty.

284.    In addition to the above, the Broker Defendants, the Auditor Defendants, the Fund Administrator, and the Valuation Defendants provided substantial assistance to the other Defendants in the commission of these wrongs. These Defendants provided material assistance in the wrongdoing alleged herein by knowingly disseminating documents containing material misrepresentations or failing to disclose material information to investors. This included misrepresenting or not disclosing the information regarding the true value of Class members'

investments, the need for registration under the Securities Exchange Act and Securities Act, and the failure to comply with Regulation D.

285.     Such misrepresentations and omissions were material, indeed crucial, to Plaintiffs and the other GPB investors' evaluation of the GPB Funds, and their decision to invest in them.

286.     Defendants knew that the prospective GPB investors, including Plaintiffs, would rely to their detriment upon such misrepresentations and omissions in the Offering Materials, and indeed intended for such investors and Plaintiffs to rely on those misrepresentations and omissions in order to invest in the Funds.

287.     Plaintiffs and the other investors were reasonable in relying upon the misrepresentations and omissions in the Offering Materials.

## CLASS ACTION ALLEGATIONS

288.     Plaintiffs bring this action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(2) and/or (b)(3) on behalf of themselves and a nationwide class consisting of:

> All investors who purchased or otherwise acquired limited partnership interests in one or more of the GPB Funds between June 6, 2013 and the present (the "Class Period"), and have been damaged by the conduct alleged herein (the "Class").  No plaintiff or class member is suing or asserting claims against the Broker who directly sold to them the limited partnership interests which they purchased.

289.     The Class excludes Defendants and any entity in which any Defendant has a controlling interest, and their officers, directors, legal representatives, successors, and assigns. All members of their immediate families are also excluded from the Class.

290.     The Class is so numerous that joinder of all members is impracticable. The Class includes thousands of investors that purchased or otherwise acquired interests in the GPB Funds nationwide.

291.    Plaintiffs' claims are typical of the claims of the Class insofar as Plaintiffs similarly purchased or acquired an interest in the GPB Funds and were harmed by the same wrongful activity.

292.    Plaintiffs will fairly and adequately protect the interests of the Class and do not have any claims that are antagonistic to those of the Class. Plaintiffs have retained counsel experienced in complex nationwide class actions, including securities litigation. Plaintiffs' counsel will fairly, adequately, and vigorously protect the interests of the Class.

293.    Common questions of law and fact predominate over any questions affecting individual Class members, including, but not limited to, the following:

    a.    Whether the Offering Materials contained material misrepresentations and/or omissions of material fact;

    b.    Whether GPB violated the Texas Securities Act;

    c.    Whether the Broker Defendants and Fund Administrators and Auditors aided and abetted or substantially assisted violations of the Texas Securities Act and GPB's breach of fiduciary duty;

    d.    Whether the sale of the limited partnership interests was required to be registered under the 1933 Act and the Texas Securities Act;

    e.    Whether GPB and its affiliates breached their fiduciary duties to Plaintiffs and the Class; and

    f.    Whether Plaintiffs and the Class members were damaged as a result of Defendants' conduct.

294.     A class action is superior to other available methods for the fair and efficient adjudication of this controversy. There will be no difficulty in the management of this action as a class action.

## EQUITABLE TOLLING, FRAUDULENT CONCEALMENT, AND DISCOVERY OF THE WRONGDOING

295.     As a result of Defendants' conduct, Plaintiffs and the Class Members were not aware of Defendants' misconduct, including the Material Misrepresentations and Omissions, and were prevented from learning of the facts necessary to commence an action against Defendants for the wrongful conduct alleged in this Complaint until litigation involving the GPB Funds revealed the extent of Defendants' wrongdoing.  The facts necessary for Plaintiffs to formulate the basis of a complaint and satisfy applicable pleading standards were within the exclusive control of Defendants, as well as the individuals and entities that aided and abetted and substantially assisted Defendants.

296.     Ascendant Capital and the other GPB Defendants expressly concealed the truth about the Material Misrepresentations and Omissions from Plaintiffs and other Class members and at Ascendant Capital's instruction, through, *inter alia*, the DD Reports, the Broker Defendants concealed that information as well.

297.     Plaintiffs and the members of the Class have acted diligently in seeking to bring their claims promptly. Because of Defendants' active steps – including, but not limited to, failing to disclose various conflicts of interest, failing to disclose until recently that GPB was making investor distributions using investor capital rather than profits from capital, and providing investors monthly account statements that did not reveal the accurate value of their investment – Plaintiffs assert that the applicable statute of limitations for Plaintiffs' claims were tolled, and that Defendants are equitably estopped from asserting any statutes of limitations defense.

