UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION

| | |
|---|---|
| KINNIE MA INDIVIDUAL RETIREMENT ACCOUNT, DEAN CROOKS, JEFFERY S. GRAMM INDIVIDUAL RETIREMENT ACCOUNT, STACY GREASOR INDIVIDUAL RETIREMENT ACCOUNT, CORRI RENE EDEN, CATHERINE KOMINOS, KAREN LOCH, ROBERT A. STONE LIVING TRUST, SHIRLEY STONE LIVING TRUST, VICTOR WADE INDIVIDUAL RETIREMENT ACCOUNT, KAZUE M. BELL, individually and on behalf of all others similarly situated, | ) ) ) ) ) ) ) ) ) ) ) )  Civil Action No. 1:19-cv-01050-ly ) ) **ORAL ARGUMENT REQUESTED** |
| Plaintiffs, | ) ) |
| v. | ) ) |
| ASCENDANT CAPITAL, LLC, et al., | ) ) ) |
| Defendants. | ) ) |

## BROKER DEFENDANTS' MOTION TO DISMISS FOR *FORUM NON CONVENIENS*

The 51 Broker Defendants identified in Note 1 below[1] move to dismiss Plaintiffs'

Second Amended Complaint ("2nd Am. Compl.") (Dkt. [616]) pursuant to the doctrine of

*forum non conveniens.*

---

[1] Advisory Group Equity Services Ltd., Aegis Capital Corp., Aeon Capital Inc., American Capital Partners, LLC, Arete Wealth Management, LLC, Arkadios Capital, Ausdal Financial Partners, Inc., Cabot Lodge Securities LLC, Calton & Associates, Inc., Capital Investment Group, Inc., Cascade Investment Group, Inc., Coastal Equities, Inc., Colorado Financial Service Corporation, Concorde Investment Services, LLC, Crown Capital Securities, LP, David A. Noyes & Company, Dawson James Securities, Inc., Dempsey Lord Smith, LLC, Detalus Securities, LLC, DFPG Investments, LLC, FSC Securities Corporation, Geneos Wealth Management, Inc., Great Point Capital, LLC, HighTower Securities, LLC, IBN Financial Services, LLC, Innovation Partners LLC, International Assets Advisory, LLC, Kalos Capital, Inc., Kingsbury Capital, Inc., Landolt Securities, Inc., Lewis Financial Group n/k/a DAI Securities, LLC, Lucia Securities, LLC, Madison Avenue Securities, LLC, Moloney Securities Co., Inc., McDonald Partners LLC, Money Concepts Capital Corporation, Newbridge Securities Corporation, Orchard Securities, LLC, Purshe Kaplan Sterling Investments, Inc., Royal Alliance Associates, Inc., Sagepoint Financial, Inc., Sentinus Securities LLC n/k/a Sentinus Halo Securities, LLC, Triad Advisors, LLC, Uhlman Price Securities, LLC, United Planners Financial Services of America, LP, Vanderbilt Securities, LLC, Vestech Securities, Inc., Western International Securities, Inc., WestPark Capital, Inc., Whitehall-Parker Securities, Inc., Woodbury Financial Services, Inc.

**Summary of Argument**

Plaintiffs, just three of whom are Texas residents, are investors in securities issued by GPB Holdings, LP ("GPB Holdings"), GPB Holdings II, LP ("GPB II"), GPB Automotive Portfolio, LP ("GPB Automotive"), GPB Waste Management, LP ("GPB Waste Management") and/or GPB NYC Development, LP ("GPB NYC") (collectively "GPB Funds")[2], all Delaware limited partnerships (2nd Am. Compl. ¶¶87-97,109) with their principal places of business in New York.[3] GPB Capital Holdings, LLC ("GPB") is the general partner of each of the GPB Funds at issue. 2nd Am. Compl. ¶105. GPB is a Delaware limited liability company with its principal place of business in New York. 2nd Am. Compl. ¶105.

Plaintiffs allege that they purchased the GPB Funds through securities broker-dealers referred to in the Second Amended Complaint as the "Broker Defendants" (¶46).[4] The moving Broker Defendants are all member firms of the Financial Industry Regulatory

---

[2] Plaintiffs name as defendants a number of other issuers of securities but do not allege that Plaintiffs purchased those securities.

[3] Plaintiffs do not identify the GPB Funds' principal place of business as New York, however this information is contained in documents filed with the United States Securities and Exchange Commission ("SEC") and publicly available at https://www.sec.gov/cgi-bin/browse-edgar?CIK=1578588; https://www.sec.gov/cgi-bin/browse-edgar?CIK=1640265; https://www.sec.gov/cgi-bin/browse-edgar?CIK=1578742; https://www.sec.gov/cgi-bin/browse-edgar?CIK=1682966; https://www.sec.gov/cgi-bin/browse-edgar?CIK=1674329. The Court may take judicial notice of these facts under Fed. R. Evid. 201(b)(2).

[4] That said, many investors purchased GPB Funds through investment advisers and not securities broker-dealers. For reasons unknown, Plaintiffs name only two investment advisers - Bradley Wealth Management, LLC and HighTower Advisors, LLC - as defendants although many others were involved in the sale of GPB Funds to investors. Despite the fact that broker-dealers and investment advisers provide distinct services, Plaintiffs include the named investment advisers in the definition of "Broker Defendants."

Authority ("FINRA")[5] and facilitated investments by accredited investors[6] in the GPB Funds. None of the moving Broker Defendants is a Texas entity or has its principal place of business in Texas (see Note 5).

---

[5] Advisory Group Equity Services Ltd. is a Massachusetts corporation with its principal place of business in Massachusetts (https://files.brokercheck.finra.org/firm/firm_15427.pdf), Aegis Capital Corporation is a New York corporation with its principal place of business in New York. (https://files.brokercheck.finra.org/firm/firm_15007.pdf); Aeon Capital, Inc. is a Wisconsin corporation with its principal place of business in New Jersey (https://files.brokercheck.finra.org/firm/firm_164004.pdf); American Capital Partners, LLC is a New York limited liability company with its principal place of business in New York (https://files.brokercheck.finra.org/firm/firm_119249.pdf); Arete Wealth Management, LLC is an Illinois limited liability company with its principal place of business in Illinois (https://files.brokercheck.finra.org/firm/firm_44856.pdf); Arkadios Capital is a Georgia limited liability company with its principal place of business in Georgia (see https://files.brokercheck.finra.org/firm/firm_282710.pdf); Ausdal Financial Partners, Inc. is an Iowa corporation with its principal places of business in Iowa and Illinois (see https://files.brokercheck.finra.org/firm/firm_7995.pdf); Cabot Lodge Securities LLC is a Delaware limited liability company with its principal place of business in New York (https://files.brokercheck.finra.org/firm/firm_159712.pdf); Calton & Associates, Inc. is a Florida corporation with its principal place of business in Florida (https://files.brokercheck.finra.org/firm/firm_20999.pdf); Capital Investment Group, Inc. is a North Carolina corporation with its principal place of business in North Carolina (https://files.brokercheck.finra.org/firm/firm_14752.pdf); Cascade Investment Group, Inc. is a Colorado corporation with its principal place of business in Colorado (https://files.brokercheck.finra.org/firm/firm_35844.pdf); Coastal Equities, Inc. is a Massachusetts corporation with its principal place of business in Delaware (https://files.brokercheck.finra.org/firm/firm_23769.pdf); Colorado Financial Service Corporation is a Colorado corporation with its principal place of business in Colorado (https://files.brokercheck.finra.org/firm/firm_104343.pdf); Concorde Investment Services, LLC is a Michigan limited liability company with its principal place of business in Michigan (https://files.brokercheck.finra.org/firm/firm_151604.pdf); Crown Capital Securities, LP is a California limited partnership with its principal place of business in California (see https://files.brokercheck.finra.org/firm/firm_6312.pdf); David A. Noyes & Company is an Illinois corporation with its principal place of business in Indiana (https://files.brokercheck.finra.org/firm/firm_205.pdf); Dawson James Securities, Inc. is a Florida corporation with its principal place of business in Florida (https://files.brokercheck.finra.org/firm/firm_130645.pdf); Dempsey Lord Smith, LLC is a Georgia limited liability company with its principal place of business in Georgia (https://files.brokercheck.finra.org/firm/firm_141238.pdf); Detalus Securities, LLC is a Missouri limited liability company with its principal place of business in Missouri https://files.brokercheck.finra.org/firm/firm_103260.pdf);DFPG Investments, LLC is a Utah limited liability company with its principal place of business in Utah (https://files.brokercheck.finra.org/firm/firm_155576.pdf); FSC Securities Corporation is a Delaware corporation with its principal place of business in Georgia (https://files.brokercheck.finra.org/firm/firm_7461.pdf); Geneos Wealth Management, Inc. is a Colorado corporation with its principal place of business in Colorado (see https://files.brokercheck.finra.org/firm/firm_120894.pdf); Great Point Capital, LLC is a Delaware limited liability company with its principal place of business in Illinois (https://files.brokercheck.finra.org/firm/firm_114203.pdf); HighTower Securities, LLC is an Illinois limited liability company with its principal place of business in Illinois (https://files.brokercheck.finra.org/firm/firm_116681.pdf); IBN Financial Services, LLC is a New York limited liability company with its principal place of business in New York (https://files.brokercheck.finra.org/firm/firm_42360.pdf); Innovation Partners LLC is a North Carolina limited liability company with its principal place of business in North Carolina

Plaintiffs allege that they and others similarly situated were induced to invest in

GPB Funds as a result of material misrepresentations and omissions in the Private

---

(https://files.brokercheck.finra.org/firm/firm_146344.pdf); International Assets Advisory, LLC is a Florida limited liability company with its principal place of business in Florida (https://files.brokercheck.finra.org/firm/firm_10645.pdf); Kalos Capital, Inc. is a Georgia corporation with its principal place of business in Georgia (https://files.brokercheck.finra.org/firm/firm_44337.pdf); Kingsbury Capital, Inc. is an Illinois corporation with its principal place of business in Illinois (https://files.brokercheck.finra.org/firm/firm_7638.pdf); Landolt Securities, Inc. is a Wisconsin corporation with its principal place of business in Illinois (https://files.brokercheck.finra.org/firm/firm_28352.pdf);Lewis Financial Group n/k/a DAI Securities, LLC is a Minnesota limited liability company with its principal place of business in Georgia (https://files.brokercheck.finra.org/firm/firm_36673.pdf); Lucia Securities, LLC is a Delaware limited liability company with its principal place of business in California https://files.brokercheck.finra.org/firm/firm_37179.pdf); Madison Avenue Securities, LLC is a Delaware limited liability company with its principal place of business in California (https://files.brokercheck.finra.org/firm/firm_23224.pdf); Moloney Securities Co., Inc. is a Missouri corporation with its principal place of business in Missouri (https://files.brokercheck.finra.org/firm/firm_38535.pdf); McDonald Partners LLC is an Ohio limited liability company with its principal place of business in Ohio (https://files.brokercheck.finra.org/firm/firm_135414.pdf); Money Concepts Capital Corporation is a Florida corporation with its principal place of business in Florida (https://files.brokercheck.finra.org/firm/firm_12963.pdf); Newbridge Securities Corporation is a Virginia corporation with its principal place of business in Florida (https://files.brokercheck.finra.org/firm/firm_104065.pdf); Orchard Securities, LLC is a Utah limited liability company with its principal place of business in Utah (see https://files.brokercheck.finra.org/firm/firm_133378.pdf); Purshe Kaplan Sterling Investments, Inc. is a New York corporation with its principal place of business in New York (https://files.brokercheck.finra.org/firm/firm_35747.pdf); Royal Alliance Associates, Inc. is a Delaware corporation with its principal place of business in New Jersey (https://files.brokercheck.finra.org/firm/firm_23131.pdf); Sagepoint Financial, Inc. is a Delaware corporation with its principal place of business in Arizona (https://files.brokercheck.finra.org/firm/firm_133763.pdf); Sentinus Securities LLC n/k/a Sentinus Halo Securities, LLC is an Illinois limited liability company with its principal place of business in Illinois (https://files.brokercheck.finra.org/firm/firm_279029.pdf); Triad Advisors, LLC is a Florida limited liability company with its principal place of business in Georgia (https://files.brokercheck.finra.org/firm/firm_25803.pdf); Uhlman Price Securities, LLC is an Illinois limited liability company with its principal place of business in Illinois (https://files.brokercheck.finra.org/firm/firm_42854.pdf); United Planners Financial Services of America, LP is an Arizona partnership with its principal place of business in Arizona (https://files.brokercheck.finra.org/firm/firm_20804.pdf); Vanderbilt Securities, LLC is a New York limited liability company with its principal place of business in New York (https://files.brokercheck.finra.org/firm/firm_5953.pdf); Vestech Securities, Inc. is a Kansas corporation with its principal place of business in Missouri (https://files.brokercheck.finra.org/firm/firm_41409.pdf); Western International Securities, Inc. is a Colorado corporation with its principal place of business in California (https://files.brokercheck.finra.org/firm/firm_39262.pdf); WestPark Capital, Inc. is a Colorado corporation with its principal place of business in California (https://files.brokercheck.finra.org/firm/firm_39914.pdf); Whitehall-Parker Securities, Inc. is a California corporation with its principal place of business in California (https://files.brokercheck.finra.org/firm/firm_10608.pdf); Woodbury Financial Services, Inc. is a Minnesota corporation with its principal place of business in Minnesota (https://files.brokercheck.finra.org/firm/firm_421.pdf). The Court may take judicial notice of these facts under Fed. R. Evid. 201(b)(2).

[6] Generally speaking, an individual is an accredited investor if the individual has a net worth which exceeds $1,000,000, excluding the individual's personal residence. 17 C.F.R. § 230.501.

Placement Memoranda ("PPMs"), the governing documents by which the securities were offered. *See* 2nd Am. Compl. ¶35 ("The GPB Defendants made highly material misrepresentations and omissions in the PPMs for the securities purchased by the Class."). Plaintiffs further allege that the Broker Defendants aided and abetted the alleged fraud and, therefore, are liable to Plaintiffs for their alleged losses. *See* 2nd Am. Compl. ¶129 ("[T]he Broker Defendants . . . directly, materially and substantially aided GPB Capital, the Individual Defendants, and the GPB Funds with actual knowledge of the falsity of the statements made by them in the Offering Materials used in connection with such sales.").

In order to purchase GPB Funds, Plaintiffs were required to execute a subscription agreement ("SA") wherein they agreed to certain terms and conditions. *See, e.g.*, the PPM for GPB II at p.ii, attached as Exhibit A ("In order to invest in the Company, investors will be required to execute a subscription agreement."). The SA for GPB II is attached as Exhibit B.

The SA contains a mandatory forum-selection clause requiring that "Venue for any litigation arising out of, under, or in connection with this Agreement will lie in the state courts having jurisdiction over such matters located in New York County, New York." Exhibit B at p.12. The SA similarly contains a choice-of-law provision calling for the application of New York law. *Id.*

Accordingly, and as further set forth below, the moving Broker Defendants seek dismissal of the Second Amended Complaint for *forum non conveniens* pursuant to the SA's forum-selection clause.

## I.    INTRODUCTION

Plaintiffs bring this putative class action on behalf of themselves and others purportedly similarly situated to recover alleged losses on investments in the GPB Funds and other limited partnership investments issued by affiliates of GPB. Interests in the limited partnerships (2nd Am. Compl. ¶109) are private placement securities offered by way of PPMs (2nd Am. Compl. ¶3) to accredited investors who satisfy certain minimum requirements and execute an SA. See Exhibits A and B.

The nearly 100 defendants in this matter are individuals and entities with some connection to the securities such as GPB and its affiliates, principals, auditors, and selling broker-dealers. The moving Broker Defendants in particular are securities broker-dealers and FINRA member firms through which certain investors purchased interests in GPB Funds. 2nd Am. Compl. ¶¶87-97, 129-132.[7] Notably, Plaintiffs disclaim any connection to the named Broker-Defendants. 2nd. Am. Compl. ¶46 ("Each Plaintiff . . . is not asserting claims against the specific Broker Defendant who directly sold the subject Securities to such Plaintiff . . . ; they are suing only the remaining Broker Defendants for their substantial participation and assistance and/or aiding and abetting in the scheme.").

Per the terms of the PPMs (referenced throughout the Second Amended Complaint), GPB investors were required to execute an SA in order to consummate the transactions. Indeed, the PPMs expressly state: "In order to invest in the Company, investors will be required to execute a subscription agreement." Exhibit A at p.ii. The SA, a form copy of which is included in the PPM (and is separately attached as Exhibit B),

---

[7] Notably, other investors purchased GPB investments through investment advisers. Indeed, the PPMs define the "Selling Group" as including both broker-dealers and investment advisers. See, e.g., Exhibit A at p.3. Notwithstanding same, Bradley Wealth Management, LLC and HighTower Advisors, LLC are the only investment advisers named as defendants in this action. Plaintiffs include them in the definition of "Broker Defendants" although investment advisers and broker-dealers are distinct types of entities.

similarly states: "By signing the Agreement, the undersigned subscriber (the 'Subscriber') confirms acceptance of the Company's offer of Units on the terms and conditions set out in the Confidential Private Placement Memorandum ('Memorandum')." Exhibit B at p.7. Notably, Plaintiffs admit that the SA was "used to effect transactions in the GPB interests." 2nd Am. Compl. ¶100. Upon information and belief, the original and/or copies of the SAs executed by Plaintiffs and all other GPB investors are in the possession of: (1) the investors, (2) the issuers, and (3) the entities through which the investors purchased the securities.

The SA includes a broadly worded mandatory forum-selection clause that requires "*any litigation* arising out of, under, or in connection with this Agreement *will lie* in the state courts having jurisdiction over such matters located in New York County, New York." Exhibit B at 12 (emphasis added). The moving Broker Defendants seek to enforce the forum-selection clause pursuant to the doctrine of *forum non conveniens.*

## II.    ARGUMENT

### A.    A Federal Action is Subject to Dismissal for *Forum Non Conveniens* Where a Forum-Selection Clause Requires Litigation in a Non-Federal Forum.

Where—as here—the subject of litigation is bound by a valid forum-selection clause and the plaintiffs nevertheless choose a different venue to file suit, the path for the court is a simple one. "The Supreme Court found 'the proper mechanism to enforce [a forum-selection clause] that calls for litigation in a domestic state court or in a foreign court is through a motion to dismiss on grounds of [*forum non conveniens*].' *Weber v. PACT XPP Techs., AG*, 811 F.3d 758, 766 (5th Cir. 2016) (citing *Atlantic Marine Const. Co., v. U.S. District Court for the W. Dist. of Tex.*, 134 S. Ct. 568, 580 (2013)).

**B.      This Action Is Subject to Dismissal Pursuant to the Forum-Selection Clause Requiring Litigation in New York State Court.**

In considering a motion to dismiss for *forum non conveniens* based on a forum-selection clause, the Court must determine (1) whether the forum-selection clause is permissive or mandatory; (2) whether the clause is enforceable; and (3) whether the dispute at hand falls within its scope. *See generally Morgan-Rinehart v. Van de Perre*, No. A-16-CA-01327-SS, 2017 WL 1383933, at *1 (W.D. Tex. Apr. 12, 2017). In this case, the Court must also determine whether the Broker Defendants, as non-parties to the SA, are entitled to enforce the forum-selection clause. *JFP Servs., L.L.C. v. Torans*, No. SA-17-CV-00210-FB, 2018 WL 3326841, at *8 (W.D. Tex. Apr. 30, 2018), *report and recommendation adopted sub nom. JFP Servs., LLC v. Torans*, No. SA-17-CA-210-FB, 2018 WL 4343439 (W.D. Tex. July 2, 2018).

All of the above elements are satisfied here. When Plaintiffs and other GPB investors executed the SA to purchase their respective investments, they each agreed that:

> Venue for any litigation arising out of, under, or in connection with this Agreement will lie in the state courts having jurisdiction over such matters located in New York County, New York.

Exhibit B at 12.

**1.      The Forum-Selection Clause in the SA is Mandatory.**

A forum-selection clause is permissive where it allows an action to be bought in a particular jurisdiction but does not preclude litigation elsewhere. *Von Graffenreid v. Craig*, 246 F.Supp. 2d 553, 561 (N.D. Tex. 2003). On the other hand, a "mandatory [forum-selection clause] affirmatively requires that litigation arising from the contract be carried out in a given forum." *Weber v. PACT XPP Techs., AG*, 811 F.3d 758, 768 (5th Cir. 2016);

*see also Bustos v. Dennis*, No. SA-17-CV-39-XR, 2017 WL 1944165, at *3 (W.D. Tex. May 8, 2017) ("To be mandatory, a forum-selection clause must show that the parties intended the named location to serve as the forum for disputes arising out of the contract.").

"[T]he use of 'shall' in forum-selection clauses is 'generally mandatory.'" *Impact Recovery Sys. v. Liddell Bros., Inc.*, No. CV SA-15-CA-722-FB, 2016 WL 8257050, at *7 (W.D. Tex. Jan. 22, 2016), *report and recommendation adopted sub nom. Impact Recovery Sys., Inc. v. Liddell Bros., Inc.*, No. SA-15-CA-722-FB, 2016 WL 8257098 (W.D. Tex. Apr. 6, 2016). "Courts have determined clauses with similar 'will be' language are mandatory." *Morgan-Rinehart, supra,* at *5; *see also Wolfe v. CareFirst of Maryland, Inc.*, No. 4:09-CV-492, 2010 WL 1998290, at *4 (E.D. Tex. Apr. 27, 2010), *report and recommendation adopted*, No. 4:09-CV-492, 2010 WL 1998222 (E.D. Tex. May 18, 2010) (finding forum-selection clause stating that any action "will be brought and maintained in the State of Maryland" is "is not ambiguous and is a mandatory rather than permissive clause."). Courts have also concluded that forum-selection clauses which relate only to "jurisdiction" are often permissive, while clauses referencing "venue" are generally mandatory. *Cardinal Database Servs., LLC v. Kleski*, No. 1:15-CV-494 RP, 2015 WL 5062293, at *4 (W.D. Tex. Aug. 27, 2015). Here, the forum-selection clause specifically references venue and mandates that any litigation "*will lie* in the state courts . . . located in New York County, New York."[8] Exhibit B at 12 (emphasis added). This unambiguous

---

[8] In *DeLuca v. GPB Automotive Portfolio LP*, 2020 WL 7343788, at *11 (S.D.N.Y. Dec. 14, 2020), the Southern District of New York interpreted the phrase "venue will lie" in the forum-selection clause at issue here as permissive rather than mandatory. The opinion, however, did not cite any case in New York or elsewhere in which a court actually construed the phrase "venue will lie" as being merely permissive in this context. The Broker Defendants submit that the interpretation of "will" in *Morgan-Rinehart, supra,* as signifying a mandatory venue restriction is more consistent with the plain meaning of that term than the interpretation adopted in *DeLuca.*

language clearly restricts venue for this action to New York state courts located in New York County. Indeed, there are several pending actions in the Supreme Court for New York County arising out of these same securities and substantially similar allegations. *See* Note 9, *infra*.

### 2. The Forum-Selection Clause in the SA is Enforceable.

Forum-selection causes "are prima facie valid and should be enforced unless enforcement is shown by the resisting party to be 'unreasonable' under the circumstances." *Braspetro Oil Servs. Co. v. Modec (USA), Inc.*, 240 F. App'x 612, 615 (5th Cir. 2007) (citing *M/S Bremen v. Zapata Off–Shore Co.*, 407 U.S. 1, 10 (1972)). "Usually, a court applying *[the forum con conveniens*] doctrine must determine whether there is an adequate alternative forum and, if so, decide which forum is best-suited to the litigation by considering a variety of private- and public-interest factors and giving deference to the plaintiff's choice of forum." *Barnett v. DynCorp Int'l, L.L.C.*, 831 F.3d 296, 300 (5th Cir. 2016). However, a forum-selection clause significantly alters the application of this doctrine and affords no weight to the plaintiff's chosen forum:

> The presence of a valid forum-selection clause simplifies this analysis in two ways. "First, the plaintiff's choice of forum merits no weight" because, by contracting for a specific forum, "the plaintiff has effectively exercised its 'venue privilege' before a dispute arises." *Atl. Marine*, 134 S.Ct. at 581–82. Second, the private-interest factors "weigh entirely in favor of the preselected forum," so that the "district court may consider arguments about public-interest factors only." Id. at 582. Hence, a valid forum-selection clause controls the *forum non conveniens* inquiry "[i]n all but the most unusual cases." *Id.* at 583. This harmonizes with the Court's guidance that contractually selected forums often "figure[ ] centrally in the parties' negotiations" and become part of those parties' "settled expectations"—so if a plaintiff disregards such a contractual commitment, "dismissal ... work[s] no injustice." *Id.* at 583 & n. 8.

*Id.* at 296 (brackets and punctuation in original).

Accordingly, in order to overcome the strong presumption of enforceability of a forum-selection clause, the plaintiff has the burden of proving that the clause is unreasonable. *Id.* To demonstrate unreasonableness, the plaintiff must show that: "(1) the incorporation of the forum-selection clause into the agreement was the product of fraud or overreaching; (2) the party seeking to escape enforcement 'will for all practical purposes be deprived of his day in court' because of the grave inconvenience or unfairness of the selected forum; (3) the fundamental unfairness of the chosen law will deprive the plaintiff of a remedy; or (4) enforcement of the forum-selection clause would contravene a strong public policy of the forum state." *Haynsworth v. The Corp.*, 121 F.3d 956, 963 (5th Cir. 1997) (citations omitted). "The party resisting enforcement on these grounds bears a heavy burden of proof." *Id.* (citation and internal quotation marks omitted).

Here, there is no basis to find the forum-selection clause calling for venue in New York state courts in New York County unreasonable. First, there is no allegation that its inclusion in the SA was procured by fraud. Notably, for fraud to provide a basis for invalidating a forum-selection clause, the fraud must be specific to that provision. *Id.* In other words, "allegations of such conduct as to the contract as a whole—or portions of it other than the [forum-selection] clause—are insufficient; the claims of fraud or overreaching must be aimed straight at the [forum-selection] clause in order to succeed." *Id.*

Second, there is no grave inconvenience or unfairness to Plaintiffs having this matter heard in New York County, New York. Certainly, New York is no less convenient than the Western District of Texas to the majority of Plaintiffs who are not residents of Texas or their New York lawyers. Further, there is nothing inherently unfair about venue

in New York state courts as New York courts provide Plaintiffs with an available alternative forum such that Plaintiffs will not be deprived of their day in court. Similarly, the contract's New York choice-of-law provision is not fundamentally unfair and will not deprive Plaintiffs or other GPB investors of an adequate remedy. Indeed, as of this writing there are numerous pending class and/or shareholder derivative actions brought by GPB investors making similar allegations pending in New York County, New York.[9]

Moreover, dismissal would not contravene any strong public policy of Texas. Like the other grounds for finding a forum-selection clause unreasonable, public policy arguments must be analyzed in the context of the "strong presumption of enforceability." *Haynsworth*, 121 F.3d at 966. Notably, "Texas [has not] adopted statutes or issued opinions that reflect a clear public policy against enforcing this forum-selection provision." *Boccard USA Corp. v. TigPro, Inc.*, No. CIV.A. H-07-0177, 2007 WL 1894154, at *9 (S.D. Tex. July 2, 2007). Rather, "Texas has strong public policy in favor of forum-selection clauses." *Id.* Moreover, Texas has a "strong public policy that parties be held liable to what they contracted for." *Trevino v. Cooley Constructors, Inc.*, No. 5:13-CV-00924-DAE, 2014 WL 2611823, at *5 (W.D. Tex. June 9, 2014). Notably, in *Haynsworth*, 121 F.3d at 969, the Fifth Circuit expressly rejected the plaintiff investors' contention that a forum-selection clause violated Texas public policy because it contravened the anti-waiver provisions of the Texas Securities Act.

---

[9] *See In Re GPB Capital Holdings, LLC Litigation,* Index No.157679/2019 (the consolidation of two prior actions: *Younker v. GPB Capital Holdings, LLC*, Index No. 157679/2019 and *Golder v. GPB Capital Holdings, LLC*, Index No. 257232/2019); *Miller v. GPB Capital Holdings, LLC*, Index No. 656982/2019; *Pierce v. GPB Capital Holdings, LLC*, Index No.652858/2020; *Ranssi v. GPB Capital Holdings, LLC*, Index. No. 654059/2020. The dockets for these matters can be located online at http://iapps.courts.state.ny.us/iscroll/ and the Court may take judicial notice of same under Fed. R. Evid. 201(b)(2).

Further, the Broker Defendants are hard pressed to see the relevance of Texas public policy to a dispute involving a majority of Plaintiffs who are not residents of Texas and who purchased securities issued in New York through broker-dealers or investment advisers which were all formed in and have principal places of business in states other than Texas. *See, e.g., Bowling v. Carnival Corp.*, No. CIV.A. G-08-0250, 2009 WL 890454, at *3 (S.D. Tex. Mar. 30, 2009) ("Indeed, there is no strong public policy in Texas that favors litigating here disputes between a citizen of Oklahoma and a citizen of Florida.").

Accordingly, there is no basis for finding the forum-selection clause in the SA unreasonable.

### 3.    This Dispute Falls Squarely Within the Scope of the Forum-Selection Clause.

In the face of a mandatory enforceable forum-selection clause, the court must the next determine whether the dispute at hand falls within the provision's scope. *Mendoza v. Microsoft, Inc.*, 1 F. Supp. 3d 533, 542 (W.D. Tex. 2014). In determining whether a dispute falls within the scope of a forum-selection clause, the court must look to the plain language of the contract containing the clause. *Marinechance Shipping, Ltd. v. Sebastian*, 143 F.3d 216, 222 (5th Cir. 1998). Initially, it should be noted that absent language to the contrary, a forum-selection clause is not limited solely to claims for breach of the contract that contains it. *Tricon Precast, Ltd. v. Easi Set Indus., Inc.,* 395 F. Supp. 3d 871, 880 (S.D. Tex. 2019) (quotation marks and citation omitted).

Indeed, a broad forum-selection clause such as the one here encompasses "all claims that have some possible relationship with the contract, including claims that may only relate to the contract." *Id. See also Mendoza*, 1 F. Supp at 548 ("[F]orum-selection clauses covering claims 'relating to' an agreement are broad in scope."); *Sabal Ltd. LP v.*

*Deutsche Bank AG*, 209 F. Supp. 3d 907, 923 (W.D. Tex. 2016) ("[F]orum-selection clause covering 'any action or proceeding arising out of or relating to this Agreement' . . . is a broadly worded forum selection clause that will encompass a wide variety of claims and remedies."); *JFP Servs., L.L.C. v. Torans*, No. SA-17-CV-00210-FB, 2018 WL 3326841, at *6 (W.D. Tex. Apr. 30, 2018), *report and recommendation adopted sub nom. JFP Servs., LLC v. Torans*, No. SA-17-CA-210-FB, 2018 WL 4343439 (W.D. Tex. July 2, 2018) (citing *Pinto Tech. Ventures, L.P. v. Sheldon*, 526 S.W.3d 428, 437 (Tex. 2017) ("[F]orum-selection clause with 'arising out of' language [encompasses] business tort claims brought by shareholders alleging claims of fraud, breach of fiduciary duty, and dilution of their shareholder interests, among other claims.")).

Here, the forum-selection clause covers "any litigation arising out of, under, or in connection with this Agreement." Exhibit B at 12. There is no language in the SA excluding any particular claim or dispute from this provision. Like the cases cited above, this is a broadly-worded clause which encompasses the claims asserted in the Second Amended Complaint. Indeed, all of Plaintiffs' claims relate to GPB investments which Plaintiffs could not have made without their execution of an SA containing the forum-selection clause. See Exhibit A at ii ("In order to invest in the Company, investors will be required to execute a subscription agreement."). In other words, the investments simply would not exist without the SA. Accordingly, the forum-selection clause applies to this action.

### 4.    The Broker-Dealer Defendants Are Entitled to Enforce the Forum-Selection Clause.

"Courts have ruled that 'a range of transaction participants, parties and nonparties, should benefit from and be subject to forum selection clauses.'" *JetPay Merch. Servs., LLC v. Merrick Bank Corp.*, No. 3:13-CV-3101-L-BN, 2014 WL 798373, at *5 (N.D. Tex.

Feb. 28, 2014). "Whether a party is a signatory to the contract containing an arbitration or venue provision is not dispositive." *Dickey's Barbecue Restaurants, Inc. v. Campbell Investments, LLC*, No. 4:18-CV-491-ALM-KPJ, 2019 WL 2301367, at *5 (E.D. Tex. Feb. 11, 2019), *report and recommendation adopted*, No. 418CV00491ALMKPJ, 2019 WL 1219118 (E.D. Tex. Mar. 15, 2019). Absent a provision expressly limiting the application of a forum-selection clause to the contracting parties or expressly excluding enforcement by nonparties, such a clause may, in certain circumstances, be enforced by others. *Fiesta Mart, LLC v. Acon Investments, LLC*, No. CV H-18-4704, 2019 WL 3080824, at *3 (S.D. Tex. June 11, 2019).

"Enforcement of a [forum-selection] clause is permitted if the relationship between a nonsignatory and a signatory to the contract is close enough that the nonsignatory's enforcement of the forum-selection clause would be foreseeable to the opposing party." *JFP Servs., L.L.C.*, *supra*, 2018 WL 3326841 at *8 (citation and internal quotation marks omitted). "The rationale supporting enforcement in such circumstances is that signatories have already assented to a forum selection clause and thus have agreed to litigate disputes relating to the contract in the chosen forum such that enforcing the provision comports with the legitimate expectations of the parties, as manifested in their freely negotiated agreement." *Id. See also Huawei Techs. Co. v. Yiren Huang*, No. 4:17-CV-00893, 2018 WL 1964180, at *9 (E.D. Tex. Apr. 25, 2018), *motion to certify appeal denied sub nom. Huawei Techs. Co. v. Huang*, No. 4:17-CV-00893, 2018 WL 2463800 (E.D. Tex. June 1, 2018) (adopting holding that "a nonsignatory may be bound to a forum-selection clause if the nonsignatory or alleged conduct is closely related to the contractual relationship.").

"A nonparty can be 'closely related' to the signatory or the alleged conduct can be 'closely related' to the contractual relationship." *Id.* (citations omitted). A forum-selection clause is enforceable by a non-party where the plaintiff alleges "substantially interdependent and concerted misconduct" by both the signatory (i.e., GPB) and nonsignatory defendants and where the defendants' alleged conduct "arises directly out of the relationship created by" the contract. *Idearc Media Corp. v. Encore Mktg. Grp., Inc.*, No. CIV.A.3:08CV223-M, 2009 WL 129379, at *4 (N.D. Tex. Jan. 20, 2009). *See also Vartec Telecom, Inc. v. BCE Inc.*, No. 3:02-CV-2585-M, 2003 WL 22364302, at *2 (N.D. Tex. Oct. 9, 2003) ("[T]o allow a party to 'have it both ways' by asserting claims intertwined with the agreement but denying the forum selection clause's applicability would 'fly in the face of fairness.'") (citations omitted).

In this case, the Broker Defendants are not parties to the SA. Nonetheless, the Broker Defendants were required to sign each SA certifying that "it has procured this subscription and that it is familiar with the Subscriber named above and it has determined that the Subscriber meets the requirements set forth under the caption 'Qualification of Investors' in the Private Placement Memorandum." Exhibit B at 6. The Broker Defendants were further required to confirm that the brokerage firm's agent was licensed to sell securities in the state where the investor resides. *Id.* at 6.

Moreover, the allegations in the Second Amended Complaint assert "substantially interdependent and concerted misconduct" (*Idearc Media Corp., supra*) by the Broker Defendants with GPB and the issuers of GPB securities which *were* signatories to the SAs (enumerated in Exhibit B at 6). Indeed, Plaintiffs allege these defendants "could not have achieved their fraudulent goals alone" (2nd Am. Compl. ¶27) and, under Plaintiffs' theory of the case, required the Broker Defendants' alleged participation:

> [T]he Broker Defendants . . . directly, materially and substantially aided GPB Capital, the Individual Defendants, and the GPB Funds with actual knowledge of the falsity of the statements made by them in the Offering Materials used in connection with such sales. The Broker Defendants knowingly distributed materially false Offering Materials to investors, including the PPMs, that contained Material Misrepresentations and Omissions. Each of the Broker Defendants substantially assisted the GPB Funds and the GPB Defendants in their efforts to offer limited partnership interests in the Funds by ensuring that these interests were widely offered to a large number of investors in the United States. This provided the Funds and GPB Capital with the capital to continue paying themselves exorbitant fees, continue operations, and continue making distributions to prior investors in the various Funds, which were operated as a Ponzi scheme.
>
> In addition, each of the Broker Defendants directly and substantially aided the Funds and the GPB Defendants by participating in the illegal unregistered Offerings being affected by GPB, which they knew were required to be registered under the TSA and the 1933 Act. The Broker Defendants knew that the Offerings did not qualify for an exemption under SEC Regulation D or SEC Rule 506. Each of the Broker Defendants knew from the DD Reports, their role in the Offerings, and the size of the Offerings that GPB was required to register certain of the Securities under the Securities Exchange Act. The Broker Defendants also knew the size of the Offerings from GPB's Form D filings with the SEC, which described for each Offering the brokers involved in the sales, the amount of investment raised, and the number of investors.

2nd Am. Compl. ¶¶129-130.

Accordingly, the forum-selection clause in the SA is enforceable by the Broker Defendants.

## III.   CONCLUSION

Plaintiffs and all other GPB investors agreed that *any litigation* relating to their GPB investments would be heard in New York state courts located in New York County. Plaintiffs should not be permitted to thwart their clear contractual obligations. Moreover,

the venue provision is enforceable by the Broker Defendants as necessary and integral parties to the underlying transactions from which all of the claims emanate. GPB investors could not have made the investments at issue without executing an SA containing the forum-selection clause. Moreover, GPB investors could not have executed the SA without the assistance of a FINRA broker-dealer such as the Broker Defendants.

For the reasons set forth herein, the Broker Defendants respectfully request that the Second Amended Complaint be dismissed in its entirety.

Dated: December 21, 2020                                  Respectfully submitted,

| | |
|---|---|
| Saretsky Hart Michaels + Gould PC | Markun Zusman Freniere & Compton LLP |
| **/s/ Gary M. Saretsky**<br>Texas State Bar No. 24071150<br>995 South Eton Street<br>Birmingham, MI 48009<br>248-502-3300<br>248-502-3301 (fax)<br>gsaretsky@saretsky.com | **/s/ Edward S. Zusman**<br>Pro hac vice<br>California State Bar No. 154366<br>465 California Street, Suite 401<br>San Francisco, CA 94104<br>415-438-4515<br>415-434-4505 (fax)<br>ezusman@mzclaw.com |
| **/s/ Janine M. Lucas**<br>Michigan State Bar No. P66352<br>995 South Eton Street<br>Birmingham, MI 48009<br>248-502-3300<br>248-502-3301 (fax)<br>jlucas@saretsky.com | **/s/ Kevin K. Eng**<br>Pro hac vice<br>California State Bar No. 209036<br>465 California Street, Suite 401<br>San Francisco, CA 94104<br>415-438-4515<br>415-434-4505 (fax)<br>keng@mzclaw.com |
| **/s/ Jonathan M. Sterling**<br>Michigan State Bar No. P69770<br>995 South Eton Street<br>Birmingham, MI 48009<br>248-502-3300<br>248-502-3301 (fax)<br>jsterling@saretsky.com | Attorneys for FSC Securities Corporation, Royal Alliance Associates, Inc., Sagepoint Financial, Inc., Triad Advisors LLC, Western International Securities, Inc., Woodbury Financial Services, Inc. |
| Attorneys for Arkadios Capital, Ausdal Financial Partners, Inc., Crown Capital Securities, LP, DFPG Investments, LLC, Geneos Wealth Management, Inc., Orchard Securities, LLC | |

| | |
|---|---|
| Ewell, Brown, Blanke & Knight LLP | Fox Swibel Levin & Carroll LLP |
| **/s/ Gary Ewell**<br>Texas State Bar No. 06752800<br>111 Congress Ave.<br>Suite 2800<br>Austin, TX 78701<br>512-770-4030<br>877-851-6384 (fax)<br>gewell@ebbklaw.com | **/s/ David E. Koropp**<br>Pro Hac Vice<br>Illinois State Bar No. 6201442<br>200 W. Madison Avenue, Suite 3000<br>Chicago, IL 60606<br>312-224-1200<br>312-224-1201 (fax)<br>dkoropp@foxswibel.com |
| Attorneys for Aegis Capital Corp., Aeon Capital Inc., American Capital Partners, LLC, Arkadios Capital, Ausdal Financial Partners, Inc., Crown Capital Securities, LP, David A. Noyes & Company, DFPG Investments, LLC, FSC Securities Corporation, Geneos Wealth Management, Inc., Innovation Partners LLC, Kingsbury Capital, Inc., Landolt Securities, Inc., Orchard Securities, LLC, Royal Alliance Associates, Inc., Sagepoint Financial, Inc., Western International Securities, Inc., Woodbury Financial Services, Inc., Whitehall-Parker Securities, Inc. | **/s/ Steven Vanderporten**<br>Pro hac vice<br>Illinois State Bar No. 6314184<br>200 W. Madison Avenue, Suite 3000<br>Chicago, IL 60606<br>312-224-1200<br>312-224-1201 (fax)<br>svanderporten@foxswibel.com<br><br>Attorneys for David A. Noyes & Company |
| Armstrong Teasdale LLP | Winstead PC |
| **/s/ Matthew D. Turner**<br>Missouri Bar No. 48031<br>3405 West Truman Boulevard, Suite 210<br>Jefferson City, MO 65109<br>573-634-7146<br>573-636-8457 (fax)<br>mturner@armstrongteasdale.com<br><br>Winstead PC | **/s/ James G. Ruiz**<br>Texas State Bar No. 17385860<br>401 Congress Ave., Suite 2100<br>Austin, Texas 78701<br>512-370-2818<br>jruiz@winstead.com<br><br>Marshall, Dennehey, Warner, Coleman & Goggin |
| **/s/ James G. Ruiz**<br>State Bar No. 17385860<br>401 Congress Ave., Suite 2100<br>Austin, Texas 78701<br>512-370-2818<br>512-370-2850 (fax)<br>jruiz@winstead.com | **/s/ John P. Quinn**<br>Pro Hac Vice<br>Pennsylvania State Bar No. 85239<br>2000 Market Street, Suite 2300<br>Philadelphia, PA, 19103<br>215-575-2883<br>205-575-0856 (fax)<br>jpquinn@mdwcg.com |

| | |
|---|---|
| Attorneys for Defendant Moloney Securities Co., Inc. | **/s/ Samuel E. Cohen**<br>Pro Hac Vice<br>Pennsylvania State Bar No. 78996<br>2000 Market Street, Suite 2300<br>Philadelphia, PA, 19103<br>215-575-2883<br>205-575-0856 (fax)<br>secohen@mdwcg.com<br><br>Attorneys for Center Street Securities, Inc., Concorde Investment Services, LLC, Colorado Financial Services Corporation, Uhlmann Price Securities, LLC, IBN Financial Services, LLC, Lewis Financial Group n/k/a DAI Securities, LLC, Vestech Securities, Inc. |
| Law Offices of Abe Lampart, P.C.<br><br>**/s/ Abe Lampart**<br>Pro hac vice<br>California Bar No. 92406<br>456 Montgomery Street, Suite 1300<br>San Francisco, CA 94104<br>415-274-0999<br>415-274-2563 (fax)<br>abe@lampartlaw.com<br><br>Attorneys for Whitehall-Parker Securities, Inc. | Akerman LLP<br><br>**/s/ C. Bryce Benson**<br>Texas State Bar Number: 24031736<br>2001 Ross Avenue, Suite 3600<br>Dallas, Texas 75201<br>214-720-4300<br>214-981-9339 (fax)<br>bryce.benson@akerman.com<br><br>Attorneys for Sentinus Securities LLC n/k/a Sentinus Halo Securities, LLC, Money Concepts Capital Corporation |
| Winstead PC<br><br>**/s/ James G. Ruiz**<br>Texas State Bar No. 17385860<br>401 Congress Ave., Suite 2100<br>Austin, Texas 78701<br>512-370-2818<br>jruiz@winstead.com<br><br>Kaufman Dolowich & Voluck LLP<br><br>**/s/ Nancy L. Hendrickson**<br>Pro hac vice<br>Illinois State Bar No. 6207710<br>135 S. LaSalle Street, Suite 2100<br>Chicago, IL  60603 | Kelly Hart & Hallman LLP<br><br>**/s/ J. Stephen Ravel**<br>Texas State Bar No. 16584975<br>303 Colorado Street, Suite 2000<br>Austin, TX  78701<br>512-495-6429<br>512-495-6464 (fax)<br>steve.ravel@khh.com<br><br>Kaufman Dolowich & Voluck LLP<br><br>**/s/ Nancy L. Hendrickson**<br>Pro hac vice<br>Illinois State Bar No. 6207710<br>135 S. LaSalle Street, Suite 2100 |

| | |
|---|---|
| 312- 863-3662<br>312-759-0402 (fax)<br>nhendrickson@kdvlaw.com<br><br>Attorneys for Arete Wealth Management LLC | Chicago, IL  60603<br>312- 863-3662<br>312-759-0402 (fax)<br>nhendrickson@kdvlaw.com<br><br>Attorneys for Great Point Capital LLC, Newbridge Securities Corporation, WestPark Capital Inc. |
| Schiff Hardin LLP<br><br>**/s/ Kayvan B. Sadeghi**<br>Pro hac vice<br>New York State Bar No. 4250163<br>1185 Avenue of the Americas<br>Suite 3000<br>New York, NY 10036<br>212-745-0855<br>212-753-5044 (fax)<br>ksadeghi@schiffhardin.com<br><br>Attorneys for Dawson James Securities, Inc. | Lewis S. Fischbein, P.C.<br><br>**/s/ Lewis S. Fischbein**<br>Pro hac vice<br>New York State Bar No. 1474691<br>2727 Henry Hudson Parkway, Suite 609<br>Riverdale, New York 10463<br>914-772-7491<br>lfischbein@wsmblaw.com<br><br>Attorneys for Purshe Kaplan Sterling Investments, Inc., Cabot Lodge Securities LLC |
| Norton Rose Fulbright US LLP<br><br>**/s/ Peter Andrew Stokes**<br>Texas State Bar No. 24028017<br>98 San Jacinto Blvd, Suite 1100<br>Austin, TX 78701<br>512-474-5201<br>512-536-4598 (fax)<br>peter.stokes@nortonrosefulbright.com<br><br>Attorneys for Advisory Equity Group Ltd., International Assets Advisory, LLC, Madison Avenue Securities, LLC, Vanderbilt Securities, Calton & Associates, Inc., Kalos Capital, Inc., Coastal Equities, Inc., McDonald Partners LLC, Lucia Securities LLC | K&L Gates LLP<br><br>**/s/ Stephen G. Topetzes**<br>Pro hac vice<br>1601 K Street, NW<br>Washington, DC  20006-1600<br>202-778-9328<br>202-778-9100 (fax)<br>stephen.topetzes@klgates.com<br><br>**/s/ Michael DeMarco**<br>Pro Hac Vice<br>State Street Financial Center<br>One Lincoln Street<br>Boston, Massachusetts 02111-2950<br>617-261-3100<br>617-261-3175 (fax)<br>michael.demarco@klgates.com<br><br>**/s/ John Gavin**<br>Pro Hac Vice<br>State Street Financial Center<br>One Lincoln Street |

| | Boston, Massachusetts 02111-2950<br>617-261-3100<br>617-261-3175 (fax)<br>john.gavin@klgates.com<br><br>**/s/ Jonathan R. Dotson**<br>Texas State Bar No. 24036495<br>2801 Via Fortuna, Suite 350<br>Austin, Texas 78746<br>512-482-6889<br>512-482-6859 (fax)<br>jon.dotson@klgates.com<br><br>Attorneys for HighTower Securities, LLC |
|---|---|
| Mound Cotton Wollan & Greengrass LLP<br><br>**/s/ Barry R. Temkin**<br>Pro hac vice<br>New York Bar No. 1848068<br>One New York Plaza<br>New York, NY 10004<br>212-804-4200<br>212-344-8066 (fax)<br>btemkin@moundcotton.com<br><br>**/s/ Andrea Ann Ortiz**<br>Texas Bar No. 24105908<br>2700 Post Oak Boulevard<br>Suite 2100<br>Houston, Texas 77056<br>281-572-8350<br>aortiz@moundcotton.com<br><br>Attorneys for Defendant United Planners<br>Financial Services of America, LP | Winstead PC<br><br>**/s/ James G. Ruiz**<br>State Bar No. 17385860<br>401 Congress Ave., Suite 2100<br>Austin, Texas 78701<br>512-370-2818<br>512-370-2850 (fax)<br>jruiz@winstead.com<br><br>Attorneys for Detalus Securities, LLC,<br>Cascade Investment Management<br>Dempsey Lord Smith, LLC, Capital<br>Investment Group, Inc. |

## **CERTIFICATE OF SERVICE**

I certify that on December 21, 2020, I electronically filed the foregoing document with the Clerk of the Court using the Case Management/Electronic Case Files (CM/ECF) system which will send notification of this filing to all counsel of record.

Dated: December 21, 2020                Saretsky Hart Michaels & Gould PC

                        By:    Gary M. Saretsky
                               Texas State Bar No. 24071150
                               995 South Eton Street
                               Birmingham, MI 48009
                               248-502-3300
                               248-502-3301 (fax)
                               gsaretsky@saretsky.com

# EXHIBIT A

**Memorandum #  REDACTED**

**CONFIDENTIAL PRIVATE PLACEMENT MEMORANDUM**

**$350,000,000**

**Class A Limited Partnership Units**

# GPB HOLDINGS II, LP

**April 13, 2015**

**SUBSCRIPTION BOOKLET**

**FOR**

**CLASS A LIMITED PARTNERSHIP INTERESTS**

**IN**

**GPB HOLDINGS II, LP**

**PLEASE REVIEW CAREFULLY AND FOLLOW THE INSTRUCTIONS IMMEDIATELY BEHIND THIS COVER PAGE.  INCOMPLETE AGREEMENTS AND QUESTIONNAIRES WILL BE RETURNED TO SUBSCRIBERS FOR COMPLETION.**

*Confidential—Do Not Copy or Circulate*

## GPB Holdings II, LP
## Class A - Subscription Agreement

**Units:** This Subscription Agreement relates to Subscriber's purchase of Class A Limited Partnership Units ("Units") of GPB Holdings II, LP ("Company"). GPB Capital Holdings, LLC ("GPB") serves as the Company's General Partner.

**Instructions For Individual Subscribers** (*Natural Persons*): (1) Fill out Section 1 regarding the Subscriber Information. (2) Check the appropriate box in Section 2 regarding Registration of Units. (3) Check the appropriate box(es) in Section 4 regarding your accredited investor status. (4) Complete Section 7.

**Instructions For Entities** (*Non-Individual Subscribers*): (1) Fill out Section 1 regarding the Subscriber Information. (2) Check the appropriate box in Section 2 regarding Registration of Units. (3) Check the appropriate box in Section 3 regarding your tax status. (4) Check the appropriate box(es) in Sections 5 regarding your accredited investor status. (5) If you are a benefit plan investor, then check the appropriate box(es) in Section 6 regarding your plan assets. (6) Complete Section 7.

### Section 1a Subscriber Information (*If an IRA, provide personal data for the IRA owner*)

| | |
|---|---|
| Name (Last, First Middle Initial or Name of Entity): | DOB |
| Mailing Address: | |

| City: | State: | Zip: |
|---|---|---|
| Telephone: | Fax: | Email: |

| Social Security Number or Employer ID No.: | The Subscriber is a citizen of (Country): |
|---|---|

☐ Please check if you would like to receive correspondence via **e-mail only** (Neither the Company nor GPB will be responsible for the security and privacy of materials sent to you by email.)

### Check the appropriate box and fill in the blanks where needed:

☐ The Subscriber is a resident of, and the Units were offered to subscriber in, the State included in the mailing address above.

☐ The Subscriber is a resident of the State of _____ (insert name of state) and the Units were offered to Subscriber in the State of _____ (insert name of state).

### Section 1b Subscriber Information (*If an IRA, provide personal data for the IRA owner*)

| | |
|---|---|
| Name (Last, First Middle Initial or Name of Entity): | DOB |
| Mailing Address: | |

| City: | State: | Zip: |
|---|---|---|
| Telephone: | Fax: | Email: |

| Social Security Number or Employer ID No.: | The Subscriber is a citizen of (Country): |
|---|---|

☐ Please check if you would like to receive correspondence via **e-mail only** (Neither the Company nor GPB will be responsible for the security and privacy of materials sent to you by email.)

### Check the appropriate box and fill in the blanks where needed:

☐ The Subscriber is a resident of, and the Units were offered to subscriber in, the State included in the mailing address above.

☐ The Subscriber is a resident of the State of _____ (insert name of state) and the Units were offered to Subscriber in the State of _____ (insert name of state).

## Section 2 Registration of Units: (*Check the appropriate box*)

☐ **(a)** Separate or individual property. *(A married Subscriber who resides in a community property state must submit written consent from his or her spouse to purchase Units using community funds.)*

☐ **(b)** Tenants in Common. *(Both parties must sign all required documents.)*

☐ **(c)** Joint Tenants with right of survivorship. *(Both parties must sign all required documents unless advised by their attorneys that one signature is sufficient.)*

☐ **(d)** Husband and Wife Tenants by the Entirety. *(Both husband and wife must sign all required documents unless advised by their attorneys that one signature is sufficient.)*

☐ **(e)** Husband and Wife Community Property. *(Community property states only. Both husband and wife must sign all required documents unless advised by their attorneys that one signature is sufficient.)*

☐ **(f)** Trust. *(Attach a copy of trust instrument and include the name of trust, the name of trustee and the date the trust was formed.)*

☐ **(g)** Individual Retirement Account ("IRA"). *(Provide exact name of custodian, account name and account number on page 13).*

☐ **(h)** Other *(Describe):*_____

## Section 3 Entity Related Information (*Entities Only*): (*Check the appropriate box*)

☐ Corporation              ☐ Estate                    ☐ IRA

☐ Partnership *(General or Limited)*     ☐ Trust *(Revocable or Irrevocable)*     ☐ Custodial

☐ Limited Liability Company      ☐ Benefit Plan Investor        ☐ Other *(Specify)*_____

State of Formation: _____     Date of Formation: _____

☐ Yes  ☐ No     Was the entity formed for the purpose of investing in the Company?

## Section 4 Accredited Investor (*Individuals*): (*Check the appropriate box*)

☐ **(a)** The Subscriber is a natural person whose individual net worth, or joint net worth with the Subscriber's spouse, at the time of the Subscriber's purchase exceeds $1,000,000. *For purposes of this Subscription Agreement, (i) "net worth" means the excess of total assets at fair market value, including home furnishings and automobiles, over total liabilities; (ii) Subscriber may not count the value of Subscriber's primary residence in net worth, and if the amount of debt on Subscriber's primary residence exceeds its value, Subscriber must count the excess against net worth; and (iii) Subscriber does not need to count as a liability debt secured by the Subscriber's primary residence up to the value of the residence, unless the amount of such debt exceeds the amount that was outstanding 60 days prior, other than debt resulting from the acquisition of the primary residence.*

☐ **(b)** The Subscriber is a natural person who had an individual income in excess of $200,000 in each of the two most recent years or joint income with the Subscriber's spouse in excess of $300,000 in each of those two years and has a reasonable expectation of reaching the same income level in the current year.

## Section 5 Accredited Investor (*Entities*): (*Check all the appropriate boxes*)

☐ **(a)** **The Subscriber is a corporation, limited liability company, Massachusetts or similar business trust, or partnership**, not formed for the specific purpose of acquiring the Units, with total assets in excess of $5,000,000.

☐ **(b)** **The Subscriber is an organization** described under Section 501(c)(3) of the Internal Revenue Code of 1986, as amended (the "Code"), not formed for the specific purpose of acquiring the Units, with total assets in excess of $5,000,000.

☐ **(c)** **The Subscriber is a trust with total assets in excess of $5,000,000**, not formed for the specific purpose of acquiring the Units, whose purchase is directed by a sophisticated person as described in Rule 506(b)(2)(ii) of Regulation D promulgated under the Securities Act of 1933, as amended (the "1933 Act").

☐ **(d)**    **The Subscriber is one of the following**: *(please specify)*

    ☐ **a bank** as defined in 1933 Act §3(a)(2), or **a savings and loan association** as defined in 1933 Act §3(a)(5)(A), acting in its individual or fiduciary capacity;

    ☐ **a broker or dealer** registered under Section 15 of the Securities Exchange Act of 1934, as amended ("<u>1934 Act</u>");

    ☐ **an insurance company** as defined in 1933 Act §2(a)(13);

    ☐ **an investment company** registered under the Investment Company Act of 1940, as amended (the "<u>1940 Act</u>");

    ☐ **a business development company** as defined in 1940 Act §2(a)(48);

    ☐ **a Small Business Investment Company** licensed by the U.S. Small Business Administration under Section 301 (c) or (d) of the Small Business Investment Act of 1958, as amended; or

    ☐ **a private business development company** as defined in Section 202(a)(22) of the Investment Advisers Act of 1940, as amended (the "<u>Advisers Act</u>").

☐ **(e)**    **The Subscriber is an employee benefit plan** within the meaning of the Employee Retirement Income Security Act of 1974, as amended ("<u>ERISA</u>"), and (i) the investment decision is made by a plan fiduciary, as defined in ERISA §3(21), which is either a bank, savings and loan association, insurance company or registered investment adviser, or (ii) the employee benefit plan has total assets in excess of $5,000,000 or, (iii) if a self-directed plan, with investment decisions made solely by persons that are accredited investors.

☐ **(f)**    **The Subscriber is a plan established and maintained by a state or its political subdivisions**, or any agency or instrumentality of a state or its political subdivisions, for the benefit of its employees, if such plan has total assets in excess of $5,000,000.

☐ **(g)**    **The Subscriber is an entity in which all of the equity owners are "accredited investors"** within the meaning of one of the categories (a), (b) and (d) - (f) of Section 5 or (a) or (b) of Section 4.

☐ **(h)**    **The Subscriber is an "individual retirement account"** under Code §408(a), owned by and for the benefit of an "accredited investor" or a self-directed plan (e.g. 401(k) plan or profit sharing plan) in which all investment decisions are made solely by, and such investments are made on behalf of, "accredited investors" pursuant to one of the categories (a) through (g) of Section 5 or (a) or (b) of Section 4. If you checked this box, complete this form for each participant and list the total number of equity owners:_____.

## Section 6 For Benefit Plan Investors: (*Check all appropriate boxes*)

**Subscriber is a "benefit plan investor" as defined under ERISA §3(42) that is one of the following:**

☐ **(a)**    **The Subscriber is an "employee benefit plan"** as defined under ERISA §3(3) and subject to part 4 of Title I or ERISA; or

☐ **(b)**    **The Subscriber is a plan to which Code §4975 applies**, other than an "employee benefit plan" described above; or

☐ **(c)**    **The Subscriber is an entity (other than a life insurance company) whose underlying assets include plan assets** by reason of a plan's investment in such entity, and either:

    ☐ the benefit plan investor is deemed to be investing "plan assets" under U.S. Department of Labor Regulation §2510.3101(h), or

    ☐ the Subscriber certifies that the percentage of Subscriber's equity interest held by "benefit plan investors" as defined in ERISA §3(42) and U.S. Department of Labor Regulation §2510.3-101 is _____.

    The Subscriber agrees to notify GPB promptly if the information provided above changes. .

☐ **(d)**    **The Subscriber is a life insurance company** and either:

    ☐ the Subscriber is making this investment solely with assets of one or more of its separate accounts, or

    ☐ the Subscriber is making this investment with assets of its general account, and no more than ____% of such general account assets used to acquire Units constitutes "plan assets," within the meaning of ERISA §3(42), U.S. Department of Labor Relations §2510.3-101 and other applicable law.

    The Subscriber agrees to notify GPB promptly if the information provided above changes.

**Section 7 For all Investors:** (*Please read and fill in the appropriate amounts in each blank*)

Total Amount of Subscription: $_____

Number of GPB Holdings II Units Purchased ($50,000/unit):_____    **(Minimum Investment of ONE Unit: $50,000)**

**By check payable to**: "Phoenix American Financial Services FBO GPB Holdings II, LP", delivered to the following address:

> GPB Holdings II, LP
> c/o: Phoenix American Financial Services
> 2401 Kerner Blvd
> San Rafael, CA 94901

**By wire transfer directly to**:

> Phoenix American Financial Services, Inc. for GPB Holdings II, LP
> Bank of the West
> 20 Petaluma Blvd South
> Petaluma, CA 94952


> Routing:    121 100 782
> Account:    030 954 628


> Memo: Investor Name


☐ Please check here to verify that funds have been wired


| Paperwork Delivery Instructions | |
| --- | --- |
| **Via Mail** | **Electronic** |
| GPB Holdings II, LP<br>c/o: Phoenix American Financial Services<br>2401 Kerner Blvd<br>San Rafael, CA 94901 | Info@Ascendant-Cap.com<br>Fax: (512) 758-7872 |

V 2

## Certificate of Broker–Dealer Representative:

The undersigned registered representative of _____ (name of broker–dealer) certifies that it has procured this subscription and that it is familiar with the Subscriber named above and it has determined that the Subscriber meets the requirements set forth under the caption "Qualification of Investors" in the Private Placement Memorandum.

Registered Representative certifies he/she is licensed in the state of _____ where the Subscriber resides.

_____

*(Signature):* OSJ or Principal

_____

Print Name

**Broker/Dealer Information:**

_____

Name of Brokerage Firm and CRD

_____

Address

_____

City                 State                 Zip

_____

Representative

_____

Representative

_____

*(Signature):* Registered Rep

_____

Print Name:

_____

Registered Representative

_____

Address

_____

City                 State                 Zip

_____

Phone                          Email

_____

Phone                                    Email

☐ Confirmed NAV Ticket @ _____ %

☐ Net of All Commissions

## Accepted by:

GPB Holdings II, LP   By:
GPB Capital Holdings, LLC
its General Partner

By: _____
                    *(Signature)*

Print Name: _____
Title: _____
Date: _____

## Subscription Agreement Terms and Conditions

These Subscription Agreement Terms and Conditions ("Terms"), part of the Subscription Agreement (collectively, the "Agreement") relate to the offering (the "Offering") of Class A Limited Partnership Units ("Units") by GPB Holdings II, LP, a Delaware limited partnership ("Company"). By signing the Agreement, the undersigned subscriber (the "Subscriber") confirms acceptance of the Company's offer of Units on the terms and conditions set out in the Confidential Private Placement Memorandum ("Memorandum") and the Company's Agreement of Limited Partnership included in the memorandum, as it may be amended from time to time (the "LPA"). Terms not otherwise defined in this Agreement have the meaning ascribed to them in the Memorandum..

The Subscriber represents and warrants that the Subscriber has examined the suitability of investment in the Units for the Subscriber's own needs, investment objectives and financial capabilities, and has made an independent investigation and decision as to suitability and as to the risk and potential gain involved in the investment. Also, the Subscriber represents and warrants that the Subscriber has had the opportunity to consult his, her or its attorneys, accountants, financial consultants or other business or tax advisors regarding the risks and merits of the proposed purchase of Units.

The Subscriber represents and warrants to, and agrees with, the Company, GPB Capital Holdings, LLC, a Delaware limited liability company and the General Partner of the Company ("GPB"), as follows:

1. The Subscriber has received, read carefully and fully understands the Memorandum and its exhibits, including, as applicable, the LPA. The Subscriber recognizes that an investment in Units involves substantial risk and is fully cognizant of, and understands, all of the risk factors related to the purchase of Units.

2. Subject to the terms and conditions of the Agreement, the Subscriber irrevocably subscribes for, and agrees to purchase, the Units for a total price provided in Section 7 of the Subscription Agreement or such lesser amount as GPB may choose to accept under Section 4of the Terms in the LPA (the "Capital Contribution"). Together with the Agreement, the Subscriber is delivering a check or wire transfer in the amount of the aggregate subscription price.

3. Subscriber agrees, so long as it is a Limited Partner in Company, to pay the General Partner, quarterly in advance, the Managerial Assistance Fee, which fee will be paid quarterly in advance out of Subscriber's Capital Account in the Company.

4. The Subscriber acknowledges that this Agreement will not be binding against the Company until accepted and executed by the Company. GPB, in its sole discretion, on behalf of the Company, reserves the right to accept or reject this subscription or any other subscription for Units, in whole or in part, for any reason at any time, and the subscription proceeds paid under this Agreement will be held by the Company until accepted or rejected by it. This Agreement and the Capital Contribution will be deemed to be accepted by GPB only when the undersigned has been admitted into the Company as a Limited Partner (a "Limited Partner" or "LP") by enrollment as a Limited Partner in the books and records of the Company. If GPB chooses to accept only part of the Capital Contribution amount, then GPB is authorized to revise the amount indicated as the Total Amount of Subscription on Section 7 of the Subscription Agreement, will notify the undersigned in writing of such revision promptly after the Closing (the amount as so revised shall thereafter be the undersigned's Capital Contribution for all purposes hereof), and will return any amount unaccepted to the Subscriber without interest. If this subscription is rejected in whole, the Company will promptly return to the Subscriber this executed Agreement and related documents, together with the purchase price (or the applicable part of the purchase price) paid by the Subscriber for the Units, without deduction and without interest, and this Agreement will have no further force or effect to that extent.

5. The Subscriber understands and acknowledges that: (i) the Units have not been registered for sale under the 1933 Act or the securities laws of any state or other political subdivision of the United States, and are being offered for sale to the Subscriber in reliance upon the private offering exemption contained in 1933 Act §4(a)(2) and Rule 506 of Regulation D thereunder; (ii) the Offering has not been approved, disapproved or passed on by any federal or state regulatory agency or other organizations, (iii) the reliance by the Company and GPB upon the private offering exemption is predicated, in part, upon the representations, warranties and agreements made by the Subscriber under this Agreement; and (iv) that exemption may not be available if any of the Subscriber's representations and warranties are not correct and complete or its agreements under this Agreement are not fulfilled. The Company does not intend to register the Units under the 1933 Act at any time in the future and the Company is under no obligation to register any Units or to assist the Subscriber in complying with any exemption from registration for any resale of Units. There are substantial restrictions on the transferability of the Units under the LPA, the 1933 Act, applicable state laws and the Internal Revenue Code, and there is no established market for the Units, and none is expected to develop in the future.

6. Any information that the Subscriber has furnished to the Company or GPB with respect to the Subscriber is correct and complete as of the date of this Agreement and if there should be any material change in such information prior to the Subscriber's purchase of Units, the Subscriber will immediately furnish such revised or corrected information to the Company. The representations, warranties, agreements, undertakings and acknowledgments made by the Subscriber in this Agreement are made with the intent that

they be relied upon by GPB and the Company in determining his, her or its suitability as a purchaser of the Units, and will survive his, her or its purchase of the Units. In addition, the Subscriber undertakes to notify the Company immediately of any change in any representation, warranty or other information relating to the Subscriber contained herein.

7.    The Subscriber understands and acknowledges that the Company does not intend to issue certificates to evidence Units. However, certificates, if any are issued, representing the Units purchased by Subscriber hereunder, and all certificates, if any, issued in exchange for or in substitution of such certificates, will bear the following legend upon the original issuance of the Units and until the legend is no longer required under applicable requirements of the 1933 Act or applicable state securities laws:

THE UNITS REPRESENTED HEREBY HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED (THE "1933 ACT"), OR STATE SECURITIES LAWS. THE HOLDER HEREOF, BY PURCHASING THESE SECURITIES, AGREES FOR THE BENEFIT OF GPB HOLDINGS II, LP (THE "COMPANY") THAT THESE UNITS MAY BE OFFERED, SOLD, PLEDGED OR OTHERWISE TRANSFERRED ONLY IN ACCORDANCE WITH THE COMPANY'S AGREEMENT OF LIMITED PARTNERSHIP AND IN COMPLIANCE WITH APPLICABLE LAWS AND REGULATIONS. IN ANY EVENT, A LEGAL OPINION SATISFACTORY TO THE COMPANY MUST FIRST BE PROVIDED TO THE COMPANY.

8.    The Subscriber is aware that the Units are illiquid and may not be resold, pledged or otherwise transferred except in accordance with this Agreement, the LPA and all applicable laws. By purchasing Units, the Subscriber agrees that the Units may be offered, sold or otherwise transferred only in accordance with substantial restrictions contained in the LPA, which include an exemption from registration under the 1933 Act and applicable state securities laws after providing to the Company an opinion of counsel to that effect, which counsel and opinion shall both be reasonably satisfactory to the Company, and the required consent of GPB.

9.    The Subscriber is purchasing the Units for its own account, and not with a view to, or for resale in connection with, any distribution in violation of the 1933 Act, and no one other than the Subscriber will have any interest in, or any right to acquire, all or any part of the Units or have any interest in this subscription.

10.    Subscriber is a sophisticated investor with such knowledge and experience in financial and investment matters, and in illiquid investments in particular, and in such other business matters, that Subscriber is capable of evaluating the merits and risks of an investment in Units (without the assistance of a Purchaser Representative as defined in the 1933 Act). In evaluating the suitability of an investment in the Units, the Subscriber has not relied upon any representations or other information (whether oral or written) other than as provided in the Memorandum and LPA, and their attachments, and independent investigations made by the Subscriber or representative(s) of the Subscriber.

11.    The Subscriber is an "accredited investor" as defined in Rule 501(a) of the 1933 Act ("Accredited Investor").

12.    The Subscriber's overall commitment to investments that are not readily marketable is not excessive in view of the Subscriber's net worth and financial circumstances, and the purchase of the Units will not cause that commitment to become excessive. The Subscriber represents that the Subscriber (i) has adequate means of providing for the Subscriber's current needs, anticipated future needs and possible contingencies and emergencies, (ii) is able to bear the economic and other risks of investment in the Units for an indefinite period of time, including the risks summarized in the Memorandum and (iii) has no need for liquidity in the investment in the Units and could afford the complete loss of the investment.

13.    The Subscriber understands that the Company is not registered as an investment company under the 1940 Act, and that GPB may not be registered as an investment adviser under the Investment Advisers Act of 1940, as amended ("Advisers Act") or a commodity pool operator or a commodity trading advisor under the Commodity Exchange Act, as amended (collectively with the 1940 Act and Advisers Act, the "Acts"), and that neither the Company nor the LPs will have any of the protections afforded by the Acts.

14. ERISA.

(a)  The Subscriber is aware of and has considered the issues addressed under the headings "Qualification of Investors" and "Certain Federal Tax, ERISA & Regulatory Matters" in the Memorandum and understands that investments by "benefit plan investors," as defined in ERISA and in the U.S. Department of Labor regulations ("Benefit Plan Investors"), will be monitored and may be restricted by GPB.

(b)  If the Subscriber is a Benefit Plan Investor, then the Subscriber agrees to promptly notify GPB if its status changes.

(c)  The Subscriber understands that: (i) without the prior consent of GPB, Units may not be held by or transferred to a Benefit Plan Investor; (ii) in no event may 25% or more of the Units be held by Benefit Plan Investors; and (iii) GPB may restrict investment in or transfer of Units at any time or compel transfers of Units to limit investments by Benefit Plan Investors. The Subscriber agrees to promptly notify GPB if the Subscriber becomes a Benefit Plan Investor.

(d)  If the Subscriber has indicated above that it is a Benefit Plan Investor, it represents and acknowledges that (i) it has been informed of and understands the Company's investment objectives, policies and strategies; (ii) the decision to invest in the Units has been made with appropriate consideration of all relevant investment factors applicable to the Subscriber; (iii) the decision to invest in the Units is consistent with the duties and responsibilities imposed upon the Subscriber, including fiduciary duties, under ERISA or other applicable laws and the terms of the Benefit Plan; (iv) the investment in the Company does not constitute or otherwise result in a non-exempt prohibited transaction under ERISA §406 or Code §4975; (v) it has requested and received from GPB all information that the Subscriber, after due inquiry, deemed relevant to such determinations and that it has taken into account that there is a risk of loss of this investment, and that this investment will be relatively illiquid so that invested amounts will not be readily available for the payment of employee benefits; (vi) promptly after the undersigned obtains knowledge thereof, the Subscriber will notify GPB in writing of (A) any termination, substantial contraction, merger or consolidation, or transfer of assets of any Benefit Plan Investor, (B) any amendment to the governing instrument(s) of a Benefit Plan Investor that materially affects the investments of such Benefit Plan Investor or the authority of any named fiduciary or investment manager to authorize investments by such Benefit Plan Investor, and (C) any change in the identity of any named fiduciary or investment manager (including the Benefit Plan Investor itself) who has authority to approve investments for any Benefit Plan Investor; (vii) the Subscriber acknowledges that neither GPB nor any of its affiliates provides any investment advice on a regular basis to the Subscriber (or, to the Subscriber's knowledge, to any other Benefit Plan Investor) and none of such parties provides any investment advice to the undersigned (or, to the Subscriber's knowledge, to any other Benefit Plan Investor) that serves as the primary basis of any investment decisions the undersigned makes as to any of its assets (or that such other Benefit Plan Investor(s) makes, as the case may be); (viii) if GPB, or equity owner, employee, agent, or affiliate of GPB, is ever held to be a fiduciary of the Subscriber or any other Benefit Plan Investor, then, in accordance with ERISA §§405(b)(1), 405(c)(2) and 405(d), the fiduciary responsibilities of that person will be limited to the person's duties in administering the business of the Company, and the person will not be responsible for any other duties to the Subscriber or such other Benefit Plan Investor, specifically including evaluating the initial or continued appropriateness of this investment in the Company under ERISA §404(a)(1); and (ix) if the Subscriber itself is an Employee Benefit Plan, then the person executing this Agreement on behalf of the Subscriber (the "Signer") further represents and warrants that (A) the Signer is an authorized fiduciary of the Subscriber, with full authority under the terms of the Subscriber's governing instrument(s) and, if applicable, the agreement pursuant to which the Signer has been engaged by the Subscriber, to cause the Subscriber to purchase the Units, and (B) this investment has been duly approved by all other fiduciaries of the Subscriber whose approval is required, if any, and this investment is not prohibited by ERISA or prohibited or restricted by any provision of the Subscriber's governing instrument(s) or of any related agreement or instrument. If the Subscriber is an insurance partnership investing in the Company with its general account assets or any entity whose underlying assets include "plan assets" by reason of a plan's investment in such entity, the Subscriber agrees to inform GPB of the percentage of its investment that constitutes "plan assets" as defined under ERISA.

15. The Subscriber acknowledges that the discussion of the tax consequences arising from an investment in the Company described in the Memorandum is general and not complete. The tax consequences to the Subscriber of its investment in Units will depend on, among other things, the Subscriber's particular circumstances. The Subscriber is not relying on the Company for the tax and other economic considerations involved in an investment, and has been urged by the Company to seek independent advice from the Subscriber's professional advisors relating to the suitability of an investment in the Company in view of the Subscriber's overall financial needs and for the legal and tax implications of such an investment.

16. The Subscriber understands that: (a) the Company has no operating history, (b) the Units are highly speculative investments which involve a high degree of risk of loss of the entire investment, (c) the Company will have significant transaction costs regardless of whether it realizes a profit, (d) there are potential conflicts of interest involved in the structure and operation of the Company and its affiliates as described in the Memorandum, and (e) there are significant contracts, payments and transactions by the Company

with GPB and affiliates as described in the Memorandum. The Subscriber has evaluated the nature of the risks involved in purchasing the Units and has carefully reviewed and understands those risks, including the provisions in the LPA providing for compensation to GPB and its affiliates and the sections of the Memorandum describing the potential conflicts of interest. The Subscriber understands that the risks described in the Memorandum are not a complete list of the risks involved in an investment in the Company.

17. The Subscriber has had the opportunity to ask questions of and receive answers from representatives of the Company or any of its principals concerning the terms and conditions of the Offering and the accuracy of the information contained in the Memorandum, and to obtain any additional information (including information with respect to the past employment of the principals of GPB) necessary to verify the information contained in the Memorandum or otherwise relative to the financial data and business of the Company, to the extent that such parties possess such information or can acquire it without unreasonable effort or expense, and all such questions, if asked, have been answered satisfactorily and all such documents, if examined, have been found to be fully satisfactory to the Subscriber.

18. The Subscriber has not become aware of, and is not purchasing the Units as a result of, any general solicitation or general advertising, as those terms are used in Regulation D under the 1933 Act, including (i) advertisements, articles, notices and other communications published in any newspaper, magazine or similar media, or broadcast over television, radio or the internet, or (ii) any seminar or meeting whose attendees have been invited by general solicitation or general advertising.

19. The Subscriber agrees to be admitted as an LP of the Company and to be bound by all of the terms and conditions of the LPA.

20. If the Subscriber is a natural person, he or she is over 21 years of age.

21. The Subscriber has full right, power and authority to execute and deliver this Agreement and the LPA and all related documents, has duly and validly executed this Agreement, the LPA and all related documents, and has full right, power and authority to perform its obligations under this Agreement, the LPA and all related documents. This Agreement, the LPA and all related documents constitute a valid and binding obligation of the Subscriber. The execution and performance of this Agreement, the LPA and related documents by the Subscriber does not and will not violate any statute, regulation, law, order, writ, injunction, judgment, decree, agreement or controlling document to which the Subscriber is a party or that is otherwise specifically applicable to the Subscriber, or require any authorization or approval under any of the foregoing.

22. If the Subscriber is not a natural person, it represents that: (i) it is duly organized, validly existing and in good standing under the laws of the jurisdiction in which it has been formed; (ii) the execution and delivery of this Agreement, the LPA and related documents by the Subscriber has been duly authorized by all necessary action on the part of its officers, directors, stockholders, partners, trustees and custodians, and will not violate any agreement to which the Subscriber is a party; (iii) the individual executing and delivering this Agreement, the LPA and related documents has the requisite right, power, capacity and authority to do so on behalf of the Subscriber; (iv) it has its principal place of business at the address provided above, and (v) it has not been formed for the specific purpose of acquiring the Units and has substantial assets in addition to the funds to be used to purchase the Units. In addition, the execution and performance of this Agreement, the LPA and related documents by the Subscriber will not result in a breach of any of the terms, conditions or provisions of, or constitute a default under, any of its organizational instruments.

23. If the Subscriber is not a natural person, (i) it has or will have substantial business activities or investments other than its investment in the Company and was not specifically formed for the purpose of purchasing Units; (ii) less than 40% of its assets will be invested in the Company; (iii) its governing documents and its practice provide that its investment decisions are based on its investment objectives and its owners generally, not on the particular investment objectives of any one or more of its owners; and (iv) its governing documents and its practice provide that the participation of each owner of the Subscriber in each investment made by the Subscriber is based on the owners' ownership percentages or on some other allocation provision that (A) does not result in varying levels of participation among owners based on the nature, amount or other characteristics of a particular investment; and (B) cannot be varied for particular investments made by the Subscriber as a result of any election or other decision by any such owner in connection with a particular investment, any exercise of judgment or discretion made by the Subscriber's investment decision-maker(s) in connection with a particular investment, or any other reason.

24. The Subscriber acknowledges and agrees that it may not cancel, terminate or revoke this Agreement or any agreement made by the Subscriber under this Agreement, and that this Agreement and any agreements of the Subscriber under this Agreement and the LPA will survive the death, disability or legal incapacity of the Subscriber and shall be binding upon and inure to the benefit of the Company and GPB. If the Subscriber is more than one person, the obligations of each Subscriber under this Agreement and the LPA will be joint and several and the agreements, representations, warranties, acknowledgments and agreements contained in this

V 2

Agreement and LPA will be deemed to be made by and be binding upon each Subscriber and its heirs, executors, administrators, successors and legal representatives.

25. The Subscriber understands that, under the circumstances described in the LPA, GPB may (i) require a Unit holder to transfer its Units (ii) compulsorily redeem an LP's Units, or (iii) sell an LP's Units on its behalf.

26. For the Units to be acquired by Subscriber by this Agreement, Subscriber hereby irrevocably constitutes and appoints GPB the true and lawful attorney-in-fact of Subscriber in Subscriber's name, place and stead (i) to make, execute, acknowledge, deliver and file any of the following documents: (a) the LPA and all documents permitted to be executed thereunder, and (b) to the extent consistent with the provisions of the LPA: (I) all amendments or restatements of the LPA adopted in accordance with its provisions and (II) all documents that may be required to effect the continuation, winding up or termination of the Company under the LPA and the cancellation of the Company's Certificate of Formation, the admission of an additional or substituted LP and (ii) to take any such other action as may be necessary in connection with any aspect of the operations and activities of the Company by giving GPB full power and authority to do and perform each and every act and thing whatever required and necessary to be done in and about the foregoing as fully as the undersigned might or could do if personally present, and hereby ratifies and confirms all that GPB will lawfully do or cause to be done by virtue thereof.

This foregoing power of attorney is coupled with an interest, is irrevocable and shall survive and be unaffected by (x) any subsequent disability or incapacity of Subscriber or, if Subscriber is not a natural person, the dissolution or termination of Subscriber or (y) an assignment by the Subscriber of his, her or its Units except that, where the assignee of all Units owned by a Limited Partner has been approved by GPB for admission to the Company as a substituted LP, the special power of attorney shall survive such assignment for the sole purpose of enabling GPB to execute, acknowledge and file any instrument or document necessary to effect such substitution .

27. The Subscriber agrees to indemnify and hold harmless the Company, GPB and each member, officer, director, manager, employee and agent of the Company, GPB and any person who controls the Company, as defined in 1933 Act §15, against any loss, liability, claim, damage, cost and expense whatsoever (including any and all expenses reasonably incurred in investigating, preparing or defending against any litigation commenced or threatened or any claim whatsoever) arising out of or based upon any false or incorrect representation, warranty or acknowledgment of the Subscriber or any failure by the Subscriber to comply with any covenant or agreement, made by the Subscriber in this Agreement, the LPA or in any other document furnished by the Subscriber to any of the foregoing persons in connection with this subscription or the sale to it of all or part of the Units.

28. Each provision of this Agreement is intended to be severable from every other provision, and the invalidity or illegality of any part of this Agreement will not affect the validity or legality of the remainder of this Agreement.

29. This Agreement may be executed in counterpart copies, each of which will be considered an original and all of which together shall constitute one and the same instrument binding on the parties, notwithstanding that the parties are not signatories to the same counterpart.

30. Under penalties of perjury, the Subscriber certifies that:

   (a) the number shown above is its correct taxpayer identification number; and

   (b) it is not subject to backup withholding because (i) it is exempt from backup withholding, (ii) it has not been notified by the Internal Revenue Service (the "IRS") that it is subject to backup withholding as a result of a failure to report all interest or dividends, or (iii) the IRS has notified the Subscriber that he, she or it is no longer subject to backup withholding.

31. As part of any responsibility of the Company or GPB to prevent money laundering, Subscriber has completed all applicable sections of pages 1 through 4 of the Agreement. Depending upon a Subscriber's status, the Company or GPB may require a detailed verification of its identity and the source of payment. The Company and GPB reserve the right to request information to verify a Subscriber's identity and the source of the Subscriber's subscription payment and other information. If a Subscriber delays or fails to produce any information required for verification, the Company or GPB may refuse to accept its subscription application and subscription monies or may refuse to honor a withdrawal request, until the proper information is provided, or may require mandatory withdrawals. If the Company or GPB suspects that a Subscriber is engaged in money laundering activities or is involved with terrorism or terrorist property, it will report its suspicions to the appropriate regulatory authorities.

32. Each Subscriber is required to make such representations to the Company and GPB as the Company or GPB may require in connection with applicable anti-money laundering programs, including representations that the Subscriber is not a prohibited country, territory, individual or entity listed on the U.S. Department of Treasury's Office of Foreign Assets Control ("OFAC")

V 2

website, and that it is not directly or indirectly affiliated with any country, territory, individual or entity named on an OFAC list or prohibited by any OFAC sanctions programs. Subscriber represents to the Company and GPB that amounts contributed by it to the Company were not directly or indirectly derived from activities that may contravene U.S. Federal, state or international laws and regulations, including any applicable anti-money laundering laws and regulations.

33. GPB or the Company also may suspend any payments of any withdrawal proceeds to a Subscriber if GPB or the Company considers it necessary to comply with any anti-money laundering laws or regulations applicable to the Company or GPB, or any one or more of their affiliates or service providers. The Subscriber will have no claim whatsoever against the Company or GPB for any form of losses or other damages incurred as a result of any action taken under this Agreement or otherwise taken in connection with anti-money laundering laws, regulations or programs.

34. All of the information that the Subscriber has furnished to the Company and GPB in connection with this Agreement or the LPA or which is included in either of such documents is correct and complete as of the date of this Agreement or, if provided thereafter, as of that later date and will be true and correct on the date that the Units are issued to the Subscriber and will continue to be true, correct and complete thereafter. If there should be any material change to that information, the Subscriber will immediately furnish revised or corrected information to the Company and GPB.

35. The Subscriber agrees to hold the Memorandum and its exhibits in confidence. The Memorandum is strictly for the Subscriber's use and is not to be redistributed or reduplicated by the Subscriber.

36. The Subscriber agrees not to transfer or assign this Agreement, or any interest in this Agreement, and agrees that any purported transfer will be void.

37. All agreements, representations and warranties contained herein or made in writing by or on behalf of the Company in connection with the transactions contemplated by this Agreement will survive the execution and delivery of this Agreement, any investigation at any time made by the Subscriber or on the Subscriber's behalf, and the sale and purchase of the Subscriber's Units in the Company and payment therefor.

38. This Agreement supersedes any previous subscription agreement executed by or on behalf of the Subscriber relating to Units, and any such previous agreement is rescinded and is of no further force and effect. The Subscriber understands that this Agreement and the LPA constitute the entire agreement between the parties thereto with respect to the subject matter thereof, that there are no representations, covenants or other agreements related to the subject matter thereof except as stated or referred to in this Agreement and the LPA, and that this Agreement may be amended only by a writing executed by both of its parties.

39. The parties hereto agree that they have been represented by counsel during the negotiation, preparation and execution of this Agreement and, therefore, waive the application of any law, regulation, holding or rule of construction providing that ambiguities in an agreement or other document will be construed against the party drafting such agreement or document.

40.

  (a) This Agreement will be enforced, governed and construed in all respects in accordance with the laws of the State of New York, without regard to that state's conflicts of law provisions.

  (b) Venue for any litigation arising out of, under, or in connection with this Agreement will lie in the state courts having jurisdiction over such matters located in New York County, New York.

  (c) THE SUBSCRIBER KNOWINGLY, VOLUNTARILY AND INTENTIONALLY WAIVES ANY RIGHT IT MAY HAVE TO A TRIAL BY JURY IN RESPECT OF ANY LITIGATION BASED ON THIS AGREEMENT, OR THE LPA OR ARISING OUT OF, UNDER OR IN CONNECTION WITH THIS AGREEMENT, THE LPA OR ANY OTHER AGREEMENT CONTEMPLATED TO BE EXECUTED IN CONJUNCTION THEREWITH OR ANY COURSE OF CONDUCT, COURSE OF DEALING, STATEMENTS (WHETHER VERBAL OR WRITTEN) OR OTHER ACTIONS OF EITHER PARTY RELATED TO THIS AGREEMENT OR THE LPA.

  THIS PROVISION IS A MATERIAL INDUCEMENT FOR THE COMPANY TO ACCEPT THIS AGREEMENT.

**[This space intentionally left blank]**

## Agreement Signature Page

The undersigned hereby represents, agrees and certifies that (i) the undersigned has carefully read and understands the Memorandum, Agreement and the LPA, and (ii) the execution of this signature page constitutes the execution of, and agreement to be bound by all the provisions of, the Agreement and the LPA. This page will serve as counterpart signature pages to both the Agreement and the LPA.

**IN WITNESS WHEREOF**, the Subscriber(s) has/have executed (or caused to be executed on its/their behalf) this Agreement this _____ day of _____ 201__.

**PPM Dated** _____

---

**SUBSTITUTE IRS FORM W-9 CERTIFICATION**

I (we) declare that the information supplied in this subscription agreement is true and correct and may be relied upon by the Company in connection with my (our) investment in the Company. Under penalties of perjury, each investor signing below certifies that (1) the number shown in the Investor Social Security Number/ Taxpayer Identification Number field in Section 1 of this form is my correct taxpayer identification number (or I am waiting for a number to be issued to me), and (2) I am not subject to backup withholding because (a) I am exempt from backup withholding, or (b) I have not been notified by the Internal Revenue Service (IRS) that I am subject to backup withholding as a result of a failure to report all interest or dividends, or (c) the IRS has notified me that I am no longer subject to backup withholding, (3) I am a U.S. person (including a non-resident alien, and (4) the FATCA code entered on this form (if any) indicating that the payee is exempt from FACTA reporting is correct. Item 4 is not being collected therefore does not apply. **NOTE: You must cross out item (2) above if you have been notified by the IRS that you are currently subject to backup withholding because you have failed to report all interest and dividends on your tax return.** The Internal Revenue Service does not require your consent to any provision of this document other than this certification, which is required to avoid backup withholding.

---

**For an Individual or Joint Subscriber who is a Natural Person (Including IRA Owner):**

_____          _____
(Signature)                              (Signature of Joint Subscriber, if any)

_____          _____
Print Name                               Print Name of Joint Subscriber

**For a Subscriber that is an Entity:**

_____          *If Applicable*
(Print Name of Entity)

_____          _____
Signature By:                            Signature By:

_____          _____
Printed Name:                            Printed Name:

_____          _____
Title:                                   Title:

_____
Address (if different than Section 1)

_____

_____
City            State            Zip

| Custodian Approval |
|---|
| |

**For IRA/CRT/Custodial Accounts:**

Custodian Name    _____

Account#          _____

## DISTRIBUTIONS/DIVIDENDS

**Distributions:**

**Distributions for investments in the Company will be sent as directed below.**

☐   Distribution payment sent to the person(s) or entity listed above under *Section 1 Subscriber Information*

☐   Distribution payment sent to a **different** address than the one listed under *Section 1 Subscriber Information*

Name:
_____

Address:
_____

_____

☐   Distribution payment sent to a Brokerage Account

Name:
_____

Address:
_____

Account Number:
_____

☐   Distribution payment sent via ACH

Bank Name:
_____

Routing Number:
_____

Account Number:
_____

☐   Distribution payment sent to a custodian-held account (i.e. IRAs). Distributions will be sent to the brokerage account from which funds were invested and position is held

**GPB Holdings II, LP**

**NOTICE TO PROSPECTIVE INVESTORS REGARDING COMPLIANCE WITH ANTI-MONEY LAUNDERING REGULATIONS**

To ensure compliance with statutory and other generally accepted principles relating to anti-money laundering, GPB may, in its sole discretion, require written verification ("Anti-Money Laundering Compliance Documents") of identity from any person that submits completed Subscription Documents to the Company prior to accepting such subscription. Depending on the circumstances of each proposed subscription, a detailed verification may not be required if: (i) the investor is a recognized financial institution; or (ii) the investor makes the payment from an account held in the investor's name at a recognized financial institution. These exceptions will only apply if the financial institution referred to above is within a country recognized as having sufficient anti-money laundering regulations, such as a member state of the European Union that is subject to the EC Money Laundering Directive or one of the countries that make up the Financial Action Task Force ("FATF") and that is subject to the FATF recommendations.

To verify the identity of Subscriber(s) in the Company, please provide each of the following Verification Documents (as applicable):

If an individual please provide:

☐  A copy of a government-issued photo ID (*e.g.*, a driver's license or passport) of the individual.

If an entity please provide:

☐  A copy of a government-issued photo ID (*e.g.*, a driver's license or passport) of the authorized signatory;

☐  The entity's banking information relating to the bank from which the funds are to be wired to and from your account (including name, physical address, telephone number, bank account number and a contact at the bank);

☐  Evidence of the entity's existence (*e.g.*, a certified copy of the entity's organizational documents or a Certificate of Good Standing from the jurisdiction of organization); and

☐  A written representation that the entity has anti-money laundering policies and procedures in place and that these are applied on a consistent basis.

GPB reserves the right to request such additional information as is necessary to verify the identity of any person attempting to subscribe to the Company. Pending the provision of evidence satisfactory to GPB as to identity, the closing of a sale of Units to such person may be delayed at the absolute discretion of GPB. If within a reasonable period of time following a request for verification of identity, GPB has not received evidence satisfactory to it in its sole discretion, it may refuse to accept the proposed subscription, in which event all subscription monies will be returned without interest to the account from which such monies were originally debited. Subscription monies also may be rejected by GPB if the remitting bank or financial institution is unknown to GPB.

> THE OFFER AND SALE OF UNITS HEREBY HAS NOT BEEN REGISTERED WITH THE SECURITIES AND EXCHANGE COMMISSION OR THE SECURITIES COMMISSION OF ANY STATE IN RELIANCE UPON AN EXEMPTION FROM REGISTRATION UNDER THE SECURITIES ACT OF 1933, AS AMENDED (THE "1933 ACT"), AND, ACCORDINGLY, MAY NOT BE OFFERED OR RESOLD EXCEPT PURSUANT TO AN EFFECTIVE REGISTRATION STATEMENT UNDER THE 1933 ACT OR PURSUANT TO AN AVAILABLE EXEMPTION FROM, OR IN A TRANSACTION NOT SUBJECT TO, THE REGISTRATION REQUIREMENTS OF THE 1933 ACT AND IN ACCORDANCE WITH APPLICABLE STATE SECURITIES LAWS.

## CERTAIN NOTICES

This Confidential Private Placement Memorandum (this "Memorandum") is being furnished on a confidential basis and is intended solely for the use of the recipient in connection with this offering. Each recipient, by accepting delivery of this Memorandum agrees not to copy or divulge the contents hereof to any person other than a legal, business, investment or tax advisor under the same duty of confidentiality and only in connection with obtaining the advice of any such persons with respect to this offering and not to reproduce or redistribute this Memorandum in whole or in part.

The Memorandum relates to the offering (the "Offering") of Class A Limited Partnership Units (the "Class A Units") by GPB Holdings II, LP, a Delaware limited partnership (the "Company," "we" or "us").  We are offering $350,000,000 in Class A Units, which amount may be increased at the sole discretion of GPB Capital Holdings, LLC ("GPB"), our general partner (the "General Partner," "GPB" or the "GP"), up to an anticipated maximum amount of $500,000,000.

Class A Units are suitable only for sophisticated investors (i) who do not require immediate liquidity for their investments, (ii) for whom an investment in the Class A Units does not constitute a complete investment program and (iii) who fully understand and are willing to assume the risks involved in our acquisition program.  An investment in the Class A Units involves significant risks. Prospective investors should carefully consider the information under "Risk Factors" starting on page 25.

The Class A Units have not been approved or disapproved by the Securities and Exchange Commission (the "SEC") or the securities regulatory authority of any state, nor has the SEC or any such authority passed upon the accuracy or adequacy of this Memorandum. Any representation to the contrary is unlawful. The Class A Units are being offered as a private placement to a limited number of investors, will not be registered under the 1933 Act, or the securities laws of any state or foreign jurisdiction, may not be sold or transferred without compliance with applicable federal, state, or foreign securities laws and may only be transferred in compliance with (as applicable) our Agreement of Limited Partnership dated April 13, 2015 (as the same may be amended from time to time, the "LPA"). There is no public market for the Class A Units, and none is expected to develop. The Company will not list Class A Units on any exchange.

The information in this Memorandum is given as of the date on the cover page, unless another time is specified, and investors may not infer from either the subsequent delivery of this Memorandum or any sale of Class A Units that there has been no change in the facts described since that date.

No representations or warranties of any kind are intended or should be inferred with respect to the economic return that may accrue to investors. Prospective investors must consider this investment to be highly illiquid. This Memorandum does not constitute an offer to sell or the solicitation of an offer to buy the Class A Units by any person in any state or jurisdiction in which it is unlawful for such person to make such offer, solicitation or sale. No offering literature or advertising in any form other than this Memorandum and the agreements and documents referred to herein may be considered to constitute an offering of the Class A Units.

In order to invest in the Company, investors will be required to execute a subscription agreement and related investor questionnaire (the "Subscription Agreement"), attached in Exhibit C, which, among other things, requires that the investor certify as to its status as an "accredited investor" (as defined in the 1933 Act). We reserve the right, notwithstanding any such offer, to withdraw or modify the Offering and to reject any subscriptions for the Class A Units in whole or in part for any or no reason.

We do not intend to register as an investment company under the Investment Company Act of 1940, as amended (the "1940 Act").  GPB is registered as an investment adviser under the Investment Advisers Act of 1940, as amended (the "Advisers Act"), though such registration does not imply any type of qualification. GPB's Disclosure Brochure ("Brochure"), which provides additional information about GPB, its business and management, is attached to this Memorandum as Exhibit B.

To assist us in monitoring our status under the Employee Retirement Income Security Act of 1974, as amended ("ERISA") so that our assets are not deemed to be "plan assets," we will require each prospective investor to make certain representations regarding its status under ERISA and the Internal Revenue Code of 1986, as amended (the "Code"). Also, each investor will be required to obtain from any potential transferee of Class A Units, for our benefit, representations as to the potential transferee's status under ERISA and the Code, among other matters. *See "Certain Tax, ERISA & Regulatory Matters."*

THIS MEMORANDUM DOES NOT PURPORT TO CONTAIN ALL OF THE INFORMATION THAT A PROSPECTIVE INVESTOR MAY DESIRE IN INVESTIGATING US AND THE SUITABILITY OF PURCHASE OF THE CLASS A UNITS. EACH INVESTOR MUST CONDUCT AND RELY UPON HIS/HER OR ITS OWN EVALUATION OF THE COMPANY AND OF THE TERMS OF THE OFFERING, INCLUDING THE MERITS AND RISKS INVOLVED, IN MAKING AN INVESTMENT DECISION. THIS MEMORANDUM IS CURRENT AS OF THE DATE SHOWN ON THE COVER. CHANGES IN OUR STATUS AND AFFAIRS MAY OCCUR AFTER THE DATE ON THE COVER OF THIS MEMORANDUM.

No person other than GPB has been authorized to give any information other than that contained in this Memorandum, or to make any representations in connection with the Offering. This Memorandum contains summaries of certain agreements and other documents. While we believe these summaries are accurate, reference is made to the actual agreements and documents for more complete information about the rights, obligations and other matters in the agreements and documents. Consequently, each offeree must carefully read the documents included and described in this Memorandum before making a decision to invest in the Class A Units. All summaries are qualified in their entirety by this reference. Copies of these agreements and other documents will be made available upon request.

The contents of this Memorandum and any other communications from us or any of our officers, Limited Partners, employees, agents or affiliates should not be construed as legal, tax, investment or other advice. Each offeree should consult his or her own legal, tax and financial advisors to ascertain the merits and risks of the transactions described herein prior to subscribing for the Class A Units. Each prospective investor is invited to meet with our representatives and to discuss with, ask questions of and receive answers from such representatives concerning the terms and conditions of this Offering and to obtain any additional information, to the extent that such representatives possess such information or can acquire it without unreasonable effort or expense, necessary to verify the information contained herein.

Investors are asked to pay particular attention to *"Certain Tax, ERISA & Regulatory Matters"* which is a summary of certain United States federal income tax rules and considerations affecting investors, us and our operations and does not purport to be a complete analysis of all relevant tax rules and considerations or a complete listing of all potential tax risks inherent in purchasing, holding or disposing of Class A Units. Each prospective investor is urged to consult its tax advisor in order to understand fully the United States federal, state, local and any non-U.S. tax consequences of such an investment in its particular situation.

Certain of the factual statements made in this Memorandum are based upon information from various sources believed by GPB to be reliable. Neither we nor GPB has independently verified any of such information and will have no liability associated with the inaccuracy or inadequacy thereof.

FOR FLORIDA INVESTORS

THE CLASS A UNITS ARE BEING SOLD TO, AND ACQUIRED BY, THE INVESTOR IN A TRANSACTION EXEMPT UNDER §517.061(11) OF THE FLORIDA SECURITIES AND INVESTOR PROTECTION ACT. THE CLASS A UNITS HAVE NOT BEEN REGISTERED UNDER THAT ACT IN THE STATE OF FLORIDA. IN ADDITION, THE FLORIDA SECURITIES ACT PROVIDES THAT WHERE SALES ARE MADE TO 5 OR MORE FLORIDA INVESTORS, ALL FLORIDA INVESTORS SHALL HAVE THE PRIVILEGE OF VOIDING THE PURCHASE WITHIN 3 DAYS AFTER THE FIRST TENDER OF CONSIDERATION IS MADE BY SUCH PURCHASER TO A COMPANY, AN AGENT OF A COMPANY OR AN ESCROW AGENT, OR WITHIN 3 DAYS AFTER THE AVAILABILITY OF THAT PRIVILEGE IS COMMUNICATED TO SUCH PURCHASER, WHICHEVER OCCURS LATER.

**FORWARD-LOOKING STATEMENTS**

Certain statements contained in this Memorandum, including statements containing the words "believes," "anticipates," "intends," "plans," "expects," or words of similar import, constitute "forward-looking statements." Such forward-looking statements involve known and unknown risks, uncertainties and other factors that may cause our actual results, performance or achievements to be materially different from any future results, performance or achievements expressed or implied by such forward-looking statements. Certain of these factors are discussed in more detail elsewhere in this Memorandum, including under *"Summary of Key Terms," "Risk Factors," and "Related Parties & Conflicts of Interest."* Given these uncertainties, prospective investors are cautioned not to place undue reliance on such forward-looking statements. We disclaim any obligation to update any such factors or to announce the result of any revisions to any of the forward-looking statements contained herein to reflect future events or developments.

In addition, all materials or documents supplied by us, including any pro forma budgets or cash flows, should be considered speculative and are qualified in their entirety by the assumptions, information and risks disclosed in this Memorandum. The projections are based on assumptions made by GPB regarding future events. There is no assurance that actual events will correspond with these assumptions. Actual results for any period may or may not approximate projections and may differ significantly. Investors should consult with their tax and business advisors about the validity and reasonableness of any factual, accounting and tax assumptions. Due to the significant uncertainties inherent in any prediction of future events, the inclusion of such forward-looking statements should be regarded as illustrations only and should not be treated as a representation made by us as to the certainty of future results and not relied upon in making an investment decision concerning this Memorandum.

Neither we nor any other person or entity makes any representation or warranty as to our future profitability or of an investment in Class A Units.

This Memorandum is part of a continuous offering process. Periodically, as we acquire subsidiaries or we have other material developments, we may, but are under no obligation to provide a supplement, or amend the Memorandum, which may add, update or change information contained in this Memorandum. Any statements that we make in this Memorandum, as supplemented, will be modified or superseded by any inconsistent or updated statement made by us in a subsequent supplement or amendment to the Memorandum.

**This Memorandum is confidential and proprietary to us. It is provided to the recipient in confidence with the understanding that the recipient will observe and comply with the terms and conditions set forth in this paragraph and the paragraphs below. The recipient's acceptance and retention of this Memorandum constitutes an agreement to be bound by such terms and conditions. If any of such terms are not acceptable, this Memorandum should be promptly returned to:**

**GPB Holdings II, LP**

**c/o: GPB Capital Holdings, LLC**
**535 West 24th Street, Floor 4**
**New York, NY 10011**
**Telephone: (877) 489-8484**
**Facsimile: (516) 487-0166**

**TABLE OF CONTENTS**

SUMMARY OF KEY TERMS ................................................................................................................1

SUMMARY OF GPB ACQUISITION PROGRAM ...............................................................................9

MANAGEMENT.................................................................................................................................21

STRUCTURE DIAGRAM ..................................................................................................................24

RISK FACTORS ................................................................................................................................25

SELLING FEES .................................................................................................................................43

COMPANY FEES & EXPENSES ......................................................................................................44

ALLOCATION OF PROFITS & LOSSES .........................................................................................44

RELATED PARTIES & CONFLICTS OF INTEREST .......................................................................45

SUMMARY OF THE LPA ..................................................................................................................46

SERVICE PROVIDERS .....................................................................................................................51

CERTAIN TAX, ERISA & REGULATORY MATTERS .....................................................................52

INVESTOR QUALIFICATION ...........................................................................................................61

PLAN OF PRIVATE PLACEMENT ...................................................................................................63

RESTRICTIONS ON TRANSFER OF UNITS ...................................................................................64

USA PATRIOT ACT COMPLIANCE .................................................................................................65

ADDITIONAL INFORMATION ..........................................................................................................67

PRIVACY NOTICE ............................................................................................................................67

AVAILABILITY OF PRINCIPAL DOCUMENTS ...............................................................................67

EXHIBIT A: GPB HOLDINGS II, LP AGREEMENT OF LIMITED PARTNERSHIP

EXHIBIT B: DISCLOSURE BROCHURE OF GPB CAPITAL HOLDINGS, LLC

EXHIBIT C: SUBSCRIPTION DOCUMENTS

## SUMMARY OF KEY TERMS

*The following is a summary of the terms of the Offering and a description of the Company. It is qualified in its entirety by the more detailed information contained elsewhere in this Memorandum and by the terms and conditions of the LPA and the Subscription Agreement and other subscription documents (as the same may be amended from time to time, the "Subscription Documents") related to the Offering, each of which should be read carefully by any prospective investor before investing. Capitalized terms used below and not otherwise defined will have the same meaning as provided in the LPA. If any disclosure made herein is inconsistent with any provision of the LPA or Subscription Documents, the provision of the LPA or Subscription Documents, as the case may be, will control. References below to other sections of this Memorandum are for convenience only and are not the only sections that should be considered with respect to the term summarized.*

**The Company** .................... The Company was organized as a Delaware limited partnership on April 13, 2015 to operate as a private holding company.

**Units** ................................... Under this Memorandum, we are offering Class A Units at a price of $50,000 per Unit.

**Investment Objective** ........ We were formed to (i) acquire controlling interests in income producing, middle-market private companies in North America (the "Portfolio Companies"), (ii) provide managerial assistance to such companies, and (iii) further develop the Portfolio Companies' operations and increase cash flow. We will focus on acquisitions of automotive retail, managed IT services and life sciences companies with strong management, earnings and market position.

We will generally hold controlling interests in Portfolio Companies for at least two years and play an active role in managing and operating them by maintaining a controlling position on their boards of directors and appointing one or more persons to serve as their executive officers. We will nonetheless consider divestment opportunities as they arise.

We generally expect to allocate our assets among our three targeted industry sectors: Automotive Retail, Managed IT Services and Life Sciences, though we may make acquisitions in other sectors as well.  When fully invested and subject to 1940 Act-related limitations, we generally expect our portfolio to be comprised of approximately 30-50% Automotive Retail, 20-30% Managed IT Services, 15-20% Life Sciences and 20-30% in Portfolio Companies in other sectors in which GPB's personnel have relevant experience.

There can be no assurance that we will achieve our objective or avoid substantial losses, including the loss of the investor's entire investment. An investor should not make an investment in the Class A Units with the expectation of sheltering income. Investors are urged to consult with their financial advisors before investing in the Class A Units. *See "Summary of GPB Acquisition Program" and "Risk Factors."*

**GPB** .................................... GPB serves as our General Partner. Under the LPA, GPB, to the exclusion of our limited partners ("Limited Partners," "LPs" or "Investors"), conducts and manages our business.  GPB controls all major decisions concerning the Company and is responsible for reporting and monitoring distributions to the Unit holders.  *See "Management."*

**Special LP** .......................... GPB's principals and certain other individuals and entities that have assisted and may in the future assist in our operations are and/or will be members in GPB SLP, LLC, a Delaware limited liability company (the "Special LP"). As described in more detail below, the Special LP will receive a profit allocation from the Company. The identity of the members of the Special LP and their relative ownership interests in that entity may change over time to reflect additions to and withdrawals from the Special LP, as determined by the Special LP and its governance documents.

The placement agent(s) for this Offering will be eligible to receive ownership interests in the Special LP in the discretion of the Special LP.

| | |
|---|---|
| **Investment Committee .....** | We have an Investment Committee composed of five members who are nominated, appointed and removed by GPB. All Portfolio Company acquisition and disposition decisions require the approval of at least 75% of the Investment Committee members. *See "Management."* |
| **Advisory Committee .........** | We have an Advisory Committee composed of three members who are appointed by GPB, but must be independent of GPB, the Company and their respective affiliates, in a manner proscribed for companies listed on the New York Stock Exchange. *See §3.16 of the LPA.* Although we do not intend to engage in any future Related Party Transactions (described below), such transactions require the Advisory Committee's approval, which approval must include the Advisory Committee's determination that the transaction is in our best interest. *See "Management" and "Related Parties & Conflicts of Interest."* |
| **Auditor ...............................** | Our books of account and records, prepared on the basis of generally accepted accounting principles in the U.S. ("<u>GAAP</u>"), will be audited annually. McGladrey LLP, a firm registered with the Public Company Accounting Oversight Board ("<u>PCAOB</u>"), has been engaged as our auditor. GPB retains the authority to engage and dismiss any such auditors.  Additionally, the financial statements of GPB and each Portfolio Company will be annually audited, and LPs will be provided GPB's audited financial statements annually, and we will make the Portfolio Companies' audited financial statements available upon LP request. |
| **Administrator.....................** | GPB has engaged a financial services provider selected by it in its discretion— Trident Fund Services (the "<u>Administrator</u>")—to perform various administrative services for us.  *See "Management."* |
| **Risks...................................** | In general, investment in the Class A Units involves various and substantial risks, including the risks associated with our acquisitions and operation of Portfolio Companies, risks for certain tax-exempt investors, risks related to the limited transferability of Class A Units, our lack of operating history, our dependence upon key personnel, conflicts of interest and certain tax risks. *See "Risk Factors" and "Certain Tax, ERISA & Regulatory Matters."* |
| **Related Parties & Conflicts of Interest ..........** | GPB, the Special LP and/or their respective affiliates, officers, directors, agents and equity-holders (collectively the "<u>Related Parties</u>") may have potential or actual conflicts of interest in connection with the activities of, and investments by, us. Related Parties may serve as accountants, advisors or managers to Portfolio Companies or other companies and conduct investment activities for their own accounts. Such other entities, clients or accounts may have investment objectives or may implement investment strategies similar to ours. |
| | Related Parties, such as Mr. Gentile and others, have or will also provide us benefits, such as personally guaranteeing certain floor plans. |
| | The Related Parties and certain broker-dealers involved in the Offering may have investments in the entities in which we invest or may make investments in such entities with us. The Related Parties may have investments in certain of the entities managed by a Related Party, and/or serve as officers and/or directors (and receive fees or other compensation in connection therewith) of entities in which we invest. Although we do not contemplate acquiring an asset or Portfolio Company in which a Related Party has an interest in the future (a "<u>Related Party Transaction</u>"), if we do, we will obtain a third party evaluation of the transaction in connection with the Advisory Committee's consideration of the transaction.  Further, we will not enter into a Related Party Transaction involving the sale by a Related Party of an economic interest.  Additionally, the Advisory Committee must unanimously approve any Related Party Transaction by determining that the transaction is in our best interest after obtaining an independent evaluation by a nationally-recognized firm with qualified personnel holding such accreditations appropriate to value a specific industry or asset. |

As a result of the foregoing, the Related Parties may have conflicts of interest in allocating their time and activity between us and other clients, in allocating investments between us and other clients and in effecting transactions for us and other clients, including ones in which the Related Party may have a greater financial interest. *See "Risk Factors" and "Related Parties & Conflicts of Interest."*

**Allocation of Investment Opportunities....................**  GPB or its affiliates may organize other vehicles (each, a "<u>Vehicle</u>") that may wish to invest in companies in the same target sectors we are pursuing, and Vehicles may wish to co-invest with us.  If a potential Portfolio Company acquisition fits the investment objective of the Company and one or more Vehicles, and each have capital available to invest in the Portfolio Company, GPB will allocate the investment opportunity among us and the Vehicles taking into account all relevant factors, including:

- The amount of capital each participant has available to invest, as compared to the total amount of capital each participant anticipates raising;
- The extent to which the potential Portfolio Company deviates from the participants' investment objectives; and
- The extent to which the potential acquisition would promote the participants' sector, geographic, brand or other diversification goals.

To mitigate any potential conflicts of interests, GPB will avoid organizing any Vehicle with economic structures that are different.  *See "Risk Factors" and "Related Parties & Conflicts of Interest."*

**Tax Consequences ...........**  An investment in the Class A Units involves certain tax consequences, which should be evaluated by each potential Limited Partner prior to investing. *See "Certain Tax, ERISA & Regulatory Matters."*

**Leverage ............................**  We expect to utilize debt, or leverage, on a limited basis to help finance our acquisitions of some Portfolio Companies.  Under the LPA, we may not incur debt exceeding 50% of our expected total assets.  *See "Risk Factors—General Investment Risks—Leverage" and "Summary of the LPA."*

**Investor Qualification .......**  Class A Units are offered in the United States to persons that are "accredited investors," as defined in Regulation D ("<u>Regulation D</u>") under the 1933 Act ("<u>Accredited Investor</u>"), purchasing for their own account or one or more accounts with respect to which they exercise sole investment discretion.

An investment in the Class A Units is suitable only for persons who have adequate means of providing for their current needs and personal contingencies and have no need for liquidity in their investment. An investment in the Class A Units should not be made by any person who (i) cannot afford a complete loss of investment and (ii) has not carefully read or does not understand this Memorandum, including the portions concerning the risks and the income tax consequences of an investment in the Class A Units. GPB, in its sole discretion, may decline to admit any subscriber to the Class A Units for any reason. *See "Investor Qualification."*

**The Offering.......................**  We are offering $350,000,000 of Class A Units, which amount may be increased at the sole discretion of GPB, up $500,000,000 or more.

GPB, the Special LP and their affiliates may purchase Units on the same terms as the other Investors.

Offers and sales of the Class A Units are made on a "best efforts" basis by broker-dealers who are members of the Financial Industry Regulatory Authority, Inc. ("<u>FINRA</u>"), or recommended by investment advisers without compensation from the Company (collectively, the "<u>Selling Group</u>"). Members of the Selling Group may include investors in the Units. We may agree to indemnify members of the Selling Group against certain liabilities, including liabilities under federal and state securities laws, or to contribute to payments that they may be required to make in respect of those liabilities.

3

**Selling Fees** ........................ A portion of the proceeds from your subscription will be used to pay brokerage fees and commissions to members of the Selling Group, as follows:

*Selling Commissions & Due Diligence Fees*. We may pay selected dealers up to 8% of the gross proceeds from the Offering as follows: 7% for selling commissions and 1% as a due diligence allowance, to the extent permitted by applicable securities laws (the "Commissions"). We reserve the right to pay lower or no Commissions for sales of Class A Units to certain investors.

*Placement & Marketing Support Fees*. We may pay an additional cash placement and marketing support fee to selected dealers for assistance with the placement, marketing and due diligence of the Offering of up to 1.75% of the gross proceeds of the Offering, a portion of which may be re-allowed to selected dealers (the "Placement Fee").

*Wholesaling Fees*. We may also pay registered representatives of broker-dealers engaged in wholesaling activities a marketing and distribution allowance of up to 1.25% of the gross proceeds received from the Offering (the "Wholesaling Fee," together with Placement Fees and Commissions, the "Selling Fees"), a portion of which may be re-allowed to selected dealers.

GPB reserves the right to pay Selling Fees that are less than or more than the respective percentages above, so long as the aggregate Selling Fees do not exceed 11%.

Additionally, GPB may permit some investors to purchase Class A Units with lower or no Selling Fees, and GPB may treat those capital accounts as if the full amount of Selling Fees were assessed.

Upon acceptance of a Limited Partner's subscription, a portion of such Limited Partner's subscription will be used to pay the Selling Fees. The Selling Fees are in addition to the Managerial Assistance Fees, Acquisition Fees, Partnership Expenses and Organizational Expenses payable by us. *See "Selling Fees" and "Company Fees & Expenses."*

The Selling Fees will be different than the fees and commissions paid by investors in the Class B Units we are separately offering to clients of independent investment advisers.

**Side Letters & Additional Unit Classes**........................ We may from time to time enter into side letters or other similar agreements (collectively, "Side Letters") with one or more prospective Investors that provide those Investors with additional and/or different rights (including access to information, minimum investment amounts or liquidity terms) than such Investors otherwise have under the terms of this Memorandum. GPB may enter into Side Letters with any party as it may enter into Side Letters in its discretion, and neither we nor GPB will be required to notify any LP of any such Side Letters or any of their rights or terms, nor will GPB be required to offer such terms to any other LP. GPB is also authorized under the LPA to create additional Unit classes, provided such other classes do not modify Class A Unit holders' economic rights. *See "Summary of the LPA."*

**Fees & Expenses** .............. We will bear the following fees and expenses:

*Managerial Assistance Fee*: GPB receives an annualized fee (the "Managerial Assistance Fee"), payable by us quarterly of 2.0% per annum on the Capital Contributions made to the Company for providing managerial assistance and other services to us and our Portfolio Companies. Those services include conducting our day to day operations as described below, along with providing reports to LPs and other duties assumed under the LPA.

GPB has the right to assign all or a portion of the Managerial Assistance Fee to properly licensed third parties (where licensing is required) for services rendered by persons in connection with the offering of Units, including placement agents that are members of the Selling Group.

*Acquisition Fee*. Upon the consummation of any acquisition of a Portfolio Company, we will pay qualified third parties, including members of the Selling Group (other than persons holding any financial interest in the Portfolio Company), an acquisition fee of 1.75% of the total acquisition cost of the Portfolio Company (the "Acquisition Fee").  The Acquisition Fee may be paid in consideration of services provided in our Offering, as well as identifying, structuring and providing us with advice on our acquisitions. We presently anticipate paying one third party (who is a member of the Selling Group) Acquisition Fees, and we may identify other third parties for which we determine such compensation would be appropriate.

*Organizational Expenses*: All expenses, up to 1.25% of the gross proceeds received by (or expected to be received by) us from the Offering, incurred by us or GPB in connection with the Offering, the organization of the Company and GPB, including legal and accounting fees and expenses and any management and consulting agreements ("Organizational Expenses"), will be paid by us. Any Organizational Expenses in excess of such amount will be paid by GPB or its affiliates.

While GPB is entitled to full reimbursement of our Organizational Expenses up to the cap (which is in part based on our expected Offering size), it likely may defer reimbursements of a significant portion of our Organizational Expenses in its discretion until the time at which GPB believes our returns can be appropriately balanced with Organizational Expense reimbursements. *See "Summary of the LPA"* and the LPA.

*Partnership Expenses*. We will pay our operating expenses, including financing and other transactions fees, costs and expenses, professional and insurance expenses, expenses for personnel to attend industry conferences, litigation-related and indemnification expenses, administrative expenses, and any taxes, fees or other governmental charges levied against us (collectively, "Partnership Expenses").  Because GPB provides operational services to us and other Vehicles it manages, GPB allocates such expenses among its clients on a pro-rata basis, as further described below under *"Related Parties & Conflicts of Interest—Expense Allocations."*

**Plan of Distribution** ........... We intend to conduct the Offering and receive subscriptions for Class A Units on an ongoing basis until the earlier of (i) the date GPB determines, in its sole discretion, to discontinue the Offering, or (ii) the date we have received subscriptions for $500,000,000 of Units (which amount may be increased by the GP). The Offering period will terminate on June 30, 2017 unless such date is extended by GPB up to two one-year periods in its discretion. Subject to GPB's discretion, we intend to receive subscriptions for Units at any time; provided that we expect to accept such subscriptions and admit new Limited Partners on a monthly basis on the first business day of each calendar month following receipt of such subscription (a "Monthly Closing Date") (except as otherwise determined by GPB in its sole discretion).

Upon admission, each LP will contribute in cash and/or other items of value (as determined in good faith by GPB) in the amount in such Limited Partner's Subscription Agreement. The minimum investment is generally $50,000 (including Selling Fees), subject to GPB's discretion to accept subscriptions for lesser amounts or, upon giving notice to the Limited Partners, to require a higher minimum. GPB may, in its sole discretion, reject any initial subscription request, or temporarily or permanently suspend the Offering.

**Capital Contributions** ....... Investors must purchase a minimum of $50,000 of Class A Units. GPB may, in its discretion, reject any subscription request, in whole or in part for any or no reason. All subscriptions for Class A Units are irrevocable.

We will establish and maintain on our books a capital account ("Capital Account") for each LP into which such Limited Partner's capital contribution ("Capital Contribution"), net of Selling Fees (such net amount being referred to as the "Net Capital Contribution") will be credited.

**Subscription Procedures .**   To subscribe for Class A Units, a new subscriber must (i) complete, execute and deliver to the Administrator the Subscription Documents and (ii) arrange for payment of the amount of the subscription in accordance with the instructions in the Subscription Documents. Generally, existing LPs subscribing for additional Class A Units need only fill out an additional contribution form and update information in the Subscription Documents that may have changed.

GPB generally requires receipt of Subscription Documents at least three business days prior to the requested Monthly Closing Date. We will hold subscription proceeds paid in connection with the Offering until the subscription is accepted or rejected by us. Subscriptions will only be accepted on a "<u>Subscription Effective Date</u>" (the first day of the month following receipt and acceptance of the Subscription Documents and Subscription funds by the Administrator). Subscriptions that are not accepted will be returned as promptly as practicable after the relevant requested Monthly Closing Date. Subscription funds must be credited to us at least three business days prior to the requested Monthly Closing Date in order for a subscription to be accepted (except as otherwise determined by GPB in its discretion).

A subscriber admitted to the Company receives, in exchange for its initial Capital Contribution and any subsequent Capital Contribution, Class A Units representing a proportionate share of the Company at that time, based upon the Units of all LPs.

**Limitation of Liability; Indemnification..................**   The LPA limits GPB's liability and provides for indemnification of GPB, the Special LP, their respective affiliates, as well as members of the Advisory and Investment Committees. We are authorized to enter into agreements, including the administration and custodian services agreements that provide for indemnification of third parties in connection with transactions with or services provided to us. *See "Summary of the LPA"* and the LPA.

**Distributions.......................**   We will make cash distributions when determined by GPB in its discretion. At any time GPB may cause us to make a distribution in cash or retain and/or reinvest cash otherwise available for distributions. GPB intends for us to make distributions of cash, if any, to the LPs beginning three months after their subscription at annual return rates targeted to be 8.0% of LPs' gross Capital Contributions (though distributions could be more, less or none at all, depending on our cash flow) (the "<u>Target Return</u>"). We will make distributions of cash in the following amounts and order of priority:

(i) <u>first</u>, until the LPs have received (when aggregated with all previous distributions to the LPs) all of their respective Net Capital Contributions, and in the GP's discretion, either (a) the Target Return to each LP, or (b) to the LPs in proportion to their unreturned Net Capital Contributions;

(ii) <u>second</u>, to the LPs in proportion to their unpaid Hurdle until the LPs have received an amount that when aggregated with all previous distributions to the LPs for all prior periods, is equal to the sum of (a) the Limited Partners' gross Capital Contributions, plus (b) a cumulative return of 8% per annum (the "<u>Hurdle</u>"); with the Hurdle paid on LPs' gross Capital Contributions, less distributions, measured on the last day of each calendar month and then averaged over the preceding 12 months, at the end of each calendar year;

(iii) <u>third</u>, subject to any offset of any tax distributions received as described below, 100% to the Special LP until the aggregate distributions made to the Special LP equal 20% of the sum of (a) the amount paid to the LPs holding Class A Units above their Net Capital Contributions described in clause (ii)(a) above, plus (b) the amount paid to the LPs holding Class B Units above their gross Capital Contributions, plus (c) the aggregate distributions made to the Special LP (the "<u>Catchup</u>"); and

(iv) <u>thereafter</u>, 80% to the LPs in proportion to their Capital Contributions and (subject to the offset of any tax distributions made to the Special LP described below) 20% to the Special LP (the "<u>Performance Allocation</u>").

Additionally, to the extent the Special LP or its members incur tax liability resulting from the recognition by the Special LP of the amounts distributable under clauses (iii) and (iv) above, and the Special LP has not received a distribution to cover such tax liability, GPB may cause the Company to advance amounts sufficient to cover such tax liability to the Special LP. Any such tax-related advances will offset any future distributions that the Special LP is entitled to.  *See "Summary of the LPA."*

Because it is possible the rate of the Target Return could change over time, and because LPs will receive the Target Return based on their gross Capital Contribution until their Net Capital Contributions have been returned, and finally because of differences in the amount of Selling Fees attributable to LPs holding different Unit classes, there may be variances in the amounts individual LPs receive from the Company until the point at which all LPs have received a return of their Net Capital Contributions.  *See "Summary of the LPA."*

We reserve the right to return Capital Contributions to LPs as part of our distributions, though we do not presently have plans to do so.

|  |  |
|---|---|
| **Term & Termination ..........** | While we generally expect the Company to operate for approximately six to eight years (the *Company's* term differs from the length of time we may hold a *Portfolio Company* (which we will hold for at least three to five years)), the Company's term will expire on the earliest of: (i) a determination by GPB that the Company should be wound up, (ii) the date we divest our ownership interest in the last Portfolio Company, (iii) the termination, bankruptcy, insolvency or dissolution of GPB, (iv) the sale of substantially all of our assets, (v) upon the written consent of all of our Partners to terminate, (vi) an event of withdrawal of GPB, or (vii) a court decree requiring the winding up or dissolution of the Company.  Upon the winding up or termination of the Company, the Company will be wound up in accordance with the LPA. |
| **Redemption & Liquidity....** | Limited Partners do not have the right to redeem their Class A Units except in limited circumstances described below under *"Summary of the LPA." See the LPA*. |
| **GPB Removal ...................** | GPB may be removed as General Partner upon the vote of 20% of the LPs to remove upon any of the following events to occur: (i) a final, non-appealable judicial determination that the General Partner has committed fraud, gross negligence or willful misconduct, or (ii) (A) an action or proceeding under the United States Bankruptcy Code is filed against the General Partner and (I) such action or proceeding is not dismissed within 90 days after the date of its filing or (II) the General Partner files an answer acquiescing in or approving of such action or proceeding, (B) an action or proceeding under the United States Bankruptcy Code is filed by the General Partner or (C) a receiver or conservator is appointed to take control of the General Partner or all or a substantial portion of its property. |
| **Compulsory Transfer or Acquisition of Class A Units ..................................** | The LPA grants GPB the authority to require an LP to transfer his / her Units or, if the LP does not transfer its Units within 21 days, to have the Company sell the Units on such Limited Partner's behalf or to reacquire them for the price paid by such LP. GPB may exercise this power if, in its sole determination, any continued holding of Units by any direct or beneficial Limited Partner might cause or be likely to cause (i) us to be classified as a "publicly traded partnership" under the Code (a "PTP"), (ii) our assets to be considered "plan assets" within the meaning of ERISA or Code §4975 or applicable regulations, (iii) the Units to be required to be registered under the Securities Exchange Act of 1934 (the "1934 Act"), or (iv) some legal, regulatory, pecuniary, tax or material administrative disadvantage to us or the LPs. |
| **Restrictions on Transfers; Withdrawals ....** | LPs may not transfer Units without GPB's consent and unless certain other conditions are satisfied or waived. Any transfers permitted by GPB will be made only on a monthly basis. The transferability of the Units is also restricted by federal and state securities laws. *See "Risk Factors."* The LPA contains customary provisions allowing for the transfer and re-registration of Units upon the death of a Limited Partner, subject to certain conditions. *See "Summary of the LPA" and the LPA.* |

**Periodic Reports** ............... GPB will deliver to each LP, as soon as practicable (generally within 120 days) following the end of each Fiscal Year, beginning in 2016 (i) financial statements for such Fiscal Year prepared on a GAAP basis and audited by a PCAOB-registered firm, and (ii) all necessary tax reporting information to satisfy reporting obligations under the Code with respect to any acquisitions we make in any entities organized or formed in jurisdictions outside the United States.

Within 45 days after the end of each fiscal quarter, GPB will use its best efforts to deliver to each LP an unaudited summary investment report for such quarter. If and when our Units are registered under the 1934 Act and we begin filing quarterly reports with the SEC, the GP may elect to substitute the 10-Qs we file with the SEC for the summary investment report. *See "Summary of the LPA" and the LPA.*

**Fiscal Periods** ................... Our fiscal year ends December 31, and our fiscal quarter ends are March 31, June 30, September 30 and December 31. GPB may change such fiscal period end-dates in its reasonable discretion.

**Employee Benefit Plan Considerations** ................. We may accept contributions from tax-exempt investors, including entities subject to ERISA and/or Code §4975. We expect to qualify as a "venture capital operating company," or we may qualify for another exception under Department of Labor ("<u>DOL</u>") regulations, so that our assets will not be treated as the "plan assets" of such investors. In that connection, prospective investors and subsequent transferees of Units will be required to make certain representations regarding their status under ERISA, and to assist us in monitoring our status under ERISA. If we fail to qualify for a "plan assets" exception, our assets may be considered "plan assets" under ERISA, which could result in adverse consequences to us, GPB and the fiduciaries of benefit plan investors. *See "Certain Tax, ERISA & Regulatory Matters."*

# SUMMARY OF GPB ACQUISITION PROGRAM

**Introduction**

Our investment objective is to provide investors with attractive medium-to-long-term returns by investing in income-producing, middle-market private companies in North America – primarily focused on the Automotive Retail, Managed IT Services and Life Sciences industries.  A key component of our strategy is to concentrate our acquisitions on Portfolio Companies that will allow us to distribute the highest level of income to LPs throughout our acquisition phase.  We will seek to accomplish our objectives primarily by acquiring controlling interests in Portfolio Companies. Our returns will substantially depend on our operation of our Portfolio Companies.

**Investment Strategy**

GPB believes achieving the greatest profitability from portfolio companies begins with concentrating acquisition activities and resources in the right sectors and businesses. For this reason, our Portfolio Companies will generally meet the following fundamental investment criteria:

- High, sustainable current yield, created through strong, consistent cash-flows generated from operations;
- Their strategies and business plan are viable in changing market conditions with the ability to thrive in good times, as well as a bad times;
- They operate in industries or sectors with defined barriers to entry or that have clear, sustainable, competitive advantages, making it difficult for new entrants;
- Their management teams have a verifiable track record of success

**Targeted Industries**

We will focus our acquisitions in three sectors:

- Automotive Retail
- Managed IT Services
- Life Sciences

GPB's senior management have a great deal of experience investing in the Automotive Retail, Managed IT Services and Life Sciences sectors, so the majority of our assets will be allocated in these sectors or in Portfolio Companies that have significant relevance to, or crossover with, these sectors. Because of the experience of GPB's senior management and long-term established relationships, we believe that each of these sectors lends itself well to our acquisition strategy.

We intend to acquire Portfolio Companies in each of these sectors and we generally expect our portfolio to be comprised of approximately 30-50% Automotive Retail, 20-30% Managed IT Services, 15-20% Life Sciences and 20-30% in Portfolio Companies in other sectors in which GPB's personnel have relevant experience.

**GPB Acquisition Parameters**

In addition to identifying potential acquisitions from targeted industries where we believe GPB's experience, relationships and operational expertise create a significant advantage, a typical GPB acquisition also must meet the following parameters:

- Income producing, private, middle-market companies with operations focused in North America;
- Existing businesses, target operating history of at least five years;
- Target acquisition size between $5 million and $75 million;
- Target enterprise values between $10 million and $150 million;
- Transaction types:
    - Growth equity/expansion capital
    - Strategic follow-on acquisitions for Portfolio Companies
    - Restructurings, reorganizations, and refinancing
    - High growth, secured financing

As highlighted in the chart below, GPB is focused on identifying and acquiring controlling interests in expansion-stage companies. We believe there are a significant number of companies within the Automotive Retail, Managed IT Services and Life Sciences sectors fitting our acquisition criteria and acquisition parameters. We believe many of these firms can principally benefit from the operational expertise and firm resources GPB can provide, as well as our capital.



# THE THREE INDUSTRY SECTORS
## —Automotive Retail—

### *Market Opportunity*

The franchised auto dealer industry is the largest retail business segment in the U.S. with annual revenues exceeding $750 billion and over 17,000 franchised new car dealers according to the 2014 NADA Annual Financial Profile of America's Franchised New Car Dealerships. In addition to the size of the industry, it is highly fragmented with greater than 90% of the dealers being privately owned, providing a deep pipeline of potential acquisitions. In many cases, existing dealers will have owned an individual or group of dealerships for many years, even decades, and have no succession plan. Thus, we may represent a viable exit strategy for those dealers seeking a buyer.

The franchised auto dealer industry provides for a high return on investment as illustrated in the table below.



Source: EisnerAmper with assistance from Haig Partners

Over the last 20 years, dealers have averaged a pretax return on equity of 25.0%, and during the economic downturn of 2008 and 2009, the average dealership return on equity was 12.3% and 18.0%, respectively.

In 2014, over 16.5 million new vehicles were sold in the United States versus 2013's 15.6 million; a healthy 5.9% increase. This increase was widespread, with over 70% of the makes contributing to this year-over-year uptrend. As shown in the chart below, as an industry, the automotive retail sector has proven its resilience through challenging economic times. We expect this momentum to continue through 2015 and beyond.



In support of this, Bank of America Merrill Lynch ("BAML") remains bullish on automotive retail. BAML estimates 2015 new vehicle unit sales of 17.3 million, an increase of approximately 5% from 2014. They further estimate unit sales will increase to 18-20 million units by 2018 year-end.

We believe this growth trajectory is supported by the following factors:

- Pent up demand – the average age of a vehicle is currently over 11 years old. Prior to the recession, the average vehicle age rarely surpassed 8 years.  This, coupled with a historically high number of miles driven, point to the need for replacement vehicles.

- New Models – manufacturers are bringing to market near historical highs in new product launches.  This drives buyers into showrooms leading to increased sales.

- Auto expenditures as a % of U.S. GDP, currently 3.2%, remains below the long-term average of 3.9%.  A return to this long-term average % of U.S. GDP, assuming no economic growth from the current U.S. GDP, would imply a 20% increase in auto expenditures from current levels.

- Auto loan interest rates are near all-time lows.

- Gas prices have dropped significantly.

- Consumer confidence is strong.

### Acquisition Strategy

The automotive retail business fits precisely within the GPB acquisition strategy of acquiring income producing, middle-market companies with high barriers to entry, strong cash-flows, viability in changing market conditions and strong management teams.

GPB's acquisition strategy is to focus on a defined range of manufacturers with strong commitment to the U.S. market. This includes both domestic and foreign brands. In determining which manufacturers to work with, GPB has developed a grading system which is used to help guide this process.  Most importantly, GPB and its executives are working directly in the automotive retail industry and make assessments and decisions that reflect on the ground information and insight in order to drive the acquisition process.

GPB's acquisition strategy will also consider geographic diversification.  We will seek to distribute acquisitions throughout the U.S. to provide for this diversification.  This includes the Northeast, the Sunbelt, as well as the west coast.  GPB's managed funds' retail automotive portfolio is located mainly in the Northeast, with a vast pipeline of dealerships in southern markets currently under screening or due diligence.

Market multiples are also a major factor considered when making acquisitions. Due to this, GPB will concentrate mainly on mid-line brands which it is believed will generate higher returns for investors.

Finally, in many cases GPB will buy into dealership groups, either partially or through complete group acquisition. There are several reasons why this makes sense. In a typical dealership group there will be existing back-office consolidation and other operational efficiencies which have been established. Thus, it will save GPB time and resources in the future. Acquiring a group of dealerships also allows for a more efficient due diligence process and more efficient capital deployment, and thus, scale is reached more rapidly. It is also an advantage when acquiring a group of dealerships that they may be located along a single or concentrated auto mall which allows for greater visibly and recognition, and is historically an effective way of doing business in this sector.

### High, sustainable current cash flow

Automotive dealerships that are targets for acquisition into our portfolio will have a minimum return on equity of 15% at the Portfolio Company level.  GPB's strategy is to cause funds to invest only in those automotive assets that it strongly believes can support such a yield. This is done by sourcing potential acquisitions through GPB's Automotive Retail Directors as well as through GPB Automotive Management and their deep and long-standing ties within the industry.  The ability to continue to bring high-yielding automotive assets into our portfolio by leveraging relationships will continue to be central to our ability to meet our acquisition and profitability goals.

According to the accompanying chart from the National Automobile Dealers Association ("NADA"), the average annual U.S. auto dealership net profit neared $1 million in 2013, providing a stable income stream. Further, a single auto dealership comprises multiple sources of income, including new and used vehicle sales, service and parts sales, and finance and insurance product sales. Manufacturers also compensate the dealership with bonus incentive money for achieving certain sales volume levels, which can be a significant source of profit for a dealership.


Source: NADA

## Barriers to entry

The primary barrier to entry in the automotive retail industry is the franchisee approval process. All franchisees need to possess a certain level of industry experience in order to garner the approval to own and operate new car dealerships from the manufacturers. GPB's Directors of Automotive Retail have several decades of experience in the industry and have personally worked in every position in a dealership. As a result, they have a vast knowledge of the business—expertise that is based in reality—and extensive relationships throughout the country at both the manufacturer and dealership level. This improves the ability to gain manufacturer consent to acquisitions, a continuous and growing pipeline of new potential acquisitions, and the expertise and relationships necessary for operational success.  As a result of their success, GPB's Directors of Automotive have been awarded multiple open-points from manufacturers (the opening of a new dealership for a given manufacturer in a location where none previously existed).

## Recession resilient

With a manufacturing operation the size of the automotive industry, manufacturers need to maintain production at consistent and predictable levels. As a result, they must implement strategic incentives during tough times to encourage and enable dealers to maintain sales levels despite challenging economic conditions. These incentives allow dealers to lower the cost of sale to the consumer and thereby drive in more business, while maintaining a profit on the sale for the dealer. These incentives may come in the form of overall volume bonuses, special incentives to sell particular models which have a higher profit margin, and extra incentives for customer satisfaction and retention rates, for example. While most manufacturers offer incentives programs as part of their normal business operation, during any economic down-turn these programs will become even more aggressive in order to support and stabilize sales volume. The dealership franchise model is the single outlet for auto manufacturers and the best dealers can take advantage of this fact during an economic downturn through these enhanced incentive programs.

In addition, a single automotive dealership consists of multiple streams of income which provides insulation during an economic downturn. These income streams include new and used vehicle sales, service and parts sales ("fixed operations"), and finance and insurance product sales. Fixed operations are so referred to because they remain consistent and have high profit margins. By maintaining and even increasing revenues to the fixed operations of service and parts, as well as increasing used vehicle sales and continuing the high profit margin finance and insurance product sales, a dealership can continue to be profitable during challenging times. The accompanying chart representative of GPB's current automotive dealership holdings in its previous offering illustrates these diverse income sources.



**Proven Management teams**

GPB has teamed up with automotive industry specialists with a proven track record of success in owning and operating automotive dealerships. They bring their vast network of long-standing relationships to the strategy, giving GPB a distinct advantage. It is through this network of relationships that these automotive industry experts have the ability to acquire potentially high performing dealerships with top management teams. We seek to keep these existing, proven management teams in place upon acquisition and incentivize them to keep all interests aligned with GPB and the Company.

***Dispositions***

While we focus on acquiring retail automotive Portfolio Companies with a primary goal to profitably operate them, we may dispose of acquisitions if the appropriate opportunity arises.  GPB's acquisition strategy for the Company is to roll-up 40+ profitable dealerships across the U.S. with a minimum of five years of operating history and build a diversified portfolio of stores (by manufacturer, brand, and geography) with a $2 billion annual revenue goal.  If we are able to achieve that goal, it may enhance favorable disposition opportunities by building an auto group that potentially has the ability to access the public market, strategically sell to a public dealership group or a top private group, or dispose of dealerships individually or in small portfolios to regional buyers.

# —Managed IT Services—

### *Market Opportunity*

We live in an environment where the Internet and its associated media are accessible and immediate, where people and businesses communicate with each other instantly, and where machines are connected with each other across time zones and geographies. Widespread adoption of information and communication technologies has fundamentally changed the nature of the global economy and the way people live and work; the influence of the IT industry is simply present everywhere and in every facet of our daily lives on a global scale.

Within the greater IT space, Managed IT Services are critical to managing and monitoring this broad base of connected devices and applications. Managed IT Services companies provide technology services for corporate networks, connectivity, security and technology support. Technology support services range from remote infrastructure management through centralized network operations centers ("NOCs") to a fully outsourced IT services and support system. In many cases, these services are provided for a fixed recurring monthly fee. We believe this space will continue to experience growth as companies of all sizes look to reduce infrastructure maintenance costs by outsourcing the functions to Managed IT Services providers.

Managed IT Services company revenue can be broadly categorized into the following:

- Value-added reselling ("VARs") – one time transaction with low margin (installation of infrastructure and equipment)
- Integration of  hardware and software – one time transaction with medium margin
- Management of IT infrastructure and technology support – recurring contracts with higher margins

Many companies are too small and their IT needs too infrequent to hire full or part time IT personnel. However, they need to create and maintain their computing environment and deal with all the laptops, desktops, servers, routers, firewalls, networking switches, modems, mobile devices, IP telephones and tablets in their world, so they choose to hire an outsourced IT Services company to do this for them. Larger companies who have the need and the budget for in-house IT personnel are quickly discovering that it is simpler and more cost effective to hire a trusted IT Services company to handle the bulk of the work.

CompTIA's (Computing Technology Industry Association) consensus forecast projects a 2015 growth rate of 5% for the global IT industry, a notable increase over the 2014 forecast of 3.4%. The U.S. growth rate is expected to mirror the global rate. If the forecast hits its mark, it will translate to more than $50 billion in new current dollar revenue, propelling the U.S. IT industry to nearly $1.1 trillion by year's end.

### *Acquisition Strategy*

In the Managed IT Services industry GPB is focused on acquiring Portfolio Companies that are currently serving small to medium sized businesses ("SMB") and middle-market businesses locally, regionally and nationwide. We will seek out Portfolio Companies that will have well-developed sales and marketing strategies, help desk services, technical operations, NOCs, back office, and general administration best practices. It is currently estimated that over 4,000 such companies exist in the U.S. that service the SMB markets[1].

GPB's strategy includes acquiring a series of platform Portfolio Companies which provide an ideal foundation for follow-on acquisitions which are "bolted on" to the platform. This may be an effective way to aggregate a customer base, develop technological and administrative synergies and to produce economies of scale and efficiencies otherwise unobtainable. Such follow on acquisitions could also allow individual IT services companies to potentially broaden their customer base and service offerings, opening up new income streams. GPB believes that it and platform Portfolio Companies will be able to add value to the target acquisitions and improve margins by increasing real revenues, improving margins, and adding planned efficiency measures to operations. The key elements to the strategy are:

---

[1]Gartner: Forecast: IT Services, Worldwide, 2012-2018, 1Q14



**High, sustainable current cash flow**

The Managed IT Services industry typically focuses on a customer base that represents a high percentage of monthly recurring revenue ("MRR"). Simply put, once a client has formed a relationship with an IT service provider, they tend to remain with that provider through multi-year renewable contracts. Both contracts and revenue tend to be "sticky" due to the significant amount of resources required to switch providers, implement new systems, gain familiarity, etc. Since GPB intends to only cause us to acquire companies that have proven themselves as reliable, with a track record of success in their industry and with their customer base, it may enable us to tap into these recurring and sticky revenue streams to provide a consistent and highly predictable stream of cash-flow back to the Company through operational profits generated at the Portfolio Company level.

In addition to monthly recurring revenue streams, Managed IT Service providers typically offer additional high margin professional services to their client base outside of the scope of the client contract. These types of services require trained IT professionals to provide service on the ground and in-house. The client already has an established relationship with their provider and thus they can effectively become their outsourced IT department. Accordingly, the Portfolio Companies may build a client base and create multiple streams of income due to the contractual relationship.

Managed IT Services companies usually not only maintain and support existing technology and infrastructure, but where the opportunity presents itself, they may also sell and install new equipment to the customer for a profit. This is known as Value-Added Reselling.



Source: iTelagen 2014

Further, the intention of GPB and its industry expert Director of IT and Operating Partners (those Portfolio Company personnel who remain with the enterprise with some management and/or ownership interest in the Portfolio Company after we acquire it) is to leverage strengths across our portfolio. As acquisitions are completed, it may be possible to share skill sets, technology and resources across the portfolio, which may provide a more efficient use of resources, increased profit margins, and even additional unforeseen income streams not yet in place through value-add industry expertise that will be brought to bear. GPB will seek to streamline operations and organically grow revenues of Managed IT Services Portfolio Companies we acquire.

**Barriers to entry**

A number of factors are barriers to entry within the Managed IT Services industry that may enable strategic and stable growth within our portfolio. First and foremost, there is a high level of technical expertise required to service the various industries that will be targeted by our Managed IT Services strategy. Customer segments include Healthcare IT, Financial Services, Legal and Education, to name a few. Each one of these industries has its own set of complex needs that only an expert IT services team can provide efficiently, effectively, profitability and at scale. Each requires knowledge of the sector itself, as well as a highly developed and effective team of technology professionals with the infrastructure to service their clients.

A successful Managed IT Services Portfolio Company will have built out their infrastructure over time, typically at great cost over a period of years. This acts as a key barrier to entry as it requires significant knowledge and expertise as well as access to capital in order to do so.

The Managed IT Services industry typically signs clients up on multi-year contracts. Thus, once a client-base is developed for a particular company, it may not be easily interrupted. Relationships often have been developed and technology and systems often have been implemented and integrated that are part and parcel to the operation of the company. Switching costs to the end customer are high, further dis-incentivizing a company to switch IT providers.

**Recession Resilience**

Once a Managed IT Services provider is in the budget of a client, they tend to remain in place through multi-year contracts. Often at this point in time IT budgets have been reduced and out-sourced, and thus IT services expense represents only a small percentage of revenue to a client. Therefore, even during an economic slowdown, critical, outsourced IT services are usually not an area ripe for cost-reduction. Furthermore, technology infrastructure and its reliability are business-critical items today that most companies cannot survive without. Thus, once confidence is established with a provider and a multi-year contract is in place, there may be little incentive for a company to switch. Finally, GPB intends to target Managed IT Services companies that are focused on serving sectors that have growing markets with high-demand products and services. This may include, by way of example, Healthcare IT, security, cloud hosting and disaster recovery.

**Proven Management teams**

A successful Portfolio Company will always be led by a strong management team with a proven track record and a vision for the future in alignment with GPB values and investment strategy. GPB will seek to partner with companies that have executive teams who are veterans in their industry with strong technical backgrounds and who are directly in touch with other industry experts as well as the end users of their services. They will have keen insight into the landscape of the market, the changes currently taking place, and most importantly, the opportunities available for growth. These management teams will have built their companies successfully and profitably and have a desire to partner with GPB to achieve growth and access to resources otherwise out of their reach.

***Dispositions***

While we focus on acquiring Managed IT Services Portfolio Companies with a primary goal to profitably operate them, we may dispose of acquisitions if the appropriate opportunity arises.  When IT Services firms reach $100,000,000 of revenues, an active market of both strategic and financial buyers often rapidly develops due to the scarcity of these platforms and the challenge of acquiring Managed IT Services customers. Additionally, GPB intends to develop an attractive portfolio for us with geographic significance and highly enhanced profit margins which could be considered strategically important to a broad group of technology companies.

## —Life Sciences—

### Market Opportunity

While healthcare reform has continued to be a matter of political debate at the national and state levels, one variable has remained constant: healthcare spending in the United States continues to surge, though at perhaps a reduced growth rate. Add to that the increasing healthcare needs of the aging "Baby Boomer" generation, and you have a recipe for continued growth. In addition, as the government increases the role it plays in all aspects of healthcare, the sector will undergo significant changes – and change can create ongoing opportunities for growth and investment.

According to the Centers for Medicare & Medicaid Services ("CM&MS") information in the accompanying chart, by 2019, national health spending will reach $4.5 trillion and comprise 19.3% of GDP. The government-sponsored share of health spending is projected to increase from 45% in 2010 to about 50% by 2020. This will be driven by expected robust Medicare enrollment growth, Medicaid coverage expansions, and Exchange plan premium and cost-sharing subsidies.



The Patient Protection and Affordable Care Act has impacted all segments of the healthcare industry. Firms in the healthcare sector will need to adapt to changes brought on by healthcare reform – changes that will heighten competition and place increasing pressure on profitability. Yet the strong fundamental drivers of growth of healthcare spending, the aging "Baby Boomer" generation, the increased role the government has in the healthcare system, and the fragmentation of the market, make this an attractive sector, one that may generate compelling acquisition opportunities.

According to a Deloitte Consulting report that evaluated the healthcare industry for 2012, "The healthcare system in the U.S. is highly fragmented: 4,500 biotech companies, 6,000 device manufacturers, 5,800 hospitals, 700,000 physicians, 1,300 health plans, and so on." This fragmentation may present opportunities to acquire Portfolio Companies that are in need of cash to grow their business and can leverage GPB's industry contacts to grow their businesses.

### Acquisition Strategy

Our Life Sciences acquisition strategy is generally focused on providing short to intermediate term debt to Portfolio Companies with successful Operating Partners in both the public and private space with secured revenue streams in place through sales of approved products. Ideal target companies have secure cash flows or sufficient collateral and security to warrant investment, and are seeking a capital partner to increase R&D spending on development programs. Potential areas of focus include FDA-approved products in niche areas, drug development companies, equipment and research tool manufacturers, healthcare services, and device and diagnostic companies. This sector is simultaneously attractive because when transactions are structured using GPB's unique, secured approach, dividend yields in the range of 12-15% may be possible at the same time the firms realize significant growth potential as a result of R&D success.  Our ability to target these types of investments in Life Sciences Portfolio Companies will likely be limited to a small part of our overall portfolio—as opposed to acquiring controlling interests in Portfolio Companies.

18

**High, sustainable current cash flow**

We will target pre-IPO and IPO stage Portfolio Companies (as opposed to development stage) in underserved, niche areas of medicine. Subject to any limitations within the size of our overall portfolio, GPB will seek to utilize unique and effective investment structures to secure cash flow from all Life Sciences investments. Acquisition structures may include several of the following characteristics:

- Secured convertible debt
  - First lien secured position; secured with intellectual property or other asset such as inventory, facilities, equipment, or a lockbox on revenue
  - Amortization schedule over 1-4 years from cash flows
  - Debt will convert at a discount into common or preferred stock
  - Downside protection through potential conversion price adjustments
- Warrant coverage at close to market value with minimum of 50% coverage to increase upside leverage
- Original Issue Discount (OID)
- Monthly coupon to provide a steady stream of income
  - 12-15% annual interest paid monthly to the Fund
  - In certain cases an additional 2-4% accrued interest
- Potential royalty on net sales of products
- Oversight of management through Board participation
- Legal and due diligence fee reimbursement by target company

**Barriers to entry**

Companies in the Life Sciences sector require highly specialized expertise ranging from a focused medical background, sophisticated product development know-how, understanding of complex and highly regulated markets, knowledge of the FDA approval process (which takes place typically over a long period and at high cost), clinical trials and patent expertise, to name a few. In order to succeed, these and other factors must be present to bring a product to the market profitably. Furthermore, established relationships with experts in related industries, including medical professionals, specialized legal counsel, engineering and technology support, drug manufacturing, equipment testing and more, are a necessity. GPB executives have experience and established relationships in these areas.

**Recession Resilience**

Many view the Life Sciences sector as fundamentally recession resilient, because even in a weak financial environment, consumers still require drugs and healthcare services. Additionally, Life Sciences companies can enjoy extensive patent and intellectual property positions as a result of expensive R&D investments and FDA and other regulatory body approvals.

**Proven Management teams**

Due to the sophistication of this sector, only management teams with the necessary industry expertise and a proven track record in their vertical will be considered for investment. GPB's Director of Life Sciences is representative of the type of expertise and experience that will be sought in Portfolio Company management teams. This includes experience with pre-clinical and clinical drug development, regulatory affairs, medical devices, biotech tools, intellectual property, knowledge of the pharmaceutical industry.

*Dispositions*

While we focus on acquiring Life Sciences Portfolio Companies with a primary goal to profitably operate them, we may dispose of acquisitions if the appropriate opportunity arises.  To the extent we have capacity in our portfolio for non-controlling investments, many Life Science investments may be designed for liquidity via an IPO or other liquidity strategy. A structural advantage employed by GPB in Life Sciences transactions includes the ability for early conversion of secured notes into equity with the option to sell stock when liquidity allows. Additionally, GPB may preserve our ability to exercise or sell warrants opportunistically to capture equity gains when companies go public and stocks appreciate. In addition to conversion features, our target Life Science Portfolio Companies must maintain a targeted yield, utilize amortization where appropriate and notes will generally mature and be repaid in full within four years of issuance.

## GPB Acquisition Process

GPB brings its unique perspective to each phase of the acquisition process. If GPB decides the deal is in line with our acquisition strategy and criteria, GPB will conduct the following steps as shown in the diagram below:



GPB partners with best in class operating partners with verifiable track records which will maximize returns. One or more of GPB's personnel will usually serve as an officer of each Portfolio Company under employment agreements with minimum two year terms.  After holding each Portfolio Company for at least two years, and after they achieve our profitability target, we may consider divestiture opportunities as they arise.

**Asset Management Process**

After GPB closes on a Portfolio Company that is meeting the acquisition criteria, the GPB Asset Management team takes on the oversight. The GPB Asset Management team is responsible for a systematic process of operating, maintaining, upgrading, and disposing of assets cost-effectively, ensuring that Portfolio Companies meet projected operating milestones and maximize overall returns.

This requires constant and effective communication with the operator GPB partners with. If milestones are not being met, GPB works with the operator to make course corrections as necessary.

# MANAGEMENT

## Overview

We are managed by GPB Capital Holdings, LLC (GPB), a New York-based, middle-market private equity firm whose principals are experienced financial, management and accounting professionals with almost 100 years of collective experience working with privately-held companies and their management teams. GPB looks to achieve increased cash flow and profitability by acquiring companies possessing strong management teams. GPB provides strategic planning and managerial insight, along with capital, enabling the businesses we acquire to attain the next stage of development and profitability. Investing in people has served GPB's principals well. Under the LPA, GPB conducts and manages our business, to the exclusion of the LPs.

## General Partner

**David Gentile**, *Founder and Chief Executive Officer*, is jointly responsible for the management of GPB, including the formulation of strategy, oversight of investment policy and leadership of the Investment Committee. Prior to founding GPB, Mr. Gentile spent 25 years at the Corporate Advisory and Accounting practice of GP&B in New York. During his tenure there, he developed and maintained executive level relationships with many of the Firm's 3,000+ entrepreneurial, corporate executive and high-net-worth clients. During his career at GP&B, Mr. Gentile advised, oversaw, structured or financed over $1 billion worth of transactions in the private and public markets. Mr. Gentile is acting Chairman and serves on the Board of Directors of AlphaServe Technologies, Qello Holdings, LLC and QT Ultrasound, LLC.

**Bill Jacoby**, *Chief Financial Officer,* leads GPB's finance, treasury management, fund accounting, fund administration, financial statement preparation, and overall finance infrastructure. He is also a voting member of the Firm's Executive and Investment Committee. Mr. Jacoby has nearly 30 years of wide-ranging experience in financial services and alternative investments. Prior to joining GPB, he was Managing Director, Chief Financial Officer at Citi Capital Advisors, a $5 billion (as of December 2014) alternative asset manager with ten investment teams comprising hedge fund, private equity, managed accounts and CLO strategies. Mr. Jacoby was also previously the Chief Financial Officer and Member of the Management Committee at Morgan Stanley Investment Management, an $11 billion (peak AUM) hedge fund platform with 200 people in eight offices worldwide. In addition, Mr. Jacoby has held senior positions at Arlington Hill Investment Management, JP Morgan Chase, Barclays Capital and Greenwich Capital. Mr. Jacoby began his career on Wall Street where he spent over ten years in a variety of structured derivative operations, fixed income trading and institutional sales roles. Mr. Jacoby brings significant experience in developing and implementing middle and back-office infrastructure at large and emerging alternative asset management firms and has substantial expertise in derivatives, complex asset pricing and valuation, and fund launch activities.

**Jeffrey Lash**, *Co-Director – Automotive Retail,* is responsible for formulating GPB's Automotive Retail strategy, which includes developing the Firm's investment strategy, risk management framework and portfolio strategy. He brings to GPB more than 23 years of automotive retail expertise with a focus on operations and underperforming dealership turnaround. At GPB, Mr. Lash oversees the various operating partners to enhance operational efficiencies at the dealership level while enhancing its senior leadership team. Prior to joining GPB, Mr. Lash's accomplishments included running a portfolio of dealerships, restructuring large Automotive Retail portfolios and working as a consultant for a software company whose product focused on improving operations and providing strategic planning steps crucial to an automotive dealership.

**Patrick Dibré**, *Co-Director – Automotive Retail,* is responsible for implementing GPB's Automotive Retail strategy, which includes sourcing, structuring, closing and monitoring potential acquisitions and divestitures. He works in conjunction with Mr. Lash, also a Co-Director of GPB Automotive Retail, to increase sales, service, and finance income while also improving operational efficiencies to increase profitability at the Firm's dealerships. Mr. Dibré brings over 20 years of automotive retail expertise with a focus on sales, financing, and dealership turnaround. Prior to joining GPB, Mr. Dibré was the owner of multiple auto dealer franchises in New York, New Jersey, Virginia and California. The total sales at his dealerships exceeded $800 million annually in 2013, and his stores consistently rank among the top dealerships in the nation in both number of units sold and customer satisfaction.

**Scott Naugle,** *Chief Financial Officer – Automotive Retail,* is responsible for overseeing GPB's automotive dealership investments including financial reporting, risk management, procurement, acquisition due diligence, internal audit, and profit optimization. With more than 20 years of accounting and corporate finance experience, Mr. Naugle is a results-oriented leader with experience in the retail, distribution, financial services, and leasing industries. Prior to joining GPB, he served as Director of Corporate Finance and Accounting at DCH Automotive Group, where he successfully led the due diligence team in the acquisition of two large dealerships with revenues exceeding $200 million annually. Previously, he served as Financial Officer and Treasurer at Holman Automotive Group, Inc. and was a Senior Auditor at Deloitte & Touche.

**Mike Frost,** *Director - Managed IT Services,* is responsible for formulating GPB's Managed IT Services strategy, and sourcing, structuring, closing and monitoring potential acquisitions and divestitures. With more than 20 years of leadership experience, Mr. Frost brings a proven ability to commercialize technology and drive revenue. With a hands-on approach, he has successfully raised capital while directing, articulating, advancing, and evaluating overall strategic and tactical planning for his organizations. Prior to joining GPB, Mr. Frost served as Senior Director, Retail & Commercial Systems, for Siemens Industry, where he developed the strategy and built the nationwide U.S. team responsible for revenue from small commercial buildings for the $1.2 Billion Siemens U.S. Sector of Building Technologies. Previously, Mr. Frost served as President of SureGrid, where he helped architect and implement a plan that resulted in 100% annual growth in core business with over $3 million in first year revenues. Site Control & SureGrid was later acquired by Siemens. Additional career highlights include, CEO and President of ClearCube Technology and Founder and President of TechWorks (acquired by MELCO Japan). Mr. Frost was named a High Technology Entrepreneur of the Year by Ernst & Young for his role with TechWorks.

**Evan Myrianthopoulos,** *Director - Life Sciences,* is responsible for formulating GPB's Life Sciences strategy, and sourcing, structuring, closing and monitoring potential acquisitions and divestitures. Bringing more than 18 years of experience, he is known for his strength in identifying, financing, developing, managing and publicly exiting emerging biotechnology investments. Mr. Myrianthopoulos served as CFO and Board Member of Soligenix, Inc., a clinical stage biopharmaceutical company, where he led 17 financings totaling over $150 million in proceeds, four company Acquisitions and thirteen licensing deals. Previously, he was co-founder, Board Director, CFO, COO, and VP of Finance of Discovery Laboratories, Inc., where he led Discovery's reverse merger with Ansan Pharmaceuticals to go public in addition to managing its merger with Acute Therapeutics.

**Brian Marshall,** *Chief Operating Officer*, oversees GPB's operations, including deal flow, the due diligence process, acquisitions, and after-care of investments. He is also responsible for GPB's Quality Control division, ensuring investments are meeting their goals. Prior to joining GPB, Mr. Marshall spent 16 years in management and accounting positions for companies ranging from an international not-for-profit to a small family business and boutique public accounting firms. Mr. Marshall brings a proven track record of statistical analysis and management techniques to the Firm. He has extensive experience with audits in a variety of industries, including defined benefit pension plans with assets up to $800 million. Mr. Marshall uses his unique blend of education in accounting, and his experience as a business owner and manager to develop and implement GPB's due diligence and asset management process.

**Investment Committee**

The Investment Committee is composed of the following five members appointed by GPB: David Gentile, James Prestiano (biography below), Brian Marshall, Bill Jacoby and Dustin Muscato (biography below).  GPB may increase or decrease the size of the Investment Committee, and nominate and remove Investment Committee members at its sole discretion. Investment Committee members serve as such under letter agreements with us under which they agree to serve on the Investment Committee, for compensation from GPB, for automatically renewing one year terms and providing that either party may terminate the relationship at any time, that they will use their best judgment when making recommendations to us, and that they will regularly attend committee meetings.

*Authority & Responsibilities*

The authority and responsibilities of the Investment Committee include:

- Understanding our mission and organizational goals and how they underscore and support the objectives of the underlying Portfolio Companies.
- Reviewing and advising on proposed Portfolio Company acquisitions based on the consistency, viability and fit of those proposed Portfolio Companies with our acquisition and operational criteria.
- Voting on Portfolio Company acquisitions and divestitures, which require the approval of at least 75% of the Investment Committee members.

**James A. Prestiano**, is the principal and owner of The Law Offices of James A. Prestiano, P.C. a corporate, securities and commercial litigation law firm located in Commack, NY.  Prior to entering into private practice Mr. Prestiano was a Staff Attorney at the Northeast Regional Office of the U.S. Securities and Exchange Commission during the period 1990-1993. Mr. Prestiano was admitted to the New York State Bar in 1991, and the U.S. District Court, Southern and Eastern Districts of New York in 1993. Mr. Prestiano is a graduate of St. John's University, St. John's College (B.A., cum laude, 1987) and St. John's University, School of Law (J.D., 1990) where he was Research Editor, St. John's Journal of Legal Commentary, 1989-1990. Mr. Prestiano's practice areas include Securities Law, Business Law, Corporate Law, Mergers and Acquisitions, Buying and Selling Business, SEC Enforcement Proceedings, FINRA Enforcement Proceedings, and Securities Fraud.

**Dustin Muscato**, *Director – GPB, Asset Management,* is responsible for implementing strategic planning and operational improvements to ensure the expected long-term appreciation in equity value for the Portfolio Companies. Mr. Muscato brings over 13 years of experience to GPB in the areas of business and not-for-profit management, project management, strategic planning, organizational optimization, and engineering. Mr. Muscato has developed a successful track record of acquiring, organizing, coordinating resources and personnel, project management, implementation of new or special projects within organizations and in organizational analysis and optimization. Additionally, he has experience in organizational forensics whereby he studies, investigates, and isolates the underlying cause of non-optimum performance in companies, organizations and large professional conferences. Some of his career highlights include: initiating the redesign of a critical process for a Fortune 500 engineering company; turning around a struggling nonprofit; serving as regional manager for an international nonprofit where he successfully implemented programs across 21 organizations to expand their production and personnel resources to their highest levels in a 10 year period; serving as Executive Director of a nonprofit which he successfully ran for five years, taking it from four to 30 staff, doubling the size of its quarters and bringing it successfully from insolvency to solvency by increasing production and stabilizing financial management.

**Advisory Committee**

The Advisory Committee is composed of three members appointed by GPB, all of whom are either significant limited partners in other Vehicles managed by GPB or are advisers to such investors.  Under the LPA, Advisory Committee members must be "independent" of us, as that term is used in the NYSE listed manual.  To be so independent, GPB must first determine that the person has no material relationship with us (either directly or as a partner, shareholder or officer of an organization that has a relationship with us).  Further, a person is not "independent" of us if:

- The person is, or has been within the last three years, an employee of the Company, or an immediate family member is, or has been within the last three years, an executive officer, of the Company.

- The person has received, or has an immediate family member who has received, during any 12-month period within the last three years, more than $120,000 in direct compensation from us;

- The person is a current partner or employee of a firm that is our auditor, the person has an immediate family member who is a current partner of such a firm, the person has an immediate family member who is a current employee of such a firm and personally works on our audit, or the person or an immediate family member was within the last three years a partner or employee of such a firm and personally worked on our audit within that time;

- The person or an immediate family member is, or has been with the last three years, employed as an executive officer of another company where any of the present executive officers of the Company or GPB at the same time serves or served on that company's compensation committee; or

- The person is a current employee, or an immediate family member is a current executive officer, of a company that has made payments to, or received payments from, us for property or services in an amount which, in any of the last three fiscal years, exceeds the greater of $1 million, or 2% of such other company's consolidated gross revenues.

While we will seek to avoid Related Party Transactions, if GPB identifies one meeting our criteria, it will submit it to the Advisory Committee for its consideration. GPB will obtain in advance an independent third party evaluation of the fairness of the Related Party Transaction for the Advisory Committee's consideration.  GPB will engage a firm to perform the evaluation that is nationally-recognized with qualified personnel holding such accreditations (i.e. CFA, NACVA, CBA, ASA, CPA) appropriate to value a specific industry or asset.  As discussed elsewhere in this Memorandum, we will not enter into any future Related Party Transactions involving the sale by a Related Party of an economic interest.

Under the LPA, the Advisory Committee's approval requires it to unanimously find that any Related Party Transaction is in our best interest. The Advisory Committee will meet as needed, and will be compensated according to industry terms and as agreed by the committee members and GPB.

# COMPANY STRUCTURE



AUSDAL 000695

CONFIDENTIAL TREATMENT REQUESTED

# RISK FACTORS

An investment in Class A Units involves risks and uncertainties. Potential investors should carefully consider the following risk factors in conjunction with the other information contained in this Memorandum before purchasing Class A Units. The risks discussed in this Memorandum can adversely affect our operations, operating results, financial condition and prospects. This could cause the value of the Class A Units to decline and could cause you to lose part or all of your investment. The risks and uncertainties described below are not the only ones we face. Additional risks and uncertainties not presently known to us or that we currently believe are immaterial may also harm our operations.

In addition to the risk factors listed below, prospective investors should also consider the risks described under *"Certain Tax, ERISA & Regulatory Matters"* and elsewhere in this Memorandum. Potential investors should review the risks of this investment with their legal and financial advisors. In addition, there will be occasions when GPB, the Special LP and their affiliates may encounter potential conflicts of interest in connection with us. As a result of these factors, as well as the risks inherent in any investment, there can be no assurance that we will meet our objectives or otherwise be able to successfully carry out our business plan.

## General Risks

***General Investment Risks***. Our success depends on GPB's ability to implement its acquisition strategy for us. Any factor that would make it more difficult to execute timely acquisitions, such as a significant reduction of liquidity in a particular market, may also be detrimental to profitability. No assurance can be given that our acquisition strategies will be successful under all or any market conditions.

***No Operating History***. We have no operating results, so investors have a limited basis upon which to evaluate our ability to achieve our business objectives or judge our prospects for success.

***No Participation in Management***. Other than respecting any Portfolio Companies we may identify at later dates, investors will not have the opportunity to evaluate the specific merits or risks of any Portfolio Company. Moreover, LPs will not participate in management and are dependent on GPB for management of the Company. An investor in the Class A Units must rely upon GPB's ability to identify, structure and make acquisitions of companies consistent with our objectives and policies. Notwithstanding any prior operating experience or experience that members of the Investment Committee or GPB affiliates may have in making acquisitions of the type expected to be made by us, any such prior experience was obtained under different market conditions and under a different organizational structure. There can be no assurance that members of the Investment Committee or GPB affiliates will be able to duplicate prior success or that we will achieve our objectives or achieve positive results of any kind.

***Expenses will be Significant***. We will be obligated to pay fees and substantial administrative, travel, accounting, tax and legal expenses regardless of whether we realize revenues. Any use of leverage will increase these fees and charges, and we will need to make substantial profits to avoid depletion of our assets and provide a return to LPs.

***Illiquidity of Class A Units***. The Class A Units are highly illiquid, have no public market and are generally not transferable except with GPB's prior consent. Voluntary withdrawals of LPs or redemptions of Class A Units are not permitted without GPB's consent and are otherwise subject to the terms of the LPA. Each investor will be required to represent that s/he is acquiring the Class A Units for investment and not with a view to distribution or resale, that such investor understands the Class A Units are not freely transferable and, in any event, that such investor must bear the economic risk of investment for an indefinite period of time. The Class A Units have not been registered under the 1933 Act or applicable state "Blue Sky" securities laws, and the Class A Units cannot be sold unless they are subsequently registered or an exemption from such registration is available. Investors cannot expect to be able to liquidate their investment in case of an emergency.

***Competition***. We expect to encounter intense competition from other entities having similar business objectives, including other Vehicles, venture capital funds, leveraged buyout funds and operating businesses competing for acquisitions. Many of these entities are well established and have extensive experience in identifying and effecting business combinations directly or through affiliates. Many of these competitors possess greater technical, human and other resources than we do, and our financial resources will be relatively limited when contrasted with those of many of these competitors. While we believe that there are numerous potential Portfolio Companies that we could acquire with the net proceeds of this Offering, our ability to compete in acquiring certain sizable target businesses will be limited by our available financial resources. This inherent competitive limitation gives others an advantage in pursuing the acquisition of certain target businesses. Any of the foregoing may place us at a competitive disadvantage in successfully negotiating an acquisition.

***Portfolio Company Competition Risks.*** We expect that our Portfolio Companies will compete with other companies in their respective businesses. We expect to focus on acquisitions in Automotive Retail, Managed IT Services and Life Sciences companies with strong management, earnings and market share. These industries are rapidly evolving and may become more competitive. While we believe investments in these areas offers the opportunity for current yield and potential capital appreciation when we divest, they also involve a high degree of risk. As is typical in rapidly evolving industries, demand and market acceptance for new products and services are subject to a high degree of uncertainty. In addition, while many companies in these sectors have grown or have the potential to grow, there is no guarantee of the same in the future. Portfolio Companies may have histories of net losses and may continue to have net losses for years after our acquisition. There can be no assurance that we will be able to make acquisitions on attractive terms or operate Portfolio Companies profitably. To the extent we consummate acquisitions, we may be affected by numerous risks inherent in the businesses we acquire. For example, if we purchase a financially unstable business or an entity lacking an established record of sales or earnings, we will be affected by the risks inherent in the business and operations of a financially unstable or a development stage entity. Although GPB endeavors to evaluate the risks inherent in a particular target business, we cannot assure investors that GPB will properly ascertain or assess all of the significant risk factors or that we will have adequate time to complete due diligence. Furthermore, some of these risks may be outside of our control and leave us with no ability to control or reduce the chances that those risks will adversely impact a Portfolio Company.

***No Assurance of Confidentiality***. As part of the subscription process and otherwise in their capacity as LPs, investors will provide significant amounts of information about themselves to GPB and us. Under the terms of the LPA as well as applicable laws, such information may be made available to other LPs, third parties that have dealings with us and governmental authorities (including by means of securities law-required information statements that are open to public inspection). Investors that are highly sensitive to such issues should consider taking steps to mitigate the impact upon them of such disclosures (such as by investing in us through an intermediary entity). GPB will endeavor to take all reasonable steps under the law and within its obligations described herein to maintain confidentiality.

***Litigation Risks***. We and Portfolio Companies will be subject to a variety of litigation risks. Under most circumstances, we will indemnify GPB, its principals and representatives for any costs they may incur in connection with such disputes. The officers, directors and representatives of the Portfolio Companies (which will include our personnel or persons affiliated with GPB) will be similarly indemnified by such entities. Beyond direct costs, such disputes may adversely affect us or our Portfolio Companies in a variety of ways, including by distracting GPB and/or the officers, directors and representatives of such entities and harming relationships between such entities and the Portfolio Companies as well as active or potential investors, other potential sources of capital, and other entities important to the success of the Portfolio Companies. In connection with the disposition of a Portfolio Company, we may be required to make representations about the business and financial affairs of the Portfolio Company typical of those made in connection with the sale of any business, and may be responsible for the content of disclosure documents under applicable securities laws. These arrangements may result in the contingent liabilities, for which GPB may establish reserves and escrows. In that regard, distributions may be delayed or withheld until such reserve is no longer needed or the escrow period expires. Such liabilities might ultimately have to be funded by Limited Partners to the extent that the investors have received prior distributions from us.

***Limited Access to Information***. Although GPB generally provides access to material and substantive information concerning us, the rights of LPs to information regarding us and our Portfolio Companies will be limited—even if the Units are registered under the 1934 Act and we publicly report thereunder. In particular, GPB will likely obtain certain types of material information that will not be disclosed to LPs. For example, GPB may obtain information regarding Portfolio Companies that is material to determining the value of such assets. Such information may be withheld from LPs in order to comply with duties or otherwise to protect the interests of other parties or us.

Decisions by GPB to withhold information may have adverse consequences for LPs in a variety of circumstances. For example, a Limited Partner that seeks to sell his/her Class A Units may have difficulty in determining an appropriate price for such Class A Units. Even though the Company has been structured to align the interests of GPB and LPs, decisions to withhold information may also make it difficult for LPs to subject GPB to rigorous oversight.

*Exculpation & Indemnification*. The LPA contains provisions that relieve GPB and its principals and representatives of liability for certain improper acts or omissions. For example, GPB and its affiliates will not be liable to the Limited Partners or us for acts or omissions that constitute ordinary negligence. Under certain circumstances, we may indemnify GPB and its members against liability to third parties resulting from such improper acts or omissions.

Furthermore, GPB is structured as a limited liability company, and the owners of GPB generally will not be personally liable for the entity's debts and obligations. In consequence, LPs will have no recourse to the personal assets of the owners of GPB even if such entity breaches a duty to the Limited Partners or us.

*Legal Counsel*. Documents relating to the Company, including the Subscription Documents to be completed by each investor, as well as the LPA, are detailed and often technical in nature. Our legal counsel represents our interests and will not represent the interests of any Investor. Accordingly, each prospective Investor is urged to consult with its own legal counsel before investing in the Company. Finally, in advising as to matters of law (including matters of law described in this Memorandum), legal counsel has relied, and will rely, upon representations of fact made by GPB and other persons in this Memorandum and other documents. Such advice may be materially inaccurate or incomplete if any such representations are themselves inaccurate or incomplete, and legal counsel generally will not undertake independent investigation with regard to such representations.

## General Investment Risks

*General Investment Risks*. Our success will depend on GPB's ability to implement its strategy for us. Our ability to effectively implement our acquisition strategy will be limited by our ability to source appropriate acquisitions. No assurance can be given that our acquisition strategies will be successful under all or any market conditions.

*No Assurance of Distributions.*  The process of identifying, screening and successfully acquiring private companies is difficult and risky.  Accordingly, we can provide no assurances that we will be able to make distributions of income at any level.  Furthermore, while we have no present plans to do so, we could include LPs' invested capital in amounts we distribute to LPs, which would reduce an LP's rate of return.

*Risks Associated with Portfolio Companies*. Identifying and participating in attractive acquisition opportunities and assisting in the building of successful enterprises are difficult tasks. There is no assurance that our acquisitions will be profitable and there is a substantial risk that our losses and expenses will exceed our income and gains. Any return on investment to the LPs will depend upon successful acquisitions we make. There generally will be little or no publicly-available information regarding the status and prospects of the Portfolio Companies. Many acquisition decisions by GPB will be dependent upon its ability to obtain relevant information, and we often will be required to make decisions without complete information or in reliance upon information provided by third parties that is impossible or impracticable to verify. The value of each acquisition will depend upon many factors beyond our control. Portfolio Companies may have substantial variations in results from period to period; face intense competition, and experience failures or substantial declines in value at any stage. Portfolio Companies may need substantial additional equity or debt capital to support growth or to achieve or maintain a competitive position. Such capital may not be available on attractive terms, or may not be available at all. Our capital is limited and may not be adequate to protect us from dilution in multiple rounds of financing in connection with our acquisitions of Portfolio Companies. An otherwise successful acquisition may yield poor returns if it is unable to divest when GPB determines it is appropriate. Generally, our acquisitions will be illiquid and difficult to value.

*Investment Strategy Risks.* Like any strategy, there are risks associated with the targeted investment sectors. These include market risk in the Managed IT Services space, whereby companies focused on legal services, healthcare, media and logistics apart from asset management, are not immune to the risks these verticals face. Thus, there is a need to constantly evaluate such risks and develop clear strategies that measure and manage these risks. There are risks emerging from operators who may not be able to run the business both from a personal and business point of view. The aggregation model poses litigation risk. Litigation costs are substantial and could potentially impact a Portfolio Company. There is also a culture integration risk. In the services business, people are critical to success. Cultural integration issues could pose risks to the overall consolidated company

*Lower Initial Returns.* In most cases, our acquisitions will be long-term in nature and will not be sold for many years from the date of acquisition. Given the size of the Offering, it may take a significant amount of time to fully invest the proceeds. We anticipate that at least 60% of the net proceeds of this Offering will be used for the above purposes within one year following the termination of the Offering, depending on the availability of appropriate acquisition opportunities consistent with our objectives and other market conditions. We will initially invest the net proceeds primarily in cash, cash equivalents, deposit accounts, money market funds, U.S. government securities

and other high-quality debt investments that mature in one year or less from the date of investment. These securities may earn yields substantially lower than the income that we anticipate receiving once we have acquired the Portfolio Companies. As a result, we may not be able to achieve our investment objective and/or pay any distributions during this period or, if we are able to do so, such distributions may be substantially lower than the distributions that we expect to pay when we have acquired and operate the Portfolio Companies. If we do not realize yields in excess of our expenses, we may incur operating losses.

*Failure of a Portfolio Company*. We expect to focus our acquisitions in Automotive Retail, Managed IT Services and Life Sciences companies (in addition to companies in other sectors, provided they otherwise meet GPB's acquisition criteria and provided GPB's personnel have experience in the sector), and it is possible that those segments could suffer more so than other segments. There are no legal requirements as to concentration or diversification imposed on us with respect to the allocation of assets among those or other sectors, such as are imposed on registered investment companies. No assurance can be given that the failure of one or more Portfolio Companies will not have a material adverse effect on us.

*Withdrawal of Capital from Portfolio Companies*. We will be subject to withdrawal restrictions of the Portfolio Companies, meaning we could have difficult time selling a Portfolio Company, even if a buyer was willing to pay a price GPB determines is favorable. Such restrictions could have a material adverse effect on us.

*Lack of Publicly Available Information Regarding Acquisitions*. The interests in the Portfolio Companies will not be offered under registration statements under the 1933 Act. In addition, Portfolio Companies will not be subject to the periodic information and reporting provisions of the 1934 Act. Accordingly, publicly-available information about Portfolio Companies may be limited. We will be required to rely on the ability of GPB to obtain adequate information to evaluate the potential operational returns from acquiring these companies. If GPB is unable to uncover all material information about Portfolio Companies, it may not make a fully informed acquisition decision, and we may lose some or all of our capital on such acquisitions.

*Risks Related to Acquisitions*. We expect to acquire companies with smaller market capitalizations. Acquisitions of small- and medium-capitalization companies involve significantly greater risks than investments in larger, better-known companies. There is ordinarily a more limited marketplace for the sale of interests in smaller, private companies, which may make realizations of gains more difficult, by requiring sales to other private investors. In addition, the relative illiquidity of private investments generally, and the somewhat greater illiquidity of private investments in small- and medium-sized companies, could make it difficult for us to react to negative economic or political developments. Accordingly, our Investors should have a long-term investment horizon.

*Illiquid Holdings*. We plan to acquire private companies for which no (or only a limited) liquid market exists or that are subject to legal or other restrictions on transfer. We may be unable to sell assets when we desire to do so or to realize what we perceive to be their fair value in the event of a sale. Because there will be no readily available market for the equity in Portfolio Companies, those acquisitions will be difficult to value. Determination of fair values for such companies involves judgments that are not susceptible to substantiation by auditing procedures. Values assigned to Portfolio Companies may not accurately reflect values that may be actually realized if we seek to dispose of them.

We intend to own Portfolio Companies on a long term basis, but in all cases at least two years and normally at least three years. If we elect to sell a Portfolio Company, it may take a significant period of time to sell the Portfolio Company due to market conditions, availability of financing, lack of demand and other conditions.

*Risk Inherent In Portfolio Company Acquisitions*. Acquisitions of private companies involve a high degree of risk, including that private companies:

- may have limited financial resources and may require substantial amounts of financing that may not be available;
- typically have shorter operating histories, narrower product lines and smaller market shares than larger businesses, which tend to render them more vulnerable to competitors' actions and market conditions, as well as general economic downturns;
- are more likely to depend on the management talents and efforts of a small group of persons; therefore, the death, disability, resignation or termination of one or more of these persons could have a material adverse impact on a Portfolio Company and, in turn, on us;
- generally have less predictable operating results, may from time to time be parties to litigation, may be engaged in rapidly changing businesses with products subject to a substantial risk of obsolescence, and may require substantial additional capital to support their operations, finance expansion or maintain their competitive position;

- may be particularly susceptible to economic slowdowns or recessions and may be unable to repay their loans or meet other obligations during these periods; and
- often experience unexpected problems in the areas of product development, manufacturing, marketing, financing, and general management, which, in some cases, cannot be adequately solved.

There can be no assurance of the success of such enterprises.

***Follow-on Funding Requirements***. Following our initial acquisition of a Portfolio Company, we may be required to make additional capital contributions to the Portfolio Company. Such additional contributions may be necessary to protect our interest in Portfolio Companies that require additional financing to carry out their business plans. There is no assurance that we will make such additional contributions or that we will have the ability to do so. The failure to make additional contributions may impact our ability to realize a meaningful return and may impact the recovery of our contribution.

***Financing for Acquisitions***. We cannot ascertain the capital requirements for all of our potential acquisitions. If the net proceeds of this Offering prove to be insufficient, either because of the size of the acquisition, the depletion of the available net proceeds in search of a target business, or other reasons, we will be required to seek additional financing. Such financing may not be available on acceptable terms, if at all. To the extent that additional financing proves to be unavailable when needed to consummate a particular acquisition, we would be compelled to either restructure the transaction or abandon that particular acquisition and seek an alternative target business candidate. In addition, if we consummate an acquisition, we may require additional financing to fund the operations or growth of the target business. The failure to secure additional financing could have a material adverse effect on the continued development or growth of the Portfolio Companies. GPB and its affiliates are not required to provide any financing in connection with or after an acquisition. If a Portfolio Company is unable to generate sufficient cash flow to meet its obligations, including any debt service obligations for financing, the Portfolio Company may default under its loan obligations, be required to sell assets, obtain additional financing, or alternatively, liquidate, which could have a material adverse effect on our revenue, asset value and ability to pay distributions. If we guarantee any such indebtedness, we could be required to sell assets or obtain additional financing to repay any guaranteed amounts, which could have a material adverse effect on our revenue, asset value and ability to pay distributions.

***1934 Act Reporting Requirements***. If Units become beneficially owned by 2,000 or more persons for purposes of the 1934 Act, we would become subject to the information and reporting requirements of the 1934 Act. Such reporting obligations would entail significant administrative burdens, including legal and accounting costs that could negatively impact our operations and returns to Investors. While Investors would be provided more comprehensive publicly-reported financial and other information about us if we are registered under the 1934 Act, such registration would divert cash and managerial resources from our operations and would therefore reduce our returns to Investors.

***Regulation Under the 1940 Act***. The 1940 Act and the rules thereunder contain detailed parameters for the organization and operation of investment companies. Among other things, the 1940 Act and the rules thereunder limit or prohibit transactions with affiliates, impose limitations on the issuance of debt and equity securities, generally prohibit the issuance of options and impose certain governance requirements. GPB intends to conduct our operations so that we will not be required to register as an investment company under the 1940 Act. This will be done by restricting our activities such that we are primarily engaged in owning and operating Portfolio Companies. If we were deemed to be primarily engaged in acquiring Portfolio Companies with a view to reselling them for a profit, then we could become subject to the 1940 Act.

Our performance would be materially adversely affected if we became subject to the registration requirements of the 1940 Act, due to the various burdens of compliance therewith. If anything were to happen to cause us to be required to register as an investment company under the 1940 Act, requirements imposed by the 1940 Act, including limitations on capital structure, ability to transact business with affiliates, and ability to compensate key employees, could make it impractical or impossible for us to operate as contemplated by this Memorandum. Additionally, if it were determined that we were required to be registered under the 1940 Act and were not, we would be subject to significant penalties under the 1940 Act for such failure. Accordingly, GPB will have to limit our activities in order for each to avoid classification as an investment company under the 1940 Act. Neither GPB nor its counsel can assure the Limited Partners that under certain conditions, changing circumstances, or changes in the law, we may not become subject to such regulation.

***Regulation Under the Patriot Act***. The Uniting and Strengthening America by Providing Appropriate Tools Required to Intercept and Obstruct Terrorism Act of 2001 ("Patriot Act") was enacted in reaction to the terrorist attacks on the World Trade Center and the Pentagon. Title III of the Patriot Act, referred to as the International Money Laundering Abatement and Anti-Terrorist Financing Act of 2001 ("IMLA"), imposes obligations on financial service entities, including companies like us under anti-money laundering ("AML") provisions. The Treasury Department adopted rules under the Patriot Act implementing the AML provisions. Many entities are required, under the Treasury rules, to implement procedures designed to detect and report suspicious activities that identify transactions that may involve illegal activity. If it is determined that we are required to comply with the AML provisions, we will be required to implement procedures and make reports when necessary. Penalties for not implementing and maintaining effective AML compliance programs could result in prosecution, regulatory enforcement action and adverse publicity for both us and GPB.

***Other Regulatory Burdens***. We and our Portfolio Companies are subject to laws and regulations enacted by national, regional and local governments. Compliance with, and monitoring of, applicable laws and regulations may be difficult, time consuming and costly. Those laws and regulations and their interpretation and application may also change from time to time and those changes could have a material adverse effect on our business, acquisitions and results of operations. In addition, a failure to comply with applicable laws or regulations, as interpreted and applied, could have a material adverse effect on our business and results of operations. In addition, we expect that the Patient Protection and Affordable Care Act will increase any annual employee health care costs that we or our Portfolio Companies fund, and significantly increase the cost of compliance and compliance risk related to offering health care benefits.

***Systems Risks***. We depend on GPB to develop and implement appropriate systems for our activities. The ability of our systems to accommodate increasing volume could also constrain our ability to manage our portfolio. In addition, certain of GPB's operations may interface with or depend on systems operated by third parties, and there may be inadequate means to verify the risks or reliability of such third party systems. These programs or systems may be subject to certain defects, failures or interruptions, including those caused by worms, viruses and power failures. Any such defect or failure could have a material adverse effect on us. Although GPB endeavors to provide sufficient redundancy and back-up for material information related to us, GPB is not liable to us for losses caused by systems failures.

***Inadequate Capital***. We intend to acquire companies and operate them. The net income, if any, earned from our acquisitions may not be significant. We anticipate that we will hold an acquisition in a Portfolio Company for at least three to five or more years, and market and economic conditions and other relevant factors may compel us to hold such assets for much longer, which could delay any possible distributions to us, and in turn, to the LPs. If for any reason our operating reserves are insufficient to fund expenses of the Company or of its Portfolio Companies, we or such Portfolio Companies may seek debt financing, which would accrue interest and would be payable prior to any distributions to equity holders. Such sources or other sources of funding may not be available or may not be available under terms that are acceptable. Any additional financing could ultimately dilute your interest in the Company.

***Changes in Environment***. Our acquisition program is intended to extend over a period of years during which the business, economic, political, regulatory, and technology environment within which we will operate Portfolio Companies may undergo substantial changes, some of which may be adverse to us. GPB, on our behalf, will have the exclusive right and authority to determine the manner in which we respond to such changes, and LPs generally will have no right to withdraw from the Company or to demand specific modifications to our operations in consequence thereof.

***Leverage***. Our acquisitions, directly or indirectly, may be leveraged acquisitions. Utilization of leverage is a speculative technique and involves risks to Investors. While leverage may enhance total returns to Investors, if investment results fail to cover borrowing costs, then returns to the LPs will be lower than if there had been no borrowings. To the extent we utilize leverage in an acquisition, the acquisition will be subject to increased exposure to adverse economic factors such as a significant rise in interest rates, a severe downturn in the economy or deterioration in the condition of such acquisition. In the event of our dissolution, our lenders and holders of its debt securities would receive a distribution of our available assets before distributions to Unit holders. Any new units of limited partnership interest may have a preference over the Units with respect to distributions and upon dissolution, which could further limit our ability to make distributions to Investors. Because our decision to incur debt and issue shares in any future offerings will depend on market conditions and other factors beyond our control, we cannot predict or estimate the amount, timing or nature of our future offerings or our future debt and equity financings. Further, market conditions could require us to accept less favorable terms for the issuance of our securities in the future, including issuing limited partnership interests at a discount to market value. Accordingly, Investors will bear the risk of future offerings reducing the value of their Units, diluting their interest in us.

***Undisclosed Investing Strategy***. Our acquisition strategies and techniques employed to attempt to reach our goals are proprietary and may not be disclosed to potential Investors (or to LPs). As a result, a potential Investor's decision to invest in us must be made without the benefit of being able to review and analyze our strategies and techniques in their entirety.

***Preference of Certain Fees Regardless of Profitability***. Certain entities and persons referenced herein are entitled to receive the various fees described herein regardless of whether we or any Portfolio Companies, operate at a profit. To the extent that our Portfolio Companies are not generating sufficient revenue to pay the fees, we may have to pay these fees out of other available cash, thus further reducing the amount of cash available for distribution to the LPs or to pay other expenses.

## IT Services Risks

***The Industry is highly competitive, fragmented and continually evolving.*** IT Services is a highly competitive and fragmented industry that includes a large number of diverse participants. The market is fragmented, and no company holds a dominant position. Consequently, competition for client requirements and experienced personnel varies significantly by geographic area and by the type of service provided. Some competitors are large and have immense technical, financial, and marketing resources and substantial name recognition. In addition, clients may elect to increase their internal IT systems resources to satisfy their custom software development and integration needs. Finally, the IT Services industry is being impacted by the growing use of lower-cost offshore delivery capabilities (primarily India and other parts of Asia). There can be no assurance that IT Services Portfolio Companies will be able to continue to compete successfully with existing or future competitors or that future competition will not have a material adverse effect on their results of operations and financial condition.

***Increased Competition & Large Customers' Bargaining Power May Reduce Billing Rates.*** Certain IT Services companies have experienced reductions in the rates at which they bill some large customers for services due to the highly competitive market conditions that exist at this time. Additionally, many IT Services companies actively compete against other IT Services companies for business at new and existing clients. Billing rate reductions or competitive pressures may lead to a further decline in revenue. If IT Services Portfolio Companies are unable to make commensurate reductions in their personnel costs, their margins and operating results in the future would be adversely affected.

***New Products or Services or Changes in Customer Requirements.*** The success of IT Services companies depends, in part, on their ability to implement and deliver IT solutions or IT services that anticipate and keep pace with rapid and continuing changes in technology, industry standards, and client preferences and requirements. IT Services Portfolio Companies may not be successful in anticipating or responding to these developments on a timely basis, and their offerings may not be successful in the marketplace. Also, services, solutions and technologies developed by competitors may make the solutions or staffing offerings of our IT Services Portfolio Companies uncompetitive or obsolete. Any one of these circumstances could have a material adverse effect on our IT Services Portfolio Companies' ability to obtain and successfully complete client engagements.

***Cyber-Attacks or Data Breaches.*** Information security risks for companies providing information technology and professional services, especially in healthcare-related industries, have increased over recent years. This increase in risk may be attributed to the value of personally identifiable information or personal data used for identity theft and fraud, the increasing sophistication and activities of attackers including organized crime, hackers, terrorists, activists, and other third parties, and the reliance on Internet-based communications, and new technologies. IT Services companies' operations and business rely on the secure processing, transmission, storage and availability of information and resources provided by their information technology environment.

IT Services companies may become the target of cyber-attacks or data breaches caused by external entities, third-party vendors, or a company's own personnel, either intentionally and unintentionally. These cyber-attacks or data breaches could result in the disruption of IT companies' internal and customer-facing business operations, and could also result in the unauthorized disclosure, misuse, loss, and destruction of confidential and regulated information, including United States designated personally identifiable information, personal data under the European Union Data Protection Directive, or protected health information under the United States Health Insurance Portability and Accountability Act of 1996 ("HIPAA").

IT Services companies' failure to protect such information could result in reputational damage, fines and penalties, litigation costs, external investigations, compensation costs including reimbursement and monetary awards, and/or additional compliance costs which could have a material, adverse impact. As the cyber threat landscape continues to evolve, IT Services companies may be required to expend additional resources to enhance existing protective measures or implement new mitigation strategies.

***Failure to Maintain State of the Art Technology & Network Equipment.*** Technology is a critical foundation in IT Services companies operations and service delivery. IT Services companies utilize and deploy internally developed and third party software across various hardware environments. Their clients are highly dependent upon the high availability and uncompromised security of these systems. The systems are subject to the risk of an extended interruption or outage due to many factors, such as system failures, acts of nature and attacks from third parties. Accordingly, maintenance of and investment in these foundational components are critical to success in the IT industry. If the reliability of IT Services companies' technology or network operations falls below required service levels, or a systemic fault affects the organization broadly, the companies may be obligated to pay performance penalties to customers, and their business from existing and potential clients may be jeopardized.

## Life Sciences Industry Risk Factors

***General Risks.*** Investment risks associated with investing in Life Sciences companies, in addition to other risks, include: operating in rapidly changing fields, abrupt or erratic market movements, limited product lines, markets or financial resources, management that is dependent on a limited number of people, short product cycles, aggressive pricing of products and services, new market entrants and obsolescence of existing technology.

***The Life Sciences Industry is Highly Competitive.*** To be successful in this industry, companies must be able to, among other things, effectively discover, develop, test and obtain regulatory approvals for products and effectively commercialize, market and promote approved products, including by communicating the effectiveness, safety and value of products to actual and prospective customers and medical professionals. Competitors may have greater resources than our Life Sciences Portfolio Companies have. These greater resources will enable competitors to make greater research and development investments, including the acquisitions of technologies, products and businesses, and spread their research and development costs, as well as their marketing and promotion costs, over a broader revenue base.
Future growth of companies in the Life Sciences industry depends, in part, on their ability to develop and introduce products which are more effective than those developed by competitors. Developments by competitors, the entry of new competitors into the markets in which the companies compete, and the rapid pace of scientific advancement in the Life Sciences industry could make Life Sciences Portfolio Companies' products or technologies less competitive or obsolete. For example, sales of a company's existing products may decline rapidly if a new product is introduced that represents a substantial improvement over the company's existing products or that is sold at a lower price.

***Novel Technology-Based Product Development.*** Life Sciences companies are generally subject to the risks of failure inherent in the development of products based on new technologies. The novel nature of these products creates significant challenges in regard to product development and optimization, manufacturing, government regulation, third party reimbursement, and market acceptance. These challenges may prevent companies from developing and commercializing products on a timely or profitable basis or at all.

***Patent Protection.*** Life Science companies' commercial success will depend, in part, on obtaining and maintaining patent protection for new technologies, product candidates, products and processes and successfully defending such patents against third party challenges. The patent positions of Life Sciences Portfolio Companies can be highly uncertain and involve complex legal, scientific and factual questions and recent court decisions have introduced significant uncertainty regarding the strength of patents in the industry. Moreover, the legal systems of some countries do not favor the aggressive enforcement of patents and may not protect Life Science Portfolio Companies' intellectual property rights to the same extent as they would, for instance, under the laws of the United States. Any of the issued patents owned or licensed by a Life Sciences company may be challenged by third parties and held to be invalid, unenforceable or with a narrower or different scope of coverage that what the company currently believes, effectively reducing or eliminating protection the company believed it had against competitors with similar products or technologies. If Life Sciences Portfolio Companies ultimately engage in and lose any such patent disputes, they could be subject to competition and/or significant liabilities, they could be required to enter into third party licenses, or they could be required to cease using the disputed technology or product. In addition, even if such licenses are available, the terms of any license requested by a third party could be unacceptable to the company.

***Trade Secrets.*** A significant amount of a Life Science Portfolio Company's technology may be unpatented and held in the form of trade secrets. Life Science Portfolio Companies generally expend significant efforts to protect these trade secrets, including the use of confidentiality and proprietary information agreement, and knowledge segmentation among staff. Even so, improper use or disclosure of confidential information could occur and in such cases adequate remedies may not exist. The inadvertent disclosure of trade secrets could impair the company's competitive position.

***Extensive Government Regulation.*** Life Sciences companies are subject to extensive, complex, costly and evolving regulation by federal and state governmental authorities in the United States, principally by the FDA and the U.S. Drug Enforcement Administration, or DEA, and foreign regulatory authorities. Failure to comply with all applicable regulatory requirements, including those promulgated under the FFDCA and Controlled Substances Act, may subject Life Sciences Portfolio Companies to operating restrictions and criminal prosecution, monetary penalties and other disciplinary actions, including, sanctions, warning letters, product seizures, recalls, fines, injunctions, suspension, revocation of approvals, or exclusion from future participation in the Medicare and Medicaid programs.

After products receive regulatory approval or clearance, Life Sciences Portfolio Companies, and their direct and indirect suppliers, remain subject to the periodic inspection of their plants and facilities, review of production processes, and testing of products to confirm that they are in compliance with all applicable regulations. Compliance with these regulations can be complex, expensive and time-consuming.  In addition, failure to take adequate and timely corrective action in response to an adverse inspection could result in a shutdown of the manufacturing of a company's products, significant fines, suspension of marketing clearances and approvals, seizures or recalls of devices, operating restrictions and, in the most egregious cases, criminal sanctions.  Additionally, new FDA guidance and new and amended regulations that regulate the way Life Sciences companies do business may occasionally result in increased compliance obligations and costs.  If any of these were to occur, it would cause harm to Life Sciences companies' business.

***Health Care Reform Initiatives.*** The levels of revenue and profitability of Life Sciences companies may be affected by the continuing efforts of government and third party payers to contain or reduce the costs of health care through various means. In the U.S., there have been, and may continue to be, a number of federal and state laws and regulations to control health care costs. These regulations contain measures intended to control public and private spending on health care as well as to provide universal public access to the health care system. Such laws and regulations may result in a substantial restructuring of the health care delivery system. Significant changes in the U.S. health care system could have a substantial impact on the manner in which Life Sciences companies conduct their business and could have a material adverse effect on their business.  Similarly, health care reform in foreign countries could materially and adversely affect Life Sciences companies' ability to market and sell their products in those countries.

***Third Party Reimbursement & Coverage.*** Many products developed by Life Sciences companies are purchased by hospitals and other providers who will then seek reimbursement from various public and private third-party payers, such as Medicare, Medicaid, governments, and private insurers, for the health care services provided to patients. There can be no assurance that third-party reimbursement and coverage will remain available or adequate, or that future legislation, regulation, or reimbursement policies of third party payers will not adversely affect the demand for Life Sciences companies' products or their ability to sell such products profitably. The unavailability or inadequacy of third-party payer coverage or reimbursement could have a material adverse effect on Life Science Portfolio Companies' business, operating results, and financial condition.

***Privacy & Security of Health Information Laws & Regulations.*** Failure to comply with domestic and international privacy and security laws can result in the imposition of significant civil and criminal penalties. The costs of compliance with these laws, including protecting electronically stored information from cyber-attacks, and potential liability associated with failure to do so could adversely affect a Life Science Portfolio Company's business, financial condition and results of operations.

Many Life Science companies are subject to various domestic and international privacy and security regulations, including HIPAA. HIPAA mandates, among other things, the adoption of uniform standards for the electronic exchange of information in common healthcare transactions, as well as standards relating to the privacy and security of individually identifiable health information, which require the adoption of administrative, physical and technical safeguards to protect such information. In addition, many states have enacted comparable laws addressing the privacy and security of health information, some of which are more stringent than HIPAA.

Life Science Portfolio Companies may need to expend significant resources to protect against potential security breaches or to address problems caused by such attacks or any breach of safeguards. A party that is able to circumvent Life Science Portfolio Companies' security safeguards could, among other things, misappropriate or misuse sensitive or confidential information, user information or other proprietary information, cause significant interruptions in the companies' operations and impair their ability to conduct business, comply with regulations, and adversely impact the companies' customers during the occurrence of any such incident.

### Automotive Dealership Risks

As discussed elsewhere in this Memorandum, we intend to devote a significant portion of our capital to acquiring retail automotive dealerships ("Dealerships"), which face their own unique set of risks and uncertainties, such as the following.

***Adverse Economic Conditions.*** The automotive retail industry, and especially new vehicle unit sales, is influenced by general economic conditions, particularly consumer confidence, the level of personal discretionary spending, interest rates, fuel prices, unemployment rates, credit availability, auto emission and fuel economy standards, the rate of inflation, currency exchange rates, the level of manufacturers' production capacity, manufacturer incentives and consumers' reaction to such incentives, intense industry competition, the prospects of war, other international conflicts or terrorist attacks, severe weather events, product quality, affordability and innovation, the number of consumers whose vehicle leases are expiring and the length of consumer loans on existing vehicles. During economic downturns, retail new vehicle sales typically experience periods of decline characterized by oversupply and weak demand. The general economic slowdown, as well as tightening of the credit markets and credit standards, volatility in consumer preference around fuel-efficient vehicles in response to volatile fuel prices and concern about domestic manufacturer viability, has resulted in a difficult business environment. And, as a result, the automotive retail industry has periodically experienced a decline in vehicle sales and margins.

Changes in interest rates can significantly impact industry new vehicle sales and vehicle affordability due to the direct relationship between rates and monthly loan payments, a critical factor for many vehicle buyers, and the impact interests rates have on customers' borrowing capacity and disposable income.

Fuel prices have remained volatile and may continue to affect consumer preferences in connection with the purchase of vehicles. Rising fuel prices may make consumers less likely to purchase larger, more expensive vehicles, such as sports utility vehicles or luxury automobiles and more likely to purchase smaller, less expensive and more fuel efficient vehicles. Further increases or sharp declines in fuel prices could have a material adverse effect on our business, revenues, cash flows and profitability.

In addition, local economic, competitive and other conditions affect the performance of our Dealerships. Our revenues, cash flows and profitability will depend on general economic conditions and spending habits in those regions of the U.S. where we hold Dealerships.

***Our Dealerships May Be Located in a Small Number of Geographic Regions.*** Our Dealerships may be located in a small number of states.  As such, our Dealership operations may be adversely affected by economic conditions in a relatively small number of regions in the country.

***Natural Disasters & Adverse Weather Events.*** Part of our investment objective is to acquire income-producing auto Dealerships in North America, where actual or threatened natural disasters and severe weather events (such as hurricanes, earthquakes, fires, landslides, and hail storms) may disrupt our store operations, which may adversely impact our business, results of operations, financial condition, and cash flows. In addition to business interruption, the automotive retail business is subject to substantial risk of property loss due to the significant concentration of property values at store locations. Although we will obtain insurance (subject to certain deductibles, limitations, and exclusions), we cannot assure you that we will not be exposed to uninsured or underinsured losses that could have a material adverse effect on our business, financial condition, results of operations, or cash flows.

In addition, natural disasters may adversely impact new vehicle production and the global automotive supply chain. In 2011, the earthquake and tsunami that struck Japan and the flooding in Thailand caused significant production and supply chain disruptions that resulted in significantly reduced new vehicle production and lower new vehicle shipments by Japanese manufacturers. These disruptions also impacted non-Japanese manufacturers that rely on components produced in Japan and/or Thailand.

***Property Loss, Business Interruption or Other Liabilities.*** Our Dealership business will be subject to substantial risk of loss due to the significant concentration of property values, including vehicle and parts inventories; claims by employees, customers and third parties for personal injury or property damage; and fines and penalties in connection with alleged violations of regulatory requirements. While we will have insurance for many of these risks, we will retain risk relating to certain of these perils and certain perils are not covered by our insurance. Certain insurers have limited available property coverage in response to the natural catastrophes experienced in recent years. If we experience significant losses that are not covered by our insurance, whether due to adverse weather conditions or otherwise, or we are required to retain a significant portion of a loss, it could have a significant and adverse effect on us.

**Conditions in the Credit Markets in the U.S.** The last several years' turmoil in the credit markets has resulted in tighter credit conditions. In the automotive finance market, tight credit conditions have resulted in a decrease in the availability of automotive loans and leases and have led to more stringent lending conditions. As a result, new and used vehicle sales and margins have been adversely impacted. If economic conditions are adverse and the availability of automotive loans and leases becomes limited again, it is possible that vehicle sales and margins could be adversely impacted.

A significant portion of vehicle buyers, particularly in the used car market, finance their vehicle purchases. Sub-prime finance companies have historically provided financing for consumers who, for a variety of reasons, including poor credit histories and lack of a down payment, do not have access to more traditional finance sources. Economic conditions have caused most sub-prime finance companies to tighten their credit standards and this reduction in available credit has adversely affected used vehicle sales and margins. If sub-prime finance companies apply higher standards, if there is any further tightening of credit standards used by sub-prime finance companies, or if there is additional decline in the overall availability of credit in the sub-prime lending market, the ability of these consumers to purchase vehicles could be limited, which could have a material adverse effect on the used car business.

**Unfavorable Economic Conditions in the U.S. and/or Europe.** The unfavorable economic conditions that have affected the United States for the past few years, including low economic growth, high unemployment, and the decline in wealth resulting from depressed housing and equity markets, have adversely impacted the automotive retail market. Concerns over sovereign debt levels in the United States and/or the failure by Congress and the President of the United States to address federal deficits and rising debt levels or to raise the debt ceiling, and the possible negative implications to banks and the global economy arising out of the European debt crisis, could adversely impact the U.S. economy, credit availability, consumer confidence, and demand for new and used vehicles. Continuing or worsened unfavorable economic conditions in the United States or elsewhere could adversely impact our business and results of operations.

**Continued Viability & Overall Success of a Limited Number of Manufacturers.** We will be subject to a concentration of risks related with auto manufacturers' overall operations, including their financial distress, merger, sale or bankruptcy, including potential liquidation. The success of our Dealerships will be dependent on vehicle manufacturers in several key respects. First, we will rely exclusively on the various vehicle manufacturers for new vehicle inventory. Our ability to sell new vehicles will be dependent on a vehicle manufacturer's ability to produce and allocate to our Dealerships an attractive, high quality, and desirable product mix at the right time in order to satisfy customer demand. Second, manufacturers generally support their franchisees by providing direct financial assistance in various areas, including, among others, floor plan assistance and advertising assistance. Third, manufacturers provide product warranties and, in some cases, service contracts to customers. To the extent our Dealerships perform warranty and service contract work for vehicles under manufacturer product warranties and service contracts, the Dealerships will direct bill the manufacturer as opposed to invoicing the customer. At any particular time, Dealerships will have significant receivables from manufacturers for warranty and service work performed for customers, as well as for vehicle incentives. In addition, our Dealerships will rely on manufacturers to varying extents for original equipment manufactured replacement parts, training, product brochures and point of sale materials, and other items.

Vehicle manufacturers may be adversely impacted by economic downturns or recessions, significant declines in the sales of their new vehicles, increases in interest rates, adverse fluctuations in currency exchange rates, declines in their credit ratings, reductions in access to capital or credit labor strikes or similar disruptions (including within their major suppliers), supply shortages or rising raw material costs, rising employee benefit costs, adverse publicity that may reduce consumer demand for their products (including due to bankruptcy), product defects, vehicle recall campaigns, litigation, poor product mix or unappealing vehicle design, governmental laws and regulations, or other adverse events. These and other risks could materially adversely affect any manufacturer and impact its ability to profitably design, market, produce or distribute new vehicles, which in turn could materially adversely affect our business, results of operations, financial condition, LPs' equity, cash flows and prospects. During the recent economic downturn, vehicle manufacturers and in particular domestic manufacturers, were adversely impacted by the unfavorable economic conditions in the United States.

Vehicle manufacturers are subject to federal fuel economy requirements, which will increase substantially as a result of a new national program being implemented by the U.S. government to regulate greenhouse gases and fuel economy standards. These new requirements could materially adversely affect the ability of manufacturers to produce, and our ability to sell, vehicles in demand by consumers at affordable prices, which could materially adversely impact our Dealership business.

Our Dealership business could also be materially adversely impacted by another bankruptcy of a major vehicle manufacturer or related lender. For example—

- a manufacturer in bankruptcy could attempt to terminate all or certain of our Dealership franchises, in which case we may not receive adequate compensation for our franchises;
- consumer demand for such manufacturer's products could be materially adversely affected;
- a lender in bankruptcy could attempt to terminate our floor plan financing and demand repayment of any amounts outstanding;
- we may be unable to arrange financing for our customers for their vehicle purchases and leases through such lender, in which case we would be required to seek financing with alternate financing sources, which may be difficult to obtain on similar terms, if at all;
- we may be unable to collect some or all of our significant receivables that are due from such manufacturer or lender, and we may be subject to preference claims relating to payments made by such manufacturer or lender prior to bankruptcy; and
- such manufacturer may be relieved of its indemnification obligations with respect to product liability claims.

Additionally, any such bankruptcy may result in us being required to incur impairment charges with respect to the inventory, fixed assets, and intangible assets related to certain franchises, which could adversely impact our results of operations, financial condition, and our ability to remain in compliance with the financial ratios contained in our debt agreements. Tens of billions of dollars of U.S. government support were provided to Chrysler, General Motors, and Ally Financial (formerly known as GMAC). There can be no assurance that U.S. government support will be provided to the same extent or at all in the event of another bankruptcy of a major vehicle manufacturer or related lender. As a result, the potential adverse impact on our financial condition and results of operations could be relatively worse in a manufacturer or related lender bankruptcy which is not financially supported by the U.S. government.

***Franchise Agreement Renewals.*** It is likely that the Dealerships we acquire will operate under franchise agreements with one of our manufacturers (or authorized distributors). Without a franchise agreement, Dealerships cannot obtain new vehicles from a manufacturer, receive floor plan and advertising assistance, perform warranty-related services or purchase parts at manufacturer pricing. As a result, Dealerships are significantly dependent on relationships with these manufacturers, which exercise a great degree of influence over their operations through the franchise agreements. Franchise agreements may be terminated or not renewed by the manufacturer for a variety of reasons, including any unapproved changes of ownership or management and other material breaches of the franchise agreements. We cannot guarantee all of the franchise agreements that our Dealerships will be party to will be renewed or that the terms of the renewals will be as favorable to agreements in place when we acquire the Dealership. In addition, actions taken by manufacturers to exploit their bargaining position in negotiating the terms of renewals of franchise agreements could also have a material adverse effect on revenues and profitability. Our future results of operations may be materially and adversely affected to the extent that franchise rights that our Dealerships enjoy become compromised or operations restricted due to the terms of franchise agreements.

Franchise agreements often do not give a Dealership the exclusive right to sell a manufacturer's product within a given geographic area. Subject to state laws that are generally designed to protect dealers, a manufacturer may grant another dealer a franchise to start a new dealership near the location of one of the Dealerships, or an existing dealership may move its dealership to a location that would more directly compete against one of our Dealerships. The location of new dealerships near existing dealerships could materially adversely affect operations and reduce the profitability of our Dealerships.

***Failure to Acquire Dealerships & Successfully Integrate Them Into our Business.*** Growth in our revenues and earnings will depend on our ability to acquire Dealerships and successfully integrate those Dealerships into our operations. We cannot guarantee that we will be able to identify and acquire Dealerships. In addition, we cannot guarantee that any acquisitions will be successful. Restrictions by our manufacturers, as well as covenants contained in our debt instruments, may directly or indirectly limit our ability to acquire Dealerships. In addition, increased competition for acquisitions may develop, which could result in fewer acquisition opportunities available to us and/or higher acquisition prices. And, some of our competitors may have greater financial resources than us.

We will need substantial capital in order to acquire Dealerships. We currently intend to finance acquisitions by using Offering proceeds and borrowings for real property purchases and working capital. While it has improved recently, access to funding through the debt capital markets could become challenging again in the future. Also, in the recent past, the cost of obtaining money from the credit markets increased as many lenders and institutional investors

increased interest rates, enacted tighter lending standards, refused to refinance existing debt as maturity at all or on terms similar to current debt, and reduced and, in some cases, ceased to provide funding to borrowers. Accordingly, our ability to make acquisitions could be adversely affected if our access to capital is limited.

***Consumer Incentive & Marketing Programs of Manufacturers.*** Most vehicle manufacturers from time to time establish various incentive and marketing programs designed to spur consumer demand for their vehicles. These programs will impact our operations, particularly sales of new vehicles. Since these programs are often not announced in advance, they can be difficult to plan for when ordering inventory. Additionally, manufacturers may modify and discontinue these incentive and marketing programs from time to time, which could have a material adverse effect on our results of operations and cash flows.

***Substantial Competition in Automotive Sales & Services.*** The automotive retail industry is highly competitive. Depending on the geographic market, our Dealerships will compete with:

- franchised automotive dealerships in markets that sell the same or similar makes of new and used vehicles that our Dealerships offer, occasionally at lower prices than our Dealerships;
- other national or regional affiliated groups of franchised dealerships and/or of used vehicle dealerships;
- private market buyers and sellers of used vehicles;
- Internet-based vehicle brokers that sell vehicles obtained from franchised dealers directly to consumers;
- service center chain stores; and
- independent service and repair shops.

Dealerships will also compete with regional and national vehicle rental companies that sell their used rental vehicles. In addition, automobile manufacturers may directly enter the retail market in the future, which could have a material adverse effect on our Dealerships. Some of our Dealerships' competitors may have greater financial, marketing and personnel resources and lower overhead and sales costs than our Dealerships have. Our revenues and profitability may be materially and adversely affected if competing dealerships expand their market share or are awarded additional franchises by manufacturers that supply our Dealerships.

In addition to competition for vehicle sales, Dealerships will compete with franchised dealerships to perform warranty repairs and with other automotive dealers, franchised and independent service center chains and independent garages for non-warranty repair and routine maintenance business. Dealerships' parts operations will compete with other automotive dealers, service stores and auto parts retailers. A number of regional or national chains offer selected parts and services at prices that may be lower than our Dealerships' prices. Dealerships will also compete with a broad range of financial institutions in arranging financing for customers' vehicle purchases.

Some automobile manufacturers have acquired in the past, and may attempt to acquire in the future, automotive dealerships in certain states. Our revenues and profitability could be materially adversely affected by the efforts of manufacturers to enter the retail arena.

In addition, the Internet has become a significant part of the advertising and sales process in the automotive industry. Customers are using the Internet as part of the sales process to compare pricing for cars and related finance and insurance services and even though we utilize Internet as an important selling and leads generation tool, it may reduce gross profit margins for new and used cars and profits for related finance and insurance services. Some web sites offer vehicles for sale over the Internet without the benefit of having a dealership franchise. If Internet new vehicle sales are allowed to be conducted without the involvement of franchised dealers, or if dealerships are able to effectively use the Internet to sell outside of their markets, our business could be materially adversely affected. We would also be materially adversely affected to the extent that Internet companies acquire dealerships or align themselves with our competitors' dealerships.

***Substantial Regulation.*** A number of state and federal laws and regulations affect our proposed Dealership business, such as those relating to motor vehicle sales, retail installment sales, leasing, sales of finance, insurance, and vehicle protection products, licensing, consumer protection, consumer privacy, escheatment, anti-money laundering, environmental, vehicle emissions and fuel economy, health and safety, wage-hour, anti-discrimination, and other employment practices.  Any failure to comply with these laws and regulations may result in the assessment of administrative, civil, or criminal penalties, the imposition of remedial obligations or the issuance of injunctions limiting or prohibiting operations. In the states in which Dealerships operate, the Dealerships will be required to obtain various licenses in order to operate their businesses, including dealer, sales, finance and insurance-related licenses issued by state authorities. These laws also regulate the conduct of business, including advertising, operating, financing, employment and sales practices. Other laws and regulations include state franchise laws and regulations and other extensive laws and regulations applicable to new and used motor vehicle dealers, as well as various employment practices laws.

Dealerships' financing activities with customers will be subject to federal truth-in-lending, consumer leasing and equal credit opportunity laws and regulations, as well as state and local motor vehicle finance laws, installment finance laws, insurance laws, usury laws and other installment sales laws and regulations. Claims arising out of actual or alleged violations of law may be asserted against Dealerships by individuals or governmental entities and may expose Dealerships to significant damages or other penalties, including revocation or suspension of licenses to conduct Dealership operations and fines.

The Dodd-Frank Wall Street Reform and Consumer Protection Act ("Dodd-Frank Act") established a new consumer financial protection agency with broad regulatory powers. Although automotive dealers are generally excluded, the Dodd-Frank Act could lead to additional, indirect regulation of automotive dealers through its regulation of automotive finance companies and other financial institutions.

Furthermore, we expect that new laws and regulations, particularly at the federal level, in other areas may be enacted, which could also materially adversely impact our Dealership business. The labor policy of the current administration could lead to increased unionization efforts, which could lead to higher labor costs, disrupt store operations, and reduce our profitability.

Possible penalties for violation of any of these laws or regulations include revocation or suspension of licenses to operate and civil or criminal fines and penalties. In addition, many laws may give customers a private cause of action. Violation of these laws, the cost of compliance with these laws, or changes in these laws could result in adverse financial consequences to our dealerships.

***Stringent Federal, State & Local Environmental Laws & Regulations.*** Dealerships will be subject to a wide range of federal, state and local environmental laws and regulations. As with automotive dealerships generally, and service, parts and body shop operations in particular, the automotive dealership business involves the use, storage, handling and contracting for recycling or disposal of hazardous substances or wastes and other environmentally-sensitive materials. These environmental laws and regulations may impose numerous obligations that are applicable to Dealerships' operations including the acquisition of permits to conduct regulated activities, the incurrence of capital expenditures to limit or prevent releases of materials from storage tanks and other equipment that they operate, and the imposition of substantial liabilities for pollution resulting from their operations. Numerous governmental authorities, such as the Environmental Protection Agency, and analogous state agencies, have the power to enforce compliance with these laws and regulations and the permits issued under them, oftentimes requiring difficult and costly actions. Failure to comply with these laws, regulations, and permits may result in the assessment of administrative, civil, and criminal penalties, the imposition of remedial obligations, and the issuance of injunctions limiting or preventing some or all of a Dealership's operations.

***Interest Rate Risk in Connection With Vehicle Floor Plan Payables & any Debt Facility.*** Most of our projected Dealership debt, including our vehicle floor plan payable, will be subject to variable interest rates. Any variable interest rate debt will fluctuate with changing market conditions and, accordingly, our interest expense on any such debt will increase if interest rates rise. In addition, our net inventory carrying cost (new vehicle floor plan interest expense net of floor plan assistance that we receive from automotive manufacturers) may increase due to changes in interest rates, inventory levels, and manufacturer assistance. We cannot assure you that a significant increase in interest rates would not have a material adverse effect on our business, financial condition, results of operations, or cash flows.

***Failure of Our Information Systems or Any Security Breach.*** Our Dealership business will be dependent upon the efficient operation of information systems. In particular, we will rely on information systems to effectively manage our pricing strategy and tools, sales, inventory, and service efforts, the preparation of our consolidated financial and operating data, consumer financing, and customer information. The failure of information systems to perform as designed or the failure to maintain and enhance or protect the integrity of these systems could disrupt our business operations, impact sales and results of operations, expose us to customer or third-party claims, or result in adverse publicity. Additionally, we will collect, process, and retain sensitive and confidential customer information in the normal course of our business. Despite the security measures we plan to have in place and any additional measures we may implement, our facilities and systems, and those of any third-party service providers, could be vulnerable to security breaches, computer viruses, lost or misplaced data, programming errors, human errors, acts of vandalism, or other events. Any security breach or event resulting in the misappropriation, loss, or other unauthorized disclosure of confidential information, whether by us directly or any third-party service providers, could damage our reputation, expose us to the risks of litigation and liability, disrupt our business, or otherwise affect our results of operations.

***Loss of Key Personnel or Failure to Attract Additional Qualified Personnel.*** We believe our success will depend to a significant extent upon the efforts and abilities of GPB's senior management. The unexpected or unanticipated loss of the services of one or more members of GPB's management team could have an adverse effect on us and impair the efficiency and productivity of our operations, though we will have key man insurance for any of GPB's key personnel. In addition, the market for qualified employees in the industry and in the regions in which we plan operate, particularly for general managers and sales and service personnel, is highly competitive and may subject us to increased labor costs during periods of low unemployment. Accordingly, the loss of any key employees or the failure to attract qualified managers could have an adverse effect on our business and may impact the ability of Dealerships to conduct their operations in accordance with our national standards.

## Management Risks

***Reliance on Individual Members of GPB & its Affiliates***. We are particularly dependent upon the efforts, experience, contacts and skills of the individual members of GPB, the Investment Committee and certain of their affiliates and principals. The loss of any such individual could have a material, adverse effect on us, and such loss could occur at any time due to death, disability, resignation or other reasons. In some cases we may insure the lives of principals we deem important to our success. There can be no assurance that the individual employees and advisors to GPB will continue to be employed by GPB or that such employees and advisors will continue to function on our behalf. If the services of certain key employees of GPB become unavailable, GPB would need to recruit qualified personnel, which may prove difficult.

***Evaluation of Acquisitions***. Limited Partners will not be permitted to evaluate Portfolio Company opportunities or relevant business, economic, financial or other information that will be used by GPB in making acquisition decisions. Except as specifically provided in the LPA, GPB will have the exclusive right and power to manage our business and affairs.

***Changes in Acquisition Strategies***. GPB has broad discretion to expand, revise or contract our business without the consent of the Limited Partners. Our acquisition strategies may be altered, without prior approval by, or notice to, the LPs, if GPB determines that such change is in our best interest.

***Due Diligence***. Even if GPB conducts extensive due diligence on a target business, we cannot assure investors that this diligence will surface all material issues that may be present inside a particular target business, that it would be possible to uncover all material issues through a customary amount of due diligence, or that factors outside of the target business and outside of our control will not later arise. As a result of these factors, we may be forced to later write-down or write-off assets, restructure our operations, or incur impairment or other charges that could result in losses. Even if GPB's due diligence successfully identifies certain risks, unexpected risks may arise and previously known risks may materialize in a manner not consistent with preliminary risk analyses. We expect that the investigation of each specific target business and the negotiation, drafting, and execution of relevant agreements, disclosure documents, and other instruments will require substantial management time and attention and substantial costs for accountants, attorneys and others. If we decide not to complete a specific acquisition, the costs incurred up to that point for the proposed transaction likely would not be recoverable. Furthermore, if we reach an agreement relating to a specific target business, we may fail to consummate the transaction for any number of reasons including those beyond our control. Any such event will result in a loss to us of the related costs incurred, which could materially adversely affect subsequent attempts to locate and acquire another business.

***Return Variances.*** GPB's goal is to make the Target Return to Investors, and we will focus on strategies that permit us to maintain the rate of the return, including targeting Portfolio Company acquisitions that will provide adequate income and utilizing reserves.  The rate of the Target Return—or whether to make such distributions at all—remains in GPB's discretion under the LPA.  It is possible that the rate of the Target Return may be reduced or increased at later times.  To the extent that the rate of the Target Return varies, and because LPs will invest in the Company at different times, an LP's relative returns from us will vary as compared to other LPs.  Furthermore, because the Target Return is calculated on an LP's gross Capital Contribution and different Unit classes are charged different selling fees, the relative return one LPs receives may be different than other LPs' returns. However, because the Target Return is only paid until an LP receives all of his / her gross Capital Contribution, and because of the impact of the Hurdle, all LPs' total returns will be proportionately the same over time.

***Conflicts of Interest***. GPB will devote such time to manage the Company as it, in its sole discretion, deems necessary. GPB and the other Related Parties, the Special LP and their affiliates may invest in, have responsibilities for, render investment advice to or perform other services, including investment advisory services for personal and family accounts, and managed accounts for individuals or entities (collectively, the "Other Entities"), including Other Entities that invest in companies similar to the Portfolio Companies in which we expect to invest. The activities of such Other Entities may be similar to or may differ from our activities, and neither we nor the Limited Partners will have any rights in respect of investments for, and profits or other income earned from, such Other Entities. As a

result of the foregoing, GPB and the other Related Parties may have conflicts of interest in (i) allocating their time and activity between us or such Other Entities; (ii) allocating investments between us and such Other Entities; and (iii) effecting transactions between us or such Other Entities, as the case may be, and Portfolio Companies, including ones in which such Other Entities, their principals and affiliate(s), may have a greater financial interest.

GPB and the other Related Parties may give advice or take action with respect to such Other Entities that differs from advice given to us. To the extent a particular investment is suitable for both us and the Other Entities, such investments will be allocated between us and the Other Entities in a manner determined to be fair and equitable under the circumstances to all clients, including us.

GPB receives a Managerial Assistance Fee for its services to us and the Special LP will receive a percentage of our Net Profits (defined below). GPB and its Related Parties (including the Special LP) may also receive fees and compensation from Portfolio Companies for services provided by GPB or other Related Parties to a Portfolio Company. These relationships may from time to time create conflicts of interest between GPB, the Special LP, and/or other Related Parties and us.

Furthermore, because we will control Portfolio Companies, we may be deemed a fiduciary with respect to Portfolio Companies and their minority shareholders. In such situation, our ability to act solely in our own interest with respect to such Portfolio Companies may be limited.

Instances may arise where the interest of GPB and the other Related Parties may potentially or actually conflict with our interest and the Limited Partners' interests. For example, GPB or the other Related Parties have, and may in the future organize Vehicles to invest in companies in the same target sectors we are pursuing, and Vehicles may co-invest with us on terms GPB determines are equitable and in each such investor's interests. Where a proposed investment is a Related Party Transaction, GPB must obtain in advance an independent third party evaluation of the fairness of the investment to us as part of the Advisory Committee's approval process, and the Advisory Committee must unanimously determine that the investment is in our best interest. Such committee members are independent as that term is used in the NYSE listed manual. Furthermore, we do not intend to enter into a Related Party Transaction under which the Related Party sells his/her economic interests to us**.**

Related Parties may serve as officers or directors, or both, of Portfolio Companies, and receive fees or other compensation in connection therewith regardless of our success. Furthermore, the Related Parties may enter into contractual relationships with Portfolio Companies under which services are provided to, or other business is conducted with, the Portfolio Companies, and receive fees or other compensation in connection therewith.

GPB provides us with all of our personnel, systems, back office services and other resources.  As is customary, GPB allocates such expenses among its clients, including the Company and other Vehicles, on a pro-rata basis and as further discussed below under *"Related Parties & Conflicts of Interest—Expense Allocations."*

GPB has not provided the Limited Partners with separate counsel, accountants or other experts in connection with our formation, the preparation of the LPA or the Offering. GPB does not intend to retain separate counsel or other advisors for the LPs in the future. Certain of the attorneys and other professionals and experts who perform services for us and GPB also may perform services for GPB's affiliates.

*See "Related Parties & Conflicts of Interest."*

# General Tax Risks

**Taxation**. Certain federal tax risks relating to an investment in the Company are discussed under the section entitled *"Certain Tax, ERISA & Regulatory Matters,"* which prospective Investors should read carefully. No assurances can be given that current tax laws, rulings and regulations will remain the same during the life of the Company, and therefore it is possible that the tax consequences of an investment in the Company may change during the period in which a Limited Partner owns Units. Prospective Investors should consult their tax advisors for further information about the tax consequences of purchasing Units.

**Deductibility of Managerial Assistance Fees.** The Managerial Assistance Fees payable to GPB are intended to constitute guaranteed payments as that term is defined in Code §707(c), if the recipient is a partner. A guaranteed payment under §707(c) has to be determined without regard to income of the partnership and be for services or the use of capital. The Managerial Assistance Fees and performance allocations should satisfy these requirements based upon the IRS's interpretation of the requirements, although the ultimate determination would depend on all the facts and circumstances. Although subject to potential challenge by the IRS, a guaranteed payment ought to be treated as a deductible expense in computing the Company's adjusted gross income. Thus, such amount would not be treated as a miscellaneous itemized deduction. The IRS may contend that the Managerial Assistance Fees is a deduction under the Code §212 and treated as a miscellaneous itemized deduction. Miscellaneous itemized deductions for a taxable year are only allowed to the extent that the aggregate of such deductions exceeds 2% of adjusted gross income.

***Taxation as a Partnership***. We intend to qualify as a partnership for United States federal income tax purposes, but will not seek a ruling from the Internal Revenue Service ("IRS") regarding such qualification, and there can be no assurance that we will so qualify. If we were to be treated as a corporation for United States federal income tax purposes, our income and gains would be subject to two levels of federal income taxation, first at the Company level at applicable federal corporate income tax rates and second at the Limited Partner level, where distributions would be treated as either dividends, returns of capital, or gains from the sale or exchange of Units.

***Unrelated Trade or Business Income***. We anticipate that we may incur income that would be treated as unrelated business taxable income under Code §512 ("UBTI"). Accordingly, prospective Investors that are tax-exempt entities, including qualified retirement plans (stock, bonus, pension, or profit sharing plans described in Code §401(a)) and individual retirement accounts ("IRAs"), are urged to consult their tax advisors concerning the federal, state and local income and other tax consequences that may result from an investment in the Company.

***Phantom Income***. GPB in its sole discretion may, but is not required to, cause us to make distributions during the Company's term. Taxable income realized in any year by us will be allocated, and thus taxable, to its LPs in that year regardless of whether any distributions are made to LPs. Accordingly, LPs may recognize taxable income for United States federal income tax purposes without receiving a sufficient distribution from the Company with which to pay the taxes thereon. Although GPB may consider such possible tax liability of LPs when determining whether to cause distributions to be made, no assurance is given that distributions, if made, will equal the amount of any LP's tax liability.

***Tax Audits & Adjustments.*** An entity organized as a limited partnership may be subject to an audit by the IRS. Certain tax aspects of our operations may be challenged upon audit by the IRS. Any adjustment resulting from an audit by the IRS also could result in adjustments to the tax returns of the Limited Partners and may lead to an examination of other items unrelated to us in such returns or an examination of prior tax returns of the LPs. Moreover, we could incur substantial legal and accounting costs in connection with any challenge by the IRS of the position taken by us on our tax returns regardless of the outcome of such a challenge.

***Allocations.*** Under Code §704, a partner's distributed share of any Company items of income, gain, loss, deduction or credit is governed by the LPA unless the allocation provided by the LPS does not have "substantial economic effect." The regulations adopted under the Code ("Treasury Regulations") provide certain "safe harbors" with respect to allocations that, under the Treasury Regulations, will be deemed to have substantial economic effect. The validity of an allocation that does not satisfy any of the "safe harbors" of these Treasury Regulations is determined by taking into account all facts and circumstances relating to the economic arrangements among the LPs. While no assurance can be given, the allocations provided by the LPA should have substantial economic effect and should be sustained under the facts and circumstances test. However, if it were determined by the IRS or otherwise that the allocations provided in the LPA with respect to a particular item does not have substantial economic effect, each LP's distributive share of that item would be determined for tax purposes in accordance with such LP's interest in the Company, taking into account all facts and circumstances.

***Passive Income & Losses.*** It is likely that a LPs' ownership of Units may constitute a passive activity to the extent income from such ownership relates to a trade or business, directly or indirectly, conducted by us through a flow-through entity. To the extent the income is portfolio income, such partnership income will not be considered passive. Generally, the passive loss rules prevent a taxpayer who does not materially participate in a trade or business activity from using losses sustained in that trade or business activity (a "passive activity") to offset income other than that generated by other passive activities ("passive income"). If an LP's interest in the Company constitutes a passive activity, the LP may be able to use any net income earned by us to offset losses generated by other passive activities. However, if we generate passive losses, the LP may not use those losses to offset income other than that generated by other passive activities.

***Alternative Minimum Tax Liability.*** The alternative minimum tax is payable by an LP to the extent that the Limited Partner's alternative minimum tax exceeds his regular tax. The alternative minimum tax is calculated based on the LP's alternative minimum taxable income. As a general rule, alternative minimum taxable income is equal to a taxpayer's taxable income for regular tax purposes (i) adjusted to reflect differences in the treatment of items of income and deduction for minimum tax purposes and (ii) increased by items of tax preference. Because of the flow-through nature of an entity characterized as a partnership for federal income tax purposes, the alternative minimum tax is not imposed on the Company as such. Instead, items of income, gain, loss, deduction and tax preference are allocated to an LP by us and will affect the calculation of the LP's alternative minimum tax liability.

***State & Local Taxes.*** Although we will generally not be subject to state income taxes, the Limited Partners are subject to any state income taxes on their respective shares of our income and gain in the states in which they reside. Additionally, depending upon the states in which we conduct business, LPs may be liable for state income taxes on the income and gain derived from our activities in those states. A Limited Partner may be entitled to a deduction or a credit against taxes owed to his state of residence for income taxes the LP pays to a state other than the Limited Partner's state of residence. Because an LP may be liable for income tax in a particular state if we realize net income from our activities in that state, a Limited Partner may incur state income tax liability even though our combined activities in all states generates a net loss. Because the imposition of any particular state's income tax on a Limited Partner's share of our income depends upon the particular facts and circumstances of that LP, each respective LP should consult his own tax advisor regarding the state and local taxes that may be payable as a result of an investment in the Company.

***The foregoing list of risk factors does not purport to be a complete enumeration or explanation of the risks involved in an investment in the Company. Prospective Investors should read the entire Memorandum, the LPA, the Subscription Documents, and consult with their own advisers before deciding whether to invest in the Company. In addition, as our investment program develops and changes over time, an investment in the Company may be subject to additional and different risk factors.***

## SELLING FEES

A portion of the proceeds from your subscription will be used to pay brokerage fees and commissions to members of the Selling Group. The following table provides information concerning the estimated Selling Fees relating to an investment in the Class A Units. The table does not reflect the further reduction in our capital available to deploy in Portfolio Companies for Organizational Expenses or Partnership Expenses.

| | Target Offering Amount | | Maximum Offering Amount | |
|---|---|---|---|---|
| | Amount | Percent | Amount | Percent |
| Gross Offering Proceeds | $350,000,000 | 100.00% | $500,000,000 | 100.00% |
| Less: | | | | |
|    Commissions | $24,500,000 | 7.00% | $35,000,000 | 7.00% |
|    Due Diligence Fees | $3,500,000 | 1.00% | $5,000,000 | 1.00% |
|    Placement Fee | $6,125,000 | 1.75% | $8,750,000 | 1.75% |
|    Wholesaling Fees | $4,375,000 | 1.25% | $6,250,000 | 1.25% |
| Total Selling Fees | $38,500,000 | 11.00% | $55,000,000 | 11.00% |
| **Net Offering Proceeds†** | **$311,500,000** | **89.00%** | **$445,000,000** | **89.00%** |

*†Before deduction of Organizational Expenses, which may be 1.25% of our anticipated or actual gross proceeds.*

***Selling Commissions & Due Diligence Fees***. Selected dealers that are part of the Selling Group may receive Commissions of up to 7% and a Due Diligence allowance of 1%, to the extent permitted by applicable securities laws. We reserve the right to pay lower or no Commissions for sales of Class A Units to certain investors.

***Placement & Marketing Support Fees***. We may pay an additional cash placement and marketing support fee to members of the Selling Group for assisting with the placement, marketing and due diligence of the Offering of up to 1.75% of the gross proceeds of the Offering, a portion of which may be re-allowed to selected dealers.

***Wholesaling Fees***. We may also pay registered representatives of broker-dealers engaged in wholesaling activities a marketing and distribution allowance of up to 1.25% of the gross proceeds received from the Offering, a portion of which may be re-allowed to selected dealers.

GPB reserves the right to pay Selling Fees that are less than or more than the respective percentages above, so long as the aggregate Selling Fees do not exceed 11%. Additionally, GPB may permit some Investors to purchase Class A Units with lower or no Selling Fees, and GPB may treat those Investors' Capital Accounts as if the full amount of Selling Fees were assessed.

Upon acceptance of a Limited Partner's subscription, a portion of such LP's subscription price will be used to pay the Selling Fees. The Selling Fees are in addition to the Partnership Expenses, Managerial Assistance Fees, Acquisition Fees and Organizational Expenses payable by us.

The Selling Fees will be greater than the fees and commissions paid by investors in the Class B Units. Information regarding the fees, commissions and expenses payable by investors in the Class B Units is available from the Company upon request.

# COMPANY FEES & EXPENSES

We will bear the following fees and expenses:

*Organizational Expenses*: We will pay up to 1.25% of the gross proceeds received by (or expected to be received by) us from the Offering of our Organizational Expenses. Any Organizational Expenses in excess of such amount will be paid by GPB or its affiliates. While GPB is entitled to full reimbursement of our Organizational Expenses up to the cap (which is in part based on our expected Offering size), it likely may defer reimbursements of a significant portion of our Organizational Expenses in its discretion until the time at which GPB believes our returns can be appropriately balanced with Organizational Expense reimbursements.  *See "Summary of the LPA" and the LPA.*

*Managerial Assistance Fee*: GPB is entitled to receive an annualized Managerial Assistance Fee, payable by us quarterly in advance equal to 2.0% of the Capital Contributions made to us for providing managerial assistance and other services to us and the Portfolio Companies. Those services will include conducting our day to day operations as described above, along with providing reports to LPs and other duties assumed under the LPA.

The Managerial Assistance Fee will be paid over time and based on the initial value of LPs' Capital Contributions. It will not decrease if the value of our acquisitions decreases, nor will it increase if the value of our acquisitions increases.

GPB has the right to assign all or a portion of the Managerial Assistance Fee otherwise payable to GPB, and we will pay such Managerial Assistance Fee, to designated placement agents for services rendered by such placement agents in connection with the Offering, including placement agents that are members of the Selling Group.

*Acquisition Fee*. Upon the consummation of any acquisition of a Portfolio Company, we will pay qualified third parties, including members of the Selling Group (other than persons holding any financial interest in the Portfolio Company), an Acquisition Fee of 1.75% of the total acquisition cost of the Portfolio Company.  The Acquisition Fee will be paid in consideration of services provided to us in our Offering, as well as identifying, structuring and providing us with advice on our acquisitions.  We presently anticipate paying one third party (who is a member of the Selling Group) Acquisition Fees, and we may identify other third parties for which we determine such compensation would be appropriate.

*Partnership Expenses*. We will pay our Partnership Expenses, including financing and other transactions fees (such as acquisition and closing fees), costs and expenses, conference and other similar expenses (such as research and data services), professional and insurance expenses, all litigation-related and indemnification expenses, administrative expenses, and any taxes, fees or other governmental changes levied against us. Because GPB provides operational services to us and other Vehicles it manages, GPB allocates such expenses among its clients on a pro-rata basis, as further described below under *"Related Parties & Conflicts of Interest—Expense Allocations."*

# ALLOCATION OF PROFITS & LOSSES

For each Fiscal Period (fiscal quarters or fiscal years), Net Profit will be tentatively allocated to the LPs, including GPB, according to their Capital Accounts in a manner sufficient to cause each LP's Capital Account to equal the amounts such LPs would receive upon the liquidation of the Company. Net Profits and Net Losses are determined on an accrual basis of accounting in accordance with GAAP. "Net Profits" or "Net Losses" are our taxable income or loss determined in accordance with the Code, with adjustments provided in the LPA.

# RELATED PARTIES & CONFLICTS OF INTEREST

*Generally*

The Related Parties may be subject to certain potential or actual conflicts of interest in connection with our activities and acquisitions. Related Parties may serve as advisors or managers to other companies and conduct investment activities for their own accounts. Such other entities, clients or accounts may have investment objectives or may implement investment strategies similar to ours. The Related Parties may provide services to or have investments in the entities in which we invest or may make acquisitions in such entities with us. The Related Parties may also have investments in certain of the entities managed by any of the Related Parties, and/or serve as officers and/or directors (and receive fees or other compensation in connection therewith) of entities in which we invest. In addition, certain of the Related Parties receive certain fees described herein regardless of our success. Our placement agents may have provided, and may in the future provide, investment banking, commercial banking and other services to the Portfolio Companies.

We or a Related Party may, from time to time, have the opportunity to retain third parties who have prior business relationships with a Related Party to act for us or a Related Party as consultants or in some other capacity. If we or a Related Party retains any such parties, the Related Parties may experience a conflict between the Related Party's interests and its interest in preserving any ongoing business relationship with that party. This conflict may result in our paying more for these services than would otherwise be the case.

As a result of the foregoing, the members and/or partners and principals and affiliates of the Related Parties may have conflicts of interest in allocating their time and activity between us and other clients, in allocating acquisitions between us and other clients and in effecting transactions for us and other clients, including ones in which the Related Party may have a greater financial interest. In addition, there is no assurance that GPB will devote adequate time to our operations or that any Related Party will devote adequate time to the Related Party with respect to which it performs services or management. If a Related Party suffers or is distracted by adverse financial or operational developments in connection with its operations unrelated to the Related Party to which it is performing management or other services, it may allocate less time and/or resources to such Related Party's operations. If any of these things occur, the value of an investment in the Company may suffer.

*Specific Transactions & Co-Investments*

GPB may also effect principal transactions between itself or its affiliates and us. Related Parties have served or currently serve as officers and board members for other entities, including Chairman of LAG; Chairman of Qello Holdings, LLC; Chairman of Comgroup Holdings, LLC DBA AlphaServe Technologies; Board Member of Assure Net; investor in Soligenix, Inc., Treasurer and Chief Financial Officer of QT Ultrasound, LLC and Managing Member of CVUS Ventures, LP and others. Any transaction effected between us and GPB or its affiliates—including Related Party Transactions—will be conducted at arm's length for fair market value and on terms as favorable to us as would be the case in a transaction with an independent party and in accordance with any fiduciary obligation of GPB under applicable law.

We do not anticipate entering into any Related Party Transactions, and we do not plan to enter into one involving the sale by a Related Party of an economic interest. Further, under the LPA, the Advisory Committee must unanimously approve any Related Party Transaction by determining that the transaction is in our best interest after obtaining an independent evaluation by a nationally-recognized firm with qualified personnel holding such accreditations appropriate to value a specific industry or asset. For example, we have identified MBAF (www.mbafcpa.com) (automotive sector specialist), Citrin Cooperman (www.citrincooperman.com) (automotive dealership specialist) and Crowe Horwath (www.crowehorwath.com) as independent evaluation providers.

The Related Parties may engage in businesses in which we do not have an interest and which may be competitive with our activities, and may be equity holders, directors, employees, advisors or engaged in another capacity with entities which compete with us, including for acquisition opportunities. For example, GPB or its affiliates have, and may in the future, organize other Vehicles that may also invest in the sectors we are targeting, or may co-invest with us. Accordingly, they may have conflicts of interest in determining to which entity a particular business opportunity should be presented to us, though GPB will attempt to equitably allocate acquisition opportunities between us and any other affiliated vehicles. We cannot assure Investors that these conflicts will be resolved in our favor or that a potential target business would not be presented to another entity prior to its presentation to us.

If a potential Portfolio Company acquisition fits our investment objective and one or more Vehicles, and each have capital available to invest in the Portfolio Company, GPB will allocate the investment opportunity among us and Vehicles taking into account all relevant factors, including:

- The amount of capital each participant has available to invest, as compared to the total amount of capital each participant anticipates raising;
- The extent to which the potential Portfolio Company deviates from the participants' investment objectives; and
- The extent to which the potential acquisition would promote the participants' sector, geographic, brand or other diversification goals.

To mitigate any potential conflicts of interests in a co-investment situation, GPB will avoid organizing any Vehicle with different economic structures.  Further, GPB's allocation policies provide that when allocating acquisition opportunities among us and other Vehicles, GPB will:

- Not disadvantage one client over another client;
- Not pursue the transaction unless each client invests on the same terms as all other clients—including the ability of a client to make follow-on investments and exit;
- Ensure that no affiliated person has any ownership interest in the potential acquisition;
- Not recommend one client invest as a method to increase its fees from that or another client;
- Not pursue such transactions as a method to transfer investment risk from one client to another client;
- Not bring in additional clients into the transaction for the purpose of reducing another client's transactional costs;
- Not favor the portfolio company over its clients' interests, even if GPB's personnel serve as officers or directors of such portfolio investment; and
- Ensure that any committee or other approval required for the client is obtained.

*Expense Allocations*

As is customary with acquisition vehicles like the Company, we do not have any personnel or operational capabilities.  Instead, all of our operational capabilities and personnel are provided by GPB, which provides similar resources for its other investment vehicle clients.  Because provides these resources to multiple clients, their expense must be allocated among its clients.  GPB fairly allocates such expenses among its clients in conformance with its duties to its clients.  When allocating expenses, GPB takes into account the stage of the investment vehicle client—whether still raising capital or having concluded its offering.  Once the vehicle's stage is taken into account, GPB allocates those operational expenses pro-rata among its clients.

# SUMMARY OF THE LPA

The following description of certain provisions of the LPA, which governs substantially all aspects of our business, including the rights and obligations of GPB and the other LPs, is not intended to be complete, and reference is made to the detailed provisions of the LPA. All prospective Limited Partners should read the LPA in their entirety and may wish to consult with their own counsel with respect thereto. A representation that the prospective Investor has done so is contained in the Subscription Documents. A copy of the LPA is attached as <u>Exhibit A</u>. Capitalized terms used below and not otherwise defined have the same meaning as provided in the LPA.

**Nature of Company & Limitation of Liability**

The Company is a limited partnership formed under the Delaware Revised Uniform Limited Partnership Act (the "<u>Act</u>"). The LPA limits LPs' liability for our losses or debts up to their Capital Contributions, any gains or income allocated to their respective Capital Accounts, and the obligation, if any, to return distributions to the Company to the extent required under the Act.

Under the Act, a limited partnership may not make a distribution to a partner to the extent that, at the time of the distribution, after giving effect to the distribution, all liabilities of the limited partnership, other than liabilities to partners on account of their limited partnership interests and liabilities for which the recourse of creditors is limited to specified property of the limited partnership, exceed the fair value of the limited partnership's assets. A Limited Partner who receives a distribution in violation of this provision, and who knew at the time of the distribution that the distribution violated this provision, is liable to the limited partnership for the amount of the distribution.

**Control of Operations**

GPB is vested with the exclusive management and control of our business. LPs have no power to take part in the management of or bind us. No person should become a Limited Partner unless such person is willing to entrust all aspects of the management of the Company to GPB. GPB may contract with any person to carry out any of its duties and may delegate to such person any of its power or authority under the LPA, but no such contract or delegation will relieve GPB of any of its duties or obligations thereunder. In addition, any lender may restrict the ability of GPB to take certain actions without such lender's consent.

**Removal of GPB**

GPB may be removed as General Partner if upon the affirmative vote of at least 20% of the LPs (who are not affiliates of GPB) to remove GPB if any of the following events occur: (i) a final, non-appealable judicial determination that GPB has committed fraud, gross negligence or willful misconduct, or (ii) (A) an action or proceeding under the United States Bankruptcy Code is filed against GPB and (I) such action or proceeding is not dismissed within 90 days after the date of its filing or (II) GPB files an answer acquiescing in or approving of such action or proceeding, (B) an action or proceeding under the United States Bankruptcy Code is filed by GPB or (C) a receiver or conservator is appointed to take control of GPB or all or a substantial portion of its property. If GPB were to be so removed, a majority of the LPs will elect a successor general partner, any Units held by GPB would not be affected, and the Special LP's Performance Allocation would be exchanged for Class A Units.

**Voting Rights of LPs**

The Limited Partners do not have voting rights except in certain situations specified in the LPA.

**Side Letters & Additional Unit Classes**

We are permitted to enter into Side Letters with prospective Investors that provide those Investors with additional and/or different rights (including access to information, minimum investment amounts or liquidity terms) than such Investors otherwise have under the terms of this Memorandum. GPB may enter into Side Letters with any party as it may enter into Side Letters in its discretion, and neither we nor GPB will be required to notify any LP of any such Side Letters or any of their rights or terms, nor will GPB be required to offer such terms to any other LP. GPB is also authorized under the LPA to create additional Unit classes, provided such other classes do not modify Class A Unit holders' economic rights.

**Liability of General Partner; Indemnification**

To the fullest extent provided by law, our debts, liabilities and obligations belong solely to us, and GPB will not be liable or obligated personally for any such debt, liability or obligation solely by reason of its status as General Partner. GPB and its affiliates will not be liable to us or any Limited Partner for losses sustained, liabilities incurred, or benefits not derived by the LPs in connection with (i) any decisions made by, or actions taken or not taken by, GPB or its affiliates, so long as GPB or its affiliates acted in good faith and in a manner it reasonably believed to be in, or not opposed to, the best interests of the Company and its conduct did not constitute gross negligence, fraud or willful or wanton misconduct; or (ii) any Partner's experience of identity theft or other similar criminal activity.

The LPA provides that we will, to the fullest extent permitted by law, indemnify GPB and its officers, directors, members, employees and other related parties and their respective affiliates, as well as members of the Advisory Committee and the Investment Committee (collectively, "Indemnified Persons"), and advance expenses to Indemnified Persons as described in the LPA. We will indemnify Indemnified Persons for losses, liabilities and damages sustained by them if they acted in good faith and in a manner that they reasonably believed to be in or not opposed to our best interest, and, with respect to any criminal action, had no reasonable cause to believe that their actions were unlawful. No indemnification will be made for any claim for which an Indemnified Person is found to be liable for gross negligence, willful misconduct or fraud in the performance of its duties. To the extent that an Indemnified Person is successful in defending a suit, they will be indemnified against expenses, including attorney's fees, actually incurred in connection therewith.

Expenses incurred by the Indemnified Person in defending any suit or action will be paid by us in advance of final disposition of the action or suit, provided that the Indemnified Person will undertake to repay the amount if they are found not to be entitled to indemnification. The indemnification and advancement of expenses provided to the Indemnified Persons are not exclusive of any other rights to which the Indemnified Person may be entitled. We reserve the power to buy and maintain insurance on behalf of GPB and its affiliates in addition to these indemnification provisions.

**Conflicts of Interest**

The LPA does not have any provisions prohibiting any member, officer, director, security holder or affiliate of the Company or GPB from (i) having any direct or indirect pecuniary interest in any property to be acquired or disposed of by us or in any transaction to which we are a party or has an interest, or (ii) engaging for their own account in activities of the sort engaged in by us. However, the LPA does require the Advisory Committee's approval before entering into a Related Party Transaction. *See "Related Parties & Conflicts of Interest."*

**Advisory Committee**

The Advisory Committee is composed of three members appointed by GPB. Under the LPA, Advisory Committee members must be "independent" of us. To be so independent, GPB must first determine that the person has no material relationship with us (either directly or as a partner, shareholder or officer of an organization that has a relationship with us). Further, a person is not "independent" of us if:

- The person is, or has been within the last three years, an employee of the Company, or an immediate family member is, or has been within the last three years, an executive officer, of the Company.
- The person has received, or has an immediate family member who has received, during any 12-month period within the last three years, more than $120,000 in direct compensation from us;
- The person is a current partner or employee of a firm that is our auditor, the person has an immediate family member who is a current partner of such a firm, the person has an immediate family member who is a current employee of such a firm and personally works on our audit, or the person or an immediate family member was within the last three years a partner or employee of such a firm and personally worked on our audit within that time;
- The person or an immediate family member is, or has been with the last three years, employed as an executive officer of another company where any of the present executive officers of the Company or GPB at the same time serves or served on that company's compensation committee; or
- The person is a current employee, or an immediate family member is a current executive officer, of a company that has made payments to, or received payments from, us for property or services in an amount which, in any of the last three fiscal years, exceeds the greater of $1 million, or 2% of such other company's consolidated gross revenues.

GPB will determine, consistent with industry norms, the Advisory Committee's compensation. Since the Advisory Committee's sole role is to review any potential Related Party Transaction and we do not intend to enter into Related Party Transactions, the Advisory Committee will only meet on an *ad hoc* basis. The Advisory Committee members must unanimously approve any proposed Related Party Transaction after reviewing materials they deem appropriate, including a third party evaluation, and after determining that the transaction is in our best interest.

**Capital Contributions & Capital Accounts**

Each LP will have a Capital Account established on the books of the Company which will be credited with such LP's Capital Contribution, net of Selling Fees (the Net Capital Contribution). Each such Limited Partner's Capital Account will be increased to reflect (i) any additional Capital Contributions and (ii) any Net Profits allocable to such Limited Partner, and will be decreased to reflect (y) any withdrawals and (z) any Net Losses allocable to such Limited Partner.

**Additional Capital Contributions**

Additional Capital Contributions may be made by LPs at any time while the Offering is open in amounts of at least $10,000, subject to GPB's discretion to accept lesser amounts. Such additional contributions will not be "credited" to us (i.e., deemed to be part of our assets for purposes of calculating Allocation Percentages or Net Profits and Net Losses) until the later of acceptance by us and the first day of the calendar month following such Additional Contributions. GPB may, in its sole discretion, reject any additional subscription request.

**Allocation of Net Profits & Net Losses**

For each Fiscal Period (fiscal quarters or fiscal years), Net Profit will be tentatively allocated to the LPs, including GPB, according to their Capital Accounts in a manner sufficient to cause each LP's Capital Account to equal the amounts such LPs would receive upon the liquidation of the Company. Net Profits and Net Losses are determined on an accrual basis of accounting in accordance with GAAP. "Net Profits" or "Net Losses" are our taxable income or loss determined in accordance with the Code, with adjustments provided in the LPA.

**Distributions to LPs**

Distributions will be made by us at the discretion of GPB. GPB may decide to retain and/or reinvest cash otherwise available for distributions to the Limited Partners. We expect to make distributions of cash, if any, to the LPs no more frequently than on a monthly basis.

GPB intends for us to make distributions of cash, if any, to the LPs beginning three months after their subscription at the Target Return (though distributions could be more, less or none at all, depending on our cash flow). If we have excess cash available to distribute, we may make special distributions in GPB's sole discretion. We will make distributions of cash in the following amounts and order of priority:

(i) <u>first</u>, until the LPs have received (when aggregated with all previous distributions to the LPs) all of their respective Net Capital Contributions, and in the GP's discretion, either (a) the Target Return to each LP, or (b) to the LPs in proportion to their unreturned Net Capital Contributions;

(ii) <u>second</u>, to the LPs in proportion to their unpaid Hurdle until the LPs have received an amount that when aggregated with all previous distributions to the LPs for all prior periods, is equal to the sum of (a) the Limited Partners' gross Capital Contributions, plus (b) a cumulative return of 8% per annum; with the Hurdle paid on LPs' gross Capital Contributions, less distributions, measured on the last day of each calendar month and then averaged over the preceding 12 months, at the end of each calendar year;

(iii) <u>third</u>, subject to any offset of any tax distributions received as described below, the Catchup, which is 100% to the Special LP until the aggregate distributions made to the Special LP equal 20% of the sum of (a) the amount paid to the LPs holding Class A Units above their Net Capital Contributions described in clause (ii)(a) above, plus (b) the amount paid to the LPs holding Class B Units above their gross Capital Contributions, plus (c) the aggregate distributions made to the Special LP; and

(iv) <u>thereafter</u>, 80% to the LPs in proportion to their Capital Contributions and (subject to the offset of any tax distributions made to the Special LP described below) the Performance Allocation of 20% to the Special LP.

Additionally, to the extent the Special LP or its members incur tax liability resulting from the recognition by the Special LP of the amounts distributable under clauses (iii) and (iv) above, and the Special LP has not received a distribution to cover such tax liability, GPB may cause the Company to advance amounts sufficient to cover such tax liability to the Special LP. Any such tax-related advances will offset any future distributions that the Special LP is entitled to.

By way of example of the waterfall provided above, if (i) we have only one LP with Class A Units and the Limited Partner's gross Capital Contribution is $100,000, (ii) the Selling Fees attributable to the Limited Partner equaled 11.0% of his / her Capital Contribution, and (iii) we make a distribution of $200,000 on the first anniversary of the Limited Partner's Closing, then the waterfall would be calculated as follows:

- First, $89,000 to the LP under clause (i) above as a return of the Limited Partner's Net Capital Contribution (i.e., $100,000 less $11,000 in Selling Fees);

- Second, $19,000 to the LP ($11,000 to the LP as a return of the Selling Fees and $8,000 to the LP for the Hurdle amount (assuming no prior distributions under clause (iv) above));

- Third, $4,750 to the Special LP as the Catchup (calculated as 20% of (i) the total distributions to the LP over LP's Net Capital Contribution plus (ii) the distribution to the Special LP);

- Fourth, $87,250 as follows (i) $69,800 (or 80%) to the LP and (ii) $17,450 (or 20%) to the Special LP (the Performance Allocation).

In the example above, distributions to the Class A Limited Partner would total $177,800 (constituting the return of the LP's $89,000 Net Capital Contribution plus $88,800) and distributions to the Special LP would total $22,200. All subsequent distributions would be shared 80/20 between the LP and the Special LP under clause (iv) above, since all of the LP's Capital Contributions would have been returned, plus payment of the Hurdle amount.

Because it is possible the rate of the Target Return could change over time, and because LPs will receive the Target Return based on their gross Capital Contribution until their Net Capital Contributions have been returned, and finally because of differences in the amount of Selling Fees attributable to LPs holding different Unit classes, there may be variances in the amounts individual LPs receive from the Company until the point at which all LPs have received a return of their Net Capital Contributions.

We are restricted in the distribution of profits by the Act, which prohibits a limited partnership from making a distribution of profits to its partners if, after giving effect to the distribution, the limited partnership would be unable to pay its debts as they become due in the usual course of business, or if the limited partnership's total assets would be less than the sum of its total liabilities. Even if we may legally declare distributions, the amount and timing of such distributions will depend on our earnings, if any, our financial condition, and other factors considered relevant by GPB. While LPs will receive current distributions out of cash, we are not required to return any capital to the Limited Partners until the Company is liquidated. Until that time, it is GPB's objective to invest and in some cases reinvest our capital as described above.

**Term & Termination**

While we generally expect the Company to operate for approximately six to eight years (the *Company's* term is different from the length of time we may hold a *Portfolio Company* (which we will hold for at least three to five years)), the Company's term will expire on the earliest of: (i) a determination by GPB that the Company should be wound up, (ii) the date we divest our ownership interest in the last Portfolio Company, (iii) the termination, bankruptcy, insolvency or dissolution of GPB, (iv) the sale of substantially all of our assets, (v) upon the written consent of all of the Partners to terminate, (vi) an event of withdrawal of GPB, or (vii) a court decree requiring the winding up or dissolution of the Company.

Upon the winding up or termination of the Company, the Company will be wound up in accordance with the LPA. GPB is empowered to distribute our assets in-kind when liquidating the Company, and such in-kind assets may be difficult for individual LPs to monetize.

**Amendment of LPA & Other Action**

GPB has the power, without the consent of the Limited Partners, to amend the LPA and take such other action as it deems necessary to (i) reflect the admission, substitution, termination, or withdrawal of LPs in accordance with the LPA; (ii) cure any ambiguity, correct or supplement any provision in the LPA not inconsistent with the law or with other provisions of the LPA, or make other changes with respect to matters arising under the LPA that will not be inconsistent with the law or with the provisions of the LPA, provided that no such amendment will materially adversely affect the LPs without appropriate Limited Partner consent; (iii) add, amend or delete provisions of the LPA which addition, amendment or deletion is, in the opinion of counsel to the Company, for the protection of or otherwise to the benefit of the Limited Partners; (iv) take such actions (if any) as may be necessary to ensure that the Company will be treated as a partnership for federal income tax purposes; (v) reflect the proposal or adoption of regulations under Code §704(b) or §704(c) otherwise to preserve or achieve uniformity of the Units, provided that such amendment would not have a material adverse effect on the Limited Partners or the Company and is consistent with the principles of Code §704; and (vi) make such amendments or deletions to take into account the effect of any change in, amendment of or repeal of any applicable legislation, which amendments, in the opinion of counsel to the Company, do not and will not materially adversely affect the interests of the LPs without appropriate Limited Partner consent. Investors should note that LPs have no voting rights except in very limited and specific situations.

**Assignment & Transfer of Units**

There are significant restrictions on the transferability of Units. *See "Restrictions on Transfer of Interests."*

**Compulsory Transfer or Acquisition of Units**

The LPA grants GPB the authority to require a Limited Partner to transfer its Units or, if the Limited Partner does not transfer its Units within 21 days, to have the Company sell the Units on such LP's behalf or to reacquire them for the price paid by such Limited Partner. GPB may exercise this power if, in its sole determination, any continued holding of Units by any direct or beneficial LP might cause or be likely to cause (i) the Company to be classified as a PTP, (ii) our assets to be considered "plan assets" within the meaning of ERISA, Code §4975 or applicable regulations, (iii) the Units to be required to be registered under the 1934 Act, or (iv) some legal, regulatory, pecuniary, tax or material administrative disadvantage to the Company or its LPs.

**Limited Redemption Rights**

LPs who have held their Units for at least one year may request that we repurchase all, but not less than all, of their Units; though LPs do not have a right to demand a return of their capital. An LP wishing to have Units redeemed must mail or deliver in writing a request to us indicating that desire. The purchase price for redeemed Units will be 95% of the purchase price of such Units, minus (i) any Selling Fees paid with respect to such Units, (ii) any fees incurred by us in connection with the redemption, including legal and administrative costs for redemption.

We intend to redeem Units on a quarterly basis and will not redeem in excess of 10% of the Units during any 12-month period. GPB reserves the right in its sole discretion at any time and from time to time to (i) reject any request for redemption, (ii) change the purchase price for redemptions, or (iii) terminate, suspend and/or reestablish our redemption program. GPB will determine from time to time whether we have sufficient excess cash from operations to repurchase Units. Generally, the cash available for redemption will be limited to 10% of our operating cash flow from the previous fiscal year. If funds set aside for the redemption program are not sufficient to accommodate all requests, at such time, if any, when sufficient funds become available, pending requests will be honored among all requesting LPs in accordance with their order of receipt.

## Power of Attorney

Under the LPA and the Subscription Agreement, you appoint GPB your attorney-in-fact for signing certain documents, including the LPA. You cannot revoke this special power of attorney, which will survive your death and any transfer of your Units.

## Meetings & Reports

We have adopted a taxable year ending on December 31. Books of account will be kept by the Company in accordance with GAAP. GPB will perform an annual valuation of the Company in conformance with GAAP, and our financial statements will be annually audited by a PCAOB-registered firm and provided to the LPs. LPs will also receive a copy of GPB's audited financial statements, and may, upon request, obtain the annually audited financial statements of the Portfolio Companies.

Our books and records, including certain information regarding GPB, copies of the LPA and certain other organizational documents, and federal, state and local income tax or information returns and reports will be maintained at the office of the Company. Any LP will, at its expense and upon providing GPB with no less than 10 business days' prior written request, have access to the books and records of the Company during normal business hours or as designated by GPB for such purposes as required by the Act; provided, however, that the LP exercising such right may not unreasonably interfere with or disrupt our business.

Within 120 days after the end of each fiscal year, GPB will deliver to each LP on our behalf (i) an audited financial report of the Company for such fiscal year containing a balance sheet as of the beginning and the end of such fiscal year, a statement of changes in the Limited Partners' equity as of such dates; and a statement of operations for such period, and (ii) all necessary tax reporting information, which information will include all necessary information in order for all LPs to satisfy reporting obligations under the Code with respect to any acquisitions we make in any entities organized or formed in jurisdictions outside the United States.

Within 45 days after the end of each Fiscal Quarter, GPB will use its best efforts to deliver to each LP an unaudited summary investment report of the Company for such Fiscal Quarter; provided that if our Units become registered under the 1934 Act, GPB may elect to provide such information with reference to our 1934 Act quarterly reports filed with the SEC.

GPB may call meetings of the LPs from time to time to consider the advisability of taking certain action in conducting our business if in its opinion such a meeting would be useful in explaining the proposal, but GPB has no obligation to call such meetings.

# SERVICE PROVIDERS

## Auditor

The books of account and records for the Company, GPB and each Portfolio Company, prepared on the basis of GAAP, will be audited annually. McGladrey LLP, a firm registered with the Public Company Accounting Oversight Board ("PCAOB") has been engaged as our auditor. GPB retains the authority to engage and dismiss any such auditors.

## Administrator

GPB has engaged a financial services provider to perform various administrative services for us. GPB has initially so engaged Trident Fund Services, and retains the authority to engage and dismiss any such service provider. Trident Fund Services has been contracted to perform the following functions:

**Full Service Investor Administration – including**
- New Business Processing
- Bank Account Management
- Electronic Document Management
- Database & File Management
- Electronic & Physical Data Storage
- Confirmation Letters
- Investor / Rep Record Access Through Customized Web Portal

**Investor Relations**
- Distributions
- Redemptions
- Account Summary
- Commission Calculation
- Tax Reporting
- OFAC Compliance

## CERTAIN TAX, ERISA & REGULATORY MATTERS

**WITH RESPECT TO ANY AND ALL OF THE U.S. FEDERAL INCOME TAX DISCUSSION CONTAINED ANYWHERE IN THIS MEMORANDUM (THE "TAX ADVICE"), EACH INVESTOR IS INFORMED THAT: (A) THE TAX ADVICE WAS NOT INTENDED OR WRITTEN TO BE USED, AND SUCH TAX ADVICE CANNOT BE USED BY ANY PERSON, FOR PURPOSES OF AVOIDING PENALTIES THAT MAY BE IMPOSED UNDER FEDERAL TAX LAW; (B) THE TAX ADVICE WAS WRITTEN TO SUPPORT THE PROMOTION OR MARKETING OF UNITS; AND (C) EACH POTENTIAL INVESTOR SHOULD SEEK ADVICE BASED ON THE INVESTOR'S PARTICULAR CIRCUMSTANCES FROM AN INDEPENDENT TAX ADVISOR.**

The following is a summary of certain material United States federal income tax considerations relating to an investment in the Company. This summary is based on the Code, existing and proposed Treasury Regulations revenue rulings, administrative interpretations and judicial decisions (all as currently in effect and all of which are subject to change, possibly with retroactive effect). Except as specifically provided below, this summary deals only with Units held as capital assets within the meaning of Code §1221. This summary does not purport to address all federal income tax considerations that may be relevant to investors in light of their particular circumstances or to investors subject to special tax rules, such as insurance companies, dealers in securities or foreign currencies, or persons holding Units as part of a hedging transaction, straddle, conversion transaction, or other integrated transaction.

No ruling has been requested from the IRS or any other federal, state or local agency with respect to the matters discussed below and GPB has not asked its counsel to render any legal opinions regarding any of the matters discussed below. This summary does not in any way either bind the IRS or the courts or constitute an assurance that the federal income tax consequences discussed herein will be accepted by the IRS, any other federal, state or local agency or the courts. The Company is not intended and should not be expected to provide any tax shelter.

The following summary of certain United States federal tax issues is not intended as a substitute for tax or legal advice. Except where otherwise indicated, this discussion is addressed solely to prospective Investors who are or would be U.S. Investors (as defined below). Prospective Investors should consult with their own tax advisors with regard to the application of the United States federal income tax laws to their particular situations as well as any tax consequences arising under the laws of any state, local or foreign jurisdiction.

As used below, the term "U.S. Investor" means a beneficial owner of Class A Units who or that is, for United States federal income tax purposes, (i) a citizen or resident (within the meaning of Code §7701(b)) of the United States, (ii) a corporation or other entity treated as such for United States federal income tax purposes created or organized in or under the laws of the United States or of any political subdivision thereof, (iii) an estate the income of which is subject to United States federal income taxation regardless of its source, or (iv) a trust if a United States court is able to exercise primary supervision over its administration, and one or more United States trustees or fiduciaries have the authority to control all of its substantial decisions. A "Foreign Investor" means a beneficial owner of Class A Units who or that is not a U.S. Investor. If a partnership or other flow-through entity owns Class A Units, the federal tax treatment of a partner or other owner of such entity generally will depend on the status of the partner or other owner and the activities of the partnership or other flow-through entity.

**Tax Status**

The Company was formed as a Delaware limited partnership and does not intend to "check the box" to be treated as an association for United States federal income tax purposes. Accordingly, we should be treated as a "partnership" for United States federal income tax purposes.

Code §7704 treats certain partnerships, the interests of which are either publicly traded on an established securities market or readily tradable on a secondary market (or the substantial equivalent thereof), as corporations for federal income tax purposes. Under Regulation §1.7704-1(d), interests in a partnership are not considered traded on an established securities market or readily tradable on a secondary market unless the partnership participates in the establishment of the market or the inclusion of its interests in a market, or the partnership recognizes any transfers made on the market by redeeming the transferor partner, admitting the transferee as a partner, or otherwise recognizing any rights of the transferee.

We will not list any Units on any stock exchange. The Treasury Regulations provide certain safe harbors that, if satisfied, will allow transfers to occur that will not result in the Units being treated as publicly-traded or treated as readily tradable on a secondary market or the substantial equivalent. The safe harbors include transfers:

- In "private" transfers;
- Pursuant to a qualified matching service ("QMS"); or
- In limited amounts that satisfy a 2% test.

"Private" transfers include, among others:

- Transfers in which the basis of the partnership interest in the transferee is determined, in whole or in part, by reference to its basis in the hands of the transferor or is determined under Code §732, related to distributions from a partnership;
- Transfers by gifts in which the transferee's tax basis in the Units is determined by reference to the transferor's tax basis in the interests transferred;
- Transfers at death, including transfers from an estate or testamentary trust;
- Transfers between members of a family as defined in Code §267(c)(4);
- Transfers from retirement plans qualified under Code §401(a) or an IRA; and
- "Block transfers." A block transfer is a transfer by a Limited Partner and any related persons as defined in the Code in one or more transactions during any 30 calendar day period of Units that in the aggregate represents more than 2% of the total interests in partnership capital or profits.

Transfers through a QMS are also disregarded in determining whether Units are readily tradable. A matching service is qualified only if it meets extensive conditions and limitations. We do not have any plan to utilize a QMS at this time.

In addition, interests are not treated as readily tradable if the sum of the percentage of the interests transferred during the entity's tax year, excluding private transfers, does not exceed 2% of the total interests in partnership capital or profits. The LPA provides that LPs must receive the consent of GPB prior to any transfer of Units, and one of the conditions to approval is that the transfer will not cause it to be treated as a PTP. Thus, we should not be treated as a PTP.

If we are classified as an association taxable as a corporation instead of as a partnership, for any year, we would be subject to federal income tax on our taxable income at rates up to 35% (with adjustments to recapture lower graduated tax rates) and any applicable state and local taxes; distributions to LPs would be taxable as dividends to the LPs to the extent of our current and accumulated earnings and profits and would not be deductible by us; and our deductions, if any, would be allowed only by the Company, rather than being passed through to LPs. If designated by us, such dividends may qualify (provided holding period and certain other requirements are met) for the dividends received deduction in the case of corporate stockholders under Code §243. Under current law, the qualified dividend income will be taxed to individuals, trusts, and estates at net capital gain rates. The newer 3.8% Medicare tax may also be applicable to the receipt of qualified dividends by certain U.S. Investors who are individuals, estates or trusts and whose income exceeds certain thresholds.

The remainder of this discussion of *"Certain Tax, ERISA & Regulatory Matters"* assumes that we will be classified as a partnership, and not as a corporation, for federal income tax purposes. Thus, the following rules applicable to partnerships and their partners will apply to us and our LPs unless otherwise indicated.

**Taxable U.S. Investors**

***Allocations of Income, Gains, Losses, Deductions & Credits***. For United States federal income tax purposes, a partnership is not a taxable entity but rather a conduit through which items of income, gain, loss, deduction and credit are passed and its partners must report. Thus, each U.S. Investor will be required to report on its federal income tax return its allocable share of items of income, gain, loss, deduction or credit realized by us. Because portions of our available cash will be used to fund certain expenses and may be used to repay borrowings for which we are liable, such funds may not be available for distribution to U.S. Investors. Consequently, a U.S. Investor may be allocated income from us in a particular year, yet may not receive a cash distribution in respect of such income, and would have to find an alternate source of funds to pay its taxes on such amount. Taxable income or loss allocated to Limited Partners from us will retain the same character, as capital gain or loss, or ordinary income or loss, for the LPs as determined at the Company level. Such income will be capital gain or loss to the extent that it arises from the sale of capital assets.

Code §704(b) and the Treasury Regulations thereunder provide that a partner's distributive share of income, gain, loss, deduction or credit will be controlled by the partnership agreement if the allocation provided for in the partnership agreement has "substantial economic effect." If the allocation provided for in the partnership agreement does not have substantial economic effect, then a partner's distributive share must be allocated in accordance with each partner's interest in the partnership, which will be determined by taking into account all the facts and circumstances, such as a partner's interest in profits and losses, relative share of capital contributed, interest in cash flow and right to distributions upon liquidation.

Treasury Regulations promulgated under Code §704(b) provide certain guidelines which, if satisfied by the Company, will result in the allocation of profits and losses being deemed to have substantial economic effect. If the IRS were to contend successfully that the allocation of profits and losses under the terms of the LPA was not in accordance with such guidelines, then each LP's share of the income, gain, losses, deductions or credits from us would be determined in accordance with his, her or its interest in the Company, taking into account all the facts and circumstances, including those discussed above.

***Tax Basis in a Class A Unit***. A U.S. Investor's tax basis in a Class A Unit initially will equal the amount paid to acquire such Class A Unit. It will be increased by (i) any subsequent cash contributions the U.S. Investor makes to the Company, (ii) the U.S. Investor's distributive share of our taxable income, (iii) the U.S. Investor's distributive share of our tax-exempt income, and (iv) any increase in the U.S. Investor's share of our liabilities. It will be decreased (but not below zero) by (i) actual distributions we make to the U.S. Investor, (ii) the U.S. Investor's distributive share of our losses (even if such losses are deferred as described below), (iii) the U.S. Investor's distributive share of our non-deductible expenses that are not properly chargeable to a capital account and (iv) a decrease in the U.S. Investor's share of our liabilities.

***Basis & At Risk Limitations on Deductions***. U.S. Investors' ability to deduct their share of deductions and losses will be limited to their adjusted tax basis in their Class A Units, or in the case of a U.S. Investor that is an individual or a corporation (if more than 50% of the value of such corporation's stock is owned directly or indirectly by five or fewer individuals or certain tax-exempt organizations), to the amount that the U.S. Investor is considered to be "at risk" with respect to our activities, if that is less than the U.S. Investor's adjusted tax basis. A U.S. Investor must recapture losses deducted in previous years to the extent that our distributions cause the U.S. Investor's at risk amount to be less than zero at the end of any taxable year. Losses disallowed to a U.S. Investor or recaptured as a result of these limitations will carry forward and will be allowable to the extent that the U.S. Investor's tax basis or at risk amount (whichever is the limiting factor) is increased above zero.

In general, each U.S. Investor will be at risk to the extent of the purchase price of its Class A Units, but this will be less than the U.S. Investor's tax basis in its Class A Units to the extent of the U.S. Investor's share of any of our nonrecourse liabilities (other than certain "qualified nonrecourse financing"). A U.S. Investor's at risk amount will increase or decrease as the adjusted tax basis of the U.S. Investor's Class A Units increase or decrease except that changes in our nonrecourse liabilities (other than with respect to certain "qualified nonrecourse financing") will not increase or decrease the U.S. Investor's at risk amount.

***Investment Interest Expense Deductions***. To the extent that we have interest expense, a non-corporate U.S. Investor may be subject to the "investment interest" limitations of Code §163(d). Investment interest includes interest paid or accrued on indebtedness incurred or continued to purchase or carry property held for investment, and short sale expenses. Investment interest is not deductible in the current taxable year to the extent it exceeds a taxpayer's "net investment income," consisting of net gain and ordinary income from investments in the current year. For the purposes of this limitation, net long-term capital gains are generally excluded from the computation of investment income, unless the taxpayer elects to pay tax on such gains at ordinary income tax rates.

If or to the extent that the limitation on investment interest applies, a non-corporate U.S. Investor could be denied a deduction for all or part of its distributive share of our interest expenses unless such U.S. Investor had sufficient investment income from all sources, including the Company. In such case, a U.S. Investor that could not deduct such interest expenses currently as a result of the application of this limitation would be entitled to carry such amounts forward to future years, when the same limitation would again apply. The limitations on the deductibility of investment interest would also apply to interest paid by a U.S. Investor on debt incurred to finance its investment in the Company.

***Passive Activity Losses***. The passive activity limitations of Code §469 apply to individuals, trusts, estates, personal service corporations, and certain closely-held C corporations. In general, these rules limit the deductibility of losses from passive activities (which generally include losses attributable to a trade or business carried on as a limited partner) as well as any rental activity or other business activity in which the taxpayer does not materially participate, to the income generated from the taxpayer's other passive activities. In general, a U.S. Investor may realize passive income or loss from our operations. If a U.S. Investor is subject to these rules, such Investor's share of passive losses, if any, from our operations may be used to offset such Investor's net income (and associated tax liability) from other passive activities. Conversely, such Investor may utilize losses, if any, from its other passive activities to offset his or her passive income, if any, from our operations. However, any "excess" passive loss from our operations cannot be utilized to offset the U.S. Investor's income from other sources, such as "active income" (i.e., wages and active trade or business income) or "portfolio income" (i.e., dividend, interest, royalty and annuity income and gains derived from assets producing portfolio income).

54

If a U.S. Investor's passive losses exceed its passive income, such excess may not be used to offset such Investor's other taxable income and must be carried forward to future years to offset passive income recognized in those years under the same rules or upon the disposition in full of such passive interest. Therefore, a U.S. Investor will receive no current tax benefit from our losses to the extent that such Investor has no passive activity income from other sources during that tax year.

Portfolio income earned by a taxpayer is treated as non-passive income of the taxpayer and cannot be offset by such taxpayer's passive losses, if any. Consequently, to the extent that we generate portfolio income, each U.S. Investor will have an increased tax liability regardless of the amount of passive losses, if any, realized by the Company from its operations. Please note that certain income (including dividend and royalty income) generated by the Company may constitute portfolio income to U.S. Investors.

The passive activity loss rules are applied after other applicable limitations on deductions such as the tax basis limitation and the at risk rules described above.

***Treatment of Distributions***. In the event cash distributions made to a U.S. Investor by us exceed such Investor's adjusted tax basis in his, her or its Class A Units, such Investor must recognize gain equal to such excess. Cash distributions in excess of a U.S. Investor's adjusted tax basis generally will be considered gain from the sale or exchange of an interest in the Company, which gain may be treated, at least in part, as capital gain. *See the discussion below under the heading "Disposition of a Class A Unit."* Please note that any reduction in a U.S. Investor's share of our liabilities will be treated as a cash distribution for federal income tax purposes.

***Exclusion from Income of Certain Qualified Small Business Investments***. In general, if we sell or exchange "qualified small business stock" that it has held for more than five years, a non-corporate Limited Partner may be entitled to exclude from taxable income 100% of the gain (or 50% of the gain for "qualified small business stock" acquired after December 31, 2013) from such sale or exchange that we allocate to such LP. This exclusion will apply to gain allocated to the non-corporate LP in respect of an interest in the Company that he or she held on the date we acquired the "qualified small business stock" and continuously thereafter through the date of our sale or exchange of the "qualified small business stock." Any non-excluded gain would be subject to a 28% tax rate. For each non-corporate LP, the amount of gain eligible for the 100% or 50% exclusion generally is limited to the greater of (i) 10 times the LP's proportionate share of our basis in the stock or (ii) a total of $10 million with regard to stock in the issuing corporations. For "qualified small business stock," 28% of the 50% exclusion is treated as a preference item for federal alternative minimum tax purposes. Subject to the limitations described above, qualified gain recognized by an individual Limited Partner who is not subject to the alternative minimum tax would be subject to federal income tax at an effective maximum rate of 14% for "qualified small business stock."

To be treated as small business stock eligible for the above exclusions, stock must have been acquired at original issue from a "qualified small business corporation." In general, a "qualified small business corporation" is a domestic C corporation that, immediately after issuing the stock in question, has $50 million or less in gross assets and satisfies certain other requirements. Because several of these requirements must continue to be satisfied after the issuance of qualified small business stock, it is possible that such stock may cease to so qualify due to events occurring after the issue date. If we should sell qualified small business corporation stock at a gain, a Limited Partner that is not a corporation may be eligible for a tax-free rollover of that gain if we or that LP makes a new investment in another qualified small business corporation within 60 days of that sale.

***Disposition of a Class A Unit***. Upon the sale of Class A Units, a U.S. Investor will recognize gain or loss equal to the difference between such Investor's "amount realized" and such Investor's adjusted tax basis in their Class A Units. A U.S. Investor's "amount realized" will equal the sum of the cash and fair market value of other property received plus the portion of our nonrecourse liabilities allocated to the Class A Units sold and any LP recourse liabilities of which the LP is relieved. If the amount of cash and fair market value of other property received plus the allocable share of our nonrecourse liabilities and LP recourse liabilities of which the U.S. Investor is relieved exceeds the U.S. Investor's adjusted basis with respect to the Class A Units disposed of, such U.S. Investor will recognize gain equal to such excess. The tax liability resulting from such gain could exceed the amount of cash received upon the disposition of such Class A Units. To the extent that a portion of the gain upon the sale of Class A Units is attributable to a U.S. Investor's share of our "inventory items" and "unrealized receivables," as those terms are defined in Code §751, such portion will be treated as ordinary income. Unrealized receivables include (i) to the extent not previously includable in our income, any rights to pay for services rendered or to be rendered and (ii) amounts that would be subject to recapture as ordinary income if we had sold our assets at their fair market value at the time of the transfer of such Units.

Capital gain or loss recognized by an individual U.S. Investor on the sale or exchange of a Unit held for more than 12 months will be long-term capital gain or loss for United States federal income tax purposes. All other gains will be taxed at ordinary income rates. A U.S. Investor's ability to deduct capital losses may be severely limited.

If a U.S. Investor sells or otherwise disposes of a Class A Unit prior to the end of a taxable year in which we have net income, such Investor will be liable for the income taxes due on its proportionate share of the net income attributable to such Unit for that period ending on the date of disposition, even though the Limited Partner may not have received any cash distributions.

***Constructive Termination***. Under Code §708(b)(I)(B), a partnership will be considered to terminate for federal income tax purposes if within a 12-month period there is a sale or exchange of 50% or more of the interests in partnership capital and profits. Such a termination would result, among other things, in a closing of our taxable year for all LPs, and our assets would be treated as having been contributed by us to a new partnership in exchange for interests in the new partnership, which immediately thereafter are treated as distributed to LPs. Such a termination should not result in the recognition of gain or loss to us or the LPs; however, it could result in adverse tax consequences to LPs since it would require that new tax elections be made by the reconstituted partnership. In addition, such a termination could result in a deferral of our depreciation deductions. Further, such a termination may either accelerate the application of (or subject the reconstituted partnership to the application of) any change in law effective as of a date after the termination.

***Timing of Admission***. Under the Offering, LPs will be joining the Company up until June 30, 2017, unless otherwise dictated by GPB. The Code provides that if, during a year, there is a change in a partner's interest in a partnership, each partner's distributive share of any item of income, gain, loss, deduction or credit must be determined using any method prescribed by Treasury Regulations which takes into account the varying interests of the partners during the taxable year.

In general, the Treasury Regulations under Code §706 permit the interim closing of our books or the use of a proration method. The proration method may be based on either (i) the portion of our taxable year that elapses prior to the change in interest; or (ii) any other reasonable method. An allocation method that would allow a Limited Partner to be allocated losses attributable to the time prior to its admission would likely be considered unreasonable. The LPA allows GPB to use any permissible method under Code §706 and the Treasury Regulations thereunder in allocating tax items for any period, including periods before and after the admission of a new LP.

Each potential Limited Partner should consult its own tax advisor regarding the application of the varying interest rule to the timing of his, her or its potential investment.

***Tax Returns, Elections & Audits***. GPB will have the authority to decide how to report our partnership items on our tax returns and all LPs are required under Code §6222 to treat the items consistently on their own returns, unless they file a statement with the IRS disclosing the inconsistency. It is possible that the IRS may not agree with the manner in which our partnership items have been reported. In the event our income tax returns are audited by the IRS, Code §6221 requires that the tax treatment of our income and deductions generally is determined at the Company level in a single proceeding rather than by individual audits of the LPs. The United States federal information tax returns we file will be subject to audit by the IRS, and an audit of our returns could result in an audit of a U.S. Investor's own United States federal income tax return. In connection with such audits, adjustments to our partnership items could result in the assertion of tax deficiencies (as well as interest and penalties thereon) against the U.S. Investors.

The Code provides for optional adjustments to the basis of our property upon distributions of our property to a U.S. Investor and transfers of Units (including by reason of death), *provided* that an election has been made pursuant to Code §754. Under the LPA, GPB, in its discretion, may cause us to make such an election. Any such election, once made, cannot be revoked without the IRS's consent. Adjustments may be mandatory under certain circumstances and could affect the amount of a U.S. Investor's distributive share of gain or loss recognized by us on a disposition of our assets. GPB can request from any LP such information as GPB deems necessary to enable GPB to make such mandatory adjustments for the Company.

GPB, in its capacity as the "Tax Matters Partner," has considerable authority to make decisions affecting the tax treatment and procedure rights of all U.S. Investors, including coordination of any tax proceedings and providing any required notices to U.S. Investors. It also has the authority to bind certain U.S. Investors to settlement agreements and to extend the statute of limitations relating to all U.S. Investors' tax liabilities with respect to our partnership items.

We will report our operations on an accrual basis for each calendar year and will file a partnership information income tax return, although we will not be subject to any federal income taxes. *See "Tax Status" above.* Subject to the receipt of tax information with respect to entities in which we have invested, we generally will provide to its LPs United States tax information on Schedule K-1 within a reasonable time following the close of our taxable year. If we do not receive on a timely basis all of the underlying tax information from our acquisitions, we will be unable to provide timely final tax information to LPs. Each LP will be responsible for the preparation and filing of such Limited Partner's own income tax returns, and such LPs should expect that they may have to file for extensions for the completion of their United States federal, state and/or other income tax returns.

***Reportable Transaction Disclosure Rules***. Treasury Regulations provide that every taxpayer that has participated in a "reportable transaction," and who is required to file a tax return, must attach to its return for the taxable year a disclosure statement (IRS Form 8886) with respect to such reportable transaction. The Code imposes a penalty of $10,000 on natural persons who fail to include such information. For failures with respect to "listed transactions," the penalty is increased to $100,000 for natural persons. A reportable transaction includes "listed transactions" (those that are the same as or substantially similar to one of the types of transactions that the IRS has identified and determined to be a tax avoidance transaction), transactions that result in the incurrence of a loss or losses (including foreign currency losses) exceeding certain thresholds, or transactions that, in certain circumstances, are offered under conditions of confidentiality. The IRS has issued guidance that likely exempts many of our transactions from the loss category of reportable transactions. Nevertheless, there can be no assurance that we will not engage in reportable transactions. If we engage in any reportable transactions, certain U.S. Investors may have disclosure obligations with respect to their investment in us. In addition, a U.S. Investor may have disclosure obligations with respect to its investment in the Company if such Investor engages in a reportable transaction with respect to its Units. U.S. Investors should consult with their tax advisors concerning these possible disclosure obligations.

***Penalty for Substantial Understatements***. Code §6662, in part, imposes an accuracy-related penalty of 20% of the amount of any underpayment attributable to (i) negligence or intentional disregard of rules or regulations; and (ii) any substantial understatement. "Substantial understatement" is defined as a reported liability that understates the amount of tax owed by the greater of 10% or $5,000 ($10,000 for corporations other than S corporations and personal holding companies). An understatement is reduced by that portion of the understatement attributable to an item (other than a "tax shelter" item) if there is "substantial authority" for the taxpayer's treatment of such item on his return or if the taxpayer's return (including the partnership return in the case of a partnership item) adequately discloses the facts relating to the item's tax treatment. Under Treasury Regulations, there is substantial authority for the tax treatment of an item only if the weight of the authorities supporting the treatment is substantial in relation to the weight of authorities supporting contrary positions.

With respect to an item attributable to a "tax shelter," however, a more stringent standard applies for the reduction of understatements attributable thereto. A "tax shelter" is defined as a partnership or other entity or any other plan or arrangement the principal purpose of which is to avoid or evade tax. The Treasury Regulations provide that the principal purpose of an entity, plan or arrangement is not the avoidance or evasion of federal income tax if the entity, plan or arrangement merely claims tax benefits provided by the Code. An item will be considered a tax shelter item if such item is directly or indirectly attributable to the principal purpose of a tax shelter to avoid or evade federal income tax. With respect to an item attributable to a tax shelter, in addition to having "substantial authority" for his, her or its position, the taxpayer must reasonably believe that the treatment claimed was "more likely than not" the proper treatment for such an item. Each prospective U.S. Investor's decision to invest in the Company should be made without regard to any tax benefits but rather based solely upon the anticipated cash return to such investor without regard to any tax benefits.

### United States Tax-Exempt Investors

Organizations that are otherwise exempt from United States federal income tax under Code §501 (including ERISA plans) are subject to tax on their UBTI. UBTI generally is defined as gross income from any unrelated trade or business regularly carried on by a tax-exempt entity less any deductions attributable thereto. An unrelated trade or business consists of any trade or business the conduct of which is not substantially related to the organization's exempt purpose or function. UBTI generally does not include dividends, interest, royalties or capital gains. UBTI also includes unrelated debt-financed income ("UDFI"). UDFI includes income derived from debt-financed property during the taxable year and may include income derived from a sale or other disposition of debt-financed property if there was acquisition indebtedness outstanding with respect to such property during the twelve-month period ending with the date of sale or other disposition. Acquisition indebtedness generally includes any debt incurred directly or indirectly to purchase such property.

If we earn UBTI, a tax-exempt LP's allocable share of such income generally would be subject to United States federal income tax. We may generate UBTI if certain of our income is deemed to be derived from a trade or business. In addition, because we expect to use acquisition indebtedness to acquire Portfolio Companies, we may generate UBTI from such activities under the UDFI rules. Finally, if a tax-exempt investor borrows to fund its purchase of Units, some or its entire distributive share of income from the Company could be UBTI under the UDFI rules, which would be taxable to such tax-exempt investor.

The potential for having income characterized as UBTI may have a significant effect on any investment by a tax-exempt entity in the Company. Prospective Investors that are tax-exempt entities should consult their own tax advisors regarding all aspects of UBTI.

**Foreign Investors**

This Memorandum does not address the federal, state, local or foreign tax consequences to Foreign Investors. Such Investors should consult their own tax advisors.

**Possible Changes in Federal Tax Laws**

The statutes and regulations with respect to all of the foregoing tax matters are subject to continual change by Congress or the Treasury Department. Similarly, interpretations of these statutes and regulations may be modified or affected by judicial decision, the IRS or the Treasury Department. Any such change may have an effect on the discussion above.

**Recently Enacted Legislation**

Health care legislation, effective for taxable years after December 31, 2012, imposes a 3.8% Medicare tax on certain U.S. Investors who are individuals, estates or trusts and whose income exceeds certain thresholds. This tax will apply to income and gains which pass through to a U.S. Investor from us as well as gain from the disposition of Units.

**State & Local Taxes**

In addition to the federal income tax consequences described above, prospective LPs should consider potential state and local tax consequences of an investment in the Company. State and local laws often differ from federal income tax laws with respect to the treatment of specific items of income, gain, loss, deduction and credit. We may be subject to state and/or local tax, depending on the location and scope of our activities. In addition, a state in which a Limited Partner is not a resident but in which we may be deemed to be engaged in business may impose a tax and a tax return filing obligation on that LP with respect to his, her or its share of our income derived from that state. Under some circumstances, a Limited Partner with tax liabilities to more than one state may be entitled to a deduction or credit for taxes paid to one state against the tax liability to another. Prospective Investors should consult their own tax advisors for further information about state and local taxes that may be incurred in connection with an investment in the Company.

The summary of federal income tax consequences in this Memorandum is not intended to be a complete summary of the tax consequences of this investment and is not intended as a substitute for careful tax planning. The applicability of the tax laws to Investors will vary from one Investor to another, depending upon each Investor's tax situation. Accordingly, each prospective Investor is advised to consult with his or her own attorneys, accountants and other personal tax advisors as to the effect on his or her own tax situation of a purchase and ownership of Class A Units and as to the effect of recent, pending and potential changes in the applicable law.

**Certain ERISA Considerations**

In considering an investment in the Company of a portion of the assets of a qualified employee benefit plan that is subject to ERISA, a fiduciary for such plan, taking into account the facts and circumstances of such qualified plan, should consider, among other things:

    (1)  whether the investment is in accordance with the documents and instruments governing such qualified plan;
    (2)  the definition of plan assets under ERISA;
    (3)  whether the investment satisfies the diversification requirements of ERISA §404(a)(1)(C);
    (4)  whether, under ERISA §404(a)(1)(B), the investment is prudent, considering the nature of an investment in and the compensation structure of the Company and the fact that there is not expected to be a trading market created in which the fiduciary can sell or otherwise dispose of the Units;
    (5)  that the Company has had no history of operations;
    (6)  whether the Company or any Affiliate is a fiduciary or a party in interest to the qualified plan; and
    (7)  that an investment in the Company may cause the qualified plan to recognize UBTI.

The prudence of a particular investment must be determined by the responsible fiduciary (usually the trustee, plan administrator, or investment manager) with respect to each qualified plan, taking into account all of the facts and circumstances of the investment.

ERISA provides that Units may not be purchased by a qualified plan subject to ERISA if the Company or any affiliate is a "fiduciary" or "party in interest" (as defined in ERISA §§3(21) and 3(14)) to the plan unless such purchase is exempt from the prohibited transaction provisions of ERISA §406. Under ERISA, it is the responsibility of the fiduciary responsible for purchasing the Units not to engage in a non-exempt prohibited transaction.

Code §4975 has similar prohibited transaction restrictions applicable to transactions between disqualified persons and qualified plans or IRAs. If a prohibited transaction occurs, the fiduciary who caused the transaction to occur and the party in interest (or disqualified person) involved in the transaction could be liable for excise taxes, damages and other penalties. In the case of an individual retirement account that engages in a prohibited transaction involving the IRA owner or a related party, the IRA could be disqualified and the entire value of the IRA could be taxable to the IRA owner.

The DOL has promulgated regulations ("DOL Regulations"), 29 C.F.R. Section 2510.3-101 (as modified by ERISA §3(42)), that define what constitutes "Plan Assets" in a situation in which a qualified plan invests in a limited partnership or other entity. If assets of the Company are classified as Plan Assets, the significant penalties discussed above could be imposed under certain circumstances.

Under the DOL Regulations, if a qualified plan invests in an equity interest of an entity that is neither a publicly offered security nor a security issued by an investment company registered under the 1940 Act, its assets include both the equity interest and an undivided interest in each of the underlying assets of the entity (i.e., the entity will be deemed to hold Plan Assets), unless it is established that either (i) the entity is an "operating company" or (ii) the entity satisfies the "less-than-25% exception" described below.

Since the Units will not qualify as publicly-offered securities and will not be issued by an investment company registered under the 1940 Act, our assets will avoid being classified as Plan Assets only if either (i) we are an "operating company" or (ii) we qualify for the less-than-25% exception.

The term "operating company" is defined in the DOL Regulations as an entity that is primarily engaged, either directly or through one or more majority-owned subsidiaries, in the production or sale of a product or service other than the investment of capital. The term "operating company" also includes an entity that is a "venture capital operating company" (a "VCOC") as defined in the DOL Regulations. Under the DOL Regulations, an entity is a VCOC if at least 50% of its assets, valued at cost, are invested in "venture capital investments." A "venture capital investment" is an investment in an operating company (other than a VCOC) as to which the investor has or obtains management rights. In addition, to qualify as a VCOC the entity must exercise certain management rights with respect to at least one of its venture capital investments at least annually in the ordinary course of business. For purposes of meeting the requirements, the term "management rights" means contractual rights directly between the investor and an operating company to substantially participate in, or substantially influence the conduct of, the management of the operating company. Determining what management rights will work to satisfy the regulation is a factual question and will depend on the specific circumstances of each investment. The DOL has provided some clarity as to what will qualify as sufficient management rights. Specifically, the DOL has described management rights by example, indicating that the right to appoint a director would qualify as management rights sufficient to

satisfy the definition in the regulation. Other management rights, such as the right to consult with and advise the management of the operating company, the right to inspect the operating company's properties and the right to receive financial information, may, together with other rights, constitute "management rights" for this purpose.

GPB intends to operate the Company so that it will satisfy the definition of a VCOC. However, because this determination involves questions of fact regarding future activities, complete assurance on this issue cannot be provided. If we are classified as a VCOC, we should not be treated as holding the Plan Assets.

If we do not qualify as a venture capital operating company under DOL Regulations, we will nevertheless avoid being treated as holding Plan Assets if we qualify for the less-than-25% exception. An entity will qualify for that exception if, immediately after the most recent acquisition of any equity interest in the entity, "benefit plan investors" hold less than 25% of the total value of each class of interest in the entity. Under the DOL Regulations, "<u>benefit plan investors</u>" are defined as (i) qualified employee benefit plans subject to ERISA, (ii) IRAs and similar plans and accounts that are subject to Code §4975, and (iii) entities or accounts that are deemed to hold the Plan Assets of such plans or accounts. For purposes of the 25% calculation, interests in the Company held by GPB or any of its affiliates (other than benefit plans) will be disregarded. We intend to sell Units to benefit plan investors, including IRAs, and cannot provide any assurance that equity participation in the Company by benefit plan investors will not equal or exceed 25%.

If we are deemed to hold Plan Assets, additional issues relating to the Plan Assets and "prohibited transaction" concepts of ERISA and the Code may arise. Anyone with discretionary authority with respect to our assets could become a "fiduciary" of the qualified plans within the meaning of ERISA. As a fiduciary, such person would be required to meet the terms of the qualified plan regarding asset investment and would be subject to prudent investment and diversification standards. In addition, if we are deemed to hold Plan Assets, investment in the Company by a qualified plan might constitute an improper delegation of fiduciary responsibility to GPB and expose the fiduciary of a qualified plan investor to co-fiduciary liability under ERISA for any breach by GPB of its ERISA fiduciary duties. Finally, we could be found to have engaged in a "prohibited transaction," with the consequences described above.

Fiduciaries of plans subject to ERISA are required to determine annually the fair market value of the assets of such plans as of the close of the plan's fiscal year. Also, IRA custodians are required to report the value of the assets in an IRA annually. Although GPB will provide annually an estimate of the value of the Units based upon, among other things, the book value of the Company, it may not be possible to precisely value the Units from year to year, because there will be no market for them. Accordingly, there can be no assurance that the valuation information provided will satisfy the annual valuation requirements applicable to ERISA plans and to IRAs.

Plans sponsored by state and local governments, foreign plans and certain church plans generally are not subject to ERISA. However, such plans may be subject to other laws or regulations that are similar to ERISA ("<u>Similar Laws</u>"). Advisors to such plans should take into account the requirements of such Similar Laws.

**Prospective Investors that are subject to the provisions of ERISA, Code §4975 or Similar Laws are urged to consult their own advisors with specific reference to their own situations and the application of ERISA, the Code, or Similar Laws to an investment in the Company.**

## INVESTOR QUALIFICATION

AN INVESTMENT IN THE CLASS A UNITS IS SUITABLE ONLY FOR INVESTORS OF SUBSTANTIAL FINANCIAL MEANS WHO HAVE NO NEED FOR LIQUIDITY IN THIS INVESTMENT.

The Units have not been and will not be registered under the 1933 Act (irrespective of whether the Units are ever registered under the 1934 Act), or any state or other securities laws, and will be offered and sold for investment only to qualifying recipients of this Memorandum under the exemption from the registration requirements of the 1933 Act provided by Regulation D promulgated thereunder and in compliance with any applicable state or other securities laws.

In order to be eligible to invest in the Company (an "Eligible Investor"), Investors must certify in the Subscription Agreement that they qualify as an Accredited Investor and are purchasing for their own account or one or more accounts with respect to which they exercise sole investment discretion.

Accordingly, offers and sales of Units will be made only to prospective Investors who satisfy, among other things, the following eligibility requirements:

1. On the basis of its financial situation and needs, the Investor must confirm and represent that it has the ability to bear the economic risks of the investment in the Company, including the risk of loss of the Investor's entire investment;
2. The Investor must confirm and represent that the Investor, either alone or with its personal representative(s), is sophisticated and has sufficient knowledge and experience in financial, business and investment matters so that it is or they are capable of evaluating the merits and risks of the prospective investment;
3. The Investor must confirm and represent that the Units are being acquired for investment purposes and not with a view to distribution or resale;
4. The Investor must confirm and represent that the Investor is an Accredited Investor;
5. The Investor must confirm its identity and the identity of its beneficial owners (if applicable) in a manner sufficient to ensure compliance by the Company and GPB with the Patriot Act; and
6. The Investor must make certain other representations to us including representations as to the information described in items 1 - 5 above, as well as to the Investor's access to information concerning the Company and the Investor's ability to bear the economic risk of the investment and net worth.

GPB reserves the right to reject subscriptions, in whole or in part, in its discretion. Each purchaser will be required to represent that such purchaser's overall commitment to investments which are not readily marketable is not disproportionate to such purchaser's net worth, and that such purchaser's acquisition of Units will not cause such overall commitment to become excessive; that such purchaser can sustain a complete loss of such purchaser's investment in the Units and has no need for liquidity in such purchaser's investment in the Units; and that such purchaser has evaluated the risks of investing in the Units.

LPs may not be able to liquidate their investment in the event of an emergency or for any other reason because there is not now any public market for the Units and none is expected to develop. We will establish and maintain on our books a Capital Account for each LP, into which its Capital Contribution(s) will be credited and in which certain other transactions will be reflected.

GPB will maintain a list of the LPs, which is available for an inspection by a requesting LP who is not a FINRA-registered representative. Such inspection by a Limited Partner will be available so long as it comports with state and federal disclosure and confidentiality rules. GPB may, without the consent of the existing LPs, admit new LPs. GPB may reject a subscription for a Unit for any reason in its sole and absolute discretion. If a subscription is rejected, the payment remitted by the Investor will be returned without interest.

EACH PROSPECTIVE INVESTOR SHOULD CONSIDER WHETHER THE PURCHASE OF THE UNITS IS SUITABLE FOR HIM OR HER IN LIGHT OF HIS OR HER INDIVIDUAL INVESTMENT OBJECTIVES.

### *Accredited Investor*

To be eligible to subscribe for Units, each Investor who is in the United States or who is a U.S. Person must meet one of the definitions of Accredited Investor provided in Rule 501(a) of Regulation D and as described in the Subscription Documents.

The definition of "accredited investor" provided in Rule 501(a) includes, among others:

(a) a natural person whose individual net worth, or joint net worth with that person's spouse, exceeds $1,000,000 (provided that for this purpose, (i) "net worth" means the excess of total assets at fair market value, including home furnishings and automobiles, over total liabilities; (ii) the Investor may not count the value of his/her primary residence in net worth, and if the amount of debt on the Investor's primary residence exceeds its value, the Investor must count the excess against net worth; and (iii) the Investor does not need to count as a liability debt secured by the Investor's primary residence up to the value of the residence, unless the amount of such debt exceeds the amount that was outstanding 60 days prior, other than debt resulting from the acquisition of the primary residence);

(b) a natural person who had an individual income in excess of $200,000 in each of the two most recent years or joint income with that person's spouse in excess of $300,000 in each of those years and has a reasonable expectation of reaching the same income level in the current year;

(c) any corporation, partnership, limited liability company or business trust not formed for the specific purpose of acquiring the Units with total assets exceeding $5,000,000;

(d) any trust, with total assets in excess of $5,000,000 not formed for the specific purpose of acquiring the Units, whose purchase is directed by a sophisticated person;

(e) an entity in which all of the equity owners are accredited investors;

(f) any plan established and maintained by a state, its political subdivisions, or any agency or instrumentality of a state or its political subdivisions, for the benefit of its employees with total assets in excess of $5,000,000;

(g) any employee benefit plan within the meaning of ERISA, if the investment decision is made by a plan fiduciary, as defined in ERISA §3(21), which is either a bank, savings and loan association, insurance company or registered investment adviser, or if the employee benefit plan has total assets in excess of $5,000,000 or, if a self-directed plan, with investment decisions made solely by persons that are accredited investors; and

(h) an IRA as defined in Code §408(a) owned by and for the benefit of an accredited investor.

## PLAN OF PRIVATE PLACEMENT

### Description of the Offering

We intend to offer $350,000,000—and potentially up to $500,000,000 or more (in GPB's discretion)—of Units. We presently intend to conduct the Offering and receive subscriptions for Units on an ongoing basis until the earlier of (i) the date GPB determines, in its discretion, to discontinue the Offering, or (ii) the date we have received subscriptions for $500,000,000 of Units. In any event, the Offering will terminate no later than the close of business on June 30, 2017, unless that date is extended by GPB in its discretion up to two one-year periods. GPB may, in its discretion, elect to temporarily or permanently suspend the Offering.

The minimum initial Capital Contribution is $50,000. Units must be purchased for cash at time of subscription, though GPB may accept subscriptions under which a portion of the offering price is not paid in full upon execution and delivery of the Subscription Agreement. GPB, or one or more of its affiliates, may invest as LPs in the Company. All subscriptions tendered by investors are subject to acceptance by GPB, and we reserve the right to reject or reduce any subscription for any reason prior to acceptance. Subscriptions rejected by us will be returned to the subscriber without interest. Except as otherwise permitted by GPB, in its sole discretion, Units may be purchased as of the first business day of any calendar month.

### Conduct of the Offering

The Units are being offered on a "best efforts" basis, which means generally that broker-dealers will be required to use only their best efforts to sell the Units and have no commitment or obligation to purchase any of the Units.

We may agree to indemnify members of the Selling Group against certain liabilities, including liabilities under federal and state securities laws, or to contribute to payments that they may be required to make in respect of those liabilities.

The Offering is made only by means of this Memorandum. No certificates will be issued for Units. Investors will, however, receive written confirmation of their investment in the Company.

### How to Subscribe

To purchase Units, a new subscriber must (i) review this Memorandum and the LPA (ii) complete, execute and deliver to us the Subscription Documents and (iii) arrange for payment of the amount of the subscription in accordance with the instructions in the Subscription Documents. We may subsequently also request IRS Form W-9 and/or the Investor's Taxpayer Identification Number. Prospective Investors whose subscriptions have been accepted by GPB will be notified of their acceptance into the Company. Generally, existing Limited Partners subscribing for additional Units need only update information in the Subscription Documents that may have changed. GPB reserves the right to accept or reject, in its sole discretion, subscriptions in whole or in part, and to close the subscription books at any time without notice.

By subscribing for Units, you confirm that you meet the suitability standards for purchasers of Units and agree to be bound by all of the terms of the Subscription Agreement attached as a part of the Subscription Documents and the LPA. The Subscription Agreement contains, among other things, representations and warranties of the subscribing LPs.

We generally must receive Subscription Documents and cleared funds in payment therefore prior to the applicable Monthly Closing Date. Subscription funds must generally be credited to our account at least three business days prior to the requested Monthly Closing Date in order for a subscription to be accepted (except as otherwise determined by GPB in its discretion).

All subscriptions that are accepted by GPB will be credited to us only on the first business day of each calendar month (except as otherwise provided by GPB in its discretion). Subscriptions for cash that are received but not credited to us will be deposited in an interest-bearing account selected by GPB.

# RESTRICTIONS ON TRANSFER OF UNITS

An Investor's rights to sell or transfer Units are limited—both under the LPA and under the Code. There is no public market in which you may sell your Units and we do not expect a public market to develop in the future. You may sell or transfer your Units only using a form approved by us and must obey all relevant laws if you are permitted to transfer Units. Any person who buys Units from a Limited Partner must meet the investor suitability requirements imposed by us and applicable law.

No transfer of a Unit made under the foregoing will relieve the LP of any obligation that has accrued or was incurred before the transfer. A transferee of a Unit or a person who has become entitled to a Unit by operation of law but has not complied with the transfer provisions referred to above has no right to access or to be provided with any information with respect to our affairs and has only the rights accorded to such transferees under applicable Delaware law. A transfer of a Unit will be deemed to take effect on the date that GPB records such transfer, which will typically be recorded on a monthly basis.

GPB (or any affiliate thereof) may buy Units for their account or facilitate transfers of Units between LPs and others. Any transfer facilitated by GPB (or any affiliate thereof) will be subject to the foregoing restrictions on transfer to the same extent as if GPB (or any affiliate thereof) had not been involved.

**LPA Transfer Restrictions**

All transfers of Units must receive GPB's consent, which may be granted or withheld at GPB's sole discretion, and must comply with the LPA. In no event may Units be transferred unless all of the following conditions are satisfied or waived by GPB:

(i)   the transferor or transferee has delivered to GPB an opinion of counsel reasonably acceptable to GPB that the transfer would not (a) require registration under the 1933 Act or any state securities laws, or (b) adversely affect the status of the Company as a partnership for federal income tax purposes or cause us to become a PTP;

(ii)  any required third-party consent or approval to the transfer has been obtained or waived, including the consent of any lender providing financing to us to the extent required;

(iii) GPB is satisfied that the transfer, when considered with all other transfers of Class A Units within the preceding 12-month period, would not result in the Company being considered to have terminated within the meaning of Code §708;

(iv)  GPB has received an agreement in form and substance satisfactory to it that the transferee agrees to be bound by the terms and conditions of the LPA and making such representations and warranties as GPB determines to be advisable and in our best interest;

(v)   the transferor or transferee bears all costs and expenses of the transfer and the transferor's admission to the Company, including our actual and reasonable legal fees; and

(vi)  the transferor and the transferee execute, acknowledge and deliver to us such other certificates, instruments and documents as GPB deems reasonably necessary, appropriate or desirable to effect the transfer or the transferee's admission to the Company.

**Code Transfer Restrictions**

As discussed above under *"Certain Tax, ERISA & Regulatory Matters—Tax Status,"* the Company is organized as a Delaware limited partnership and as such, the Code limits the number of Units which may be transferred in any Fiscal Year generally to 2.0% of our outstanding Units. If more than 2.0% of our Units are transferred in a Fiscal Year, we could be treated as a PTP under the Code and would be accordingly taxed as a corporation. The Code does provide that certain transfers are not included in the 2% limitation, such as:

• Transfers in which the basis of the Units in the transferee is determined, in whole or in part, by reference to its basis in the hands of the transferor or is determined under Code §732;

• Transfers by gifts in which the transferee's tax basis in the Units is determined by reference to the transferor's tax basis in the Units transferred;

• Transfers at death, including transfers from an estate or testamentary trust;

• Transfers between members of a family as defined in Code §267(c)(4);

• Transfers from retirement plans qualified under Code §401(a) or an IRA; and

• "Block transfers." A block transfer is a transfer by a Limited Partner and any related persons as defined in the Code in one or more transactions during any 30 calendar day period of Units that in the aggregate represents more than 2% of the Units.

Transfers through a QMS are also disregarded in determining whether Units are readily tradable. A matching service is qualified only if it meets extensive conditions and limitations, and we do not have any plan to utilize a QMS at this time.

The foregoing list does not provide all of the exceptions to the PTP limitations. *See "Certain Tax, ERISA & Regulatory Matters—Tax Status"* above.

# USA PATRIOT ACT COMPLIANCE

The Patriot Act requires that some financial institutions implement policies and procedures ("<u>AML Programs</u>") designed to guard against and identify money laundering activities. Under our own AML Program, we confirm the identity of each Investor to the extent reasonable and practicable, including the principal beneficial owners of an Investor, if applicable. New Investors, and additional capital from existing Investors, can be accepted only after GPB has confirmed the identity of the Investor and the principal beneficial owners of the Investor, if applicable, unless GPB concludes that it can rely on the diligence of a third party with respect to such Investor.

Depending on the circumstances of each proposed subscription, a detailed verification may not be required if (i) the Investor is a recognized financial institution; or (ii) the Investor makes the payment from an account held in the Investor's name at a recognized financial institution. These exceptions will only apply if the financial institution referred to above is within a country recognized as having sufficient anti-money laundering regulations, such as a member state of the European Union that is subject to the EC Money Laundering Directive or one of the countries that make up the Financial Action Task Force ("<u>FATF</u>") and that is subject to the FATF recommendations.

If required to verify its identity, an individual may be required to produce a copy of a passport or identification card certified by a notary public. Corporate entities may be required to produce a certified copy of the certificate of incorporation (and change of name), memorandum and articles of association (or equivalent), and the names, occupations, dates of birth, and residential and business addresses of all directors and/or beneficial holders of the applicant's securities.

GPB reserves the right to request such additional information as is necessary to verify the identity of any person attempting to subscribe to the Company. Pending the provision of evidence satisfactory to GPB as to identity, the closing of a sale of Units to such person may be delayed at the absolute discretion of GPB. If within a reasonable period of time following a request for verification of identity, GPB has not received evidence satisfactory to its sole discretion, it may refuse to accept the proposed subscription, in which event all subscription monies will be returned without interest to the account from which such monies were originally deposited. Subscription monies also may be rejected by GPB if the remitting bank or financial institution is unknown to GPB.

We may undertake enhanced due diligence procedures prior to accepting Investors GPB believes present high risk factors with respect to money laundering activities. Examples of persons posing high risk factors are persons resident in or organized under the laws of a "non-cooperative jurisdiction" or other jurisdictions designated by the Department of the Treasury as warranting special measures due to money laundering concerns, and any person whose Capital Contributions originate from or are routed through certain banking entities organized or chartered in a non-cooperative jurisdiction.

In addition, we will not accept subscriptions from or on behalf of:

- persons on the List of Specially Designated Nationals and Blocked Persons maintained by the U.S. Office of Foreign Asset Control;
- the Annex to Executive Order 13224;
- such other lists as may be promulgated by law or regulation; and
- foreign banks unregulated in the jurisdiction they are domiciled in or which have no physical presence.

We may be required to undertake additional actions to guard against and identify money laundering activities, when final regulations under the Patriot Act are adopted by the Department of the Treasury. The requirements for GPB to guard against and identify money laundering activities in deciding whether to accept subscriptions are in addition to the discretion that GPB has in deciding whether to accept subscriptions.

**1940 Act Regulation**

We will not be registered as an investment company under the 1940 Act so long as at least 55% of our income is derived from operating Portfolio Companies, and at least 60% of our assets are represented by Portfolio Companies in which we hold a majority of the outstanding equity, in addition to other criteria. Additionally, we must be primarily engaged in the business of operating Portfolio Companies, and not primarily engaged in rehabilitating Portfolio Companies or otherwise improving them with a view toward reselling them for a profit.

**Adviser Act Regulation**

GPB is registered as an investment adviser under the Advisers Act.  You are encouraged to review GPB's Brochure, which is attached to this Memorandum as <u>Exhibit B</u>, to familiarize yourself with GPB's business and its practices.

**Federal Securities Law Regulation**

We are offering Units to prospective investors in reliance upon an exemption from the registration requirements of the 1933 Act provided in Section 4(a)(2) and Rule 506 promulgated thereunder. As a result, in order to be able to rely on such exemption, we will be obtaining from each prospective Investor certain representations in connection with a subscription for the Units, including that such prospective Investor is acquiring such Units for investment and not with a view to resale or distribution and that it is an Accredited Investor. Further, each Investor must be prepared to bear the economic risk of the investment for an indefinite period, because the Units can be resold only pursuant to an offering registered under the 1933 Act or an exemption from such registration requirement. It is unlikely that the Units will ever be registered under the 1933 Act (irrespective of whether the Units are registered under the 1934 Act).

## ADDITIONAL INFORMATION

This Memorandum contains references to or summaries of certain provisions of the LPA, the Subscription Documents and certain other documents. All such summaries are qualified in their entirety by reference to said documents, copies of which are included or will be made available (subject to certain limitations and requirements) by GPB upon request, and reference is made to such documents for complete information concerning the rights and obligations of the parties thereto. Those agreements and the various other documents referred to in this Memorandum or included in the appendices are subject to further negotiation or changes. Such negotiations and changes will not, however, result in changes that, in the aggregate, are materially adverse to the Limited Partners.

We do not anticipate distributing revised drafts of documents to subscribers for Units prior to the time such subscribers are admitted to a Company as LPs. However, prospective LPs and their authorized representatives are invited to review any such materials from time to time at our offices or to make inquiry of GPB with respect thereto. Information contained herein has been obtained from sources deemed reliable. Such information necessarily incorporates significant assumptions as well as factual matters.

During the course of the Offering, each prospective Investor is invited to examine documents relating to this investment and to ask questions of and obtain additional information from GPB concerning the terms and conditions of the Offering or any other relevant matters (including additional information necessary to verify the accuracy of the information herein) to the extent GPB possesses such information or can acquire it without unreasonable effort or expense.

## PRIVACY NOTICE

We do not disclose nonpublic personal information about you or former Investors to third parties other than as follows. We collect information about you (such as name, address, social security number, assets and income) from our discussions with you, from documents that you may deliver to us (such as Subscription Documents) and in the course of providing services to you. In order to service your account and effect your transactions, we may provide your personal information to our affiliates and to firms that assist us in servicing your account and have a need for such information, such as GPB, other advisors, financial services provider, accountants or auditors. We do not otherwise provide information about you to outside firms, organizations or individuals except as required or permitted by law. Any party that receives this information will use it only for the services required and as allowed by applicable law or regulation, and is not permitted to share or use this information for any other purpose.

## AVAILABILITY OF PRINCIPAL DOCUMENTS

We will provide to each prospective Investor and such Investor's representatives and advisors, if any, copies of the LPA, Subscription Documents and the opportunity to ask questions and receive answers concerning the terms and conditions of this Offering and obtain any additional information which we may possess or obtain without unreasonable effort or expense that is necessary to verify that accuracy of the information furnished to such prospective Investor. Any such questions should be addressed to us at the address indicated below. No other persons have been authorized to give information or to make any representations concerning this Offering, and if given or made, such other information or representations must not be relied upon as having been authorized by us. For additional information regarding the Company, interested investors should contact:

**GPB Holdings II, LP**

**c/o: GPB Capital Holdings, LLC**
**535 West 24th Street, Floor 4**
**New York, NY 10011**
**Telephone: (877) 489-8484**
**Facsimile: (516) 487-0166**

**CONFIDENTIAL PRIVATE PLACEMENT MEMORANDUM**

**$350,000,000**

**Class A Limited Partnership Units**

# GPB HOLDINGS II, LP

**April 13, 2015**

---

**EXHIBIT A**

**AGREEMENT OF LIMITED PARTNERSHIP**

**AGREEMENT OF LIMITED PARTNERSHIP**

**OF**

# GPB HOLDINGS II, LP

**(A Delaware Limited Partnership)**

THE LIMITED PARTNERSHIP UNITS (THE "UNITS") OF GPB HOLDINGS II, LP, (THE "PARTNERSHIP") HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED (THE "SECURITIES ACT"), THE SECURITIES LAWS OF ANY STATE OR ANY OTHER APPLICABLE SECURITIES LAWS IN RELIANCE UPON EXEMPTIONS FROM THE REGISTRATION REQUIREMENTS OF THE SECURITIES ACT AND SUCH LAWS. SUCH UNITS MUST BE ACQUIRED FOR INVESTMENT ONLY AND MAY NOT BE OFFERED FOR SALE, PLEDGED, HYPOTHECATED, SOLD, ASSIGNED OR TRANSFERRED AT ANY TIME EXCEPT IN COMPLIANCE WITH (i) THE SECURITIES ACT, ANY APPLICABLE STATE SECURITIES LAWS AND ANY OTHER APPLICABLE SECURITIES LAWS; AND (ii) THE TERMS AND CONDITIONS OF THIS AGREEMENT OF LIMITED PARTNERSHIP. THE UNITS MAY NOT BE TRANSFERRED OF RECORD EXCEPT IN COMPLIANCE WITH SUCH LAWS AND THIS AGREEMENT OF LIMITED PARTNERSHIP. THEREFORE, PURCHASERS OF THE UNITS WILL BE REQUIRED TO BEAR THE RISK OF THEIR INVESTMENT FOR AN INDEFINITE PERIOD OF TIME.

# AGREEMENT OF LIMITED PARTNERSHIP

## OF

## GPB HOLDINGS II, LP

### (A Delaware Limited Partnership)

This AGREEMENT OF LIMITED PARTNERSHIP OF GPB HOLDINGS II, LP (this "Agreement") is made and entered into on this 13 day of April, 2015 (the "Effective Date"), by and among GPB CAPITAL HOLDINGS, LLC, a Delaware limited liability company, as General Partner (defined below), GPB SLP, LLC, a Delaware limited liability company, as Special Partner (defined below), and each of the other Persons (defined below) who have executed Subscription Documents (defined below) that have been accepted by the General Partner as Limited Partners (the "Limited Partners").

## ARTICLE 1.
## GENERAL

### 1.1    Organization.

The Partners formed the Partnership under the DRUPA (defined below) and other relevant laws of the State of Delaware and in accordance with and subject to the terms and conditions set forth in this Agreement, effective on the commencement of the Partnership as provided in Section 1.5. Except as otherwise provided in this Agreement, the rights and liabilities of the Partners are governed by the DRUPA.

### 1.2    Name.

The name of the Partnership is "GPB Holdings II, LP." The General Partner is authorized to make any variations in the Partnership's name that the General Partner may deem necessary or advisable; provided, however, that the name must contain the words "Limited Partnership" or the letters "L.P." or "LP" or the equivalent translation thereof.

### 1.3    Certificates and Other Filings.

If requested by the General Partner, the Limited Partners must immediately execute all certificates and other documents consistent with the terms of this Agreement necessary for the General Partner to accomplish all filing, recording, publishing and other acts as may be appropriate to comply with all requirements for (i) the formation and operation of a limited partnership under the laws of the State of Delaware, and (ii) if the General Partner deems it advisable, the operation of the Partnership as a limited partnership, or partnership in which the Limited Partners have limited liability, in all jurisdictions where the Partnership proposes to operate.

### 1.4    Offices and Agent.

The principal office and registered office of the Partnership will be located at 535 West 24th Street, Floor 4, New York, NY 10011, or at other places selected by the General Partner after sending notice of that change to the Limited Partners. The registered agent of the Partnership for service of process will be The Corporation Trust Company, 1209 Orange Street, Wilmington, Delaware

19801, or a substituted agent selected by the General Partner after sending notice of that change to the Limited Partners.

**1.5    Term.**

The Partnership shall expire the earliest of (a) the termination, bankruptcy, insolvency or dissolution of the General Partner (b) a determination by the General Partner that the Partnership should windup or (c) the date the Partnership divests its ownership interest in the last Portfolio Company (the "Partnership Term").

**1.6    Purpose.**

The purpose of the Partnership is to engage in any lawful business activities in which limited partnerships formed under the DRUPA may engage or participate.  The Partnership expects to focus on acquisitions of Portfolio Companies in automotive retail, information technology and healthcare sectors.

**1.7    Powers.**

The Partnership will be empowered to do any and all acts necessary, appropriate, proper, advisable, incidental to or convenient for the furtherance and accomplishment of the purposes and business described herein and for the protection and benefit of the Partnership.

**1.8    Partner Information.**

The names and addresses of the General Partner and each of the Limited Partners are available at the office of the Partnership. The General Partner will cause the List of Partners to be revised, without the necessity of obtaining the consent of any other Partner, to reflect (i) the admission of any additional or substituted Partner occurring under the terms of this Agreement, (ii) the withdrawal, or partial withdrawal, of any Partner under the terms of this Agreement, (iii) any change in the identity or address of a Partner, or (iv) the Capital Contributions and Net Capital Contributions of the Partners occurring under the terms of this Agreement.

**1.9    Ownership.**

The Unit of each Partner shall be personal property for all purposes. All property and interests in property, real or personal, owned by the Partnership will be deemed owned by the Partnership as an entity, and no Partner, individually, shall have any ownership of such property or interest owned by the Partnership except as a Partner in the Partnership.

**ARTICLE 2.**
**DEFINITIONS**

**2.1    Certain Definitions.**

In addition to the terms defined elsewhere in this Agreement, the terms set forth below shall have the following respective meanings:

"1934 Act" means the Securities Exchange Act of 1934, as amended.

"Additional Limited Partners" has the meaning provided in Section 4.1.

"Adjusted Capital Account Deficit" means, with respect to any Partner for any Fiscal Year, the deficit balance, if any, in such Partner's Capital Account as of the end of the relevant Fiscal Year, after giving effect to the following adjustments: (i) crediting to such Capital Account (A) any amount that such Partner is obligated to restore following the liquidation of such Partner's Units (under the terms of this Agreement or otherwise) and (B) any amount that such Partner is deemed obligated to restore in accordance with Regulations §§1.704-1(b)(2)(ii)(c), 1.704-2(g)(1) and 1.704-2(i)(5); and (ii) debiting to such Capital Account the items described in Regulations §§1.704-1(b)(2)(ii)(d)(4), (5), and (6). This definition is intended to comply with the provisions of Regulations §1.704-1(b)(2)(ii)(d) and will be interpreted consistently therewith.

"Adverse Effect" means an ownership or proposed ownership of a Unit that, in the opinion of counsel to the Partnership, would cause or be likely to cause (i) the Partnership to be classified as a "publicly traded partnership" under the Code, (ii) the assets of the Partnership to be considered "plan assets" within the meaning of ERISA, Code §4975 or applicable regulations, (iii) the Units to be required to be registered under the 1934 Act, (iv) the Partnership to register as an investment company under the Investment Company Act of 1940, as amended (the "1940 Act"), or (v) some other legal, regulatory, pecuniary, tax or material administrative disadvantage to the Partnership or Partners.

"Advisory Committee" is defined in Section 3.16.

"Affiliate" means, as to any Person, any other Person that directly or indirectly, through one or more intermediaries, controls, is controlled by, or is under common control with such specified Person, and the term "affiliated" has a meaning correlative to the foregoing. For purposes of this definition, "control" when used with respect to any Person means the power to direct the management and policies of such Person, directly or indirectly, whether through the ownership of voting securities, by contract or otherwise, and the terms "controlling" and "controlled" have meanings correlative to the foregoing.

"Agreement" means this Agreement of Limited Partnership, as amended, restated, supplemented or otherwise modified from time-to-time.

"Allocation Percentage" means, with respect to each Partner, the percentage specified as such in the List of Partners. The formula for determining such Allocation Percentage means, with respect to any Partner, the quotient obtained by dividing (i) such Partner's Capital Contribution by (ii) the Capital Contributions for all Partners, as of such date of determination.

"Average Capital Contribution" means, with respect to a Limited Partner, for a Fiscal Year (i) the sum of such Limited Partner's twelve Monthly Remaining Capital Contributions calculated for each month in such Fiscal Year, divided by (ii) twelve (12).

"Book Depreciation" means, for each Fiscal Year or other period, an amount equal to the depreciation, amortization or other cost recovery deduction allowable with respect to the Partnership's assets for such year or other period for federal income tax purposes, except that if the Gross Asset Value of any asset differs from its adjusted basis for federal income tax purposes at the beginning of such year or other period, Book Depreciation with respect to such asset will be an amount which bears the same ratio to such beginning Gross Asset Value as the federal income tax depreciation, amortization or other cost recovery deduction with respect to such asset for such year or other period bears to such beginning adjusted tax basis; *provided*, *however*, that if the federal income tax depreciation, amortization or other cost recovery deduction with respect

to such asset for such year is zero, Book Depreciation will be determined with reference to such beginning Gross Asset Value using any reasonable method selected by the General Partner.

"Capital Account" means, with respect to any Partner, an account that initially has a balance equal to the Net Capital Contribution of such Partner under Section 5.2 and that is increased by (i) the amount of additional cash and the fair market value of any additional property contributed by such Partner to the capital of the Partnership (net of liabilities secured by such contributed property that the Partnership is considered to assume or to take subject to under Code §752), (ii) the amount of any Net Profits allocated to such Partner under Section 7.1, and (iii) the amount of any special allocations of income or gain to such Partner under Section 7.3 and decreased by (A) the amount of money distributed to such Partner by the Partnership, (B) the fair market value of any property distributed to such Partner by the Partnership (net of liabilities secured by such distributed property that such Partner is considered to assume or take subject to under Code §752), (C) the amount of any Net Losses allocated to such Partner under Section7.1, and (D) the amount of any special allocation of deductions or losses to such Partner under Sections 7.3. The foregoing Capital Account definition and the other provisions of this Agreement relating to the maintenance of Capital Accounts are intended to comply with Regulation §1.704-1(b) and will be interpreted and applied in a manner consistent with such Regulations.

"Capital Contribution" means, with respect to any Partner as of any particular date, the amount of money and the initial Gross Asset Value of any property (other than money) contributed, or deemed by the General Partner to have been contributed, by such Partner to the Partnership in accordance with the provisions of this Agreement, and shall be the total amount paid by the Partner to the Partnership prior to reduction by the Partnership's payment of any Selling Fees with respect to such Capital Contribution.

"Certificate" means the Certificate of Limited Partnership relating to the Partnership filed in the office of the Secretary of State of the State of Delaware, as amended from time-to-time in accordance with the terms hereof and the DRUPA.

"Class A Unit" means, as to any Partner, the Partner's interest in the Partnership designated as a Class A Unit on the List of Partners, including any and all benefits to which the holder of such interest in the Partnership may be entitled as provided in this Agreement and under the DRUPA, together with all obligations of the Partner to comply with the terms and provisions of this Agreement, as adjusted from time-to-time as provided in this Agreement.

"Class B Unit" means, as to any Partner, the Partner's interest in the Partnership designated as a Class B Unit on the List of Partners, including any and all benefits to which the holder of such interest in the Partnership may be entitled as provided in this Agreement and under the DRUPA, together with all obligations of the Partner to comply with the terms and provisions of this Agreement, as adjusted from time-to-time as provided in this Agreement.

"Closing" has the meaning provided in Section 4.1.

"Code" means the United States Internal Revenue Code of 1986, as amended from time-to-time, and any successor statute.

"Commissions" means cash fees paid on behalf of purchasers of Class A Units, as determined by the General Partner, to broker-dealers and/or an Affiliate of the Partnership for assisting with the marketing of the Private Placement, as determined by the General Partner, a substantial portion of which may be paid or reallowed on a non-accountable basis. The Commissions will be payable with

respect to such Capital Contributions upon acceptance by the Partnership of an investor's subscription and will be subtracted from such Capital Contributions. The General Partner may, in its sole discretion, reduce, waive or calculate differently Commissions with respect to any Limited Partner, including Limited Partners that are members, Affiliates or employees of the General Partner, members of the immediate families of such persons and trusts or other entities for their benefit, as well as Limited Partners (such as other funds) that charge management or similar fees to their investors.

"DRUPA" means the Delaware Revised Uniform Limited Partnership Act, as amended from time-to-time (or any corresponding provisions of succeeding law).

"ERISA" means the Employee Retirement Income Security Act of 1974, as amended from time-to-time, and any successor statute.

"Fair Market Value" means the proportionate share of the fair market value of the assets of the Partnership with respect to a Partner's Unit as of the date of determination. In determining the fair market value of the assets of the Partnership under this definition, fair market value shall be based on the entire value of the assets of the Partnership and its investments, without any discount for any minority interest. The Fair Market Value of a Unit shall be determined by agreement of the holder of such Unit and the General Partner; *provided, however*, that if such parties do not reach agreement on the Fair Market Value thereof within 30 days after either party first proposes to the other party in writing an amount that represents its calculation of the Fair Market Value of such Unit, the Fair Market Value thereof shall be determined by an independent appraiser selected by such parties, and engaged by the Partnership. If no agreement can be reached on the selection of an appraiser, (i) each of the General Partner and such Partner shall select an appraiser and those two appraisers will select a third appraiser, each of whom will complete an appraisal and (ii) Fair Market Value will be calculated by averaging the two appraisals that are closest in value. The holder of the pertinent Unit must pay the expenses of its own appraiser and the Partnership shall pay the remainder of the expenses.

"Final Closing" has the meaning provided in Section 4.1.

"Financial Statements" mean the Partnership's balance sheet setting forth the assets and liabilities of the Partnership as of the beginning and the end of each Fiscal Year, a statement of changes in the Partners' equity as of such dates and a statement of operations.

"Fiscal Period" means a Fiscal Quarter or a Fiscal Year, as the case may be.

"Fiscal Quarter" means each of the three-month periods ended March 31, June 30, September 30 and December 31.

"Fiscal Year" means the calendar year.

"GAAP" means United States generally accepted accounting principles.

"General and Administrative Expenses" has the meaning provided in Section 3.5.

"General Partner" means GPB Capital Holdings, LLC, a Delaware limited liability company, and also includes any other Person admitted to the Partnership as a general partner in accordance with the provisions hereof.

"General Partner Indemnitees" has the meaning set forth in Section 9.3(a).

"Gross Asset Value" means, with respect to any asset, the asset's adjusted basis for federal income tax purposes, subject to the following exceptions and adjustments: (i) the initial Gross Asset Value of any asset contributed by a Partner to the Partnership will be the gross fair market value of such asset, as determined by the contributing Partner and the General Partner; (ii) the Gross Asset Value of all Partnership assets will be adjusted to equal their respective gross fair market values, as determined by the General Partner, immediately preceding the occurrence of any of the following events: (A) the acquisition of an additional interest in the Partnership by any new or existing Partner in exchange for more than a *de minimis* Capital Contribution if the General Partner determines that such adjustment is necessary or appropriate to reflect the relative economic interests of the Partners in the Partnership; (B) the distribution by the Partnership to a Partner of more than a *de minimis* amount of property as consideration for an interest in the Partnership if the General Partner determines that such adjustment is necessary or appropriate to reflect the relative economic interests of the Partners in the Partnership; (C) the liquidation of the Partnership within the meaning of Regulations §1.704-1(b)(2)(ii)(g) (which for this purpose will include the termination of the Partnership for federal income tax purposes pursuant to Code §708(b)(1)(B)), if the General Partner determines that such adjustment is necessary or appropriate to reflect the relative economic interests of the Partners in the Partnership; and (D) any other event for which such an adjustment is permitted under Regulations §1.704-1(b)(2)(ii) if the General Partner determines that such adjustment is necessary or appropriate to reflect the relative economic interests of the Partners in the Partnership; (iii) the Gross Asset Value of any Partnership asset distributed to any Partner will be the gross fair market value of such asset on the date of distribution as agreed to by the General Partner and the distributee Partner; (iv) the Gross Asset Values of Partnership assets will be increased (or decreased) to reflect any adjustment to the adjusted basis of such assets pursuant to Code §734(b) or Code §743(b), but only to the extent that such adjustments are taken into account in determining Capital Accounts pursuant to Regulations §1.704-1(b)(2)(iv)(m) and Section 7.3(d); *provided*, *however*, that Gross Asset Values will not be adjusted pursuant to this subsection (iv) to the extent the General Partner determines that an adjustment pursuant to subsection (ii) above is necessary or appropriate in connection with a transaction that would otherwise result in an adjustment pursuant to this subsection (iv); and (v) if the Gross Asset Value of an asset has been determined or adjusted pursuant to subsection (i), (ii), or (iv) above, such Gross Asset Value will thereafter be adjusted by the Book Depreciation (calculated in accordance with Regulations §1.704-1(b)(2)(iv)(g)) taken into account with respect to such asset for purposes of computing Net Profits and Net Losses.

"Indemnitee" has the meaning provided in Section 9.3(a).

"Independent" means a Person whom the General Partner has determined has no material relationship with the Partnership (either directly or as a partner, shareholder or officer of an Affiliate); and a Person will not be "Independent" if such Person (i) is, or has been within the last three years, an employee of either the Partnership, or an immediate family member is, or has been within the last three years, an executive officer, of the Partnership; (ii) has received, or has an immediate family member who has received, during any 12-month period within the last three years, more than $120,000 in direct compensation from the Partnership); (iii) is a current partner or employee of a firm that is the internal or external auditor of the Partnership, the Person has an immediate family member who is a current partner of such a firm, the Person has an immediate family member who is a current employee of such a firm and personally works on the audit of the Partnership, or the Person or an immediate family member was within the last three years a partner or employee of such a firm and personally worked on the audit of the Partnership within that time; (iv) or an immediate family member is, or has been with the last three years, employed

as an executive officer of another company where any of the present executive officers of the Partnership or the General Partner at the same time serves or served on that company's compensation committee; or (v) is a current employee, or an immediate family member is a current executive officer, of a company that has made payments to, or received payments from, the Partnership for property or services in an amount which, in any of the last three fiscal years, exceeds the greater of $1 million, or 2% of such other company's consolidated gross revenues.

"Investment Committee" means the investment committee of the Partnership, as provided in Section 3.15.

"Legal Counsel" has the meaning provided in Section 13.13.

"Limited Partner" means any Person, including Additional Limited Partners, admitted to the Partnership as a limited partner in accordance with the terms hereof.

"Limited Partner Preferred Return" means an amount equal to eight percent (8%) per annum on a Limited Partner's Average Capital Contribution.

"Limited Partner's Targeted Return" means with respect to each Limited Partner, an annual rate of return based on the amount of such Limited Partner's gross Capital Contribution to the Partnership multiplied by the Targeted Return Percentage.

"List of Partners" means the list, maintained by the General Partner, setting forth the names, addresses, e-mail addresses, telecopy numbers and Allocation Percentages, Capital Contributions and Net Capital Contributions of the Partners, as well as the percentage of Class A Units or Class B Units held by such Partners.

"Majority of Limited Partners" means Limited Partners holding Units representing at least fifty percent (50%) of the aggregate Allocation Percentages of all Limited Partners who are eligible to vote or grant their consent or approval with respect to the applicable matter.

"Managerial Assistance Fee" means a fee that is payable by the Partnership to the General Partner at a rate of 0.5% per Fiscal Quarter (2.0% annualized) of each Limited Partner's Capital Contribution, paid upon each Limited Partner's entry into the Partnership (such amount to be pro-rated for any partial Fiscal Quarter for the first Fiscal Quarter in which the Limited Partner has entry into the Partnership) and quarterly thereafter in advance.

"Monthly Remaining Capital Contribution" means, with respect to a Limited Partner, calculated at the end of each month, the excess of (i) such Limited Partner's Capital Contribution, over (ii) cumulative distributions to such Limited Partner pursuant to Sections 8.3(a) and (b) and Section 11.3(a)(3).

"Net Capital Contribution" means, with respect to any Partner, as of any particular date, the amount of such Partner's Capital Contribution, less the Selling Fees paid by the Partnership attributable to such contribution upon acceptance of a Partner's subscription.

"Net Profits" or "Net Losses" means, as the case may be, for any period, an amount equal to the Partnership's Taxable Income or Taxable Loss for such period, with the following adjustments: (i) any income of the Partnership that is exempt from federal income tax and not otherwise taken into account in computing Net Profits and Net Losses pursuant to this definition will be added to such Taxable Income or will reduce such Taxable Loss; (ii) any expenditure of the Partnership

described in Code §705(a)(2)(B) or treated as a Code §705(a)(2)(B) expenditure pursuant to Regulations §1.704-1(b)(2)(iv)(i), and not otherwise taken into account in computing Net Profits or Net Losses pursuant to this definition, will be subtracted from such Taxable Income or Taxable Losses; (iii) if the Gross Asset Value of any Partnership asset is adjusted pursuant to subsection (ii) or (iii) of the definition of Gross Asset Value, the amount of such adjustment will be taken into account as gain or loss from the disposition of such asset for purposes of computing Net Profits or Net Losses; (iv) gain or loss resulting from the disposition of any Partnership asset with respect to which gain or loss is recognized for federal income tax purposes will be computed by reference to the Gross Asset Value of the asset disposed of, notwithstanding that the adjusted tax basis of such property differs from its Gross Asset Value; (v) in lieu of the depreciation, amortization and other cost recovery deductions taken into account in computing such Taxable Income or Loss, there will be taken into account Book Depreciation for such Fiscal Year or other period; and (vi) notwithstanding any other provision of this definition, any item that is specially allocated pursuant to <u>Section 7.3</u> will not be taken into account in computing Net Profit or Net Loss.

"<u>Organization and Offering Expenses</u>" means fees, costs, and expenses incurred by the General Partner, an Affiliate or a third party, through the Final Closing, in connection with the formation and organization of the Partnership and the General Partner as well as conducting the Private Placement, including (i) the preparation of this Agreement and the organizational agreements of such other entities, or any amendment or restatement of this Agreement or such other agreements (to the extent prepared in connection with the formation or organization of the Partnership or any transaction at or in connection with any Closing), (ii) the preparation of any offering documents, subscription materials and related documents in connection with any Private Placement, (iii) legal, accounting, filing, consulting and other professional fees and expenses, (iv) a reasonable allocation of time expended by the General Partner or Affiliates thereof, and their respective employees and representatives, and (v) all other costs and expenses (including travel and entertainment expenses) actually incurred by the Partnership, the General Partner or Affiliates thereof. "<u>Organization and Offering Expenses</u>" do not include Selling Fees.

"<u>Partner</u>" means either the General Partner or any Limited Partner, and "<u>Partners</u>" means the General Partner and all Limited Partners.

"<u>Partnership</u>" means the partnership formed pursuant to this Agreement and the partnership continuing the business of the Partnership in the event of winding up as provided herein.

"<u>Partnership Expenses</u>" has the meaning provided in <u>Section 3.3</u>.

"<u>Partnership Information</u>" has the meaning provided in <u>Section 9.5(a)</u>.

"<u>Partnership Legal Matter</u>" has the meaning provided in <u>Section 13.13</u>.

"<u>Partnership Term</u>" has the meaning provided in <u>Section 1.5</u>.

"<u>PCAOB</u>" means the Public Company Accounting Oversight Board or its successor.

"<u>Person</u>" means an individual or a corporation, limited liability company, partnership (whether general, limited or limited liability), trust, unincorporated organization, joint stock company, joint venture, association or other entity, or any government, or any agency or political subdivision thereof.

"Placement and Marketing Support Fee" means cash fees paid by purchasers of Class A Units, as determined by the General Partner, to broker-dealers and/or an Affiliate of the Partnership for assisting with the marketing and due diligence of the Private Placement, as determined by the General Partner, a substantial portion of which may be paid or reallowed on a non-accountable basis. The Placement and Marketing Support Fee will be payable with respect to such Capital Contributions upon acceptance by the Partnership of an investor's subscription and will be subtracted from such Capital Contributions. The General Partner may, in its sole discretion, reduce, waive or calculate differently the Placement and Marketing Support Fee with respect to any Limited Partner, including Limited Partners that are members, Affiliates or employees of the General Partner, members of the immediate families of such persons and trusts or other entities for their benefit, as well as Limited Partners (such as other funds) that charge management or similar fees to their investors.

"Private Placement" means any offering of Units by the Partnership that is not registered under the Securities Act.

"Profits Interest" means an interest that is awarded to the Special Partner or its designee in exchange for its services to the Partnership, and that is intended as a "profits interest" (as such term is defined in Revenue Procedure 93-27).

"Registrar and Transfer Agent" means the registrar and transfer agent for the Partnership referred to in Section 3.9, which will be the General Partner if no other registrar and transfer agent is appointed thereunder.

"Register" means the list of Partners, their Units and other information as provided in Section 3.9.

"Regulations" means the final and temporary regulations promulgated by the United States Department of the Treasury pursuant to and in respect of provisions of the Code. All references herein to Sections of the Regulations shall include any corresponding provision or provisions of successor provisions thereof.

"Regulatory Allocations" has the meaning provided in Section 7.3(g).

"Related Party" means the General Partner, the Special Partner or any of their respective Affiliates, officers, directors, agents or equity holders.

"Related Party Transaction" means any transaction in which the Partnership would acquire an asset from or sell an asset to a Person in which a Related Party has a financial interest.

"Securities Act" means the Securities Act of 1933, as amended.

"Selling Fees" means any sourcing, commitment, financing, transaction, investment banking, brokers', finders', and other similar fees payable to a selling agent for any offering or sale of Units, including the Commissions, Wholesaling Fees and the Placement and Marketing Support Fees respecting Class A Units and the Servicing Fee respecting Class B Units.

"Servicing Fee" means cash fees paid by purchasers of Class B Units, as determined by the General Partner, to broker-dealers and/or an Affiliate of the Partnership for assisting with the marketing and due diligence of the Private Placement and payable as determined by the General Partner, a substantial portion of which may be paid or reallowed on a non-accountable basis. The Servicing Fee will be payable with respect to such Capital Contributions upon acceptance by the Partnership of

an investor's subscription and will be subtracted from such Capital Contributions, and thereafter on an annual basis as determined by the General Partner. The General Partner may, in its sole discretion, reduce, waive or calculate differently the Servicing Fee with respect to any Limited Partner, including Limited Partners that are members, Affiliates or employees of the General Partner, members of the immediate families of such persons and trusts or other entities for their benefit, as well as Limited Partners (such as other funds) that charge management or similar fees to their investors.

"Side Letter" is defined in Section 4.1(d).

"Special Partner" means GPB SLP, LLC, a Delaware limited liability company, and also includes any other Person admitted to the Partnership as a Special Partner.

"Subscription Documents" means the subscription agreement and other documents utilized by the General Partner in accepting subscriptions for Units from investors, which documents shall be in such form as is determined by the General Partner.

"Supermajority of Limited Partners" means Limited Partners holding Units representing at least sixty-six and two-thirds percent (66 2/3%) of the aggregate Allocation Percentages of all Limited Partners who are eligible to vote or grant their consent or approval with respect to the applicable matter.

"Target Capital Account" means the amount of distributions a Partner would receive pursuant to Section 8.3 if each of the Partnership's assets were disposed of for an amount equal to their Gross Asset Value, and all liabilities of the Partnership were satisfied to the extent required by their terms (limited, with respect to a nonrecourse liability (as such term is defined in Regulations §1.702-2(b)(3)) or partner nonrecourse debt (as such term is defined in Regulations §1.704-2(b)(4)), to the Gross Asset Value of the assets securing each such liability), and the proceeds of such disposition and all other cash of the Partnership remaining after satisfaction of all Partnership liabilities were distributed among the Partners pursuant to Section 8.3, reduced by such Partner's share of partner nonrecourse debt minimum gain (as such term is defined in Regulations §1.704-2(i)(5)) and partnership minimum gain (as such term is defined in Regulations §1.704-2(d)) immediately prior to such sale.

"Targeted Return Percentage" means the percentage return determined annually in the sole discretion of the General Partner to be used to calculate the Limited Partner's Targeted Return.

"Taxable Income" or "Taxable Loss" means, as the case may be, for any period, the taxable income or taxable loss of the Partnership for such period, determined in accordance with Code §703(a), including all items of income, gain, loss or deduction required to be stated separately pursuant to Code §703(a)(1).

"Tax Distribution" means any distributions made to the Special Partner under Section 8.2.

"Transfer" means a sale, assignment, transfer, gift, encumbrance, hypothecation, mortgage, pledge, exchange or any other conveyance or disposition by law or otherwise, voluntarily or involuntarily.

"Unit" means, as to any Partner, all of the Partner's Class A Units and Class B Units.

"Unpaid Preferential Return" means the excess of (i) the sum of (A) the Capital Contributions of all Limited Partners plus (B) the sum of all Limited Partners' Limited Partner Preferred Return as of the end of the period for which such calculation is being made, over (ii) all distributions to such Limited Partners pursuant to Sections 8.3(a) and (b) and Section 11.3(a)(3).

"Unreturned Capital Contributions" means, with respect to each Partner, the excess of (i) a Partner's Capital Contribution, over (ii) all distributions received by such Partner under Sections 8.3 and 11.3(a)(3).

"Unreturned Net Capital Contributions" means, with respect to each Partner, the excess of (i) a Partner's Net Capital Contribution, over (ii) all distributions received by such Partner under Sections 8.3 and 11.3(a)(3).

"Wholesaling fees" means a fee paid by Class A Unit purchasers, as determined by the General Partner, a portion of which may be reallowed to selected dealers on a non-accountable basis. The Wholesaling fees will be payable with respect to Capital Contributions upon acceptance by the Partnership of an investor's subscription and will be subtracted from such Capital Contributions.

## 2.2    Other Definitions.

All terms used in this Agreement that are not defined in this Article 2 have the meanings contained elsewhere in this Agreement.

## ARTICLE 3.
## MANAGEMENT

## 3.1    Authority.

Except as otherwise provided in this Agreement, the management and operation of the Partnership is vested exclusively in the General Partner. The General Partner has the power on behalf of the Partnership to carry out any and all of the purposes of the Partnership and to perform all acts and enter into and perform all contracts and other undertakings that it may deem necessary or advisable or incidental thereto. Except as otherwise expressly provided herein, the General Partner shall have, and shall have full authority to exercise, on behalf of and in the name of the Partnership, all rights and powers of a general partner of a limited partnership under the DRUPA necessary or convenient to carry out the purposes of the Partnership. Without limiting the foregoing but subject to the terms of this Agreement, including Section 3.2, the General Partner is hereby authorized and empowered in the name of and on behalf of the Partnership to:

(a)  acquire (i) the assets of or equity interests in private companies (the "Portfolio Companies"), (ii) provide managerial assistance to such companies, (iii) develop such companies for income and/or long term growth, and (iv) otherwise operate and manage such interests as the General Partner deems appropriate in its sole discretion;

(b)  acquire by purchase, lease, or otherwise any real or personal property which may be necessary, convenient, or incidental to the accomplishment of the purposes of the Partnership including the authority to acquire real and personal property from the General Partner or any Limited Partner or their respective Affiliates;

(c)  operate, maintain, improve, construct, lease and sell any Partnership assets necessary, convenient, or incidental to the accomplishment of the purposes of the Partnership;

(d) execute any and all agreements, contracts, documents, certifications, and instruments necessary or convenient in connection with the management, maintenance, and operation of Partnership assets, or in connection with managing the affairs of the Partnership, including executing Side Letters with certain Limited Partners and amendments to the Agreement and the Certificate in accordance with the terms of the Agreement, pursuant to any power of attorney granted by the Limited Partners to the General Partner;

(e) register or take title to Partnership assets in the Partnership's name or as trustee, with or without disclosing the identity of his, her or its principal;

(f) pay, prepay in whole or in part, refinance, recast, increase, modify, or extend any liabilities affecting Partnership assets and in connection therewith execute any extensions or renewals of encumbrances on any or all of the Partnership's assets;

(g) borrow and lend money, and, in accordance with this Agreement, allow a Partner to lend money to and transact other business with the Partnership or Partners;

(h) borrow or raise money by issuing, accepting, endorsing or executing notes, drafts, bills of exchange, warrants, bonds, debentures, instruments or evidences of indebtedness; securing the indebtedness by mortgage, pledge, transfer, or assignment in trust of all or any part of the Partnership's assets; and selling, pledging, or disposing of the Partnership's obligations;

(i) care for and distribute funds to the Partners by way of cash, income, return of capital, or otherwise, all in accordance with the provisions of this Agreement, and perform all matters in furtherance of the objectives of the Partnership or this Agreement;

(j) contract on behalf of the Partnership for the employment and services of employees and/or independent contractors, such as lawyers and accountants, and delegate to such Persons the duty to manage or supervise any of the assets or operations of the Partnership;

(k) engage in any kind of activity, including any other trade, business, or investment activity, and perform and carry out contracts of any kind (including contracts of insurance covering risks to the Partnership's assets and General Partner liability) necessary or incidental to, or in connection with, the accomplishment of the purposes of the Partnership, as may be lawfully carried on or performed by a partnership under the laws of each state in which the Partnership is then formed or qualified;

(l) make any and all elections for federal, state, and local income tax purposes including any election, if permitted by applicable law: (i) to adjust the basis of the Partnership's assets under Code §§754, 734(b), and 743(b), or comparable provisions of state or local law, in connection with transfers of Partnership interests and Partnership distributions; (ii) to extend the statute of limitations for assessment of tax deficiencies against the Partners with respect to adjustments to the Partnership's federal, state, or local tax returns; and (iii) to represent the Partnership and the Partners, before taxing authorities or courts of competent jurisdiction in tax matters affecting the Partnership, the General Partner, and the Limited Partners in their capacities as General Partner or Limited Partners and to execute any agreements or other documents relating to or affecting such tax matters, including agreements or other documents that bind the General Partner and Limited

Partners with respect to such tax matters or otherwise affect the rights of the Partnership, General Partner, and Limited Partners;

(m) take, or refrain from taking, all actions, not expressly proscribed or limited by this Agreement, as may be necessary or appropriate to accomplish the purposes of the Partnership;

(n) institute, prosecute, defend, settle, compromise, and dismiss lawsuits or other judicial or administrative proceedings brought on or in behalf of, or against, the Partnership or the Partners in connection with activities arising out of, connected with, or incidental to this Agreement, and to engage counsel or others in connection therewith;

(o) withhold any funds due to a Limited Partner who is a foreign Person as may be required by the Code and the Regulations;

(p) establish any reserve accounts for either operating expenses or capital expenditures, which reserves may be increased or decreased in the sole and absolute discretion of the General Partner;

(q) sell any Partnership assets to Affiliates if the sales price is at fair market value and pursuant to such terms to which an independent seller or buyer (as the case may be) would agree;

(r) enter into any contract, agreement, lease or other arrangement for the furnishing to or by the Partnership of goods, services or space with any party or entity related to or affiliated with the General Partner or with respect to any entity which the General Partner has any direct or indirect ownership or control if such arrangement is bona fide, at competitive price;

(s) waive or reduce, in whole or in part, any notice period, minimum amount requirement, or other limitation or restriction imposed on Capital Contributions or withdrawals of capital; waive, reduce or, by agreement with any Limited Partner, otherwise vary any fee or special allocation to the General Partner, and/or any requirement imposed on that Limited Partner by this Agreement. The General Partner will have such right, power and authority regardless of whether such notice period, minimum amount, limitation, restriction, fee, or special allocation, or the waiver or reduction thereof, operates for the benefit of the Partnership, the General Partner or fewer than all the Limited Partners;

(t) admit Limited Partners or additional General Partners to the Partnership and remove Limited Partners;

(u) amend this Agreement in accordance with the terms hereof; and

(v) engage in any kind of activity, and to perform and carry out contracts of any kind, necessary to, or in connection with, or incidental to the accomplishment of, the purposes of the Partnership.

The General Partner may appoint such officers of the Partnership as it may deem appropriate and may remove any such officer at any time with or without cause. The General Partner may delegate to the Partnership's officers such powers and duties as it may deem appropriate and subsequently revoke or modify those powers and duties, and except to the extent that the

General Partner determines otherwise, each officer will have the powers and duties normally associated with an officer having a similar title with a Delaware corporation. The General Partner also may delegate authority to other Persons and revoke that delegation as it may deem appropriate include the power to delegate authority.

**3.2     Limitations on Authority.**

Notwithstanding any term or provision set forth in this Agreement to the contrary, the General Partner does not have the authority, right, power or privilege to:

(a) Do or undertake any act in contravention of this Agreement without the approval of a Majority of Limited Partners;

(b) Cause the Partnership to participate in a Related Party Transaction without the approval of the Advisory Committee in the manner provided in Section 3.16; or

(c) Cause the Partnership to borrow in excess of 50% of the amount the General Partner expects the Company to raise in its Private Placement.

**3.3     Partnership Expenses.**

The Partnership is responsible for and shall pay all Partnership Expenses. All Partnership Expenses shall be paid out of funds of the Partnership determined by the General Partner to be available for such purpose. As used herein, the term "Partnership Expenses" means all costs, expenses and charges incurred with respect to the ownership, operation and maintenance of the Partnership and its assets, as determined by the General Partner, and includes the following, but does not include the Organization and Offering Expenses:

(a) (i) expenses incurred in connection with the origination, evaluation (including industry analyses and evaluations), investigation, structuring, acquisition, or disposition of Partnership assets, including appraisals fees, taxes, brokerage fees, underwriting commissions and discounts, legal, accounting, investment banking, consulting, information services, professional fees and financing fees (including the repayment of those financings and the costs related to establishing and maintaining a credit facility for the Partnership); (ii) expenses incurred in connection with the carrying or management of the Partnership's assets; (iii) expenses incurred in connection with communications with Partners; (iv) attorneys' and accountants' fees and expenses; (v) taxes (including margin taxes) and other governmental charges levied against the Partnership; (vi) insurance, regulatory or litigation expenses (and damages), including regulatory expenses of the General Partner and litigation expenses and damages of persons indemnified under the Agreement; (vii) expenses incurred in connection with the winding up or liquidation of the Partnership; (viii) expenses incurred in connection with any restructuring or amendments to the constituent documents of the Partnership, the General Partner and related entities; and (ix) expenses incurred in connection with distributions to the Partners;

(b) Managerial Assistance Fees;

(c) all fees and expenses incurred in connection with any meetings of the Limited Partners;

(d) all fees and expenses incurred in connection with the registration, qualification or exemption of the Partnership under any applicable federal, state, or local law and all other fees and expenses imposed by any governmental authority with respect to the Partnership's operations or assets;

(e) all fees and expenses relating to the preparation of financial statements of the Partnership, the local, state and federal income, franchise, margin and other tax returns of the Partnership, other regulatory reports and filings of the Partnership, and all other documents, opinions, appraisals and reports delivered to the Partners;

(f) all fees and expenses incurred in connection with any litigation, mediation, arbitration or other legal or tax proceeding involving the Partnership (including the cost of any investigation and preparation) and the amount of any judgment or settlement paid in connection therewith;

(g) all fees and expenses incurred in connection with the collection of amounts due to the Partnership;

(h) all fees and expenses incurred in connection with the winding-up, dissolution and liquidation of the Partnership;

(i) all fees and expenses incurred in connection with transactions that are allocated to the Partnership but not consummated; and

(j) all insurance costs and expenses, and all costs and expenses incurred in connection with any obligations to provide indemnification or contribution to any Indemnitee pursuant to Section 9.3, pursuant to any approval of the Partners or as a matter of law.

**3.4     Organization and Offering Expenses.**

The Partnership will bear and/or reimburse the General Partner for all Organization and Offering Expenses, but only up to 1.25% of the gross proceeds received by or expected to be received by the Partnership in all Private Placements.  Any Organization and Offering Expenses exceeding 1.25% of the gross proceeds received by or expected to be received by the Partnership in all Private Placements will be borne by the General Partner or an Affiliate.

**3.5     General and Administrative Expenses.**

The General Partner shall bear, and shall not be entitled to be reimbursed by the Partnership for, its or its Affiliates' general and administrative costs and expenses and its day-to-day overhead expenses of managing the Partnership (collectively, the "General and Administrative Expenses"). General and Administrative Expenses shall mean the following, whether such expenses are incurred directly by the General Partner or indirectly through any Affiliate:

(a) costs and expenses for the compensation of the General Partner's or its Affiliates' officers and employees (including salaries, bonuses, payroll taxes and employee benefits), other than for the portion of time such officers or employees provide services to the Partnership or its businesses;

(b) rental expense and other occupancy costs and expenses for the rental or lease of office space for the General Partner or its Affiliates, other than space rented primarily for the Partnership's business;

(c) travel and entertainment expenses unrelated to the Partnership or its business; and

(d) costs and expenses for, or relating to, the General Partner's office or offices including (i) acquiring or leasing furniture, fixtures and equipment, (ii) office materials and supplies,

(iii) telephone and telecommunication services and other utilities, and (iv) repair and maintenance costs, other than the portion of any such items related to the Partnership's business. General and Administrative Expenses shall not include out-of-pocket costs and expenses of the General Partner or any Affiliate thereof related specifically to the Partnership, its business or its assets.

For the avoidance of doubt, Selling Fees and Managerial Assistance Fees are not General and Administrative Expenses.

### 3.6    Other Fees.

Other than as set forth in this Agreement, no Partner shall receive any salary, fee, or draw for services rendered to or on behalf of the Partnership in its Partner capacity, nor shall any Partner be reimbursed for any expenses incurred by such Partner in its Partner capacity on behalf of the Partnership, other than as set forth in this Agreement.

### 3.7    Certain Activities.

(a)  The General Partner, itself or through an Affiliate, intends to devote a sufficient portion of its financial, personnel and other resources to administering the businesses of the Partnership to the extent that the General Partner deems necessary to perform its duties as set forth in this Agreement.

(b)  Except as expressly provided in this Agreement, neither the General Partner, its Affiliates or their respective partners, managers, members, officers and directors shall be expressly or implicitly restricted or prohibited under this Agreement from engaging in other activities for profit, and the General Partner, its Affiliates and their respective partners, managers, members, officers and directors shall have the right to engage in and possess an interest in other business ventures of any and every type and description, independently or with others. The Limited Partners acknowledge that the General Partner, its Affiliates and their respective partners, managers, members, officers and directors may be engaged in other businesses in which the Partnership will not have an interest and which may be competitive with the activities of the Partnership. The General Partner, its Affiliates and their respective partners, managers, members, officers and directors may be a partner, shareholder, director, officer, employee, consultant, joint venturer, advisor or act in any other capacity, with or to other entities, including limited partnerships and limited liability companies or other entities, which may compete with the Partnership. The General Partner may propose from time-to-time that the Partnership enter into contractual arrangements with its Affiliates for the provision of certain services.

(c) Subject to the General Partner's express obligations under this Agreement, the Limited Partners agree that the activities and facts described in this Section 3.7 shall not constitute a breach of the General Partner's fiduciary duty to the Partnership or the Limited Partners. The Limited Partners hereby consent to such activities and the Limited Partners waive, relinquish and renounce any right to participate in, and any other claim whatsoever concerning, those activities. The Limited Partners further agree that neither the General Partner nor any other party referred to in this Section 3.7 will be required to account to the Partnership or any Limited Partner for any benefit or profit derived from any such activities or from such similar or competing activity or any related transactions by reason of any conflict of interest or the fiduciary relationship created by virtue of the position of the General Partner unless such activity is contrary to the express terms of this Agreement or the DRUPA. Each Limited Partner waives any right such Limited Partner may have against the General Partner for using for its own benefit information received as a consequence of the General Partner's management of the affairs of the Partnership.

**3.8    Other Matters.**

(a) The General Partner and its Affiliates shall not be liable to the Partnership or any Partner for losses sustained, liabilities incurred, or benefits not derived by any Partner in connection with or resulting from (i) any decisions made by, or actions taken or not taken by, the General Partner or its Affiliates, so long as the General Partner or its Affiliates, if applicable, acted in good faith and in a manner it reasonably believed to be in, or not opposed to, the best interests of the Partnership and its conduct did not constitute gross negligence, fraud or willful or wanton misconduct; (ii) any identity theft or similar criminal action experienced by any Partner.

(b) The General Partner and its Affiliates may exercise any of the powers granted to it hereunder and perform any of the duties imposed upon it hereunder either directly or by or through agents and shall not be responsible for any misconduct or negligence on the part of any such agent appointed and supervised in good faith.

(c) The General Partner and its Affiliates may rely, and shall be protected in acting or refraining from acting, upon any consent, approval and any other action taken by the Limited Partners, and upon any resolution, certificate, statement, instrument, opinion, report, notice, request, consent, order, bond, debenture, or other paper or document believed by it in good faith to be genuine and to have been signed or presented by the proper party or parties.

(d) The General Partner and its Affiliates may consult with legal counsel, accountants, appraisers, management consultants, investment bankers, architects, engineers, environmental consultants and other consultants and advisers, and any act taken or omitted to be taken in reliance upon the opinion or advice (whether written or oral) of such Persons as to matters which the General Partner reasonably believes to be within such Person's professional or expert competence shall be presumed to have been done or omitted in good faith.

(e) The General Partner and its Affiliates shall not be liable to the Partnership or the Partners for the failure to perform any obligation to the extent the General Partner could not perform such obligation due to the fact that the Partnership does not have sufficient funds to enable the General Partner to perform such obligation.

(f) Any Person may, with the consent of the General Partner, lend or advance money to the Partnership. If any Partner shall make any loan or loans to the Partnership or advance money on its behalf, the amount of any such loan or advance shall not be treated as a Capital Contribution but shall be a debt due from the Partnership. The amount of any such loan or advance by a lending Partner shall be repayable out of the Partnership's cash and shall bear interest at such rate as the General Partner and the lending Partner shall agree pursuant to the terms hereof. None of the Partners shall be obligated to make any loan or advance to the Partnership.

### 3.9    Registrar and Transfer Agent.

The General Partner will either act as registrar and transfer agent for the Partnership or appoint a duly qualified and properly licensed trust or other company for such purpose and in such capacity the Registrar and Transfer Agent will maintain and keep a Register comprised of: (a) a list of the name and last known residence address or principal place of business of each Partner, and the type and amount of Units held by such Partner; (b) particulars of the registration of Units; and (c) particulars of the assignment of Units. Upon request, a Partner or his duly authorized representative shall be entitled to inspect, and at its expense receive a copy of, the Register.

### 3.10    Removal.

(a) The General Partner may be removed as the Partnership's general partner upon the affirmative vote of at least 20% of the Limited Partners who are not Affiliates of the General Partner to remove the General Partner if any of the following events occur: (i) a final, non-appealable judicial determination that the General Partner has committed fraud, gross negligence or willful misconduct, or (ii) (A) an action or proceeding under the United States Bankruptcy Code is filed against the General Partner and (I) such action or proceeding is not dismissed within ninety (90) days after the date of its filing or (II) the General Partner files an answer acquiescing in or approving of such action or proceeding, (B) an action or proceeding under the United States Bankruptcy Code is filed by the General Partner or (C) a receiver or conservator is appointed to take control of the General Partner or all or a substantial portion of its property.

(b) Upon any such removal the former General Partner shall be given prompt written notice of such removal.

(c) A Majority of Limited Partners shall select, in writing, any Person to be a successor General Partner of the Partnership, and such Person shall be granted a Profits Interest as of such date.

(d) Any removal shall be without prejudice to the rights, if any, of the General Partner under any contract by and between the General Partner and the Partnership and will not affect the General Partner's or any Affiliates' rights as a Limited Partner.

(e) Upon removal of the General Partner, the Special Partner's Profits Interest will automatically and without further action by any Person, be deemed to have been distributed to the Special Partner, and, in turn, deemed to have been contributed to the Partnership in exchange for Units as a Limited Partner.  Such deemed transaction shall require an adjustment to the Gross Asset Value of the Partnership's assets, as described in (ii) to the definition of Gross Asset Value.

**3.11    Reliance on Authority of General Partner.**

No Person dealing with the General Partner or the Partnership shall be required to determine the authority of the General Partner to make any undertaking on behalf of the Partnership or to determine any fact or circumstance bearing upon the existence of such authority. No purchaser of any property or interest owned by the Partnership shall be required to determine the sole and exclusive authority of the General Partner to execute and deliver, on behalf of the Partnership, any and all documents and instruments in connection therewith or to see to the application or distribution of revenues or proceeds paid or credited in connection therewith:

**3.12    Co-Investment Opportunities.**

At any time during the Partnership Term, the General Partner may make available to strategic investors, lenders, employees or affiliates of the General Partner, the Partnership, and/or any Limited Partner opportunities to make investments outside the Partnership in securities, including though Affiliates of the Partnership or the General Partner ("Co-investment Opportunities"). Such opportunities (i) must be on such terms and conditions as the General Partner shall determine are reasonable under the circumstances, which terms and conditions may include Managerial Assistance Fees and incentive interests to the General Partner or its affiliates that are substantially different from those provided in this Agreement, (ii) may take the form of senior debt, subordinated debt, equity or equity related securities, (iii) may be made available through limited partnerships or other entities formed to make such investments and (iv) may be made to less than all or none of the Limited Partners.

**3.13    Affiliated Funds.**

The General Partner may form additional partnerships or other ownership entities ("Affiliated Funds") to accommodate investors with special legal, regulatory, tax, or other needs. The Affiliated Funds generally will invest side by side with the Partnership on any reasonable basis (expected to be in proportion to Allocation Percentages), and each will pay its share of expenses. The Affiliated Funds may contain terms and conditions different from the Partnership.

**3.14    Managerial Assistance Fee.**

Commencing upon each Limited Partner's entry into the Partnership, the Partnership will pay the General Partner the Managerial Assistance Fee. The Managerial Assistance Fee paid pursuant to this Section 3.14 is intended to constitute a guaranteed payment within the meaning of Code §707(c).

**3.15    Investment Committee.**

The General Partner will establish and appoint the members of the Investment Committee.  The General Partner has the right, in its sole discretion, to appoint additional members of the Investment Committee and replace members of the Investment Committee.  The Investment Committee will be available to consult with the General Partner, make determinations, decisions and recommendations.  The General Partner will be permitted to submit to the Investment Committee for its consideration issues upon which it desires the Investment Committee's advice, including those involving conflicts of interest.  The Partnership will not acquire or dispose of any Portfolio Company without approval of at least seventy-five percent (75%) of the members of the Investment Committee.

**3.16   Advisory Committee.**

(a) <u>Composition</u>.  The Advisory Committee will be composed of three members appointed by the General Partner.  All members of the Advisory Committee must be Independent.  The General Partner may dismiss and replace members of the Advisory Committee.

(b) <u>Meetings and Compensation</u>.  The General Partner and members of the Advisory Committee will agree to compensation paid to its members for serving as such.  The Advisory Committee will meet on an as-needed basis.

(c) <u>Related Party Transactions</u>.  The Partnership may not enter into a Related Party Transaction without the approval of all of the members of the Advisory Committee.  In approving any Related Party Transaction, the General Partner must provide the Advisory Committee with an independent valuation of the proposed acquisition, and the Advisory Committee must determine that the Related Party Transaction is in the best interest of the Partnership.

**ARTICLE 4.**
**<u>THE LIMITED PARTNERS</u>**

**4.1   Admission.**

(a) Each Limited Partner is hereby admitted to the Partnership as of the date the General Partner accepts their respective Subscription Documents.

(b) The General Partner may, in its discretion, cause the Partnership to hold one or more subsequent closings (each, a "<u>Closing</u>" and, the last such closing, the "<u>Final Closing</u>"), pursuant to which additional Limited Partners ("<u>Additional Limited Partners</u>") may be admitted to the Partnership; *provided*, that the Final Closing shall occur on or before June 30, 2017, unless the General Partner in its discretion extends the Final Closing by a period of up to two additional one-year periods. At each Closing, each Additional Limited Partner shall be admitted to the Partnership as of the date of such Closing upon execution and delivery by such Additional Limited Partner of this Agreement and the other Subscription Documents, and acceptance by the General Partner thereof.

(c) Certain affiliates of the General Partner will be able to invest in the Partnership as a Limited Partner. Any Limited Partner that is affiliated with the General Partner will be disregarded for the purposes of any vote on the removal of the General Partner pursuant to <u>Section 3.10(a)</u>.

(d) Notwithstanding any other provision of this Agreement, the General Partner is authorized to admit Limited Partners to the Partnership under separate agreements that have the effect of establishing rights or benefiting such Limited Partner in a manner more favorably than other Limited Partners (a "<u>Side Letter</u>") without the consent of any other Person, including the consent of any other Limited Partner, contemporaneously with the admission of any such Limited Partner to the Partnership, that affect the terms of this Agreement or such Limited Partner's Subscription Agreement to meet certain requirements of such Limited Partner, and the terms of any such Side Letter with such Limited Partner shall govern with respect to such Limited Partner notwithstanding the provisions of this Agreement, the Subscription Agreements and each other written agreement executed by the Partnership in connection with a Limited Partner's subscription for Units.

**4.2     Rights and Duties.**

Except as otherwise required by the DRUPA, no Limited Partner shall be personally liable for any of the debts or obligations of the Partnership, the liability of each Limited Partner to the Partnership will be limited to the total Capital Contributions that the Limited Partner is required to make to the Partnership and the obligations, if any, to return distributions to the Partnership to the extent required under the DRUPA or this Agreement, and such liability will be enforceable only by the Partnership and the Partners thereof and not by any creditors of the Partnership. The Limited Partners will have such approval and consent rights as are specifically provided for in this Agreement or under the DRUPA, but will not participate in the management or control of the Partnership's operations, business or affairs, transact any business for the Partnership or have the power to act for or bind the Partnership, such powers being vested solely and exclusively in the General Partner. Limited Partners may exercise any such approval or consent rights at a meeting of the Partners or by written consent.

**4.3     Meetings.**

(a)  The General Partner may call a meeting of the Limited Partners from time-to-time by delivering to the Limited Partners notice of the time and purpose of the meeting at least ten days before the day of the meeting. Each meeting of Limited Partners shall be conducted by the General Partner. Meetings may be held by telephone conference or other electronic means and participation by a Limited Partner in a meeting by telephone conference or other electronic means shall constitute presence of that Partner. Each Limited Partner may authorize any Person or Persons to act for him by proxy on all matters in which a Limited Partner is entitled to participate, including waiving notice of any meeting, or voting or participating at a meeting. Every proxy must be signed by the Limited Partner or his attorney-in-fact. No proxy shall be valid after the expiration of 11 months from the date thereof unless otherwise provided in the proxy. Every proxy will be revocable at the pleasure of the Limited Partner executing it.

(b)  Whenever action is required by this Agreement to be taken by, or with the approval of, any Limited Partners, such action will be deemed to be valid if taken upon the written vote or written consent of those Limited Partners whose Allocation Percentages represent the specified Allocation Percentages required by this Agreement, the DRUPA or the 1934 Act and rules thereunder to take or approve such action. Whenever action is required by this Agreement to be taken by a specified percentage in interest of a specified class or group of Limited Partners, such action will be deemed to be valid if taken upon the vote or written consent of those Limited Partners of such class or group whose Allocation Percentages represent the specified percentage of the aggregate Allocation Percentages of all Limited Partners of such class or group. Except as expressly provided herein (or as may be required by the 1934 Act and rules thereunder), no class of, or enumerated category of, Limited Partners shall be entitled to vote or consent separately as a class with respect to any matter.

**4.4     Book-Entry Evidence of Ownership.**

The Units will be issued only in fully-registered book-entry form. Ownership of Units will be shown in, and transfer of Units will be affected only through, the Register. Certificates evidencing ownership of Units will not be issued. Units shall be transferable in the manner prescribed by law and in this Agreement, subject to restrictions set forth in this Agreement. Assuming all restrictions on transfers have been met, transfers of Units shall be made in the Register.

**4.5     Joint Holders of Units.**

Where Units are subscribed for by or assigned to two or more Persons: (a) the name of each Person will be shown on the Register for the Units; (b) the Units will be presumed by the Partnership to be held jointly; (c) amounts distributed by the Partnership for the Units will be in both names but may be sent to the Person whose name appears first on the Register for the Units or to such one of them as the joint holders direct in writing, and any one of such Persons may give effectual receipts for any distributions for the Units with the other of such Persons having no further recourse against the Partnership; and (d) any one of such Persons may vote for the Units as if that Person were solely entitled to the Units, but if more than one of such Persons is present or is represented at a meeting, the Person whose name appears first on the Register for the Units will alone be entitled to vote in respect of the Units.

**ARTICLE 5.**
**CAPITALIZATION**

**5.1     Units.**

The Partnership is authorized to issue an unlimited amount of Units and any other classes of Units as the General Partner shall from time-to-time create and issue, with such rights, designations and obligations as the General Partner may specify. Each outstanding Unit of a class shall have attached to it the same rights and obligations as, and will rank equally and *pari passu* with, each other Unit of such class for distributions, allocations and voting except with respect to any amounts required to make up differences, if any, in Selling Fees paid for any offering or sale of Units, or, with respect to voting, as may be provided in any Side Letter.

**5.2     Capital Contributions.**

(a) The Capital Contributions and Net Capital Contributions of the Partners will be the amounts specified in the List of Partners, as amended from time-to-time.

(b) At each Closing, each Additional Limited Partner will make the Capital Contribution specified in the Subscription Documents executed by it and accepted by the General Partner, which amount will be reflected in the List of Partners effective as of the first day of the calendar month following the month in which such payment was made.

(c) The General Partner has an initial Capital Account of $0.00 with respect to its Profits Interest (so that if, following the contribution of all initial Capital Contributions, the Partnership's assets were sold at their Fair Market Value and then the proceeds were distributed in a complete liquidation of the Partnership, the General Partner's share of such distribution with respect to such Profits Interest would be $0.00).

**5.3     Additional Capital Contributions.**

The Partners will not be obligated to make any additional Capital Contributions to the Partnership.

**5.4     Return of Capital.**

No Partner has the right to demand or receive the return of such Partner's Capital Contributions, even in the event of withdrawal of the General Partner, whether or not such withdrawal is permitted hereunder or in breach hereof. Under circumstances requiring a return of any Capital Contributions, no Partner shall have the right to receive property other than cash except as may be specifically provided herein.

**5.5     No Interest on Capital Contributions.**

No Partner may receive any interest on such Partner's Capital Contributions or such Partner's Capital Account, notwithstanding any disproportion therein as between the Partners.

**5.6     Debt Facility.**

Subject to <u>Section 3.2(c)</u>, the General Partner may arrange for one or more debt facilities, including seller financing, to acquire any assets, to make capital expenditures, to pay operating expenses, and for any other permitted purposes, in addition to, lieu of, or in advance of, using Capital Contributions.

**ARTICLE 6.**
**<u>BOOKS AND RECORDS</u>**

**6.1     Bank Accounts.**

The General Partner will, at the expense of the Partnership, deposit all funds collected by it relating to the Partnership, including funds collected from Capital Contributions or proceeds generated from the Partnership's business into an account or accounts in the name of the Partnership, as determined by the General Partner. Withdrawals from said accounts shall be made by signatures only of such Persons as designated by the General Partner.

**6.2     Records.**

The General Partner will maintain for the Partnership books and records in the form determined by the General Partner. Any Partner may, at its expense and upon providing the General Partner with no less than ten business days' prior written request, have access to such books and records during normal business hours or as designated by the General Partner, all of which the General Partner shall **k**eep at the Partnership's principal offices; *provided*, *however*, that the Partner exercising such right may not unreasonably interfere with or disrupt Partnership business.

**6.3     Books and Tax Returns.**

The General Partner will prepare and file all federal, state and local income and other tax returns required to be filed by the Partnership and will keep or cause to be kept complete and appropriate records and books of account in which will be entered all such transactions and other matters relative to the Partnership's operations, business and affairs as are usually entered into records and books of account maintained by Persons engaged in businesses of like character or which are required by the DRUPA. Except as otherwise expressly provided herein, such books and records will be maintained in accordance with GAAP.

**6.4     Audits.**

The Financial Statements will be prepared on a GAAP basis and audited by a PCAOB-registered accounting firm as of the end of each Fiscal Year.  Similar financial statements of each company that is controlled by the Partnership will be prepared on a GAAP basis and audited by a PCAOB-registered accounting firm as of the end of such company's fiscal year.

**6.5     Reports.**

(a)     Within 120 days after the end of each Fiscal Year, the General Partner will cause to be prepared and furnished to the Limited Partners a financial report for such Fiscal Year that includes the audited Financial Statements for such Fiscal Year and any other information that the General Partner deems necessary or appropriate.

(b)     Within 120 days after the end of each Fiscal Year, the General Partner will cause to be prepared and furnished to the Limited Partners all necessary tax reporting information, which information shall include all necessary information in order for all Limited Partners to satisfy reporting obligations under the Code with respect to any investments by the Partnership in any entities organized or formed in jurisdictions outside the United States.

(c)     Within 45 days after the end of each Fiscal Quarter, the General Partner shall cause to be prepared and furnished to the Limited Partners an unaudited summary investment report for such Fiscal Quarter; provided that in the event any Units are registered under the 1934 Act, the General Partner may deem reports filed by the Partnership thereunder to satisfy the foregoing.

**6.6     Tax Elections.**

Except as otherwise provided herein, the General Partner will determine whether to make, refrain from making or revoke any available election pursuant to the Code (other than any election that would cause the Partnership to be classified for federal income tax purposes as an association taxable as a corporation). The General Partner shall not permit the Partnership to elect, and the Partnership shall not elect, to be treated as an association taxable as a corporation for U.S. federal, state or local income tax purposes under Regulations §301.7701-3(a) or under any corresponding provision of state or local law.

**6.7     Tax Matters Partner.**

The General Partner will be the "tax matters partner" of the Partnership for federal income tax purposes under Code §6231(a)(7), and the Partners shall take any and all steps required under the Code to ensure that the General Partner is properly designated as the "tax matters partner."

**ARTICLE 7.**
**ALLOCATIONS**

**7.1     Allocation of Net Profits and Net Losses.**

(a)     Subject to Section 7.3, for each Fiscal Period, all Selling Fees shall be allocated among the Limited Partners in accordance with any Selling Fee actually charged with respect to the Units held by such Limited Partner.

(b) Subject to <u>Sections 7.1(a)</u> and <u>7.3</u>, for each Fiscal Period, Net Profits and Net Losses (and items thereof) shall generally be allocated among the Partners, in proportion to, and until, each such Partner's Capital Account balance (determined after taking into account all distributions and all allocations for the current Fiscal Year, except for the allocations pursuant to this <u>Section 7.1</u>) is increased or reduced to an amount equal to such Partner's Target Capital Account.  The General Partner may allocate in any particular Fiscal Period (i) items of income and gain to those Partners whose Capital Account balances are less than their Target Capital Account and (ii) items of loss and deduction to those Partners whose Capital Account balances are greater than their Target Capital Account, but in each case only up to an amount that would cause their Target Capital Account and Capital Account balances to be equivalent.

## 7.2    Authority to Reallocate.

The Partners acknowledge and agree that (i) it is the overriding intent of the parties that the cumulative distributions made by the Partnership to the Partners over the life of the Partnership pursuant to <u>ARTICLE 8</u> and <u>ARTICLE 11</u>, including distributions made in liquidation of the Partnership, shall be made among the Partners as described in <u>Section 8.3</u>, and (ii) notwithstanding <u>Section 7.1</u>, the General Partner shall have the authority to reallocate items of income, gain, loss, and deduction of the Partnership among the Partners so as to cause the allocations thereof to be consistent with the distributions set forth in <u>Section 8.3</u>.

## 7.3    Special Allocations.

(a) <u>Minimum Gain Chargebacks</u>. If during any taxable year there is a net decrease in partnership minimum gain (as such term is defined by Regulations §1.704-2(d)), then each Partner shall be specially allocated gross income for such taxable year (and, if necessary, for subsequent taxable years) in the manner provided in Regulations §1.704-2(f). Likewise, if there is a net decrease during any taxable year in the minimum gain attributable to Partner nonrecourse debt (as defined in Regulations §1.704-2(i)(3)) with respect to Partner nonrecourse debt, then any Partner with a share of the minimum gain attributable to such debt at the beginning of such taxable year shall be specially allocated items of gross income for such taxable year (and, if necessary, for subsequent taxable years) in the manner provided in Regulations §1.704-2(i)(4). This <u>Section 7.3(a)</u> is intended to comply with, and shall be interpreted to be consistent with, the minimum gain chargeback requirements of Regulations §§1.704-2(f) and 1.704-2(i).

(b) <u>Qualified Income Offset</u>. If any Limited Partner unexpectedly receives any adjustment, allocation or distribution described in Regulations §§1.704-1(b)(2)(ii)(d)(4), (5), or (6), that, after tentatively taking into account all allocations that would be made for the current period under this Agreement (other than allocations pursuant to this <u>Section 7.3(b)</u>), would cause or increase an Adjusted Capital Account Deficit, items of Partnership income and gain will be specially allocated to such Partner in an amount and manner sufficient to eliminate, to the extent required by the Regulations under Code §704(b), the Adjusted Capital Account Deficit as quickly as possible. This <u>Section 7.3(b)</u> is intended to comply with the qualified income offset requirement in Regulations §1.704-1(b)(2)(ii)(d) and will be interpreted consistently therewith.

(c) <u>Preventative Allocation</u>. If any Limited Partner would have an Adjusted Capital Account Deficit at the end of any Fiscal Year then such Limited Partner will be specially allocated items of Partnership income and gain in the amount of such excess as quickly as possible.

(d) <u>Optional Adjustment to Basis – Section 754</u>. To the extent an adjustment to the adjusted tax basis of any Partnership asset pursuant to Code §734(b) or Code §743(b) is required pursuant to Regulations §1.704-1(b)(2)(iv)(m) to be taken into account in determining Capital Accounts, the amount of such adjustment to the Capital Accounts will be treated as an item of gain (if the adjustment increases the basis of the asset) or loss (if the adjustment decreases such basis), and such gain or loss will be specially allocated to the Partners in a manner consistent with the manner in which their Capital Accounts are required to be adjusted pursuant to such Regulations Section.

(e) <u>Overall Limitation on Allocation of Net Loss</u>. Notwithstanding any other provision of this Agreement, no Net Loss will be allocated to any Limited Partner if such allocation would cause or increase an Adjusted Capital Account Deficit in such Limited Partner's Capital Account. If the Capital Account of any Limited Partner would have an Adjusted Capital Account Deficit at any time when the Capital Account of any other Limited Partner would not have an Adjusted Capital Account Deficit, any further Net Loss will be allocated in accordance with the respective Capital Account balances of the Limited Partners whose Capital Accounts would have no Adjusted Capital Account Deficit. In the event that the allocation of further Net Loss would cause Adjusted Capital Account Deficits in the Capital Accounts of all Limited Partners, all such Net Loss will be allocated to the General Partner.

(f) <u>Nonrecourse Deductions</u>. Gross deductions that are Partner nonrecourse deductions (as defined in Regulations §1.704-2(i)(2)) for any taxable year shall be allocated to the Partner that bears the economic risk of loss with respect to the nonrecourse debt to which such Partner nonrecourse deductions are attributable in accordance with Regulations §1.704-2(i). Nonrecourse deductions (as defined in Regulations §1.704-2(b)) will be allocated to the Partners in accordance with their respective Allocation Percentages. Solely for purposes of allocating excess nonrecourse liabilities of the Partnership among the Partners, the Partners agree that their respective interests in the profits of the Partnership are equal to their respective Allocation Percentages.

(g) <u>Curative Allocations</u>. The allocations set forth in <u>Section 7.3(a)</u> through <u>7.3(f)</u> ("<u>Regulatory Allocations</u>") are intended to comply with certain requirements of Regulations §§1.704-1(b) and 1.704-2. The Regulatory Allocations may not be consistent with the manner in which the Partners intend to divide Partnership distributions. Accordingly, the General Partner is hereby authorized to divide other allocations of Net Profit, Net Loss, and other items among the Partners so as to cause all of the Partnership's allocations, including the Regulatory Allocations, to be consistent with the agreed division of Partnership distributions. In general, the Partners anticipate that this will be accomplished by specially allocating other Net Profit, Net Loss, and items of income, gain, loss and deduction among the Partners so that the net amount of the Regulatory Allocations and such special allocations to each such Person is zero. However, the General Partner may accomplish this result in any reasonable manner.

**7.4    Tax Rules.**

The following special allocations shall be made in the following order:

(a)  <u>Proportional to Net Profits or Net Loss</u>. Except as otherwise provided in this <u>Section 7.4</u>, for each taxable period, each item of Partnership income, gain, deduction and loss for tax purposes shall be allocated among the Partners in the same proportion as they share the corresponding item of Net Profits, Net Losses or other item of Partnership income, gain, loss or deduction for such period.

(b)  <u>Contribution of Property</u>. In accordance with Code §704(c) and the Regulations thereunder, income, gain, loss, and deduction as to any property contributed to the capital of the Partnership shall, for tax purposes, be allocated among the Partners so as to take into account any variation between the adjusted basis of such property to the Partnership for federal income tax purposes and its initial Gross Asset Value.

(c)  <u>Gross Asset Value Adjustment</u>. If the Gross Asset Value of any Partnership asset is adjusted as the result of an adjustment as described in subsection (ii) or (iv) of the definition of "Gross Asset Value," subsequent allocations of income, gain, loss, and deduction as to such asset shall, for tax purposes, be made so as to eliminate as quickly as possible any variation between the adjusted basis of such asset for federal income tax purposes and its Gross Asset Value in the same manner as pursuant to Code Section 704(c) and the Regulations thereunder.

(d)  <u>Elections Under Code §704(c)</u>. Notwithstanding anything herein to the contrary, the General Partner will allocate taxable items of income, gain, loss and deduction with respect to any property owned by the Partnership as of the date hereof, the adjusted basis of which differs from its Gross Asset Value, among the Partners on a property-by-property basis in accordance with one of the methods provided in Regulations §1.704-3, as selected by the General Partner. Any election or other decision relating to allocations under this <u>Section 7.4</u> will be made by the General Partner in any manner that reasonably reflects the purposes and intention of this Agreement. Allocations under this <u>Section 7.4</u> are for purposes of federal, state and local taxes only and shall not affect or in any way be taken into account in computing any Partner's Capital Account balance or share of Net Profits, Net Losses or distributions pursuant to any provision of the Agreement.

**7.5    Other Allocation Rules.**

(a)  <u>Frequency</u>. For purpose of determining the Net Profit, Net Loss, or any other item allocated to any period, Net Profit, Net Loss, and any such other item will be determined on a daily, monthly, quarterly, or other basis, as determined by the General Partner using any permissible method under Code §706 and the Regulations thereunder.

(b)  <u>Remaining Items</u>. Any item of Partnership income, gain, loss or deduction and any other allocation not otherwise provided for in this Agreement must be divided among the Partners in the same proportions as the Partners share Net Profit or Net Loss, as the case may be, for such period.

## ARTICLE 8.
## DISTRIBUTIONS

**8.1     Amounts.**

Except as otherwise provided herein, distributions will be made by the Partnership as determined by the General Partner in its sole and absolute discretion. The General Partner shall be entitled to withhold from any distribution such amounts as the General Partner determines are necessary to create or fund any reserve for Partnership Expenses, liabilities or obligations of the Partnership. The General Partner may use broad discretion with respect to the current needs for operating capital, reserves for future operating capital, current investment and reinvestment opportunities, reserves for future investment and reinvestment opportunities, and distribution of the Partnership assets; *provided*, *however*, notwithstanding any provision herein to the contrary, the General Partner may not withhold any distribution of funds to the Partners which would violate the General Partner's fiduciary duty under the DRUPA. It is the General Partner's duty in determining the amount of distributions to the Partners, to take into account: (a) the Partnership's anticipated needs in its business and sums necessary to operate its business until the income from further operations is available; (b) the amounts of its debts; (c) the necessity or advisability of paying its debts, or at least reducing them within the limits of the Partnership's credit; and (d) the necessity or advisability of establishing any reserve amounts for either operating expenses or capital expenditures.

**8.2     Special Partner Tax Distribution.**

The Special Partner or its designee may receive a cash advance against distributions to be paid under Section 8.3 to the extent that such distributions are not sufficient for the Special Partner or its designee or any of its members or beneficial owners (whether such interests are held directly or indirectly) to pay when due any income tax imposed on it or its members or beneficial owners with respect to allocations of income attributable to the Profits Interest determined by assuming the applicability of the highest combined effective marginal federal, state and local income tax rates applicable to an individual resident in New York, New York, and taking into account the character of the income underlying the applicable tax obligation (i.e., capital gain, ordinary income or qualified dividend) and previous allocations of Net Losses attributable to the Special Partner's Profits Interest under Section 7.1.  Amounts distributed under this Section 8.2 will be treated as advances against distributions for purposes of Section 8.3 and will reduce subsequent distributions to the Special Partner under Section 8.3.

**8.3     Priority.**

After payment of any Tax Distributions and payment and reservation of all amounts deemed necessary by the General Partner in its sole discretion as contemplated by Section 8.1, the Partnership will make distributions of cash as follows:

(a)  First, 100% to the Limited Partners until there are no Unreturned Net Capital Contributions, with each Limited Partner to receive an amount (limited to the amount necessary to cause such Limited Partner to have no Unreturned Net Capital Contributions after such distribution) equal to either (i) such Limited Partner's Targeted Return or (ii) the amount of such distribution multiplied by a fraction, the numerator of which is such Limited Partner's Unreturned Net Capital Contribution immediately prior to such distribution and the denominator of which is the total Unreturned Net Capital Contributions of all Limited Partners as of such time;

(b) <u>Second</u>, 100% to the Limited Partners until there is no Unpaid Preferential Return, with each Limited Partner to receive an amount equal to the amount of such distribution (limited to the amount necessary to cause there to be no Unpaid Preferential Return after such distribution) multiplied by a fraction, the numerator of which is such Limited Partner's Unpaid Preferential Return immediately prior to such distribution and the denominator of which is the Unpaid Preferential Return of all Limited Partners as of such time;

(c) <u>Third</u>, 100% to the Special Partner until the aggregate distributions made to the Special Partner equal the product of (i) 20%, multiplied by (ii) the sum of (A) the excess of all distributions with respect to Class A Units under <u>Sections 8.3(a)</u> and <u>(b)</u>, over the total Net Capital Contributions with respect to Class A Units; plus (B) the excess of all distributions with respect to Class B Units under <u>Sections 8.3(a)</u> and <u>(b)</u>, over the total Capital Contributions with respect to Class B Units; plus (C) the aggregate distributions made to the Special Partner; and

(d) <u>Thereafter</u>, 80% to the Limited Partners pro-rata in accordance with their Allocation Percentages and 20% to the Special Partner.

**8.4    General.**

(a) <u>Overriding Limitations on Distributions</u>. Notwithstanding any other provision of this Agreement, distributions shall be made only to the extent of available cash of the Partnership and in compliance with the DRUPA and other applicable law.

(b) <u>Distributions to Persons Shown on Partnership Records</u>. Any distribution by the Partnership to the Person shown on the Partnership's records as a Partner or to such Person's legal representatives, or to the transferee of such Person's right to receive such distributions as provided herein, shall constitute a release of the Partnership and the General Partner of all liability to any other Person that may be interested in such distribution by reason of any Transfer of such Person's Units for any reason (including a Transfer of such interest by reason of the death, incompetence, bankruptcy or liquidation of such Person).

**8.5    Tax Withholding.**

(a) <u>General</u>. Each Partner shall, to the fullest extent permitted by applicable law, indemnify and hold harmless the General Partner and any officer, agent or representative thereof who is or who is deemed to be the responsible withholding agent for U.S. federal, state or local or non-U.S. income tax purposes against (i) all claims, liabilities and expenses of whatever nature relating to such Person's obligation to withhold and to pay over, or otherwise pay, any withholding or other taxes payable by the Partnership or as a result of such Partner's participation in the Partnership and (ii) any liabilities, costs, expenses (including, without limitation, reasonable expenses of investigation and attorneys' fees and expenses), losses, damages, assessments, settlements or judgments arising out of or incident to the imposition, assessment or assertion of any amounts described in clause (i) above.

(b) <u>Authority to Withhold; Treatment of Withheld Tax</u>. Notwithstanding any other provision of this Agreement, each Partner hereby authorizes the Partnership to withhold and to pay over, or otherwise pay, any withholding or other taxes payable by the Partnership or any of its Affiliates (under the Code or any provision of U.S. federal, state or local or non-U.S. tax law) with respect to such Partner or as a result of such Partner's participation in the Partnership (including as a result of a distribution in kind to such Partner). If and to the extent the Partnership is required to withhold or pay any such withholding or other taxes with respect to a Partner, such Partner will be deemed for all purposes of this Agreement to have received a distribution from the Partnership pursuant to the then relevant provisions of <u>Section 8.3</u>, as of the time that such withholding or other tax is required to be paid, to the extent such Partner (or any successor to such Partner's interest in the Partnership) would have received a cash distribution but for such withholding. For purposes of this <u>Section 8.5(b)</u>, the amount of taxes required to be withheld or paid with respect to a Partner will be determined based on the withholding tax rate applicable to such Partner under <u>Section 8.5(c)</u> (which must take into account any withholding exemptions or reductions applicable to such Partner, as established under <u>Section 8.5(c)</u>).

(c) <u>Withholding Tax Rate</u>. Any withholdings referred to in this <u>Section 8.5</u> will be made at the maximum applicable statutory rate under the applicable tax law unless the General Partner has received an opinion of counsel, a valid and properly completed and executed withholding certificate, or other evidence, satisfactory to the General Partner to the effect that a lower rate is applicable or that no withholding is applicable.

(d) <u>Withholding from Distributions to the Partnership</u>. If the Partnership receives a distribution from or in respect of which tax has been withheld, the Partnership will be deemed to have received cash in an amount equal to the amount of such withheld tax, and each Partner will be treated as having received as a distribution pursuant to the relevant clause of <u>Section 8.3</u> of the portion of such amount that is attributable to such Partner's interest in the Partnership as equitably determined by the General Partner.

## ARTICLE 9.
## REPRESENTATIONS; WARRANTIES; RIGHTS; OBLIGATIONS

**9.1    Representations & Warranties of the General Partner.**

The General Partner represents and warrants to the other Partners as of the Effective Date and the date of the Final Closing as follows:

(a) it is duly formed, validly existing, and in good standing under the laws of the State of Delaware;

(b) the transactions contemplated by this Agreement, the execution and delivery by it of this Agreement and the performance by it of its obligations hereunder have been duly authorized by all requisite action, and to the best of its knowledge, do not and will not conflict with, violate, result in a breach of, or constitute (with due notice or lapse of time or both) a default under, (i) any agreement or contract; (ii) any provision of law, statute, rule or regulation; (iii) any charter, bylaw, partnership agreement, trust agreement or other organizational document; or (iv) any decree or order of any court or other agency of government; and

(c) this Agreement is a legal, valid and binding obligation of it and is enforceable against it in accordance with its terms, except to the extent that such enforceability may be limited by applicable bankruptcy, insolvency, reorganization and similar laws of general application relating to or affecting creditors' rights generally and general principles of equity (regardless of whether such enforceability is considered in a proceeding in equity or at law).

**9.2     Representations & Warranties of the Limited Partners.**

Each of the Limited Partners hereby represents and warrants to the Partnership and the other Partners as of the date that such Limited Partner is admitted to the Partnership and each date upon which it acquires any Unit that the information provided by such Limited Partner pursuant to the Subscription Documents completed and executed by such Limited Partner and the representations and warranties contained in such Subscription Documents are true, correct and complete at all times from and after the date upon which such Subscription Documents were completed and executed by such Limited Partner through and including the date upon which the Limited Partner acquired such Units.

**9.3     Indemnification.**

(a) To the fullest extent permitted by law, (i) the General Partner, (ii) its Affiliates, (iii) members of the Investment Committee and the Advisory Committee, and (iv) the officers, directors, stockholders, members, managers, partners and employees of the General Partner and its Affiliates who perform or are alleged to perform any duties, responsibilities or functions for or on behalf of the Partnership or the General Partner or its Affiliates on behalf of the Partnership or the General Partner (individually, an "Indemnitee"), shall be indemnified and held harmless by the Partnership from and against any and all losses, claims, damages, liabilities, whether joint or several, expenses (including legal fees and expenses), judgments, fines, settlements and other amounts arising from any and all claims, demands, actions, suits or proceedings, civil, criminal, administrative or investigative, in which the Indemnitee may be involved, or threatened to be involved, as a party or otherwise, by reason of its status specified in clause (i) through (iii) above, if (A) such Indemnitee acted in good faith and in a manner it reasonably believed to be in, or not opposed to, the best interests of the Partnership, and, with respect to any criminal proceeding, had no reasonable cause to believe that its conduct was unlawful and (B) the conduct of such Indemnitee did not constitute fraud, gross negligence, willful misconduct or a material breach of this Agreement; provided, however, that the Partnership shall not be obligated to indemnify the General Partner, its Affiliates or their respective officers, directors, stockholders, members, managers, partners and employees (collectively, the "General Partner Indemnitees") against losses, claims, damages, liabilities, expenses, judgments, fines, settlements and other amounts arising from claims brought by one General Partner Indemnitee against another General Partner Indemnitee that do not involve and are not made in response to a claim brought against a General Partner Indemnitee by a third party. The termination of any action, suit or proceeding by judgment, order, settlement, or upon a plea of nolo contendere, or its equivalent, will not, of itself, create a presumption that the Indemnitee failed to meet the standards for indemnification set forth in the immediately preceding sentence.

(b) To the fullest extent permitted by law, expenses incurred by an Indemnitee in defending any claim, demand, action, suit or proceeding subject to this Section 9.3 (other than any such claim, demand, action, suit or proceeding brought against an Indemnitee directly by a Limited Partner or by or in the right of the Partnership in accordance with applicable law in which the allegations against such Indemnitee consist exclusively of claims that such Indemnitee is subject to liability to such Limited Partner or the Partnership as a result of conduct that does not meet the standards specified in clause (A) or (B) of Section 9.3(a)) will, from time-to-time, be advanced by the Partnership prior to the final disposition of such claim, demand, action, suit or proceeding, upon receipt by the Partnership of an undertaking by or on behalf of the Indemnitee to repay such amount if it is determined that such Person is not entitled to be indemnified as authorized in this Section 9.3.

(c) The indemnification provided by this Section 9.3 will be in addition to any other rights to indemnification or contribution to which those indemnified may be entitled from the Partnership pursuant to any approval of the Partner or as a matter of law, both as to (i) an action in a capacity described in clauses (i) - (iv) of Section 9.3(a) and (ii) an action in another capacity, and will continue as to an Indemnitee who has ceased to serve in such capacity (but only as to actions taken by such Indemnitee prior to such Indemnitee ceasing to serve in such capacity) and will inure to the benefit of the heirs, successors, assigns and administrators of the Indemnitee. The Partnership may indemnify an Indemnitee against, or make contribution in respect of, losses, claims, damages, liabilities, whether joint or several, expenses (including legal fees and expenses), judgments, fines, settlements and other amounts incurred by an Indemnitee on a basis other than that described in this Section 9.3 if such indemnification or contribution is approved by a Majority of Limited Partners.

(d) The Partnership may purchase and maintain insurance as the General Partner determines is available, customary and appropriate for a company engaged in activities similar to those of the Partnership, which insurance may provide coverage against any liability that may be asserted against or expense that may be incurred by the Partnership, the General Partner or any Indemnitee in connection with the Partnership's activities, regardless of whether the Partnership would have the power to indemnify such Person against such liability under the provisions of this Agreement. Any indemnification under this Section 9.3 will first be satisfied out of insurance proceeds to the extent such proceeds have been received by the Partnership. In the event any assets of the Partnership are used to satisfy any indemnification obligation hereunder and insurance proceeds are subsequently received in respect of the losses, claims, damages, liabilities or expenses in respect of which indemnification has been provided, such proceeds will be used to repay the Partnership for the amounts used by it to satisfy such indemnification obligation.

(e) Any indemnification hereunder shall be satisfied solely out of the assets of the Partnership. In no event may an Indemnitee subject any of the Partners to personal liability by reason of these indemnification provisions. Notwithstanding anything to the contrary set forth herein, the Limited Partners will be required to return to the Partnership distributions for purposes of meeting the indemnification obligations for a period of three years following the termination of the Partnership.

(f) An Indemnitee will not be denied indemnification in whole or in part under this <u>Section 9.3</u> because the Indemnitee had an interest in the transaction with respect to which the indemnification applies if the transaction was otherwise permitted by the terms of this Agreement; *provided*, *however*, that such indemnification will extend only to such Indemnitee's activities with respect to or on behalf of the Partnership, and not to such Indemnitee's other interest in the transaction.

(g) The indemnification provided in this <u>Section 9.3</u> is for the benefit of the Indemnitees and will not be deemed to create any right to indemnification for any other Persons.

(h) To the fullest extent permitted by law, the debts, liabilities and obligations (whether arising under this Agreement, in contract, tort or otherwise) of the Partnership will be solely the debts, liabilities and obligations of the Partnership, and no Partner, agent or representative of the Partnership (including any Person who formerly held such status) will be liable or shall be obligated personally for any such debt, liability or obligation of the Partnership solely by reason of such status. No individual trustee, officer, director, shareholder, member, manager, managing member, constituent partner, employee or agent of the General Partner, its Affiliates or any Partners (subject to the terms hereof and as required by law), in his, her or their individual capacity as such, will have any personal liability for the performance of any obligation of the General Partner, its Affiliates or such Partner under this Agreement

## 9.4    Inspection Rights.

At any time before the Partnership's complete liquidation, each Limited Partner, or a designee thereof, at its own expense may (i) fully examine and audit the Partnership's books, records, accounts and assets, including bank account balances, and (ii) examine, or request that the General Partner furnish, such additional information as is reasonably necessary to enable the requesting Partner to review the state of the activities of the Partnership; *provided*, *however*, that the General Partner can obtain such additional information without unreasonable effort or expense. Any such examination or audit will be made (i) only upon reasonable prior written notice to the General Partner, (ii) during normal business hours or as specified by the General Partner, and (iii) without undue disruption. Notwithstanding the foregoing, the General Partner will have the benefit of any confidential information provisions of the DRUPA and the obligation to make Partnership Information available or to furnish Partnership Information shall be subject to <u>Section 9.5</u>.

## 9.5    Confidentiality.

(a) A Limited Partner's rights to access or receive any information about the Partnership, its assets and the Partnership's affairs, including (i) information to which a Limited Partner is provided access under <u>Section 9.4</u> or otherwise as required by law; (ii) financial statements, reports and other information provided under <u>Section 6.5</u>; and (iii) the offering documents for the Partnership, this Agreement, any Subscription Documents and any other related agreements (the "<u>Partnership Information</u>"), are conditioned on such Limited Partner's willingness and ability to assure that the Partnership Information will be used solely by such Limited Partner for purposes reasonably related to such Limited Partner's interest as a Limited Partner, and that such Partnership Information will not become publicly available as a result of such Limited Partner's rights to access or receive such Partnership Information, and each Limited Partner agrees not to use Partnership Information other than for purposes of evaluating, monitoring or protecting its investment in the Partnership.

(b) Each Limited Partner acknowledges the General Partner's belief that the Partnership Information includes trade secrets of the Partnership and that the release of any such Partnership Information would cause competitive harm to the Partnership, the General Partner and/or the Partners. Each Limited Partner agrees to maintain any Partnership Information provided to it in the strictest confidence and not to disclose the Partnership Information to any Person including a prospective transferee of such Partner's Units, without the written prior consent of the General Partner. Notwithstanding the foregoing, the General Partner consents to the disclosure by a Limited Partner to its accountants, attorneys and similar advisors bound by a duty of confidentiality. With respect to any Limited Partner, the obligation to maintain the Partnership Information in confidence shall not apply to any Partnership Information (i) that becomes publicly available (other than by reason of a disclosure by a Limited Partner), (ii) the disclosure of which such Limited Partner has been consented to by the General Partner in writing, or (iii) the disclosure of which by such Limited Partner is required by a court of competent jurisdiction or other governmental authority or otherwise as required by law. Before any Limited Partner discloses Partnership Information pursuant to clause (iii), such Limited Partner will promptly, and in any event prior to making any such disclosure, notify the General Partner of the court order, subpoena, interrogatories, government order or other reason that requires disclosure of the Partnership Information so that the General Partner may seek a protective order or other remedy to protect the confidentiality of the Partnership Information. Such Limited Partner will also consult with the General Partner on the advisability of taking steps to eliminate or narrow the requirement to disclose the Partnership Information and shall otherwise cooperate with the efforts of the General Partner to obtain a protective order or other remedy to protect the Partnership Information. If a protective order or other remedy cannot be obtained, such Limited Partner may disclose only that Partnership Information that its counsel advises in writing (which writing shall also be addressed and delivered to the Partnership) that it is legally required to disclose.

(c) Each Limited Partner must promptly inform the General Partner if it becomes aware of any reason, whether under law, regulation, policy or otherwise, that it (or any of its equity holders) will, or might become compelled to, use the Partnership Information other than as contemplated by Section 9.5(a) or disclose Partnership Information in violation of the confidentiality restrictions in Section 9.5(b) (disregarding clause (iii) thereof).

(d) Notwithstanding any other provision of this Agreement, with the exception of the tax return information to be provided to each Partner pursuant to this Agreement, the General Partner will have the right not to provide any Limited Partner, for such period of time as the General Partner in good faith determines to be advisable, with any Partnership Information that such Limited Partner would otherwise be entitled to receive or to have access to pursuant to this Agreement or the DRUPA if: (i) the Partnership or the General Partner is required by law or by agreement with a third party to keep such Partnership Information confidential; (ii) the General Partner in good faith believes that the disclosure of such Partnership Information to such Limited Partner is not in the best interest of the Partnership or could damage the Partnership or the conduct of the affairs of the Partnership (which may include a determination by the General Partner that such Limited Partner (or any of its equity holders) is disclosing or may disclose such Partnership Information (or may be compelled to disclose such Partnership Information) or has not indicated a willingness to protect Partnership Information from being disclosed (or compelled to be disclosed) and that the potential of such disclosure by such Limited Partner (or any of its equity holders) is not in the best interest of the Partnership or could

damage the Partnership or the conduct of the affairs of the Partnership) or (iii) such Limited Partner has notified the General Partner of its election not to have access to, or to receive, such Partnership Information.

(e) The Limited Partners acknowledge and agree that: (i) the Partnership, the General Partner and Affiliates of the General Partner may acquire confidential information related to third parties that under fiduciary, contractual, legal or similar obligations may not be disclosed to the Limited Partners without violating such obligations; and (ii) neither the Partnership, the General Partner nor Affiliates of the General Partner will be in breach of any duty under this Agreement or the DRUPA in consequence of acquiring, holding or failing to disclose Partnership Information to a Limited Partner so long as such obligations were undertaken in good faith.

(f) In addition to any other remedies available at law, the Partners agree that the Partnership will be entitled to equitable relief, including, without limitation, the right to an injunction or restraining order (without the necessity of proving damages or posting a bond or other security), as a remedy for any failure by a Limited Partner to comply with its obligations with respect to the use and disclosure of Partnership Information, as provided in Section 9.5(a) and 9.5(b).

(g) Each Limited Partner agrees to cooperate with such procedures and restrictions as may be developed by the General Partner from time-to-time in connection with the disclosure of non-public information concerning the General Partner and the Partnership, as determined by the General Partner to be reasonably necessary and advisable to maintain and promote compliance with legal and other regulatory matters applicable to the General Partner, the Partnership and the Limited Partners, including securities laws and regulations.

(h) Each Limited Partner acknowledges and agrees that the General Partner may consider the different circumstances of Limited Partners with respect to the restrictions and obligations imposed on Limited Partners in this Section 9.5 and the provision of information under this Agreement, and the General Partner may modify any of such restrictions and/or obligations with respect to a Limited Partner with the consent of such Limited Partner. Each Limited Partner further acknowledges and agrees that any such agreement by the General Partner with a Limited Partner to modify any of the restrictions and/or obligations imposed by this Section 9.5 (or to withhold Partnership Information) will not constitute a breach of any duty stated or implied in law or in equity to any Limited Partner, regardless of whether different agreements are reached with different Limited Partners.

(i) The provisions of this Section 9.5 will survive the withdrawal of any Partner or the Transfer of any Partner's interest in the Partnership and will be enforceable against such Partner after such withdrawal or Transfer.

## ARTICLE 10.
## TRANSFERS AND WITHDRAWALS

**10.1    Transfer Limitation.**

Except as provided in this ARTICLE 10, no Unit may be Transferred, in whole or in part. Any attempted Transfer in violation of this ARTICLE 10 will be void *ab initio*.

**10.2    Permissible Transfers.**

(a) No Limited Partner may Transfer any portion of its Units without first obtaining the written consent of the General Partner, which consent may be withheld for any reason; *provided*, *however*, that such consent will not be required for a Transfer of a Unit (or portion thereof) by a Limited Partner to an Affiliate of such Limited Partner if all of the conditions relating to the applicable Transfer contained in Section 10.2(b) are satisfied; and provided, further, that upon the death of an individual Limited Partner, the rights and obligations of such Limited Partner will accrue to his or her estate, and the consent of the General Partner will not be required with respect to such event. The General Partner may not grant its consent to any Transfer for purposes of this Section 10.2 if such Transfer would cause the Partnership to be treated for federal income tax purposes as a publicly traded partnership taxable as a corporation, or as an investment company required to be registered under the 1940 Act.

(b) Notwithstanding anything to the contrary contained in this Section 10.2, in no event may all or any part of the Units of a Limited Partner be Transferred (including pursuant to Section 10.2(a)), unless all of the following conditions are satisfied or waived by the General Partner:

(1) the transferor or transferee has delivered to the General Partner an opinion of counsel reasonably acceptable to the General Partner that the Transfer would not require registration under the Securities Act or any state securities laws;

(2) the transferor or transferee has delivered to the General Partner an opinion of counsel reasonably acceptable to the General Partner that the Transfer will not adversely affect the status of the Partnership as a partnership under Subchapter K of the Code for federal income tax purposes, or cause the Partnership to become a publicly-traded partnership within the meaning of Code §7704, or cause the Partnership to have to register as an investment company under the 1940 Act;

(3) any required third party consent or approval to the Transfer has been obtained or waived, including the consent of any lender providing financing to the Partnership to the extent required under the terms of such financing;

(4) the General Partner is satisfied that the Transfer will not result in the Partnership being considered a "publicly traded partnership" as defined by Code §7704(b);

(5) the General Partner is satisfied that the Transfer, when considered in the aggregate with all other Transfers of Units within the preceding 12-month period, would not result in the Partnership being considered to have terminated within the meaning of Code §708;

(6) the General Partner has received an agreement in form and substance satisfactory to it that the transferee agrees to be bound by the terms and conditions set forth in this Agreement and making such representations and warranties as the General Partner determines to be advisable and in the best interest of the Partnership;

(7) the transferor or transferee bears all costs and expenses of the Transfer and the transferor's admission to the Partnership, including the actual legal fees of the Partnership; and

(8) the transferor and the transferee execute, acknowledge and deliver to the Partnership such other certificates, instruments and documents as the General Partner deems reasonably necessary, appropriate or desirable to effect the Transfer or the transferee's admission to the Partnership.

Upon request by the transferor, the General Partner must provide such certifications as to factual matters that the General Partner knows to be true with respect to the Partnership and the Partners, other than the transferor, as may reasonably be required in connection with the giving of any opinion of counsel required by this Section 10.2(b).

Except as expressly provided in this Agreement and the DRUPA, no event affecting a Limited Partner other than death (including bankruptcy or insolvency) will affect this Agreement.

**10.3    Substitute Partner.**

A transferee of any Partner may become a substituted Limited Partner, as to the Units transferred, in place of the transferor only upon the written consent of the General Partner, which consent may be withheld without reason or cause. The General Partner has the right to become a substituted Limited Partner. Unless a transferee of any Unit becomes a substituted Limited Partner in accordance with the provisions of this Agreement, such transferee will not be entitled to any of the rights granted to a Partner hereunder other than the right to receive all or part of the share of the income, gains, losses, deductions, expenses, credits, distributions, or returns of capital to which its transferor would otherwise be entitled with respect to the transferred interest.

**10.4    Assignment of the General Partner's Units.**

The General Partner shall not Transfer any portion of its interest in the Partnership (other than to an Affiliate of the General Partner) without the consent of the Majority of Limited Partners.

**10.5    Substitute General Partner.**

A transferee of any portion of the Partnership interest of the General Partner that is transferred in accordance with the provisions of this Agreement will be admitted to the Partnership as a general partner, effective as of the date of such Transfer. A successor to all of the Partnership interest of the General Partner must carry on the business of the Partnership without dissolution.

**10.6    Allocations Between Transferor and Transferee.**

If any Transfer of a Unit occurs during a Fiscal Year, ARTICLE 7 and ARTICLE 8 will be applied to the transferor and transferee on the basis of an interim closing of the books of the Partnership as of the date of such Transfer.

**10.7    Redemption.**

(a) Limited Partners who have held their Units for at least one year may request that the Partnership repurchase all, but not less than all, of their Units. A Limited Partner's ability to request a redemption under this Section 10.7 may not be construed to mean a Limited Partner has any right to demand or receive the return of such Limited Partner's Capital Contribution or otherwise modify the limitations of Section 5.4.  A Limited Partner wishing to have Units repurchased must mail or deliver in writing a request to the Partnership indicating such desire. The purchase price for redeemed Units, once a Limited Partner

has held the Units for a period of one year, will be 95% of the purchase price of such Units, minus (i) any Selling Fees paid with respect to such Units, and (ii) any fees incurred by the Partnership in connection with the redemption, with such fees to not exceed 2% of such Limited Partner's Capital Contributions.

(b) The Partnership intends to redeem Units on a quarterly basis and will not redeem in excess of 10% of the Units during any 12-month period. The General Partner reserves the right in its sole discretion at any time and from time to time to (1) reject any request for redemption, (2) change the purchase price for redemptions, or (3) terminate, suspend and/or reestablish the Partnership's redemption program. The General Partner will determine from time to time whether the Partnership has sufficient excess cash from operations to repurchase Units. Generally, the cash available for redemption will be limited to 10% of the Partnership's operating cash flow from the previous fiscal year. If the funds set aside for the redemption program are not sufficient to accommodate all requests, at such time, if any, when sufficient funds become available, pending requests will be honored among all requesting Limited Partners in accordance with their order of receipt.

## 10.8    Representations Regarding Transfers.

Each Limited Partner hereby covenants and agrees with the Partnership for the benefit of the Partnership and all Partners, that: (i) it is not currently making a market in Units and will not in the future make a market in Units; (ii) it will not Transfer its Units on an established securities market, a secondary market (or the substantial equivalent thereof) within the meaning of Code §7704(b) (and any Regulations, proposed Regulations, revenue rulings, or other official pronouncements of the Internal Revenue Service or the Treasury Department that may be promulgated or published thereunder); and (iii) in the event such Regulations, revenue rulings, or other pronouncements treat any or all arrangements which facilitate the selling of Units (commonly referred to as "matching services") as being a secondary market or the substantial equivalent thereof, no Limited Partner will Transfer any Units through a matching service that is not approved in advance by the General Partner.

## 10.9    Parties Not Bound to See to Trust or Equity.

Neither the Registrar and Transfer Agent nor the General Partner will be bound to see to the execution of any trust (whether express, implied or constructive), charge, pledge, or equity to which any Unit or any interest under this Agreement is subject, nor to ascertain or inquire whether any sale or assignment of any Unit or any interest under this Agreement by any Limited Partner is authorized by such trust, charge, pledge or equity, nor to recognize any Person as having an interest in any Unit, except for the Person recorded on the Register as the holder of such Unit. The Partnership, the General Partner and the Registrar and Transfer Agent will be entitled to treat the Person in whose name any Unit is registered as the absolute owner for all purposes. The receipt by any Person in whose name a Unit is recorded on the Register will be a sufficient discharge for all monies, securities and other property payable, issuable or deliverable for such Unit and from all liability therefor.

## 10.10    Compulsory Transfer or Acquisition of Units.

(a) If it comes to the attention of the General Partner that any Unit is or may be owned or held directly or beneficially by any Person whose holding or continued holding of that Unit (whether on its own or in conjunction with any other circumstance appearing to the General Partner to be relevant) might in the sole and conclusive determination of the General

Partner be likely to cause an Adverse Effect, the General Partner may serve a notice (a "Transfer Notice") upon the Person (or any one of such Persons where the Unit is registered in joint names) appearing in the Register of Limited Partners as the holder (the "Vendor") of the Unit (the "Relevant Unit") requiring the Vendor within 21 calendar days (or such extended time as in all the circumstances the General Partner shall consider reasonable) to transfer (and/or procure the disposal of interests in) the Relevant Unit to another Person whose holding of the Relevant Unit, in the sole and conclusive determination of the General Partner, would not be likely to cause an Adverse Effect (such Person, an "Eligible Transferee"). On and after the date of the Transfer Notice, and until registration of a transfer of the Relevant Unit to which it relates under the provisions of this Section 10.10(a) or Section 10.10 (b) below, the rights and privileges attaching to the Relevant Unit will be suspended and not capable of exercise.

(b) If within 21 calendar days after the giving of a Transfer Notice (or such extended time as in the circumstances the General Partner considers reasonable) the Transfer Notice has not been complied with to the satisfaction of the General Partner, the General Partner may arrange for the Partnership to sell the Relevant Unit at the best price reasonably obtainable to any Eligible Transferee or Transferees, or the General Partner may arrange for the Partnership to compulsorily reacquire some or all of the Relevant Unit for the price for the Unit paid by the Vendor without interest. For the sale of Relevant Unit by the General Partner on the Vendor's behalf:

(i) the General Partner may execute or cause to be executed on behalf of the Vendor a transfer of the Relevant Unit to an Eligible Transferee;

(ii) the net proceeds of the sale will be received by the Partnership whose receipt will be a good discharge for the purchase money and shall be paid over by the Partnership to the Vendor (less any amounts required to be withheld under the provisions of the Code or any other similar legislation of any state); and

(iii) the Partnership may register the transferee or transferees as holder or holders of the Relevant Unit and thereupon the transferee or transferees will become the absolute and sole owner of the Relevant Unit.

(c) A Person who becomes aware that his holding, directly or beneficially, of the Unit will, or is likely to, cause an Adverse Effect, and who has not already received a Transfer Notice under Section 10.10(a) above, shall immediately either transfer the Unit to an Eligible Transferee or Transferees or give a request in writing to the General Partner for the issue of a Transfer Notice under Section 10.10(a) above, provided that any such Transfer complies with Section 10.2.

(d) Subject to the provisions of this Agreement, the General Partner will be entitled to assume without inquiry that none of the Units are held in such a way as to entitle the General Partner to serve a Transfer Notice in respect of the Unit, unless it has actual knowledge of a reason to believe otherwise. However, the General Partner may call upon any holder (or any one of joint holders) of the Unit by notice in writing to provide such information and evidence as it will require upon any matter connected with or in relation to such holder or joint holders of the Unit. If such information and evidence is not provided within such reasonable period (being not less than 21 calendar days after service of the notice requiring the same) as may be specified by the General Partner in the notice, the General Partner may, in its absolute discretion, treat any Unit held by such a holder or joint holders

as being held in such a way as to entitle the General Partner to serve a Transfer Notice for the Unit.

(e)  The General Partner will not be required to give any reasons for any decision, determination or declaration taken or made under this Section 10.10. The exercise of the powers conferred by this Section 10.10 will not be questioned or invalidated in any case on the ground that there was insufficient evidence of direct or beneficial ownership of the Unit by any Person or that the true direct or beneficial owner of any Unit was otherwise than appeared to the General Partner at the relevant date provided that such powers have been exercised in good faith.

## ARTICLE 11.
## WINDING UP

**11.1  Events Requiring Winding Up.**

(a)  Except as provided in Section 11.1(b), no Partner has the right to wind up the Partnership.

(b)  The Partnership will be wound up upon the first to occur of the following events:

(1)  at any time, if the General Partner elects to wind up the Partnership;

(2)  the expiration of the Partnership Term;

(3)  the sale of all or substantially all of the Partnership's assets;

(4)  at any time, with the written consent of all Partners to wind up and terminate the Partnership;

(5)  an event of withdrawal by the General Partner; or

(6)  a decree by a court requiring the winding up or dissolution of the Partnership pursuant to the DRUPA.

A withdrawal by a General Partner will not be a breach of this Agreement.  The General Partner must provide written notice of its intention to withdraw to each of the Limited Partners at least 30 days prior to its withdrawal from the Partnership.

**11.2  Election to Continue the Partnership.**

To the extent permitted by the DRUPA, upon the occurrence of an event described in Section 11.1(b)(2), (3), (4) or (5), the Partnership will not be wound up and its business will be continued, and its properties and assets will not be liquidated, if, within 90 days (or such longer period permitted by law) after the occurrence of such event, a Supermajority of Limited Partners agree in writing to continue the Partnership and, if there is no remaining general partner of the Partnership, to elect a Person to be admitted to the Partnership as successor general partner thereof, who will be required to acquire at least a one-tenth of one percent (0.1%) interest in the capital, profits and losses of the Partnership and assume all of the obligations of the General Partner. Upon the satisfaction of all conditions necessary to the continuation of the Partnership, including the admission of a successor general partner thereof and the amendment of the Partnership's Certificate to the extent required by applicable law, the Partnership will be continued

without any further consent or approval of any Partner, in which case the Partnership will continue to conduct the business of the Partnership with the Partnership's properties and assets in accordance with, and the Partnership and interests of the Partners will continue to be governed by, the terms of this Agreement. If the business of the Partnership is continued pursuant to this Section 11.2, any withdrawing General Partner's interest in the Partnership shall be converted into the interest of a Limited Partner, and the interest in the Partnership acquired by the successor general partner will (if acquired from the Partnership) reduce the interests of all other Partners (including the withdrawing General Partner) ratably in relation to their interest in the Partnership prior to such reduction.

**11.3     Winding Up.**

(a) Upon the occurrence of an event requiring winding up described in Section 11.1(b) (and provided that no election to continue the Partnership has been made pursuant to Section 11.2), the Partnership will continue solely for the purposes of winding up its affairs in an orderly manner, liquidating its assets, and satisfying the claims of its creditors and Partners, as required by law. No Partner may take any action that is inconsistent with the winding up of the Partnership's business and affairs. The General Partner will be responsible for overseeing the winding up and dissolution of the Partnership and will take full account of the Partnership's liabilities and property and the Partnership property will be liquidated as promptly as is consistent with maximizing the realizable value thereof. In this regard, a reasonable time will be allowed after an event requiring winding up occurs for the orderly winding up of the business and affairs of the Partnership and the liquidation of its assets in order to minimize any losses otherwise attendant upon such winding up, and the provisions of this Agreement shall remain in effect between the Partners during the period of winding up and liquidation. To the fullest extent permitted by law, the proceeds realized by the Partnership from the liquidation of its assets will be applied and distributed in the following order:

(1) first, to the payment and discharge of all of the Partnership's debts and liabilities to creditors (other than to Partners);

(2) second, to the payment and discharge of any debts owed the Partners, including (i) any loans made by Partners, and (ii) any Partnership Expenses paid by the General Partner or any Affiliate on behalf of the Partnership for which the General Partner or Affiliate has not been reimbursed by the Partnership; and

(3) the balance, if any, shall be distributed to the Partners in accordance with Section 8.3.

(b) Notwithstanding the provisions of Section 11.3(a), which require liquidation of the assets of the Partnership, but subject to the order of priorities set forth therein, to the extent permitted by law, if prior to or upon an event requiring winding up of the Partnership the General Partner determines that an immediate sale of part or all of the Partnership's assets would be impractical or would cause undue loss to the Partners, the General Partner may defer for a reasonable time the liquidation of any assets except those necessary to satisfy liabilities of the Partnership (including to those Partners as creditors). The General Partner must use commercially reasonable efforts to make any distributions contemplated by Section 11.3(a) in cash; *provided*, *however*, that if the General Partner determines that it would be advisable and in the best interests of the Partners to distribute Partnership assets in kind, the General Partner may make distributions in liquidation of

the Partnership in kind in lieu of cash in accordance with Section 11.3(a). Any such distributions in kind will be subject to the following rules and conditions.

(1) The General Partner will determine the fair market value of each Partnership asset. All Partnership assets will be valued at their current fair market value as determined in good faith by the General Partner.

(2) The assets to be distributed in kind shall be distributed in undivided interests such that each Partner receives its proportionate interest in each such asset distributed in kind.

(3) The assets to be distributed in kind will be deemed to have been sold for their fair market value determined pursuant to this Agreement, and immediately prior to the distribution, the Net Profit or Net Loss resulting from such deemed sale shall be allocated to the Capital Accounts of the Partners pursuant to ARTICLE 7.

(4) The General Partner may cause the distributed assets to be subject to such agreements, conditions and restrictions relating to the disposition, management and operation of such assets as the General Partner deems reasonable and equitable.

## 11.4    Rights of Limited Partners.

Except as otherwise provided in this Agreement, the Limited Partners will look solely to the assets of the Partnership for the return of their Capital Contributions and will have no right or power to demand or receive property other than cash from the Partnership.

## 11.5    Termination of Partnership.

Upon the completion of the liquidation of the Partnership's cash and property as provided in Section 11.3, the Partnership will be terminated, a certificate of termination shall be filed, all qualifications of the Partnership as a foreign limited partnership will be canceled, and such other actions as may be necessary to terminate the Partnership shall be taken.

## 11.6    Waiver of Partition.

Each Partner hereby waives any right to partition of the Partnership's property.

## 11.7    Negative Capital Accounts.

Except as provided in this Agreement, no Partner will be liable to the Partnership or to any other Partner for any negative balance outstanding in such Partner's Capital Account.

## ARTICLE 12.
## POWER OF ATTORNEY

## 12.1    Power of Attorney.

Each Limited Partner constitutes and appoints the General Partner and its authorized partners, directors, managers, members and officers, and each of them acting singly, in each case with full power of substitution and resubstitution, as its true and lawful agent and attorney-in-fact, with full power and authority in its name, place and stead to execute, swear to, seal, acknowledge, deliver, file and record in the appropriate public offices the following: (i) all certificates, documents and

other instruments (including this Agreement and the Certificate and all amendments or restatements thereof) that the General Partner deems appropriate or necessary to form, qualify or continue the existence or qualification of the Partnership as a limited partnership (or a partnership in which the limited partners have limited liability to the extent provided by applicable law) in the State of Delaware and in all other jurisdictions in which the Partnership may or plans to conduct business or own property; (ii) all instruments that the General Partner deems appropriate or necessary to reflect any amendment, change, modification or restatement of this Agreement that is authorized in accordance with the terms of this Agreement, including the terms requiring any vote, consent, approval or agreement on the part of the Limited Partners as a condition to such amendment, change, modification or restatement; (iii) all conveyances and other instruments or documents that the General Partner deems appropriate or necessary to reflect the dissolution and liquidation of the Partnership pursuant to the terms of this Agreement, including a certificate of cancellation; (iv) all instruments relating to the admission, withdrawal, removal or substitution of any Partner or the Capital Contributions of any Partner pursuant to the terms of this Agreement; (v) all certificates, documents and other instruments relating to any determination of the rights, preferences and privileges of Units that are authorized in accordance with the terms of this Agreement, including the terms requiring any vote, consent, approval or agreement on the part of the Limited Partners as a condition to such determination; (vi) all conveyances and other instruments or documents that the General Partner deems appropriate or necessary to effectuate a transfer of Units pursuant to the terms of this Agreement; and (vii) all ballots, consents, approvals, waivers, certificates and other instruments that the General Partner deems appropriate or necessary to evidence or confirm any vote, consent, approval, agreement or other action that is made or given by the Partners in accordance with the terms of this Agreement.

**12.2    Duration of Power.**

The power of attorney granted herein is hereby declared to be irrevocable and a power coupled with an interest in recognition of the fact that each of the Partners will be relying upon the power of the General Partner to act as contemplated by this Agreement in any filing or other action by it on behalf of the Partnership, and such power of attorney shall survive and not be affected by the subsequent incapacity of any Limited Partner and the transfer of all or any portion of any Limited Partner's Units, will survive the bankruptcy or insolvency of any Limited Partner and will extend to any Limited Partner's successors, assigns and personal representatives. Each Limited Partner (i) will be bound by any action taken by the General Partner in accordance with this Agreement, acting in good faith pursuant to such power of attorney; (ii) waives any and all defenses that may be available to contest, negate or disaffirm any action of the General Partner that is taken pursuant to the authority expressly granted under such power of attorney and is in accordance with the terms of this Agreement, including the terms requiring any vote, consent, approval or agreement on the part of the Limited Partners as a condition to the taking of any action; and (iii) must execute and deliver to the General Partner, within 30 days after receipt of the General Partner's request therefor, such further designation, powers of attorney and other instruments as the General Partner deems necessary to effectuate this Agreement and the purposes of the Partnership.

**ARTICLE 13.**
**<u>MISCELLANEOUS</u>**

**13.1    Amendments.**

This Agreement generally may be modified or amended only with the written consent of the General Partner and the Majority of Limited Partners; *provided*, *however*, that:

(a) the General Partner has the power, without the consent of the Limited Partners, to amend this Agreement as may be required to (i) reflect the admission, substitution, termination, or withdrawal of Partners or of additional classes of Units in accordance with this Agreement; (ii) subject to Section 13.1(c), cure any ambiguity, correct or supplement any provision in this Agreement not inconsistent with the law or with other provisions, or make other changes with respect to matters arising under this Agreement that will not be inconsistent with the law or with the provisions of this Agreement, provided that that no such amendment will materially adversely affect the Limited Partners; (iii) add, amend or delete provisions of the Agreement which addition, amendment or deletion is, in the opinion of counsel to the Partnership, for the protection of or otherwise to the benefit of the Limited Partners; (iv) take such actions (if any) as may be necessary to ensure that the Partnership will be treated as a partnership for federal income tax purposes and not be required to register as an investment company under the 1940 Act; (v) reflect the proposal or adoption of regulations under Code §704(b) or Code §704(c) or otherwise to preserve or achieve uniformity of the Units, provided that such amendment would not have a material adverse effect on the Limited Partners or the Partnership and is consistent with the principles of Code §704; and (vi) make such amendments or deletions to take into account the effect of any change in, amendment of or repeal of any applicable legislation, which amendments, in the opinion of counsel to the Partnership, do not and will not materially adversely affect the interests of the Limited Partners.

(b) if any such amendment would cause the dissolution of the Partnership prior to the time set forth in Section 11.1, this Agreement may not be amended without the consent of each Partner adversely affected;

(c) no amendment that would cause the Partnership to fail to be treated as a limited partnership for state law purposes or change the limited liability status of any Limited Partner or that would change the participation of any Limited Partner in the income, gain, loss, deductions, expenses, credits, capital or distributions of the Partnership or that would otherwise adversely affect in any respect the financial or economic terms to which a Limited Partner is entitled as of the date such Limited Partner was admitted to the Partnership may be made without the written consent of such Limited Partner (except for amendments to admit Limited Partners pursuant to the terms of this Agreement);

(d) no amendment that would cause the Partnership to fail to be treated as a partnership for federal income tax purposes may be made without the consent of all Partners;

(e) no amendment shall be made that has the effect of increasing the Capital Contribution of any Limited Partner or reducing its share of distributions made by the Partnership without the consent of each Limited Partner adversely affected; and

(f) no amendment may be made to change the Allocation Percentage required for any consents required hereunder to the taking of any action, unless such amendment is approved by the Limited Partners holding aggregate Allocation Percentages equal to or in excess of the required amount.

**13.2    Complete Agreement.**

This Agreement (together with the Subscription Documents and any Side Letters) constitutes the complete and exclusive statement of the agreement among the Partners with respect to the

subject matter hereof and replaces and supersedes any prior oral or written agreements by and among the Partners.

**13.3    Governing Law.**

This Agreement and the rights of the parties hereunder shall be governed by, interpreted and enforced in accordance with, the internal laws (exclusive of the choice of law provisions thereof) of the State of Delaware as to all matters, including matters of validity, construction, effect, performance and remedies.

**13.4    Binding Effect.**

Subject to the provisions of this Agreement relating to transferability, this Agreement will be binding upon and inure to the benefit of the parties' signatory hereto, and their respective transferees, successors and assigns.

**13.5    Interpretation.**

Common nouns and pronouns will be deemed to refer to the masculine, feminine, neuter, singular and plural, as the identity of the person or persons, firm or corporation may in the context require. All headings, titles or captions herein are inserted only for convenience and ease of reference and are not to be considered in the construction or interpretation of any provision of this Agreement. Numbered or lettered articles, Sections and subsections herein contained refer to articles, Sections and subsections of this Agreement unless otherwise expressly stated. Words such as "herein," "hereinafter," "hereof," "hereto," "hereby" and "hereunder," when used with reference to this Agreement, refer to this Agreement as a whole, unless the context otherwise requires. Except as otherwise provided in this Agreement, all actions that the General Partner may take and all determinations that the General Partner may make pursuant to this Agreement may be taken and made at the sole and absolute discretion of the General Partner. If any provision of this Agreement or the application thereof to any person or circumstances is or becomes invalid or unenforceable to any extent, the remainder of this Agreement and the application of such provisions to other persons or circumstances shall not be affected thereby and shall be enforced to the greatest extent permitted by law.

**13.6    Multiple Counterparts.**

This Agreement may be executed in several counterparts (including by execution of the Subscription Documents), each of which will be deemed an original, but all of which will constitute one and the same instrument. However, in making proof hereof it will be necessary to produce only one copy hereof signed by the party to be charged. Signatures of the parties transmitted by facsimile, PDF or other electronic file will be deemed to be their original signatures for all purposes and the exchange of copies of this Agreement and of signature pages by facsimile transmission, PDF or other electronic file will constitute effective execution and delivery of this Agreement as to the parties and may be used in lieu of the original Agreement for all purposes. At the request of any party hereto, all parties hereto agree to execute an original of this Agreement as well as any facsimile, telecopy, PDF or other reproduction hereof.

**13.7    Execution of Documents.**

Each party hereto agrees to execute, with acknowledgment or affidavit, if required, any and all documents and writings that may be necessary or expedient in connection with the creation of the Partnership and the consummation of any of the transactions expressly provided for in this Agreement.

**13.8    Reliance on Authority.**

In no event will any person dealing with the General Partner be obligated to ascertain that the terms of this Agreement have been complied with, or be obligated to inquire into the necessity or expediency of any act or action of the General Partner. Every contract, agreement, deed, or other instrument or document executed by the General Partner with respect to the Partnership will be conclusive evidence in favor of any and every Person relying thereon or claiming thereunder that (i) at the time of the execution and/or delivery thereof, this Agreement was in full force and effect, (ii) such instrument or document was duly executed in accordance with the terms and provisions of this Agreement and is binding upon the Partnership and all of the Partners thereof, and (iii) the General Partner was duly authorized and empowered to execute and deliver any and every such instrument or document for and on behalf of the Partnership.

**13.9    No Third Party Beneficiary.**

This Agreement is made solely and specifically among and for the benefit of the parties hereto, and their respective successors and assigns (except that the provisions of <u>Section 9.3</u> will inure to the benefit of each of the Indemnitees, and no other Person (except to the extent provided in the immediately preceding parenthetical) will have any rights, interest or claims hereunder or be entitled to any benefits under or on account of this Agreement as a third-party beneficiary or otherwise. No third party, including any creditor of the Partnership, will have any right to enforce any contribution of capital or other advance of funds by any Partner.

**13.10    Notices.**

All notices and other communications provided for herein must be given or made by telecopy or in writing and telecopied, mailed or delivered to the intended recipient at the address set forth in each Partner's Subscription Documents and reflected in the List of Partners. All such communications shall be deemed to have been duly given when transmitted by telecopy or email, or personally delivered or, in the case of a mailed notice, upon depositing the notice in the mail, postage prepaid and return receipt requested, in each case given or addressed as aforesaid. Any

party hereto may, at any time by giving ten days' prior written notice to the other parties hereto, designate any other address in substitution of the foregoing address to which such notice shall be given.

**13.11  Waiver.**

No failure by any party to insist upon strict performance of any covenant, duty, agreement or condition of this Agreement or to the exercise of any right or remedy resulting from a breach thereof shall constitute a waiver of any such breach or any other covenant, duty, agreement or condition.

**13.12  Liability.**

In no circumstances shall a shareholder, limited partner, director, officer, manager, member, employee or agent of a Partner, or a partner in or member or trustee of a Partner, be personally liable for any of the obligations of a Partner under this Agreement. In no event will any Limited Partner be or become obligated personally to respond in damages to the Partnership or any other Partner with respect to this Agreement or on account of its being a Limited Partner, and any claim or judgment in favor of the Partnership or such other Partner shall be limited accordingly so that the Partnership and such other Partner may look only to the Limited Partner's Units for the recovery of such claim or judgment and not to any of the Limited Partner's other assets. The Partnership and each of the Partners waives and disclaims any right it may have to proceed against any other Limited Partner other than to the extent of such Limited Partner's Units.

**13.13  Legal Counsel.**

Each Partner hereby agrees and acknowledges that (i) counsel has been retained by the General Partner ("Legal Counsel") to form and represent the Partnership and in such capacity has provided legal services to the Partnership, the General Partner, and their Affiliates; (ii) Legal Counsel has not represented, nor will it represent, the Limited Partners in connection with the formation and organization of the Partnership, the acquisition of their Units, the management and operation of the Partnership, or any dispute that may arise between the Partnership and any Limited Partner (each, a "Partnership Legal Matter"); (iii) neither this Agreement nor the transactions contemplated hereby relating to the representation by Legal Counsel are intended to create an attorney/client or any other relationship between Legal Counsel and any Limited Partner; (iv) the Limited Partners should, if they desire counsel on a Partnership Legal Matter, retain their own independent counsel with respect thereto and will be individually liable for all fees and expenses of such independent counsel; (v) Legal Counsel may represent the Partnership and/or General Partner in connection with any and all Partnership Legal Matters; and (vi) Legal Counsel may represent any Limited Partner or their Affiliates on other matters.

*Remainder of Page Intentionally Left Blank.*
*Signature Pages Follow.*

IN WITNESS WHEREOF, the General Partner, the Special Partner and the Limited Partners have executed this Agreement of Limited Partnership, effective as of the date as provided above.

<u>GENERAL PARTNER</u>:

**GPB CAPITAL HOLDINGS, LLC**
a Delaware limited liability company

By: _____
_____, Manager


<u>SPECIAL PARTNER</u>:

**GPB SLP, LLC**
a Delaware limited liability company

By: _____
_____, Manager


<u>LIMITED PARTNERS</u>:

All Limited Partners now and hereafter admitted pursuant to the powers of attorney now and hereafter granted to the General Partner.

**GPB CAPITAL HOLDINGS, LLC**
as duly appointed attorney-in-fact for the Limited Partners.


By: _____
_____, Manager

**CONFIDENTIAL PRIVATE PLACEMENT MEMORANDUM**

**$350,000,000**

Class A Limited Partnership Units

# GPB HOLDINGS II, LP

April 13, 2015

---

**EXHIBIT B**

**DISCLOSURE BROCHURE OF GPB CAPITAL HOLDINGS, LLC**

# GPB CAPITAL HOLDINGS, LLC

535 West 24th Street
New York, New York 10011

Tel: (212) 235-2650
www.gpb-cap.com

## Part 2A of Form ADV
## (the "Brochure")

March 28, 2015

This Brochure provides information about the qualifications and business practices of GPB Capital Holdings, LLC. If you have any questions about the contents of this Brochure, or to request a current copy of it free of charge, please contact William Jacoby at (212) 235-2650 or bjacoby@gpb-cap.com. The information in this Brochure has not been approved or verified by the United States Securities and Exchange Commission (the "SEC") or by any state securities authority.

Additional information about GPB Capital Holdings, LLC also is available on the SEC's website at www.adviserinfo.sec.gov.

## Table of Contents

Item 2: Material Changes ........................................................................................................................ 3

Item 3: Advisory Business .................................................................................................................... 4

Item 4:  Fees and Compensation ......................................................................................................... 4

Item 5:  Performance-Based Fees and Side-by-Side Management .............................................. 5

Item 6:  Types of Clients ....................................................................................................................... 5

Item 7:  Methods of Analysis, Investment Strategies, and Risk of Loss ................................... 6

Item 8:  Disciplinary Information ....................................................................................................... 11

Item 9:  Other Financial Industry Activities and Affiliations .................................................... 12

Item 10:  Code of Ethics, Participation or Interest in Client Transactions, and Personal Trading ............ 12

Item 11:  Brokerage Practices ............................................................................................................. 14

Item 12:  Review of Accounts ............................................................................................................. 14

Item 13:  Client Referrals and Other Compensation ..................................................................... 14

Item 14:  Custody ................................................................................................................................... 14

Item 15:  Investment Discretion ........................................................................................................ 15

Item 16:  Voting Client Securities ...................................................................................................... 15

Item 17:  Financial Information .......................................................................................................... 15

## Item 2: Material Changes

GPB Capital Holdings, LLC ("GPB") does not consider any of the information contained in this version of the Brochure to represent a material change from the information contained in its most recent previous version dated January 2015.  Our current and potential investors are encouraged to read this Brochure, as well as all of the governing documents applicable to their current or prospective investment, in their entirety.

## Item 3: Advisory Business

GPB is an investment adviser that structures, manages, promotes, sponsors, and through itself and affiliate entities serves as general partner and/or investment manager for various limited partnerships (the "Funds"). GPB was formed in March of 2013 and is owned by David Gentile, its sole member.

GPB has three investment strategy goals for the Funds:

- To cause Funds to acquire controlling interests in income-producing, middle-market North America-based private portfolio companies primarily focused on specified sectors (the "Portfolio Companies")

- To provide managerial assistance to Portfolio Companies

- To develop the operations of Portfolio Companies to increase their cash flow

GPB is a New York-based, middle-market investment management firm whose principals are experienced financial, management and accounting professionals with over 100 years of collective experience working with privately-held companies and their management teams. GPB looks to achieve increased cash flow and profitability of Portfolio Companies by initially focusing on Funds' acquisition of Portfolio Companies possessing strong management teams. GPB provides strategic planning and managerial insight, along with an investment vehicle's capital, which is designed to enable the businesses acquired to attain the next stage of development and profitability.

GPB seeks for Funds to acquire controlling interests in Portfolio Companies, build their value over time, and reward management teams that perform well, while also providing Fund investors ("Investors") with current income and long-term return potential.

We bring our unique perspective to each phase of the acquisition process. When we identify an acquisition opportunity, we evaluate it based on its individual merit and the potential to add strategic value to the Fund. If we decide it is right for a Fund's portfolio, we will coordinate the acquisition, conduct due diligence, undertake financial and strategic analysis, and monitor and report on the Portfolio Company on an ongoing basis. We also provide hands-on management at the Portfolio Company's executive officer level.

Currently, GPB's clients are only the Funds. Investment advice is tailored as set forth in each Fund's governing documents, which may include a private placement memorandum, subscription agreement and limited partnership agreement (collective the "Offering Documents"). Since investment advice is provided pursuant to the Fund's agreed upon investment objective, it is not tailored pursuant to the investment objectives of any individual investors in a Fund (an "Investor").

As of December 31, 2014, we managed approximately $77,000,000 in regulatory assets on a discretionary basis.

## Item 4: Fees and Compensation

GPB receives management and performance fees as described in the Offering Documents. The management fees are typically based on contributions made to a Fund, and the manner in which they are paid will depend on the structure of a particular Fund. Performance fees paid by Funds usually are 20% of distributions made by a Fund after certain return thresholds are met.

Depending on a Fund's Offering Document or other governing agreements (the "Governing Agreements") GPB, in its sole discretion, may agree to a different fee structure for certain Investors, which may include employees of GPB, their relatives and certain other Investors.

Fees may differ between the Funds and each Investor must review the Offering Documents carefully for a list of the actual fees and expenses.

As may be described in an Offering Document, GPB may have the right to assign all or a portion of the fee to properly licensed third parties (where licensing is required) for services rendered by persons in connection with the offering of interests in a Fund ("Interests").

In addition, as described in the Offering Documents, a portion of the proceeds from the sale of Interests may be used to pay brokerage fees and commissions, which may include selling commissions, due diligence, marketing and wholesaling fees (collective "Selling Fees") to properly licensed third parties. GPB typically reserves the right to pay Selling Fees that are less than or more than may be stated in an Offering Document, however, aggregate Selling Fees will be no more than 11% of the amount of interest subscribed for.

Further, as described in the Offering Documents, the Fund may pay an acquisition fee upon the consummation of any acquisition on behalf of a Fund to qualified third parties (other than persons holding any financial interest in the acquired asset) for making the opportunity available identifying and/or structuring acquisitions for us. The acquisition fee may be the lesser of 1.75% of the enterprise value as defined in the relevant transactional agreements, or 2.75% of the purchase price of the asset.

In addition, the Funds are each responsible for their own operational and organizational expenses, such as audit expense, tax accounting and preparation, K-1 reporting, real estate brokerage, legal fees, compliance fees and other Fund operating expenses.

The Funds will usually not have any personnel or operational capabilities. Instead, all of Funds' operational capabilities and personnel are usually provided by GPB. Because we provide these resources to multiple clients, our expenses must be allocated among our clients. GPB fairly allocates such expenses among Funds in conformance with its duties to its clients. When allocating expenses, we take into account the stage of the investment vehicle client—whether still raising capital or having concluded its offering. Once the vehicle's stage is taken into account, we allocate those operational expenses pro-rata among our clients. Allocating a portion of our internal expenses incurred on Funds' behalf presents a conflict of interest, as discussed below under Item 10.

Potential Investors must review the Offering Documents carefully for a discussion of the actual fees and expenses applicable to their investment.

## Item 5:  Performance Based Fees and Side by Side Management

As discussed above, GPB typically receives performance fees from Funds as described in a Fund's Offering Documents.

## Item 6: Types of Clients

Currently, our only clients are the Funds.

## Item 7: Methods of Analysis, Investment Strategies, and Risk of Loss

A.    Methods of Analysis and Investment Strategies

For a discussion of the investment strategies and methods of analysis employed by GPB on behalf of the Funds, please refer to Item 3 above and the Offering Documents of each Fund.

B.    Risks

Each Fund has its own specific risks, but the following are risks that are generally associated with the types of investments the Funds may make. The list of risk factors does not purport to be a complete enumeration or explanation of the risks involved in a Fund investment. Each Investor and prospective Investor must review the Offering Documents carefully for a comprehensive list of a Fund's risks and conflicts.

Risks Associated with Portfolio Companies.

Identifying and participating in attractive investment opportunities and assisting in the building of successful enterprises are difficult tasks. There is no assurance that a Fund's investments will be profitable, and there is a substantial risk that a Fund's losses and expenses will exceed its income and gains. There generally will be little or no publicly available information regarding the status and prospects of Portfolio Companies. Many investment decisions by GPB will be dependent upon the ability of its members and agents to obtain relevant information from non-public sources, and GPB often will be required to make decisions without complete information or in reliance upon information provided by third parties that is impossible or impracticable to verify. The marketability and value of each investment will depend upon many factors beyond a Fund's control. Portfolio Companies may have substantial variations in results from period to period, face intense competition, and experience failures or substantial declines in value at any stage. Portfolio Companies may need substantial additional equity or debt capital to support growth or to achieve or maintain a competitive position. Such capital may not be available on attractive terms, or may not be available at all. Generally, the investments made by a Fund will be illiquid and difficult to value, and there will be little or no collateral to protect an investment once made. In most cases, a Fund's investments will be long-term in nature and may require many years from the date of initial investment before disposition.

General Risks

*General Investment Risks.* GPB's success depends on its ability to implement its acquisition strategy for the Funds. Any factor that would make it more difficult to execute timely acquisitions, such as a significant reduction of liquidity in a particular market, may also be detrimental to profitability. No assurance can be given that GPB's acquisition strategies will be successful under all or any market conditions.

*Portfolio Company Competition Risks.* Portfolio Companies will compete with other companies in their respective businesses. Funds may focus on acquisitions in specific sectors with strong management, earnings, and market share. Those sectors may be rapidly evolving and may become more competitive. As is typical in rapidly evolving industries, demand and market acceptance for new products and services are subject to a high degree of uncertainty. In addition, while many companies in these sectors have grown or have the potential to grow, there is no guarantee of the same in the future.

Portfolio Companies may have histories of net losses and may continue to have net losses for years after acquisition. There can be no assurance that a Fund will be able to make acquisitions on attractive terms or operate Portfolio Companies profitably. To the extent a Fund consummates an acquisition, it may be affected by numerous risks inherent in the business it acquires. For example, if a financially unstable business or an entity lacking an established record of sales or earnings is purchased, a Fund will be affected by the risks inherent in the business and operations of a financially unstable or a development stage entity. Although GPB will endeavor to evaluate the risks inherent in a particular target business, no Fund can assure Investors that GPB will properly ascertain or assess all of the significant risk factors or that there will be adequate time to complete due diligence. Furthermore, some of these risks may be outside of a Fund's control and leave it with no ability to control or reduce the chances that those risks will adversely impact a Portfolio Company.

*Litigation Risks.* Funds and their Portfolio Companies will be subject to a variety of litigation risks. Under most circumstances, a Fund will indemnify GPB, its principals, and representatives for any costs they may incur in connection with such disputes. The officers, directors, and representatives of the Portfolio Companies (which will include our personnel or persons affiliated with GPB) will be similarly indemnified by such entities. Beyond direct costs, such disputes may adversely affect a Fund or its Portfolio Companies in a variety of ways, including by distracting GPB and/or the officers, directors, and representatives of such entities and harming relationships between such entities and the Portfolio Companies as well as active or potential investors, other potential sources of capital, and other entities important to the success of the Portfolio Companies. In connection with the disposition of a Portfolio Company, a Fund may be required to make representations about the business and financial affairs of the Portfolio Company typical of those made in connection with the sale of any business, and may be responsible for the content of disclosure documents under applicable securities laws. These arrangements may result in the contingent liabilities, for which a Fund may establish reserves and escrows.

*Failure of a Portfolio Company.* Funds focus acquisitions in a limited number of industries, and it is possible that those segments could suffer more so than other segments. There are no requirements as to concentration or diversification imposed on any Fund with respect to the allocation of assets. No assurance can be given that the failure of one or more Portfolio Companies will not have a material adverse effect on a Fund.

*Lack of Publicly Available Information.* The interests in the Portfolio Companies are typically not offered under registration statements under the Securities Act of 1933 (the "1933 Act"). In addition, Portfolio Companies will typically not be subject to the periodic information and reporting provisions of the Securities Exchange Act of 1934 (the "1934 Act"). Accordingly, publicly-available information about Portfolio Companies may be limited. Funds will be required to rely on the ability of GPB to obtain adequate information to evaluate the potential operational returns from acquiring these companies. If GPB is unable to uncover all material information about Portfolio Companies, it may not make a fully informed acquisition decision, and a Fund may lose some or all of its capital on such acquisitions.

*Risks Related to Acquisitions.* Funds often acquire Portfolio Companies with smaller market capitalizations. Acquisitions of small- and medium-capitalization companies involve significantly greater risks than investments in larger, better-known companies. There is ordinarily a more limited marketplace for the sale of interests in smaller, private companies, which may make realizations of gains more difficult, by requiring sales to other private investors. In addition, the relative illiquidity of private investments generally, and the somewhat greater illiquidity of private investments in

small- and medium-sized companies could make it difficult for a Fund to react quickly to negative economic or political developments.

*Illiquid Holdings.* Funds intend to invest in private companies for which no (or only a limited) liquid market exists or that are subject to legal or other restrictions on transfer. A Fund may be unable to sell assets when it desires to do so or to realize what it perceives to be their fair value in the event of a sale. Because there will be no readily available market for the equity in Portfolio Companies, those acquisitions will be difficult to value. Determination of fair values for such companies involves judgments that are not susceptible to substantiation by auditing procedures. Values assigned to Portfolio Companies may not accurately reflect values that may be actually realized. Funds will normally intend to own Portfolio Companies on a long-term basis. If a Fund elects to sell a Portfolio Company, it may take a significant period of time to sell the Portfolio Company due to market conditions, availability of financing, lack of demand, and other conditions.

*Risk Inherent in Portfolio Company Acquisitions.* Acquisitions of private companies involve a high degree of risk, including that private companies may have limited financial resources and may require substantial amounts of financing that may not be available. Private companies typically have shorter operating histories, narrower product lines, and smaller market shares than larger businesses, which tend to render them more vulnerable to competitors' actions and market conditions, as well as general economic downturns. Private companies are more likely to depend on the management talents and efforts of a small group of persons; therefore, the death, disability, resignation, or termination of one or more of these persons could have a material adverse impact on a portfolio company and, in turn, on a Fund. Private companies generally have less predictable operating results, may from time to time be parties to litigation, may be engaged in rapidly changing businesses with products subject to a substantial risk of obsolescence, and may require substantial additional capital to support their operations, finance expansion, or maintain their competitive position. Private companies may be particularly susceptible to economic slowdowns or recessions and may be unable to repay their loans or meet other obligations during these periods. Private companies often experience unexpected problems in the areas of product development, manufacturing, marketing, financing, and general management, which in some cases cannot be adequately solved. Many risks and uncertainties affect early-stage companies, which often have very limited operating history, profits, or cash flow. There can be no assurance of the success of such enterprises. Their potential must be considered in light of the problems, expenses, difficulties, complications, and delays frequently encountered in connection with new or developing businesses, including technology risks, unproven business models, untested plans, uncertain market acceptance, competition, and lack of revenues and financing.

*Follow-On Funding Requirements.* Following its initial acquisition of a Portfolio Company, a Fund may be required to make additional capital contributions to it. Such additional contributions may be necessary to protect the Fund's interest in the companies that require additional financing to carry out their business plans. There is no assurance that a Fund will make such additional contributions or that it will have the ability to do so. The failure to make additional contributions may impact a Fund's ability to realize a meaningful return and may impact the recovery of its contribution.

*High Expense Ratio.* Fund expenses may be significant and will be payable regardless of the success of any Fund. Funds are typically obligated to pay fees and substantial administrative, travel, accounting, tax and legal expenses regardless of whether the Fund realize revenues. To the extent a Fund utilizes leverage, such use will increase these fees and charges, and the Fund will need to make substantial profits to avoid depletion of assets and provide a return to Investors.

*No assurance of profit or distributions.* There is no assurance that any Fund's acquisitions will be profitable or that any distribution will be made to the Investors.  Any return on investment to the Investors will depend on successful acquisitions made by a particular Fund.  The value of any such acquisition will depend upon many factors beyond the control of GPB or the Fund.  A Fund may not have sufficient cash available to make distributions to the Investors. Funds' expenses may exceed their income, and the Investors could lose the entire amount of their contributed capital.

*Financing for Acquisitions.* Because a Fund may have not yet identified any prospective target business, the Fund may not ascertain the capital requirements for any particular acquisition. If a Fund's assets are insufficient, either because of the size of the acquisition, the depletion of the available proceeds in search of a target business, or other reasons, the Fund will be required to seek additional financing. Such financing may not be available on acceptable terms, if at all. To the extent that additional financing proves to be unavailable when needed to consummate a particular acquisition, a Fund would be compelled to either restructure the transaction or abandon that particular acquisition and seek an alternative target business candidate. In addition, if a Fund consummates an acquisition, it may require additional financing to fund the operations or growth of the target business. The failure to secure additional financing could have a material adverse effect on the continued development or growth of the Portfolio Companies. GPB and its affiliates are not required to provide any financing in connection with or after a Fund acquisition. If a Portfolio Company is unable to generate sufficient cash flow to meet its obligations, including any debt service obligations for financing, the Portfolio Company may default under its loan obligations, be required to sell assets, obtain additional financing, or alternatively, liquidate, which could have a material adverse effect on a Fund's revenue, asset value, and ability to pay distributions. If a Fund guaranteed any such indebtedness, the Fund could be required to sell assets or obtain additional financing to repay any guaranteed amounts, which could have a material adverse effect on the Fund's revenue, asset value, and ability to pay distributions.

*Regulatory Burdens.* Funds are subject to laws and regulations enacted by national, regional, and local governments. Compliance with, and monitoring of, applicable laws and regulations may be difficult, time consuming, and costly. Those laws and regulations and their interpretation and application may also change from time to time and those changes could have a material adverse effect on a Fund's business, acquisitions, and results of operations. In addition, a failure to comply with applicable laws or regulations, as interpreted and applied, could have a material adverse effect on a Fund's business and results of operations.

*Systems Risks.* The Funds depend on GPB to develop and implement appropriate systems for their activities. The ability of GPB's systems to accommodate increasing volume could also constrain the ability to manage the Funds' portfolios. In addition, certain of GPB's operations may interface with or depend on systems operated by third parties, and there may be inadequate means to verify the risks or reliability of such third-party systems. These programs or systems may be subject to certain defects, failures, or interruptions, including those caused by worms, viruses, cyber-attacks and power failures. Any such defect or failure could have a material adverse effect on a Fund. Although GPB endeavors to provide sufficient redundancy and back-up for material information related to the Funds, GPB is not liable for losses caused by systems failures or cyber-attacks.

*Inadequate Capital.* Funds typically intend to acquire Portfolio Companies and operate them. Therefore, the net income, if any, earned from a Fund's acquisitions may not be significant. Funds typically will hold an acquisition for several years, and market and economic conditions and other relevant factors may compel a Fund to hold assets for much longer, which could delay any possible distributions to Investors. If for any reason a Fund's operating reserves are insufficient to fund its

expenses or of its Portfolio Companies, such Fund or such Portfolio Companies may seek debt financing, which would accrue interest and would be payable prior to any distributions to equity holders. Such sources or other sources of funding may not be available or may not be available under terms that are acceptable. Any additional financing could ultimately dilute interest in the Funds.

*Leverage.* Funds' acquisitions, directly or indirectly, may be leveraged acquisitions. Utilization of leverage is a speculative technique and involves risks to Investors. While leverage may enhance total returns to Investors, if investment results fail to cover borrowing costs, then returns to the Investors will be lower than if there had been no borrowings. To the extent a Fund utilizes leverage in an acquisition, such acquisition will be subject to increased exposure to adverse economic factors such as a significant rise in interest rates, a severe downturn in the economy, or deterioration in the condition of such acquisition. In the event of a Fund's dissolution, its lenders and holders of its debt securities would receive a distribution of its available assets before distributions to Investors. Any new Interest may have a preference over existing Interests with respect to distributions and upon dissolution, which could further limit a Fund's ability to make distributions to Investors. Because a Fund's decision to incur debt and issue equity in any future offerings will depend on market conditions and other factors beyond its control, a Fund cannot predict or estimate the amount, timing, or nature of its future offerings or its future debt and equity financings. Further, market conditions could require a Fund to accept less favorable terms for the issuance of its securities in the future, including issuing Interests at a discount to market value. Accordingly, Investors will bear the risk of future offerings reducing the value of their Interests, diluting their Interests.

Management Risks

*Due Diligence.* Even if GPB conducts extensive due diligence on a target business, no Fund can assure Investors that this diligence will surface all material issues that may be present inside a particular target business, that it would be possible to uncover all material issues through a customary amount of due diligence, or that factors outside of the target business and outside of our control will not later arise. As a result of these factors, a Fund may be forced to later write-down or write-off assets, restructure our operations, or incur impairment or other charges that could result in the Fund reporting losses. Even if GPB's due diligence successfully identifies certain risks, unexpected risks may arise and previously known risks may materialize in a manner not consistent with preliminary risk analyses. GPB expects that the investigation of each specific target business and the negotiation, drafting, and execution of relevant agreements, disclosure documents, and other instruments will require substantial management time and attention and substantial costs for accountants, attorneys, and others. If a Fund decides not to complete a specific acquisition, the costs incurred up to that point for the proposed transaction likely would not be recoverable. Furthermore, if a Fund reaches an agreement relating to a specific target business, the Fund may fail to consummate the transaction for any number of reasons including those beyond its control. Any such event will result in a loss to the Fund of the related costs incurred, which could materially adversely affect subsequent attempts to locate and acquire another business.

*Conflicts of Interest.* GPB and members of any Fund's Investment Committee will devote such time to the Funds or their Portfolio Companies as each, in its sole discretion, deems necessary. Any members of GPB, a Fund's Investment Committee and their affiliates may invest in, have responsibilities for, render investment advice to, or perform other services, including investment advisory services for personal and family accounts, managed accounts for individuals or entities, including other entities that invest in companies similar to the companies in which a Fund may

invest. The activities of such other entities may be similar to or may differ from a Fund's activities, and neither a Fund nor the Investors will have any rights in respect of investments for, and profits or other income earned from, such companies. As a result of the foregoing, GPB, members of a Fund Investment Committee and their affiliates may have conflicts of interest in (i) allocating their time and activity between a Fund or such entities, as the case may be, and other entities; (ii) allocating investments among a Fund or such entities, as the case may be, and other entities; and (iii) effecting transactions between a Fund or such entities, as the case may be, and other entities, including ones in which such entities, their principals, and affiliate(s), may have a greater financial interest. GPB and its affiliates, and members of an Investment Committee and their affiliates, may give advice or take action with respect to such other entities that differs from advice given with respect to a Fund or such entities. To the extent a particular investment is suitable for both a Fund and other clients, their principals, and affiliates, such investments will be allocated between the Fund and the other clients in a manner determined to be fair and equitable under the circumstances to all clients, including the companies.

GPB will receive fees for its services to the Funds, and GPB and its affiliates and members of a Fund Investment Committee may receive fees and compensation from Portfolio Companies for services provided by them. These relationships may from time to time create conflicts of interest between GPB, members of an Investment Committee, and/or their affiliates and the Funds. Furthermore, because Funds will normally control Portfolio Companies, a Fund may be deemed a fiduciary with respect to Portfolio Companies and their minority shareholders. In such situation, a Fund's ability to act solely in its own interest with respect to such Portfolio Companies may be limited.

Instances may arise where the interest of GPB (or its members) and/or members of a Fund's Investment Committee may potentially or actually conflict with such Fund's interest and the Investors. For example, GPB or its affiliates may organize other vehicles to invest in companies in the same target sectors a Fund is pursuing, and such other vehicles may co-invest with a Fund on terms GPB determines are equitable and in each such investor's interests. Where a proposed transaction is a related party transaction, GPB may be required to obtain in advance an independent third-party evaluation of the fairness of the transaction to the Fund. In such cases, GPB will engage a firm to perform the evaluation that is nationally recognized with qualified personnel holding such accreditations appropriate to value a specific industry or asset.

GPB typically provides Funds with all of their personnel, systems, back office services and other resources. GPB normally allocates such expenses among its clients, including the Funds, on a pro-rata basis and as further discussed below under Item 10.

GPB does not provide Investors with separate counsel, accountants, or other experts in connection with the formation of any Fund, the preparation of the Governing Agreements, or the offering of the Interests. GPB does not intend to retain separate counsel or other advisers for the Investors in the future. Certain of the attorneys and other professionals and experts who perform services for a Fund and GPB also may perform services for GPB's affiliates.

## Item 8: Disciplinary Information

Not applicable.

## Item 9: Other Financial Industry Activities and Affiliations

Affiliates of GPB serve as general partners to the Funds (collectively "Managing Entities"), and as such they may receive incentive allocations from the Funds.  In some cases other GPB affiliated special purpose vehicles may be formed for the purpose of receiving all or part of the incentive allocation paid by certain Funds.  The Managing Entities will operate under GPB's regulatory umbrella as Relying Advisers, as noted in GPB's Form ADV Part 1.

## Item 10: Code of Ethics Participation or Interest in Client Transactions and Personal Trading

A.     Code of Ethics

GPB has adopted a Code of Ethics (the "Code"). Among other things, the Code includes written procedures governing the conduct of the Firm's advisory and access persons. The Code also imposes certain reporting obligations on persons subject to the Code. The Code and applicable securities transactions are monitored by our Chief Compliance Officer. GPB will send clients or Investors a copy of its Code upon written request.  To receive copy of the Code, please contact Bill Jacoby at 212-235-2650 or bjacoby@gpb-cap.com

GPB has policies and procedures in place to ensure that the interests of its clients are given preference over those of the Firm, its affiliates, and its employees. For example, there are policies in place to prevent the misappropriation of material nonpublic information, and such other policies and procedures reasonably designed to comply with federal securities laws.

GPB, either individually or through affiliate entities, may cause one Fund to sell or purchase assets from another Fund, which may pose a conflict of interest.  Although GPB strives to put the interests of its clients first, such Inter-Fund and related-party transactions could be viewed as being in the best interest of one Fund versus another Fund.  Inter-Fund transactions may occur for a variety of reasons, such as lack of liquidity, the closing of a Fund, tax, and related issues.  In certain cases, GPB may determine that it is also appropriate for more than one Fund to co-invest in a Portfolio Company.  Additionally, supervised persons of GPB may be invested in the Funds and therefore have an indirect interest in securities held by the Funds and involved in these Inter-Fund transactions.  Accordingly, GPB may have conflicts of interest in determining to which entity a particular business opportunity should be presented to, though GPB will attempt to equitably allocate acquisition opportunities between Funds.  If a potential acquisition fits the investment objective of more than one Fund, and each have capital available to invest in the acquisition, GPB will allocate the investment opportunity among the Funds, taking into account all relevant factors, including:

- The amount of capital each participant has available to invest, as compared to the total amount of capital each participant anticipates raising;

- The extent to which the potential Portfolio Company deviates from the participants' investment objectives; and

- The extent to which the potential acquisition would promote the participants' sector, geographic, brand or other diversification goals.

To mitigate any potential conflicts of interest, Funds may use an advisory committee with independent members that normally must approve any transaction between a Fund and an affiliate of the Fund or GPB.  Further, GPB's allocation policy provide that when allocating acquisition opportunities among Funds, GPB will:

- Not disadvantage one client over another client;

- Not pursue the transaction unless each client invests on the same terms as all other clients—including the ability of a client to make follow-on investments and exit;

- Ensure that no affiliated person has any ownership interest in the potential acquisition (except as may be contemplated in an Offering Document);

- Not recommend one client invest as a method to increase its fees from that or another client;

- Not pursue such transactions as a method to transfer investment risk from one client to another client;

- Not bring in additional clients into the transaction for the purpose of reducing another client's transactional costs;

- Not favor the Portfolio Company over its clients' interests, even if GPB's personnel serve as officers or directors of such portfolio investment; and

- Ensure that any committee or other approval required for the client is obtained.

To the extent GPB causes a Fund to enter into a transaction with an affiliate, it will only do so for purposes of better enabling the Fund to achieve its objectives, and will not enter into such transactions for the purpose of providing any benefit to an affiliate beyond consideration such persons would receive in an arms-length transaction.

A Fund may, from time to time, have the opportunity to retain third parties who have prior business relationships with another Fund or GPB to act as a consultant or in some other capacity. If a Fund retains any such parties, the Fund may experience a conflict between one Fund's interests and its interest in preserving any ongoing business relationship with that party. This conflict may result in a Fund paying more for these services than would otherwise be the case.  As may be set forth in a Fund's Offering Documents, an advisory committee may approve any proposed transactions or operations that may contain potential conflicts of interest in compliance with GPB's compliance policies and procedures.

As a result of the foregoing, the members and/or partners and principals and affiliates of the GPB affiliates may have conflicts of interest in allocating their time and activity between the Funds and other clients, in allocating investments among Funds and other clients, and in effecting transactions for the Funds and other clients, including ones in which a Fund may have a greater financial interest.

Since Funds normally pay for their own directly-incurred expenses, and because GPB also typically will be paid a management fee and be entitled to receive other performance fees from a Fund, allocating internal expenses to a Fund poses a conflict of interest—both between GPB and the particular Fund, as well as among the Funds and any other GPB client to which operational expenses are allocated.  GPB mitigates its conflict by ensuring no expenses incurred for its behalf are allocated to any client, and mitigates the conflict among clients by fairly allocating such expenses among clients based upon their size and organizational stage.

B.    Investment Recommendations Involving a Material Financial Interest

See Item 9 above.

13

C.    Purchase of Same Securities Recommended to Clients

Unless otherwise restricted by a Fund's Governing Agreement or as described in an Offering Document, GPB, its affiliates, employees and their families, trusts, estates, charitable organizations, and retirement plans established by it are typically not prohibited from purchasing or having any direct or indirect interest in the same assets as are purchased for Funds provided such purchase or interest is in accordance with the Code. The personal asset or securities transactions by advisory representatives and employees may raise potential conflicts of interest when they acquire an interest in a portfolio company that is:

- Owned by the Fund, or
- Considered for purchase or sale for the Fund.

GPB has adopted the following policies and procedures that are intended to address these conflicts of interest:

- Require our advisory representatives and employees to act in the client's best interest.
- Require our advisory representatives to disclose any direct or indirect interest in a portfolio company considered for purchase in one or more affiliate Funds.
- Require our advisory representatives and employees to follow GPB's procedures.

## Item 11: Brokerage Practices

The Funds do not acquire securities for which execution services need be provided by a broker-dealer.  In the event a Fund were to acquire such securities, we would select the broker-dealer consistent with our duty to achieve best execution for the Funds.

## Item 12: Review of Accounts

The management and monitoring of the Funds is done by our personnel and Investment Committees we establish for Funds according to their Governing Agreements. David Gentile and his fellow Investment Committee members are also responsible for ensuring that any significant change in a Fund's investment strategy or in the concentration of a Fund's assets is appropriate for the respective client.

We may perform ad-hoc reviews on an as-needed basis if there have been material changes in a Fund's investment objectives or a material change in how GPB formulates investment advice.

## Item 13: Client Referrals and Other Compensation

Not applicable.

## Item 14: Custody

Rule 206(4)-2 promulgated under the Investment Advisers Act (the "Custody Rule") (and certain related rules and regulations under the Investment Advisers Act) imposes certain obligations on registered investment advisers that have custody or possession of any funds or securities in which any client has any beneficial interest.  An investment adviser is deemed to have custody or possession of client funds or securities if the adviser directly or indirectly holds client funds or securities or has the authority to obtain

possession of them (regardless of whether the exercise of that authority or ability would be lawful). An investment adviser is deemed to have custody if it or its affiliate serves as a general partner to a limited partnership client of GPB.

GPB is required to maintain the funds and securities (except for securities that meet the privately offered securities exemption in the Custody Rule) over which it has custody with a "qualified custodian." Qualified custodians include banks, broker-dealers, FCM and certain foreign financial institutions.

Rule 206(4)-2 generally imposes on advisers with custody of clients' funds or securities certain requirements concerning reports to such clients (including underlying investors in certain circumstances) and surprise examinations relating to such clients' funds or securities. However, GPB need not comply with such requirements with respect to pooled investment vehicles if the pooled investment vehicle: (i) is audited at least annually by an independent public accountant, and (ii) distributes its audited financial statements prepared in accordance with generally accepted accounting principles to the client, or, in certain circumstances, all limited partners, members or other beneficial owners, within 120 days (180 days in the case of a fund of fund adviser) of its fiscal year end. GPB intends to rely upon this exception and therefore will be exempt from the Rule 206(4)-2 reporting and examination requirements.

## Item 15: Investment Discretion

GPB, either individually or through its affiliates, normally acts as general partner for the Funds. As such, it will normally have full discretionary authority to act on behalf of the Funds in all aspects, subject to the Fund's objectives and guidelines in its Offering Documents and any restrictions in a Governing Agreement. GPB does not tailor Funds' investment strategies for any investor. Funds generally have very limited restrictions on the types or number of investments strategies it may pursue or the kind or range of products in which it may invest. Investors should review the Offering Documents of each Fund to understand the breadth of investments a Fund may hold and extent of the Fund's ability to hold assets which may not have been specifically identified in the Offering Documents.

## Item 16: Voting Client Securities

Unless provided otherwise in an Offering Documents or Governing Agreement, GPB will have voting power with respect to a Fund's securities, but is it unlikely that a Fund would hold any security for which proxies would be solicited. In keeping with its fiduciary duties, GPB has adopted a Proxy Voting Policy, which sets forth policies and procedures designed to ensure that GPB would vote any client's securities in the best interests of the client. When making proxy voting decisions, GPB may seek advice or assistance from third-party consultants, such as proxy voting services or legal counsel.

Investors may contact Bill Jacoby at 212-235-2650 or bjacoby@gpb-cap.com to find out how we have voted any proxies or to obtain our Proxy Voting Policy.

## Item 17: Financial Information

GPB is not required to provide a balance sheet in response to this Item since it does not require nor solicit prepayment of fees six months or more in advance.

GPB is not aware of any financial condition that is likely to impair its ability to meet its contractual commitments to its clients.

GPB has never been the subject of a bankruptcy petition.

# EXHIBIT B

**CONFIDENTIAL PRIVATE PLACEMENT MEMORANDUM**

**$350,000,000**

**Class A Limited Partnership Units**

# GPB HOLDINGS II, LP

**April 13, 2015**

---

**EXHIBIT C**

**SUBSCRIPTION DOCUMENTS**

SUBSCRIPTION BOOKLET

FOR

CLASS A LIMITED PARTNERSHIP INTERESTS

IN

GPB HOLDINGS II, LP

PLEASE REVIEW CAREFULLY AND FOLLOW THE INSTRUCTIONS
IMMEDIATELY BEHIND THIS COVER PAGE.  INCOMPLETE AGREEMENTS AND
QUESTIONNAIRES WILL BE RETURNED TO SUBSCRIBERS FOR COMPLETION.

*Confidential—Do Not Copy or Circulate*

## GPB Holdings II, LP
## Class A - Subscription Agreement

**Units:** This Subscription Agreement relates to Subscriber's purchase of Class A Limited Partnership Units ("<u>Units</u>") of GPB Holdings II, LP ("<u>Company</u>").  GPB Capital Holdings, LLC ("<u>GPB</u>") serves as the Company's General Partner.

**Instructions For Individual Subscribers** (*Natural Persons*): (1) Fill out Section 1 regarding the Subscriber Information. (2) Check the appropriate box in Section 2 regarding Registration of Units. (3) Check the appropriate box(es) in Section 4 regarding your accredited investor status. (4) Complete Section 7.

**Instructions For Entities** (*Non-Individual Subscribers*): (1) Fill out Section 1 regarding the Subscriber Information. (2) Check the appropriate box in Section 2 regarding Registration of Units. (3) Check the appropriate box in Section 3 regarding your tax status. (4) Check the appropriate box(es) in Sections 5 regarding your accredited investor status. (5) If you are a benefit plan investor, then check the appropriate box(es) in Section 6 regarding your plan assets. (6) Complete Section 7.

### Section 1a Subscriber Information (*If an IRA, provide personal data for the IRA owner*)

| Name (Last, First Middle Initial or Name of Entity): | DOB |
| --- | --- |

Mailing Address:

| City: | State: | Zip: |
| --- | --- | --- |

| Telephone: | Fax: | Email: |
| --- | --- | --- |

| Social Security Number or Employer ID No.: | The Subscriber is a citizen of (Country): |
| --- | --- |

☐ Please check if you would like to receive correspondence via **e-mail only** (Neither the Company nor GPB will be responsible for the security and privacy of materials sent to you by email.)

### Check the appropriate box and fill in the blanks where needed:

☐ The Subscriber is a resident of, and the Units were offered to subscriber in, the State included in the mailing address above.

☐ The Subscriber is a resident of the State of _____ (insert name of state) and the Units were offered to Subscriber in the State of _____ (insert name of state).

### Section 1b Subscriber Information (*If an IRA, provide personal data for the IRA owner*)

| Name (Last, First Middle Initial or Name of Entity): | DOB |
| --- | --- |

Mailing Address:

| City: | State: | Zip: |
| --- | --- | --- |

| Telephone: | Fax: | Email: |
| --- | --- | --- |

| Social Security Number or Employer ID No.: | The Subscriber is a citizen of (Country): |
| --- | --- |

☐ Please check if you would like to receive correspondence via **e-mail only** (Neither the Company nor GPB will be responsible for the security and privacy of materials sent to you by email.)

### Check the appropriate box and fill in the blanks where needed:

☐ The Subscriber is a resident of, and the Units were offered to subscriber in, the State included in the mailing address above.

☐ The Subscriber is a resident of the State of _____ (insert name of state) and the Units were offered to Subscriber in the State of _____ (insert name of state).

## Section 2 Registration of Units: (*Check the appropriate box*)

☐ **(a)** Separate or individual property. (*A married Subscriber who resides in a community property state must submit written consent from his or her spouse to purchase Units using community funds.*)

☐ **(b)** Tenants in Common. (*Both parties must sign all required documents.*)

☐ **(c)** Joint Tenants with right of survivorship. (*Both parties must sign all required documents unless advised by their attorneys that one signature is sufficient.*)

☐ **(d)** Husband and Wife Tenants by the Entirety. (*Both husband and wife must sign all required documents unless advised by their attorneys that one signature is sufficient.*)

☐ **(e)** Husband and Wife Community Property. (*Community property states only. Both husband and wife must sign all required documents unless advised by their attorneys that one signature is sufficient.*)

☐ **(f)** Trust. (*Attach a copy of trust instrument and include the name of trust, the name of trustee and the date the trust was formed.*)

☐ **(g)** Individual Retirement Account ("IRA"). (*Provide exact name of custodian, account name and account number on page 13.*)

☐ **(h)** Other (*Describe*):_____

## Section 3 Entity Related Information (*Entities Only*): (*Check the appropriate box*)

☐ Corporation                     ☐ Estate                     ☐ IRA

☐ Partnership (*General or Limited*)     ☐ Trust (*Revocable or Irrevocable*)     ☐ Custodial

☐ Limited Liability Company        ☐ Benefit Plan Investor        ☐ Other (*Specify*)_____

State of Formation: _____     Date of Formation: _____

☐ Yes   ☐ No     Was the entity formed for the purpose of investing in the Company?

## Section 4 Accredited Investor (*Individuals*): (*Check the appropriate box*)

☐ **(a)** The Subscriber is a natural person whose individual net worth, or joint net worth with the Subscriber's spouse, at the time of the Subscriber's purchase exceeds $1,000,000. *For purposes of this Subscription Agreement, (i) "net worth" means the excess of total assets at fair market value, including home furnishings and automobiles, over total liabilities; (ii) Subscriber may not count the value of Subscriber's primary residence in net worth, and if the amount of debt on Subscriber's primary residence exceeds its value, Subscriber must count the excess against net worth; and (iii) Subscriber does not need to count as a liability debt secured by the Subscriber's primary residence up to the value of the residence, unless the amount of such debt exceeds the amount that was outstanding 60 days prior, other than debt resulting from the acquisition of the primary residence.*

☐ **(b)** The Subscriber is a natural person who had an individual income in excess of $200,000 in each of the two most recent years or joint income with the Subscriber's spouse in excess of $300,000 in each of those two years and has a reasonable expectation of reaching the same income level in the current year.

## Section 5 Accredited Investor (*Entities*): (*Check all the appropriate boxes*)

☐ **(a)** **The Subscriber is a corporation, limited liability company, Massachusetts or similar business trust, or partnership**, not formed for the specific purpose of acquiring the Units, with total assets in excess of $5,000,000.

☐ **(b)** **The Subscriber is an organization** described under Section 501(c)(3) of the Internal Revenue Code of 1986, as amended (the "Code"), not formed for the specific purpose of acquiring the Units, with total assets in excess of $5,000,000.

☐ **(c)** **The Subscriber is a trust with total assets in excess of $5,000,000**, not formed for the specific purpose of acquiring the Units, whose purchase is directed by a sophisticated person as described in Rule 506(b)(2)(ii) of Regulation D promulgated under the Securities Act of 1933, as amended (the "1933 Act").

☐ **(d)**   **The Subscriber is one of the following**: *(please specify)*

☐ **a bank** as defined in 1933 Act §3(a)(2), or **a savings and loan association** as defined in 1933 Act §3(a)(5)(A), acting in its individual or fiduciary capacity;

☐ **a broker or dealer** registered under Section 15 of the Securities Exchange Act of 1934, as amended ("<u>1934 Act</u>");

☐ **an insurance company** as defined in 1933 Act §2(a)(13);

☐ **an investment company** registered under the Investment Company Act of 1940, as amended (the "<u>1940 Act</u>");

☐ **a business development company** as defined in 1940 Act §2(a)(48);

☐ **a Small Business Investment Company** licensed by the U.S. Small Business Administration under Section 301 (c) or (d) of the Small Business Investment Act of 1958, as amended; or

☐ **a private business development company** as defined in Section 202(a)(22) of the Investment Advisers Act of 1940, as amended (the "<u>Advisers Act</u>").

☐ **(e)**   **The Subscriber is an employee benefit plan** within the meaning of the Employee Retirement Income Security Act of 1974, as amended ("<u>ERISA</u>"), and (i) the investment decision is made by a plan fiduciary, as defined in ERISA §3(21), which is either a bank, savings and loan association, insurance company or registered investment adviser, or (ii) the employee benefit plan has total assets in excess of $5,000,000 or, (iii) if a self-directed plan, with investment decisions made solely by persons that are accredited investors.

☐ **(f)**   **The Subscriber is a plan established and maintained by a state or its political subdivisions**, or any agency or instrumentality of a state or its political subdivisions, for the benefit of its employees, if such plan has total assets in excess of $5,000,000.

☐ **(g)**   **The Subscriber is an entity in which all of the equity owners are "accredited investors"** within the meaning of one of the categories (a), (b) and (d) - (f) of Section 5 or (a) or (b) of Section 4.

☐ **(h)**   **The Subscriber is an "individual retirement account"** under Code §408(a), owned by and for the benefit of an "accredited investor" or a self-directed plan (e.g. 401(k) plan or profit sharing plan) in which all investment decisions are made solely by, and such investments are made on behalf of, "accredited investors" pursuant to one of the categories (a) through (g) of Section 5 or (a) or (b) of Section 4. If you checked this box, complete this form for each participant and list the total number of equity owners:_____.

## Section 6 For Benefit Plan Investors: (*Check all appropriate boxes*)

Subscriber is a "benefit plan investor" as defined under ERISA §3(42) that is one of the following:

☐ **(a)**   **The Subscriber is an "employee benefit plan"** as defined under ERISA §3(3) and subject to part 4 of Title I or ERISA; or

☐ **(b)**   **The Subscriber is a plan to which Code §4975 applies**, other than an "employee benefit plan" described above; or

☐ **(c)**   **The Subscriber is an entity (other than a life insurance company) whose underlying assets include plan assets** by reason of a plan's investment in such entity, and either:

☐ the benefit plan investor is deemed to be investing "plan assets" under U.S. Department of Labor Regulation §2510.3101(h), or

☐ the Subscriber certifies that the percentage of Subscriber's equity interest held by "benefit plan investors" as defined in ERISA §3(42) and U.S. Department of Labor Regulation §2510.3-101 is _____.

The Subscriber agrees to notify GPB promptly if the information provided above changes. .

☐ **(d)**   **The Subscriber is a life insurance company** and either:

☐ the Subscriber is making this investment solely with assets of one or more of its separate accounts, or

☐ the Subscriber is making this investment with assets of its general account, and no more than ____% of such general account assets used to acquire Units constitutes "plan assets," within the meaning of ERISA §3(42), U.S. Department of Labor Relations §2510.3-101 and other applicable law.

The Subscriber agrees to notify GPB promptly if the information provided above changes.

**Section 7 For all Investors:** (*Please read and fill in the appropriate amounts in each blank*)

Total Amount of Subscription: $_____

Number of GPB Holdings II Units Purchased ($50,000/unit):_____  **(Minimum Investment of ONE Unit: $50,000)**

**By check payable to**: "Phoenix American Financial Services FBO GPB Holdings II, LP", delivered to the following address:

GPB Holdings II, LP
c/o: Phoenix American Financial Services
2401 Kerner Blvd
San Rafael, CA 94901

**By wire transfer directly to**:

Phoenix American Financial Services, Inc. for GPB Holdings II, LP
Bank of the West
20 Petaluma Blvd South
Petaluma, CA 94952

Routing:    121 100 782
Account:    030 954 628

Memo: Investor Name

☐ Please check here to verify that funds have been wired

| Paperwork Delivery Instructions | |
|---|---|
| **Via Mail** | **Electronic** |
| GPB Holdings II, LP<br>c/o: Phoenix American Financial Services<br>2401 Kerner Blvd<br>San Rafael, CA 94901 | Info@Ascendant-Cap.com<br>Fax: (512) 758-7872 |

## Certificate of Broker–Dealer Representative:

The undersigned registered representative of _____ (name of broker–dealer) certifies that it has procured this subscription and that it is familiar with the Subscriber named above and it has determined that the Subscriber meets the requirements set forth under the caption "Qualification of Investors" in the Private Placement Memorandum.

Registered Representative certifies he/she is licensed in the state of _____ where the Subscriber resides.

_____
*(Signature):* OSJ or Principal

_____
*(Signature):* Registered Rep

_____
Print Name

_____
Print Name:

**Broker/Dealer Information:**

_____
Name of Brokerage Firm and CRD

_____
Registered Representative

_____
Address

_____
Address

_____
City            State            Zip

_____
City            State            Zip

_____
Representative

_____
Phone                    Email

_____
Representative

_____
Phone                    Email

☐ Confirmed NAV Ticket @ _____ %

☐ Net of All Commissions

## Accepted by:

GPB Holdings II, LP   By:

GPB Capital Holdings, LLC

its General Partner

By: _____
        *(Signature)*

Print Name: _____

Title: _____

Date: _____

## Subscription Agreement Terms and Conditions

These Subscription Agreement Terms and Conditions ("Terms"), part of the Subscription Agreement (collectively, the "Agreement") relate to the offering (the "Offering") of Class A Limited Partnership Units ("Units") by GPB Holdings II, LP, a Delaware limited partnership ("Company"). By signing the Agreement, the undersigned subscriber (the "Subscriber") confirms acceptance of the Company's offer of Units on the terms and conditions set out in the Confidential Private Placement Memorandum ("Memorandum") and the Company's Agreement of Limited Partnership included in the memorandum, as it may be amended from time to time (the "LPA"). Terms not otherwise defined in this Agreement have the meaning ascribed to them in the Memorandum..

The Subscriber represents and warrants that the Subscriber has examined the suitability of investment in the Units for the Subscriber's own needs, investment objectives and financial capabilities, and has made an independent investigation and decision as to suitability and as to the risk and potential gain involved in the investment. Also, the Subscriber represents and warrants that the Subscriber has had the opportunity to consult his, her or its attorneys, accountants, financial consultants or other business or tax advisors regarding the risks and merits of the proposed purchase of Units.

The Subscriber represents and warrants to, and agrees with, the Company, GPB Capital Holdings, LLC, a Delaware limited liability company and the General Partner of the Company ("GPB"), as follows:

1.  The Subscriber has received, read carefully and fully understands the Memorandum and its exhibits, including, as applicable, the LPA. The Subscriber recognizes that an investment in Units involves substantial risk and is fully cognizant of, and understands, all of the risk factors related to the purchase of Units.

2.  Subject to the terms and conditions of the Agreement, the Subscriber irrevocably subscribes for, and agrees to purchase, the Units for a total price provided in Section 7 of the Subscription Agreement or such lesser amount as GPB may choose to accept under Section 4of the Terms in the LPA (the "Capital Contribution"). Together with the Agreement, the Subscriber is delivering a check or wire transfer in the amount of the aggregate subscription price.

3.  Subscriber agrees, so long as it is a Limited Partner in Company, to pay the General Partner, quarterly in advance, the Managerial Assistance Fee, which fee will be paid quarterly in advance out of Subscriber's Capital Account in the Company.

4.  The Subscriber acknowledges that this Agreement will not be binding against the Company until accepted and executed by the Company. GPB, in its sole discretion, on behalf of the Company, reserves the right to accept or reject this subscription or any other subscription for Units, in whole or in part, for any reason at any time, and the subscription proceeds paid under this Agreement will be held by the Company until accepted or rejected by it. This Agreement and the Capital Contribution will be deemed to be accepted by GPB only when the undersigned has been admitted into the Company as a Limited Partner (a "Limited Partner" or "LP") by enrollment as a Limited Partner in the books and records of the Company. If GPB chooses to accept only part of the Capital Contribution amount, then GPB is authorized to revise the amount indicated as the Total Amount of Subscription on Section 7 of the Subscription Agreement, will notify the undersigned in writing of such revision promptly after the Closing (the amount as so revised shall thereafter be the undersigned's Capital Contribution for all purposes hereof), and will return any amount unaccepted to the Subscriber without interest. If this subscription is rejected in whole, the Company will promptly return to the Subscriber this executed Agreement and related documents, together with the purchase price (or the applicable part of the purchase price) paid by the Subscriber for the Units, without deduction and without interest, and this Agreement will have no further force or effect to that extent.

5.  The Subscriber understands and acknowledges that: (i) the Units have not been registered for sale under the 1933 Act or the securities laws of any state or other political subdivision of the United States, and are being offered for sale to the Subscriber in reliance upon the private offering exemption contained in 1933 Act §4(a)(2) and Rule 506 of Regulation D thereunder; (ii) the Offering has not been approved, disapproved or passed on by any federal or state regulatory agency or other organizations, (iii) the reliance by the Company and GPB upon the private offering exemption is predicated, in part, upon the representations, warranties and agreements made by the Subscriber under this Agreement; and (iv) that exemption may not be available if any of the Subscriber's representations and warranties are not correct and complete or its agreements under this Agreement are not fulfilled. The Company does not intend to register the Units under the 1933 Act at any time in the future and the Company is under no obligation to register any Units or to assist the Subscriber in complying with any exemption from registration for any resale of Units. There are substantial restrictions on the transferability of the Units under the LPA, the 1933 Act, applicable state laws and the Internal Revenue Code, and there is no established market for the Units, and none is expected to develop in the future.

6.  Any information that the Subscriber has furnished to the Company or GPB with respect to the Subscriber is correct and complete as of the date of this Agreement and if there should be any material change in such information prior to the Subscriber's purchase of Units, the Subscriber will immediately furnish such revised or corrected information to the Company. The representations, warranties, agreements, undertakings and acknowledgments made by the Subscriber in this Agreement are made with the intent that

they be relied upon by GPB and the Company in determining his, her or its suitability as a purchaser of the Units, and will survive his, her or its purchase of the Units. In addition, the Subscriber undertakes to notify the Company immediately of any change in any representation, warranty or other information relating to the Subscriber contained herein.

7.   The Subscriber understands and acknowledges that the Company does not intend to issue certificates to evidence Units. However, certificates, if any are issued, representing the Units purchased by Subscriber hereunder, and all certificates, if any, issued in exchange for or in substitution of such certificates, will bear the following legend upon the original issuance of the Units and until the legend is no longer required under applicable requirements of the 1933 Act or applicable state securities laws:

THE UNITS REPRESENTED HEREBY HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED (THE "1933 ACT"), OR STATE SECURITIES LAWS. THE HOLDER HEREOF, BY PURCHASING THESE SECURITIES, AGREES FOR THE BENEFIT OF GPB HOLDINGS II, LP (THE "COMPANY") THAT THESE UNITS MAY BE OFFERED, SOLD, PLEDGED OR OTHERWISE TRANSFERRED ONLY IN ACCORDANCE WITH THE COMPANY'S AGREEMENT OF LIMITED PARTNERSHIP AND IN COMPLIANCE WITH APPLICABLE LAWS AND REGULATIONS. IN ANY EVENT, A LEGAL OPINION SATISFACTORY TO THE COMPANY MUST FIRST BE PROVIDED TO THE COMPANY.

8.   The Subscriber is aware that the Units are illiquid and may not be resold, pledged or otherwise transferred except in accordance with this Agreement, the LPA and all applicable laws. By purchasing Units, the Subscriber agrees that the Units may be offered, sold or otherwise transferred only in accordance with substantial restrictions contained in the LPA, which include an exemption from registration under the 1933 Act and applicable state securities laws after providing to the Company an opinion of counsel to that effect, which counsel and opinion shall both be reasonably satisfactory to the Company, and the required consent of GPB.

9.   The Subscriber is purchasing the Units for its own account, and not with a view to, or for resale in connection with, any distribution in violation of the 1933 Act, and no one other than the Subscriber will have any interest in, or any right to acquire, all or any part of the Units or have any interest in this subscription.

10.  Subscriber is a sophisticated investor with such knowledge and experience in financial and investment matters, and in illiquid investments in particular, and in such other business matters, that Subscriber is capable of evaluating the merits and risks of an investment in Units (without the assistance of a Purchaser Representative as defined in the 1933 Act). In evaluating the suitability of an investment in the Units, the Subscriber has not relied upon any representations or other information (whether oral or written) other than as provided in the Memorandum and LPA, and their attachments, and independent investigations made by the Subscriber or representative(s) of the Subscriber.

11.  The Subscriber is an "accredited investor" as defined in Rule 501(a) of the 1933 Act ("Accredited Investor").

12.  The Subscriber's overall commitment to investments that are not readily marketable is not excessive in view of the Subscriber's net worth and financial circumstances, and the purchase of the Units will not cause that commitment to become excessive. The Subscriber represents that the Subscriber (i) has adequate means of providing for the Subscriber's current needs, anticipated future needs and possible contingencies and emergencies, (ii) is able to bear the economic and other risks of investment in the Units for an indefinite period of time, including the risks summarized in the Memorandum and (iii) has no need for liquidity in the investment in the Units and could afford the complete loss of the investment.

13.  The Subscriber understands that the Company is not registered as an investment company under the 1940 Act, and that GPB may not be registered as an investment adviser under the Investment Advisers Act of 1940, as amended ("Advisers Act") or a commodity pool operator or a commodity trading advisor under the Commodity Exchange Act, as amended (collectively with the 1940 Act and Advisers Act, the "Acts"), and that neither the Company nor the LPs will have any of the protections afforded by the Acts.

14. ERISA.

(a) The Subscriber is aware of and has considered the issues addressed under the headings "Qualification of Investors" and "Certain Federal Tax, ERISA & Regulatory Matters" in the Memorandum and understands that investments by "benefit plan investors," as defined in ERISA and in the U.S. Department of Labor regulations ("Benefit Plan Investors"), will be monitored and may be restricted by GPB.

(b) If the Subscriber is a Benefit Plan Investor, then the Subscriber agrees to promptly notify GPB if its status changes.

(c) The Subscriber understands that: (i) without the prior consent of GPB, Units may not be held by or transferred to a Benefit Plan Investor; (ii) in no event may 25% or more of the Units be held by Benefit Plan Investors; and (iii) GPB may restrict investment in or transfer of Units at any time or compel transfers of Units to limit investments by Benefit Plan Investors. The Subscriber agrees to promptly notify GPB if the Subscriber becomes a Benefit Plan Investor.

(d) If the Subscriber has indicated above that it is a Benefit Plan Investor, it represents and acknowledges that (i) it has been informed of and understands the Company's investment objectives, policies and strategies; (ii) the decision to invest in the Units has been made with appropriate consideration of all relevant investment factors applicable to the Subscriber; (iii) the decision to invest in the Units is consistent with the duties and responsibilities imposed upon the Subscriber, including fiduciary duties, under ERISA or other applicable laws and the terms of the Benefit Plan; (iv) the investment in the Company does not constitute or otherwise result in a non-exempt prohibited transaction under ERISA §406 or Code §4975; (v) it has requested and received from GPB all information that the Subscriber, after due inquiry, deemed relevant to such determinations and that it has taken into account that there is a risk of loss of this investment, and that this investment will be relatively illiquid so that invested amounts will not be readily available for the payment of employee benefits; (vi) promptly after the undersigned obtains knowledge thereof, the Subscriber will notify GPB in writing of (A) any termination, substantial contraction, merger or consolidation, or transfer of assets of any Benefit Plan Investor, (B) any amendment to the governing instrument(s) of a Benefit Plan Investor that materially affects the investments of such Benefit Plan Investor or the authority of any named fiduciary or investment manager to authorize investments by such Benefit Plan Investor, and (C) any change in the identity of any named fiduciary or investment manager (including the Benefit Plan Investor itself) who has authority to approve investments for any Benefit Plan Investor; (vii) the Subscriber acknowledges that neither GPB nor any of its affiliates provides any investment advice on a regular basis to the Subscriber (or, to the Subscriber's knowledge, to any other Benefit Plan Investor) and none of such parties provides any investment advice to the undersigned (or, to the Subscriber's knowledge, to any other Benefit Plan Investor) that serves as the primary basis of any investment decisions the undersigned makes as to any of its assets (or that such other Benefit Plan Investor(s) makes, as the case may be); (viii) if GPB, or equity owner, employee, agent, or affiliate of GPB, is ever held to be a fiduciary of the Subscriber or any other Benefit Plan Investor, then, in accordance with ERISA §§405(b)(1), 405(c)(2) and 405(d), the fiduciary responsibilities of that person will be limited to the person's duties in administering the business of the Company, and the person will not be responsible for any other duties to the Subscriber or such other Benefit Plan Investor, specifically including evaluating the initial or continued appropriateness of this investment in the Company under ERISA §404(a)(1); and (ix) if the Subscriber itself is an Employee Benefit Plan, then the person executing this Agreement on behalf of the Subscriber (the "Signer") further represents and warrants that (A) the Signer is an authorized fiduciary of the Subscriber, with full authority under the terms of the Subscriber's governing instrument(s) and, if applicable, the agreement pursuant to which the Signer has been engaged by the Subscriber, to cause the Subscriber to purchase the Units, and (B) this investment has been duly approved by all other fiduciaries of the Subscriber whose approval is required, if any, and this investment is not prohibited by ERISA or prohibited or restricted by any provision of the Subscriber's governing instrument(s) or of any related agreement or instrument. If the Subscriber is an insurance partnership investing in the Company with its general account assets or any entity whose underlying assets include "plan assets" by reason of a plan's investment in such entity, the Subscriber agrees to inform GPB of the percentage of its investment that constitutes "plan assets" as defined under ERISA.

15. The Subscriber acknowledges that the discussion of the tax consequences arising from an investment in the Company described in the Memorandum is general and not complete. The tax consequences to the Subscriber of its investment in Units will depend on, among other things, the Subscriber's particular circumstances. The Subscriber is not relying on the Company for the tax and other economic considerations involved in an investment, and has been urged by the Company to seek independent advice from the Subscriber's professional advisors relating to the suitability of an investment in the Company in view of the Subscriber's overall financial needs and for the legal and tax implications of such an investment.

16. The Subscriber understands that: (a) the Company has no operating history, (b) the Units are highly speculative investments which involve a high degree of risk of loss of the entire investment, (c) the Company will have significant transaction costs regardless of whether it realizes a profit, (d) there are potential conflicts of interest involved in the structure and operation of the Company and its affiliates as described in the Memorandum, and (e) there are significant contracts, payments and transactions by the Company

with GPB and affiliates as described in the Memorandum. The Subscriber has evaluated the nature of the risks involved in purchasing the Units and has carefully reviewed and understands those risks, including the provisions in the LPA providing for compensation to GPB and its affiliates and the sections of the Memorandum describing the potential conflicts of interest. The Subscriber understands that the risks described in the Memorandum are not a complete list of the risks involved in an investment in the Company.

17. The Subscriber has had the opportunity to ask questions of and receive answers from representatives of the Company or any of its principals concerning the terms and conditions of the Offering and the accuracy of the information contained in the Memorandum, and to obtain any additional information (including information with respect to the past employment of the principals of GPB) necessary to verify the information contained in the Memorandum or otherwise relative to the financial data and business of the Company, to the extent that such parties possess such information or can acquire it without unreasonable effort or expense, and all such questions, if asked, have been answered satisfactorily and all such documents, if examined, have been found to be fully satisfactory to the Subscriber.

18. The Subscriber has not become aware of, and is not purchasing the Units as a result of, any general solicitation or general advertising, as those terms are used in Regulation D under the 1933 Act, including (i) advertisements, articles, notices and other communications published in any newspaper, magazine or similar media, or broadcast over television, radio or the internet, or (ii) any seminar or meeting whose attendees have been invited by general solicitation or general advertising.

19. The Subscriber agrees to be admitted as an LP of the Company and to be bound by all of the terms and conditions of the LPA.

20. If the Subscriber is a natural person, he or she is over 21 years of age.

21. The Subscriber has full right, power and authority to execute and deliver this Agreement and the LPA and all related documents, has duly and validly executed this Agreement, the LPA and all related documents, and has full right, power and authority to perform its obligations under this Agreement, the LPA and all related documents. This Agreement, the LPA and all related documents constitute a valid and binding obligation of the Subscriber. The execution and performance of this Agreement, the LPA and related documents by the Subscriber does not and will not violate any statute, regulation, law, order, writ, injunction, judgment, decree, agreement or controlling document to which the Subscriber is a party or that is otherwise specifically applicable to the Subscriber, or require any authorization or approval under any of the foregoing.

22. If the Subscriber is not a natural person, it represents that: (i) it is duly organized, validly existing and in good standing under the laws of the jurisdiction in which it has been formed; (ii) the execution and delivery of this Agreement, the LPA and related documents by the Subscriber has been duly authorized by all necessary action on the part of its officers, directors, stockholders, partners, trustees and custodians, and will not violate any agreement to which the Subscriber is a party; (iii) the individual executing and delivering this Agreement, the LPA and related documents has the requisite right, power, capacity and authority to do so on behalf of the Subscriber; (iv) it has its principal place of business at the address provided above, and (v) it has not been formed for the specific purpose of acquiring the Units and has substantial assets in addition to the funds to be used to purchase the Units. In addition, the execution and performance of this Agreement, the LPA and related documents by the Subscriber will not result in a breach of any of the terms, conditions or provisions of, or constitute a default under, any of its organizational instruments.

23. If the Subscriber is not a natural person, (i) it has or will have substantial business activities or investments other than its investment in the Company and was not specifically formed for the purpose of purchasing Units; (ii) less than 40% of its assets will be invested in the Company; (iii) its governing documents and its practice provide that its investment decisions are based on its investment objectives and its owners generally, not on the particular investment objectives of any one or more of its owners; and (iv) its governing documents and its practice provide that the participation of each owner of the Subscriber in each investment made by the Subscriber is based on the owners' ownership percentages or on some other allocation provision that (A) does not result in varying levels of participation among owners based on the nature, amount or other characteristics of a particular investment; and (B) cannot be varied for particular investments made by the Subscriber as a result of any election or other decision by any such owner in connection with a particular investment, any exercise of judgment or discretion made by the Subscriber's investment decision-maker(s) in connection with a particular investment, or any other reason.

24. The Subscriber acknowledges and agrees that it may not cancel, terminate or revoke this Agreement or any agreement made by the Subscriber under this Agreement, and that this Agreement and any agreements of the Subscriber under this Agreement and the LPA will survive the death, disability or legal incapacity of the Subscriber and shall be binding upon and inure to the benefit of the Company and GPB. If the Subscriber is more than one person, the obligations of each Subscriber under this Agreement and the LPA will be joint and several and the agreements, representations, warranties, acknowledgments and agreements contained in this

Agreement and LPA will be deemed to be made by and be binding upon each Subscriber and its heirs, executors, administrators, successors and legal representatives.

25. The Subscriber understands that, under the circumstances described in the LPA, GPB may (i) require a Unit holder to transfer its Units (ii) compulsorily redeem an LP's Units, or (iii) sell an LP's Units on its behalf.

26. For the Units to be acquired by Subscriber by this Agreement, Subscriber hereby irrevocably constitutes and appoints GPB the true and lawful attorney-in-fact of Subscriber in Subscriber's name, place and stead (i) to make, execute, acknowledge, deliver and file any of the following documents: (a) the LPA and all documents permitted to be executed thereunder, and (b) to the extent consistent with the provisions of the LPA: (I) all amendments or restatements of the LPA adopted in accordance with its provisions and (II) all documents that may be required to effect the continuation, winding up or termination of the Company under the LPA and the cancellation of the Company's Certificate of Formation, the admission of an additional or substituted LP and (ii) to take any such other action as may be necessary in connection with any aspect of the operations and activities of the Company by giving GPB full power and authority to do and perform each and every act and thing whatever required and necessary to be done in and about the foregoing as fully as the undersigned might or could do if personally present, and hereby ratifies and confirms all that GPB will lawfully do or cause to be done by virtue thereof.

This foregoing power of attorney is coupled with an interest, is irrevocable and shall survive and be unaffected by (x) any subsequent disability or incapacity of Subscriber or, if Subscriber is not a natural person, the dissolution or termination of Subscriber or (y) an assignment by the Subscriber of his, her or its Units except that, where the assignee of all Units owned by a Limited Partner has been approved by GPB for admission to the Company as a substituted LP, the special power of attorney shall survive such assignment for the sole purpose of enabling GPB to execute, acknowledge and file any instrument or document necessary to effect such substitution .

27. The Subscriber agrees to indemnify and hold harmless the Company, GPB and each member, officer, director, manager, employee and agent of the Company, GPB and any person who controls the Company, as defined in 1933 Act §15, against any loss, liability, claim, damage, cost and expense whatsoever (including any and all expenses reasonably incurred in investigating, preparing or defending against any litigation commenced or threatened or any claim whatsoever) arising out of or based upon any false or incorrect representation, warranty or acknowledgment of the Subscriber or any failure by the Subscriber to comply with any covenant or agreement, made by the Subscriber in this Agreement, the LPA or in any other document furnished by the Subscriber to any of the foregoing persons in connection with this subscription or the sale to it of all or part of the Units.

28. Each provision of this Agreement is intended to be severable from every other provision, and the invalidity or illegality of any part of this Agreement will not affect the validity or legality of the remainder of this Agreement.

29. This Agreement may be executed in counterpart copies, each of which will be considered an original and all of which together shall constitute one and the same instrument binding on the parties, notwithstanding that the parties are not signatories to the same counterpart.

30. Under penalties of perjury, the Subscriber certifies that:

(a) the number shown above is its correct taxpayer identification number; and

(b) it is not subject to backup withholding because (i) it is exempt from backup withholding, (ii) it has not been notified by the Internal Revenue Service (the "IRS") that it is subject to backup withholding as a result of a failure to report all interest or dividends, or (iii) the IRS has notified the Subscriber that he, she or it is no longer subject to backup withholding.

31. As part of any responsibility of the Company or GPB to prevent money laundering, Subscriber has completed all applicable sections of pages 1 through 4 of the Agreement. Depending upon a Subscriber's status, the Company or GPB may require a detailed verification of its identity and the source of payment. The Company and GPB reserve the right to request information to verify a Subscriber's identity and the source of the Subscriber's subscription payment and other information. If a Subscriber delays or fails to produce any information required for verification, the Company or GPB may refuse to accept its subscription application and subscription monies or may refuse to honor a withdrawal request, until the proper information is provided, or may require mandatory withdrawals. If the Company or GPB suspects that a Subscriber is engaged in money laundering activities or is involved with terrorism or terrorist property, it will report its suspicions to the appropriate regulatory authorities.

32. Each Subscriber is required to make such representations to the Company and GPB as the Company or GPB may require in connection with applicable anti-money laundering programs, including representations that the Subscriber is not a prohibited country, territory, individual or entity listed on the U.S. Department of Treasury's Office of Foreign Assets Control ("OFAC")

V 2

website, and that it is not directly or indirectly affiliated with any country, territory, individual or entity named on an OFAC list or prohibited by any OFAC sanctions programs. Subscriber represents to the Company and GPB that amounts contributed by it to the Company were not directly or indirectly derived from activities that may contravene U.S. Federal, state or international laws and regulations, including any applicable anti-money laundering laws and regulations.

33. GPB or the Company also may suspend any payments of any withdrawal proceeds to a Subscriber if GPB or the Company considers it necessary to comply with any anti-money laundering laws or regulations applicable to the Company or GPB, or any one or more of their affiliates or service providers. The Subscriber will have no claim whatsoever against the Company or GPB for any form of losses or other damages incurred as a result of any action taken under this Agreement or otherwise taken in connection with anti-money laundering laws, regulations or programs.

34. All of the information that the Subscriber has furnished to the Company and GPB in connection with this Agreement or the LPA or which is included in either of such documents is correct and complete as of the date of this Agreement or, if provided thereafter, as of that later date and will be true and correct on the date that the Units are issued to the Subscriber and will continue to be true, correct and complete thereafter. If there should be any material change to that information, the Subscriber will immediately furnish revised or corrected information to the Company and GPB.

35. The Subscriber agrees to hold the Memorandum and its exhibits in confidence. The Memorandum is strictly for the Subscriber's use and is not to be redistributed or reduplicated by the Subscriber.

36. The Subscriber agrees not to transfer or assign this Agreement, or any interest in this Agreement, and agrees that any purported transfer will be void.

37. All agreements, representations and warranties contained herein or made in writing by or on behalf of the Company in connection with the transactions contemplated by this Agreement will survive the execution and delivery of this Agreement, any investigation at any time made by the Subscriber or on the Subscriber's behalf, and the sale and purchase of the Subscriber's Units in the Company and payment therefor.

38. This Agreement supersedes any previous subscription agreement executed by or on behalf of the Subscriber relating to Units, and any such previous agreement is rescinded and is of no further force and effect. The Subscriber understands that this Agreement and the LPA constitute the entire agreement between the parties thereto with respect to the subject matter thereof, that there are no representations, covenants or other agreements related to the subject matter thereof except as stated or referred to in this Agreement and the LPA, and that this Agreement may be amended only by a writing executed by both of its parties.

39. The parties hereto agree that they have been represented by counsel during the negotiation, preparation and execution of this Agreement and, therefore, waive the application of any law, regulation, holding or rule of construction providing that ambiguities in an agreement or other document will be construed against the party drafting such agreement or document.

40.

   (a) This Agreement will be enforced, governed and construed in all respects in accordance with the laws of the State of New York, without regard to that state's conflicts of law provisions.

   (b) Venue for any litigation arising out of, under, or in connection with this Agreement will lie in the state courts having jurisdiction over such matters located in New York County, New York.

   (c) THE SUBSCRIBER KNOWINGLY, VOLUNTARILY AND INTENTIONALLY WAIVES ANY RIGHT IT MAY HAVE TO A TRIAL BY JURY IN RESPECT OF ANY LITIGATION BASED ON THIS AGREEMENT, OR THE LPA OR ARISING OUT OF, UNDER OR IN CONNECTION WITH THIS AGREEMENT, THE LPA OR ANY OTHER AGREEMENT CONTEMPLATED TO BE EXECUTED IN CONJUNCTION THEREWITH OR ANY COURSE OF CONDUCT, COURSE OF DEALING, STATEMENTS (WHETHER VERBAL OR WRITTEN) OR OTHER ACTIONS OF EITHER PARTY RELATED TO THIS AGREEMENT OR THE LPA.

   THIS PROVISION IS A MATERIAL INDUCEMENT FOR THE COMPANY TO ACCEPT THIS AGREEMENT.

**[This space intentionally left blank]**

### Agreement Signature Page

The undersigned hereby represents, agrees and certifies that (i) the undersigned has carefully read and understands the Memorandum, Agreement and the LPA, and (ii) the execution of this signature page constitutes the execution of, and agreement to be bound by all the provisions of, the Agreement and the LPA. This page will serve as counterpart signature pages to both the Agreement and the LPA.

**IN WITNESS WHEREOF**, the Subscriber(s) has/have executed (or caused to be executed on its/their behalf) this Agreement this _____ day of _____ 201__.

**PPM Dated** _____

---

**SUBSTITUTE IRS FORM W-9 CERTIFICATION**

I (we) declare that the information supplied in this subscription agreement is true and correct and may be relied upon by the Company in connection with my (our) investment in the Company. Under penalties of perjury, each investor signing below certifies that (1) the number shown in the Investor Social Security Number/ Taxpayer Identification Number field in Section 1 of this form is my correct taxpayer identification number (or I am waiting for a number to be issued to me), and (2) I am not subject to backup withholding because (a) I am exempt from backup withholding, or (b) I have not been notified by the Internal Revenue Service (IRS) that I am subject to backup withholding as a result of a failure to report all interest or dividends, or (c) the IRS has notified me that I am no longer subject to backup withholding, (3) I am a U.S. person (including a non-resident alien, and (4) the FATCA code entered on this form (if any) indicating that the payee is exempt from FACTA reporting is correct.  Item 4 is not being collected therefore does not apply. **NOTE: You must cross out item (2) above if you have been notified by the IRS that you are currently subject to backup withholding because you have failed to report all interest and dividends on your tax return.** The Internal Revenue Service does not require your consent to any provision of this document other than this certification, which is required to avoid backup withholding.

---

**For an Individual or Joint Subscriber who is a Natural Person (Including IRA Owner):**

_____   _____
(Signature)                                          (Signature of Joint Subscriber, if any)

_____   _____
Print Name                                           Print Name of Joint Subscriber

**For a Subscriber that is an Entity:**

_____   _____
(Print Name of Entity)                            *If Applicable*

_____   _____
Signature By:                                         Signature By:

_____   _____
Printed Name:                                         Printed Name:

_____   _____
Title:                                                      Title:

_____
Address (if different than Section 1)

_____

_____
City                State              Zip

| Custodian Approval |
|---|
|  |

**For IRA/CRT/Custodial Accounts:**

Custodian Name   _____

Account#           _____

V 2

## DISTRIBUTIONS/DIVIDENDS

**Distributions:**

**Distributions for investments in the Company will be sent as directed below.**

☐   Distribution payment sent to the person(s) or entity listed above under *Section 1 Subscriber Information*

☐   Distribution payment sent to a **different** address than the one listed under *Section 1 Subscriber Information*

Name:
_____

Address:
_____

_____

☐   Distribution payment sent to a Brokerage Account

Name:
_____

Address:
_____

Account Number:
_____

☐   Distribution payment sent via ACH

Bank Name:
_____

Routing Number:
_____

Account Number:
_____

☐   Distribution payment sent to a custodian-held account (i.e. IRAs). Distributions will be sent to the brokerage account from which funds were invested and position is held

**GPB Holdings II, LP**

**NOTICE TO PROSPECTIVE INVESTORS REGARDING COMPLIANCE WITH ANTI-MONEY LAUNDERING REGULATIONS**

To ensure compliance with statutory and other generally accepted principles relating to anti-money laundering, GPB may, in its sole discretion, require written verification ("Anti-Money Laundering Compliance Documents") of identity from any person that submits completed Subscription Documents to the Company prior to accepting such subscription. Depending on the circumstances of each proposed subscription, a detailed verification may not be required if: (i) the investor is a recognized financial institution; or (ii) the investor makes the payment from an account held in the investor's name at a recognized financial institution. These exceptions will only apply if the financial institution referred to above is within a country recognized as having sufficient anti-money laundering regulations, such as a member state of the European Union that is subject to the EC Money Laundering Directive or one of the countries that make up the Financial Action Task Force ("FATF") and that is subject to the FATF recommendations.

To verify the identity of Subscriber(s) in the Company, please provide each of the following Verification Documents (as applicable):

If an individual please provide:

☐  A copy of a government-issued photo ID (*e.g.*, a driver's license or passport) of the individual.

If an entity please provide:

☐  A copy of a government-issued photo ID (*e.g.*, a driver's license or passport) of the authorized signatory;

☐  The entity's banking information relating to the bank from which the funds are to be wired to and from your account (including name, physical address, telephone number, bank account number and a contact at the bank);

☐  Evidence of the entity's existence (*e.g.*, a certified copy of the entity's organizational documents or a Certificate of Good Standing from the jurisdiction of organization); and

☐  A written representation that the entity has anti-money laundering policies and procedures in place and that these are applied on a consistent basis.

GPB reserves the right to request such additional information as is necessary to verify the identity of any person attempting to subscribe to the Company. Pending the provision of evidence satisfactory to GPB as to identity, the closing of a sale of Units to such person may be delayed at the absolute discretion of GPB. If within a reasonable period of time following a request for verification of identity, GPB has not received evidence satisfactory to it in its sole discretion, it may refuse to accept the proposed subscription, in which event all subscription monies will be returned without interest to the account from which such monies were originally debited. Subscription monies also may be rejected by GPB if the remitting bank or financial institution is unknown to GPB.