# UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF TEXAS
### AUSTIN DIVISION

KINNIE MA INDIVIDUAL RETIREMENT
ACCOUNT, GRACEMARIE BOLAND, DEAN
CROOKS, CORRI RENE EDEN, JEFFERY S.
GRAMM INDIVIDUAL RETIREMENT
ACCOUNT, STACY GREASOR INDIVIDUAL
RETIREMENT ACCOUNT, CATHERINE
KOMINOS, KAREN LOCH, ROBERT A. STONE
LIVING TRUST, SHIRLEY STONE LIVING
TRUST, AND VICTOR WADE INDIVIDUAL
RETIREMENT ACCOUNT, individually and on
behalf of all others similarly situated,

        Plaintiffs,

    v.

ASCENDANT CAPITAL, LLC, *et al.*,

        Defendants.

CASE NO. 1:19-CV-01050-LY

**PLAINTIFFS' BRIEF IN OPPOSITION TO DEFENDANTS' MOTIONS TO DISMISS
THE SECOND AMENDED COMPLAINT PURSUANT TO FED. R. CIV. P. 12(B)(1),
(B)(2), (B)(6), 9(B), AND 8(a)**

## MOTIONS TO DISMISS TO WHICH PLAINTIFFS'
## BRIEF IN OPPOSITION RESPONDS

1. Docket No. 669
   a. Movant: United Planners Financial Services of America, LLC
   b. Pursuant to: Fed. R. Civ. P. 12(b)(6)

2. Docket No. 685
   a. Movants: Advisory Group Equity Services, LTD.; Aegis Capital Corp.; Aeon Capital, Inc.; American Capital Partners, LLC; Arete Wealth Management LLC; Arkadios Capital; Ausdal Financial Partners, Inc.; BCG Securities, Inc.; Cabot Lodge Securities, LLC; Calton & Associates, Inc.; Capital Investment Group, Inc.; Cascade Financial Management, Inc.; Center Street Securities, Inc.; Coastal Equities, Inc.; Colorado Financial Services Corporation; Concorde Investment Services, LLC; Crown Capital Securities, LP; DAI Securities, LLC; David A. Noyes & Company (n/k/a Sanctuary Wealth Group, LLC); Dawson James Securities, Inc.; Dempsey Lord Smith, LLC; Detalus Securities, LLC; DFPG Investments, LLC; Emerson Equity LLC; FSC Securities Corporation; Geneos Wealth Management, Inc.; Great Point Capital LLC; Hightower Securities, LLC; IBN Financial Services, LLC; Innovation Partners LLC; International Assets Advisory, LLC; Kalos Capital, Inc.; Kingsbury Capital, Inc.; Landolt Securities, Inc.; Lion Street Financial, LLC; Lowell & Company, Inc.; Lucia Securities LLC; Madison Avenue Securities, LLC; McDonald Partners LLC; McNally Financial Services Corporation; Moloney Securities Co., Inc.; Money Concepts Capital Corporation; MSC-BD-LLC LTD; Newbridge Securities Corporation; Orchard Securities, LLC; Purshe Kaplan Sterling Investments, Inc.; Royal Alliance Associates, Inc.; Sagepoint Financial, Inc.; SCF Securities, Inc.; Sentinus Securities LLC n/k/a Sentinus Halo Securities, LLC; Stephen A. Kohn & Associates, LTD; Titan Securities; Triad Advisors LLC; Uhlmann Price Securities, LLC; United Planners Financial Services of America, LLC; Vanderbilt Securities; Vestech Securities, Inc.; Western International Securities; Westpark Capital Inc.; Whitehall Parker Securities; and Woodbury Financial Services, Inc.
   b. Pursuant to: Fed. R. Civ. P. 12(b)(6), 9(b), and 8(a)

3. Docket No. 687
   a. Movant: Bradley Wealth Management
   b. Pursuant to: Fed. R. Civ. P. 12(b)(2)

4. Docket No. 691
   a. Movant: Margolin, Winer & Evens LLP
   b. Pursuant to: Fed. R. Civ. P. 12(b)(2) and 12(b)(3)

5. Docket No. 692
   a. Movant: WithumSmith + Brown, PC
   b. Pursuant to: Fed. R. Civ. P. 12(b)(2)

6. Docket No. 693

a. Movant: EisnerAmper LLP
b. Pursuant to: FNC and Fed. R. Civ. P. 12(b)(2) and 12(b)(6)

7. Docket No. 694
   a. Movants: Ascendant Capital; Ascendant Alternative Strategies; DJ Partners; MR Ranger; Jeffry Schneider; and Mark D. Martino
   b. Pursuant to: Fed. R. Civ. P. 9(b), 12(b)(1), 12(b)(2), and 12(b)(6)

8. Docket No. 696
   a. Movant: CohnReznick LLP
   b. Pursuant to: FNC and Fed. R. Civ. P. 12(b)(2)

9. Docket No. 699
   a. Movant: David Gentile
   b. Pursuant to: Fed. R. Civ. P. 12(b)(6) and 9(b)

10. Docket No. 701
    a. Movant: Phoenix American Financial Services, Inc.
    b. Pursuant to: Fed. R. Civ. P. 12(b)(1)–12(b)(3), 12(b)(6), and 9(b)

11. Docket No. 702
    a. Movant: Gentile, Pismeny & Brengel, LLP
    b. Pursuant to: FNC and Fed. R. Civ. P. 12(b)(2), 12(b)(3), and 12(b)(6)

12. Docket No. 703
    a. Movant: Morrison, Brown, Argiz & Farra
    b. Pursuant to: Fed. R. Civ. P. 12(b)(1), 12(b)(2), and 12(b)(6)

13. Docket No. 705
    a. Movant: Deloitte Transactions and Business Analytics LLP
    b. Pursuant to: Fed. R. Civ. P. 12(b)(6)

14. Docket No. 707
    a. Movants: RSM; Crowe; CohnReznick; and WithumSmith + Brown
    b. Pursuant to: Fed. R. Civ. P. 12(b)(6) and 9(b)

15. Docket No. 708
    a. Movant: Hightower Advisors, LLC
    b. Pursuant to: FNC and Fed. R. Civ. P. 12(b)(6), 9(b), and 8(a)

16. Docket No. 709
    a. Movant: Axiom Capital Management, Inc.
    b. Pursuant to: Fed. R. Civ. P. 12(b)(6) and 9(b)

# TABLE OF CONTENTS

I.      INTRODUCTION ...................................................................................................1

II.     PRELIMINARY STATEMENT ...........................................................................2

III.    FACTUAL BACKGROUND ...............................................................................12

        A.      The Second Amended Complaint........................................................12

        B.      The Offerings.......................................................................................13

        C.      The GPB Ponzi Scheme: GPB/Ascendant's Material Misrepresentations and Omissions ...........................................................................................15

        D.      GPB's Unregistered Integrated Public Offering and Failure to Register Under Texas Law ......................................................................................21

        E.      The Aiders and Abettors Possessed the Requisite General Awareness/Knowledge and Recklessly Disregarded the Facts and Legal Standards..................................22

        1.      The Broker Defendants Possessed the Requisite Knowledge ..............22

        2.      Fund Administrator Phoenix Had the Requisite Knowledge ................24

        3.      The Auditor Defendants and Valuation Defendants Had the Requisite Knowledge ...........................................................................................26

ARGUMENT ...................................................................................................................28

I.      LEGAL STANDARDS........................................................................................28

II.     PLAINTIFFS ARE NOT REQUIRED TO PLEAD WITH PARTICULARITY; AND EVEN IF THEY ARE, PLAINTIFFS HAVE CLEARLY DONE SO. ...........................29

        A.      Rule 9(b) Does Not Apply to Most of the Claims Pled, But Only to the Claims Pled Under TSA Section 33(A)(2) and Fraud, and Even as to Those Claims the Standard Is Relaxed Here. ......................................................................32

        B.      Fraud is Pled With Particularity as to those Claims Requiring It..........37

                1.      GPB, The Funds, and Ascendant Capital ..................................41

                2.      GPB Affiliated Defendants........................................................41

        3.      Broker Defendants ...............................................................................42

                4.      Individual Defendants Gentile, Schneider, Martino ..................43

        5.      Phoenix .................................................................................................43

        6.      Auditor Defendants and Valuation Defendants....................................44

        7.      Valuation Defendants ...........................................................................46

        8.      Gentile Pismeny....................................................................................46

        C.      Defendants Rule 9(b) Arguments Are Flawed. ....................................47

        D.      The Group Pleading Doctrine Has No Application To This Action. ....51

III.    DEFENDANTS' CHALLENGES TO THE WELL PLED TSA CLAIMS ARE MERITLESS .........................................................................................................55

        A.      TSA Must Be Broadly Construed........................................................55

B.  The TSA Applies Extraterritorially ...........................................................55

C.  Plaintiffs Have Properly Alleged Privity with the Primary Violators; No Privity is Required To Assert Claims Against Aiders and Abettors....................................59

D.  Broker Defendants' Standing Arguments are Meritless.......................................62

IV.  PLAINTIFFS HAVE PROPERLY PLED AIDER AND ABETTOR CLAIMS UNDER THE TSA.....................................................................................................66

A.  General Awareness. ....................................................................................66

B.  Facts Pled Showing General Awareness and Reckless Disregard .......................68

C.  Each Of The Defendants Substantially Assisted In The Primary Violation Of The TSA..............................................................................................................73

D.  Phoenix's challenge to Plaintiffs' substantial assistance allegations is also misguided. ..................................................................................................77

E.  The Auditors' Conduct Satisfies the Substantial Assistance Requirement. ..........78

V.  THE SAC ADEQUATELY ALLEGES TSA CLAIMS FOR CONTROL PERSON LIABILITY (COUNTS III AND VI) ..................................................................79

VI.  THE SUBSCRIPTION AGREEMENT CHOICE OF LAW PROVISION DOES NOT APPLY TO PLAINTIFFS' CLAIMS HERE ..................................................81

A.  The Narrow Language Contained in The Subscription Agreement Does Not Control the Choice of Law Here, and, In Any Event, Is not Available to Third Parties to the Agreement. ..............................................................................83

B.  The Court Should Not Determine the Choice of Law Applicable to Absent Class Members on This Motion. .............................................................................86

C.  Texas Has the Most Significant Relationship with the Claims Asserted; ............87

D.  In Any Event, There Is No Conflict Between Texas and New York Law. ..........91

VII.  PERSONAL JURISDICTION ...........................................................................93

A.  Standard on the Motion ...............................................................................93

B.  This Court May Exercise Specific Personal Jurisdiction Over Defendants. ........95

1.  Phoenix ....................................................................................................97

2.  Auditor Defendants ..................................................................................103

3.  CohnReznick (Dkt. 696 at 4-10) ................................................................104

4.  Margolin (Dkt. 691 at 6-11) ......................................................................105

5.  EisnerAmper (Dkt. 693 at 6-9).................................................................106

6.  Withum (Dkt. 692 at 2, 9-11) ...................................................................107

7.  Valuation Defendant MBAF (703 at 2-13) .................................................107

8.  GPB Accountant Gentile Pismeny (Dkt. 702 at 4-8) ....................................108

9.  MR Ranger & DJ Partners (Dkt. 694 at 7-9)...............................................109

10.  Bradley Wealth (Dkt. 687 at 6-8) ..............................................................110

VIII.    SUBJECT MATTER JURISDICTION ........................................................................111

IX.      PLAINTIFFS' CLAIMS ARE NOT PREEMPTED OR PRECLUDED BY NSMIA OR
         SLUSA ....................................................................................................................113

X.       PLAINTIFFS ADEQUATELY PLED TUFTA CLAIMS. ...........................................118

XI.      THE SAC PROPERLY PLEADS COMMON LAW CLAIMS FOR FRAUD,
         NEGLIGENCE AND FIDUCIARY DUTY ..................................................................124

         A.    Fraud ...............................................................................................................124

         B.    Negligence .......................................................................................................127

XII.     GPB'S CONTENTION THAT IT HAD NO FIDUCIARY DUTY TO PURCHASERS
         OF GPB SECURITIES IS WRONG. ..........................................................................131

XIII.    THE SAC ADEQUATELY PLEADS THE CLAIMS FOR AIDING AND ABETTING
         COMMON-LAW TORTS. ..........................................................................................134

         A.    Texas Law Recognizes These Causes of Action. ..............................................135

         B.    The SAC Adequately Pleads a Claim for Aiding and Abetting Fraud Against All
               Named Defendants Herein. ...............................................................................136

         C.    The SAC Adequately Pleads a Claim for Aiding and Abetting Breach of Fiduciary
               Duty. ...............................................................................................................137

XIV.     PLAINTIFFS' CLAIMS ARE TIMELY. ....................................................................137

         A.    The TSA Claims ...............................................................................................138

         B.    Negligence .......................................................................................................141

         C.    TSA and TUFTA Class Claims ........................................................................143

XV.      CONCLUSION..........................................................................................................144

**Cases**

*Adams v. Kinder-Morgan, Inc.*,
 340 F.3d 1083 (10th Cir. 2003), *as amended on denial of reh'g* (Aug. 29, 2003)...................52

*Aegis Ins. Holding Co., L.P. v. Gaiser*,
 No. 04-05-00938-CV, 2007 WL 906328 (Tex. App. Mar. 28, 2008) ......................................61

*Alaska Elec. Pension Fund v. Asar*,
 768 F. App'x 175 (5th Cir. 2019) ...........................................................................................58

*Am. In re Am. Int'l Grp., Inc. 2008 Sec. Litig.*,
 741 F. Supp. 2d 511 (S.D.N.Y. 2010) ....................................................................................57

*Anegada Master Fund, Ltd. v. PXRE Group Ltd.*,
 680 F. Supp. 2d 616 (S.D.N.Y. 2010) ....................................................................................42

*Anheuser-Busch Companies, Inc. v. Summit Coffee Co.*,
 934 S.W.2d 705 (Tex. App. 1996), *writ dismissed by agreement* (Oct. 24, 1996) ..................61

*Ashcroft v. Iqbal*,
 556 U.S. 662 (2009) ...............................................................................................................29

*B Choice Ltd. v. Epicentre Dev. Assocs. LLC*,
 No. 4:14-cv-2096, 2015 WL 4586719 (S.D.Tex. 2015), *report and recommendation adopted
 sub nom. B. Choice Ltd. v. EpiCentre Dev. Assocs., LLC*, No. 14-cv-2096, 2015 WL 4128936
 (S.D. Tex. July 7, 2015) .........................................................................................................35

*In re Banco Bradesco S.A. Sec. Litig.*,
 277 F. Supp. 3d 600 (S.D.N.Y. 2017) ....................................................................................56

*Baron v. Strassner*,
 7 F. Supp. 2d 871 (S.D. Tex. 1998).....................................................................................62, 63

*Batson v. RIM San Antonio Acquisition, LLC*,
 No. 15-cv-07576, 2018 WL 1581675 (S.D.N.Y. Mar. 27, 2018) ...........................................67

*Broyles v. Commonwealth Advisors, Inc.*,
 936 F.3d 324, 326 (5th Cir. 2019) ..........................................................................................70

BSG Clearing Solutions, N. Am., L.L.C. v. McKay,
 No. 5:17-cv-57, 2017 WL 11207327 (W.D. Tex., Oct. 4, 2017), *report and recommendation
 adopted*, No. 17-cv-57, 2017 WL 11207328 (W.D. Tex. Oct. 24, 2017) ...............................33

*Chrysler Capital Corp. v. Century Power Corp.*,
 No. 91-cv-1937, 1992 WL 163006 (S.D.N.Y. June 24, 1992), *adhered to on reargument*, 800
 F. Supp. 1189 (S.D.N.Y. 1992) ..............................................................................................13

*Citizens Ins. Co. of Am. v. Daccach*,
   217 S.W.3d 430 (Tex. 2007) ...................................................................................62, 66

*City of Driscoll, Texas v. Saenz*,
   No. 2:06-cv-543, 2007 WL 173232 (S.D. Tex. 2007). ............................................36

*Coates v. Heartland Wireless Comms., Inc.*,
   26 F. Supp. 2d 910 (N.D. Tex. 1998) ................................................................53, 58

*Concha v. London*,
   62 F.3d 1493 (9th Cir, 1995) .................................................................................37

*Contractors Source, Inc. v. SI Geosolutions*,
   No. 4:04-cv-2054, 2005 WL 8164832 (S.D. Tex. Apr. 5, 2005) .............................54

*Cortec Indus., Inc. v. Sum Holding L.P.*,
   949 F.2d 42 (2d Cir. 1991) .......................................................................................43

*In re Countrywide Fin. Corp. Mortg.-Backed Sec. Litig.*,
   No. 2:11-cv-10414, 2012 WL 1322884 (C.D. Cal. Apr. 16, 2012) .........................12

*Davis v. Bayless*,
   70 F.3d 367 (5th Cir.1995) .......................................................................................42

*DeAngelis v. Corzine*,
   17 F. Supp. 3d 270 (S.D.N.Y. 2014) ........................................................................56

*In re Deepwater Horizon*,
   753 F.3d 509, 513 (5th Cir. 2014) ...........................................................................70

*Del Castillo v. PMI Holdings N. Am. Inc*,
   No. 4:14-CV-03435, 2016 WL 3745953 (S.D. Tex. July 13, 2016) ........................54

*Emery v. Am. Gen. Fin., Inc.*,
   134 F.3d 1321 (7th Cir. 1998) .................................................................................37

*Energytec, Inc. v. Proctor*,
   516 F. Supp. 2d 660 (N.D. Tex. 2007) .....................................................................68

*Enntex Oil & Gas Co. (of Nev.) v. State*,
   560 S.W.2d 494 (Tex. App. 1977) ...........................................................................62

*In re Enron Corp. Sec., Derivative & ERISA Litig.*,
   235 F. Supp. 2d 549 (S.D. Tex. 2002).................................................................61, 63

*In re Enron Corp. Secs., Derivative ERISA Litig.*,
   761 F. Supp. 2d 504 (S.D. Tex. 2011).............................................................61, 63, 64

*Flaherty & Crumrine Preferred Income Fund, Inc. v. TXU Corp.*,
    565 F.3d 200 (5th Cir. 2009) ..................................................................53

*Frank v. Bear, Stearns & Co.*,
    11 S.W.3d 380, 384 (Tex.App.-Houston [14th Dist.] 2000) ....................................69

*GE Capital Commercial, Inc. v. Wright & Wright, Inc.*,
    No. 3:09-cv-572, 2009 WL 5173954 (N.D. Tex. 2009) ..........................................32

*Geodyne Energy Income Prod. Partnership I-E v. Newton Corp.*,
    97 S.W.3d 779 (Tex. App. 2003), *order withdrawn* (May 7, 2004), *rev'd in part*, 161 S.W.3d
    482 (Tex. 2005) ...............................................................................62

*George v. Urban Settlement Servs.*,
    833 F.3d 1242 (10th Cir. 2016) ..............................................................38

*Halprin v. Fed. Deposit Ins. Corp.*,
    No. 5:13-cv-1042, 2016 WL 5718021 (W.D. Tex. Sept. 30, 2016) .............................37

*Hatteras Enters. Inc. v. Forsythe Cosmetic Grp., Ltd.*,
    No. 2:15-cv-05887 (ADS) (ARL), 2018 WL 1935984 (E.D.N.Y. Apr. 23, 2018) .................13

*Highland Capital Mgmt., L.P. v. Ryder Scott Co.*,
    402 S.W.3d 719 (Tex. App. 2012). ........................................................69, 70

*Indiana Bell Tel. Co. Inc. v. Lovelady*,
    No. SA-05-CA-285-RF, 2006 WL 485305 (W.D. Tex. Jan. 11, 2006) ...........................32

*Janvey v. Alguire*,
    846 F. Supp. 2d 662 (N.D. Tex. 2011) ...................................................32, 33

*Janvey v. Maldonado*,
    No. 3:14-cv-2826, 2015 WL 1428612 (N.D. Tex. Feb. 19, 2015) .............................36

*JTS Corp. v. GFL Advantage Fund Ltd.*,
    No. 98-cv-497, 1999 WL 731606 (S.D.N.Y. Sept. 20, 1999) .................................43

*Jyue Hwa Fu v. Yeh Chin Chin*,
    No. 3:18-cv-2066, 2020 WL 4296360 (N.D. Tex. May 6, 2020), *report and recommendation
    adopted*, No. 3:18-cv-2066, 2020 WL 4287590 (N.D. Tex. July 27, 2020) ...................36

*Kubbernus v. ECAL Partners, Ltd.*,
    574 S.W.3d 444 (Tex. App. 2018) .....................................................61, 62, 63

*Leal v. McHugh*,
    731 F.3d 405 (5th Cir. 2013) ...............................................................29

*Lemmer v. Nu-Kote Holding, Inc.*,
No. 398-C-0161, 2001 WL 1112577 (N.D. Tex. Sept. 6, 2001), *aff'd*, 71 F. App'x 356 (5th Cir. 2003)..................................................................................................42

*Life Partners Creditors' Tr. v. Black Diamond Lifeplan Fund*,
No. 4:17-cv-00225, 2017 WL 9934885 (N.D. Tex. Nov. 27, 2017)...................35, 38

*Local 731 I.B. of T. Excavators & Pavers Pension Tr. Fund v. Diodes, Inc.*,
810 F.3d 951 (5th Cir. 2016) ......................................................................................52

*Lone Star Ladies Inv. Club v. Schlotzsky's Inc.*,
238 F.3d 363 (5th Cir 2002)..................................................................................35, 39

*Lorley Fin. (Jersey) No. 3 Ltd. v. Wells Fargo Securities, LLC*,
797 F.3d 160 (2d Cir. 2015) .......................................................................................43

*Lovelace v. Software Spectrum, Inc.*,
78 F.3d 1015, (5th Cir. 1996) .....................................................................................42

*Luce v. Edelstein*,
802 F.2d 49 (2d Cir. 1986) .........................................................................................43

*Lujan v. Defenders of Wildlife*,
504 U.S. 555 (1992) ..............................................................................................70, 71

*Moore v. Kayport Package Express, Inc.*,
885 F.2d 531 (9th Cir. 1989) ................................................................................37, 56

Moore v. Payson Petroleum Grayson, LLC,
No. 3:17-cv-1436, 2018 WL 793800 (N.D. Tex. Jan. 22, 2018) (Ramirez, Mag.), *report and recommendation adopted*, No. 3:17-cv-1436, 2018 WL 776577 (N.D. Tex. Feb. 8, 2018). ....55

*Official Stanford Invs. Committee v. Greenberg Traurig, LLP*,
No. 3:12-cv-4641, 2015 WL 13741905 (N.D. Tex. Feb. 4, 2015)..........................34

*Ouaknine v. MacFarlane*,
897 F.2d 75 (2d Cir. 1990) ...................................................................................10, 43

*Owens v. Jastrow*,
789 F.3d 529 (5th Cir. 2015) ...........................................................................52, 57, 58

*Physicians ACO, LLC v. Computer Scis. Corp., et. al.*,
No. 4:16-cv-1293, 2018 WL 1172653 (S.D. Tex. Mar. 5, 2018).............................38

*In re Pool Prod. Distribution Mkt. Antitrust Litig.*,
988 F. Supp. 2d 696 (E.D. La. 2013) ........................................................................40

*In re Primera Energy, LLC*,
    560 B.R. 448 (Bankr. W.D. Tex. 2016) ...........................................................29, 30

*Rangel v. Adtalem Global Educ., Inc.*,
    No. 18-cv-00082, 2019 WL 6828298 (W.D. Tex. Dec. 13, 2019)..........................37

*Ratner v. Sioux National Gas Corporation*,
    77- F.2d 512 (5th Cir. 1985)....................................................................................69

*Rio Grande Oil Co. v. The State of Texas*,
    539 S.W.2d 917 (Tex. App. 1976) ...........................................................................63

*Rotstain v. Trustmark Nat'l Bank*,
    No. 3:09-cv-2384, 2020 WL 1513516 (N.D. Tex. Mar. 30, 2020) ..........................33

*Rubenstein v. Neiman Marcus Grp. LLC*,
    687 F. App'x 564 (9th Cir. 2017)............................................................................37

*S.E.C. v. Couch*,
    No. 3:14-cv-1747, 2014 WL 7404127 (N.D. Tex. Dec. 31, 2014) ..........................55

*Silvercreek Mgmt., Inc. v. Citigroup, Inc.*,
    248 F. Supp. 3d 428 (S.D.N.Y. 2017) .............................................................12, 13

*Southland Sec. Corp. v. INSpire Ins. Sols., Inc.*,
    365 F.3d 353 (5th Cir. 2004)....................................................................................57

*St. Denis J. Villere & Co. v. Caprock Comms. Corp.*,
    No. 3:00-cv-1613, 2003 WL 21339286 (N.D. Tex. June 4, 2003) ..........................58

*Sterling Tr. Co. v. Adderley*,
    168 S.W.3d 835 (Tex. 2005) ....................................................................................67

*Stone v. Life Partners Holdings, Inc.*,
    26 F. Supp. 3d 575 (W.D. Tex. 2014) ......................................................................42

*Strong v. Cochran*,
    No. 2:14-cv-788, 2017 WL 4620984 (D. Utah Oct. 13, 2017) ................................43

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*,
    551 U.S. 308 (2007) .................................................................................................30

*Thompson v. City of Waco, Texas*,
    764 F.3d 500 (5th Cir. 2014)....................................................................................29

*Tigue Inv. Co., Ltd. v. Chase Bank of Tex., N.A.*,
    No. 3:03-cv-2490, 2004 WL 3170789 (N.D. Tex. Nov. 15, 2004)...............36, 54, 57

*Troice v. Willis of Colorado Inc.*,
No. 3:09-cv-1274, 2014 WL 12824741 (N.D. Tex. Dec. 15, 2014) ........................................63

*Turk v. Pershing LLC*,
No. 3:09-cv-2199, 2014 WL 12572906 (N.D. Tex. Dec. 8, 2014) ....................................67, 71

*U.S. Bank Nat. Ass'n v. Verizon Comms. Inc.*,
No. 3:10-cv-1842, 2012 WL 3100778 (N.D. Tex. July 31, 2012) ...........................................33

*U.S. ex rel. Chorches for Bankr. Estate of Fabula v. Am. Med. Response, Inc.*,
865 F.3d 71 (2d Cir. 2017) ...............................................................................11, 38, 40, 44

*U.S. ex rel. Integra Med Analytics, L.L.C. v. Baylor Scott & White Health*,
816 F. App'x 892 (5th Cir. 2020), *cert. denied sub nom. U.S. ex rel. Integra Med v. Baylor Scott*, No. 20-581, 2020 WL 7132371 (U.S. Dec. 7, 2020) ......................................................53

*U.S. ex rel. King v. Alcon Labs, Inc.*,
232 F.R.D. 568 (N.D. Tex. 2005).................................................................................11, 36, 39

*U.S. ex rel. Ramsey-Ledesma v. Censeo Health, L.L.C.*,
No. 3:14-cv-00118, 2016 WL 5661644 (N.D. Tex. Sept. 30, 2016).......................................55

*U.S. ex rel. Thompson v. Columbia/HCA Healthcare Corp.*,
125 F.3d 899 (5th Cir.1997), ...........................................................................................11, 36

*United States ex rel. Grubbs v. Kanneganti*,
565 F.3d 180 (5th Cir. 2009) ................................................................................................30

*Vess v Ciba-Geigy Corp. USA*,
317 F3d 1097 (9th Cir. 2003) ...............................................................................................39

*Wexner v. First Manhattan Co.*,
902 F.2d 169 (2d Cir. 1990). ................................................................................................11

*Williams v. Duke Energy Int'l, Inc.*,
681 F.3d 788 (6th Cir. 2012) ................................................................................................38

*Wing v. Horn*,
No. 2:09-cv-00342, 2009 WL 2843342 (D. Utah Aug. 28, 2009) ...........................................33

**Statutes**

15 U.S.C. § 78u-4 .....................................................................................................................52

15 U.S.C. § 78u-4(a)(1) ............................................................................................................53

7 Tex. Admin. Code § 101.1(c). ..........................................................................................63, 64

Tex. Rev. Civ. Stat. Ann. art. 581-1, *et seq* ..............................................................................3

Texas Administrative Code, 7 Tex. Admin. Code § 139.7(a). ................................................63, 64

**Rules**

Fed. R. Civ. P. 9(b)) ........................................................................................................10, 29, 37

Fed. R. Evid. 201 ........................................................................................................................38

## I.    INTRODUCTION

On February 4, 2021 eight separate Complaints and a criminal Indictment were filed against GPB, Ascendant, David Gentile and Jeffry Schneider by, respectively, the Securities Exchange Commission, and seven State Attorneys General, and the U.S. Department of Justice ("DOJ"). The Complaints and the Indictment contain overlapping allegations, all of which support the claims pled by Plaintiffs here, and which make clear that, as alleged, GPB was a multi-year Ponzi scheme, which sold limited partnerships pursuant to materially misleading Private Placement Memoranda ("PPM") and other materials.[1] The SEC Complaint (which appears to be the result of a multi-year investigation), like Plaintiffs' detailed Complaint, alleges the following:

1.      that GPB was a "Ponzi-like scheme" using investor funds to pay distributions back to investors;

2.      that "during the entire period – April 2014 through December 2018 – [Defendants] represented in marketing and in due diligence materials" that the distributions were 100% funded from operations" … based on cash flow from portfolio companies…";

3.      that GPB Capital, Ascendant Capital and Schneider failed to accurately disclose … acquisition fees;

4.      that GPB Funds commingled funds and capital that "exaggerated the strength of the 'borrowing' funds"; and

---

[1] This Court may take judicial notice of these filings and the complaint filed by the New Jersey Attorney General ("NJAG Cmplt.") for the reasons stated *infra* at note 12. In addition, Plaintiffs refer the Court to a Complaint filed by the State of Massachusetts ("Mass. Cmplt."), containing similar allegations, which is expressly referenced in Plaintiffs' Second Amended Complaint. All exhibits referenced herein (including the SEC Complaint, the DOJ Indictment, the NJAG Cmplt., as well as the Mass. Cmplt.) are attached as exhibits to the Linden Declaration ("Linden Decl."), filed contemporaneously herewith. All exhibits attached to that declaration are cited herein as "Ex._." Unless otherwise specified, this opposition employs the terms as defined in Plaintiffs' Second Amended Complaint. Dkt. 616.

5.     that certain of the GPB Funds violated the Securities Exchange Act of 1934 by failing to register under section 12(g) thereof.[2]

In sum, these government actions allege the same facts and similar claims to those pled by Plaintiffs, making clear that Plaintiffs' allegations are well pled.

## II.     PRELIMINARY STATEMENT

This action arises out of Defendants' improper and illegal conduct in selling and/or participating in the sale of interests in limited partnerships/funds ("GPB Funds" or "Funds") through integrated offerings (the "Offerings") issued by and at the direction of GPB Capital Holdings, LLC (hereinafter "GPB") (the General Partner of the Funds) and its alter ego, Austin-based Ascendant Capital, LLC ("Ascendant" or "Ascendant Capital"), an alternative asset management firm, which acted as the primary distribution agent or lead underwriter for such limited partnership interests.[3]

Plaintiffs' 200-plus page Second Amended Complaint ("SAC") sets forth in detail the story of one of the largest Ponzi schemes in Texas history.[4] It is the story of GPB and Ascendant's

---

[2] *See* Ex. B (SEC Complt.) Similar allegations are contained in the Mass. Complt. (Ex. A), DOJ Indictment (Ex. C), the NJAG Complt. (Ex. D).

[3] All of the defendants named herein are referred to collectively as "Defendants" and are listed on Appendix A, attached hereto.

[4] Certain Defendants mistakenly assert that Plaintiffs here simply assert the same claims as other outstanding and earlier class actions pending in other courts. Defendants are wrong on both counts. This action is different from the other class actions: it asserts claims not pled in the other class as against brokers, the Fund administrator, valuation agents, and auditors not named in such actions. Moreover, Plaintiffs' Complaint is far more detailed than these other actions, on behalf of a broader class of investors and against scores of defendants that are not named in other class action. Plaintiffs here assert no fewer than nine (9) types of material misrepresentations and omissions, most of which were not asserted in any of the other class actions. Indeed, the Broker Defendants and the Fund Administrator (Phoenix) named herein were not previously sued in any other action pending in other courts. Moreover, this action represents the earliest existing federal class action concerning the GPB Funds, and named Plaintiffs Wade and Loch asserted class claims against GPB before any other class action, state or federal. Wade and Loch voluntarily dismissed their
**[Footnote continued on next page]**

2

scheme to effect an unregistered public offering through materially misleading offering documents and to use the money raised to pay themselves and their co-conspirators unprecedented commissions and related fees, diverting customer invested monies from potential operating businesses. ¶¶ 10-13.[5]

As pled, the fraudulent Offerings of units in these GPB-sponsored Funds (hereinafter, "GPB Securities") violated Texas law in two separate and independent ways. *First*, Defendants, while engaged in a multi-year, integrated, unregistered public offering of the GPB Securities, knowingly made numerous misstatements and omissions of highly material facts in the Offering documents for the GPB Securities and repeated these and additional material misrepresentations and omissions throughout the course of the Offerings. ¶¶ 3, 19, 46, 129, 131, 214, 219, 284, 343. The GPB Defendants (GPB, the GPB Funds and Ascendant Capital), and their principals David Gentile and Jeffry Schneider were aided and abetted by the other Defendants, including numerous brokerage firms and/or registered investment advisers ("RIAs"), certain entities affiliated with GPB, the fund administrator, the auditors, GPB's accountants, and the valuation agents for the various GPB Funds.

*Second*, while GPB, Ascendant Capital and the other Defendants represented that the Offerings were exempt from registration under Regulation D of the Securities Act of 1933 (the "1933 Act") and its Rule 506, they were not. Each of the Defendants knew this. Instead, the multiple GPB/Ascendant Offerings of GPB Securities constituted a massive $1.8 billion unregistered public offering in violation of federal law, as well as Texas Securities Act (Tex. Rev. Civ. Stat. Ann. art. 581-1, *et seq.*) ("TSA") registration requirements. Here too, the GPB

_____

initial action, *Wade et al. v. GPB Capital Holdings, LLC, et al.*, No. 1:19-cv-7250 (S.D.N.Y. Aug. 2, 2019), to join this action.

[5] All references to the SAC, Dkt. 616, filed Nov. 9, 2020, are cited herein as "¶_."

Defendants were aided and abetted by the numerous brokerage firms and/or RIAs, the Funds' Administrator, the Funds' auditors, GPB's accountant, and the valuation agents for the various Funds that have been named as defendants in this action.

All of the claims pled as against the primary violators of the TSA and the related common law causes of action for negligence, fraud, and breach of fiduciary duty, as well as the claims pled as against the aiders and abettors of such violations, arise from the unregistered public offerings effected from Texas by Ascendant and GPB and from the material misstatements and material omissions made by Ascendant, GPB, and the more than 60 brokers dealers and RIAs (the "Broker Defendants") who distributed the GPB Securities. These Defendants employed false and misleading PPMs and related Offering materials, as well as other material misstatements and material omissions subsequent to the issuance of the relevant PPMs.

Plaintiffs' claims do not relate to GPB/Ascendant's, and their principals' improper business conduct in the operation of the GPB businesses. Instead, the claims relate to material misstatements and non-disclosures in connection with the Texas-based Offerings, as well the violation of Texas registration requirements based upon GPB/Ascendant's failure to register the relevant integrated Offerings under Texas law. However, GPB/Ascendant's improper and highly unusual business conduct relating to the Funds' assets and businesses, together with the outrageous compensation they paid to themselves and to the broker dealers (including those named as Broker Defendants herein), establish that these Defendants knew that these operating assets were not generating, and could not generate, the type of returns represented to investors by GPB.

The GPB Offerings are described in the SAC, and also in the Mass. Complt. (Ex. A), the SEC Complt. (Ex. B), the DOJ Indictment (Ex. C, and the NJAG Cmplt. (Ex.D). The Mass. Complaint, for example, makes clear that GPB Capital and Ascendant Capital "were one-and-the-

same." Ex. A at 4. "The line between Gentile, Schneider, GPB Capital, and Ascendant Alternative Strategies [("AAS" or "Ascendant Strategies")] and Ascendant Capital is blurred beyond recognition. The firms even share office space in Austin, Texas. The only difference between GPB Capital and the Ascendant entities is the e-mail addresses used." *Id.* And the SEC complaint and the State Attorney General complaints make clear that GPB was a Ponzi scheme which paid phantom dividends to investors from capital accounts of other later investors.

GPB/Ascendant's money raising activities constituted a Ponzi scheme, because GPB promised and actually paid high distributions to investors amounting to at least 8% annualized on the nominal amount that they invested, *which amounts were paid from the capital accounts of other investors*. ¶¶ 9, 32. GPB/Ascendant described these payments as dividends from "operating profits" and "cash flow" from "operating businesses." ¶¶ 8, 12, 155, 157-159. Indeed, GPB/Ascendant and Fund Administrator Phoenix perpetuated this falsehood on a monthly basis when they reported false and misleading net asset value ("NAV") calculations to GPB investors. These were designed to hide the Ponzi scheme from investors and from potential investors, and to conceal the fact that GPB's operating businesses were losing money. ¶¶ 14, 31, 34, 82, 117, 366. Defendants knew that the Funds could never generate sufficient cash flow to make such payments, especially early on after actual investments were made. ¶¶ 9, 33, 53, 157, 209(a). Instead, GPB and Ascendant created and implemented the massive Ponzi scheme whereby they paid 8% distributions to existing investors from the capital paid in by new investors and/or from existing investors' own capital accounts. ¶¶ 35(a), 154. Thus, while GPB, Ascendant, Phoenix, and the Broker Defendants reported to investors and prospective investors distributions of 8% from operating cash flow, in fact there was no such operating cash flow. Instead, payments were made to GPB investors from other investors' money and from their own capital accounts, but were

improperly reported to them as from cash flow. ¶¶ 158, 165. The GPB/Ascendant scheme was also designed to divert monies to GPB, Ascendant, and Broker Defendants who participated in the Ponzi scheme. Indeed, despite the false promises of 8% dividends from profits earned by underlying investments, the GPB Ponzi scheme and its excessive fee structure made returns from operations to investors all but impossible. ¶ 8.