298.    Defendants are equitably estopped from asserting that any otherwise applicable period of limitations has run.

299.    As a result of Defendants' breaches of fiduciary duties and other wrongdoing, and concealment of the same (as described herein), Plaintiffs and the Class members were prevented from discovering their claims against Defendant until recently.

300.    In addition to the above, on account of the COVID-19 pandemic, the Supreme Court of the State of Texas extended and tolled any deadline for the filing or service of any civil case from at least March 13, 2020, until June 1, 2020, unless extended by the Chief Justice of the Supreme Court.  The Supreme Court of Texas further ordered that any deadline for the filing or service of any civil case that falls on a day between March 13, 2020, and June 1, 2020, is extended until July 15, 2020. Further, the Chief Judge of the United States District Court for the Western District of Texas ordered that all deadlines are suspended and tolled for all purposes, including the statutes of limitations, from April 15, 2020 through June 30, 2020 on account of the COVID-19 pandemic.

301.    Accordingly, the discovery rule also applies to toll the statute of limitations in this case.

302.    The applicable statutes of limitations have been tolled by both federal and state courts during the COVID-19 pandemic.

## CAUSES OF ACTION

### COUNT I
**Violation of the Texas Securities Act,**
**Tex. Rev. Civ. Stat. Ann. art. 581-33**
**(Against GPB, the GPB Funds and Ascendant Capital)**

303.    Plaintiffs incorporate by reference the preceding paragraphs as if set forth in full herein.

304.     Section 33(A)(2) of the TSA provides:

A person who offers or sells a security (whether or not the security or transaction is exempt under Section 5 or 6 of this Act) by means of an untrue statement of a material fact or an omission to state a material fact necessary in order to make the statements made, in light of the circumstances under which they are made, not misleading, is liable to the person buying the security from him, who may sue either at law or in equity for rescission, or for damages if the buyer no longer owns the security.

305.     Section 4(A) defines "security" to include "any limited partner interest in a limited partnership."

306.     GPB, Ascendant Capital, and the GPB Funds offered the limited partnership interests in the GPB Funds that Plaintiffs and the Class members purchased.

307.     In connection with offering the limited partnership interests, GPB, Ascendant Capital and the GPB Funds made material untrue statements of material fact to investors, including Plaintiffs and the Class, and omitted material facts, as described herein.

308.     Accordingly, Plaintiffs and the Class members are entitled to rescission or damages in an amount to be proven at trial.

## COUNT II
### Aiding and Abetting Violations of the Texas Securities Act,
### Tex. Rev. Civ. Stat. Ann. art. 581-33
### (Against the Broker Defendants, GPB Defendants (Other Than the Funds), GPB Affiliated Defendants, Gentile, Schneider, Martino, Phoenix, the Auditor Defendants, the Valuation Defendants, and Gentile Pismeny)

309.     Plaintiffs incorporate by reference the preceding paragraphs as if set forth in full herein.

310.     Section 33(F)(2) of the TSA states:

A person who directly or indirectly with intent to deceive or defraud or with reckless disregard for the truth or the law *materially aids* a seller, buyer, or issuer of a security is liable under Section 33A, 33B, or 33C jointly and severally with the seller, buyer, or issuer, and to the same extent as if he were the seller, buyer, or issuer.

311.    As set forth above, GPB, Ascendant Capital and the GPB Funds violated TSA Section 33A by making material misstatements and omitting material facts in offering the limited partnership interests.

312.    As pled herein, each of the Defendants against whom this count is asserted, with knowledge of the untruth of the false representations made by GPB, Ascendant Capital and the GPB Funds or their violation of the law, and with actual knowledge of the nature of the fraud as described herein, materially aided GPB, Ascendant Capital and the Funds in the sale of the subject securities.

313.    Accordingly, the Defendants against whom this count is asserted are jointly and severally liable with GPB, Ascendant Capital and the GPB Funds, and Plaintiffs and the Class members are entitled to rescission or damages in an amount to be proven at trial.