The amount of fees actually paid to Ascendant and the Broker Defendants cannot be precisely determined from the various and many inconsistent statements made by the Defendants in their PPMs, but such fees exceeded $200 million according to the SEC. ¶ 33; Mass. Cmplt. (Ex. A), ¶¶ 42-43.

Disclosures indicate that these fees together with various management fees paid to GPB/Ascendant represented between 16% to 20% of the gross capital investment of each limited partner. ¶ 7. Stated differently, from each $1 million of gross investment, only approximately $800,000 was actually available to fund the underlying businesses. As the SAC makes clear, this diversion of investors' money to pay GPB, Ascendant, and Broker Defendants commissions is unprecedented and is vastly larger than ordinary commissions in the range of 5% that are typically paid to broker dealers in similar transactions. ¶ 149 n.5. This fee structure made any reasonable investment return improbable and made the purported distribution of 8% from Fund income practically impossible.

In addition to failing to disclose completely the outrageous GPB fee structure and GPB's failure to properly register its Offerings under federal and Texas law, Defendants also engaged in numerous other material misrepresentations and omissions in connection with the Offerings in the PPMs, and related documents and thereafter.

Primary among these was the failure of Defendants to disclose to purchasers of GPB Securities that Gentile, the managing member of GPB Holdings (the general partner of the Funds), had a joint ownership interest in GPB's primary broker-dealer/underwriter, AAS. ¶¶ 146, 172, 209(c), 283(b). In fact, the principals of the offeror of GPB Securities, GPB Capital Holdings, and the primary underwriter for the securities, AAS and its affiliate, Ascendant Capital, were commonly owned and operated these entities. ¶¶ 23, 182, 376. Thus, the offerors of the GPB Securities and its primary distributor, who had a fiduciary duty to be independent under federal law and FINRA regulations, were anything but separate and independent. Instead, they were commonly owned and operated as a single business designed to siphon profits from investors without proper disclosure. As the SAC makes clear, there can be no more material conflict than failing to advise investors that their adviser, whom they understood to be offering objective advice pursuant to federal and state law, was materially conflicted because their interest was not in selling securities in their clients' best interests, but in getting a payment stream through their own brokerage entity, as well as massive fees that were paid from operating the GPB entities.

The PPMs contained other material misstatements and omissions concerning the total payments made to Defendants, the failure of GPB to register under the Securities Exchange Act of 1934 (the "1934 Act") section 12(g) (¶¶ 15-16) and the TSA, and the failure of GPB to disclose numerous conflicted transactions, whereby GPB insiders awarded money or had interests in businesses purchased by GPB without disclosure to investors and without prior approval by independent board members. ¶¶ 35(a)-(i), 139, 176, 185, 366.

As pled, each of the Defendants who aided and abetted the GPB/Ascendant violations were not only "generally aware" of the nature of the Ponzi scheme and misrepresentations/omissions detailed in the SAC but had actual knowledge of them. ¶¶ 46, 129 208, 222, 312, 357, 366. Each

of them acted in reckless disregard of the numerous red flags which were waved in front of them with respect to the illegality of the Offerings and the gross misrepresentations/omissions contained in the Offering materials. ¶¶ 28, 32, 333. By way of example, each of the Broker Defendants received due diligence reports (hereinafter, the "DD Reports"), prepared by independent third parties and paid for by GPB and Ascendant, which revealed the misrepresentations contained in Offering documents and the failures to register under federal and state statutes. ¶¶ 3, 9, 15, 18, 20, 27(b), 29, 35(a)-(c),(e),(g), 41, 44.

These DD Reports disclosed the material misrepresentations and omissions complained of, including GPB's inability to pay an 8% dividend from operating profits and the clear risk that GPB would have to register under the 1934 Act and prepare and file public financial reports on a quarterly basis as soon as 2016, which GPB failed to do. The DD Reports also described in detail the conflicted transactions alleged in the SAC, as well as the very limited operating history of GPB and Ascendant as fund operators, and their prior poor performance. ¶ 209 (a)-(k). Had the Broker Defendants revealed to investors what they learned through the DD Reports, the Ponzi scheme would never have gotten off the ground. But, if they had, then the Broker Defendants could not have earned their sky-high commissions.

Similarly, from their work on and for the GPB Funds, the Auditor Defendants, GPB's accountant Gentile Pismeny, the Valuation Defendants, Martino, the GPB Affiliated Defendants, and the Fund Administrator Phoenix (which acted as the paymaster for all funds received and distributed in connection with the Offerings) were also all aware of the unprecedent nature of the fee structure in the GPB Offerings and of the fact that GPB and Ascendant were operating as one entity, not independent entities, that their principals jointly owned the broker dealer AAS, and that

GPB and Ascendant had failed to make accurate disclosure thereof to investors. ¶¶ 8, 27(a),(c), 29-31, 33.

Furthermore, Phoenix was specifically on notice of the highly unusual business practices at GPB, because it was paid 20% of all of the payments which it processed. ¶¶ 212, 219. Given that Phoenix was hired to be an independent agent performing basic administrative services, e.g., processing monies received from investors, paying brokers, paying other third parties, maintaining investors' account records, and paying investors dividends and their balances upon redemption, it was paid highly unusual fees of 20%. ¶ 211. Stated simply, the SAC details red flags, whereby each of the Defendants charged with aiding and abetting and/or substantially assisting in the primary violations became aware of the fraudulent conduct at issue and of the undisclosed risks with respect to the GPB Offerings. ¶¶ 4, 18, 27(a)-(c), 30, 31, 46, 1299-131, 332, 333. These Defendants did nothing to inform investors or to discontinue their role in the clearly illegal Offerings.

Against the background of the clearly detailed SAC, Defendants take a unique stance. Rather than address apposite Texas state law cited by Plaintiffs in their oppositions to previous motions[6] Defendants simply ignore the SAC allegations and gratuitously misconstrue the law. Defendants do so to argue that Plaintiffs lack standing to assert claims, cannot assert TSA claims extraterritorially, are beyond the statute of limitations, and that Plaintiffs lack personal jurisdiction. As demonstrated below, these arguments are baseless.

Most egregiously, the Broker Defendants, but not the other Defendants, argue that privity is required to assert a claim against an aider and abettor under the TSA. This is a waste of the parties' and the Court's time given the at-least ten contrary cases Plaintiffs cited in prior briefing,

---

[6] Dkts. 528 (consolidation motion), 439 (forum *non conveniens*/choice of law).

holding that privity is not required, including one decided by Judge Godbey in the recent *Stanford* litigation, wherein third-party claims against aiders and abettors not in privity with purchasers were sustained on numerous occasions. Ignoring this authority, the Broker Defendants instead rely on their misinterpretation of single case from the Northern District of Texas, which they contend, incorrectly, stands for their privity proposition. Defendants' argument raises each and every element of a TSA claim and simply asserts, *ipse dixit,* that Plaintiffs did not properly plead that element, without reference to clearly applicable Texas law, or the SAC, and without distinguishing cases which were already cited in the record.

Defendants' Rule 9(b) (Fed. R. Civ. P. 9(b)) arguments are likewise unpersuasive. First, most of Plaintiffs' claims are not subject to Rule 9(b) and do not require pleading with particularity. Second, the SAC, at 200 detailed pages, easily satisfies Rule 9(b). Plaintiffs allege that the misstatements were contained in numerous PPMs, letters to investors, account statements, other marketing materials issued by GPB/Ascendant for each of the Funds, as well as in Forms D that GPB filed with the SEC. In general, reference to a PPM satisfies the 9(b) pleading requirement of time place and content. "[R]eference to an offering memorandum satisfies 9(b)'s requirement of identifying time, place, speaker, and content of representation where, as here, defendants are insiders or affiliates participating in the offer of securities." *Ouaknine v. MacFarlane*, 897 F.2d 75, 80 (2d Cir. 1990) (citations omitted).

Moreover, as here, "where the plaintiff is alleging that the fraud occurred over a multi-year period, the plaintiff is not required to allege all facts supporting each and every instance when each defendant engaged in fraud." *U.S. ex rel. King v. Alcon Labs, Inc*., 232 F.R.D. 568, 570 (N.D. Tex. 2005). Here, the details of the Ponzi scheme are also substantially confirmed by the SEC civil complaint, the DOJ Indictment, and the State Attorneys General cases.

Third, Defendants ignore the facts as plead and, importantly, consistent case law that when Defendants, including the Broker Defendants here, are in sole possession of the detailed facts that would shed further light on the transactions at issue, Rule 9(b)'s requirements are relaxed. "[A]llegations may be based on information and belief . . . ." *U.S. ex rel. Chorches for Bankr. Estate of Fabula v. Am. Med. Response, Inc.*, 865 F.3d 71, 81–82 (2d Cir. 2017) (quoting *Wexner v. First Manhattan Co.*, 902 F.2d 169, 172 (2d Cir. 1990). "[W]hen the facts relating to the alleged fraud are peculiarly within the perpetrator's knowledge or control or where fraud occurred over an extended period of time and consists of numerous acts, the specificity requirements of Rule 9(b) are applied less stringently." *U.S. ex rel. King*, 232 F.R.D. at 570 (citation omitted); *U.S. ex rel. Thompson v. Columbia/HCA Healthcare Corp.*, 125 F.3d 899, 903 (5th Cir.1997), and "fraud may be pleaded on information and belief under such circumstances . . . ." *U.S. ex rel. King*, 232 F.R.D. at 570 (citation omitted).

Defendants' alternative strategy effectively concedes that Plaintiffs have adequately pled their TSA and related claims, and argues instead that Texas law does not apply at all, and that this case must be decided under *New York* law. Dkt. 697. Defendants offer no legal authority for this approach, which is contrary to their position in prior briefing, and ignore Plaintiffs' earlier argument that the choice of law provision they rely upon is a narrow provision in the GPB Subscription Agreement that does not govern the claims Plaintiffs assert in this action. Moreover, Defendants fail to address the overwhelming case law indicating that the New York securities statute – N.Y. Gen. Bus. Law Art. 23-A ("the Martin Act" or "New York's Martin Act") – does not conflict in any way with the TSA, i.e., that there is no conflict raised in this case between Texas and New York law, and, accordingly, that Texas law may apply. As shown below, federal courts have consistently held that "plaintiff[s] may sue under the securities laws [across] several states at

once so long as the [pleading] requirements of each state's law are met." *In re Countrywide Fin. Corp. Mortg.-Backed Sec. Litig.*, No. 2:11-cv-10414, 2012 WL 1322884, at *2 (C.D. Cal. Apr. 16, 2012); *Silvercreek Mgmt., Inc. v. Citigroup, Inc.*, 248 F. Supp. 3d 428, 455-56 (S.D.N.Y. 2017) (rejecting defendants argument that New York's Martin Act, which contains no private right of action, should apply instead of Texas law, which did). "'New York has no interest in precluding claims like those [here (i.e., under Texas law)] . . . ' []even in the absence of its own cause of action[] [under the Martin Act]." *Id.* at 455 (citation omitted).

New York permits the application of the securities laws of other states, including Texas "[b]ecause application of multiple state['s] securities laws to a single securities transaction does not present a conflict of laws issue . . . ." *Id.* This case law was summarized recently in *Silvercreek*, 248 F. Supp. 3d at 455-456 (quoting *Chrysler Capital Corp. v. Century Power Corp.*, No. 91-cv-1937, 1992 WL 163006, at *2 (S.D.N.Y. June 24, 1992), *adhered to on reargument*, 800 F. Supp. 1189 (S.D.N.Y. 1992)) *See Hatteras Enters. Inc. v. Forsythe Cosmetic Grp., Ltd.*, No. 2:15-cv-05887 (ADS) (ARL), 2018 WL 1935984, at *8 (E.D.N.Y. Apr. 23, 2018) (citation omitted) (New York impliedly permitted the application of the securities laws of other states). That another state permits an express securities claim and New York law prohibits one was "not in fact a conflict, because the securities laws of multiple jurisdictions can be applied in a single jurisdiction, and New York does not have any interest in precluding claims under other states' blue sky laws." *Id.* In sum, Texas law applies to the claims pled.

## III. FACTUAL BACKGROUND

### A. The Second Amended Complaint

Because Defendants have failed to address most of the SAC's allegations, Plaintiffs must offer the Court a summary of that pleading herein. Plaintiffs plead six causes of action all based on direct or aider and abettor violations of the TSA. ¶¶ 303-341 (Counts I-VI). Plaintiffs also plead

claims for fraud and substantial assistance thereof (¶¶ 342-352 (Counts VII-VIII)), fraudulent transfer under TUFTA ¶¶ 353-371 (Counts IX-X), breach of fiduciary duty and substantial assistance thereof ¶¶ 372-384 (Counts XI-XII), and negligence on the part of the Auditor Defendants and the Fund Administrator ¶¶ 385-389 (Counts XIII).[7]

Each of these claims arises from the material misrepresentations and material omissions contained in the Offering Materials for the GPB securities and subsequent related statements containing material omissions and misstatements made by GPB and Ascendant with respect to such securities and their financial performance. As the SAC makes clear, the underlying misconduct by GPB/Ascendant and their principals respecting the underlying businesses owned by the various GPB Funds is not the focal point of Plaintiffs' claims but confirm the misrepresentations alleged. ¶¶ 69, 223, 229, 232. Instead, the claims challenge false statements and nondisclosures made by GPB/Ascendant and their respective principals with respect to the GPB Offerings and the financial performance of the GPB Securities. ¶ 234.

## B.    The Offerings

The Offerings were part of an integrated offering which was conceived in, effected from, directed from, and sold from Texas by both Ascendant personnel and GPB personnel located in Austin, Texas. ¶¶ 41-43, 45, 102, 134-37, 142. As described in the SAC, Ascendant was the primary distribution agent for GPB (and commonly owned with GPB) and was at all relevant times based in Texas. ¶ 40. Ascendant effected each of the GPB Offerings from Texas and, from Texas, paid itself and its network of Brokers Defendants unprecedently large fees. The Offering Materials provided to investors, which contained the material misstatements and material omissions, were

---

[7] In Texas, claims of substantial assistance or knowing participation are equivalent to claims for "aiding and abetting" and are allowed. *See* Section XIII A, *infra.*

drafted by Ascendant personnel in Texas and distributed to investors from Texas. ¶ 41. Schneider himself drafted large portions of the PPMs. ¶ 43. Ascendant and its principals also prepared additional marketing materials, due diligence questionnaires (DDQs) and Due Diligence Reports in Texas, and provided them to Broker Defendants, who sold GPB securities from Texas or through Texas. ¶¶ 41-45. That is, Ascendant in Texas was an essential link in the chain for all of the GPB Securities sold ("all offerings and sales of GPB limited partnership interest ran through Ascendant Capital offices in Austin, Texas"). ¶ 75.

As pled, Ascendant, operating from Texas, was involved in all aspects of the Offering process, including attracting and educating brokers nationwide (i.e., the Broker Defendants) to sell the GPB Securities, preparing and distributing the PPMs and other Offering Materials, and providing due diligence, compliance, marketing, and direct sales. ¶ 142. And, from Texas, Ascendant aided in the preparation and dissemination of the Due Diligence Reports, which were provided to Broker Defendants and which disclosed many of the material misrepresentations and omissions contained in the PPMs.

Ascendant, in Texas, also provided client relations support, including thousands of emails and numerous webinars and related informational supplements provided through Texas-based internet sources. ¶ 102. In addition, Ascendant and GPB held numerous due diligence and sales meetings on scheduled dates and on unscheduled dates in Austin, Texas. ¶¶ 42, 102. In total, Ascendant and GPB (who shared office space with Ascendant) had at least 35 employees who worked on the Offerings and customer matters related to the Offerings from Austin, Texas. ¶ 102. In addition, Ascendant from Austin processed all subscription documents, including reviewing them for completeness and formal acceptance to the Partnership. ¶¶ 102, 142.

Ascendant also maintained in Austin the virtual data room containing documents related to the Offering and underlying investments. ¶ 142. Moreover, Ascendant, from Austin, assisted GPB in connection with underwriting and financial modelling related to the Offerings. ¶ 142. Importantly, Ascendant also determined the commissions to be paid to Broker Defendants, and distributed the GPB Offerings from Texas, and caused such payments to be made from Texas. ¶ 142.

In sum, from Austin, Texas, Ascendant played a "substantial role in developing, orchestrating, organizing, executing, and overseeing the Offerings, and in selling all of the GPB securities to investors, and arranging for such sales through the Broker Defendants." ¶ 187.

C.      The GPB Ponzi Scheme: GPB/Ascendant's Material Misrepresentations and Omissions

Given Defendants' misstatements and mischaracterizations in their respective motions to dismiss, Plaintiffs are compelled to correct the record and briefly summarize the nature of the Ponzi scheme and the material misrepresentations contained in the Offering documents and related subsequent documentation.

As detailed in the SAC, GPB/Ascendant distributed Offering Materials to limited partners and potential limited partners (i.e., Plaintiffs and the Class) which contained material misrepresentations and omissions in connection with the Offering of the GPB Securities. These misrepresentations and omissions were repeated on a regular and continuous basis by GPB/Ascendant in emails, monthly and quarterly statements to investors and otherwise throughout the terms of the limited partnerships. These misrepresentations/omissions include:

1.      <u>Undisclosed Joint Ownership.</u>      Ascendant and GPB were two entities which operated as one entity co-owned by Gentile and Schneider. ¶ 37; Ex. A (Mass. Complaint), ¶ 36. Defendants' failure to disclose this pervasive, irreparable conflict of interest goes to the heart of

their fraud. Defendants portrayed Ascendant and its affiliate AAS as an independent underwriter/broker dealer which participated in the distribution of the GPB Securities when this was entirely false. ¶ 179. Ascendant was in fact commonly owned by the control persons of Schneider and GPB/Gentile. ¶¶ 2, 182. Thus, both Ascendant and GPB, as well as Gentile and Schneider personally benefitted from both the operation of the GPB limited partnerships and the sale of the limited partnership interests. This meant that such sales were tainted by the fact that the issuer and lead underwriter's (undisclosed) interest was not in providing investors with objective investment advice, but instead in selling as much of the GPB Securities as they could in order to earn money from two sources: exorbitant and excessive brokerage commissions and income earned in connection with the operation of the Funds themselves.

        2.    <u>False Representations Regarding 8% Dividends.</u>  Defendants misrepresented in the PPMs and subsequently in monthly and quarterly statements to investors that the investors were receiving an 8% dividend from <u>operating profits</u>, which were also described in the documents as "healthy cash flows" and "steady cash flows." ¶¶ 8, 12, 155, 158-59. As the SAC (and the SEC's complaints) makes clear, these representations were false and designed to trick investors into believing that they were receiving steady annualized cash flow at the rate of 8%, when in fact the distributions to them were either from their own invested capital or from capital contributions made by other limited partners. *See*, Ex. E (chart of references from PPMs). This material falsehood was pervasive and continued throughout the partnership as GPB and Phoenix reported to investors on a monthly basis the purported value of their capital accounts, and did not reduce such value by the amount paid by each such investor *pro rata* for that investor's portion of the distribution expenses associated with the Offering (*i.e.*, approximately 10%). Such value was also not reduced by the fact that the 8% dividend paid was in fact simply a return of the investor's

capital, or in some instances, a return of capital paid by other investors to GPB. SAC, Ex. A (sample account statements).

3.    Failure to Disclose Poor Past Performance.  GPB/Ascendant failed to adequately disclose their highly material past performance in similar limited partnerships. The DD Reports prepared at the direction of Ascendant, distributed to each of the Broker Defendants, and available to Phoenix and the Auditors (but not to investors), described the past performance of GPB limited partnership offerings that predate the Offerings addressed in this action. ¶ 209. This documentation indicated that GPB had operated similar limited partnerships which had earned mid-single digit returns. ¶ 209(b). Had investors known of this past performance, as the Defendants did, they would have been able to better evaluate and in all likelihood reject GPB's claims that it could pay both a current 8% dividend and a total IRR (internal rate of return) of 15% on an annualized basis. GPB-promised returns would have been more than double the prior performance of GPB Funds. In failing to make this disclosure, GPB, which was a registered investment adviser, violated its obligation to disclose its highly material past performance. Likewise, the Broker Defendants had an obligation to pass along this prior performance information to potential investors including the Class members.

4.    False Statements Concerning Need to Register the Offerings Under the Securities Act of 1933.  Ascendant and GPB falsely stated in the PPM and in subsequent documents that their Offerings were exempt from registration under the 1933 Act pursuant to Regulation D. ¶ 177. This was a material falsehood. GPB, Ascendant and the other Defendants knew that the Offerings did not qualify for a Regulation D exemption for several reasons. First, GPB/Ascendant failed to disclose that the lead underwriter, Ascendant, and its principals had engaged in "prior bad acts" that were required to be disclosed, but were not. Second, Regulation D requires disclosure of all

promotors of a specific offering and the total amount of compensation being paid to insiders and promotors in connection with such offering. Such disclosure was not made with respect to Ascendant, Schneider, Martino and other persons associated with Ascendant, who received millions of dollars in Offering-based compensation and were promotors of the Offering. ¶ 20, 29, 35(c). Third, the Offerings were not exempt under Regulation D because GPB and Ascendant lied in connection with such Offerings and failed to disclose the co-ownership of GPB and Ascendant by Schneider and Gentile. ¶ 179. Each of the Defendants was aware of this undisclosed co-ownership and, thus, the inapplicability of a Regulation D exemption.

     5.    <u>Failure to Disclose 12(g) Violations.</u>  Defendants failed to disclose (as was also alleged by the SEC in its complaint) that they were illegally operating the Funds in violation of the 1934 Act, because they had failed to register under Section 12(g) thereof. Section 12(g) requires an offeror to register and thereafter to file quarterly reports and audit annual reports (like a registered public company) when they have assets under management exceeding $10 million and more than 2,000 investors. This occurred with respect to certain of the GPB Funds in 2016. ¶¶ 54, 194, 241, 246; Ex. B (SEC Cmplt.), ¶_. All of the Defendants were aware of this failure to register under section 12(g) because all of the Defendants knew the amount of assets under management and knew with a high level of certainty that the total number of limited partners in the Offerings was in excess of 2,000. Defendants knew this information by virtue of: their work on the Offerings and other financial review for GPB (the Auditor Defendants, accountant Gentile Pismeny, and Valuation Defendants); and its inclusion in GPB's Form D filings with the SEC, which disclosed the volume of sales and funds raised by GPB as well as the number of investors (¶¶ 18, 195, 241, 246) (all Defendants). The Broker Defendants received this information directly from GPB/Ascendant and their principals and employees at due diligence meetings and in

comprehensive DD Reports and other written communications (Broker Defendants). ¶¶ 15, 18, 176, 194-195. Failing to register under section 12(g) constituted a violation of the 1934 Act and deprived investors of the quarterly reports containing unaudited financial information and annual audits required under that law.

6.    <u>Failure to Disclose Conflicted Transactions and Undocumented Inter-Company Loans and Transactions.</u> Defendants failed to disclose what is described in the SAC and the SEC complaint as material conflicted and co-mingled transactions. ¶¶ 35(f),(g), 224(l), 236. As described in the DD Reports, GPB engaged in conflicted transactions whereby it purchased car dealerships and other assets in which Gentile and other Defendants had ownership interests without prior Board approvals. Such transactions are impermissible under the partnership law of the State of New York unless they are approved by independent persons, and they were not.  In addition, again as alleged by the SEC, GPB and Ascendant failed to disclose that they were using the assets of certain of the limited partnerships, which had cash flow to support and prevent the failure of other limited partnerships which lacked cash flow. ¶ 35(f). In essence, GPB/Ascendant engaged in unsecured undocumented loans among affiliated funds to make sure that they would not fail which would have in all likelihood resulted in the entire scheme being detected and collapsed. ¶ 35(f). As alleged by the SEC, GPB and Ascendant failed to publicly disclose these co-mingled and conflicted transactions, which were disclosed to the other Defendants in the DD Reports.

7.    <u>Failure to Disclose Total Fees.</u>  Defendants failed to disclose in any coherent fashion the entire fee structure associated with each GPB Offering. ¶¶ 7-12. In addition to the approximately 10% upfront commissions, which were paid from customer accounts, GPB and its affiliates received additional amounts equaling between 6% and 10% in connection with each

Offering. Stated differently, as described in ¶ 7 of the SAC, the total expenses associated with a million dollar contribution to a Fund were approximately $200,000. GPB failed to make this disclosure or to discuss and describe the obvious consequences of such exorbitant unprecedent fees (*i.e.,* the impossibility of achieving market rates of return). Stated differently, since only 80% of an investor's capital actually made its way to the partnership for the investment, it was impossible for them to achieve the rates of return predicted by GPB/Ascendant (*i.e.,* an 8% current yield and the projected 15% IRR). To achieve a 15% IRR, when the entity was only investing 80% of the money, would have required returns in excess of 20% on an annualized basis. Given GPB's prior performance of mid-single digits, such performance was clearly not likely or predictable, as it would have approximated *three or four times* the prior performance.

8.  <u>Overpaying Purchasers As Part of the Scheme.</u>  As described in the SAC, in order to hide the fraud from investors, and to effect the phantom 8% dividends to investors, GPB engaged in a practice whereby it overpaid sellers for assets, and then received "repayment" of the overpayment so that it could distribute such amount as if such amount were earned cash flow. ¶¶ 153-155. This was a fraudulent practice designed to deceive investors into believing that they were actually receiving an 8% dividend from operating cash flow. Defendants hid this practice from investors.

9.  <u>Failure to Disclose Fees Paid.</u>  GPB and Ascendant failed to disclose the tens of millions of dollars paid to Ascendant (which was commonly owned with GPB) in the form of acquisition fees, managerial assistance fees, and related fees, which were never denominated to investors. While GPB did describe that such fees *might be* paid to third parties, they failed to describe that in fact all such fees were being paid to themselves (*i.e.,* GPB/Ascendant, Schneider and Gentile) and that such fees amounted to tens of millions of dollars throughout the period at

issue. ¶ 360. The acquisition fees and managerial fees were simply a way for GPB and Ascendant to divert additional commissions to themselves without providing any additional services. ¶ 263(d).

### D. GPB's Unregistered Integrated Public Offering and Failure to Register Under Texas Law

As described, Defendants misrepresented to investors that the Offerings of the GPB securities were exempt from registration under Regulation D, Rule 506. ¶¶ 15-16, 20-22. This was false: GPB and Ascendant, in connection with completing documentation required for exempt the Offerings under Regulation D (Rule 506) made material misrepresentations and therefore were illegible for exemption under Regulation D. At all relevant times, GPB and Ascendant **knew** that the Offerings were not exempt but did not disclose this to investors. As described in the SAC, Defendants failed to comply with Regulation D for numerous reasons. ¶¶ 20, 27(b), 35(c), 192. First, Regulation D requires disclosure of so-called "bad actors" under Rule 506. Here, the primary distributor of the GPB securities, Ascendant Capital and AAS, and their control persons, Schneider and Martino, were bad actors under Rule 506 and no disclosure of their bad actor status was made, thereby voiding their availability of Rule 506. ¶¶ 20, 27(b), 35(c).

Second, Rule 506 requires disclosure of the nature of any relationship whereby a person is acting as a "promoter" of the issuer. Here, Schneider, Ascendant, AAS, Axiom, and Martino were all "promotors" of the Offerings within the meaning of Rule 506. ¶ 20. Rule 506 required disclosure of their roles as promotors (*i.e.*, what they specifically did and also the full amount of compensation paid to them in connection with their role as promotors, which was not made). Again, this lack of disclosure voided the availability of a Regulation D registration exemption.

Finally, Regulation D was unavailable to GPB/Ascendant because they failed to disclose the full amount of compensation paid to the Broker Defendants for distributing the GPB Securities

(*i.e.*, they failed to disclose the full amount of compensation paid to Ascendant as lead underwriter and to the Broker Defendants for the Offerings). ¶ 35(e). Ascendant was paid many millions of dollars in brokerage fees which were disguised by GPB as "Acquisition Fees" and "Managerial Assistance Fees" fees. *Id*. These fees were required to be included as part of the brokerage compensation disclosure. These omissions and false disclosures were material. Had GPB made the disclosure that its primary underwriter had a regulatory history as a "bad actor," and that Ascendant and GPB were actually a single entity and commonly controlled, and that Ascendant was being paid substantial additional multi-million dollars of undisclosed fees beyond the unprecedented large brokerage fees (which it also received), it is likely that investors would have rejected the deal because of the overall compensation structure and the apparently inadequate management team.

**E.    The Aiders and Abettors Possessed the Requisite General Awareness/Knowledge and Recklessly Disregarded the Facts and Legal Standards**

The SAC makes clear that the Broker Defendants had both general awareness and specific awareness of the material misrepresentations and omissions that underlie the TSA claims, and further that they had sufficient information to put them on notice of the fraudulent and illegal activities of GPB and recklessly disregarded these red flags.

**1.    The Broker Defendants Possessed the Requisite Knowledge**

The multiple DD Reports that were provided to Broker Defendants made clear that:

a)    Ascendant and GPB failed to disclose that Gentile and Schneider collectively owned directly or indirectly both the issuer of the GPB Securities and the primary underwriter/broker dealer thereof (AAS). ¶ 209(c);

b)    The total fees in connection with the GPB Offerings were between 16% and 20%, vastly in excess of the fees charged in any similar type offering. ¶ 7. This was a

clear red flag with respect to the structure of the Offering, and the impossibility of a purported 8% dividend and projected 15% IRR. ¶¶ 8-9, 157;

c)     Far from paying the 8% distribution from operating profits, GPB and Ascendant were using investors' own money or new investors' money to pay the 8% distribution because the Funds were not earning sufficient profits to pay 8% on a regular and continuous basis. ¶¶ 10, 154-155;

d)     GPB's prior investment performance was mid-single digits making clear that its projected return of 15% and its purported cash dividend of 8% were not only unrealistic, but completely inconsistent with the prior mid-single digit returns achieved by GPB in in its other offerings. ¶ 209(a)-(b);

e)     Several of the Offerings needed to be registered under section 12(g) of the 1934 Act, requiring the preparation and filing of quarterly unaudited financials and annual audited financials. ¶ 209(i). The Broker Defendants knew that no such registration was ever effected. Moreover, each of the Broker Defendants knew the total number of investors in each Offering as well as the total dollar amount raised because they participated therein and the DD Reports explained as much. ¶¶ 18, 35(d), 193-95. They were also aware that their own sales were being included in Form D filings, which revealed the total number of investors and sales on periodic basis. Therefore, the Broker Defendants were actually aware of the fact that GPB had exceeded the maximum number of investors and dollar amount of assets under management, and that a 12(g) filing was, therefore, required.

f)     The Broker Defendants knew from their relationship and interaction with Ascendant that it was a promotor of the Offerings and participated in the drafting

and distribution of their related PPMs from them from the start. ¶ 41. Yet, no such disclosure of this promotor relationship was made in the filings prepared by GPB in connection with their purported Regulation D Offerings. Thus, the Broker Defendants knew that GPB had lied materially in connection with such documents filed pursuant to Regulation D, and that therefore, no exemption was available.

### 2. Fund Administrator Phoenix Had the Requisite Knowledge

g) Phoenix had general and specific awareness of the misrepresentations and fraud alleged in the SAC and recklessly disregarded obvious red flags.

    i.    Phoenix, because it was the paymaster for GPB, and because all subscription documents and payments for such subscriptions for GPB interests were physically <u>made</u> to Phoenix, was aware of the total dollar amount raised by each Funds and the total number of investors therein. ¶¶_212, 220(c). Accordingly, Phoenix was aware in 2016 that registration under section 12(g) of the Exchange Act was required for several of the Funds. ¶ 220(c). Phoenix continued to process these transactions and accept funds into the Ponzi scheme knowing that they were being obtained in violation of the 1934 Act and without proper disclosure of audited financials to investors. *Id.*

    ii.    Second, Phoenix and GPB misreported investors' NAV on a monthly basis. As detailed in the SAC, GPB had Phoenix prepare monthly NAV account statements for investors which were overstated because they failed to subtract the large commissions paid upfront on their purchases. ¶¶ 31-32, 169-170. Thus, an investor who purchased $1 million in GPB Securities would have paid approximately $100,000 in upfront commissions and have

an initial NAV of $900,000. Instead, as described in the SAC, ¶ 31, GPB and Phoenix reported this NAV as $1 million. Thus, Phoenix knew and directly participated in the regular and continuous misrepresentation of the NAV of investors' interests in the Funds.

iii. Third, because Phoenix was the GPB paymaster, and made payments to Defendants Ascendant, Martino, and Schneider, it was aware that they were receiving large commissions that were not disclosed in the Form D filings made by GPB or to investors generally. ¶¶ 31, 83, 221. Moreover, Phoenix was obviously aware that Schneider and Ascendant were promotors of the Offerings from the beginning because it regularly interacted with them in processing investor subscription documents, and payments. ¶ 217. This information too was not disclosed in GPB's Regulation D filings, therefore voiding any potential reliance on Regulation D for a registration exemption. ¶ 35(e).

iv. Because Phoenix acted as the paymaster for the Funds, it received monies and paid out monies on behalf of GPB and Ascendant. ¶¶ 212, 218, 220(a). Thus, as part of its role as paymaster and recordkeeper, it was aware that GPB was not receiving sufficient operating profits from underlying companies from which it paid out the 8% distribution. ¶¶ 217, 218. And, it knew that such distributions were not in fact coming from operating profits but from other assets held by the Funds (*i.e.*, capital contributions made by new investors and existing capital from old investors).

v.        Finally, Phoenix was aware of a unique red flag with respect to its role in the GPB scam. Phoenix was paid a fee amounting to 20% of each distribution that it made. ¶¶ 212, 219. This is not only unusual; it is completely unique to Phoenix and otherwise unheard of in the industry. Phoenix knew that it was not being paid these exorbitant amounts to process simple transactions, but because it was a participant in hiding the underlying fraud in which GPB was engaging with Phoenix's assistance. This burning red flag made clear to Phoenix that GPB could not be a legitimate operation and at the same time pay almost 20% in commissions and related expenses as well as 20% to Phoenix for processing simple transactions. ¶ 219. Clearly, Phoenix had knowledge that GPB was not operating a legitimate business, but instead was diverting funds to its principals and other related parties participating in the fraud. ¶¶ 35(e), 220(a)-(b). Moreover, as pled in the SAC, ¶¶ 20, 35(g), Phoenix received or had available to it the DD Reports provided to each of the Broker Defendants participating in the Offerings. Therefore, it was aware of all of the information contained therein as described above with respect to the falsity of representations made by GPB as well as its failure to comply with the requirements of Regulation D, and section 12(g) of the 1934 Act.

### 3. The Auditor Defendants and Valuation Defendants Had the Requisite Knowledge

The Auditor Defendants and Valuation Defendants also had general awareness of the GPB fraud and recklessly disregarded red flags with respect to such fraud:

a) The Auditor Defendants were aware of the number of underlying investors and the assets under management in each of the Funds as they audited (and in the case of Valuation Defendants, reviewed such information). ¶¶ 25(b),(g), 52, 197-206, 222. Accordingly, they were aware that several of the Funds as early as 2016 were improperly not registered under the 1934 Act and that accordingly they were being illegally offered. Furthermore, they were aware that investors were not receiving critical audited financials with respect to such Funds as was required under the 1934 Act. ¶¶ 197, 205-206.

b) By virtue of their work on the Funds' financials, the Auditor Defendants and Valuation Defendants were aware of the numerous payments being made to Ascendant and its principals, including Schneider, denominated as managerial fees and acquisition fees, which were not disclosed in connection with the filings made by GPB in connection within its application under Regulation D. ¶ 20. Accordingly, these Defendants knew that GPB was making undisclosed multi-million-dollar payments to affiliates (*i.e.,* Ascendant and Schneider) and that such payments were undisclosed compensation for Ascendant's and Schneider's role in effecting the GPB distribution. ¶¶ 29, 35(e).

c) The Auditor Defendants and Valuation Defendants (by virtue of their work for the Funds) were aware of the transactions which have been described in the SAC, opted in the SEC Complaint, as co-mingled transactions and conflicted transactions. ¶ 35(g). The co-mingled transactions were transactions whereby one Fund loaned money to another Fund for inadequate consideration and without formal approval of such transaction. The conflicted transactions are transactions whereby GPB and

Ascendant purchased assets which were owned by GPB insiders (without prior approvals).

d) Finally, the Auditor Defendants were aware that the compensation scheme in the Offerings (*i.e.,* the fact that almost 20% of invested capital was being used to pay distribution expenses and related expenses to insiders) made the transactions uneconomic and therefore that the Funds could not achieve a market base return. ¶ 122. Each of the Auditor Defendants has a national practice related to private investment funds and was aware that these fees were not only extraordinary but were completely unheard of. The fee structure itself was a significant red flag to the Auditor Defendants.

## ARGUMENT

Defendants offer many arguments in support of their motions to dismiss the direct and aider and abettor claims, each of which is baseless and is addressed below.

## I.  LEGAL STANDARDS

Motions to dismiss under Rule 12(b)(6) are "viewed with disfavor and [are] rarely granted." *Leal v. McHugh*, 731 F.3d 405, 410 (5th Cir. 2013) (citation omitted). "[T]he Court must 'accept all well-pleaded facts as true and view all facts in the light most favorable to the plaintiff.'" *In re Primera Energy, LLC*, 560 B.R. 448, 455 (Bankr. W.D. Tex. 2016) (quoting *Thompson v. City of Waco, Texas*, 764 F.3d 500, 502-03 (5th Cir. 2014)). To survive dismissal, a plaintiff must plead "factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)). In addition, that factual content must give the defendant "fair notice of what the plaintiff's claim is and the grounds upon which it rests." *Id.* (quoting *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 319 (2007)). For claims alleging fraud, the complaint must also "state with particularity

the circumstances constituting fraud . . . " (i.e., the "who, what, when and where") in "simple, concise, and direct allegations . . . ." *Id.* at 455-56 (quoting *United States ex rel. Grubbs v. Kanneganti*, 565 F.3d 180, 186 (5th Cir. 2009)) (citing Fed. R. Civ. P. 9(b)). "[I]ntent . . . and other conditions of a person's mind may be alleged generally." *Id.* at 455 (citing Fed. R. Civ. P. 9(b)).