<u>COUNT III</u>
**Control Person Violations of the Texas Securities Act,**
**Tex. Rev. Civ. Stat. Ann. art. 581-33**
**(Against Gentile, Schneider, Martino, MR Ranger, DJ Partners, Ascendant Capital,**
**Ascendant Strategies, and GPB)**

314.    Plaintiffs incorporate by reference the preceding paragraphs as if set forth in full herein.

315.    Section 33(A)(2) provides:

> A person who offers or sells a security (whether or not the security or transaction is exempt under Section 5 or 6 of this Act) by means of an untrue statement of a material fact or an omission to state a material fact necessary in order to make the statements made, in light of the circumstances under which they are made, not misleading, is liable to the person buying the security from him, who may sue either at law or in equity for rescission, or for damages if the buyer no longer owns the security.

316.    Section 4(A) defines "security" to include "any limited partner interest in a limited partnership."

317.    Section 33(F)(1) states:

A person who directly or indirectly controls a seller, buyer, or issuer of a security is liable under Section 33A, 33B, or 33C jointly and severally with the seller, buyer, or issuer, and to the same extent as if he were the seller, buyer, or issuer, unless the controlling person sustains the burden of proof that he did not know, and in the exercise of reasonable care could not have known, of the existence of facts by reason of which the liability is alleged to exist.

318.    Gentile, Schneider, Martino, MR Ranger, DJ Partners, Ascendant Capital, Ascendant Strategies, and GPB are "control persons" in that they had actual power or influence over the Funds and induced or controlled GPB and the Funds' limited partnership offerings, as well as the materials disseminated in connection with the offerings.

319.    As set forth above, Gentile, Schneider, Martino, MR Ranger, DJ Partners, Ascendant Capital, Ascendant Strategies and GPB violated TSA Section 33F by controlling the Funds, which violated Section 33A of the TSA by making material misstatements and omitting material facts in offering the limited partnership interests.

320.    Accordingly, the Defendants against whom this count is asserted are jointly and severally liable with the Funds, and Plaintiffs and the Class members are entitled to rescission or damages in an amount to be proven at trial.

## COUNT IV
### Violations of the Texas Securities Act,
### Tex. Rev. Civ. Stat. Ann. art. 581-7 and 581-33(A)(1)
### (Against GPB, Ascendant Capital and the Funds)

321.    Plaintiffs incorporate by reference the preceding paragraphs as if set forth in full herein.

322.    TSA Section 33(A)(1) provides that "[a] person who offers or sells a security in violation of Section 7 . . . of this Act is liable to the person buying the security from him, who may sue either at law or in equity for rescission or for damages if the buyer no longer owns the security."

323.     TSA Section 7(A) provides "No dealer or agent shall sell or offer for sale any securities . . . except those which have been registered . . . and except those which come within the classes enumerated in Section 5 [(Exempt Transactions)] or Section 6[(Exempt Securities)] of this Act, until the issuer of such securities or a dealer registered under the provisions of this Act shall have been granted a permit by the Commissioner . . . ."

324.     The transactions and securities described herein do not qualify as exempt under TSA Sections 5 or 6.  Thus, as described herein, Defendants were required to register the securities that they sold and offered for sale to Plaintiffs and the members of the Class, and their failure to do so violated Section 7 of the TSA.

325.     As discussed above, the sale of the securities was not exempt from registration under TSA Section 7, as it was not exempt under the Securities Act of 1933.  The National Secs. Markets Improvement Act ("NSMIA") does not apply to such securities as they were not exempt from registration under Regulation D.

326.     GPB, Ascendant Capital, and the Funds failed to the register the limited partnership interests which were sold and offered for sale to Plaintiffs and the members of the Class.

327.     Accordingly, Plaintiffs and the Class members seek to rescind their purchase of the securities described herein, or, in the alternative, seek to recover the damages allowed pursuant to TSA Section 33(D).

**COUNT V**
**Aiding and Abetting Violations of the Texas Securities Act,**
**Tex. Rev. Civ. Stat. Ann. art.  581-7 and 581-33(A)(1) and 581-33F(2)**
**(Against Broker Defendants, GPB Defendants (Other Than the Funds), GPB Affiliated**
**Defendants, Gentile, Schneider, Martino, MR Ranger, DJ Partners, Fund Administrator,**
**the Auditor Defendants, the Valuation Defendants, and Gentile Pismeny)**

328.     Plaintiffs incorporate by reference the preceding paragraphs as if set forth in full herein.

329.     As shown, the transactions and securities described herein do not qualify as exempt under TSA Sections 5 and 6.  Thus, pursuant to Section 7 of the TSA, GPB and the Funds were required to register the securities that they sold to Plaintiffs and the Class members.