## II. PLAINTIFFS ARE NOT REQUIRED TO PLEAD WITH PARTICULARITY; AND EVEN IF THEY ARE, PLAINTIFFS HAVE CLEARLY DONE SO.

Contrary to Defendants' assertions, as demonstrated below, Plaintiffs were not required to plead each cause of action asserted with particularity under Rule 9(b). In any event, the SAC includes hundreds of pages of detailed allegations showing how each claim was well pled. The strength and adequacy of these pleadings is affirmed by the SEC complaint, which contains overlapping claims.

Defendants urge an impossible pre-discovery pleading standard by objecting to both (1) separate allegations against Defendants that engaged in the same misconduct and thus happen to be similar *and* (2) collective references to Defendants that engaged in the same misconduct. Defendants cannot have it both ways. If they did, plaintiffs would be precluded from ever suing more than one defendant that engaged in common misconduct.

In the face of Plaintiffs' detailed 200-page SAC, and the SEC's overlapping and confirmatory pleading, certain Defendants feign ignorance of the nature of the claims pled. Defendants' bases for this feigned ignorance are two unfounded contentions. First, they argue that Plaintiffs have improperly employed "group pleading" as against the Broker Defendants, and group pleading is inadequate under Rule 9(b). The Broker Defendants' brief (Dkt. 685) repeats its mantra of group pleading no fewer than twenty times. In fact, the Group Pleading Doctrine has no application whatsoever to the claims pled or to this action, and the Broker Defendants' generalized reference to it without citation to what it actually means betrays the weakness of their argument.

At the same time, these defendants also fault Plaintiffs for repeating the same allegations separately as to each Broker Defendant. (Plaintiffs are alleging that each of these Brokers engaged in the same conduct and so allege that similar conduct as to each.) In other words, Broker Defendants fault Plaintiffs for grouping allegations together *and* for separately alleging. They also ignore that the separate allegations as to each Broker defendant do include unique facts as to where they operated and to what specific Funds they sold and (through the Form D allegations the general time period involved) and in some instances how they had specific knowledge of the scheme. *See* ¶ 132 generally, and ¶ 132vv (vi) (Purshe), ¶ 132cc (vi-xi) (Hightower), ¶¶ 235-58 (Form D allegations).

Other Defendants also argue that certain of Plaintiffs' claims are subject to Rule 9(b)'s pleading requirements. In fact, only two sets of claims—those pled under TSA section 33(A)(2) and claims asserting aiding and abetting of such violation, and the fraud claims—are subject to Rule 9(b). As shown, the claims related to GPB's failure to register its shares under the TSA, and Defendants' aiding and abetting of the same do are not subject to Rule 9(b). Nor are the claims pled under Texas Uniform Fraudulent Transfer Act ("TUFTA") (Texas Business and Commerce Code, § 24.005(a), *et seq.*), or Plaintiffs' breach of fiduciary duty claims and aiding and abetting of/knowing participation in such claims. To the extent that Plaintiffs' claims under the TSA and for common law fraudulent misrepresentations are required to be pled under Rule 9(b), the SAC easily meets this standard.

The Broker Defendants (Dkt. 685 at 15) argue that Plaintiffs' TUFTA claims are subject to Rule 9(b).[8] In fact, well-reasoned decisions have concluded that Rule 9(b) does not apply to

---

[8] Broker Defendants cases are hardly persuasive. In *Indiana Bell Tel. Co. Inc. v. Lovelady*, No. SA-05-CA-285-RF, 2006 WL 485305, at *1 (W.D. Tex. Jan. 11, 2006), the Court stated that the

[Footnote continued on next page]

TUFTA cases, like this one. First, TUFTA *addresses only the intent and/or fraud of the* transferor (GPB), but not the transferee (Broker and Phoenix). Here, the intent of GPB, as transferor, is at issue and it is clear that it is fraudulent intent that is well pled.

TUFTA specifically provides that a transfer made, or obligation incurred by a debtor (i.e., GPB) is fraudulent as to a creditor of that debtor (i.e., Plaintiffs in this action) "if the debtor made the transfer . . . with actual intent to hinder, delay, or defraud **or** without receiving a reasonably equivalent value in exchange for that transfer."). Even though the fraudulent intent of GPB is beyond dispute, Courts have routinely recognized that because the TUFTA statute and other similar uniform fraudulent transfer statutes do not require a showing of actual fraud on the part of the transferor, Rule 9(b) does not apply. *See, e.g.*, *Janvey v. Alguire*, 846 F. Supp. 2d 662, 676 (N.D. Tex. 2011) (quoting *GE Capital Commercial, Inc. v. Wright & Wright, Inc.*, No. 3:09-cv-572, 2009 WL 5173954, at *10 (N.D. Tex. 2009)) (plaintiff need merely allege that the transferee was "the recipient of funds fraudulently obtained[,]" not that transferee "committed any fraudulent act that caused the funds to be transferred."); *U.S. Bank Nat. Ass'n v. Verizon Comms. Inc.*, No. 3:10-cv-1842, 2012 WL 3100778, at *11 (N.D. Tex. July 31, 2012) ("[F]raud is simply not an aspect of a fraudulent transfer claim."). In cases against transferees, "the defendant's [transferor's] conduct is simply not an element of the [plaintiff's] claim." *Janvey*, 846 F. Supp. 2d at 676 (quoting *Wing v. Horn*, No. 2:09-cv-00342, 2009 WL 2843342, at *5 (D. Utah Aug. 28, 2009)). Indeed, the very case the Broker Defendants rely upon, *BSG Clearing Solutions, N. Am., L.L.C. v. McKay*, determined that "when directed at a transferee of the debtor's assets, a 'TUFTA claim need not satisfy Rule 9(b).'" No. 5:17-cv-57, 2017 WL 11207327, at *3 (W.D. Tex., Oct. 4, 2017), *report*

---

"question could be subjected to debate" and that "[t]he parties here do not dispute Rule 9(b)'s applicability . . . ."

*and recommendation adopted*, No. 17-cv-57, 2017 WL 11207328 (W.D. Tex. Oct. 24, 2017) (citation omitted).

Moreover, as shown herein, transfers from a Ponzi scheme are per se fraudulent transfers. *See Rotstain v. Trustmark Nat'l Bank*, No. 3:09-cv-2384, 2020 WL 1513516, at *2 (citation omitted) (N.D. Tex. Mar. 30, 2020) ("In the Fifth Circuit, [a plaintiff] may establish actual intent to defraud by showing that the [defendant's] enterprise operated as a Ponzi scheme.").

Nevertheless, Plaintiffs have adequately pled with specificity the roles of GPB, the Broker Defendants, and Phoenix in connection with the fraudulent transfers alleged.

A.    **Rule 9(b) Does Not Apply to Most of the Claims Pled, But Only to the Claims Pled Under TSA Section 33(A)(2) and Fraud, and Even as to Those Claims the Standard Is Relaxed Here.**

Plaintiffs concede that claims pled under TSA section 33(A)(2) (Counts I-III) and for fraud (Counts VII-VIII) are subject to Rule 9(b). The remainder of Plaintiffs' claims are not. Rule 9(b) only applies to allegations concerning fraudulent conduct. *See Official Stanford Invs. Committee v. Greenberg Traurig, LLP*, No. 3:12-cv-4641, 2015 WL 13741905, at *1 (N.D. Tex. Feb. 4, 2015) (citation omitted) ("[P]articularity is only required to the extent that a plaintiff in fact alleges fraud.").

Thus, Plaintiffs' claims for violation of TSA section 33(A)(1) as set forth in Counts IV-VI of the SAC do not allege fraudulent conduct and are not predicated upon allegations of fraudulent conduct and are therefore not subject to Rule 9(b) pleading standards. These claims simply allege that GPB offered or sold securities in violation of TSA section 7 by selling securities without proper registration under the TSA and that the other Defendants aided and abetted such registration violations by selling such securities which is also in violation of the TSA, as set forth in Count V of the SAC.

These registration violations and their related secondary liability violations do not require proof of fraud and there is no allegation of fraud with respect to the failure to register.[9] These are in fact strict liability statutory provisions. The 33(A)(1) claim is straightforward: GPB failed to register the securities as required under the TSA, and thereby violated the TSA. These claims do not require or hinge upon a fraudulent misrepresentation. *See Life Partners Creditors' Tr. v. Black Diamond Lifeplan Fund*, No. 4:17-cv-00225, 2017 WL 9934885, at *5 (N.D. Tex. Nov. 27, 2017); *see generally Lone Star Ladies Inv. Club v. Schlotzsky's Inc.*, 238 F.3d 363, 369 (5th Cir 2002) (Rule 9(b) does not apply to registration claims not based on fraudulent misstatements.).

Similarly, many of Plaintiffs' other claims are not based on fraud and do not require pleading with particularity. Plaintiffs' breach of fiduciary duty, and the aiding and abetting of/knowing participation in the same, and its negligence claims do not require Rule 9(b) pleading. "A claim for breach of fiduciary duty is ordinarily required to meet the notice pleading standard of Rule 8(a), not the heightened standard of Rule 9(b)." *B Choice Ltd. v. Epicentre Dev. Assocs. LLC*, No. 4:14-cv-2096, 2015 WL 4586719, at *9 (S.D.Tex. 2015), *report and recommendation adopted sub nom. B. Choice Ltd. v. EpiCentre Dev. Assocs., LLC*, No. 14-cv-2096, 2015 WL 4128936 (S.D. Tex. July 7, 2015) (citing *City of Driscoll, Texas v. Saenz*, No. 2:06-cv-543, 2007 WL 173232, at *5 (S.D. Tex. 2007). "[B]y its clear terms, Rule 9(b) applies only to averments of fraud or mistake, not to averments of negligence, breach of fiduciary duty or non-fraudulent misstatement." *Janvey v. Maldonado*, No. 3:14-cv-2826, 2015 WL 1428612, at *2 (N.D. Tex. Feb. 19, 2015) (quoting *Tigue Inv. Co., Ltd. v. Chase Bank of Tex., N.A.*, No. 3:03-cv-2490, 2004 WL 3170789, at *2 (N.D. Tex. Nov. 15, 2004).

---

[9] Obviously, the mere citation to the statutory language in Count V cannot create a fraud-based claim.

In any event, "when the facts relating to the alleged fraud are peculiarly within the perpetrator's knowledge or control or where fraud occurred over an extended period of time and consists of numerous acts, the specificity requirements of Rule 9(b) are applied less stringently[,]" *U.S. ex rel. King*, 232 F.R.D. at 570, and "fraud may be pled on information and belief under such circumstances[.]" *United States ex rel. Thompson*, 125 F.3d at 903; *see U.S. ex rel. King*, 232 F.R.D. at 570. *See also Jyue Hwa Fu v. Yeh Chin Chin*, No. 3:18-cv-2066, 2020 WL 4296360, at *5 (N.D. Tex. May 6, 2020), *report and recommendation adopted*, No. 3:18-cv-2066, 2020 WL 4287590 (N.D. Tex. July 27, 2020) (citation omitted); *Rangel v. Adtalem Global Educ., Inc.*, No. 18-cv-00082, 2019 WL 6828298, at *5 (W.D. Tex. Dec. 13, 2019); *Halprin v. Fed. Deposit Ins. Corp.*, No. 5:13-cv-1042, 2016 WL 5718021, at *4 (W.D. Tex. Sept. 30, 2016).

Both of these circumstances are present here. Defendants alone have knowledge of the particulars concerning the misconduct alleged: e.g., which Class members purchased GPB Securities, and when and where they purchased them, the specifics of the monies paid to the Broker Defendants, and when they reached the 12(g) registration requirements. Indeed, Defendants' insistence that Plaintiffs plead detailed information (that is in Defendants' sole possession) is inconsistent with established case law. Courts have uniformly recognized that pleading standards, including those imposed under Rule 9(b), are relaxed upon "a showing that further particulars of the alleged fraud could not have been obtained without discovery." *See Emery v. Am. Gen. Fin., Inc.*, 134 F.3d 1321, 1323 (7th Cir. 1998); *see also Rubenstein v. Neiman Marcus Grp. LLC*, 687 F. App'x 564, 567-68 (9th Cir. 2017) (quoting *Moore v. Kayport Package Express, Inc.*, 885 F.2d 531, 540 (9th Cir. 1989)) (quoting *Concha v. London*, 62 F.3d 1493, 1503 (9th Cir, 1995)) (Pleading standards "'may be relaxed as to matters within the opposing party's knowledge.' Rule 9(b) only 'requires that plaintiffs specifically plead those facts surrounding alleged acts of fraud

to which they can reasonably be expected to have access.'"); *Williams v. Duke Energy Int'l, Inc.*, 681 F.3d 788, 803 (6th Cir. 2012) (citation omitted) ("Rule 9(b) does not require omniscience . . . [but only a pleading that] puts a defendant on notice . . . ."); *George v. Urban Settlement Servs.*, 833 F.3d 1242, 1255 (10th Cir. 2016) (citation omitted) ("[C]ourts may consider whether any pleading deficiencies resulted from the plaintiff's inability to obtain information in the defendant's exclusive control."); *Life Partners*, 2017 WL 9934885, at *4 (citation omitted) ("[P]laintiff[s] may allege fraud based upon information and belief in instances where the 'facts relating to the alleged fraud are peculiarly within the perpetrator's knowledge . . . .'"); *Physicians ACO, LLC v. Computer Scis. Corp., et. al.*, No. 4:16-cv-1293, 2018 WL 1172653, at *4 (S.D. Tex. Mar. 5, 2018) (same).

Defendants ignore the facts alleged and, importantly, the fact that Defendants, including the Broker Defendants, are, unlike Plaintiffs, in possession of the detailed facts as to the transactions at issue. "[A]llegations may be based on information and belief when facts are peculiarly within the opposing party's knowledge." *Chorches*, 865 F.3d at 81–82 (citation omitted).

Moreover, as is the case here, "where the plaintiff is alleging that the fraud occurred over a multi-year period, the plaintiff is not required to allege all facts supporting each and every instance when each defendant engaged in fraud." *U.S. ex rel. King*, 232 F.R.D. at 570 (citation omitted). Plaintiffs expressly allege that Defendants' wrongful conduct occurred from 2013 to present (more than seven years) and involved thousands of improper sales and numerous instances of misrepresentations to investors. Plaintiffs are not required to detail the who, when, where, and what of each and every instance of such misconduct. That particularized information is unavailable without discovery from Defendants, and even if Plaintiffs had that information, a complaint

incorporating the same would be incredibly unwieldy (likely thousands of pages), and would do nothing to further inform Defendants of their roles in the wrongdoing alleged.

To the extent Defendants argue that even claims not requiring elements of fraud are bound to plead with particularity because they are based on allegations of fraud (which they are not), that is not the law. "Where averments of fraud are made in a claim in which fraud is not an element, an inadequate averment of fraud does not mean that no claim has been stated. The proper route is to *disregard* averments of fraud not meeting Rule 9(b)'s standard and then ask whether a claim has been stated." *Lone Star Ladies*, 238 F.3d at 368 (emphasis added); *see also Vess v Ciba-Geigy Corp. USA*, 317 F3d 1097, 1105 (9th Cir. 2003) (same).

As the above-mentioned cases and others make clear, the attempt by the Broker Defendants to challenge Plaintiffs' pleading by alleging that it fails to address specifically the dates on which the Broker Defendants sold Ponzi scheme securities and the amounts thereof, when such information is in their possession, is baseless. *See Chorches*, 865 F.3d at 81 (plaintiff failed to plead the exact "amounts billed or reimbursed" and the dates relevant thereto, yet, satisfied Rule 9(b)). In any event, the SAC pleads the time period during which these Broker Defendants sold GPB Securities by reference to GPB's Form D filings for each Fund, which listed the specific Broker Defendants that sold that limited partnership interests to its clients. [10]

Though Plaintiffs do not yet possess the information required to allege the details of the specific amounts of GPB securities sold by each Broker Defendant or the precise dates on which the more than 17,000 such sales took place, that is not required, contrary to the Broker Defendants'

---

[10] To the extent certain Broker Defendants have introduced evidence of their sales of GPB Securities, those are part of the record and may be considered by this Court on this Motion. *See e.g.,* UPFSA's Declaration of Dave Hauer, Ex. A (Dkt. 669-1) (detailing all of its sales of GPB Securities in the U.S., which total to $10,929,000 of GPB Holdings II units).

position. The Broker Defendants have such knowledge, and this is not a basis for dismissal, but instead a basis for prompt discovery. *See generally In re Pool Prod. Distribution Mkt. Antitrust Litig.*, 988 F. Supp. 2d 696, 726 (E.D. La. 2013) (citing Fed. R. Civ. P. 9(b)) ("Rule 9(b) standard should be relaxed . . . because the facts of the alleged fraud are 'peculiarly within the perpetrator's knowledge.'").

### B. Fraud is Pled With Particularity as to those Claims Requiring It.

As to those of Plaintiffs' claims required to comply with Rule 9(b), the SAC easily does so. The particularized allegations asserted in support of such claims and as to each of the Defendants are summarized below. As to each defendant and cause of action that requires it, Plaintiffs have pled specific instances of wrongful conduct and attributed that conduct to particular Defendants. In short, Plaintiffs have pled the *who* (GPB, Ascendant Capital, their principals Gentile and Schneider disseminated the misstatements with the assistance of the Broker Defendants, Fund Administrator Phoenix, the Auditor Defendants, Valuation Defendants, and Gentile Pismeny), the *what* (the nine groups of specific false misrepresentations and omissions, described above, that were included in (or omitted from) PPMs, account and valuation statements, marketing materials, and other communications to investors), the *when* (the time period during which these misrepresentations and omissions, occurred and how they changed over time), the *where* (the material misrepresentations and omissions were disseminated from Texas to investors in Texas and throughout the U.S), and the *how* (with the substantial assistance of the Broker Defendants, Axiom, Ascendant Capital and Ascendant Strategies, and the other Defendants named herein).

Plaintiffs' SAC details nine separate categories of misrepresentations that Defendants made in connection with the sale of the GPB Securities. *See* Factual Background Section III B, *supra.* It describes specific misrepresentations and where and when those misrepresentations were

made, namely: in the PPMs, monthly account statements sent to every investor, correspondence and valuations statements that were disseminated by GPB, Ascendant and Phoenix to all Class Members, and in Offering materials (the PPMs) that GPB through Ascendant Capital prepared for each of the Funds and disseminated to Broker Defendants and, in turn, to Class Members.

The SAC details the misrepresentations and omissions (described herein, *supra*, Background, IIIC and D) and where they were contained in the PPMs.[11] Submitted herewith are excerpts from numerous PPMs containing such misrepresentations. *See* Exs. E (Chart), F. Plaintiffs ask the Court to take judicial notice of these documents, as well as the recently filed Department of Justice Indictment, the SEC Complaint, against Defendants Gentile, Schneider, GPB, Ascendant, AAS, and others, as well as the NJAG Complaint, and the Mass. Complaint, which detail these same misrepresentations and omissions contained in PPMs and other materials.[12]

---

[11] *See, e.g.*, ¶ 159 (12/24/15 GPB letter to Holdings II investors: "GPB continues to pay all distributions at the stated rate of 8% *fully covered from operations*"), ¶155 (3/6/15 PPM Amended GPB PPM for the Automotive Portfolio stating "we will make distributions based on cash flow"), ¶ 162 (two PPMs: 3/7/16 GPB Holdings II Amended PPMs for Class A and Class B units, stating, "while we have *no present plans to do so*, we could include LPs' invested capital in amounts we distribute to LPs" (emphasis added)), ¶ 163 (3/30/17 Form ADV, filed with the SEC), ¶ 164 (referencing seven PPMs: a 6/12/16 [sic, should be 12/2016] Second Amended GPB Holdings II PPMs for Class A and Class B; 1/18 Third Amended GPB Holdings II PPMs for Class A and Class B; a 6/30/16 GPB Automotive PPM; 4/16/18 GPB Waste Management PPM, at p. 26; and 12/16 Holdings Qualified PPM, at p. 34.), ¶¶ 177-182, ¶¶ 237-259 (18 Forms D for GPB Offerings).

[12] Fed. R. Evid. 201 provides that [a] court may take judicial notice" of facts which are "not subject to reasonable dispute," i.e.*, "capable of accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned," and such notice "may be taken at any stage of the proceeding." This Court may consider "documents incorporated by reference in the Complaint, matters subject to judicial notice (such as filings with the SEC), stock prices, and matters of public record" on a motion to dismiss. *Lemmer v. Nu-Kote Holding, Inc.*, No. 398-C-0161, 2001 WL 1112577, at *1 n.1 (N.D. Tex. Sept. 6, 2001), *aff'd*, 71 F. App'x 356 (5th Cir. 2003); *Lovelace v. Software Spectrum, Inc.*, 78 F.3d 1015, 1017-18 (5th Cir. 1996); *Davis v. Bayless*, 70 F.3d 367, 371 n.3 (5th Cir.1995) (citation omitted); *Stone v. Life Partners Holdings, Inc.*, 26 F. Supp. 3d
[Footnote continued on next page]

Courts have routinely recognized that "[r]eference to the Offering Memorandum satisfies 9(b)'s requirements as to identification of the time, place, and content of the alleged misrepresentations. . . . [N]o specific connection between fraudulent representations in the Offering Memorandum and particular defendants is necessary where . . . defendants are insiders or affiliates participating in the offer of the securities in question." *Luce v. Edelstein*, 802 F.2d 49, 55 (2d Cir. 1986) (citations omitted).[13] *See Lorley Fin. (Jersey) No. 3 Ltd. v. Wells Fargo Securities, LLC*, 797 F.3d 160, 172 (2d Cir. 2015); *Ouaknine*, 897 F.2d at 80 ("reference to an offering memorandum satisfies 9(b)'s requirement of identifying time, place, speaker, and content of representation . . . ."); *Strong v. Cochran*, No. 2:14-cv-788, 2017 WL 4620984, at *10 (D. Utah Oct. 13, 2017) (citation omitted) ("The Trustee goes beyond group pleading to allege the material misstatements, giving examples of each Defendant's participation in the drafting, dissemination, and use of the PPMs. And, as noted above in the section on fiduciary duty allegations, 'group-published documents' such as the PPMs lend themselves well to group pleading.").

---

575, 603-04 (W.D. Tex. 2014); *Anegada Master Fund, Ltd. v. PXRE Group Ltd.,* 680 F. Supp. 2d 616, 618 n.4 (S.D.N.Y. 2010) (citation omitted) (allowing consideration of private placement memorandum on a 12(b)(6) motion where "the documents are integral to the complaint, it is clear on the record that no dispute exists regarding the authenticity or accuracy of the document, and the relevance of the document is undisputed."). A "[c]ourt may consider documents incorporated by reference in the Complaint, as well as documents the plaintiff either had in its possession or knew of and relied upon in bringing suit. . . . The private placement agreements fall squarely within these categories." *JTS Corp. v. GFL Advantage Fund Ltd.*, No. 98-cv-497, 1999 WL 731606 at *4 n.3 (S.D.N.Y. Sept. 20, 1999) (citing *Cortec Indus., Inc. v. Sum Holding L.P.*, 949 F.2d 42, 48 (2d Cir. 1991) (allowing judicial notice finding "offering memorandum [was] document[s] [opposing party] had either in its possession or had knowledge of and upon which they relied in bringing suit. It did not lack notice of those documents; these papers were integral to its complaint.")).

[13] Judge Kaplan notes in *DeLuca* that plaintiffs must also allege non-conclusory facts permitting the plausible inference that various defendants participated in making the complained-of offering misrepresentations or omissions, or had some control over the same, or over the scheme itself. *See DeLuca*, 2020 WL 7343788, at *15. The SAC easily satisfies this.

The SAC, ¶ 177 - 182, describes in detail the reasons why the GPB Offerings failed to comply with Regulation D and that, consequently, the Offerings were not exempt under the Securities Act of 1933 and, therefore, was not exempt from registration under the TSA. Defendants point to no other TSA exemption, which could otherwise be applicable, because there is none. *See* Factual Background III D, *supra.*

Similarly, Plaintiffs' allegations with respect to their aider and abettor claims regarding certain Defendants in Counts II and IV of the SAC make clear that each of these Defendants either directly participated in the Offering process by preparing documentation and/or selling securities pursuant to such documentation, or were brokers fueling the scheme by sending revenues up to GPB and Ascendant Capital which were obtained from transactions which were part of the unregistered public Offerings and by who distributed false and misleading Offering documents in connection with therewith. The SAC easily passes muster under the Rule 9(b).

These misrepresentations and omissions were, as the SEC notes, so pervasive in GPB's Offering materials that it is nonsensical for Defendants to assert that they do not have notice of Plaintiffs' allegations. Defendants' assertions that Plaintiffs have not provided time and place specifics of alleged misrepresentations and omissions (Dkts. 685, 693, 694, 697, 702, 703, 705, 709) is especially disingenuous because these documents and this information "were peculiarly within the opposing party's knowledge[]" and thus need not be pled to satisfy Rule 9(b). *Chorches*, 865 F.3d at 86. The GPB Defendants, the GPB Affiliated Defendants, and the Broker Defendants used the PPMs on a regular basis in connection with the Offerings to sell GPB securities. And, the remaining Defendants provided information for inclusion in the PPMs and other Offering materials. Their arguments that they are not aware of the nature of Plaintiffs' claims thus rings hollow. Plaintiffs address particularity respecting each below:

### 1. GPB, The Funds, and Ascendant Capital

The SAC alleges each of these defendants was intimately involved in the dissemination and marketing of the GPB Securities through the PPMs and other offering materials, which contained the material misrepresentations and omissions described above. In fact, as alleged, from the inception of the scheme in 2013 through the present, the Offerings were directed by Ascendant Capital in Austin, Texas, which marketed the GPB Securities through due diligence seminars, written marketing materials (including the PPMs), due diligence reports and other due diligence documents, and through its national team of brokers, including the Broker Defendants named in the SAC.[14] *See* Factual Background Section, III A-E, *supra.*

### 2. GPB Affiliated Defendants

Ascendant Strategies (AAS), Axiom, DJ Partners and MR Ranger, provided substantial assistance to Gentile, Schneider, GPB and Ascendant Capital in carrying out the TSA violations. Axiom and, beginning in 2017, Ascendant served as underwriters and broker dealers for Ascendant Capital. In that role, they disseminated the false statements to investors, sold the GPB Securities to Class members, and fueled the Ponzi scheme by delivering cash they had obtained through sale of GPB Securities to GPB, the Funds and Ascendant Capital.

AAS and Axiom each argue (Dkts. 694 and 709) that the SAC contains no particularized allegations of what they did, linking then to any misrepresentations or fraudulent intent. This is

---

[14] *See also* Ex. C (DOJ Indictment), ¶ 17 (emphasis added) ("GPB Funds *primarily raised capital through the marketing efforts of Ascendant*, whose employees contacted registered brokers ("brokers") and registered investment advisers ("RIAs") by email, by phone and at in-person meetings. Ascendant employees pitched those brokers and RIAs on the GPB Funds to encourage them to advise their individual investor clients to invest money into the GPB Funds. Ascendant Capital also organized numerous due diligence seminars in Austin at which brokers and RIAs could get information about the GPB Funds and meet with the defendant [] Gentile and other representatives of the GPB Funds.").

incorrect, the SAC alleges that Axiom and AAS sold the GPB Securities themselves (¶¶ 237-259) and used the misrepresentations contained in PPMs and other materials to promote the GPB Securities. It was not necessary for Plaintiffs to set forth the specific document in which the scores of misrepresentations and omissions were contained. Additionally, Ascendant Capital, which effectively ran the Offerings from Austin, Texas, was a subsidiary of Axiom and then Ascendant Capital. , according to the SEC. Ex. B (SEC Cmplt.) Thus, as the corporate parents of Ascendant Capital, each had offices in Texas and was intimately involved in the Offerings.

Gentile and Schneider owned DJ Partners[15] and Martino owned MR Ranger. These entities in turn owned Ascendant Strategies. ¶ 113-115. As such, DJ Partners and MR Ranger were the vehicle through which Gentile Schneider and Martino owned AAS, which played a key role in effecting the Ponzi Scheme.

### 3. Broker Defendants

As set forth supra, in Factual Background, III(C), the SAC details the Broker Defendants' role in the Ponzi Scheme. the period of time during which they are alleged to have sold GPB Securities as listing in Form D filings, that they received outsized commissions to sell securities pursuant to PPMs that contained highly material misstatements related to the core nature of the GPB Ponzi scheme, that they distributed these false and misleading PPMs to thousands of investors with actual knowledge or in reckless disregard of such falsity (¶132(a)-(kkk), and with the intent and objective of receiving commissions more than double the industry standard while knowing that GPB commonly controlled the entities underwriting those securities, and the operating

---

[15] Contrary to the assertion in Schneider's declaration submitted in support of his motion, DJ Partners was based in Austin, Texas. *See* Ex. G (Schneider's FINRA BrokerCheck Report describing his relationship to DJ Partners, which is described as located at 3811 Bee Cave Rd., Austin, TX).

businesses (*id*). The Broker Defendants also knew from the DD Reports that Ascendant Capital distributed that he entire GPB business model based upon a purported operating cash flow of 8% to be distributed to underlying investors, was a lie from the beginning. ¶132(a)-(kkk). Each of the Broker Defendants knowingly distributed PPMs and related materials which they knew contained material misrepresentations in which they knew were being used to fund the Ponzi scheme.

### 4.    Individual Defendants Gentile, Schneider, Martino

The SAC alleges these defendants' involvement in making the Material Misrepresentations and Omissions that are at the center of the violations alleged and in creating and operating the Ponzi scheme. ¶ 48. Gentile was the founder and CEO of the GPB and served as the managing member of the GPB, which was the managing partner of the Funds. ¶ 113. Schneider was the founder and CEO of Ascendant Capital, and Plaintiffs allege, and the DOJ and SEC have confirmed, that GPB and Ascendant Capital operated as "one-and-the-same." ¶ 6; DOJ Indictment ¶ 18 ("The GPB Funds and Ascendant maintained a close operational relationship, and were considered by executives at each entity to function essentially as one company. At the heart of that relationship was the partnership between the defendants … Gentile and … Schneider, who worked together on the founding, development, operation and marketing of the GPB Funds.")

Martino was the CEO of Axiom, the broker-dealer which held itself out as the parent of Ascendant Capital until mid-2017 (¶ 115) and thereafter became CEO and a part owner of Ascendant Alternative Strategies. Thus, together with Schneider, Gentile, was involved in and responsible for developing the scheme complained of. *See* Factual Background, III, *supra.*

### 5.    Phoenix

The particularized involvement of GPB's Fund Administrator, Phoenix, is fully detailed above. See Factual Background, III(B), *supra*.

43

6.    **Auditor Defendants and Valuation Defendants**

Each of the Auditor Defendants negligently prepared false and misleading audits, or reviewed, approved and authorized the dissemination of false and misleading financial statements for the Funds, and allowed their names and reputations to be used for salesmanship and marketing in connection with the sale of the Securities. The PPMs themselves specifically and repeatedly referenced the accounting firm that was responsible for the audit work for each Fund and that their financials were being audited by RSM (respecting GPB Holdings II, LP), Crowe (respecting GPB Automotive Portfolio, LP and Holdings, LP), CohnReznick (respecting Waste Management), and Margolin (respecting GPB Capital, Automotive, Holdings Qualified, Holdings and NYC Development), EisnerAmper (respecting Automotive, Holdings, and Holdings II), and Withum (respecting Waste Management/Armada Waste, Cold Storage, Holdings III and NYC Development). The extent of these auditors' work is not as limited as they claim and the SAC sets out the financial work they performed for years beyond what they now admit. [16] ¶¶ 118-123. Ex. (Chart listing Auditor's work). The fact that certain of these auditors assert that they did not issue an audit is of no moment. They still advanced the scheme by allowing their name and reputation to be included in the PPM, without revealing the misconduct alleged, and by continuing to perform audit work for the Funds. Moreover, to the extent an audit was issued the audit work each did was reprinted in PPMs even after the date of the issuance of the audit and was not withdrawn until years later, if at all: CohnReznick (Waste Management audit for 2016 (¶120)); RSM Holdings II

---

[16] For example, Margolin was the outside auditor 4 GPB capital from 2013 through 2017 and for certain funds including GPB Automotive, GPB Holdings in GPB Holdings Qualified. It audited the financial statements of GPB for fiscal years 2014, 2015 in 2016 and for GPB Holdings for fiscal years 2013, 2014 in 15 and GPB New York City development for fiscal year 2018. ¶ 122. In providing these services to GPB to help keep the scheme afloat.

(Holdings II audit for 2015 and 2016 (¶14)); Crowe (Automotive Portfolio and Holdings audits for 2016 (¶14)).

In particular, after Crowe refused to conduct audit work for GPB on the Automotive Portfolio and resigned from its engagement, GPB hired EisnerAmper to replace Crowe on that audit. ¶233(c). The SAC alleges that not only did EisnerAmper fail to act when it learned of financial improprieties affecting GPB, but it acted to conceal these matters. Crowe's audit worked had revealed that there had been numerous undisclosed and inappropriate related-party transactions. *Id.* In May 2019, David Rosenberg, the head of a group of auto dealerships that GPB had acquired (¶225), received a "Related Party Questionnaire" from EisnerAmper that he was to answer as part of the audit. ¶233(d). The Questionnaire contained questions regarding transactions that did not appear to have a legitimate business purpose. Rosenberg, who was aware of the financial improprieties relating to GPB (as detailed in the SAC), including the fictitious performance guarantees, provided that information in his response to GPB and EisnerAmper. *Id.* On May 21, 2019, Rosenberg received a threatening letter from GPB's outside counsel. The letter claimed, falsely, that Rosenberg's responses were not properly called for by the Questionnaire. It then alleged that it was somehow "inappropriate" for Rosenberg to provide the auditors with the correct information. GPB's outside counsel also asserted that Rosenberg's Questionnaire responses were somehow not "accepted," and therefore a nullity. In other words, both GPB and EisnerAmper, the auditor for GPB Automotive, GPB Holdings and GPB Holdings II, had actual knowledge of the above financial improprieties. ¶ 234. EisnerAmper's failure to act on this information of financial improprieties only served to conceal the Ponzi Scheme and to ensure that Plaintiffs and other Class members would maintain their investment with the stay in the dark, maintaining Funds and to attract new investments in the Funds.

Soon thereafter GPB filed its updated Form ADV disclosing its use of investor contributions to pay distributions, and GPB Automotive's then-CEO explicitly informed EisnerAmper that GPB Capital, Schneider, Gentile and others were engaged in illicit behavior. EisnerAmper therefore had actual knowledge of GPB's misdeeds, but also knew that GPB needed to convince investors that audits providing the framework for necessary disclosures owed to the SEC and limited partners were forthcoming. EisnerAmper and GPB publicly announced, and then strategically delayed, targeted completion dates for these audits, first claiming they would be done by end of the third quarter 2019 before pushing that to December 31, 2019.

### 7. Valuation Defendants

The Valuation Defendants, MBAF and Deloitte provided inflated valuations of GPB's assets. ¶ . Such valuations were necessary because most if not all of the assets held by such Funds were not publicly traded and had no reported market value. ¶ . Thus, Deloitte and MBAF knew that such valuations were essential to the financial reports prepared by the Funds and their auditors and to investors and prospective investors who relied upon such financial reporting to determine the performance of the relevant Funds. Indeed, because the assets owned had no reported market value, these valuations were a primary constituent of the financial results provided to investors and prospective investors and thus a primary factor by which the GPB.

### 8. Gentile Pismeny

Gentile Pismeny, the accountant for the Funds, provided critical accounting services that perpetuated the scheme complained of in this action. Gentile Pismeny prepared the Schedules K-1 reporting limited partners' respective shares of the partnership's income, deductions, and credits, which it sent to GPB's limited partners (the Plaintiffs and Class members herein) each year. ¶128. These K-1s incorporated the results of the false financials of each Funds, which overstated the

value the assets and failed to record the conflicted transactions and intercompany transfer correctly. Gentile Pismeny mailed this false information in tens of thousands of K-1 statements during the course of the Class period alleged. *See* Ex. H [Gentile Pismeny letter re K-1 to Plaintiff residing in Texas]. Gentile Pismeny also knew about Gentile's conflict of interests because the firm was itself the root of that conflict. Finally, the recently filed NJAG Complaint confirms that Gentile Pismeny was both involved in the accounting shenanigans that maintained and advanced the Ponzi Scheme taking instructions from Gentile and Schneider to conceal the scheme. That complaint details efforts of Gentile and Schneider, working together from Texas, to use income manipulations, referred to there as "true ups," to cover up the Funds' income shortfalls. *See* Ex. D (NJAG Cmplt.) at 80-81. That complaint also reports that:

> On March 18, 2015, Gentile texted Schneider and Lash asking them: please get on a call now with K[B] [KB, a partner at the accounting firm GP&B]. . . . K feels based on his convo with Schneider that the guarantee that keeps neutral income and no losses on the tax returns and therefore no negative effect to the capital accounts is 1.1mm.... I told K it was prudent to follow Schneider's instructions.

*Id.,* 81. In short, Gentile Pismeny was involved in the deceptive conduct and interacted directly with Schneider and Gentile in this scheme.

### C. Defendants Rule 9(b) Arguments Are Flawed.

Defendants do not seriously address the Fed. R. Civ. P. 8 applicable pleading standard but instead cite to opposite cases. Dkt. 685 at 8-9. Contrary to certain Broker Defendants' assertions,[17] *Owens v.* Jastrow, 789 F.3d 529 (5th Cir. 2015), is *not* a Rule 9(b) case and does not address the claims pled herein. There, the court applied the Private Securities Litigation Reform Act of 1955 ("PSLRA"), 15 U.S.C. § 78u-4, standard for scienter to federal securities fraud claims. The

---

[17] *See* Dkt 685 at 8. Other Broker Defendants' motion-to-dismiss briefs do not cite this case. *See* Dkts. 683, 687, 708.