330.     Further, as discussed above, the sale of the securities was not exempt from registration under TSA Section 7, as it was not exempt under the Securities Act of 1933.

331.     GPB and the Funds failed to the register the limited partnership interests that they sold and offered for sale to Plaintiffs and the Class members and, as set forth above, are, therefore, liable under TSA Section 33A(1).

332.     The Defendants against whom this claim is asserted knew that GPB improperly failed to register the sale of the limited partnership interests when they knew such registration was required and nevertheless materially aided the Funds in the sale of the subject securities.

333.     Each of The Broker Defendants, GPB, GPB Affiliated Defendants, Gentile, Schneider, Martino, MR Ranger, DJ Partners, Fund Administrator, the Auditor Defendants, the Valuation Defendants, Gentile Pismeny, and Ascendant Capital violated TSA Section 33F(2) having directly or indirectly with intent to deceive or defraud or with reckless disregard for the truth or the law materially aided a seller, buyer, or issuer of GPB limited partnership interest.

334.     Accordingly, Plaintiffs and the Class members seek to rescind their purchase of the securities described herein, or, in the alternative, seek to recover the damages allowed pursuant to TSA Section 33(D), for which the Defendants against whom this count is asserted are jointly and severally liable.

## COUNT VI
### Control Person Violations of the Texas Securities Act,
### Tex. Rev. Civ. Stat. Ann. art. 581-7 and 581-33(A)(1) and 581-33F(1)
### (Against Gentile, Schneider, Martino, MR Ranger, DJ Partners, Ascendant Capital and
### Ascendant Strategies, and GPB)

335. Plaintiffs incorporate by reference the preceding paragraphs as if set forth in full herein.

336. As discussed above, the sale of the securities was not exempt from registration under TSA Section 7, as it was not exempt under the Securities Act of 1933.

337. The transactions and securities described herein do not qualify as exempt under TSA Sections 5 or 6. Thus, GPB and the Funds were required to register the securities that they sold, as described herein.

338. GPB and the Funds failed to the register the limited partnership interests that it sold and offered for sale to Plaintiffs and the Class members and, as set forth above, are liable under TSA Section 33A(1).

339. Gentile, Schneider, Martino, MR Ranger, DJ Partners, Ascendant Capital, Ascendant Strategies and GPB are "control persons" to the extent that they had actual power or influence over the Funds and/or GPB and induced or controlled the Funds' limited partnership offerings complained of herein.

340. As set forth above, Gentile, Schneider, Martino, MR Ranger, DJ Partners, Ascendant Capital, Ascendant Strategies and GPB violated TSA Section 33F by directly or indirectly controlling the Funds and/or GPB, which violated TSA Section 33A(1) by failing to register the limited partnership interests that they sold and offered for sale to Plaintiffs and the Class members.

341.     Accordingly, Plaintiffs and the Class members seek to rescind their purchase of the securities described herein, or, in the alternative, seek to recover the damages allowed pursuant to TSA Section 33(D), for which the Defendants against whom this count is asserted are jointly and severally liable.

<u>**COUNT VII**</u>
**Fraud**
**(Against GPB Defendants, GPB Affiliated Defendants, Gentile, Schneider, and Martino)**

342.     Plaintiffs incorporate by reference the preceding paragraphs as if set forth in full herein.

343.     The GPB Defendants, GPB Affiliated Defendants, Gentile, Schneider, and Martino knowingly made materially false representations and omissions regarding the limited partnership interests that Plaintiffs and Class members purchased, as alleged herein.

344.     The GPB Defendants, GPB Affiliated Defendants, Gentile, Schneider, and Martino knew these representations and omissions were false or misleading when made.

345.     The GPB Defendants, GPB Affiliated Defendants, Gentile, Schneider, and Martino made the false representations and omitted material facts intending to induce Plaintiffs and the Class members to rely on the representations and purchase the limited partnership interests.

346.     Plaintiffs and the Class members justifiably relied on The GPB Defendants, GPB Affiliated Defendants, Gentile, Schneider, and Martino's false representations and non-disclosures and, as a result, were injured insofar as their limited partnership interests have declined in value materially.