PSLRA's "strong inference" standard for scienter *supersedes* the pleading standard under Rules 8(a) and 9(b), so *Owens* did not address Rule 9(b) *at all*. *See Local 731 I.B. of T. Excavators & Pavers Pension Tr. Fund v. Diodes, Inc.*, 810 F.3d 951, 956 (5th Cir. 2016) (emphasis added) (citation omitted) ("The PSLRA has raised the pleading bar even higher and enhances Rule 9(b)'s particularity requirement for pleading fraud . . . " by, *inter alia*, requiring "a *strong inference*" of scienter as to "'*each* act or omission alleged' to be false or misleading . . . ."); *Adams v. Kinder-Morgan, Inc.*, 340 F.3d 1083, 1096 (10th Cir. 2003), *as amended on denial of reh'g* (Aug. 29, 2003) ("The PSLRA supersedes . . . Rule 9(b) . . . for pleading scienter[.]"). *See U.S. ex rel. Integra Med Analytics, L.L.C. v. Baylor Scott & White Health*, 816 F. App'x 892, 897 (5th Cir. 2020), *cert. denied sub nom. U.S. ex rel. Integra Med v. Baylor Scott*, No. 20-581, 2020 WL 7132371 (U.S. Dec. 7, 2020) ("Rule 9(b)'s particularity requirement supplements Rule 8(a)'s demand that 'a complaint must . . . 'state a claim to relief that is plausible on its face.''").

Moreover, the PSLRA applies only to federal securities fraud claims, which Plaintiffs do not assert, so *Owens* has *no* applicability here *at all*. *See* 15 U.S.C. § 78u-4(a)(1) (emphasis added) ("The provisions of this subsection shall apply in each private action *arising under this chapter*[.]"); *Flaherty & Crumrine Preferred Income Fund, Inc. v. TXU Corp.*, 565 F.3d 200, 213 (5th Cir. 2009) ("[T]he PSLRA's stricter scienter requirement does not apply to state-law fraud claims[.]"). Broker Defendants' citation (Dkt. 685 at 8) to *Coates v. Heartland Wireless Comms., Inc.*, 26 F. Supp. 2d 910, 916 (N.D. Tex. 1998) (dismissing federal securities fraud claim for failing to satisfy the PSLRA's scienter standard) is similarly misplaced.

Here, however, the SAC does attribute numerous false statements to specific Broker Defendants (and other Defendants) who disseminated the false statements contained in the PPMs to thousands of investors. *See* SAC ¶ 132(a)(iii), (v) – (kkk)(iii), (v) (alleging in a separate

paragraph for each Broker Defendant that each one "repeated, distributed, or promoted" the misleading offering materials and "promoted [] the limited partnership interests in the GPB funds"). Furthermore, Plaintiffs allege that each Broker Defendant attended Ascendant Capital's due diligence meetings and webinars – but *not* to show that Broker Defendants *made* misrepresentations but rather, as *one* of the reasons why Broker Defendants *were aware* that the offering documents were misleading and had at least several bases for awareness of the Ponzi scheme. *See* ¶ 132(a)(iv)-(kkk)(iv), ¶¶ 42, 102. Accordingly, *Owens* and *Coates* are inapposite.

Broker Defendants also rely (Dkt. 685 at 8-9) on several inapposite cases holding that allegations failed to satisfy heightened or notice pleading by failing to make *any* distinctions between the defendants. *See Tigue Inv. Co.*, 2004 WL 3170789, at *1 (emphasis added) (citation omitted) ("[G]eneral allegations, which lump all defendants together *failing to segregate the alleged wrongdoing of one from those of another* cannot meet the requirements of Rule 9(b)."); *Del Castillo v. PMI Holdings N. Am. Inc*, No. 4:14-CV-03435, 2016 WL 3745953, at *13 (S.D. Tex. July 13, 2016) (emphasis added) (holding that the allegations "do not *in any way* distinguish the [] actions of . . . " different defendants or "*even delineate between the actions* of . . . " two groups of defendants);[18] *Contractors Source, Inc. v. SI Geosolutions*, No. 4:04-cv-2054, 2005 WL 8164832, at *2 (S.D. Tex. Apr. 5, 2005) (granting motion to dismiss because "listing more than a dozen individuals[]" fails to satisfy the "'by whom' requirement" of heightened pleading). Here, the SAC identifies and segregates *each* Defendant individually and only groups them according to their role in the fraud. *See* SAC ¶¶ 99-133. To the extent that any alleged wrongdoing is attributed to a group of Defendants, such as Broker Defendants, that is because *they all engaged in the same misconduct*, *see, e.g.*, *id.* ¶¶ 129-33, and this type of pleading has been expressly upheld in this

---

[18] *See* Dkt. 685 at 9 nn.10-11.

Circuit. *See U.S. ex rel. Ramsey-Ledesma v. Censeo Health, L.L.C.*, No. 3:14-cv-00118, 2016 WL 5661644, at *9 (N.D. Tex. Sept. 30, 2016) (citation omitted) ("[T]he SAC alleges that coders employed by Altegra and Censeo engaged in the same conduct, but that type of collective allegation, which describes the actions of multiple defendants alleged to have engaged in precisely the same conduct, is sufficient to satisfy Rule 9(b)."); *S.E.C. v. Couch*, No. 3:14-cv-1747, 2014 WL 7404127, at *5 (N.D. Tex. Dec. 31, 2014) (citing cases) ("Multiple defendants' conduct may be 'lumped together' if the plaintiff's allegations elsewhere designate the nature of the defendants' relationship to a particular scheme and identify the defendants' role."). Therefore, each Defendant has adequate notice of the allegations against them. *See* ¶¶ 99-133.

Axiom[19] incorrectly relies on *Moore v. Payson Petroleum Grayson, LLC* to attempt to distinguish the cases that support Plaintiffs' pleading approach. No. 3:17-cv-1436, 2018 WL 793800, at *5 (N.D. Tex. Jan. 22, 2018) (Ramirez, Mag.), *report and recommendation adopted*, No. 3:17-cv-1436, 2018 WL 776577 (N.D. Tex. Feb. 8, 2018).

*Moore* is easily distinguishable. *First*, the *Moore* complaint only "vaguely allege[d] that all Defendants . . . 'disseminated' offering documents without any particularity as to who created or made the specific misrepresentations/omissions." *Id.* at *6 (citation omitted). The SAC instead distinguishes – by name – which Defendants authored which documents, *see, e.g.*, SAC ¶¶ 13-14, 30, 41, 43-45, 52, 68, 83, 102, 114, 125(c)-(d), 128, 135, 170, 200, 209(e), 222, 224, 282, 351, 366, and which Defendants disseminated such documents, *see, e.g.*, *id.* ¶ 132(a)(iv)-(kkk)(iv).

*Second*, *Moore* involved vague allegations of defendants making misrepresentations to them "in meetings, communications, at investor events, dinners, and sales presentations." *Moore*,

---

[19] *See* ECF No. 709 at 5-6.

2018 WL 793800, at *5 (citation omitted). Here, the specific misrepresentations made by the Brokers are clearly delineated and are contained in written PPMs.

In sum, *Moore* is not remotely applicable here, because the precise document containing the misrepresentations is clearly identified.

### D. The Group Pleading Doctrine Has No Application To This Action.

The Group Pleading Doctrine permits "a court to presume, at the motion-to-dismiss stage, that 'group-published' documents such as 'statements in prospectuses, registration statements, annual reports, [and] press releases' are attributable to 'individuals with direct involvement in the everyday business of the company.'" *DeAngelis v. Corzine*, 17 F. Supp. 3d 270, 281 (S.D.N.Y. 2014) (citation omitted); *In re Banco Bradesco S.A. Sec. Litig.*, 277 F. Supp. 3d 600, 637 (S.D.N.Y. 2017) (quoting *In re Am. Int'l Grp., Inc. 2008 Sec. Litig.*, 741 F. Supp. 2d 511, 530 (S.D.N.Y. 2010)). In other words, the Group Pleading Doctrine creates a presumption that group-published documents are the "collective work" of corporate insiders. *Id.* The Group Pleading Doctrine therefore permits a plaintiff to plead fraud claims or federal securities claims against corporate insiders and officers based upon documents published by them as a group or by the corporation itself without directly stating the nature of their role concerning the preparation of such documents. It is typically used by plaintiffs to allege scienter in connection with claims brought pursuant to Rule 10b-5 promulgated pursuant to the Securities Exchange Act of 1934. *Id.* at 637-638. Defendants' implicit contention that some courts do not permit pleading of scienter or fraud based upon the Group Pleading Doctrine has some merit, but no application whatsoever to this case. Here, Plaintiffs simply are not relying upon the Group Pleading Doctrine to allege the facts necessary to plead aiding and abetting as against the Broker Defendants.

Broker Defendants' motions to dismiss collectively "rely" on numerous cases[20] asserting the Fifth Circuit's rejection of the "group pleading" or "group published" doctrine. *See Southland Sec. Corp. v. INSpire Ins. Sols., Inc.*, 365 F.3d 353, 365 (5th Cir. 2004) (cited in *Owens*, 789 F.3d at 537; *Tigue Inv. Co.*, 2004 WL 3170789, at *2 n.3); *see also Coates*, 26 F. Supp. 2d at 915-16 (rejecting the group pleading doctrine); Dkts. 683, 685, 687, 708. Such cases are inapposite.

Contrary to assertions of Broker Defendants, Ascendant, MBAF and Deloitte (Dkts. 683, 685, 687, 694, 703, 705, 708)[21] a "group pleading" is *not* a collective reference to more than one defendant. *See Alaska Elec. Pension Fund v. Asar*, 768 F. App'x 175, 184–85, 185 n.51 (5th Cir. 2019) (citing *Owens*, 789 F.3d at 538 n.4) ("The fact that these allegations pertain to more than one person does not make them group pleading."); *St. Denis J. Villere & Co. v. Caprock Comms. Corp.*, No. 3:00-cv-1613, 2003 WL 21339286, at *1 (N.D. Tex. June 4, 2003) ("[T]he use of the defined term 'Individual Defendants' to refer collectively to Defendants Cyr, Thompson, and McAleer . . . does not constitute group pleading."). Also contrary to Defendants' assertions,[22] such collective references are entirely proper when the allegations apply to more than one person, such as defendants here. =*See, e.g.*, *Asar*, 768 F. App'x at 184-85, 185 n.51; *St. Denis J. Villere & Co.*, 2003 WL 21339286, at *1. *See* SAC ¶¶ 99-133, ¶¶ 99-112 ("GPB Related Defendants," which are the fund and its affiliates), ¶¶ 113-16 (the "Individual Defendants," who ran the GPB Related Defendants), ¶ 117 ("Fund Administrator"), ¶¶ 118-24 ("Auditor Defendants"), ¶¶ 125-27 ("Valuation Defendants"), ¶ 128 (GPB's accountant, "Gentile Pismeny"), ¶¶ 129-33 ("Broker

---

[20] Broker Defendant Bradley Wealth Management, LLC does not raise a "group pleading" argument. *See* Dkt. 687.

[21] *See, e.g.*, Dkt. 685 at 3, 8. (complaining of allegations against "*sixty-three* named Broker Defendants."

[22] *See, e.g.*, Dkt. 685 at 8. (decrying that "the Complaint asserts identical claims against *sixty-three* separate broker-dealers but fails to describe a single action taken by any of them, individually").

Defendants"). Whether such collective references satisfy notice or heightened pleading requirements is simply *not* an issue of "group pleading".[23]

Moreover, the Complaint details the role of each Defendant. The Broker Defendants are alleged to have aided and abetted two claims pled under the TSA and the allegations are asserted separately as to each such defendant. ¶132(a)-(kkk). First, section 33(A)(2) of the TSA, and second, section 33(A)(1) of the TSA. Section 33(A)(1) of the TSA relates to GPB's failure to have registered securities under the TSA and is premised upon the fact that GPB did not have an exemption from federal registration under the Securities Act of 1933 and, therefore, was required to register under the TSA. The claims pled under section 33(A)(2) of the TSA allege that GPB engaged in numerous highly material misrepresentations of fact concerning the GPB integrated Securities Offering and that Defendants aided and abetted GPB by distributing the Private Placement Memoranda ("PPM") in which such statements were published with knowledge or in reckless disregard of the fact that such statements were false and misleading. Furthermore, they aided and abetted the scheme by raising billions of dollars for GPB with knowledge or in reckless disregard of the fact that GPB was involved in a massive-unregistered Offering of securities in violation of the TSA and was employing false and misleading documentation in connection with such Offering.

Plaintiffs specifically allege that <u>each</u> of the Broker Defendants sold GPB securities pursuant to false and misleading PPMs and other supporting documentation, which the Broker Defendants knew were false because of their investigation and DD Memos provided to them. The allegations of the SAC identified each Broker Defendant and their distribution of the false and

---

[23] Accordingly, the assertions and cases in Defendants' arguments that actually bear on Fed. R. Civ. P. 8(a) or 9(b) are addressed below. *See, e.g.*, Dkts. 685 at 7-9, 15; 687 at 3; 708 at 1.

misleading PPMs as well as their consummation of transactions pursuant to the PPM, whereby they raised billions of dollars for the GPB Ponzi scheme. The SAC lays out in detail the information which each Broker Defendant received, which alerted the Broker Defendants to the fact that the PPMs, employed by GPB, were false and misleading in highly material ways and that GPB was required to but did not register under the TSA.

Nowhere in the SAC do Plaintiffs attempt to employ the Group Pleading Doctrine. They are not alleging that the Broker Defendants prepared the PPMs and, therefore, that the preparation of such documents should be attributed to each Broker Defendant, but instead that the Broker Defendants employed and distributed the PPMs in interstate commerce with knowledge or in reckless disregard of the fact that the PPMs contained false and misleading information. The Group Pleading Doctrine has no application to such fact pattern. Nor does it have any application to the contention that Broker Defendants aided and abetted in an unregistered public Offering. The simple fact that each of the Broker Defendants were each separately engaged in a common effort over several years of facilitating the false and misleading integrated public Offering effected by GPB does not convert Plaintiffs' pleading into a Group Pleading, but instead clearly identifies the nature of the claims being alleged as against each of the Broker Defendants.

In fact, Broker Defendants' feigned concern with respect to the SAC appears to be based upon their contention that Plaintiffs have not identified the specific dates on which they distributed the PPMs or sold securities which resulted in the fuel for the GPB Ponzi scheme. Broker Defendants' contention styled as a Group Pleading Doctrine contention is in fact directed toward the detail alleged in the SAC itself. The Broker Defendants' contentions with respect to the pleading are baseless as well, because the "details" of the Broker Defendants' fraudulent activities

are uniquely within such Broker Defendants' knowledge. In such cases, the pleading standards, even under Fed. R. Civ. P. 9(b), are relaxed. *See supra* at Arg., Section II A.

## III.    DEFENDANTS' CHALLENGES TO THE WELL PLED TSA CLAIMS ARE MERITLESS

### A.    TSA Must Be Broadly Construed.

The TSA is a comprehensive statute which is to be broadly read. *Kubbernus v. ECAL Partners, Ltd.*, 574 S.W.3d 444, 475 (Tex. App. 2018); *In re Enron Corp. Sec., Derivative & ERISA Litig.*, 235 F. Supp. 2d 549, 691 (S.D. Tex. 2002) ("[T]he Texas Statute is a broad[,] remedial statute . . . ."). *See also Anheuser-Busch Companies, Inc. v. Summit Coffee Co.*, 934 S.W.2d 705, 708 (Tex. App. 1996), *writ dismissed by agreement* (Oct. 24, 1996) (citation omitted) (the TSA should be given "the widest possible scope" because it is a remedial statute.); *see, e.g.*, *In re Enron Corp. Secs., Derivative ERISA Litig.*, 761 F. Supp. 2d 504, 544 (S.D. Tex. 2011) ("The TSA does not require a buyer to prove reliance on the sellers's misrepresentation or omission[.]"); *Aegis Ins. Holding Co., L.P. v. Gaiser*, No. 04-05-00938-CV, 2007 WL 906328, at *6 (Tex. App. Mar. 28, 2008) (citation omitted) ("[T]here is no reliance element."); *Geodyne Energy Income Prod. Partnership I-E v. Newton Corp.*, 97 S.W.3d 779, 783 (Tex. App. 2003), *order withdrawn* (May 7, 2004), *rev'd in part*, 161 S.W.3d 482 (Tex. 2005) (same).

### B.  The TSA Applies Extraterritorially

Certain Defendants argue that the TSA does not apply to their activities because they did not sell securities *in Texas* or to a party located in Texas—*i.e.*, that the TSA does not apply extraterritorially to non-Texas purchasers, (Dkt. 685 at 27-28). Defendants' argument is specious. It is crystal clear that the TSA applies extraterritorially to persons not located in Texas and/or who did not purchase their securities in Texas, so long as the relevant securities offering "emanat[ed] from Texas" or otherwise has a nexus in Texas. *See Kubbernus*, 574 S.W.3d at 475 (citations

omitted) ("*Daccach* provides a strong indication that the Texas legislature intended the TSA to apply to transactions emanating from Texas, even when they involve non-Texas residents.");[24] *Citizens Ins. Co. of Am. v. Daccach*, 217 S.W.3d 430, 443-44 (Tex. 2007); *Baron v. Strassner*, 7 F. Supp. 2d 871, 875 (S.D. Tex. 1998) (citation omitted) ("[T]he Texas Securities Act . . . protect[s] non-Texas residents from fraudulent securities practices emanating from Texas."); *Enntex Oil & Gas Co. (of Nev.) v. State*, 560 S.W.2d 494, 497 (Tex. App. 1977), *writ refused NRE* ("It is obvious from an examination of the . . . [TSA] and the holdings in . . . cases that the [TSA] applies to appellants and their sales activities even though the purchasers, who are not regulated by the [TSA], [are] non-residents of the State of Texas."); *Rio Grande Oil Co. v. The State of Texas*, 539 S.W.2d 917, 921-22 (Tex. App. 1976) ("it [is] clear that the [TSA] applies if any act in the selling process of securities covered by the [TSA] occurs in Texas.").

Indeed, "'[t]here is nothing in the [TSA] . . . ' which would prevent the TSA from 'protect[ing] non-Texas residents from fraudulent securities practices emanating from Texas.'" *Kubbernus*, 574 S.W.3d at 475 (quoting *Baron*, 7 F. Supp. 2d at 875); *In re Enron Corp.*, 235 F. Supp. 2d at 691–92 (citation omitted) (TSA "is a broad remedial statute intended not only to protect Texas residents but also 'non-Texas residents from fraudulent securities practices emanating from Texas.'"); *Troice v. Willis of Colorado Inc.*, No. 3:09-cv-1274, 2014 WL 12824741, at *7 (N.D. Tex. Dec. 15, 2014) ("[T]he TSA applies extraterritorially . . . .").

Notwithstanding the wall of authority cited above, certain Defendants (Phoenix and Axiom) without referencing these authorities cite to a single case, *In re Enron Corp.*, 761 F. Supp. 2d at 574-75, for the inapposite proposition that the TSA does not extend to fraud in the sale of a

---

[24] Accordingly, Broker Defendant United Planners mistakenly relies on *Daccach*, *and cites no other cases*, for the opposite position. *See* Dkt. 669 at 3-4.

security by a non-Texas issuer seller that occurs <u>entirely outside</u> of Texas. This argument has no application to the facts pled here. Defendants ignore the fact that the *Enron* Court was addressing only Deutsche Bank's role in *Enron* which, according to the allegations, did not involve any Texas-based activities or any Texas-based sales by Deutsche Bank. *In re Enron* does not purport to conflict with the case law cited herein. *Id.* Here, Plaintiffs have in detail alleged that the Offerings were documented, sold from, and emanated from Austin, Texas; and involved Texas-based parties, and purchasers.

Here, the Offerings of GPB Securities clearly emanated from Texas, spearheaded by Ascendant, which, among other things, prepared the PPMs and other false and misleading offering materials, and disseminated due diligence materials to brokers and RIAs. Defendants also held many due diligence meetings with brokers – all from or in Austin, Texas. ¶¶ 42, 101, 132. And, the subscription documentation for the Class's purchases of GPB Securities were each processed in Austin, Texas. In short, every sale of GPB Securities in the scheme emanated from and was processed in Texas. ¶¶ 41-43, 45, 75, 99-106, 114.

In short, Defendants offer no case law contradicting the black letter law that the TSA applies extraterritorially where any act in the selling process occurred in Texas or if the transaction emanated from Texas, as is indisputably the case here. *See, e.g.*, ¶¶ 6, 37, 41-43, 45, 75, 99-106, 114, 117-32(a)-(kkk).

Rather than relying on relevant case law or rebutting the extensive case law cited by Plaintiffs, certain Defendants (Axiom, GPB, Phoenix, and RSM) ask this Court to dismiss Plaintiffs' TSA registration claims with respect to class members that are not Texas residents, and do not allege they were in Texas when they received the offer to purchase GPB securities. Instead, these Defendants rely solely upon their misinterpretation of the Texas Administrative Code, 7 Tex.

Admin. Code § 139.7(a). First, as explained above, Defendants fail to address and distinguish Black Letter Law, which provides for the extraterritorial application of the TSA. See cases cited, *supra*, and SAC ¶¶ 87, 89–93, 95–96. Defendants cite no contrary authority.

Moreover, Section 139.7(a) of the Texas Administrative Code, 7 Tex. Admin. Code § 139.7(a), has no application here, because it is only an administrative rule issued by the Texas State Securities Board ("TSSB"). That section states that "[t]he offer and sale of securities by an issuer or its selling agent to a non-Texas resident not present in Texas when the offer is made is exempt from the securities registration provisions of the [TSA]." It does not affect Plaintiffs' registration claims under the TSA, and Defendants cite no authority to this effect.

Significantly, pursuant to the TSSB's own rules, § 139.7(a) is applicable only to proceedings before that agency. *See* 7 Tex. Admin. Code § 101.1(c). Moreover, rules and/or proceedings of the TSSB are in any event non-precedential and thus have no effect in civil proceedings. *Id*. at § 101.3(c)).

More importantly, § 139.7(a) means only that non-Texas residents are not "counted" in determining whether a Texas-based issuer or seller must register under Texas law. However, once such registration is required or actually made because at least 35 persons—Texans or otherwise— are purchasers, <u>as was the case here</u>, registration is required, and failure to register is actionable by all offerees—Texans or not:

> [S]ince Section 5.I(a) [of the TSA] makes reference to the "total number of security holders of the issuer," all security holders of the issuer, ***whether or not they are citizens of this country or residents of this state***, must be counted in order to determine whether the 35-person limit will be exceeded at the time the sale in question takes place.

*Re: Section 5.1 Sales to Non-Residents of Texas*, 1985 WL 153935 at *1 (TSSB No-Action Letter, Jan. 23, 1985) (emphasis added).

Here, there is no question that more than 35 persons—Texan and non-Texan—purchased GPB Securities. This GPB was required to register and did not. ¶¶ 17, 75.

Section 139.7(a) does not in any way limit or preclude enforcement of the TSA by non-Texans. *E.g.*, ¶¶ 17, 75. Accordingly, it is indisputable under Texas law that absent an exemption from registration (which did not exist because Defendants did not comply with Regulation D), the Offerings of GPB Securities were required to be registered, even without counting non-Texas purchasers. Thus, 7 Tex. Admin. Code § 139.7(a) has no application here and provides no limitation upon the obligations of GPB, or the rights of purchasers like Plaintiffs and the Class. Absent registration, GPB is liable under section 581-7 and 581-33(A)(1) of the TSA for recission and other damages, as to all purchasers as every case addressing this issue has found.

Finally, the non-precedential rules of the TSSB is neither binding nor persuasive in this Court. Moreover, as shown in the cases discussed above, and as recently as 2018, appellate courts in Texas and U.S. district courts within the Fifth Circuit have consistently held that the TSA does in fact apply extraterritorially. Further, even *Daccach,* the case on which several Defendants rely, acknowledged the existence of 7 Tex. Admin Code § 139.7, yet still concluded: "the Texas Legislature intended section 12 of the Texas Securities Act to prohibit the unregistered sale of securities from Texas, even when the purchasers are nonresidents." *Daccach*, 217 S.W.3d at 446.

## C. Plaintiffs Have Properly Alleged Privity with the Primary Violators; No Privity is Required To Assert Claims Against Aiders and Abettors

Plaintiffs clearly and convincingly allege that they and Class members purchased the GPB Securities from GPB/Ascendant. ¶¶ 35-36, 87-98. In short, privity has been established with the primary violators under the TSA. No more is required.

Yet, Broker Defendants (but not other non-privity defendants) assert the entirely frivolous argument that the TSA requires a "privity of sale between the [Broker Defendants] and the

Investors." ECF No. 685 at 20.[25] Tellingly, most of the Defendants assert no such argument, conceding that no privity is required. Dkts. 687, 693, 701, 703 and 709. And, for good reason; under Black Letter Texas Law, privity is not required to assert a TSA aiding and abetting claim. *See, e.g.*, *Batson v. RIM San Antonio Acquisition, LLC*, No. 15-cv-07576, 2018 WL 1581675, at *6 (S.D.N.Y. Mar. 27, 2018) (citation omitted) ("The Act, however, 'does not require the aider to have had direct dealing with the defrauded party.'"); *Sterling Tr. Co. v. Adderley*, 168 S.W.3d 835, 843 (Tex. 2005) (citation omitted) ("As the court of appeals correctly noted, however, the TSA does not require the aider to have had direct dealing with the defrauded party; indeed, a person who 'materially aids a seller' may have no contact at all with the investor."); *Turk v. Pershing LLC*, No. 3:09-cv-2199, 2014 WL 12572906, at *3 (N.D. Tex. Dec. 8, 2014) ("Pershing's role in the success of the scheme is hardly different for an individual whose account was serviced by Pershing than it is for one who suffered collaterally as a result of Pershing's alleged involvement."). Indeed, *Turk v. Pershing* involved similar claims against Brokers who perpetuated the fraud but had no relationship at all with most of the securities purchasers.

Despite this clear case law, Broker Defendants argue that privity is required relying on: (1) a miscite to the statute itself and (2) three cases, principally *Energytec, Inc. v. Proctor*, 516 F. Supp. 2d 660 (N.D. Tex. 2007), that expressly contradict or are irrelevant to their specious privity argument. Broker Defendants' *own authorities* prove that the TSA does not require privity with aiders and abettors. *See* Dkt. 685 at 20.

*First*, these Defendants' reliance upon the statute is misplaced. Defendants' privity argument fails because they "rely" on the <u>wrong section</u> of the TSA (*i.e.*, the clause that provides

---

[25] Certain Defendants join in Broker Defendants arguments against Plaintiffs' TSA claim. Dkt. 669 at 1 (UPFSA, joining Dkt. 685); Dkt. 685 at 1, 6 (Bradley Wealth, joining).

for *primary* liability, not secondary liability). *See* Section 33(A)(1); *see also* Dkt. 685 at 20 (citing Tex. Rev. Civ. Stat. Ann. art. 581-33A(1) cmt. ("§ 33A(1) [like § 33A(2)] is a privity provision")). However, both relate to *primary* liability and Plaintiffs assert no such primary claims against Broker Defendants. Plaintiffs' claims against Broker Defendants and other aiders and abettors are based on section 33F. The very commentary these Defendants cite, Tex. Rev. Civ. Stat. Ann. art. 581-33A(1) cmt.), makes clear that "nonprivity defendants may be reached under §§ 33C and 33F." *Id.* Thus, the statute and all of the case law make clear that an aider and abettor is not required to have a privity relationship with a buyer. Defendants' miscitation of the applicable statute shows desperation, not legitimate advocacy.

*Second*, Broker Defendants improperly rely on *Energytec*, 516 F. Supp. 2d at 676 (cited in ECF No. 685 at 20-21), an inapposite case which these defendants completely misconstrue. *Energytec* merely holds that in order to assert aider and abettor liability, there <u>must first be</u> primary liability between a *seller* who has privity with a *buyer* who was injured. *Id*. at 676-77 (emphasis added) ("[A]iding and abetting liability is limited by the *privity requirement of a primary violation.*"). The TSA does not, and <u>has never been</u>, interpreted as requiring a privity relationship between aiders and abettors and purchasers. Indeed, Plaintiffs have cited to substantial authority to the contrary. *See, supra*, at 60. In particular, numerous aiders and abettors who had no relationship, privity or direct or indirect contact with purchasers, were found liable in the *Stanford* litigation.

Similarly, Broker Defendants' reliance on *Ratner* and *Highlands* is also misplaced. *See Ratner v. Sioux National Gas Corporation*, 77- F.2d 512, 517 (5th Cir. 1985); *see Highland Capital Mgmt., L.P. v. Ryder Scott Co.*, 402 S.W.3d 719 (Tex. App. 2012). *Ratner*, a 35 year old case, does not even touch on secondary liability. *See* Dkt. 685 at 20 (citing *Ratner*, 770 F.2d at

517). There, the TSA claims for primary liability had no merit because the plaintiffs "did not purchase a security" from defendants.

In *Highland*, 402 S.W.3d at 742, the Court recognized only that a broker <u>could be</u> a seller and therefore liable for a *primary* violation.[26] (Here, Plaintiffs do not assert such a claim against Broker Defendants). *Highland* did not hold that a purchaser must establish privity with an aider and abettor. *Id.* at 748. (finding that a defendant broker, "Ryder Scott[,] was not entitled to summary judgment on [the] claims that Ryder Scott violated Section 33F(2) by aiding . . . violati[ons of TSA] Section 33A(2) and . . . Section 33C."). Once again, the *Highland* court cites only primary liability statutes in discussing privity. *Id.* at 741, 742 (discussing 33(A))*.* Though Broker Defendants clearly wish that a privity requirement applied to them, that is simply not the law.

### D. Broker Defendants' Standing Arguments are Meritless.

Plaintiffs have Article III standing to assert the causes of action in the SAC, notwithstanding Broker Defendants' specious arguments to the contrary. *See* Dkt. 685 at 18-20. To assert standing, "general factual allegations of injury resulting from the defendant's conduct suffice" because they "embrace those specific facts that are necessary to support the claim." *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 561 (1992) (citation omitted) (cited in ECF No. 685 at 18).

---

[26] Indeed, Broker Defendants acknowledge that *Highland* relied on *Frank v. Bear, Stearns & Co.*, 11 S.W.3d 380, 384 (Tex.App.-Houston [14th Dist.] 2000, pet. denied), which merely held that "to impose seller liability *under Section 33A(2)* [the primary liability provision], a plaintiff must be in privity with defendant; that is, the plaintiff must have bought the securities from the defendant." *Highland,* 402 S.W.3d at 741 (emphasis added) (citing, *Frank*, 11 S.W.3d at 383).

*In re Deepwater Horizon*, 753 F.3d 509, 513 (5th Cir. 2014) (citation omitted) ("Allegations of causation are sufficient to satisfy Article III in a class action complaint and in a class definition.").

The SAC easily alleges standing, which requires (1) an injury in fact that is (2) "fairly traceable" to the defendant's conduct and (3) redressable. *Id.* Plaintiffs satisfy all three elements as to the primary violators in this action: the GPB Defendants, the GPB Related Defendants and the Individual Defendants; and as to the Aiders and Abettors. Broker Defendants dispute only the second element -- traceability -- not the first and third elements. Regardless, all three are easily satisfied when, like here, Plaintiffs are defrauded investors who seek damages. *See Broyles v. Commonwealth Advisors, Inc.*, 936 F.3d 324, 326 (5th Cir. 2019) (citing *Lujan*, 504 U.S. at 560-61) ("The investor plaintiffs . . . demonstrat[ed] . . . their injury-in-fact that arose immediately upon their purchase of the falsely overvalued securities[.]"); *e.g.*, SAC ¶ 14 (alleging losses), ¶¶ 87-98 (alleging each Plaintiff's losses), ¶ 19 (alleging Broker Defendants' role in the fraud), ¶ 27(b) (same), ¶¶ 129-32 (alleging that Broker Defendants aided and abetted the fraud by promoting and selling the securities and distributing Offering Materials that they knew were materially false), at 216 (seeking damages). The Broker Defendants were the fuel for the Ponzi scheme fire. Standing is easily satisfied.

Broker Defendants' "argument" that Plaintiffs did not buy directly from each of them is a red herring. As explained above and in prior briefing to the Court (Dkt. 685 at 20), privity is not required to assert an aider and abettor claim under the TSA and the Brokers Defendants' stubborn refusal to acknowledge this widely accepted principle is perplexing. *See, Turk*, 2014 WL 12572906, at *1-2 (Broker Pershing is liable to purchasers of Stafford CDs who had no privity or other relationship with Pershing.).

Further, Broker Defendants' argument that Plaintiffs cannot show loss causation because they did not purchase directly from them rings hollow as Plaintiffs claims under Counts 2, 5, 8, and 10,[27] do not even require causation, which is inherent in aiding-and-abetting claims. *Abecassis v. Wyatt*, 704 F. Supp. 2d 623, 637-38, 640 (S.D. Tex. 2010). The underlying violations of the TSA do not require loss causation either. *Kubbernus*, 574 S.W.3d at 485. That Broker Defendants' role in the Ponzi scheme, assisted the underlying violations that injured Plaintiffs is sufficient to "fairly trace[]" the injury to Broker Defendants' conduct. *Abecassis*, 704 F. Supp. 2d at 637 (quoting *Bennet v. Spear*, 520 U.S. 154, 168 (1997)).

In any event, injury caused by an aider and abettor *is* traceable because "cessation of the defendant's allegedly illegal activity would 'make an appreciable difference' in bringing about the harm." *Id.* at 640 (citation omitted). Indeed, had Broker Defendants not raised money to fuel the Ponzi scheme, the harm would cease. Traceability is satisfied.

Broker Defendants also attempt to hang their hat on the fact that no Plaintiff asserts claims against the specific Broker Defendant from which that Plaintiff purchased securities. *See* Dkt. 685 at 19-20. There is no argument there. A direct transaction between Plaintiffs and each Defendant is not required for standing because if that were so, then no plaintiffs could <u>ever</u> have standing to assert aiding-and-abetting claims. *See Abecassis*, 704 F. Supp. 2d at 638. That is plainly not the law, so it is no surprise that Broker Defendants make *no* attempt to explain, or cite cases requiring a direct relationship in the context of aiding-and-abetting claims. *See* Dkt. 685 at 18-20.

---

[27] To prove traceability, "[a]llegations of causation are sufficient." *In re Deepwater Horizon*, 753 F.3d at 513. That standard is satisfied as to Count 9 because causation is adequately alleged against Broker Defendants. *See infra* Part _[section discussing Count 9]_; SAC ¶ 360.

Broker Defendants further argue, based on *Franklin*, that Plaintiffs do not have standing to assert claims regarding all four GPB funds, as they did not purchase interests in each Fund. That argument fails for three reasons. First, Plaintiffs allege that each of the Offerings were part of an integrated Offering, which should be treated as a single Offering, and Plaintiffs thus have standing as to each part of the integrated Offering. *NECA-IBEW Health & Welfare Fund v. Goldman Sachs & Co.*, 693 F.3d 145, 162 (2d Cir. 2012) (Class Plaintiffs had standing to assert claims on behalf of purchasers of certificates from other related offerings as well as claims that arose from course of illegal conduct.).

Whether Plaintiffs may represent absent class members is an issue for class certification, not a standing issue.[28] *See Gen. Tel. Co. of Soutwest v. Falcon*, 457 U.S. 147, 149 (1982) (addressing differences within the class at the class certification stage); *Broquet v. Microsoft Corp.*, No. 08-cv-094, 2008 WL 2965074, at *2 (S.D. Tex. July 30, 2008); *In re RadioShack Corp. ERISA Litig.*, 547 F. Supp. 2d 606, 611 (N.D. Tex. 2008) (citation omitted) (holding that once a plaintiff "'demonstrate[d] individual standing vis-as-vis the defendant[s][,]' [] the decision of whether he

---

[28] Moreover, when that day comes, the argument will still fail. Plaintiffs may represent a class without purchasing every type of security or class of securities that every class member purchased if, as is the case here, the claims are typical and involve "a uniform pattern of illegal conduct." *In re PaineWebber Ltd. Partnerships Litig.*, 171 F.R.D. 104, 123, 106 (S.D.N.Y. 1997), *aff'd sub nom*. *In re PaineWebber Inc. Ltd. Partnerships Litig.*, 117 F.3d 721 (2d Cir. 1997) (citation omitted) (approving class settlement involving plaintiffs who held interests in only twenty-three of seventy limited partnerships at issue); *In re WorldCom, Inc. Secs. Litig.*, 219 F.R.D. 267, 280 (S.D.N.Y. 2003) (citation omitted) ("When it is alleged that the same unlawful conduct was directed at or affected both the named plaintiff and the class sought to be represented, the typicality requirement is usually met irrespective of minor variations in the fact patterns underlying individual claims."); *In re Dreyfus Aggressive Growth Mut. Fund Litig.*, No. 98-cv-4318, 2000 WL 1357509, at *3 (S.D.N.Y. Sept. 20, 2000) ("Courts have repeatedly held that . . . class representatives need not have invested in each security so long as the plaintiffs have alleged a single course of wrongful conduct with regard to each security."). Indeed, the SAC alleges no misconduct that is unique to any fund because the same conduct applies to all funds, which constituted a single integrated offering.

can pursue . . . " absent, class members' claims that may differ from his own "should be left for later determination under Rule 23.").

## IV. PLAINTIFFS HAVE PROPERLY PLED AIDER AND ABETTOR CLAIMS UNDER THE TSA.

Several of the Defendants have alleged that the claims pled for aider and abettor liability under the TSA as against them are not well pled. These arguments are baseless. The Complaint contains detailed factual allegations as to each Defendants' actual knowledge of the Ponzi scheme and misrepresentations concerning the underlying the Ponzi scheme and reckless disregard of red flags. The Complaint also alleges in detail the substantial assistance provided by each of the Defendants without whose assistance the Ponzi scheme would have failed at a much earlier stage. *See supra,* at __ - __.

To plead aider and abettor liability under the TSA a plaintiff must prove that the primary defendant: (1) "committed a primary violation of the securities laws," (2) [d]efendants had 'general awareness' of their role in this violation, (3) [d]efendants rendered 'substantial assistance' in this violation, and (4) [d]efendants either intended to deceive [p]laintiffs or **acted with reckless disregard of the truth of the representations made by [the] primary violator . . . ."** *See In re Enron Corp. Sec., Derivative & Erisa Litig.*, 762 F. Supp. 2d 942, 977 (S.D. Tex. 2010); *Goldstein v. Mortenson*, 113 S.W.3d 769, 776 (Tex. App. 2003).

### A. General Awareness.

The defendants charged with aider and abettor liability argue that plaintiffs have not satisfied the "general awareness" or "reckless disregard" factors. This is demonstrably false.