347.     Accordingly, Plaintiffs and the Class members seek damages in an amount to be proven at trial.

## COUNT VIII
### Substantially Assisting in the Commission of Fraud
**(Against the GPB Defendants (Other Than the Funds), GPB Affiliated Defendants, Fund Administrator Phoenix, the Auditor Defendants, the Valuation Defendants, Gentile Pismeny, Broker Defendants, Gentile, Schneider, and Martino)**

348.     Plaintiffs incorporate by reference the preceding paragraphs as if set forth in full herein.

349.     As set forth above, the GPB Defendants (other than the Funds) committed fraud by knowingly making material misrepresentations and omissions regarding the limited partnership interests.

350.     For the reasons discussed herein, the GPB Defendants, GPB Affiliated Defendants, the Fund Administrator, the Auditor Defendants, the Valuation Defendants, Gentile Pismeny, Broker Defendants, and Gentile, Schneider, and Martino knew that GPB engaged in the fraud.

351.     As described herein, the Defendants named in this Count substantially assisted GPB, the Funds, and Ascendant Capital in committing fraud by, *inter alia*, facilitating the sale of, and offering for sale, the limited partnership interests, through the use of false and misleading Offering Materials in part prepared by them (as well as other false and misleading documents) in violation of Texas law.

352.     Accordingly, Plaintiffs and the Class members are entitled to damages in an amount to be proven at trial.

## COUNT IX
### Fraudulent Transfer Under TUFTA
**(Against the Broker Defendants, Ascendant Capital, Ascendant Strategies and Axiom)**

353.     Plaintiffs reallege and incorporate by reference the allegations set forth in the preceding paragraphs, as if fully set forth herein.

354.     This is an action for equitable and other relief pursuant to the Texas Uniform Fraudulent Transfer Act ("TUFTA") (Texas Business and Commerce Code, § 24.005(a), *et. seq.*).

355.     Under TUFTA, a transfer made with actual or constructive intent to defraud any

creditor, including the Class as defined herein, may be avoided to the extent necessary to satisfy a

creditor's claims.  The relevant statute states:

> (a) A transfer made or obligation incurred by a debtor is fraudulent as to a creditor
> … if the debtor made the transfer or incurred the obligation:
>> (1) With actual intent to hinder, delay, or defraud any creditor of the
>> debtor; or
>> (2) Without receiving a reasonable equivalent value in exchange for the
>> transfer or obligation, and the debtor:
>>> a. Was engaged or was about to engage in a business or a transaction
>>> for which the remaining assets of the debtor were unreasonably
>>> small in relation to the business or transactions; or
>>> b. Intended to incur, or believed or reasonably should have believed
>>> that the debtor would incur, debts beyond the debtor's ability to pay
>>> as they became due."

356.     In determining actual intent under TUFTA, courts look to a list of eleven non-

exclusive *indicia* fraudulent intent.  However, when a Ponzi scheme, such as that at issue in this

case is involved, courts applying TUFTA have bypassed the statutory badges of fraud analysis in

favor of a binding and conclusive presumption that *any transfer* in furtherance of the Ponzi scheme,

or in connection with the Ponzi scheme, was made with actual intent to defraud as defined in

TUFTA.  Such transfers are fraudulent *per se* because they are based on the enterprise or corporate

entities' illegality or insolvency, which is also presumed under TUFTA.  Both Texas courts and

the Fifth Circuit have adopted these presumptions with respect to the intent to defraud in

connection with a Ponzi scheme.  Here, as described, the GPB Defendants, with the substantial

assistance of the remaining GPB Defendants, engaged in a Ponzi scheme in violation of the TSA

involving the issuance of Offering Materials containing material omissions and material

misstatements and the failure to register such Offering Materials under the Securities Act of 1933

and under the TSA.

357.     As shown, the Broker Defendants, Ascendant Capital, Ascendant Strategies, and Axiom had actual knowledge of the misrepresentations and omissions described herein and the illegality of the Offerings which were improperly registered.  Plaintiffs have pled that the Broker Defendants, Ascendant Capital, Ascendant Strategies, and Axiom had actual knowledge of the GPB entities being involved in a Ponzi scheme and the TSA violations outlined herein.  Throughout the Class Period, GPB and the Funds transferred to each of these Defendants monies and other considerations in the form of commissions and other compensation (described herein) ostensibly in payment for brokerage and related services rendered by such Broker Defendants, Ascendant Capital, Ascendant Strategies, and Axiom  to GPB and the Funds in connection with the Offerings described herein.