Texas courts have set forth the requirements for general awareness and reckless disregard as it relates to aiders and abettors under the TSA. First, courts have recognized that these issues are intensely factual and in general cannot be decided prior to a jury trial. *See Official Stanford*

*Inv'rs Committee v. Breazeale Sachse & Wilson LLP*, No. 3:11-cv-0329, 2015 WL 13740747, at *7-9 (N.D. Tex. Mar. 24, 2015); *Kneese v. Pershing, L.L.C.*, No. 3:10-cv-1908, 2012 WL 13019677, at *2-3 (N.D. Tex. Nov. 14, 2012). Moreover, courts have made it clear that a party does not need to know the exact nature of the misrepresentations made by the primary violator of the TSA, nor the exact nature of the illegal Ponzi scheme, but only have general awareness of misconduct, misrepresentations, or knowledge of an illegal scheme. *See, e.g.*, *Sterling Tr.*, 168 S.W. 3d at 840. Furthermore, as the court in *Goldstein v. Mortenson* made clear, a party need not have all of the information alerting them to the nature of the illegal scheme, but only enough information to alert them "to the possibility of . . . illegal activity *Goldstein*, 113 S.W.3d at 777 (citation omitted). Moreover, Texas courts impose a duty of investigation when an aider and abettor is put on "inquiry notice" of potential misrepresentations and/or related fraudulent misconduct. *Id.* "At the very least, his failure to conduct a minimal investigation and inquiry before assisting [ ] shows 'a reckless disregard for the truth or the law.'" *Id.* (quoting Tex. Rev. Civ. Stat. Ann. art. 581-33F(2)). In addition, the court in *Goldstein* found that awareness of atypical transactions constitutes general awareness and failure to address such atypical transaction at least through minimal investigation constitutes reckless disregard. *Id.* Other courts have specifically found that aiders and abettors who have knowledge of excessive compensation to insiders and/or brokers or who have concerns with respect to the *bona fides* of securities Offerings concerning the PPMs status and/or exemptions under Regulation D also have general awareness of the potential for fraud. The failure to address such concerns constitutes reckless disregard. *See Kneese*, 2012 WL 13019677, at *3 (Knowledge of excessive compensation to brokers and concerns with respect to *bona fides* of a CD securities offering both constituted general awareness and, as a result of the failure to conduct an investigation, reckless disregard.)

### B.     Facts Pled Showing General Awareness and Reckless Disregard

As shown in section ___ hereof, each Defendant sued as a aider and abettor, had several awareness, disregarded multiple red flags, and further failed to carry out their duty of due diligence. Phoenix, the Administrator for the GPB Funds, had general awareness of the misrepresentations and of the Ponzi scheme, and recklessly participated therein by providing administrative services and false NAV statements to GPB investors on a monthly basis over a period of at least four years, despite its awareness of the falsity of GPB statements and its awareness of material omissions with respect to such disclosure.

First, Phoenix was aware of and was the creator of the false NAV statements that were sent to investors on a monthly basis. While Phoenix received raw data as to the NAV information from GPB/Ascendant, Phoenix knew that such numbers were incorrect, because they failed to account for the enormous upfront fees (approximately 10%) paid to Broker Defendants and the Underwriters in connection with the sale of GPB Securities. Thus, the NAV statements were inflated on a continuous basis, and such inflation was known to Phoenix, when it provided such statements to GPB investors.

Second, Phoenix was aware that certain of the GPB Funds were improperly unregistered under section 12(g) of the 1934 Act. Phoenix, as the Administrator for the Funds, knew the actual number of the investors in each of the GPB Funds and, therefore, it knew as the SEC has confirmed at some point in 2016 that several of the GPB Funds exceeded 2,000 investors and $10 million in assets and thus were required to register under section 12(g) of the 1934 Act.

Third, Phoenix, like the Broker Defendants, was aware of the highly unusual nature of the excessive compensation being paid to it and the Broker Defendants in connection with the GPB Offerings and being paid to GPB and its affiliates in connection with managing the GPB investments. Such fees as described in the SAC were approximately 18%-201% of investor

monies, an unprecedently large amount. ¶ 214. This atypically large compensation not only made legitimate investment performance impossible, it alerted Phoenix to the nature of the scheme, which was designed to divert customer funds to insiders at GPB. Knowledge of such atypical transaction is under Texas law both general awareness and reckless disregard. *See Sterling Tr.*, 168 S.W. 3d at 840-841, 845-846 (Knowledge of atypical transactions constitutes both general awareness and reckless disregard).

Here, the Broker Defendants indisputably had not only general but <u>actual knowledge</u> of the nature of the GPB misrepresentations and the Ponzi scheme being conducted by GPB and acted with reckless disregard of the falsities of these misrepresentations and reckless disregard of the fact that they knew that GPB was in violation of both federal and state securities registration laws. Specifically, the Broker Defendants had actual knowledge as to GPB's misrepresentations, and falsities concerning the purported 8% payout from earnings and GPB's illegal failure to register under the TSA and the 1934 Act through the five DD Reports described in the SAC at ¶¶ 41-45. These DD Reports prepared by independent third parties disclosed to each of the Broker Defendants the nature and scope of GPB's misrepresentations and Ponzi scheme. Specifically, the DD Reports outlined the grossly excessive compensation being paid to brokers, and the outrageous compensation being paid to insiders and managers from GPB which was an additional 8%-181%. ¶ 11.

The DD Reports laid out in black and white that investors who committed to invest one million dollars in the GPB partnerships would in effect only be investing approximately $800,000. And thus legitimate market-based investment returns on this substantially reduced amount of investment corpus would be impossible or unlikely. In addition to laying out these excessive fees to insiders and brokers, the DD Reports made clear what the PPM provided to investors hid; the

fact that GPB and Ascendant were one entity. The DD Reports made clear that GPB, the Offeror of the limited partnership interests, and Ascendant, the purported objective Underwriter of such limited partnership interests, were in fact a single entity sharing compensation on an undisclosed basis. Stated differently, the PPM and the DD Reports laid out that GPB and Ascendant had created and executed a scheme in which they tricked investors into believing that an independent underwriter was reviewing and evaluating the partnerships on their behalf, but in fact the independent underwriter was actually the issuer itself.

The DD Reports also made clear that -- at some point in 2016 --several of the GPB limited partnerships would be required to become fully registered and fully reporting companies under the 1934 Act requiring them to prepare quarterly reports and annual audited financials in an annual report. Each of the Broker Defendants knew that this registration **never took place** and that accordingly GPB and Ascendant were operating in violation of the 1934 Act. The DD Reports also laid out that GPB's prior investment performance with respect to similar investment partnerships was materially less than that which GPB predicted would occur with respect to the GPB partnership. Stated specifically, the DD Reports, but not the PPM that was provided to investors, laid out definitively for brokers the investment performance that GPB had achieved in prior similar partnerships showing this performance to be in the mid-single digits. The Broker Defendants thus knew and disregarded the fact that GPB had never before achieved sufficient investment performance to pay out a current 8% dividend and the projected rate of return of in excess of 15%.

They knew in effect that GPB promises regarding investment performance were not only pie in the sky but were contradicted by prior performance disclosed to them, but not disclosed to investors. Finally, the Broker Defendants knew that GPB had not legitimately qualified for exemption from registration under the 1933 Act, because it did not comply with the basic

requirements of Regulation D. The Broker Defendants knew this because they knew that GPB and Ascendant were a single entity, and thus Ascendant and its principals were heavily compensated promotors of the GPB limited partnership interests. They knew that this information was not disclosed in the Regulation D applications filed by GPB, therefore voiding such application and making an exemption unavailable to GPB. GPB failed to make such disclosure and hid its co-ownership relationship with Ascendant and the monies that were paid to Ascendant and to GPB directly and through its co-ownership with Ascendant. The Broker Defendants knew this relationship from the DD Reports and thus knew that GPB's failure to disclose it fully in the application pursuant to Regulation D made an exemption under Regulation D unavailable. In reckless disregard of all of these fraudulent statements and in reckless disregard of the knowledge that GPB was running a scheme whereby it co-owned the lead Underwriter, the Broker Defendants went ahead with the Offering and substantially assisted with the raising of $2 billion based upon knowingly false documents distributed by them.

The Auditor Defendants also had general awareness of the GPB misrepresentations and the ongoing fraud at GPB, and recklessly disregarded it by lending their name and status to the GPB Offerings by auditing and/or reviewing financials which all parties now know were inaccurate in material respects and which have been withdrawn by GPB. More importantly, GPB has recently stated that the financials were not only wrong, but materially wrong, and that a write off of more than $1 billion – more than 50% of the GPB asset value -- reported on such financial statements has taken place. ¶¶ 14, 125.

The Auditor Defendants' role in enabling the scheme to continue was fundamental, because GPB had no substantial prior investment experience and had only raised small sums of money prior to the Offerings at issue in this litigation. Absent audits and/or reviews from legitimate,

significant, and well-regarded accounting firms, GPB could not have put together a nationwide offering involving 80 Broker Defendants and thousands of investors. Stated simply, absent the Auditor Defendants' involvement, the Offerings could not have occurred. First, each of the Auditor Defendants knew and recklessly disregarded that certain of the GPB Funds were never registered under section 12(g) of the 1934 Act, because they knew that these Funds had more than 2,000 investors and $50 million in assets – triggering the registration requirement under section 12(g). They knew this because they handled the audit or financial review for each of the Funds, so therefore they knew the number of investors receiving financial reporting in connection with each such Fund, and the assets of each such Fund. Despite knowledge that GPB was illegally operating as an unregistered entity, the Auditor Defendants continued to issue audits and reviewed GPB financial statements.

The Auditor Defendants also knew that insiders in GPB – specifically Ascendant and principals of Ascendant – were receiving large sums of money that were not disclosed in the PPM. ¶¶ 53, 233. Stated differently, the Auditor Defendants had knowledge through their access to the GPB financials that insiders in the GPB/Ascendant organization were receiving large sums of money on a regular and continuous basis that were not described in the PPM as fees payable. ¶ 209.

Third, in addition, as described in the DD Reports, GPB and its principles engaged in numerous insider transactions and undocumented inter-company loans having the effect of falsifying the financials. Indeed, GPB engaged in transactions whereby monies from one limited partnership were loaned at below market rates and without proper documentation to other GPB limited partnerships -- all in a manner inconsistent with applicable fiduciary and financial standards. Each of the Auditor Defendants was aware of these transactions because they were

included on the books and records of GPB, but not disclosed to the limited partners. The DD Reports made clear that these insider transactions were a material issue with the business operation and management of GPB entities. The Auditor Defendants were aware of this fact and yet continued to offer their assistance on the financials of GPB. The Valuation Defendants' bank had access to the GPB financials and recklessly disregarded the same information. ¶ 209.

### C. Each Of The Defendants Substantially Assisted In The Primary Violation Of The TSA.

While "Texas [c]ourts have not precisely articulated the standards governing application of the [TSA's] 'substantial assistance' element[,]" *Breazeale*, 2015 WL 13740747, at *9, the Texas Supreme Court in *Goldstein v. Morgensen*, and Judge Godbey in *Breazeale* have both held that substantial assistance is activity that "enable[s] [the primary violator] to continue to operate . . . ."[29] In any event, "whether assistance is 'substantial' . . . involve[s] factual . . . " issues and, thus, is not appropriate for determination on this motion. *See Breazeale*, 2015 WL 13740747, at *8 (citing *Hirata Corp. v. J.B. Oxford & Co.*, 193 F.R.D. 589, 600 (S.D. Ind. 2000) (collecting state cases determining that the "assistance" prong for state securities law claims is a question of fact)).

Each of the Defendants engaged in intentional conduct that purposely enabled GPB to continue to operate its Ponzi scheme through fraud and misrepresentations. Courts have consistently held that the substantial assistance test is met when the aider and abettor is involved in raising funds, equity or debt for the primary violator as is the case here with respect to and of the Broker Defendants. *See, e.g.*, *In re Monahan Ford Corp. of Flushing*, 340 B.R. 1, 34 (Bankr. E.D.N.Y. 2006) (Without financing debtor, would not have been able to implement fraudulent plan.).; *Goldstein*, 113 S.W.3d at 777 (finding substantial assistance when defendant provided the

---

[29] *Goldstein*, 113 S.W.3d at 777; *see Breazeale*, 2015 WL 13740747, at *8.

primary violator with funds that enabled it to continue to operate); *Navarro v. Grant Thornton, LLP*, 316 S.W.3d 715, 728 (Tex. App. 2010) (cited in ECF No. 685 at 21-22, 24) (citation omitted) (holding that procuring a loan for a primary violator constitutes substantial assistance if "the loan was [] funded or [] the primary violator received [] money as a result of the proposed loan.");[30] *Kneese*, 2012 WL 13019677, at *4 (financing investor purchase of CDs in ponzi scheme lent credibility to the operation, and was sufficient to plead aiding and abetting).

Here, the Broker Defendants raised $1.8 billion for GPB knowing from the DD Reports and otherwise that its PPMs contained material misrepresentations and that GPB had improperly failed to register under both the 1933 and 1934 Acts as well as the TSA. Broker Defendants substantially assisted the Ponzi scheme by (1) distributing to tens of thousands of investors PPMs that contained misleading and/or false information, and omitted to state material facts necessary to make the information therein accurate (¶¶ 35, 132(a)(iii)–132(kkk)(iii), 283-84); (2) selling the limited partnership interests despite knowing that the sales exceeded the thresholds for registration under Section 12(g) of the Exchange Act (¶¶ 192-96); and (3) sending sales proceeds to Ascendant and the GPB Defendants, thereby providing them "with the capital needed to continue the scheme." ¶ 132(a)(iii), (v)–132(kkk)(iii), (v); *see also* ¶¶ 207, 235-36, 243, 248, 251, 255-57. Such conduct easily satisfies the substantial assistance test under *Goldstein* and *Navarro* and the financing cases outlined above. *See generally*, *Turk*, 2014 WL 12572906, at *3 (sustaining aider and abettor claims against a "clearing broker" who processed securities transactions on behalf of some securities purchasers and extended credit to such customers enabling them to make capital contributions to the Stanford Ponzi scheme).

---

[30] *See Goldstein*, 113 S.W.3d at 777; *see Breazeale*, 2015 WL 13740747, at *8.

Broker Defendants do not dispute those three bases for substantial assistance, which are expressly alleged in the SAC. ¶¶ 132(a)(iii), (v)–132(kkk)(iii), (v), 192-96, 207, 235-36, 243, 248, 251, 255-57, 283-84. Rather, they mischaracterize Plaintiffs' theory as solely an unactionable "failure to disclose," but this tactic has no application here. Here, the Brokers directly made and participated in making materially false statements to class members by distributing to each class member a PPM, which as described in the Complaint, contained false and misleading information which the Brokers knew was false and misleading. Second, the Brokers did more than make false disclosures through PPMs, they actively fed the Ponzi scheme by raising billions of dollars predicted upon the false disclosures and phony 8% dividend promise. *Segner v. Sinclair Oil & Gas Co.*, No. 3-11-cv-03606, 2012 WL 12885055, at *13 (N.D. Tex. June 4, 2012), *supplemented*, No. 3-11-cv-03606, 2012 WL 12884861 (N.D. Tex. Oct. 19, 2012), *order clarified*, No. 3-11-cv-03606, 2012 WL 12885056 (N.D. Tex. Nov. 9, 2012) ("[The] Complaint [] does not allege merely that Defendants acted passively by failing to disclose the alleged Ponzi scheme, but instead actively participated in its perpetuation[.]"); Dkt. 685 at 21; Dkt. 669 at 1 (joining Dkt. 685).

Broker Defendants' failure to disclose material facts they knew is an *additional* basis for substantial assistance, but not the primary basis therefore which relates to their affirmative actions.

Funding a Ponzi scheme and publicly circulating materially misleading documents, such as the PPMs and other Offering Materials, injure all investors in the Ponzi scheme regardless of whether those investors are clients of the brokers. *See, e.g.*, *Sterling Tr.*, 168 S.W. 3d at 843 (citation omitted) (holding that aiding and abetting liability can apply even if the aider has "no contact at all with the investors."). *Turk*, 2014 WL 12572906, at *3 (Brokers who funded the scheme by lending to certain investors injured all investors, not just its clients). This is a well-supported legal proposition. Numerous courts have found aiders and abettors liable under the TSA

regardless of whether they had a customer relationship with the plaintiffs. *See, e.g.*, *Breazeale*, 2015 WL 13740747 (holding that investors can sue law firm despite having not being clients of the firm); *Kneese*, 2012 WL 13019677 (allowing aiding-and-abetting claims against broker even though not all plaintiffs or class members used that broker); *Sterling Tr.*, 168 S.W. 3d at 843 (citation omitted) (holding that custodian for self-directed IRA can be liable to all class members for aiding and abetting under TSA even though only some class members used that custodian, and recognizing that the aider "may have no contact at all with the investors"). In short, Broker Defendants' insistence that they substantially assisted TSA violations only with respect to their "own customers," or that only a direct customer can assert a TSA claim against them for aiding and abetting, is simply wrong.

Furthermore, Broker Defendants owed a duty to disclose for an additional independent reason. First, Broker Defendants "voluntarily disclose[d] partial information, but fail[ed] to disclose the whole truth" by passing along the false and misleading Offering Materials to their customer-Plaintiffs without them so disclosing the material misrepresentations and omissions. Once Defendants communicated false or misleading information, they had a duty to do so fully and accurately. *Pleasant Grove Indep. Sch. Dist. v. FieldTurf USA, Inc.*, No. 06-19-00022-CV, 2020 WL 1646633, at *12 (Tex. App. Apr. 3, 2020), *reh'g denied* (June 10, 2020); ¶ 132(a)(v), (b)(v)…(kkk)(v).

*Finally*, Broker Defendants attempt to nit pic some of the material misrepresentations they conveyed through the PPMs is inappropriate. They attempt to now argue the "merits" because there is no basis for their motion to dismiss. This is nonsense on a motion to dismiss, and in the face of the detailed material misrepresentations made and alleged. The Brokers improperly and prematurely contend that they were not required to disclose, that the securities were not registered

under the 1934 Act because, under Section 12(g) of the Exchange Act, the GPB Defendants had until "120 days after the last day of its . . . fiscal year" to register the securities. This fact-based argument also fails. First, it completely ignores all of the other material facts that Broker Defendants failed to disclose. ¶¶ 35, 132(a)(v)-(kkk)(v), 209(c). Second, the precise timing of GPB's violation of the 1934 Act, also alleged in detail in the SEC complaint, is not now ripe for decision. That the Brokers are reduced to resorting to minor factual disputes on this motion to dismiss makes clear that it should never have been brought.

### D. Phoenix's challenge to Plaintiffs' substantial assistance allegations is also misguided.

As pled, Phoenix's role in providing assistance to the Ponzi scheme easily satisfies the substantial assistance standard outlined in Texas cases. Phoenix processed transactions on behalf of GPB, including receiving and approving executed subscription documents (along with Ascendant), making payments to broker dealers, and insiders (Schneider and Gentile) and others from customer monies, and falsely reporting NAVs to customers on a regular and continuous (monthly) basis for at least four years. ¶¶ 31, 117, 366. In connection with such transactions, Phoenix was paid an extraordinary amount (20% of the amounts of the payments made on behalf of GPB). ¶¶ 366-368. This extraordinary compensation alerted Phoenix to the fact that GPB was engaged in improper conduct. No legitimate business could afford to pay a processing agent that acts as an administrator 20% of the amount of money that it pays out. Phoenix being experienced in Fund Administration business knew this.

Yet, Phoenix, with full knowledge of the misrepresentations made to investors regarding the NAV, GPB's violations of both the 1933 and 1934 Acts, and of the TSA, continued to process thousands of transactions on behalf of GPB in furtherance of the Ponzi scheme. Without an administrator effecting these transactions, GPB could not function. Phoenix's role as paymaster

for GPB meant that Phoenix was operating the day-to-day cash flow business for the Ponzi scheme knowing that GPB made material misrepresentations in violation of federal and state laws. This conduct easily satisfies the substantial assistance test. *See Sterling Tr.*, 168 S.W.3d at *839-846 (allowing an aider and abettor claim as against Sterling, the party who acted as a custodian/administrator for certain parties investing in the underlying Ponzi scheme); *Lillie v. Stanford Tr. Co.*, No. 3:13-cv-3127, 2015 WL 13741931, at *3-4 (N.D. Tex. June 17, 2015), *reconsideration granted*, *order vacated in part*, No. 3:13-cv-3127, 2015 WL 13741932 (N.D. Tex. Sept. 22, 2015) (allowing aider and abettor clam as against administrator/custodian who provided services on behalf of certain IRA accounts which invested in the fraudulent underlying scheme); *Turk*, 2014 WL 12572906, at *2-3 (Clearing firm which was back office for certain investors in Ponzi scheme was subject to aider and abettor liability).

### E. The Auditors' Conduct Satisfies the Substantial Assistance Requirement.

Similarly, the Auditor Defendants' conduct constitutes substantial assistance. The audits and reviews provided by the Auditor Defendants in this action enabled GPB to continue to operate. ¶¶ 27, 52, 118-124. Indeed, they were essential to this scheme because GPB had limited operating history and therefore investors had no basis to determine whether or not the GPB management team could effectively and accurately report financial results. ¶ 52. Thus, absent an audit and the credibility of a well-known auditor, it is unlikely that GPB would have been able to raise any monies from investors. Here, the accountants lent their name, creditability and accounting skill to the production of misleading PPMs and false financial statements. As the parties now know, GPB has acknowledged that its financial statements overstated its total assets by more than $1 billion. Stated differently, the accountants provided audit opinions and reviews and prepared audited financials which overstated the GPB assets by more than $1 billion. By lending their name, creditability, and their accounting skill to the GPB start up, the parties lent substantial assistance

essential to the operation of the GPB business. *See Kneese*, 2012 WL 13019677, at *4 (parties lending name and credibility to scheme is aider and abettor and provided substantial assistance); *see also Breazeale*, 2015 WL 13740747, at *8-9; *Troice v. Proskauer Rose, LLP*, No. 3:09-cv-1600, 2015 WL 1219522, at *8-10 (N.D. Tex. Mar. 4, 2015), *rev'd sub nom. Troice v. Proskauer Rose, L.L.P.*, 816 F.3d 341 (5th Circ. 2016). (Both cases holding that parties who render inaccurate or incorrect legal opinions to fraudulent actors which enabled those fraudulent actors to engage in further fraud are liable to investors as aider and abettor under the TSA.)

Clearly, if a third party completely unknown to investors, who renders a legal opinion to a fraudster with respect to a specific corporate legal issue is liable as an aider and abettor, than the accountant work product also is substantial assistance. Here, the Auditor Defendants whose participation was essential to the operation of the scheme are likewise aiders and abettors satisfying the substantial assistance test. For the same reasons that Plaintiffs have adequately pled substantial assistance with respect to the Valuation Defendants, who, like the auditors, lent their name and creditability to the false financial results repeated by the GPB Funds. *See Kneese*, 2012 WL 13019677, at *4; *Breazeale*, 2015 WL 13740747, at *8-9; *Troice*, 2015 WL 1219522, at *8-10; ¶¶ 125-126.

## V.  THE SAC ADEQUATELY ALLEGES TSA CLAIMS FOR CONTROL PERSON LIABILITY (COUNTS III AND VI)

Contrary to Ascendant Defendants' arguments, Dkt. 694 at 17-18,[31] Plaintiffs adequately pled Counts III and VI for control person liability pursuant to section 33F(1) of the TSA. Those Defendants baselessly contend that the SAC pleads "*no* facts" showing that the Defendants to

---

[31] Defendant Gentile also disputes his own control person liability but only on the basis that the underlying violations "cannot be maintained under the choice of law provisions." Dkt. 699 at 3. That argument is baseless. *See infra,* Section VI (choice-of-law argument).

Counts I and IV (GPB, the GPB Funds, and Ascendant) are sellers or issuers. *E.g.*, ¶¶ 1 ("securities issued by the GPB Funds"), 2 ("limited partnership interests in the GPB-sponsored Funds"), 2 ("Ascendant Capital [is] GPB's primary distribution agent[.]"), 6 (quoting Massachusetts Admin. Compl. at 4) ("Massachusetts alleged that GPB Capital and Ascendant essentially operated as a single company").

Ascendant Defendants also baselessly argue that the SAC relies solely on "speculation and innuendo" to allege that the Defendants named in Counts III and VI are control persons of the Defendants named in Counts I and IV (GPB, the GPB Funds, and Ascendant Capital). Dkt. 694 at 17. Control person liability requires that "the controlling person (1) exercised control over the operations of the corporation generally and (2) had the power to control the specific transaction or activity constituting the primary violation." *In re Enron Corp. Sec., Derivative & ERISA Litig.*, 258 F. Supp. 2d 576, 607 (S.D. Tex. 2003). The SAC is *full* of factual allegations of control. *E.g.*, ¶¶ 1-6, 8, 99-116. For example, it is neither speculation nor innuendo that, for example: Gentile controlled GPB and the GPB Funds as the founder, Chief Executive Officer, and managing member of GPB, ¶¶ 2, 15, 37, 113; "Schneider was intimately involved in GPB Capital's strategy and direction, and served as Gentile's top confidant" according to the State of Massachusetts, ¶ 6; that the "line between Gentile, Schneider, GPB Capital, and Ascendant Alternative Strategies and Ascendant Capital is blurred beyond recognition," ¶ 6; Schneider and Martino controlled Axion and Ascendant Capital, the primary distributors of the Securities, ¶ 20; "Martino, the CEO of Ascendant Strategies, and former CEO of Axiom, owns and controls MR Ranger, ¶ 108," which was a "majority owner[] of Ascendant Strategies," ¶ 38; and Gentile and Schneider, through DJ Partners, were also "majority owners of Ascendant Strategies," ¶ 38. Accordingly, Ascendant Defendants fail to show that the control-person claims are inadequately pled. *In re Enron Corp.*,

258 F. Supp. 2d at 607 ("[A] control person might include an employer, an officer or director, a large shareholder, a parent company, and a management company.").

## VI. THE SUBSCRIPTION AGREEMENT CHOICE OF LAW PROVISION DOES NOT APPLY TO PLAINTIFFS' CLAIMS HERE

The flipside to Defendants' baseless argument that the TSA does not apply extraterritorially is that Texas law should not apply at all to this Texas-based dispute. Defendants make this argument based upon a narrow contractual provision contained in the Subscription Agreement signed by Plaintiffs and the other GPB limited partners. Movants argue that this Court should dismiss the well-pled claims under the TSA because the Subscription Agreement contains a binding choice-of-law provision requiring the application of New York law rather than Texas law. *See, e.g.,* Dkts. 683 at 5, 685 at 24-27, 691 at 14, 695 at 3-4, 697 at 7-10, 699 at 2-3, 701 at 2, 703 at 11, 707 at 9-10, 709 at 10. This argument is premised upon a blatant misconstruction of the operative language in the relevant Subscription Agreement (*see, e.g.*, Dkt. 697 at 7 wrongly asserting that the choice-of-law provision applies to "all claims arising out of the Subscription Agreement"). Extensive briefing on the issue of whether or not the choice of law provision contained in the Subscription Agreement applies was made in connection with the initial set of briefs filed in this matter that related to *forum non conveniens* and choice of law. Apparently, the Defendants did not read these briefs. As shown therein, and unrebutted by Defendants on these motions, the narrow choice of law provision contained in the Subscription Agreement does not apply to the TSA and the related claims pled here, but only to contractual disputes arising under the Subscription Agreement, which has no applicability to the facts alleged herein.

Moreover, as shown and unrebutted, pursuant to Texas law non-parties to the Subscription Agreement (*i.e.*, all parties, other than GPB) cannot, as a matter of law, rely upon nor enforce the choice of law provision in the Subscription Agreement.

Certain Defendants also argue, even in the absence of a binding choice-of-law provision in the Subscription Agreement or otherwise, that this Court should now, on a motion to dismiss, decide what law applies to all (absent) Class members. Defendants go further arguing, without any discovery or any substantial factual basis and disregarding the pleading requirement that this Court assume Plaintiffs' allegations to be true, that New York law should apply to all class members. In other words, according to Defendants, Texas law <u>may not apply</u> and Plaintiffs' (and the Class') claims therefore should be dismissed. But, at the motion to dismiss stage in a nationwide class action, courts can only address the choice of law provision with respect to the named plaintiffs, not absent Class members. Here, three of the named Plaintiffs are Texas residents who purchased their GPB limited partnership interest in Texas. It is beyond dispute that Texas law applies to their claims. As several of the Defendants know firsthand, these Plaintiffs, and many class members were residents in Texas at the time of sale, and as pled, the misrepresentations and omissions disseminated in Offering materials and thereafter were prepared and distributed from Texas. As shown below, clear case law provides that on a motion to dismiss a court should only address the choice-of-law issues applicable to named Plaintiffs and not absent class members. Any remaining theoretical choice-of-law issues are to be addressed at class certification.

Moreover, application of appropriate principles of conflicts of law under applicable Texas law make clear that Texas law applies to the claims pled. Even if the Court were to determine choice of law at this juncture, under the applicable most significant relationship test, Texas law would apply. Defendants are wrong for this additional, completely dispositive reasoning.

In essence, Defendants baselessly argue that New York law should apply, rather than Texas law, because they argue there are more significant contacts with New York with respect to the Offerings at issue than there are with respect to Texas. While this argument is factually baseless,

*even if it were so*, Defendants under Texas law would bear the burden of showing that the application of foreign law, New York law in this case, presented *an actual conflict* with Texas law, and that such conflict should be resolved by applying New York law. Absent an actual conflict, Texas law would still apply. *Klinek v. Luxeyard, Inc.*, No. 17 Civ. 00899, 596 S.W.3d 437 (2020). Such is the case here. There is no conflict.

As demonstrated below, there is no conflict between Texas and New York law on whether to allow Texas securities claims to proceed.

**A.** **The Narrow Language Contained in The Subscription Agreement Does Not Control the Choice of Law Here, and, In Any Event, Is not Available to Third Parties to the Agreement.**

The Subscription Agreement's choice-of-law provision does not control the decision as to the choice of law applicable to each Class member. The language at issue provides only that, "[t]his agreement will be enforced, governed and construed in all respects in accordance with the laws of the State of New York, without regard to that state's conflicts of law provisions."[32] This type of choice-of-law provision—relating solely to the construction of the Subscription Agreement—is defined in the case law as a "*narrow* choice of law clause." *Caton v. Leach Corp.*, 896 F.2d 939, 943 (5th Cir. 1990). And this provision, drafted by Defendant GPB, does not "address the entirety of the parties' relationship" nor does it address the general rights and liabilities of the parties. *Id.* Instead, it *only* relates to the construction and interpretation of the underlying Subscription Agreement itself, rather than claims related to the Agreement. *See, e.g.*, *Thompson and Wallace of*

---

[32] Weiss Decl. (Dkt. 724, Ex. C. As noted, certain of the Movants have deliberately misquoted this language, arguing that the language includes references to "all disputes" under the Agreement and/or "all claims" under the Agreement. These references affirmatively misrepresent what the Subscription Agreement says. *See* GPB Def. Br., Dkt. 697 at 7.

*Memphis, Inc. v. Falconwood Corp.*, 100 F.3d 429, 433 (5th Cir. 1996) (choice of law clause that applied to the "agreement and its enforcement" was a "[n]arrow choice-of-law provision[] ... to be construed narrowly" and did not encompass tort claims because such claims were separate from the agreement and its enforcement); *Smith v. EMC Corp.*, 393 F.3d 590, 597 (5th Cir. 2004) ("The state's law specified by the choice-of-law clause is applied only to those claims pertaining to the instrument. All other claims are governed by the forum state's law."); *see also Benchmark Elecs. v. J.M. Huber Corp.*, 343 F.3d 719, 726-27 (5th Cir. 2003) (language substantially similar to that at issue here does not encompass fraud or negligent misrepresentation and related claims.); *Caton*, 896 F.2d at 942-3; *McCann v. Best Buy*, No. 17 Civ. 00108, 2018 WL 3244999, at *2-3 (M.D. La. July 3, 2018) (same). As certain Movants concede, the Court must apply Texas choice-of-law, and conflict-of-law, rules, and interpretations thereof.[33] *Bailey v. Shell Western E&P, Inc.*, 609 F.3d 710, 722 (5th Cir. 2010). Texas law with respect to the narrow choice-of-law provision at issue here is entirely consistent with the overwhelming federal case law cited above. *See, e.g., Stier v. Reading & Bates Corp.*, 992 S.W.2d 423, 433 (Tex. 1999) ("This agreement shall be interpreted" is a type of conflict-of-laws provision applying only to the interpretation and enforcement of the

---

[33] *See* Broker Def. Rule 12 Br., Dkt. 685, at 25, n.45, conceding "Texas law ... does guide the Court's analysis regarding the application of choice-of-law principles" and *citing Hunt Bldg. Co., Ltd.*, No. 11 Civ. 00295, 2012 WL 12867446, at *11 (W.D. Tex. Dec. 19, 2012) ("When deciding matters of state law, a federal court sitting in diversity jurisdiction must follow the choice-of-law rules prevailing in the state in which it sits."); *see also Benchmark Elecs., Inc. v. J.M. Huber Corp.*, 343 F.3d 719, 726 (5th Cir. 2003) ("To determine the applicable law, a federal court sitting in diversity applies the choice of law rules of the forum."); Dkt. 420 at 9 ("In diversity cases, 'a federal court must follow the choice of law rules of the forum state, here Texas,'" *quoting Int'l Interests, L.P. v. Hardy*, 448 F.3d 303, 306 (5th Cir. 2006)).

contractual agreement. It does not purport to encompass all disputes between the parties or to encompass tort claims as such, claims that do not rise or fall on the "interpretation of a contract".[34]

Certain Movants (*i.e.*, Broker Defendants and others that are not parties to, or in any way referenced as third party beneficiaries of, the Subscription Agreement) have argued that they are entitled to enforce the choice-of-law provision contained therein despite their non-party status. Aside from the fact that the narrow choice-of-law provision in the Subscription Agreement is inapplicable to the claims pled, these Defendants have cited no authority permitting them to enforce a narrow choice-of-law provision in a contract to which they are not a party. As shown herein, as a matter of contract law, these Defendants have no basis to argue for enforcement of the

---

[34] None of the Movants cite to <u>any</u> of these narrow choice-of-law cases. RSM, for example, cites to three cases that are inapposite or contrary to settled Fifth Circuit and Texas law. RSM's citation to *AlliantGroup, L.P. v. Mols*, 2017 WL 432810, at *11 (S.D. Tex. Jan. 30, 2017) is disingenuous and unpersuasive. First, RSM conveniently fails to note that in *AlliantGroup*, the choice-of-law provision was worded very broadly to apply the governing law (there, Texas law) to the "validity, interpretation, effect and performance" of the agreement. *Id*. at *2. GPB's narrow clause is quite different. Moreover, the *AlliantGroup* court offered no analysis of the choice-of-law issues, simply assuming Texas law applied. Second, RSM's citation to a 23-year-old Eighth Circuit case also fails to support this argument. In *Nw. Airlines, Inc. v. Astraea Aviation Servs., Inc*., 111 F.3d 1386, 1392 (8th Cir. 1997), the court expressly found that the tort claims asserted, although not denominated as contract claims, arose from work "required under the contracts," were "closely related to the interpretation of the contracts and fall within the ambit of the...contracts," and "raise[d] issues of performance and compensation for work done under the []contracts." *Id*. at 1392. Later cases have made clear that this decision was limited to non-contractual claims that involve only, or are closely related to, interpretation of the contract. Not the case here. *See Johnson Cos. v. Unified Brand, Inc*., 735 F.Supp.2d 1099, 1105 (D. Minn. 2010). In contrast, here the claims pled under the TSA have no relation to the Subscription Agreement, nor do they involve interpretation of that agreement. As shown, the Subscription Agreement is in fact not an agreement but merely an application to buy the GPB limited partnership interests. Finally, RSM misrelies on *Young v. Valt.X Holdings, Inc*., 336 S.W.3d 258, 263 n.6 (Tex. App. 2010). This decision makes no reference to the choice-of-law provision at issue and provides no analysis. Instead, the court expressly found that "each of [the] Buyers' claims involves events surrounding the specific transaction for the sale of ... stock." *Id*. at 263. And, to construe the choice of law, the court also relied on a clause which expansively reached "all disputes arising under <u>or relating to</u> this Agreement and/or the sale, purchase or holding of the ... Shares", and is far broader than the narrow clause at issue here. *Id*.

Subscription Agreement because a non-party may not enforce a choice-of-law provision under any circumstance. *See, e.g., Mayo v. Hartford Life Ins. Co.,* 354 F.3d 400, 404 (5th Cir. 2004); *Krock v. Lipsay,* 97 F.3d 640, 645 (2nd Cir. 1996); *Quicksilver Res., Inc. v. Eagle Drilling, LLC,* 792 F. Supp. 2d 948, 953-54 (S.D. Tex. 2011); *Harrison v. Procter & Gamble Co.,* No. 7:06 Civ. 121, 2007 WL 431085, at \*2 (N.D. Tex. Feb. 8, 2007).

      **B.**    **The Court Should Not Determine the Choice of Law Applicable to Absent Class Members on This Motion.**

Even if the Subscription Agreement's choice-of-law provision is applicable (which it is not), this Court should not make a choice-of-law decision immediately with respect to each Class member. These Defendants cite no authority for this position, which is contrary to case law providing that, at the motion to dismiss stage in nationwide class actions, courts should only address the choice-of-law provision with respect to the named plaintiffs. *See O'Bryan v. Holy See*, 556 F.3d 361, 381 n.8 (6th Cir. 2009); *Hughes v. Ester C Co.,* 930 F.Supp.2d 439, 451 n.6 (E.D.N.Y. 2013); *Won Kyung Hwang v. Ohso Clean, Inc.,* No. 12 Civ. 06355, 2013 WL 1632697, at \*21 (N.D. Cal. Apr. 16, 2013); *Patel v. N.Y. Life Ins. Co.,* No. 11 Civ. 4895, 2012 WL 1883529, at \*3 (S.D.N.Y. May 21, 2012); *Friedman v. Intervet Inc.*, No. 3:09 Civ. 2945, 2010 WL 2817257, at \*7-8 (N.D. Ohio July 16, 2010); *Rakes v. Life Investors Ins. Co. of Amer.*, No. 06 Civ. 99, 2007 WL 2122195, at \*11-12 (N.D. Iowa July 20, 2007). This case law makes clear that the choice of law addressed at the motion to dismiss stage in the class action context is only the choice of law with respect to the named Plaintiffs. Any potential choice-of law-issues with respect to specific Class members must await discovery, and class certification; "individualized choice of law analysis is only necessary once the class seeks certification." *See O'Bryan*, 556 F.3d at 381 n.8.