358.     Throughout the Class Period, the Broker Defendants received more than $150 million of fraudulently transferred compensation in connection with their purported sales efforts on behalf of GPB and the Funds.  During the same period, Ascendant Capital, Ascendant Strategies and Axiom received tens of millions of dollars of additional fraudulently transferred compensation in connection with such sales efforts.

359.     Each such transfer to each such Defendant was made without adequate consideration being paid or offered on the part of such Defendant.  None of such Broker Defendants, Ascendant Capital, Ascendant Strategies or Axiom rendered reasonably equivalent value in exchange for the transfer of such brokerage commissions to them.  This is so because under established Texas and Fifth Circuit law, the term "value" as used in TUFTA is viewed from an objective standpoint and is only deemed to be "value" if it actually results in value to the debtor.  Case law makes clear that brokerage services which further a Ponzi scheme do not have value as defined under TUFTA.  Instead, they increase the size of the Ponzi scheme and provide no benefit

to the corporate issuer or its creditors.  Broker sales efforts pursuant to established case law do not provide any value to the Ponzi scheme entity at issue, but only exacerbate the harm to the creditors under applicable law.  Moreover, as described herein, such commissions were excessive and at least double the industry standard.

360.     Here, the Broker Defendants', Ascendant Capital's, Ascendant Strategies' and Axiom's transactions at issue, and the transfer of more than $150 million to the Broker Defendants, and tens of millions of dollars more to Ascendant Capital, Ascendant Strategies and Axiom, rendered the relevant GPB entity insolvent, or left it with a reasonably small capital in relation to the size of its business or purported transactions, and with debts beyond the relevant GPB entities' ability to pay as they became due.

361.     The transfers of the creditors' assets to the Broker Defendants, Ascendant Capital, Ascendant Strategies and Axiom were made with actual intent to hinder, delay or defraud creditors, and these constituted fraudulent transfers in violation of TUFTA.  GPB and the Funds, with respect to each such transfer, did not receive reasonably equivalent value, or any value, for any of the transfers made herein, and did incur, and intended to incur, or believed, or reasonably should have believed, that post these transfers, it would incur debts beyond its ability to pay as they became due, and thus the transfers were and are fraudulent in violation of TUFTA.  The Class is entitled to relief under TUFTA, including legal fees and costs for bringing this action.

## COUNT X
### Fraudulent Transfer and TUFTA
### (Against Fund Administrator Phoenix)

362.     Plaintiff realleges and incorporates by reference the allegations set forth in the proceeding paragraphs as if fully set forth herein.

363.     This is an action for equitable and other relief pursuant to the Texas Uniform Fraudulent Transfer Act ("TUFTA").

364.     Under TUFTA, a transfer made with actual or constructive intent to defraud any creditor, including the Class as defined herein, may be avoided to the extent necessary to satisfy a creditor's claims.  The relevant statute states:

> (a) A transfer made or obligation incurred by a debtor is fraudulent as to a creditor
> … if the debtor made the transfer or incurred the obligation:
>> (1) With actual intent to hinder, delay, or defraud any creditor of the debtor; or
>> (2) Without receiving a reasonable equivalent value in exchange for the transfer or obligation, and the debtor:
>>> a. Was engaged or was about to engage in a business or a transaction for which the remaining assets of the debtor were unreasonably small in relation to the business or transactions; or
>>> b. Intended to incur, or believed or reasonably should have believed that the debtor would incur, debts beyond the debtor's ability to pay as they became due."

365.     In determining actual intent under TUFTA, courts look to a list of eleven non-exclusive *indicia* fraudulent intent.  However, when a Ponzi scheme, such as that at issue in this case is involved, courts applying TUFTA have bypassed the statutory badges of fraud analysis in favor of a binding and conclusive presumption that *any transfer* in furtherance of the Ponzi scheme, or in connection with the Ponzi scheme, was made with actual intent to defraud as defined in TUFTA.  Such transfers are fraudulent *per se* because they are based on the enterprise or corporate entities' illegality or insolvency, which is also presumed under TUFTA.  Both Texas courts and the Fifth Circuit have adopted these presumptions with respect to the intent to defraud in connection with a Ponzi scheme.  Here, as described, the GPB Defendants, with the substantial assistance of the remaining GPB Defendants, engaged in a Ponzi scheme in violation of the TSA involving the issuance of Offering Materials containing material omissions and material

misstatements and the failure to register such Offering Materials under the Securities Act of 1933 and under the TSA.