Here, three of the named Plaintiffs are Texas residents who purchased their GPB Limited Partnership interests in Texas. ¶¶ 93, 94, 97. It is beyond dispute that Texas law applies to their

claims, as numerous Defendants and these Plaintiffs were residents in Texas at the time of sale and, as pled, the misrepresentations and omissions with respect to the Offering Materials, which are actionable in this case, were distributed from Texas, and the PPM was drafted in Texas and was distributed from Texas to individuals and Broker Defendants who sold the GPB underlying limited partnership interests nationwide. ¶¶ 75, 102, 114.

### C.  Texas Has the Most Significant Relationship with the Claims Asserted;

Although this Court should not make any choice-of-law decisions regarding absent Class members at this stage before discovery and class certification, Texas choice of law principals, which are applicable here, (*see, e.g.*, *Anadarko E&P Onshore, LLC v. Mary Marshall Smith Tr.*, No. 14 Civ. 3168, 2016 WL 8458075, at *21 (S.D. Tex. Aug. 12, 2016)), make it clear that Texas law would apply to all Class members as Texas is the state with the most significant relationship to the TSA and other claims asserted in respect of the Offerings. *See Janvey v. Alguire*, No. 3:09 Civ. 0724, 2013 WL 2451738, at *2-5 (N.D. Tex. Jan. 22, 2013) (vacated on other grounds), *aff'd Janvey v. Brown*, 767 F.3d 430 (5th Cir. 2014); *Janvey v. Proskauer Rose LLP*, No. 3:13 Civ. 0477, 2018 WL 3968933, at *2-5 (N.D. Tex. Apr. 17, 2018).

Recent case law arising out of the Stanford Ponzi Scheme, which involved the sale of foreign issued certificates of deposit through brokers located in Texas and other states, makes clear that in such circumstances, as are applicable here, pursuant to the Restatement (Second) of Conflict of Laws, Texas applies the most significant relationship test and seeks to determine where the "center of main interest" with respect to the claims actually pled is located. *See Alguire*, 2013 WL 2451738, at *2-5; *see also In re Enron Corp.*, 761 F. Supp. 2d at 519 ("Texas courts apply the law of the state with the most significant relationship to the particular substantive issue."); *Duncan v. Cessna Aircraft Co.*, 665 S.W.2d 414, 421 (Tex. 1984) (concluding that courts must address the "qualitative nature of the particular contacts" and the "state policies underlying the particular

substantive issue[s]") (superseded on other grounds); *GJP, Inc. v. Ghosh*, 251 S.W.3d 854, 884

(Tex. App. 2008). Here, the TSA (the statute at issue) is a broad remedial statute intended to protect

both Texas residents and non-Texas residents from fraudulent securities practices emanating from

Texas. *See Citizens Ins. Co. of Amer.*, 217 S.W.3d at 440 ("Texas has a strong interest in regulating

the sale of securities in and from the state."); *Rio Grande*, 539 S.W.2d at 921 (the TSA applies to

sales in states other than Texas if any act in respect thereof occurred in Texas); *see also Brown v.*

*Cole*, 291 S.W.2d 704, 708 (Tex. 1956); *Kubbernus v. ECAL Partners, Ltd.*, 574 S.W.3d 444, 476

(Tex. App. 2018) ("the TSA is intended to apply to transactions emanating from Texas, even when

they involve non-Texas residents"); *Texas Cap. Sec., Inc. v. Sandefer*, 58 S.W.3d 760, 775 (Tex.

App. 2001); *Thaler v. Beringer*, No. 31-2013-CA-001355, 2014 WL 12670263, (Fla. Cir. Ct. Jan.

22, 2014).[35]

---

[35] RSM and Ascendant argue that Texas law would not apply to out-of-state plaintiffs even if the choice of law provision were inapplicable. *See* Dkt. 707 at 10 n.9 (relying on the Restatement (Second) Conflict of Laws § 148(2) and *Greenberg Traurig P.C. v. Moody*, 161 S.W.3d 56, 71 (Tex. App. 2004) (applying Restatement where plaintiff's purchase occurred outside of Texas)); *Grant Thornton v. Prospect High Income Fund.*, 314 S.W.3d 913, 922 (Tex. 2010) (same). This *ipse dixit* is wrong. First, three Texas residents are among the named Plaintiffs in the Second Amended Complaint. ¶¶ 93, 101, 104. Second, Defendants' cases are easily distinguishable or actually support Plaintiffs. Indeed, *Grant Thornton* supports plaintiffs' position (Texas appellate court finding that Texas law applies to all purchasers of underlying securities in all 50 states and that application of Texas law to non-Texas residents was well established and appropriate because the misrepresentations and omissions at issue flowed from activities that occurred "in Texas".). And the *Greenberg* court also applied the restatement test under Sections 145 and 148, finding that the "principal focus is where the conduct occurred" and that the court looks to the "locus of most of the alleged fraudulent acts" and here that is Texas. *See Greenberg*, 161 S.W.3d at 72, 74.

Defendants' related argument that a key factor the choice of law analysis is the location of the purchaser relying on the misrepresentations at issue is baseless. *See* Dkt. 707 at 22.This argument reflects a fundamental misunderstanding of Texas law, because reliance is not an element of the TSA claims pled and therefore cannot be part of the choice-of- law analysis. *See In re Westcap Enters.,* 230 F. 3d 717, 726 (5th Cir. 2000); *In re Enron*, 762 F.Supp. 2d at 976. As shown herein and in the SAC, all of the material contacts concerning the claims pled were with Texas.

It is also clear from the TSA's legislative history and case law that "TSA claims are in accord[ance] with Texas' public policy for comprehensive securities regulation." *In re Enron,* 761 F.Supp.2d at 543. Here, it is beyond dispute that Texas has the most significant relationship to the specific TSA claims pled, which relate to material misrepresentations and omissions in Offering Materials with respect to the limited partnership interests, which Offering Materials were prepared in and distributed from Texas. Indeed, as pled, the entire Ponzi scheme plan was hatched in and sold from Texas. *See McLennan v. Am. Eurocopter Corp., Inc.*, 245 F.3d. 403, 426 (5th Cir. 2001) ("relevant conduct that [Plaintiff] claims gave rise to his injuries...took place in Texas.") ¶¶ 37, 102, 134-135, 142

Moreover, as shown herein, the Offerings themselves were planned, orchestrated and completed by Ascendant and its 50 Texas employees in Texas, rather than in New York. Similarly, Plaintiffs' claims under section 581-33(1) of the TSA, which relate specifically to the failure to register the limited partnership Offerings in Texas, also relate exclusively to Texas conduct. Again, *in Texas*, Ascendant planned, orchestrated, and effected the Offerings, including arranging for the limited partnership interests to be sold and distributed nationwide by a group of approximately 80 brokerage firms who had a direct relationship with Ascendant. *See id.* All of the employees involved in the Offerings were Ascendant employees located in Texas, operating in Texas, and controlled by Ascendant's Texas management. ¶¶ 103-103, 142. Moreover, as alleged in the Amended Complaint, the nexus for the sales process was Texas, where due diligence meetings with brokers and customers occurred on at least a monthly basis and where the distribution was effected by emails, phone calls, and conference calls emanating from Texas across the United States. Judge Godbey in the *Stanford* litigation made a definitive finding affirmed by the Fifth Circuit that Texas state law applies in these circumstances. *See Alguire*, 2013 WL 2451738, at *2-

5, and *Proskauer*, 2018 WL 3968933, at *2-5. Thus, in the *Stanford* cases, while the issuer of the actual Stanford securities was located in Antigua and Barbuda, and while many of the business's activities related to the underlying investments made by Stanford occurred there, the nexus for the United States offering of Stanford CDs/securities was Texas, where the primary broker involved (like Ascendant) was physically located. Judge Godbey and the Fifth Circuit had no problem in finding that in such circumstances Texas was the so-called "center of main interest" with respect to these misleading and improperly unregistered Offerings. *See Alguire*, 2013 WL 2451738, at *2. The same result applies here. *See, e.g.*, *Grant Thornton*, 314 S.W.3d at 360 (Texas law applies to all purchasers of underlying securities in all 50 states). Courts have specifically found that investor contacts of a resident in another state were "relatively insignificant" and that application of Texas law to non-Texas residents was well established and appropriate because the misrepresentations and omissions at issue flowed from activities that occurred "in Texas," and that Texas laws applied to "experts" hired by primary tortfeasors in Texas. *Grant Thornton*, 314 S.W.3d at 355, 358; *see Baron v. Strassner*, 7 F.Supp.2d 871, 876 (S.D. Tex. 1998) (applying Texas law as "misrepresentations which underlie Plaintiffs' state law securities fraud claims originated, and were advanced, in the State of Texas.").

Under Texas law, the burden is on the party who asserted the application of non-Texas law (*i.e.*, foreign law) to show the existence of a true conflict of law. Defendants have failed to do so (and as show below, there is no conflict). Absent an actual conflict, Texas law must apply. *Id*. *Klinek v. Luxeyard, Inc.*, No. 14-17-00899-CV, 596 S.W.3d 437 (Tex. App. 2020).[36]

---

[36] Texas courts presume that Texas law applies. *In re Honeywell Int'l, Inc.*, No. 13-11-0067, 2013 WL 5676069, at *2 (Tex. App. Oct. 17, 2013).

## D. In Any Event, There Is No Conflict Between Texas and New York Law.

Here, Defendants have not and *cannot show a conflict between New York law and Texas law with respect to the application of state securities statutes.* This is so because courts have consistently held that a plaintiff may sue under the securities laws of several states at once so long as the requirements for each such state's securities statutes are met. *In re Countrywide Fin. Corp. Mortg.-Backed Sec. Litig.*, 2012 WL 1322884, at *2; *Hatteras Enters., Inc. v. Forsythe Cosmetic Grp. Ltd.*, 2018 WL 1935984, at *8 (E.D.N.Y. Apr. 23, 2018). Indeed, New York courts have consistently held that New York impliedly permits the application of securities laws of other states. *Silvercreek Mgmt., Inc. v. Citigroup Inc.*, 248 F. Supp. 3d 428 (S.D.N.Y. 2017); *In re Enron,* 235 F. Supp. 2d at 692[37]. As the court in *Forsythe,* 2018 WL 1935984 at *8, recently held in addressing an alleged conflict between the California securities statute, which provides for a private right of action, and New York's Martin Act, which does not -- there was no conflict -- and California law would apply.

> There is not in fact a conflict, because the securities laws of multiple jurisdictions can be applied in a single jurisdiction, and New York does not have any interest in precluding claims under other states' blue sky laws.

> * * *

> Thus, because New York has no interest in precluding [another State's] claims like those brought by plaintiff, even if defendants were correct that choice-of-law analysis is appropriate here, their effort to obtain dismissal of the Blue Sky claims [asserted under other states' laws] would fail."

In *Silvercreek, supra*, 248 F. Supp. 3d at *455-6, the court recognized:

> Because application of multiple states' securities laws to a single security transaction does not present a conflict of law issue, the argument that only New

---

[37] "A state is damaged if its citizens are permitted to engage in fraudulent practices even if those injured are outside its borders." *In re Enron Corp.* 235 F.Supp.2d, 692 (quoting *Rio Grande*, 539 S.W.2d at 921).

York law and its lack of a private cause of action may apply to the transaction is rejected.

(internal citation omitted)

Indeed, the precise argument offered by the Defendants here has been decided against them by New York federal courts. In *Silvercreek*, the defendants, alleging that the primary contacts were with New York, had argued that TSA claims should be dismissed because they were precluded by New York's Martin Act, which has no private right of action. The court found, however, that Texas law did apply, despite the absence of a private right of action under New York's Martin Act, because application of multiple states' securities laws to a single security transaction "does not present a conflict of laws issue." *Id*. at 455. See also *Fed. Hous. Fin. Agency v. Deutsche Bank AG*, 903 F. Supp. 2d 285, 291 (S.D.N.Y. 2012) ("Even assuming that a choice of law analysis is appropriate, however, defendants are incorrect that plaintiff[s'] claims are governed by New York's Martin Act . . . ."). Under New York's approach, the first step in addressing any choice–of–law issue is to determine whether a "true conflict" does exists between the interest of the jurisdictions with respect to the particular legal issue. If, after examining the "policies and purposes sought to be vindicated by the conflicting laws, it appears that one jurisdiction has no interest in applying its law. That jurisdiction must give way. . . ." Here, Defendants' [argue a] "dispositive conflict between New York's Martin Act, which provides no private cause of action . . . and the securities statutes of Virginia and the District of Columbia, which do . . . however, the New York Court of Appeals has recently made clear that although the Martin Act did not create a private right of action to enforce its provisions, it does not preclude a private plaintiff in bringing a securities–related claim rooted in some other source of law . . . Thus, because New York has no interest in precluding claims, like those brought by the plaintiff, **even if defendant were correct**

**that choice-of-law analysis is appropriate here, their effort to obtain dismissal of the Blue Sky claims would fail."**

In sum, Texas law applies because the claims at issue are rooted in Texas and have substantial contacts in Texas, easily sufficient to state causes of action under Texas law, and because no actual conflict exists between New York and Texas law under well established authority. New York law permits assertion of a TSA claim. In the absence of a true conflict of law, and here there is none, Texas law clearly applies.

## VII.   PERSONAL JURISDICTION

### A.      Standard on the Motion

In a diversity case, personal jurisdiction may be exercised over a nonresident defendant if it comports with both federal due-process requirements and the long-arm statute of Texas. *Paz v. Brush Engineered Materials, Inc.*, 445 F.3d 809, 812 (5th Cir. 2006). "Because Texas's long-arm statute extends to the limits of federal constitutional due process, only one inquiry is required." *Trois v. Apple Tree Auction Ctr. Inc.,* 882 F.3d 485, 488–89 (5th Cir. 2018). Due-process requires that the defendant have requisite minimum contacts with the forum state, and the exercise of jurisdiction in the forum state must not infringe on "traditional notions of fair play and substantial justice." *Id.* (quoting *Int'l Shoe Co. v. Washington*, 326 U.S. 310, 316 (1945)).

A defendant's "minimum contacts" may give rise to general or specific jurisdiction. *See Luv N' care, Ltd. v. Insta-Mix, Inc.*, 438 F.3d 465, 469 (5th Cir. 2006). While a *prima facie* case for general jurisdiction may be shown for certain of the defendants,[38] clear

---

[38] Two of the Auditor Defendants who challenge P.J. also satisfy general jurisdiction requirements. Several Defendants have not challenged P.J. EisnerAmper, with a large Dallas office, and CohnReznick, with Austin and Houston offices, have each designated an agent for service, and registered to do business, in Texas, and have touted their extensive Texas business on their respective websites and in publications. Another Texas district court confronting a similar
**[Footnote continued on next page]**

specific jurisdiction exists as to all of the Defendants. Specific jurisdiction arises when a defendant's minimum contacts with a forum state are related to the pending lawsuit. *Id.* at 469.

The Fifth Circuit applies a three-step analysis for the specific jurisdiction inquiry: "(1) whether the defendant has minimum contacts with the forum state, i.e., whether it purposely directed its activities toward the forum state or purposefully availed itself of the privileges of conducting activities there; (2) whether the plaintiff's cause of action arises out of or results from the defendant's forum-related contacts; and (3) whether the exercise of personal jurisdiction is fair and reasonable." *Eastern Concrete Materials, Inc. v. ACE Am. Ins. Co.*, 948 F.3d 289, 296 (5th Cir. 2020) (quoting *Seiferth v. Helicopteros Atuneros, Inc.*, 472 F.3d 266, 271 (5th Cir. 2006)). If a plaintiff establishes the first two prongs, the burden shifts to the defendant to show that the exercise of personal jurisdiction would be unfair or unreasonable. *Id.*

Finally, to establish personal jurisdiction, a plaintiff need only make a *prima facie* showing of personal jurisdiction, and the Court must accept as true the non-moving parties' allegations contained in their complaint. *See Stripling v. Jordan Production Co.*, 234 F.3d 863, 869 (5th Cir. 2000) ("When a court rules on a motion to dismiss for lack of personal jurisdiction without holding an evidentiary hearing, it must accept as true the uncontroverted allegations in the complaint and

---

circumstances held that plaintiff made a *prima facie* showing of general jurisdiction where the defendant maintained an office in Texas, the defendant designated an agent for service of process in Texas, and the defendant's website and publications indicated that it or a related company installed equipment in three locations in Texas. *Del Castillo v. PMI Holdings N. Am. Inc.,* No. 4:14 Civ. 3435, 2015 WL 3833447, at *3 (S.D. Tex. June 22, 2015). The court found that general jurisdiction could be based solely on the presence of an office in Texas and the designation of an agent for service. *See id.* * *3-4. The court characterized the defendant's permanent Texas offices as "doing business *in* Texas" as opposed to only "doing business *with* Texas." Id. at *3 The designation of an agent for service of process in Texas indicated to the Court that the business "reasonably anticipated being haled into court in the state."

resolve in favor of the plaintiff any factual conflicts") ; *Sourcing Mgmt., Inc. v. Simclar, Inc.*, 118 F. Supp. 3d 899, 907 (N.D. Tex. 2015) (same).

**B.      This Court May Exercise Specific Personal Jurisdiction Over Defendants.**

Here, this Court has specific jurisdiction over each of the Defendants. Each has minimum contacts with the forum state, i.e., each defendant purposely directed its activities toward the forum state or purposefully availed itself of the privileges of conducting activities there; and, as to each, the Plaintiffs' causes of action arise out of or results from the defendant's forum-related contacts. These Defendants have *not* shown that such an exercise of personal jurisdiction would be unfair and unreasonable, as is their burden.

The SAC alleges that each of the Defendants were an integral part, or aider and abettor, of the SEC described Ponzi scheme perpetrated by GPB/Ascendant over a multiyear period involving hundreds of Texas investors and thousands, if not tens of thousands of investors nationwide.  As alleged, the scheme involved hundreds of Texas investors and was domiciled, created, operated, and effected from the State of Texas. Under black letter law personal jurisdiction exists over each Defendant.

Before addressing the arguments against personal jurisdiction, it is worth noting that the overwhelming majority of Defendants do not challenge personal jurisdiction here.  Virtually all of the more than 60 Broker Defendants (Dkts. 683 and 685, 669 (United Planners) and 708 (HighTower Advisors),[39] the GPB Defendants (697); Gentile (699); Deloitte (705); Axiom (709);

---

[39] Any attempt by the Broker Defendants or Axiom to argue lack of personal jurisdiction would, in any event, be futile. Each of the Broker Defendants (with the exception of HighTower Advisors and Bradley Wealth) and Axiom executed on multiple occasions a consent to personal jurisdiction in Texas in the form of a Broker Dealer registration application with the SEC known as Form BD-1.  ¶77; SAC, Ex. B. Defendants are bound by their consent to personal jurisdiction (and venue) and they have no basis to challenge personal jurisdiction (or venue) as a result thereof. *See*
**[Footnote continued on next page]**

Auditors RSM and Crowe (707), or the Ascendant Defendants (694) have *not* asserted a personal jurisdiction or Rule 12(b)(2) defense.[40]

A handful of Defendants make facile arguments that personal jurisdiction does not exist with respect to them: They are: (1) Phoenix (Dkt. 701 at 3-6); (2) Auditor Defendants CohnReznick (Dkt. 696 at 4-10), Margolin (Dkt. 691 at 6-11), EisnerAmper (Dkt. 693 at 6-9), and Withum (Dkt. 692 at 2, 9-11), (3) Valuation Defendant MBAF (703 at 2-13), (4) GPB Accountant Gentile Pismeny (Dkt. 702 at 4-8), (5) MR Ranger & DJ Partners (Dkt. 694 at 7-9), and (6) Broker Defendant Bradley Wealth (Dkt. 687 at 608). Their arguments are addressed below.

With respect to the six groups of Defendants, listed above that assert a personal jurisdiction argument, under the case law just cited, each such Defendant was an integral part of the Ponzi scheme. Each such entity (a) provided their name and credibility as financial experts in the scheme (Phoenix, Auditor Defendants CohnReznick, Margolin, EisnerAmper, and Withum, Valuation Defendant MBAF, and Accountant Gentile Pismeny), (b) provided the fuel for the Ponzi scheme fire by raising money (Bradley Wealth), or owning and/or operating the entities that were deeply involved in effecting the scheme (MR Ranger and DJ Partners), and (c) made or disseminated material misrepresentations to investors. All of the Defendants did so with actual knowledge that GPB/Ascendant made material misrepresentations and failed to register and was, therefore, operating in violation of the TSA and the other claims.

With respect to all of these Defendants, Plaintiffs seek to establish specific jurisdiction. Under Texas law, this statute is satisfied if Plaintiffs assert facts which permit the conclusion that

Plaintiffs' Opposition to Defendants' Motions to Dismiss on *forum non-conveniens* grounds and Rule 12(b)(3), filed contemporaneously herewith.

[40] As explained below, among certain of the above Defendants, Broker Defendant Bradley Wealth (687) and the Ascendant Defendants (694), on behalf of only MR Ranger & DJ Partners, did assert personal jurisdiction/Rule 12(b)(2) arguments.

a defendant has minimum contacts with "Texas," and that the exercise of jurisdiction does not offend "traditional notions of fair play and substantial justice." =In *Cornerstone Healthcare Group Holding, Inc. v. Nautic Management VI, L.P.,* the Texas Supreme Court recognized that:

> "The 'touchstone' of a minimum-contacts analysis is purposeful availment. . . . To that end, a 'defendant establishes minimum contacts . . . when it purposefully avails itself of the privilege of conducting any activities within the forum state. . . .'"

*Cornerstone Healthcare Grp. Holding, Inc. v. Nautic Mgmt. VI, L.P.,* Case Nos. 14–0538, No. 14–0539, 493 S.W.3d 65, 70 (Tex., 2016) (Tex. 2016) (citations omitted).

Underlying the purposeful availment test, there are two factors that must be met. First, a defendant's acts must be "purposeful" and not "random, isolated or fortuitous." Second, a defendant "must seek some benefit, advantage or profit by availing itself of the jurisdiction."

### 1.    Phoenix

Phoenix, in particular, received unprecedented outsized commissions from Ascendant in connection with the Offering, which as alleged represented the proceeds of fraudulent conveyances. ¶¶ 31, 212-221, 366-369. Its receipt of these monies, the proceeds of the fraudulent scheme, subjects Phoenix to jurisdiction in Texas. *See Trigeant*, 183 S.W.3d at 728 ("By participating in a Texas transaction involving the transfer of Texas-based assets to allegedly defraud a Texas resident, the [Defendants have] purposefully availed themselves of the benefits and privileges of conducting business in Texas," and subjected themselves to personal jurisdiction therein.); *San Pedro Impulsora*, 330 S.W.3d 27, 33 (Personal jurisdiction exists when a defendant takes part in any aspect of a tortious scheme in the state.); *see also Retamco Operating, Inc. v. Republic Drilling Co.*, 278 S.W.3d 333, 341 (Tex. 2009) (when a non-resident defendant receives

Texas property in connection with the defrauding of a Texas resident, this subjects himself to a suit in Texas.).[41]

Phoenix argues in a manifestly incorrect fashion and without legal citation that because it did not have a physical presence in Texas that personal jurisdiction cannot be found. Phoenix is wrong, because physical presence in the forum is not a prerequisite to jurisdiction. *American v. Harrison*, No. 11 Civ. 0065, 2011 WL 4485463 (Tex. App. 2011); *Retamco Operating*, 278 S.W.3d at 339 (same); *Royal Mortg. Corp. v. Montague*, 41 S.W.3d 721, 728-729 (Tex. App. 2001) (same). Moreover, Phoenix's extensive contacts with Texas and with Texas residents were anything but "random, isolated or fortuitous," instead they were purposeful and continuous and designed to make outsized profits from Texas investors and a Texas based Offering. They were designed to perpetuate a Ponzi scheme created and operated from Texas which affected at least hundreds of Texas residents and which was effected through a business association of Phoenix and Ascendant/GPB, which operated on a continuous basis from Texas throughout the relevant period. ¶¶ 81-84, 217.

Moreover, Phoenix had as its objective in connection with such Texas-based contacts to earn an outsized profit (*i.e.*, 20% of the amount of each transaction processed by Phoenix pursuant to instructions from Texas based Ascendant/GPB). ¶ 221.

Over the approximate six-year period of Phoenix's seminal role in the GPB/Ascendant Ponzi scheme, it engaged in each of the following contacts with Texas with respect to hundreds of

---

[41] Under applicable Texas law, personal specific jurisdiction over a Defendant "may be found where a defendant takes part in any aspect of a tortious scheme that impacts Texas citizens, regardless of other links to [Texas]." *San Pedro Impulsora v. Villarreal*, 330 S.W.3d 27, 33 (Tex. App. 2010); *Siskind v. Villa Found. for Educ., Inc.*, 642 S.W.2d 434, 437 (Tex. 1982) (same); *see also Trigeant Holdings, Ltd. v. Jones*, 183 S.W.3d 717, 727-728 (Tex. App. 2005) (In Texas, personal jurisdiction may be found where a defendant takes part in any aspect of a tortious scheme that impacts Texas citizens, regardless of other links.).

Texas residents and thousands or tens of thousands of residents nationwide. First, subscribers to the GPB/Ascendant private placement, including hundreds of Texans, entered into transactions through subscription documents, which contained extensive personal, financial and other information prior to their acceptance into the relevant GPB/Ascendant partnership. Such documentation was sent directly to Phoenix and/or Ascendant for approval and ultimately to Ascendant Capital for processing prior to admission into the partnership. ¶ 83, 217, 387. In addition, all payments for the purchase of the GPB Funds were paid to Phoenix. ¶31. Because hundreds of investors in the partnership were Texas residents, over the course of the Ponzi scheme Phoenix received, pursuant to instructions contained in the PPM, where it was described and referenced, thousands of documents containing personal and financial information from Texas residents, and millions of dollars as subscription fees. Further, Phoenix sent all subscription documents it received, whether relating to Texas residents or not, to Ascendant Capital in Texas for final processing. ¶ 83.

Second, Phoenix acted as the "paymaster for the Ponzi scheme" distributing monies paid to it from Texas residents and residents of other states to Ascendant in Texas as compensation for Ascendant's fraudulent activities emanating from Texas and to other brokers across the Country. More than 20 of the Broker Defendants participating in the GPB Offerings had offices and/or headquarters in the State of Texas. Accordingly, Phoenix helped to perpetuate the Ponzi scheme by regularly, over a period of six years or more, paying monies to Texas based Broker Defendants participating in the fraudulent scheme in the State of Texas, including Ascendant Capital.

By paying such monies to participate in the fraud in the State of Texas, Phoenix perpetuated the Ponzi scheme and participated in the diversion of customer assets in Texas.

Finally, and most importantly, Phoenix itself made material misrepresentations to hundreds, if not thousands, of Texas investors on a monthly basis over the course of at least six years whereby it overstated the NAV of investor holdings in their respective GPB partnerships. Phoenix's preparation and dissemination of monthly statements to Texas investors over a period of six years translates into tens of thousands of misrepresentations directly to Texas investors over the course of the Ponzi scheme. Phoenix concedes that it responded to investor inquiries relating to the GPB Securities. Many of those calls came from or were made to persons in Texas. Indeed, Phoenix has submitted a declaration conceding that it had telephone calls with several of the Plaintiffs regarding GPB Securities including Plaintiff Wade in Texas. Dkt. 701, Ex. A (Petrecky Decl.), ¶10-11. (Curiously, Phoenix does not reveal that it also spoke with Plaintiff Bell, a Texas resident, about GPB Securities.)[42]

As shown in the Complaint (¶¶ 366 - 370), Phoenix overstated the NAV of investors' assets because it failed to deduct from such NAV the unprecedently large fees paid by investors to Broker Defendants and otherwise at the commencement of their investment in the GPB partnership. By overstating the NAV in monthly statements distributed to hundreds of Texas investors over a six-year period, Phoenix perpetuated the Ponzi scheme by convincing investors that they were receiving the 8% dividend from operating profits of GPB operated companies, rather than simply receiving back their own capital and/or the capital of other investors. This was fundamental to the perpetuation of the Ponzi scheme, because had investors been aware of the fact that they were receiving back their own money and not an actual dividend from profits, the Ponzi scheme would have been detected much earlier, and the classwide damages would have been far less.

---

[42] Plaintiffs have been unable to obtain the documentation supporting this due to the severe power outages in Texas prior to the filing of this Opposition. However, Plaintiff is ready to supplement the record should the Court deem it necessary.

In summary, Phoenix had an integral role in the State of Texas in perpetuating the Ponzi scheme. Moreover, Phoenix dealt directly on a continuous basis with hundreds of Texas investors and made direct misrepresentations to them in the form of fraudulent monthly statements recording their NAV. Similarly, Phoenix had an ongoing relationship with GPB/Ascendant headquartered in Texas whereby it assisted in the improper and illegal payment of undisclosed fees to Ascendant/GPB in its role as paymaster. These contacts with the State of Texas easily constitute purposeful availment in the State of Texas consistent with case law.

As shown, Phoenix's knowing participation in the fraudulent scheme and diversion of customers' assets through payment of improper fees to Ascendant/GPB and to itself in the form of a 20% premium, themselves constituted purposeful availment in the State of Texas as shown above. Furthermore, Phoenix's combined activities constitute purposeful availment, because it worked in Texas through an intermediator GPB/Ascendant in the State of Texas in providing services to Texas residents and in participating in a fraudulent scheme in Texas with the expectation of making profits . This is easily sufficient for specific personal jurisdiction in the State of Texas. *See Cornerstone Healthcare Grp. Holding, Inc. vs. Nautic Mgmt. VI, L.P. consol. with Cornerstone Healthcare Grp. Holding, Inc. vs. Reliant Splitter L.P.,* Nos. 14-0538, 14-0539, 2016 WL 3382159, at *70-1 (Tex. June 17, 2016) (Purposeful activity and specific jurisdiction when defendant indirectly sought Texas assets and sought to benefit and profit from Texas residents through an intermediator operating in the State of Texas.); *Bates v. Glob. Credential Evaluators, Inc.*, No. 10-09-00264-CV, 2010 WL 1797400, at *2-4 (Tex. App. 2010) (Defendant located in Arizona had significant work generated in the State of Texas through an intermediator and profited from such work and collected fees related to such work. Such activities, even absent physical presence, were sufficient for personal jurisdiction because defendant knew he was

affiliated with a Texas business and with Texas residents.); *Santy v. McElroy*, No. 03-00-00368, 2001 WL 838400, at *6 (Tex. App. 2001) (participation by non-residents in a project that aims to extricate profit from a Texas deal supports specific jurisdiction); *Citrin Holdings, LLC v. Minnis*, 305 S.W.3d 269, 281 (Tex. App. 2009) (Even a single contractual relationship can be sufficient when considered against the back drop of prior negotiations and contemplated future consequences from a long-term Texas-based contract such as that engaged in by Phoenix here.); *Yujie Ren v. Anu Res., LLC*, 502 S.W.3d 840, 850 (Tex. App. 2016) (Conduct is not random, isolated or fortuitous, but subjects defendant to personal jurisdiction when defendant has created continuing obligations on his own behalf with residents of the forum state.); *Trigeant*, 183 S.W.3d 717, 728 ("By participating in a Texas[-based] transaction involving the transfer of Texas-based assets to allegedly defraud a Texas resident, the [Defendants have] purposefully availed themselves of the benefits and privileges of conducting business in Texas," and subjected themselves to personal jurisdiction therein.); *Bates*, 2010 WL 1797400, at *5. (Defendant located in Arizona had significant work developed in Texas through an intermediator and profited from such work while collecting fees related to Texas residents. The court found the defendant knew he was affiliated with a Texas business and with Texas residents, and therefore personal jurisdiction was appropriate.); *Nogle & Black Aviation, Inc. v. Faveretto*, 290 S.W.3d 277, 281-282 (Tex. App. 2009) (knowingly working through an intermediator in the State of Texas was sufficient for the exercise of personal jurisdiction).

Phoenix's extensive contacts with Texas residents and its work through an intermediator (Ascendant) operating from the State of Texas over a six year period wherein it stood to profit by receiving 20% of all payments it processed shows that Phoenix had a permanent role in the operation of the Texas-based Ponzi scheme and deliberately and intentionally operated directly

with Texas residents and directly through Texas corporations for the purpose of making profits and perpetuating a Texas-based Ponzi scheme. Therefore, specific personal jurisdiction easily lies in this instance.

## 2. Auditor Defendants

The SAC alleges that the Auditor Defendants prepared false and misleading audits, reviewed, approved and authorized the dissemination of false and misleading financial statements for the Funds, and allowed their names and reputations to be used for salesmanship and marketing in connection with the sale of GPB Securities (the limited partnerships). ¶27. Specifically, PPMs and other marketing materials which were drafted and prepared by Ascendant Capital in Austin, Texas, named these defendants and described them as being the independent auditor, and a financing expert, for the Fund that was the subject of the PPM. *Id.* Their inclusion in these materials was no trifle. This information was included in thousands of documents prepared and disseminated from the State of Texas. Indeed, the SEC has revealed that over 17,000 investors bought GPB Securities. Thousands more were distributed as this number just represents actual investors (not those solicited). In addition, Class members like Wade, Crooks and Bell, who reside on Texas, received all of these materials in Texas. Such contacts are clearly purposeful and not merely "random, fortuitous, or attenuated." *Moncrief Oil Int'l Inc. v. OAO Gazprom,* 481 F.3d 309, 311 (5th Cir. 2007). These auditors contacts were not happenstance. They knew that Ascendant Capital, based in Texas, had a controlling role in GPB and the Funds and that their work product would be incorporated into materials that would be prepared and disseminated from Austin, Texas and to hundreds of Texas residents. ¶ 222.

"So long as it creates a 'substantial connection' with the forum, even a single act can support jurisdiction." *Burger King Corp. v. Rudzewicz,* 471 U.S. 462, 476 (1985) (quoting *McGee v. Int'l Life Ins. Co.,* 355 U.S. 220, at 223 (1957)). Here, the SAC also alleges that Auditor

Defendants RSM, Crowe, EisnerAmper and CohnReznick each engaged, through one or more offices in the State of Texas, in regular and continuous business operations related to accounting, consulting and related services provided to Ascendant and GPB in Texas. ¶ 85. Similarly, Margolin and Withum also provided accounting, consulting, valuation and related services to Ascendant and GPB in Texas. ¶ 85. To the extent these auditors had offices in Texas, the SAC alleges that these Auditor Defendants conducted all or part of the work related to the claims from such offices. *Id.*

These facts demonstrate that Auditor Defendants had sufficient minimum contacts with Texas, having purposefully availed themselves of the privileges of conducting business activities in Texas and by acting in and from Texas through Ascendant/GPB. *Cornerstone Healthcare,* 493 S.W.3d at 70 (Tex. 2016).

### 3. CohnReznick (Dkt. 696 at 4-10)

CohnReznick has more than sufficient minimum contact with Texas for this court to properly find specific jurisdiction. CohnReznick has significant offices in Austin and Houston, Texas, with at least four general partners in Texas as of September 9, 2020. ¶ 120. It is registered to do business in Texas according to the Texas Secretary of State. *Id.* Most importantly, the SAC alleges that CohnReznick Texas-based employees performed services in connection with the audits and accounting services referenced herein, and other Cohn Reznick employees travelled to Texas as part of their audit. Defendant CohnReznick was the outside auditor for certain of the Funds, including at least GPB Waste Management, for fiscal years 2016, 2017 and 2018. CohnReznick audited and issued an audit opinion for the financial statements of Waste Management for fiscal year 2016. As noted above, CohnReznick's name, reputation and audit opinion were included and/or referenced in the PPMs for Waste Management that was disseminated by Ascendant Capital Texas. The 2016 PPM for Waste Management told investors that "The books of account and

records for the Company, GPB and each Portfolio Company, prepared on the basis of GAAP, will be audited annually. Cohn Reznick LLP, a firm registered with the Public Company Accounting Oversight Board ("PCAOB") has been engaged as our auditor." August 5, 2016 Waste Management PPM at 43.

While CohnReznick contests that it performed work in Texas relating to the GPB Ponzi Scheme, this fact issue cannot be rebutted on this motion.

### 4.    Margolin (Dkt. 691 at 6-11)

Margolin (respecting GPB Capital, Automotive, Holdings Qualified, Holdings and NYC Development). Margolin is registered to do business in Texas according to the Texas Secretary of State. ¶122. Margolin performed services in connection with the audits referenced herein, and Margolin employees travelled to Texas as part of their audit. It provided accounting, auditing, tax planning, tax strategies and advisory services to both GPB Capital from at least 2013 through 2017 and for certain of the Funds, including at least GPB Automotive, GPB Holdings and GPB Holdings Qualified. Margolin audited the financial statements of GPB Capital for fiscal years 2014, 2015 and 2016, and of GPB Holdings for fiscal years 2013, 2014 and 2015, and of GPB NYC Developments for fiscal year 2018. Margolin thus allowed its name, work product and reputation to be included in PPMs and other marketing materials or reports provided from Texas to thousands of investors, including the Texas-based Plaintiffs and many other investors in Texas. ¶¶ 27, 52, 203.

The Court also may take judicial notice of the recently filed complaint of the New Jersey Attorney General ("NJAG Complaint") against GPB, Ascendant Capital, Ascendant Strategies, Gentile and Schneider. Ex. D at ¶210. That filing alleges that "both Gentile and Schneider made luxury purchases for their personal use at the expense of the GPB Funds or their portfolio

companies" and refers to "Documents prepared by GPB Capital's former auditors, Margolin …." In other words, Margolin was reviewing the GPB related expenses of Schneider, who was located in Texas. This confirms Plaintiffs' allegations that Margolin did audit work for GPB in Texas. Further, Margolin's carefully worded supporting affidavit submitted with their motion asserts that its "only contact *with GPB employees* was with GPB staff in New York." Dkt. 691-1 at ¶13 (emphasis added). But as alleged in the SAC, GPB was jointly controlled by Schneider and Ascendant Capital from Texas. Tellingly, Margolin's submission is silent about the communications or contacts with Ascendant or Texas in connection with its work for GPB or the Funds. Plaintiffs' allegations establish that this Court has personal jurisdiction over Margolin. At a minimum, it raises fact issues that cannot be decided on this motion without discovery.