366.     As shown, Phoenix had actual knowledge of the misrepresentations and omissions described herein and the illegality of the Offerings which were improperly unregistered.  Phoenix processed payments to GPB/Ascendant insiders and thus knew of their undisclosed co-ownership of GPB/Ascendant.   Phoenix also knew that only approximately 80% of investor capital was actually credited to investor limited partnership accounts and thus that the monthly NAV statements to investors prepared and distributed by GPB were false and misleading and part of the Ponzi scheme.  Throughout the Class Period, Phoenix was paid fees which were dramatically in excess of the value of the Administrator services rendered by them, including unprecedented 20% fee on open transfer of Funds at the direction of GPB/Ascendant.

367.     Throughout the Class Period, Phoenix received transfer of Funds made without adequate consideration being provided on the part of Phoenix.

368.     The 20% fee described herein was excessive, unearned compensation for which Phoenix rendered no valuable services.

369.     Each such transfer of millions of dollars to Phoenix was made without adequate consideration on the part of Phoenix, because Phoenix did not render reasonably equitable value in exchange for the transfer of such Funds to it.  Instead, such payments were "hush money" to Phoenix designed to effect Phoenix's continued participation in the Ponzi scheme.

370.     The transfer at issue rendered the relevant GPB Defendant insolvent, or left it with unreasonably small capital in relation to the size of its business, and with debts beyond the relevant GPB's investor's ability to pay as they became due.

371.     The transfers of the creditors' assets to Phoenix were made with actual intent to hinder, delay or defraud creditors, and these constituted fraudulent transfers, were in violation of TUFTA.  GPB and the Funds, with respect to each such transfer, did not receive reasonably equivalent value, or any value, for any of the transfers made herein, and did incur, and intended to incur, or believed, or reasonably should have believed, that post these transfers, it would incur debts beyond its ability to pay as they became due, and thus the transfers were and are fraudulent in violation of TUFTA.  The Class is entitled to relief under TUFTA, including legal fees and costs for bringing this action.

**COUNT XI**
**Breach of Fiduciary Duty**
**(Against GPB Capital and Gentile)**

372.     Plaintiffs incorporate by reference the preceding paragraphs as if set forth in full herein.

373.     Defendant GPB was, and is, a general partner of the GPB Funds at all times relevant hereto.  GPB was also a registered investment advisor under the IAA.  Gentile was GPB's managing member.

374.     As such, GPB and Gentile owed fiduciary duties to the limited partners of the Funds.  Under the IAA, these fiduciary duties could not be waived or otherwise contractually eliminated.

375.     Plaintiffs and the Class members were and are limited partners of the Funds, to whom GPB and Gentile owed fiduciary duties.  By law, these Defendants could not limit or seek waiver of such fiduciary duties.

376.     As described herein, GPB and Gentile breached their fiduciary duties.  Gentile had serious undisclosed conflicts of interest in that he owned interests in both GPB and the lead broker

or underwriter that was selling the GPB Funds' securities.  In addition, GPB and Gentile did not disclose the material financial improprieties involving GPB and the Funds' business and that the account statements being provided to Class members did not accurately reflect the status of their investment.

377.    As a direct and proximate result of Gentile's and GPB's breach of their fiduciary duties, Plaintiffs and the Class members were damaged.

378.    Accordingly, Plaintiffs and the other Class members are entitled to damages in an amount to be proven at trial.

**COUNT XII**
**Substantially Assisting in the Breach of Fiduciary Duty**
**(Against Fund Administrator, Broker Defendants, GPB Defendants (other than GPB Capital), GPB Affiliated Defendants, the Auditor Defendants, the Valuation Defendants and Gentile Pismeny, Schneider and Martino)**

379.    Plaintiffs incorporate by reference the preceding paragraphs as if set forth in full herein.

380.    As set forth above, GPB and Gentile owed fiduciary duties to Plaintiffs and the members of the Class because they were the general partner and managing member, respectively, of the Funds in which they invested and were Registered Investment Advisors.

381.    The Defendants named in this cause of action knew that GPB was a general partner of the Funds, a Registered Investment Advisor, and knew of Gentile's role therein.  Thus, these Defendants knew of GPB's and Gentile's fiduciary relationship with Plaintiffs and the members of the Class.  Each such Defendant knew that GPB and Gentile breached their fiduciary duties as discussed herein.

213

382.    As described herein, each of these Defendants provided substantial assistance to GPB in breaching its fiduciary duties by, *inter alia*, facilitating the sale of, and offering for sale, the limited partnership interests.