### 5. EisnerAmper (Dkt. 693 at 6-9)

EisnerAmper was hired as the auditor for the Automotive, Holdings, and Holdings II Funds. ¶_. With a regional office in Dallas, Texas, EisnerAmper is registered to do business in Texas according to the Texas Secretary of State. ¶121. One of EisnerAmper's principals is in charge of its Texas market. ¶_. EisnerAmper's website boasts that "Our Dallas, Texas office has expertise serving clients in private equity, including fund sponsors and their portfolio companies."[43] ¶121. Upon information and belief, these Texas-based employees performed services in connection with the auditing work referenced herein, and other EisnerAmper employees travelled to Texas as part of their audit work. Defendant EisnerAmper was the outside auditor for certain of the Funds, including at least GPB Automotive, for fiscal years 2016 through

---

[43]https://www.eisneramper.com/eisneramper-dallas-tx/#:~:text=Dallas%2C%20TX&text=Our%20Dallas%2C%20Texas%20office%20has,%2C%20audit%2C%20and %20compliance%20challenges.

2019, GPB Holdings for fiscal years 2017 through 2019, and GPB Holdings Qualified for fiscal years 2017 through 2019.

Regardless of whether EisnerAmper issued an audit report or not, Plaintiffs allege that it substantially assisted the TSA violations alleged herein. It allowed its name and reputation ot be included and relied upon by investors in PPMs, due diligence materials and other marketing materials that were disseminated form Texas and sent to thousands of investors, including Class members and other investors located in Texas.

### 6. Withum (Dkt. 692 at 2, 9-11)

Withum (respecting Waste Management/Armada Waste, Cold Storage, Holdings III and NYC Development) Withum is registered to do business in Texas according to the Texas Secretary of State. ¶123. Upon information and belief, Withum performed services in connection with the audits referenced herein, and other Withum employees travelled to Texas as part of their audit. Withum provides accounting, auditing, tax planning, tax strategies and advisory services. Defendant Withum was the outside auditor for GPB Waste Management (Armada Waste Management LP), GPB Cold Storage, GPB Holdings III and GPB NYC Development. In particular, Withum audited the financial statements of GPB Cold Storage for fiscal years 2015, 2016, 2017 and 2018, GPB Holdings III for fiscal year 2019, and GPB NYC Developments for fiscal year 2018.

### 7. Valuation Defendant MBAF (703 at 2-13)

Morrison, Brown, Argiz & Ferra, LLC ("MBAF") is an accounting firm which provides accounting services to businesses, including primarily valuation services related to assets and ownership interests in private companies. ¶¶ 86, 126. It is registered to do business in Texas according to the Texas Secretary of State and has multiple principals who are licensed to do

accounting work in Texas. ¶ 126(b). The SAC alleges that MBAF performed services in connection with the valuation referenced herein in Texas, and MBAF employees travelled to Texas as part of their valuation work for GPB and Ascendant. ¶ 126(b). In particular, MBAF was retained during the period from approximately 2016 through 2017 to provide valuations of otherwise difficult to value assets held by at least GPB Holdings II and GPB Automotive. ¶126(c). This information was used by GPB and Ascendant to assess the value of the Funds' assets and impacted the valuations GPB and Ascendant provided from Texas, and was used in marketing materials disseminated to Broker Defendants and investors from Texas. MBAF was featured prominently in due diligence and marketing materials provided to RIA and brokers selling the GPB Securities. ¶126(d).

MBAF concedes that it worked on a valuation of two Texas companies for an entity called "GPB Capital". Dkt 703 at 10 n.3 and Dkt. 703-1 (Dayal Decl.) at ¶ 18. They assert that GPB Capital, LLC is not named or referenced in the Plaintiff's Complaint and its relationship to any of the named Defendants, if any, is unknown to MBAF. This is implausible. In truth, "GPB Capital, LLC" is obviously GPB Capital Holdings, LLC or, at minimum an affiliate controlled by GPB. The agreement for this work is signed by Macrina Kgil, GPB Capital's CFO at the time. In addition, the documents in this case reveal that the name GPB Capital was often used as shorthand for GPB Capital. Dkt. 700, Ex, L at 6. At a minimum, MBAF's activities in Texas are a fact issue that cannot be decided on this motion.

### 8. GPB Accountant Gentile Pismeny (Dkt. 702 at 4-8)

As the accountant for the Fund, Gentile Pismeny provided accounting services to the Funds that advanced the scheme complained of in this action. Gentile Pismeny prepared the Schedules K-1 reporting limited partners' respective shares of the partnership's income, deductions, and

credits, which it sent to GPB's limited partners (the Plaintiffs and class members herein) each year.

¶128. In so doing, Gentile Pismeny mailed thousands of such K-1 statements into Texas during the course of the Class period alleged. Plaintiffs Wade, Crooks and Bell were among the hundreds of Texas Class members that received such mailings. *See* Ex. H [Gentile Pismeny letter re K-1 to Bell] The recently filed NJAG Complaint confirms that Gentile Pismeny was both involved in the accounting shenanigans that maintained and advanced the Ponzi Scheme and also that they interacted with Schneider in Texas. That complaint details efforts of Gentile and Schneider, working together from Texas, to use income manipulations, referred to there as "true ups," to cover up income shortfalls and Gentile Pismeny's involvement with Schneider, who was based in Austin, Texas, in this regard. *See* Ex. D (NJAG Cmplt.) at 80-81. That complaint reports:

> On March 18, 2015, Gentile texted Schneider and Lash asking them: please get on a call now with K[B] [KB, a partner at the accounting firm GP&B]. . . . K feels based on his convo with Schneider that the guarantee that keeps neutral income and no losses on the tax returns and therefore no negative effect to the capital accounts is 1.1mm.... I told K it was prudent to follow Schneider's instructions.

*Id.,* 81. In short, Gentile Pismeny was directly involved in the deceptive conduct and interacted directly with Schneider in Texas.

### 9. MR Ranger & DJ Partners (Dkt. 694 at 7-9)

MR Ranger and DJ Partners were the vehicles through which Schneider, Gentiel and Martino owned Ascendant Alternative Strategies, the broker dealer through which Austin-based Schneider and Ascendant Capital conducted the deceptive Offering from Texas. Indeed, Ascendant Alternative Strategies does not contest personal jurisdiction. DJ Partners was headquartered in Austin, Texas. While DJ partners submits an affidavit from Schneider asserting that the entity is not located in Texas, Schneider listed DJ Partners as based at his Austin offices in his submission

to FINRA. Ex. G  As shown, entities which operate in Texas through affiliated Texas-based entities cannot award P.J. by such corporate strategy efforts.

### 10.     Bradley Wealth (Dkt. 687 at 6-8)

Bradley Wealth is registered to do business in Texas as a registered investment advisor (RIA). ¶ 132(i). Bradley promoted and sold GPB Securities thereby providing Ascendant and the GPB Defendants with the capital needed to continue the scheme described herein. The SAC alleges that Bradley attended Ascendant Capital's due diligence meetings in, or webinars from Texas, and/or received marketing materials, PPMs, other Offering Materials and other information relating to the GPB Funds from Ascendant Capital in Texas. ¶132(i)(iii). In addition, for every one of its clients that purchased GPB Securities, it submitted executed documentation to Ascendant Capital in Austin, Texas. ¶132(i)(iv). In other words, Bradley purposefully directed the purchase of GPB Securities into and through Texas. While, as an RIA, it did not charge the extraordinarily high commissions, it still received compensation for its services in connection with its clients' purchases of GPB Securities.  The claims pled are premised on the personal jurisdictional facts alleged.

Defendants cannot seriously argue that the TSA and related claims asserted do not arise from the facts supporting personal jurisdiction in the State of Texas on the part of Phoenix. Clearly, there is a substantial connection between such Texas-based conduct and the TSA claims alleged herein, and therefore Plaintiffs easily meet the "substantial connection test for specific jurisdiction." For the same reason, specific jurisdiction exists with respect to the auditors and Valuation Defendants. Each permitted GPB/Ascendant to use their names, reputations and financial reviews in PPMs and related documents sent to thousands of Texas investors in connection with the Ponzi scheme operated from Texas.  Their ongoing connection through

Ascendant/GPB in Texas with hundreds of Texas investors, like Phoenix, subjects them to specific jurisdiction.

Certain defendants argue that Plaintiffs must demonstrate personal jurisdiction as to each and every defendant and claim. That is only so where multiple claims arise out of different forum contacts. That is not the case here. Regardless, the same allegations set forth above demonstrate the minimum contacts necessary for the Court to find specific jurisdiction for each claim. Moreover, the doctrine of pendant personal jurisdiction fills any gap that may exist jurisdictionally because "[o]nce a district court has jurisdiction over a defendant for one claim, it may 'piggyback' onto that claim other claims over which it lacks independent personal jurisdiction, provided that all the claims arise from the same nucleus of material fact as the claim over which it has proper personal jurisdiction." *F.T.C. v. Educare Ctr, Serv., Inc.,* 414 F. Supp. 3d 960, 975 (W.D. Tex., 2019) (quoting *Kinetic Concepts, Inc. v. Bluesky Med. Corp.*, No. SA-03-CA-832, 2004 WL 2550586, at *7 (W.D. Tex. Sept. 24, 2004)); As recently observed by one Texas court, with respect to pertinent personal jurisdiction, this district and every circuit to decide the issue have approved the doctrine. *See id.* at 783 (collecting cases). *See also Gen. Elec. Cap. Corp. v. Mackzilla, LLC*, No. 15 Civ. 2425, 2016 WL 1059529, at *5 (S.D. Tex. Mar. 17, 2016).

## VIII. SUBJECT MATTER JURISDICTION

Certain Defendants baselessly dispute diversity jurisdiction. Dkts. 694 at 4-6, 703 at 13-14.

Ascendant Defendants argue that the SAC "fail[s] to plead any facts showing that the matter in controversy exceeds . . . $5,000,000, or that the number of members of the putative class exceeds 100." Dkt. 694 at 4; *see* 28 U.S.C. § 1332(d). That point is frivolous: the SAC literally pleads those exact jurisdictional requirements. ¶ 74. Moreover, the SAC alleges *a $1.8 billion*

*Ponzi scheme* that victimized *thousands* of investors, *e.g.*, ¶¶ 35(d), 47, 207, 235, 260, which far exceed the jurisdictional requirements. Ascendant Defendants also cite *no authority* for the absurd suggestion that Plaintiffs must identify one hundred class members to satisfy diversity jurisdiction under CAFA. Dkt. 694 at 4; *see, e.g.*, *Floyd v. Am. Honda Motor Co.*, 966 F.3d 1027, 1033 (9th Cir. 2020) ("CAFA does not require naming all one hundred plaintiffs.").

Ascendant Defendants' request that the court decline to exercise jurisdiction pursuant to 28 U.S.C. § 1332(d)(3) is equally absurd. Dkt. 694 at 4-5. They argue that: (1) the complaint is "pleaded . . . to avoid federal jurisdiction," yet Plaintiffs *filed the complaint in federal court* and, regardless, cannot avoid federal jurisdiction because of diversity jurisdiction; (2) the class is "not properly governed" by Texas law, which is incorrect, and (3) "other class actions asserting the same or similar claims . . . have been filed," even though this case asserts *more* claims on *additional* grounds and against *far more* defendants than any other case. These Defendants also state that "Plaintiffs purposefully ignore forum selection clauses mandating New York law and venue," which is frivolous because *the parties have already briefed those issues in this case*. It is *Ascendant Defendants* who are ignoring those prior briefings by filing *additional* briefing on the *same* issues.

Defendant MBAF absurdly argues that the SAC fails to allege "citizenship" to support diversity jurisdiction because the SAC alleges where Plaintiffs reside, not where they are citizens. Dkt. 703 at 13-14. However, MBAF's own cases disprove that argument. In *Stafford v. Mobil Oil Corp.*, 945 F.2d 803, 805 (5th Cir. 1991), none of the jurisdictional allegations for the parties used the word "citizen," and yet, there was no quibbling over "residence" versus "citizenship." The issue in *Stafford* was whether "a corporation is a citizen of the state in which it was incorporated and the state in which it has its principal place of business," but the complaint alleged "only one of these two possible states of corporate citizenship with respect to each defendant." *Id.* Here,

however, MBAF raises the "citizenship" issue only as to Plaintiffs, *none* of whom are corporations. ¶¶ 87-97. There was *no dispute* in *Stafford* that the "citizenship" of the individual defendants were adequately pled, even when the allegations used the words "reside" or "resident," *not* "citizen." Thus, the SAC's allegations of each Plaintiff's residence, not citizenship, is sufficient. ¶¶ 87-97.

*Powell, Inc. v. Abney*, 83 F.R.D. 482, 488 (S.D. Tex. 1979) was not even a class action, involved the same issue as *Stafford*, and allowed the plaintiff "to amend its original complaint."[44]

In another of MBAF's cases, the issue was not "citizen" versus "resident" but, rather, that the plaintiff "fail[ed] to allege state citizenships for himself or the defendants" at all. *Fermin v. Priest of Saint Mary - Marfa, Texas*, 775 F. App'x 162, 163 (5th Cir. 2019). That is not the case here. Accordingly, the arguments offered solely by MBAF with respect to diversity jurisdiction are meritless.

## IX. PLAINTIFFS' CLAIMS ARE NOT PREEMPTED OR PRECLUDED BY NSMIA OR SLUSA

Defendant United Planners argues (Dkt. 669 at 7-11) that Plaintiffs' claims pursuant to the TSA are precluded by the National Securities Markets Improvement Act of 1996 ("NSMIA") and Securities Litigation Uniform Standard Act of 1998 ("SLUSA"). Defendant's arguments are grounded in a serious misunderstanding of the two statutes and their application.

NSMIA preempts state law with respect to certain federally registered securities and/or securities that are actually exempt from federal registration pursuant to Regulation D or otherwise. Plaintiffs allege that GPB/Ascendant failed to comply with Regulation D and improperly failed to register its shares under the Securities Act of 1933, and again at this stage of the action, that allegation must be taken as true. *See Stanford*, 379 U.S. 476 (1965). Moreover, under Texas law,

---

[44] Should the Court require Plaintiffs to clarify the record by submitting declarations to confirm their citizenship of the State in which they reside, they are prepared to do so.

the burden of establishing an exemption under Regulation D, which could serve as a predicate for an exemption from registration under the 1933 Act, is on the person claiming the exemption: here, GPB. *Tex. Cap. Secs., Inc. v. Sandefer*, 58 S.W.3d 760, 777-779 (Tex. App. 2001).

Defendant's contention that NSMIA precludes Plaintiffs' claims under the TSA because GPB had an available exemption under Regulation D is factually and legally misplaced. Under clearly established law, because Defendants cannot now establish an exemption under Registration D, NSMIA cannot preclude the application of state securities laws. Given Plaintiffs' pleading and the status of the pleadings in this case, accepting the allegations as true, Plaintiffs have alleged more than a *prima facie* case that GPB improperly failed to comply with Regulation D in numerous respects. Such noncompliance precludes Defendants from availing themselves of any purported exemption from registration under the Securities Act. *See Stanford v. Texas*, 379 U.S. 476 (1965). Therefore, GPB cannot now carry its burden to prove that the exemption under Regulation D applies. As a result, Defendants cannot prove NSMIA preemption, which applies only when the securities are *actually exempt* under Regulation D. *See, e.g.*, *Stanford v. Greenberg*, No. 3:12-CV-4641-N, 2015 WL 13741905, at *5 (N.D. Tex. Feb. 4, 2015) (holding that were fact issue exists as to whether there is an exemption under Regulation D, NSMIA preemption does not apply); *Brown v. Earthboard Sports USA Inc.*, 481 F.3d 901, 906 (6th Cir. 2007) (holding that offering must actually qualify for a valid exemption from federal registration in order for NSMIA preemption to apply.). Defendants offer no contrary authority, and there is none.

Defendant's NSMIA preclusion cases are either irrelevant or "roundly rejected." *See* Dkt. 669 at 8-11. *Myers v. Merrill Lynch & Co.*, 249 F.3d 1087 (9th Cir. 2001) is irrelevant because the exemption from registration was not at issue, and the reasoning in *Temple v. Gorman*, 201 F. Supp. 2d 1238 (S.D. Fl. 2002), and *Pinnacle Commc'ns Int'l, Inc. v. Am. Family Mortg. Corp.*, 417 F.

Supp. 2d 1073, 1087 (D. Minn. 2006), has been "roundly rejected." *Earthboard Sports USA, Inc.*, 481 F.3d, 910 (6th Cir. 2007) ("Other courts have roundly rejected *Temple*'s reasoning. . . . We likewise reject *Temple*'s approach.")); *Ciuffitelli v. Deloitte & Touche,* No. 3:16 Civ. 00580, 2017 WL 2927481, at *18 (D. Or. Apr. 10, 2017) (rejecting *Temple*). Moreover, although not referenced by Defendants, cases in this Circuit consistently reject NSMIA preemption as to securities that are not actually exempt, like the securities at issue here. *See, e.g.*, *Breazeale*, 2015 WL 13740747, at *6 ("Plaintiffs sufficiently allege that Defendants were aware the SIBL CDs did not actually meet the requirements for the Regulation D exemption . . . [a]ccordingly, NSMIA preemption is not an adequate ground for dismissal."); *Janvey v. Willis of Colo. Inc.*, No. 3:13 Civ. 3980, 2014 WL 12670763, at *11 (N.D. Tex. Dec. 5, 2014) (adopting *Brown*) ("Class Plaintiffs allege noncompliance . . . with Regulation D. . . . [T]aking Class Plaintiffs' well-pled facts as true, it is inappropriate to hold at this stage that Class Plaintiffs' TSA registration claims are preempted by the NSMIA.").

Similarly, SLUSA is completely inapplicable to the claims asserted here. For SLUSA to apply, Plaintiffs' claims must (1) involve a "covered class action" that (2) is based on state statutory or common law and (3) alleges "a misrepresentation or omission of a material fact in connection with the purchase or sale of a covered security," or "that the defendant used or employed any manipulative or deceptive device or contrivance in connection with the purchase or sale of a covered security." 15 U.S.C. § 78bb(f)(1); *Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Dabit*, 547 U.S. 71, 86 (2006). Only if a suit meets all three of these provisions may a federal court dismiss the action as preempted by SLUSA. 15 U.S.C. § 78bb(f)(2).

Here, like NSMIA, SLUSA has no applicability because Plaintiffs' claims do not relate to a covered security. SLUSA defines a "covered security" as a security that satisfies the standards

for a covered security as set forth in paragraph (1) or (2) of section 18(b) of the Securities Act of 1933, 15 U.S.C. § 77r(b), at the time during which the alleged misrepresentation, omission, or manipulative or deceptive conduct occurred, and the security must trade on a national securities exchange. 15 U.S.C. § 78bb(f)(5)(E). A "covered security" *does not include* any debt security exempt from registration under the Securities Act of 1933, 15 U.S.C. § 77l, *et seq.* Thus, in relevant part, a "covered security" is a security traded on a national exchange. 15 U.S.C. § 77r(b)(1)-(2); *see also Dabit*, 547 U.S. at 83 (holding that a "covered security" is "traded nationally and listed on a regulated national exchange"). It is undisputed that these GPB Securities at issue here were never traded on a national exchange, nor intended to be traded on such an exchange. *See e.g.,* Ex. Decl. (March 7, 2016 PPM for Class A units) at 53 ("We will not list any Units on any stock exchange.").

Accordingly, the GPB Securities are not covered securities, so SLUSA preemption does not apply. *See Roland v. Green*, 675 F.3d 503, 517-18 (5th Cir. 2012), *aff'd sub nom. Chadbourne*, 571 U.S. 377 (holding that SLUSA preemption applies only to "*nationally* traded securities").

Indeed, here not only were the GPB limited partnership interests not traded on a national securities exchange – they were never registered under the Securities Act, which is a prerequisite to trading <u>on any</u> exchange. Defendant United Planners' argument fails entirely to address SLUSA and its requirements and instead offers conjecture compounded by speculation. None of the other Defendants have the temerity to join in their baseless argumentation.

United Planners' hypothesizes that Plaintiffs' allegations suggest that the securities "*should have been* federally registered with the SEC, and that, therefore, the Court should treat the limited partnership interests "as if" they were registered under the Securities Act. It asks the Court to then further make believe that the securities would then have been traded on a national securities

exchange (as opposed to one of the many exchanges, which do not meet the definition of a national securities exchange). Dkt. 669 at 10. Defendants' fantasy does not change the facts, nor the analysis. The GPB interests were *not* federally registered and did not trade on a national securities exchange. Indeed, even if GPB had registered the limited partnerships interests (which it said it would never do), that would not make them tradeable on a national exchange. Indeed, many registered shares are traded on non-national securities exchanges, like NASDAQ, OTCBB, and Pink Sheets. *See United States v. Georgiou*, 777 F.3d 125, 134 (3d Cir. 2015) (recognizing that registered securities may not be listed on national security exchanges but, rather, on the OTCBB, and Pink Sheets – which are not national securities exchanges. In other words, (a) GPB could have registered the units and never traded them on a national exchange, and thus, (b) "even if" they had registered them for trading, it would not have been on a national securities exchange. UPFSA' speculation begs credulity and displays a fundamental lack of understanding of SLUSA.

UPFSA, again alone, also maintains a SLUSA argument based upon Supreme Court authority which in fact directly rejects their analysis. UPFSA relies upon *Chadbourne & Parke LLP v. Troice*, 571 U.S. 377 (2014), which is also factually inapposite in obvious fashion. *Troice* makes clear that only misrepresentations that directly affect the plaintiffs' decision to purchase a covered security are subject to SLUSA. Here, there is no covered security offered by GPB, and none purchased by Plaintiffs. Nor were covered securities owned by GPB as part of its investment portfolio or that of the GPB Funds. Instead, GPB purchased interests in privately held businesses, not covered securities. *Troice* presented a far more compelling case for applying SLUSA, and yet, the Supreme Court found that it did not apply even there.

In *Troice*, Stanford International Bank issued non-covered securities – CD's which were "backed" by covered securities. There plaintiffs argued that these CDs were covered securities

because there was a "connection" to covered securities via the ownership of such covered securities by Stanford International Bank. The Court rejected this argument finding that SLUSA did not extend to uncovered securities even when they owned or were "backed by" covered securities. Here, no covered securities were purchased or back the GPB limited partnership interests, so there is no basis for SLUSA preemption.

## X.    PLAINTIFFS ADEQUATELY PLED TUFTA CLAIMS.

Plaintiffs' amended complaint pleads substantial TUFTA claims against the Broker Defendants and Phoenix.  Such claims as pled under Texas Business and Commerce Code § 24.005(a) require only that Plaintiff plead that GPB (the debtor) made transfers of assets to the transferees (the Broker Defendants and Phoenix) with actual or constructive fraud.  The intent of the transferees – the Broker Defendants and Phoenix – is not at issue. *U.S. Bank Nat. Ass'n*, 2012 WL 3100778; *Franklin D. Azar & Assocs., P.C. v. Bryant*, No. 4:17-cv-00418-ALM-KPJ, 2018 WL 6929339 (E.D. Tex. Nov. 14, 2018), *report and recommendation adopted*, No. 4:17-cv-00418-ALM-KPJ, 2019 WL 181004 (E.D. Tex. Jan. 12, 2019. There is no requirement to plead that they took the transfer from GPB with improper intent or otherwise. Even so, the Complaint makes clear that both the Broker Defendants and Phoenix took with actual knowledge of the GPB Ponzi scheme.

The Complaint clearly pleads that GPB made fraudulent transfers to the Broker Defendants and Phoenix.  As to the Broker Defendants, the Complaint alleges that they collected in excess of $150,000,000 (the SEC calculates $180,000,000) from GPB in the form of commissions paid at an uneconomic rate well in excess of the typical commissions in similar transactions. ¶ 358-360. The commissions in effect were bribes paid to the Broker Defendants who raised money that fed what the Broker Defendants knew was a fraudulent scheme.  Similarly, Phoenix was paid a bribe

of 20% on each transferred amount that it processed to facilitate the Ponzi scheme.  The roles of both transferees were integral to the Ponzi scheme.

Certain Defendants contend, incorrectly, that the TUFTA claims asserted against them are inadequately pled.  TUFTA is the Texas version of, and substantially the same as, the Uniform Fraudulent Transfer Act.  Claims pled under TUFTA need not meet the 9(b) elevated pleading standard. *See U.S. Bank*, 2012 WL 3100778 (holding that the trend in Texas courts is that TUFTA claims not subject to 9(b).). *Renate Nixdorf GmbH & Co. KG v. TRA Midland Props. LLC*, No. 05-17-00577-CV, 2019 WL 92038, at *4 (Tex. App. 2019) (same).

Broker Defendants do not seriously argue that the heightened "9(b)" pleading applies.[45] Dkt. 685 at 15 (Broker concession that "[t]his dispute is not material[.]").  Moreover, they incorrectly argue that Plaintiffs and the Class are not creditors under TUFTA.[46] TUFTA, in Section 24.002, defines a creditor broadly as "a person . . . who has a claim" against a transferee – here GPB.  Texas courts broadly interpret that definition in a manner that clearly makes Plaintiffs and the Class creditors. *See Zahra Spiritual Tr. v. United States,* 910 F.2d 240, 248 (5th Cir. 1990) ("The Texas courts have given a broad construction to the term creditor, so that the Act 'protects the holders of **unliquidated unmatured** contingent claims.'"); *see also United States v. Evans*,

---

[45] The principal case cited by Defendants does not support applying Rule 9(b).  *BSG Clearing Sols., N. Am., L.L.C. v. McKay*, No. 5:17 Civ. 57, 2017 WL 11207327, at *4 (W.D. Tex. Oct. 4, 2017) (declining to rule on the issue because the TUFTA claim failed "[e]ven under" Rule 8(a)).  At a minimum, Rule 9(b) does not apply to claims under TUFTA section 24.005(a)(2), which does not even require fraudulent intent at all. *VeroBlue Farms USA, Inc. v. Wulf*, 465 F. Supp. 3d 633, 652 (N.D. Tex. 2020) (citing cases).

[46] Broker Defendants also argue, without logic that Plaintiffs must allege fraudulent transfers as to *each* Class member.  ECF No. 685 at 17 n. 28.  Each class member has the same claims as against GPB for TSA violations and other fraudulent conduct.  This makes them creditors.  The fraudulent transferees were fraudulent transferors as to each class member creditor.

513 F. Supp. 2d 825, 834 (W.D. Tex. 2007). Broker Defendants' apparent contention is that, because Plaintiffs and the Class have not obtained a judgment against GPB, Plaintiffs are not TUFTA creditors of GPB; this is clearly wrong.

Next, Broker Defendants argue that the SAC does not adequately allege that they *received* the transferred assets because the SAC does not parse out the amount of funds in each transfer to each Broker Defendant. Dkt. 685 at 15-16, 17 n.29; Dkt. 669 at 1 (joining Dkt. 685). This argument is misplaced and unsupported. First, as the pleading is subject to rule 8(a), not rule 9(b), Plaintiffs are required to only provide "notice of the circumstances which give rise to the claim". *Morrell v. Experion*, No. 3:19-CV-2982-K-BH, 2021 WL 197428, at *1 (N.D. Tex. Jan. 20, 2021). Moreover, as shown, plaintiffs need not plead information "within the defendants' knowledge" sold as the precise amount of commissions paid. *See infra* at ____. Here, Plaintiffs have clearly pled the claim, and the total amount of the fraudulent transfer to the Broker Defendants. These transfers are confirmed in the SEC complaint. Each Broker Defendants <u>knows</u> the amount they received and when they received it. This is clearly sufficient under rule 8(a). *See*, e.g., cases cited at *Rubenstein v. Neiman Marcus Grp. LLC*, 687 F. App'x 567, 567-8 (9th Cir. 2017) (Even under Rule 9(b), a plaintiff need not plead specific facts which are in defendants' knowledge and which plaintiff does not have reasonable access to under Rule 8.).

Defendants' argument based on *McKay*, which dismissed a fraudulent transfer complaint for not identifying *any recipients at all*, is baseless.[47] 2017 WL 11207327, at *1 (reciting the pertinent allegations), at *4 ("[Plaintiffs] never allege that Defendants themselves received any of

---

[47] Although *Indiana Bell Tel. Co. Inc. v. Lovelady* addressed allegations of specific dollar amounts of each transfer, that resulted from applying Rule 9(b), not Rule 8(a), and does not alter that case law holding that even under Rule 9(b) a plaintiff need not plead facts in defendants' possession which plaintiff has no access to. 2006 WL 485305, at *2. *See supra* note **Error! Bookmark not defined.**.

these transfers."). Here, however, Broker Defendants *admit* that the SAC expressly alleges that they "received" the fraudulently transferred funds. Dkt. 685 at 15-16 (quoting ¶ 358). That is a sufficient pleading, and Broker Defendants' single inapposite case does not hold otherwise. It is also sufficient to allege the fact that the transfers were made and received by Broker Defendants, even without references to bank statements or similar documents, because Plaintiffs' factual allegations must be assumed to be true. Dkt. 685 at 17 n.29. Contrary to Broker Defendants' insinuation, Plaintiffs need not provide bank statements (which they have) at the pleading stage to prove the fact of the transfers. *See Morrell*, 2021 WL 197428, at *1.

One Broker Defendant, United Planners', also vaguely contends that Plaintiffs and the Class do not plead violations of TUFTA. *See* Texas Bus. & Commerce Code § 24.005(a)(1) (defining a fraudulent transfer as a transfer made "with actual intent to hinder, delay, or defraud any creditor of the debtor"); § 24.005(a)(2) (defining a fraudulent transfer as a transfer which happened "without receiving a reasonably equivalent value in exchange for the transfer or obligation, and the debtor"); Dkt. 669 at 4-7. As to *all* Broker Defendants, Plaintiffs adequately plead claims under both sections ((a)(1) and (a)(2)).

Plaintiffs' claim under section (a)(2) is that the Broker Defendants and Phoenix were paid unreasonable compensation for their role as brokers or administrators in connection with the GPB Offerings, and therefore, GPB did not receive reasonably equivalent value in consideration for such compensation. As the SAC makes clear, the Broker Defendants were paid unprecedently large brokerage compensation in connection with the GPB Offerings. The Complaint also makes clear that the Broker Defendants were aware of many – if not all – of the fraudulent statements and materially fraudulent omissions contained in the PPMs, which the Broker Defendants distributed to their clients despite such knowledge. Stated differently, they were active participants

in the fraud and Ponzi scheme, and their active participation fed the Ponzi scheme by raising billions of dollars from unsuspecting clients.

GPB overcompensated the Broker Defendants and also, paid them unreasonably because GPB gained no material benefit from the additional assets raised as such assets were used by GPB to pay insiders rather than to make legitimate investments on behalf of investors. Again, the Complaint alleges that the Broker Defendants were aware of the Ponzi scheme and this diversion of assets. Stated simply, Plaintiffs have easily met the pleading standard under Rule 8 and 9(b).[48]

In addition, Plaintiffs have adequately pled a claim under 24.005(a)(1). Recent case law in the Fifth Circuit and Texas courts *makes clear* that in the Fifth Circuit, a party may establish <u>actual intent to defraud, hinder, or delay</u> a creditor of a debtor (the Plaintiffs) by pleading and/or establishing that the debtor was engaged in a Ponzi scheme.[49] *See Rotstain v. Trustmark Nat'l Bank*, No. 3:09 Civ. 2384, 2020 WL 1513516, at *2 (N.D. Tex. Mar. 30, 2020); *Janvey v. Democratic Senatorial Campaign Committee*, No. 11-10704, 712 F.3d 185, 189 (5th Cir. 2013) (transfer from a Ponzi scheme is presumptively made with intent to defraud); *In re IFS Fin'l Corp.*, 669 F.3d 255, *265 (5th Cir. 2012); *Janvey v. Golf Channel, Inc.*, 487 S.W.3d 560, 564 n.4, 567 n.27, 577 (Tex. 2016).[50] Here, Plaintiffs have pled a substantiated claim similar to that pled by the

---

[48] Defendants cannot seriously contend that the remaining elements of the reasonably-equivalent-value portion of TUFTA were not met. Clearly, at all relevant times, GPB was engaged in business transactions, and its remaining assets were unreasonably small given that it was paying on a regular basis 8% dividends from new investor money and/or from the capital accounts of existing investors (i.e., it could not operate its business without stealing funds from new investors). Clearly, GPB had insufficient assets from which to pay such dividends.

[49] Contrary to Broker Defendant UPFSA' argument, which is not supported by *any* caselaw, Plaintiffs do not need to allege specific statements that UPFSA's "told" Class members in selling the securities in order to plead this claim. Dkt. 669 at 5. The Ponzi scheme suffices to establish fraudulent intent on GPB's part.

[50] Contrary to Broker Defendant UPFSA's assertion, Dkt. 669 at 4-5, *Janvey* does *not* reject the presumption that Ponzi scheme transfers are fraudulent *per se*, 487 S.W.3d at 563 (citing Fifth
[Footnote continued on next page]

Securities Commission of the State of Massachusetts and the SEC, alleging that GPB, during all relevant periods, was engaged in a Ponzi scheme. Thus, the transfers at issue are presumed to have occurred with actual intent to hinder, delay, or defraud its creditors.

Plaintiffs also allege that the Broker Defendants were aware of the fraud. Therefore, there is, at least, an unresolved fact issue as to whether or not they were specifically aware of the Ponzi scheme, which occurred at GPB. Under *Janvey v. GMAG*, 592 S.W.3d 125 (Tex. 2019), this knowledge required Broker Defendants, pursuant to Texas law, to reasonably investigate GPB to determine whether its activities were part of a Ponzi scheme. Obviously, none of the Broker Defendants engaged in such an investigation because had they done so, they would have fully identified the Ponzi scheme and been obligated to discontinue their sales operations on behalf of GPB. Thus, Defendants cannot prove under Texas law that they were "good-faith transferees" and, therefore, cannot assert on affirmative defense under TUFTA because they were on inquiry notice of the fraud. *See Janvey v. GMAG*, 592 S.W.3d at 131 ("If a transferee has inquiry notice, then their activities are not in good faith." Once a defendant is put on inquiry notice of potential fraud, "they must conduct a diligent investigation to prove [its] good faith."). Regardless, the good-faith defense involves fact determinations of subjective belief and whether there was an "arm's-length transaction," which cannot be resolved on a motion to dismiss, and a defendant's bare assertions

---

Circuit case) ("[C]ourts . . . conclusively presume actual intent and insolvency when a transfer is made in furtherance of a Ponzi scheme"), 567 & n. 27 ("We express no opinion regarding the validity of the Fifth Circuit's conclusive Ponzi-scheme presumptions."). *See also Rotstain,* 2020 WL 1513516. *Janvey* (the case that defendants rely upon) simply defines the "reasonably equivalent value" requirement of the good-faith affirmative defense, which cannot now be asserted by Brokers. *Id.* at 564.

of fact must be disregarded in this content.[51] *GE Cap. Com., Inc. v. Wright & Wright, Inc.*, No. 3:09 Civ. 572, 2011 WL 124237, at *6 (N.D. Tex. Jan. 13, 2011); ECF No. 669 at 6, 6-7.

Finally, Broker Defendants provide *no* caselaw, nor can they, for the proposition that the TUFTA claims must be dismissed if the TSA claims against the GPB Defendants are dismissed. Dkt. 685 at 17 n.30. Simply, TUFTA claims are not secondary liability claims that rise or fall with the underlying claims.

In sum, Plaintiffs have adequately pled that the transfers to the Broker Defendants of hundreds of millions of dollars with the Broker Defendants' knowledge that their sales were made pursuant to material misrepresentations and omissions, were transfers with intent to hinder, delay, or defraud Plaintiffs and other Class members. They have also properly pled the claim with respect to Phoenix which received a 20% bribe on each transfer.

## XI. THE SAC PROPERLY PLEADS COMMON LAW CLAIMS FOR FRAUD, NEGLIGENCE, AND BREACH OF FIDUCIARY DUTY

### A. Fraud

Count VII is a cause of action for common law fraud, which requires: (1) "a material misrepresentation" that (2) "was false," (3) "was either known to be false when made or was asserted without knowledge of its truth," (4) "was intended to be acted upon," (5) "was relied upon," and (6) "caused injury." *Jacked Up, L.L.C. v. Sara Lee Corp.*, 854 F.3d 797, 810 (5th Cir. 2017) (quoting *Zorrilla v. Aypco Constr. II, LLC*, 469 S.W.3d 143, 153 (Tex. 2015)).

Defendants, principally the GPB Defendants (Dkt. 697), assert that Plaintiffs have not satisfactorily plead fraud. According to GPB, Plaintiffs have not plead the misrepresentations and

---

[51] United Planners' also mischaracterizes Plaintiffs' TUFTA claim as arising from "the funds declin[ing] in value." This is a fabrication. The claim is based upon cash transfers to the Brokers and Phoenix from the GPB Ponzi scheme. Dkt. 669 at 5.

omission with particularity, the misrepresentations are mere puffery, and Plaintiffs have not alleged reliance. GPB is wrong on all points.

As demonstrated above the SAC alleges specific documents (e.g., the PPMs, GPB's letters to investors, the monthly account statements, the DDQs and marketing materials disseminated by GPB and Ascendant Capital) that included specific material misstatements and omissions (concerning the nine areas of misrepresentations detailed above). Plaintiffs identified numerous examples of misrepresentations in PPMs and other documents. Plaintiff was not required to list 100 different PPMs, and hundreds of monthly statements and letters to investors to satisfy its burden. Surely, the amount and frequency of GPB's misstatements cannot provide it and its co-defendants with protection from liability.