383.    These Defendants all knew of the fiduciary relationship and Defendants' breach thereof.  They also knew that they were participating in a breach of GPB's and Gentile's fiduciary relationship.

384.    As a direct and proximate cause of each of the Fund Administrator's, Broker Defendants', GPB Defendants' (other than GPB Capital), GPB Affiliated Defendants', the Auditor Defendants', the Valuation Defendants', Gentile Pismeny's, Schneider's, and Martino's substantial assistance alleged herein, Plaintiffs and the other Class members were damaged and are entitled to damages in the amount to be proven at trial.

### COUNT XIII
**Negligence**
**(Against Fund Administrator and the Auditor Defendants)**

385.    Plaintiffs incorporate by reference the preceding paragraphs as if set forth in full herein.

386.    Each of the Auditor Defendants owed a duty to the limited partners to correctly audit the Funds' financial statements.  Each such Defendant knew the name and address of each limited partner of the GPB Funds (i.e., Plaintiffs and the other Class members herein) and consented that their audit and audit opinion be provided to such limited partners. Instead, the Auditor Defendants prepared clean audit opinions for financials which were materially incorrect, and which were later withdrawn.  RSM and the other Auditor Defendants failed to comply with applicable accounting standards and were negligent in preparing their audit opinions.

387.     The Fund Administrator also owed a duty to the limited partners to correctly advise them of the value of their holdings in the Funds.  The Fund Administrator had a privity relationship with the limited partners as it (a) obtained personal financial information from them through the Subscription Agreements; (b) provided the limited partners (Plaintiffs and the other Class members herein) with the Admit Confirmation that advised them that they had been admitted to the particular GPB limited Partnership (Fund) in which they had invested; (c) directly contacted the limited partners at their respective homes on a monthly basis with false information as to the value of their capital accounts; and (d) custodied their assets, including cash paid for the limited partnership interests.  The Fund Administrator breached this duty by reporting the incorrect value of such limited partners' capital accounts on a monthly basis.  As such, the Fund Administrator failed to comply with applicable industry standards.

388.     The Fund Administrator's breach was knowing at all times the value of such limited partners' capital accounts but failing to correctly report it to them to preserve its highly unusual income stream from GPB.

389.     As a direct and proximate result of the Fund Administrator's, and the Auditor Defendants' negligence and role in the sale of the limited partnership interests, Plaintiffs and the members of the Class were damaged in an amount to be proven at trial.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs pray for judgment and relief as follows:

A.     Determining that this action is a proper class action under Rule 23 of the Federal Rules of Civil Procedure, appointing Plaintiffs as Class representatives and Plaintiffs' counsel as Class counsel;

B.      Awarding compensatory damages to Plaintiffs and the Class against all Defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing in an amount to be determined at trial;

C.      Awarding Plaintiffs and the Class pre-judgment and post-judgment interest to the extent permitted by law;

D.      Rescinding the transaction or granting a rescissory measure of damages to Plaintiffs and the Class, or granting Plaintiffs and the Class money damages;

E.      Awarding Plaintiffs and the Class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees;

F.      Granting Plaintiffs and the Class appropriate equitable relief; and

G.      Granting such other and further relief as the Court may deem just and proper.

### JURY TRIAL DEMANDED

Plaintiffs hereby demand a trial by jury on all issues so triable.

Dated:  November 9, 2020                    **EDMUNDSON SHELTON WEISS PLLC**

By: _/s/ Jesse Z. Weiss_
   Ryan Shelton
   SBN: 24037484
   Jesse Z. Weiss
   SBN: 24013728
317 Grace Lane, Suite 210
Austin, Texas 78746
Telephone:  (512) 596-3622
Facsimile:  (512) 532-6637
Email:  ryan@eswpllc.com
        jesse@eswpllc.com

**KIRBY McINERNEY LLP**
Peter S. Linden (admitted *pro hac vice*)
Seth Shapiro (admitted *pro hac vice*)
250 Park Avenue, Suite 820
New York, New York 10177
Telephone:  (212) 371-6600
Facsimile:  (212) 751-2540
Email:  plinden@kmllp.com
        sshapiro@kmllp.com

**BLACKNER STONE & ASSOCIATES, P.A.**
Richard L. Stone (admitted *pro hac vice*)
123 Australian Avenue
Palm Beach, Florida 33480
Telephone:  (561) 804-9569
Email:  rstoneesq@aol.com

*Attorneys for Plaintiffs*

217