In any event, GPB ignores the SAC's many specific references to false statements and documents. For example, GPB ignores Plaintiffs' allegations about: misstatements in the December 24, 2015 GPB letter to Holdings II investors stating (falsely) that "GPB continues to pay all distributions at the stated rate of 8% *fully covered form operations*" (¶ 159); the March 6, 2015 PPM Amended GPB PPM for the Automotive Portfolio stating "we will make distributions based on cash flow" (¶ 155); the March 7, 2016 GPB Holdings II Amended PPMs (for Class A and Class B units) at page 25, stating, "while we have no present plans to do so, we could include LPs' invested capital in amounts we distribute to LPs" (¶162); a March 30, 2017 Form ADV, filed with the SEC reported, at page 13, stating, "the Companies could include Investors' invested capital in amounts distributed to Investors" (¶163); similar statements in other PPMs issued by GPB, including the June 12, 2016 Second Amended GPB Holdings II PPMs for Class A and Class B, pp, 24 and 32, respectively; the January 2018 Third Amended GPB Holdings II PPMs for Class A and Class B, at pages 31 and 32, respectively; a June 30, 2016 GPB Automotive PPM, at page

29; an April 16, 2018 GPB Waste Management PPM, at page 26; and a December 2016 Holdings Qualified PPM, at page 34. ¶164. All of these statements were misrepresentations because GPB and Ascendant Capital had already been using invested capital, not cash flow, to fund the "distributions" that they were making it investors.

The SAC also cited 18 Forms D for GPB Offerings that contained details about the size of the Offerings, the amount of GPB Securities sold and the Broker Defendants who were involved in the sales of those GPB Securities during the time period covered by each particular Form D. ¶¶ 237-259. These Form Ds filings were false as well, because they failed to include material information about Ascendant, Schneider and Martino as promotors, or the acquisition fees and Offering expenses used to pay Ascendant or otherwise required to be disclosed. ¶¶177-182. GPB also failed to disclose the fact that a portion of the commissions that were being paid to Ascendant as ordinary commissions pursuant to the PPM and were also being shared with GPB and Gentile directly because Gentile (undisclosed to investors) owned one- third of Ascendant and therefore one-third of its income. Defendants misrepresented the information that was required to be disclosed in Item 16. ¶182. These failures also rendered Regulation D unavailable to Defendants in connection with the exemption from registration that they sought.

Instead of addressing the actual misrepresentations alleged, GPB misleadingly asserts that Plaintiffs claims arise from or are related to contractual obligations, and then proceeds to set out Plaintiffs' allegations in the most generic fashion. Dkt. 697 at 13-15. Unable to respond to the core allegations of the SAC, GPB chooses ignore plaintiffs detailed Material Misrepresentations and Omissions set out in ¶35 and throughout the SAC. This sort of legerdemain should not be tolerated. The misrepresentations and omission alleged (*see*, *supra,* Background & Section III.C) are significant and include, for example an ongoing Ponzi Scheme by which the Funds paid out other

investors' capital as distributions; a conflict of interest whereby Gentile, the managing member of the Funds' general partner, had a financial and ownership interest in its underwriter; and falsely telling investors that the Funds were exempt from registration when they were not and then failing to register. Such allegations are not mere "puffery" as GPB seems to assert. Dkt. 697 at 15. Nor are they based on the contractual obligations of the parties. GPB's argument that Plaintiffs' fraud claims must fail because they do not plead reliance (Dkt. 697 at 15-16) is also incorrect. The SAC is replete with allegations concerning Plaintiffs' reliance on the misleading Offering materials. *See e.g.* ¶¶ 35(h), 169 (were misled), 215 (causing "investors and potential investors to rely"), 216 ("investors would have known"), 285 ("Such misrepresentations and omissions were material, indeed crucial, to Plaintiffs and the other GPB investors' evaluation of the GPB Funds, and their decision to invest in them"), 287 ("Plaintiffs and the other investors were reasonable in relying upon the misrepresentations and omissions in the Offering Materials").

## B. Negligence

"To sustain a negligence action, the plaintiff must [allege] a legal duty owed by the defendant to the plaintiff, a breach of that duty, and damages proximately caused by that breach." *Lee Lewis Const., Inc. v. Harrison*, 70 S.W.3d 778, 782 (Tex. 2001).

The Defendants against whom a negligence claim is asserted (Auditors and Phoenix) owed a duty to Plaintiffs and the remainder of the Class. In *Grant Thornton LLP,* 314 S.W.3d, 919 (Tex. 2010),[52] the Texas Supreme Court applied the approach of Section 552 of the Restatement of Torts to third-party auditor liability. That section provides that:

> [o]ne who, in the course of his business, profession or employment, or in any other transaction in which he has a pecuniary interest, supplies false information for the guidance of others in their business transactions, is subject to liability for pecuniary

---

[52] Contrary to the assertion of the Auditor Defendants at least as this juncture, it is Texas law, not New York law that controls the negligence claims against these defendants.

loss caused to them by their justifiable reliance upon the information, if he fails to exercise reasonable care or competence in obtaining or communicating the information.... [T]he liability stated ... is limited to loss suffered

(a) by the person or one of a limited group of persons for whose benefit and guidance he intends to supply the information or knows that the recipient intends to supply it; and

(b) through reliance upon it in a transaction that he intends the information to influence or knows that the recipient so intends or in a substantially similar transaction.

*Id.* (quoting Restatement (Second) of Torts § 552). "Information Negligently Supplied for the Guidance of Others."). According to the Court, the Restatement "provides a window through which direct victims of auditor negligence can demand accountability without unleashing potentially unlimited auditor liability." *Id.* Thus, in Texas, in keeping with § 552, negligence claims can be brought by third parties against attorneys, auditors, accountants, and other professionals. *See McCamish, Martin, Brown & Loeffler v. F.E. Appling Interests*, 991 S.W.2d 787, 791 (Tex. 1999).

Negligence claims, like those asserted here against the Auditor Defendants and Fund Administrator Phoenix, are available "when information is transferred by [a professional] to a *known* party for a *known* purpose." *Id.* at 794 (emphasis added). Under § 552, a "known party" is one who falls in a limited class of potential claimants, "'for whose benefit and guidance [one] intends to supply the information or **knows that the recipient intends to supply it**.'" *Id.* (emphasis added) (quoting Restatement (Second) of Torts § 552(a) (Am. Law Inst. 1975)). This formulation limits liability to situations in which the professional who provides the information is "aware of the nonclient and intends that the nonclient rely on the information." *Id.* Unless a plaintiff falls within this scope of liability, a defendant cannot be found liable for negligent misrepresentation. Auditors and accountants have been found to be subject to potential liability under this standard.

Here, Phoenix, as GPB's Fund Administrator, provided confirmations, monthly account statements and other written information concerning the value of investors' accounts from the initiation of the investment to the present. ¶ 32. They misrepresented, or, at a minimum, mislead Class members as to the current value of their GPB investment, by failing to disclose (a) the exorbitant commissions and other expenses charged to investments, (b) that distributions were being paid from invested capital, including Class members' own capital, and (c) the ever-increasing declines in the value of Fund assets. ¶¶ 210-221. These communications were regular and continuous, but also deeply misleading. Clearly, Phoenix was aware of the identity of the recipients of these materials, as Phoenix sent them directly to the investors and their respective brokers. Phoenix was in privity with the limited partners as it (a) obtained personal financial information directly from all Class members; (b) provided the limited partners (Plaintiffs and the other Class members herein) with Confirmations advising them of their admission to the Funds' partnership in which they had invested, (c) sent monthly statements, valuation statements and other communications, directly to these investors' home addresses month after month, and year after year; and (d) custodied their assets, including cash paid for the limited partnership interests. ¶ 387. Phoenix also knew the purpose of these communications: to apprise Class members of the status and value of their investments on an ongoing basis, information on which Phoenix knew Class members would rely.

Similarly, the Auditor Defendants allowed their names and reputations to be used in PPMs and other Offering materials for salesmanship and marketing to investors in connection with the sale of GPB Securities. Thus, each Auditor Defendant knew that the PPMs and their name and financial work were being distribute to each limited partner of the GPB Funds.

Moreover, both the Auditors and Phoenix knew that a substantial number of the prospective investors were also being sent the PPMs and marketing materials containing their names and financial information.

Negligence liability exists under Texas law when an auditor or other professional, like the Fund Administrator, knows or should have known that such statements would be relied upon by a limited class of persons. *Steiner v. Southmark Corp.*, 734 F. Supp. 269, 280 (N.D. Tex. 1990); *Blue Bell, Inc. v. Peat, Marwick, Mitchell & Co.,* 715 S.W.2d 408, 412 (Tex. App. 1986). *See also Shatterproof Glass Corp. v. James,* 466 S.W.2d 873, 880 (Tex. App. 1971) (accountant may be held liable to third party who suffers damage in reliance on financial statements negligently prepared by accountant). Texas precedent extends § 552 liability further "to the persons or class of persons whom the maker of the representation intends to benefit or who foreseeably may be expected to act in reliance on it." *Steiner,* 734 F. Supp. at 280 (quoting *Hermann Hosp. v. National Standard Ins. Co.,* 776 S.W.2d 249, 254 (Tex. App. 1989).

"The theory of negligent misrepresentation permits plaintiffs who are not parties to a contract for professional services to recover from the contracting professionals." *Whitley Penn LLP v. GACP Finance Co., LLC,* No. 19 Civ. 01235, 2020 WL 4187910, at *3 (Tex. App. 2020) (quoting *McCamish, supra,* 991 S.W.2d 787, 792 (Tex. 1999)). Where, as here, the group of persons to which the Auditors were potentially liable was "not the public at large … but instead the limited class of purchasers of [the] securities," and "it is plausible to infer that [P]laintiffs [and Class members] may foreseeably have been expected to rely on [the] Auditors' statements" concerning the GPB Funds' financial condition liability exists. *Steiner,* 734 F. Supp. at 280. Here, it was clearly foreseeable that investors in GPB Funds would receive the PPMs. Indeed, it was

legally required and each purchaser was required in the Subscription Agreement to represent that they actually read the relevant PPM.

Auditor Defendants and Phoenix argue that Plaintiffs do not sufficiently allege a breach of a duty by setting forth the particular statements alleged to have been negligently issued. Dkt. 707 at 22-24; Dkt. 701 at 18-19. But, Auditors and Phoenix, having chosen to communicate with Class members had a duty to do so fully and accurately.

And the Complaint pleads in detail the misrepresentations made by Phoenix in its monthly statements and by the Auditors in their audits and financial reviews. The false statements concerning the financial condition, results, and performance of the GPB Funds were obviously links in the chain of misrepresentations that allowed the GPB Funds to continue for so long.[53]

Moreover, the SAC makes clear the value of the misrepresentations as to NAV and the origin of fund distributions made by Phoenix. As to Auditors, Plaintiffs have shown that the financials of GPB overstated the value of GPB assets by at least $1 billion and that such financials failed to account for both conflicted transactions and undocumented intercompany loans.[54]

## XII.  GPB'S CONTENTION THAT IT HAD NO FIDUCIARY DUTY TO PURCHASERS OF GPB SECURITIES IS WRONG.

"To prevail on a breach-of-fiduciary-duty claim, a party must prove the existence of a fiduciary duty, breach of the duty, causation, and damages." *Cuidado Casero Home Health of El Paso, Inc. v. Ayuda Home Health Care Servs., LLC*, 404 S.W.3d 737, 752 (Tex. App. 2013).

---

[53] The accountants contentions concerning a two year statute of limitations for negligence claims are predictive as the record does not reflect when (the dates) and how many times the subject financials were published and republished to investors. Moreover, as shown, a class plaintiff need not have standing to assert each class claim.

[54] Proximate cause is easily shown here because the auditors' financial misrepresentations were part of the material misrepresentations and omissions disseminated by GPB and Ascendant that the investors relied upon.

GPB (Dkt. 697 at 17) and Gentile (699 at 5) contend that they had no fiduciary duty to purchasers of limited partnership interests because "at the time of the supposed non-disclosures, no Plaintiff was yet a limited partner, and, as a result, no fiduciary duty was owed." Dkt. 697 at 17. Not so.

GPB and Gentile neglect to inform the Court that at all relevant times **GPB** was a registered investment advisor under the Investment Advisors Act of 1940.[55] As such, at all relevant times, GPB and its principals were subject to a federal fiduciary standard substantially similar to the common law fiduciary duty standard in Texas. *See Laird v. Integrated Res., Inc.,* 897 F.2d 826, 837 (5th Cir. 1990) ("The Supreme Court has recognized the investment advisers' fiduciary status. Courts may refer to [its] cases instead of state analogies in deciding whether this status prohibits particular conduct."); *Douglass v. Beakley*, 900 F. Supp. 2d 736, 751 n.16 (N.D. Tex. 2012) (quoting *Transamerica Mortg. Advisors Inc. v. Lewis*, 444 U.S. 11, 17 (1979)) (noting U.S. Supreme Court's recognition that Section 206 of the IAA "establishes federal fiduciary standards to govern the conduct of investment advisers"). *See also Laird* 897 F.2d at 837 ("[C]oncerning entanglement with state law, because our holding encompasses a developed federal standard, it does not require reference to state corporate and securities law or the state law of fiduciary relationships."); *Belmont v. MB Inv. Partners, Inc.*, 708 F.3d 470, 501-502 (3d Cir. 2013) (same).

These cases and others impose upon a registered investment advisor and its principals a fiduciary duty to exercise utmost good faith and to make full and fair disclosure of all material facts to investment advisory clients and/or persons who worked with the investment advisor.

---

[55] As GPB's CEO, Gentile was bound by these same obligations. *Alessi v. Beracha,* 849 A.2d 939, 950 (Del. Ch. 2004) ("Fiduciary duties are owed by the directors and officers to the corporation and its stockholders.").

Plaintiffs expressly plead this federal fiduciary standard (¶¶105, 373-75), but Defendants simply ignore these allegations.

Here, GPB and Gentile provided to each limited partner, *prior* to their purchase, disclosures contained primarily in a PPM, which were false and misleading, and which contain material omissions. At the time of the distribution of such PPMs, GPB and Gentile were subject to the federal fiduciary standards under the Investment Advisors Act, and breached them. Thus, Defendants' arguments that they bore no duty at the time of the dissemination of the false and misleading material are meritless.[56]

GPB and Gentile also argue that Plaintiffs' breach of fiduciary duty claim is based on an alleged nondisclosure of "material financial improprieties," and as such can only be pursued as a derivative claim. GPB, Dkt. 697 at 17; and Gentile, Dkt. 699 at 5. But, Defendants misconstrue the nature of Plaintiffs' fiduciary duty claims. First, Plaintiffs' claims are not based on financial improprieties but on the failure to *disclose (or the misrepresentation of)* those improprieties and other material facts. Second, the alleged breach was based, not only on failure to disclose GPB's improper conduct respecting the Funds, but also the failure to disclose material conflicts of interest, "that the account statements being provided to Class members did not accurately reflect the status of their investment," as well as intercompany comingling of assets and other financial misdeeds.

Defendants are wrong to argue that any of the claims based on these material misrepresentations are derivative claims. Dkts. 697 at 17; 699 at 5. Under Texas and Delaware law, where the breach of duty asserted relates to the *nondisclosure or misrepresentation* of such

---

[56] Other Defendants' charged with aiding and abetting GPB and Gentile's fiduciary duty breaches piggyback off GPB and Gentile's arguments. For the reasons set forth above, their arguments must also be rejected as well. *See* Dkts. 709 at 12 (Axiom), 694 at 19 (Ascendant), 701 at 17-18 (Phoenix).

matters, the claims are direct, not derivative in nature. *In re Parkcentral Glob. Litig.*, No. 3:09 Civ. 0765, 2010 WL 3119403, at *5 (N.D. Tex. Aug. 5, 2010) (investors alleging a breach of fiduciary duty premised upon "nondisclosure/misrepresentation claims are generally direct, not derivative, claims"); *Albert v. Alex. Brown Mgmt. Serv., Inc.,* Nos. 762-N, 763-N, 2005 WL 2130607, at *12 (Del. Ch. Aug. 26, 2005) ("Generally, non-disclosure claims are direct claims.) Moreover, the partnerships were not harmed by the alleged disclosure violations. Any harm was to the unitholders, who either lost their opportunity to request a withdrawal from the Funds from the Managers, or to bring suit to force the Managers to redeem their interests."). Indeed, Defendants cannot identify any injury suffered by GPB resulting from the false disclosures, instead GPB benefited therefrom by raising more funds.

GPB's reliance on *Tooley v. Donaldson, Lufkin, & Jenrette, Inc.,* 845 A.2d 1031, 1033 (Del. 2004), for the proposition that claims based on financial improprieties are derivative in nature, is unavailing. *Tooley* dealt with allegedly improper corporate conduct (the delay in closing a proposed merger that had harmed stockholders), not, as here, the failure to *disclose* some impropriety or actual misstatements about GPB's finances. Similarly, GPB's citation to *Kramer v. Western Pac. Indus., Inc.*, 546 A.2d 348, 353 (Del.1988) misses the mark. Plaintiffs' claim is not "mismanagement resulting in corporate waste," but rather the Material Misrepresentations and Omissions set forth in detail above.

## XIII. THE SAC ADEQUATELY PLEADS THE CLAIMS FOR AIDING AND ABETTING COMMON-LAW TORTS.

The SAC adequately pleads claims against the specified Defendants for aiding and abetting fraud (Count VIII) and aiding and abetting breach of fiduciary duty (Count XII[57]).

---

[57] Broker Defendants mislabel this count as Count XI. ECF No. 685 at 30.

### A.      Texas Law Recognizes These Causes of Action.

The Supreme Court of Texas recently has recognized claims for aiding and abetting torts generally and common-law fraud specifically. *See Nettles v. GTECH Corp.*, 606 S.W.3d 726, 738-39 (Tex. 2020) (citing Supreme Court of Texas cases) ("Aiding and abetting and conspiracy are theories of derivative or vicarious liability. . . [that] depend upon liability for an underlying tort and they survive or fail alongside that tort.")

"); *see also Clayton v. Richards*, 47 S.W.3d 149, 154 (Tex. App. 2001) ("The general rule in Texas is that those who . . . lend aid to the wrongdoer . . . are also liable for the tortious act."); *Frank v. Commonwealth of Ant. & Barb.*, 842 F.3d 362, 366 (5th Cir. 2016) (adjudicating "claim for aiding and abetting fraud"). Any contrary, pre-*Nettles* cases, like those cited in Broker Defendants' brief, Dkt. 685 at 30, are not good law.

The Supreme Court of Texas has also long recognized the claim for aiding and abetting breach of fiduciary duty. *Sw. Tex. Pathology Assocs., L.L.P. v. Roosth*, 27 S.W.3d 204, 208 (Tex. App. 2000) ("A third party who knowingly aids and assists in the breach of a fiduciary duty may also be liable.") (citing *Kinzbach Tool Co. v. Corbett-Wallace Corp.*, 160 S.W.2d 509, 514 (Tex. 1942) ("It is settled as the law of this State that [] a third party [that] knowingly participates in the breach of duty of a fiduciary . . . is liable[.]")); *see Segner v. Sinclair Oil & Gas Co.*, No. 3:11 Civ. 03606, 2012 WL 12885055, at *17 (N.D. Tex. June 4, 2012) (adjudicating "claim for aiding and abetting a breach of fiduciary duty").

Broker Defendants' reliance on *In re DePuy Orthopaedics, Inc., Pinnacle Hip Implant Prod. Liab. Litig.*, 888 F.3d 753, 782 (5th Cir. 2018), is especially misguided. First, *DePuy* holds that aiding-and-abetting claims were "not yet recognized by the state courts," which is clearly contrary to the state court cases cited herein. Second, *DePuy* relies on cases that expressly acknowledge the "settled" claim for knowing participation in another's breach of fiduciary duty.

Courts have recognized that such "knowing participation" claim is effectively the same as aiding and abetting. *Milligan Tr. For Westech Cap. Corp. v. Salamone,* No 1:18 Civ. 327, 2019 WL 12089999, at *9 (W.D. Tex. Mar. 14, 2019). *See Milligan, Tr. for Westech Cap. Corp. v. Salamone*, No. 1:18 Civ. 327, 2019 WL 4003093, at *1-2 (W.D. Tex. Aug. 23, 2019) (discussing *DePuy* and noting that "Texas appellate courts . . . [and] the Fifth Circuit ha[ve] repeatedly recognized the existence of [that] cause of action").

Accordingly, Broker Defendants' argument that Texas law does not recognize these claims is incorrect. Regardless, the state's supreme court and appellate courts "routinely recognize[]" such claims; this Court should as well. *Id.*

## B. The SAC Adequately Pleads a Claim for Aiding and Abetting Fraud Against All Named Defendants Herein.

The SAC adequately pleads a claim for aiding and abetting fraud, which "requires (1) the commission of [fraud] by a primary violator; (2) knowledge of this tort on the part of the aider and abettor; and (3) substantial assistance by the aider and abetter [sic] in the achievement of the primary violation.").[58] *Rotstain v. Trustmark Nat'l Bank*, No. 3:09 Civ. 2384, 2016 WL 8216509, at *3 (N.D. Tex. July 27, 2016). As discussed above, the underlying fraud claim (Count VII) is adequately pled. *See e.g.*, ¶¶ 349, 342-47, as are Defendants' knowledge of the fraud, (*see* section on general awareness for aiding and abetting TSA claim); *e.g.*, ¶¶ 350, 4, 8-9, 15, 18, 23, 27-28, 30, 132(a)(iv)-(v)–132(kkk)(iv)-(v), and substantial assistance of the fraud (*see* section on substantial assistance for aiding and abetting TSA claim); ¶¶ 351, 35, 132(a)(iii)–132(kkk)(iii), 192-96, 207, 235-36, 243, 248, 251, 255-57, 283-84. Accordingly, Plaintiffs stated a claim for aiding and abetting fraud. ¶ 352.

---

[58] Broker Defendants do not dispute that the second and third elements. Dkt. 685 at 30.

### C. The SAC Adequately Pleads a Claim for Aiding and Abetting Breach of Fiduciary Duty.

The SAC adequately pleads a claim for aiding and abetting (or participating in) breach of fiduciary duty, which requires similar elements: "(1) the existence of a fiduciary relationship; (2) that the third party knew of the fiduciary relationship; and (3) that the third party was aware that it was participating in the breach of a fiduciary relationship."[59] *D'Onofrio v. Vacation Publ'n, Inc.*, 888 F.3d 197, 216 (5th Cir. 2018). The SAC establishes: (1) the existence of a fiduciary relationship on the part of the Lead Broker. *See e.g.*, ¶¶ 380, 372-78; (2) the aider and abettors' knowledge of that relationship by way of the PPMs and other documents that they received and GPB's status as registered under the Investment Advisers Act, *e.g.*, ¶¶ 381, 383, 50-51, 105, 132(cc)(xi), 173, 185, 223-61; and (3) the aider and abettors' knowledge of their own participation in the breach of that fiduciary relationship, *e.g.*, ¶¶ 382, 132(a)(iv)-(v)–132(kkk)(iv)-(v), 223-61. Accordingly, Plaintiffs state a claim for aiding and abetting, or participating in, breach of fiduciary duty. ¶ 384.

## XIV. PLAINTIFFS' CLAIMS ARE TIMELY.

Certain Defendants attack Plaintiffs' TSA registration and negligence claims as untimely and seek to limit Plaintiffs' TSA and TUFTA class claims.[60] These challenges are meritless.

As to Plaintiffs' TSA registration claims (Dkt. 616, ¶¶ Counts IV-VI), four plaintiffs, Plaintiffs Loch, Gramm, Wade and Eden, indisputably purchased within the three-year statute of limitations. ¶¶ 83, 91, 93, 94, 98, 297. Plaintiffs' negligence claims are also timely given the

---

[59] Broker Defendants do not dispute that the second and third elements. Dkt. 685 at 30.

[60] Defendants do not challenge that all Plaintiffs have timely asserted TSA claims for sale of a security based on materially untrue statements. Here, the statute of limitations is three years, plus discovery-rule tolling, and all Plaintiffs' claims are timely. *See* Tex. Rev. Civ. Stat. Ann. art. 581-33H(2)(a); SAC at Counts I-III.

discovery rule and equitable tolling. At the very least, equitable tolling presents factual issues that preclude resolution of the statute of limitations issue at this stage of the case. Finally, as to TUFTA, all Plaintiffs satisfy the four-year statute of limitations, as TUFTA claims runs from the date of the transfers not the date of Plaintiffs' purchases and challenged transfers occurred in 2018 and 2019. Instead, Defendants attempt now to limit the scope of the Class as to TSA and TUFTA claim is premature.

### A. The TSA Claims

The TSA Registration claims as to Loch and Gramm are unquestionably timely as these Plaintiffs purchased GPB Securities less than three years before they filed their claims. ¶¶89, 93, 98. GPB, Phoenix and the Broker Defendants' (but not the other Defendants) (Dkts. 697 at 11, 701 at 10, and 685 at 5) contention that these Plaintiffs cannot assert TSA claims because they are not Texas residents is baseless. As demonstrated above, that argument is misguided. The TSA registration claims are assured by non-Texas residents as well as Texas residents. Thus, Plaintiffs Loch and Gramm's claims are indisputably timely.

The registration claims of Plaintiff Wade, a Texas resident, also are clearly timely. ¶¶ 94, 98. Indeed, even Defendants GPB and Phoenix concede that Plaintiff Wade has asserted a timely TSA claim. Dkt. 697 at 11 ("[T]he claims of plaintiff Victor Wade Individual Retirement Account have been brought within the applicable three-year statute of limitation"); Dkt. 701 at 11 (Plaintiff Wade's registration claim "is not time-barred.").

Wade paid for his GPB Securities (the limited partnership interests) on April 3, 2017, and his purchase was not consummated until more than thirty days after Plaintiff signed his respective subscription agreement. Thus, Wade was not admitted to the GPB partnership in which he invested until May 5, 2017, thirty-two days after he submitted payment, from Texas, to purchase the GPB shares. As the SAC alleges, the relevant state and federal courts *expressly* tolled the statutes of

138

limitations from at least March 13, 2020 through July 15, 2020, approximately four months, via four separate orders issued by the Courts due to the COVID-19 pandemic. ¶¶ 295-300.[61] These orders tolled all limitations periods and make clear that under any interpretation Plaintiff Wade's TSA registration claims are timely (as GPB Defendants and Phoenix acknowledge). *See* ¶¶ 94,98; Ex. J (Wade Admit Confirmation. Wade filed his claims on May 8, 2020. Given the court ordered four month tolling, the timeliness of Plaintiff Wade's registration claim cannot legitimately be questioned, and certainly Defendants have not carried their burden of <u>privity</u> letting the statute of limitations run on.

Moreover, the claims asserted by Eden are also timely because they relate back to the commencement of this action. Plaintiff Kinnie Ma asserted such claims on behalf of the Class on October 25, 2019. ¶¶ 332-341 (Counts IV-VI). All claims asserted on behalf of the Class relate back to the commencement of the action, on October 25, 2019.[62] Plaintiffs may utilize the relation-back doctrine under Fed. R. Civ. P. 15(c) to avoid any claimed limitations issues, because Plaintiffs' claims are based on the same set of facts alleged by the underlying Plaintiff. *See Nolan v. Exxon Mobil Corp.,* No. 13-439-JJB-EWD, 2016 WL 1213231, at *6 (M.D. La., Mar. 22, 2016)

---

[61] As the SAC makes clear, on account of the COVID-19 pandemic, on April 1, 2020, the Supreme Court of the State of Texas issued its Eighth Emergency Order Regarding the COVID-19 State of Disaster ordering that "any deadline for the filing or service of any civil case is tolled from March 13, 2020, until June 1, 2020, unless extended by the Chief Justice of the Supreme Court." Ex. K, ¶3 The Supreme Court of Texas later extended that tolling until July 15, 2020. *Id.,* Ex. L, ¶300. Further, on April 15, 2020 the Chief Judge of the United States District Court for the Western District of Texas issued orders Regarding Court Operations Under the Exigent Circumstances Created By the COVID-19 Pandemic, ordering that "all deadlines are suspended and tolled for all purposes, including the statutes of limitations from now through May 31, 2020." *Id.,*Ex. M at 2, ¶3. On May 8, 2020, the Court extended such tolling through June 30, 2020. *Id.* Ex. N at 2, ¶3.

[62] As demonstrated above, it is not necessary for every Plaintiff to possess every all claims asserted on behalf of other members of a Class asserting claims concerning related or integrated offerings like this one.

(granting intervention by unnamed class members after finding that the intervenors' claims, which were otherwise time-barred, related back to the filing of the original class complaint).

The law is clear that "the commencement of a class action suspends the applicable statute of limitations as to all asserted members of the class who would have been parties had the suit been permitted to continue as a class action." *American Pipe & Constr. Co. v. Utah,* 414 U.S. 538, 554 (1974). "Once the statute of limitations has been tolled, it remains tolled for all members of the putative class until class certification is denied. At that point, class members may choose to file their own suits or to intervene as plaintiffs in the pending action." *Crown, Cork & Seal Co., Inc. v. Parker,* 462 US 345, 354 (1983).

In addition, "[t]he doctrine of relation back under Rule 15(c) is liberally applied . . . especially if no disadvantage will accrue to the opposing party." *Williams v. United States,* 405 F.2d 234, 236 (5th Cir. 1968). While Rule 15(c) "does not address the relation back of amendments that propose to add or substitute plaintiffs, the Fifth Circuit has looked to Rule 15(c) when faced with such situations." *In re Mike's, Inc.*, No. 02 Civ. 1073, 2002 WL 1767425, at *2 (E.D. La. July 30, 2002) (citing *Summit Office Park v. United States Steel Corp.*, 639 F.2d 1278, 1282 (5th Cir. 1981)); *Williams*, 405 F.2d at 236. The Fifth Circuit has instructed that "notice is the critical element involved in Rule 15(c) determinations." *Williams*, 405 F.2d 236. Under Rule 15(c), the determination of fair notice may generally focus on whether a new claim arises out of the same conduct, transaction, or occurrence. *Nolan,* 2016 WL 1213231, at *7. And, "when it comes to a late effort to introduce a new party, something else is added. Not only must the adversary have had fair notice about the operational facts, but it must have had fair notice that a legal claim existed in and was in effect being asserted by, the party belatedly brought in." *Williams*, 405 F.2d at 238. Here, Defendants were already on notice of the claims which are asserted by the "new" plaintiffs

who seek to be added by the amendment. Indeed, the Class described in Plaintiff Ma's initial class action complaint included, by definition, all Class members, including the additional plaintiffs added to the amended complaints. [63] All claims relate back to Kinnie Ma's October 2019 filing.[64]

## B.  Negligence

Auditors RSM, Crowe, CohnReznick and Withum (Dkt. 707 at 26-27) argue that Plaintiffs' negligence claim is untimely because it was not filed within the two-year Texas statute of limitations, which commences from the date of the audit opinion.[65] But this argument wholly ignores Texas' well settled discovery rule.

Plaintiffs concur that under Texas law the statute of limitations for negligence actions is two years. *See* Tex. Civ. Prac. & Rem. Code Ann. § 16.003(a) (West 2017). However, the "limitations period only "begins to run when 'the claimant discovers or should have discovered through the exercise of reasonable care and diligence the facts establishing the elements of his cause of action.'" *Taylor v. Rothstein Kass & Company, PLLC*, No. 3:19-CV-1594-D, 2020 WL

---

[63] In fact, Plaintiff Ma gave particularized notice as to plaintiffs Loch and Wade, when she Ma advised the parties and the court of the fact that Wade and Loch would likely be joining this action in an early filing in this case.

[64] Moreover, the three-year statute respecting TSA claims is a statute of limitations both based on the plain language and the interpretation of the Texas Courts. In *Kubbernus v. ECAL Partners, Ltd.*, 574 S.W.3d 444, 478 (Tex. App. 2018), a Texas appellate court acknowledged that "registration [c]laims" were governed by the TSA's three-year statute of limitations provision found in article 581-33(H)(1). The *Kubbernus* Court's classification of the statute as one of limitations is notable because that case provided a long analysis to explain why another TSA time period - the five-year period for misrepresentation claims - is a statute of repose, not limitation. While several *federal* courts have addressed the issue and found the time period to be one of repose, those cases rely on *dicta* in a footnote. *See Official Stanford Inv'rs Comm. v. Greenberg Traurig, LLP*, No. 3:12-CV-4641-N, 2015 WL 13741905, at *4 (N.D. Tex. Feb. 4, 2015) (citing *Williams v. Khalaf*, 802 S.W.2d 651, 654 n.3 (Tex. 1990)).

[65] These defendants assert the audit opinions were issued as follows: RSM on August 4, 2016 and April 27, 2017, *see* Exs. 1-A, 1-B; Crowe on May 1, 2017, *see* Exs. 2-A, 2-B; and CohnReznick on April 28, 2017, *see* Ex. 3-A. Dkt. 707 at 26.

554583, at *2 (N.D. Tex. Feb. 4, 2020) (quoting *Janvey ex rel. Sharp Capital, Inc. v. Thompson & Knight LLP*, No. 3:03-CV-158-M, 2003 WL 21640573, at *3 (N.D. Tex. July 8, 2003) (Lynn, J.)); *see also SC & E Admin. Servs., Inc. v. Deloitte*, No. A–05–CA–929–SS, 2006 WL 6747974, at *7 (W.D. Tex. July 25, 2006) (holding that the discovery rule applies to professional negligence claims against auditors). Here, Plaintiffs could not have known about the auditors' negligence because GPB, Ascendant and Auditors kept investors in the dark about problems relating to the audit, and repeatedly told investors that the audits were just delayed and that the Funds were still running smoothly. *See, e.g.*, ¶ 233. The SAC alleges that Crowe only resigned from its audit engagement with GPB in November, 2018 (¶¶ 63, 200, 271) and RSM resigned in April 2019 (¶198). Even if Class members were on notice form these dates, Plaintiffs' claims would be timely. But, GPB and the auditors themselves took steps to conceal that there was any real problem. Crowe resigned due to "perceived risks that Crowe determined fell outside of *their internal risk tolerance parameters*." (¶ 63) (emphasis added). And, GPB promptly hired a well-known auditor, EisnerAmper, to replace Crowe. ¶ _. The SAC alleges EisnerAmper's actions in furthering the concealment. ¶ 234. Similarly, RSM did not withdraw its opinions immediately upon issuance. Those audits were reprinted and disseminated for months, if not years, thereafter. (To the extent that Margolin, EisnerAmper, CohnReznick, Withum, or the other auditors contest the allegations as to the audit work performed or when it was performed, that raises a factual issue that cannot be determined on this motion.). There is no indication that CohnReznick withdrew its audit opinion at all. In short, Plaintiffs and other Class members were left in the dark.

Thus, investors were not aware, and could not have been aware, of any red flags alerting Plaintiffs and the Class about a potential claim until the July 2019 Contrary to these defendants' assertion, the SAC does allege the nature of the concealment and when the truth began to emerge.

¶ 68. Plaintiffs could not have plead this claim any earlier. At a minimum, the fact issue of when discovery of such claims occurred precludes dismissal on these motions to dismiss. Given this, Plaintiffs' assertion of claims against Defendants on October 25, 2019 and again on May 8, 2020 and November 9, 2020 were well within the limitations period and were entirely timely.

### C.   TSA and TUFTA Claims

The Broker Defendants do not dispute that TUFTA claims relating to transfers in the four years prior to filing are timely. The Broker Defendants' argue (Dkt. 685 at 5 and 28-29) (joined by Axiom, Dkt. 709 at 11). However, prematurely, raise a class issue in the guise of a statute of limitations issue (*i.e.*, that the class period of Plaintiffs' proposed TUFTA class should be determined now. The scope of the class is not an issue for the Court at this time, nor has it been briefed. It is quite simply not a basis for a motion to dismiss. These Defendants do not assert that any of Plaintiffs' own TSA or TUFTA claims are untimely. After discovery, at such time as Plaintiffs move for class certification, the Court will be able to determine the appropriate time horizon for the Class. But that is not an appropriate determination on a motion to dismiss.

Moreover, even if these Defendants were able to litigate the scope of the Class at this time, they are applying an incorrect truncated limitation period. According to the Texas Supreme Court, TUFTA claims under sections 24.005(a)(1)-(2) are subject to a four-year limitation. Tex. Bus. & Com. Code Ann. § 24.010(a)(1)-(2); *Nathan v. Whittington,* 408 S.W.3d 870, 874 (Tex. 2013); *Biliouris v. Patman*, 751 F. App'x 603, 604 (5th Cir. 2019) ("TUFTA's statute of repose reads . . ."). However, TUFTA claims under subparagraph (1), the repose period can be extended up to <u>one year</u> after the unlawful nature could reasonably have been discovered. *See Biliouris*, 751 F. App'x, 605. Given the concealment Plaintiffs have alleged, and the lack of disclosure of these tainted payments, the Class period begins at least as early as October 25, 2014 - five years prior to the

commencement of this case on October 25, 2019. Precisely when the Class period should begin cannot be decided on this motion as it is intensely factual.

Accordingly, Defendants' timeliness arguments should be rejected; at a minimum, these arguments raise an issues of fact which cannot be resolved on this motion to dismiss.

## XV.  CONCLUSION

For the above stated reasons, Defendants' motions to dismiss should be denied in their entirety.

Dated:  February 22, 2021                    Respectfully submitted,

By: /s/ Jesse Z. Weiss
**EDMUNDSON SHELTON WEISS PLLC**
Ryan Shelton
SBN: 24037484
ryan@eswpllc.com
Jesse Z. Weiss
SBN: 24013728
jesse@eswpllc.com
317 Grace Ln, Ste 210
Austin, TX 78746
Telephone: (512) 596-3058
Facsimile: (512) 532-6637

**KIRBY McINERNEY LLP**
Peter S. Linden (admitted *pro hac vice*)
Seth Shapiro (admitted *pro hac vice*)
250 Park Avenue, Suite 820
New York, New York 10177
Telephone: (212) 371-6600
Facsimile: (212) 751-2540
Email: plinden@kmllp.com

**BLACKNER STONE & ASSOCIATES, P.A.**
Richard L. Stone (admitted *pro hac vice*)
123 Australian Avenue
Palm Beach, Florida 33480
Telephone: (561) 804-9569
Email: rstoneesq@rstoneesq.com

*CLASS COUNSEL FOR PLAINTIFFS*