IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION

| | | |
|---|---|---|
| KINNIE MA INDIVIDUAL RETIREMENT ACCOUNT, INDIVIDUALLY AND ON BEHALF OF THOSE SIMILARLY SITUATED, | § § § § § | |
| PLAINTIFF, | § § | |
| V. | § § | CAUSE NO. 1:19-CV-1050-LY |
| ASCENDANT CAPITAL, LLC, ET AL., | § § § | |
| DEFENDANTS. | § | |

## ORDER ON MOTION TO DISMISS (DOC. 685)

Plaintiffs Kinnie Ma Individual Retirement Account, Dean Crooks, Jeffery S. Gramm Individual Retirement Account, Stacy Greasor Individual Retirement Account, Corri Rene Eden, Catherine Kominos, Karen Loch, Victor Wade Individual Retirement Account, Robert A. Stone Living Trust, Shirley Stone Living Trust, and Kazue M. Bell (collectively, "Plaintiffs") allege they are victims of a $1.8 billion "Ponzi scheme," one of the largest in Texas history. Plaintiffs' Second Amended Complaint filed November 9, 2020, brings a class-action lawsuit against over 90 Defendants on 13 counts: violations of the Texas Securities Act, including aiding-and-abetting violations, control-person violations, fraud, and substantially assisting in the commission of fraud, fraudulent transfer under the Texas Uniform Fraudulent Transfer Act, breach of fiduciary duty, substantially assisting in the breach of fiduciary duty, and negligence. Plaintiffs pray for compensatory and equitable relief.

A large group of Defendants move to dismiss Plaintiffs' Second Amended Complaint under Rule 12(b)(6), including Advisory Group Equity Services, Ltd., Aegis Capital Corporation, Aeon

Capital Inc., American Capital Partners, LLC, Arete Wealth Management, LLC, Arkadios Capital, Ausdal Financial Partners, Inc., BCG Securities, Inc., Cabot Lodge Securities LLC, Calton & Associates, Inc., Capital Investment Group, Inc., Cascade Financial Management, Inc., Center Street Securities, Inc., Coastal Equities, Inc., Colorado Financial Service Corporation, Concorde Investment Services, LLC, Crown Capital Securities, LP, David A. Noyes & Company, Dawson James Securities, Inc., Dempsey Lord Smith, LLC, Detalus Securities, LLC, DFPG Investments, Inc., Emerson Equity LLC, FSC Securities Corporation, Geneos Wealth Management, Inc., Great Point Capital LLC, HighTower Securities, LLC, IBN Financial Services, Inc., Innovation Partners LLC, International Assets Advisory, LLC, Kalos Capital, Inc., Kingsbury Capital, Inc., Landolt Securities, Inc., Lion Street Financial, LLC, Lowell & Company, Inc., Lucia Securities, LLC, Madison Avenue Securities, LLC, McDonald Partners LLC, McNally Financial Services Corporation, Moloney Securities Co., Inc., Money Concepts Capital Corporation, MSC-BD, LLC, Newbridge Securities Corporation, Orchard Securities, LLC, Purshe Kaplan Sterling Investments, Inc., Royal Alliance Associates, Inc., SagePoint Financial, Inc., SCF Securities, Inc., Sentinus Securities n/k/a Sentinus-Halo Securities, LLC, Stephen A. Kohn & Associates, Ltd., Titan Securities, Triad Advisors LLC, Uhlmann Price Securities, LLC, United Planners' Financial Services of America, LP, Vanderbilt Securities, LLC, Vestech Securities, Inc., Western Int'l Securities, Inc., WestPark Capital Inc., Whitehall-Parker Securities, Inc., and Woodbury Financial Services, Inc. (collectively, the "Moving Defendants").[1] (Doc. 685.) Plaintiffs respond in an "omnibus" opposition that the court has also reviewed in rendering this order. (Doc. 730.)

---

[1] Plaintiffs' Second Amended Complaint refers to all of the Moving Defendants as the "Broker Defendants;" however, not all of the so-called Broker Defendants have joined this motion.

## LEGAL STANDARD

The court draws all facts from Plaintiffs' Second Amended Complaint. When evaluating whether to dismiss a complaint, a well-known "tenet [is] that a court must accept as true all of the factual allegations contained in a complaint." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). But this tenet "is inapplicable to legal conclusions." *Id.*; *see also Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 572 (2007).

Attachments to a complaint are "a part of the pleading for all purposes." FED. R. CIV. P. 10(c). Additionally, while a motion to dismiss under Rule 12(b)(6) may only be based on the complaint, documents attached to the complaint, documents that are critical to the complaint and referred to in it, and information that is subject to proper judicial notice, Plaintiff "has much more flexibility in opposing a Rule 12(b)(6) motion," providing elaborations that are consistent with the pleadings. *See Geinosky v. City of Chicago*, 675 F.3d 743, 745 n.1 (7th Cir. 2012) (explaining reference to newspaper story).

## FACTUAL BACKGROUND

In their Second Amended Complaint, Plaintiffs allege GPB Capital Holdings, LLC ("GPB Capital") partnered with Ascendant Capital, LLC (formerly an Austin-based branch of Axiom Capital Management, Inc.) and Ascendant Alternative Strategies, LLC to perpetrate a nearly $2 billion Ponzi scheme. Specifically, GPB Capital sponsored a series of individual "funds," which include Defendants GPB Holdings, LP; GPB Holdings II, LP; GPB Holdings III, LP; GPB Holdings Qualified, LP; GPB Automotive Portfolio, LP; GPB Cold Storage, LP; GPB NYC Development; and GPB Waste Management, LP (collectively, the "GPB Funds"). GPB Capital is the general manager

of the GPB Funds, but Ascendant Capital was "secretly acting as the general partner" of the GPB Funds as well.

Investors such as Plaintiffs purchase interests in the GPB Funds as limited partners. Investors are promised dividends of 8% or more *per annum* from "operating profits" and an expected net internal rate of return of 15%. Such promises were allegedly made in private-placement memoranda, Forms D, and other communications disseminated to investors. For example, several materials "repeatedly described this 8% return as 'fully covered from funds from operations' or from 'steady cash flows.'" However, in reality, "GPB was operating a Ponzi scheme in which it was paying investors money from their own (or other later investors') accounts and describing such payments as investment returns."

Plaintiffs take issue with undisclosed self-dealing and conflicts of interest among GPB Capital, Ascendant Capital, Ascendant Alternative Strategies, Axiom Capital Management, the GPB Funds, and principals David Gentile, Jeffry Schneider, Mark Martino, DJ Partners, and MR Ranger who "*commonly owned* the entire revenue stream from organizing, managing, and operating the various limited partnership interests, *and* from brokering, selling and underwriting them." This arguably "created the most glaring conflict of interest that can exist in the securities business: the brokers offering the [limited partnership interests in the GPB Funds] and purportedly providing independent, objective advice were also secretly sharing in the massive fees earned by GPB Capital in connection with operating the limited partnerships themselves. The nature of this revenue sharing and co-control relationship was never fully disclosed as required under both Texas [and federal securities laws . . .] to which the [GPB] Funds were subject."

Additionally, Plaintiffs state that all parties to the GPB Funds—but the investors—profited handsomely from the alleged Ponzi scheme. For instance, "[f]ees paid out of investor funds included at least 8–11% paid to brokers who sold the Securities (an unprecedented amount), and an additional 5% to 9% paid to GPB [Capital] and its (undisclosed) affiliates on a regular and continuous basis." Taken together, Plaintiffs allege that "16% to 20% of the gross capital investment of limited partners" was being extracted in the form of fees, leaving only 80% to 84% available for investment. "This fee structure made reasonable investment returns impossible."

Lastly, Plaintiffs allege this misconduct was enabled not only by the GPB Funds' administrator Phoenix American Financial Services, but also by (1) RSM US LLP, Crowe LLP, CohnReznick LLP, Margolin Winer & Evens LLP, EisnerAmper LLP, and Withum Smith+Brown PC (collectively, the "Auditor Defendants"); (2) Deloitte Transactions and Business Analytics LLP and Morrison (collectively, the "Valuation Defendants"); and (3) over 60 broker dealers, including Advisory Group Equity Services, Ltd., Aegis Capital Corporation, Aeon Capital Inc., American Capital Partners, LLC, Arete Wealth Management, LLC, Arkadios Capital, Ausdal Financial Partners, Inc., BCG Securities, Inc., Bradley Wealth Management, LLC, Cabot Lodge Securities LLC, Calton & Associates, Inc., Capital Investment Group, Inc., Cascade Financial Management, Inc., Center Street Securities, Inc., Coastal Equities, Inc., Colorado Financial Service Corporation, Concorde Investment Services, LLC, Crown Capital Securities, LP, David A. Noyes & Company, Dawson James Securities, Inc., Dempsey Lord Smith, LLC, Detalus Securities, LLC, DFPG Investments, Inc., Dinosaur Financial Group, LLC, Emerson Equity LLC, FSC Securities Corporation, Geneos Wealth Management, Inc., Great Point Capital LLC, HighTower Securities, LLC, IBN Financial Services, Inc., Innovation Partners LLC, International Assets Advisory, LLC,

Kalos Capital, Inc., Kingsbury Capital, Inc., Landolt Securities, Inc., Lewis Financial Group n/k/a DAI Securities, LLC, Lion Street Financial, LLC, Lowell & Company, Inc., Lucia Securities, LLC, Madison Avenue Securities, LLC, McDonald Partners LLC, McNally Financial Services Corporation, Moloney Securities Co., Inc., Money Concepts Capital Corporation, MSC-BD, LLC, Newbridge Securities Corporation, Orchard Securities, LLC, Purshe Kaplan Sterling Investments, Inc., Royal Alliance Associates, Inc., SagePoint Financial, Inc., SCF Securities, Inc., Sentinus Securities n/k/a Sentinus-Halo Securities, LLC, Stephen A. Kohn & Associates, Ltd., Titan Securities, Triad Advisors LLC, Uhlmann Price Securities, LLC, United Planners' Financial Services of America, LP, Vanderbilt Securities, LLC, Vestech Securities, Inc., Western Int'l Securities, Inc., WestPark Capital Inc., Whitehall-Parker Securities, Inc., and Woodbury Financial Services, Inc. (collectively, the "Broker Defendants").

The GPB Funds' Administrator Phoenix American Financial Services agreed to perform functions for limited partners such as Plaintiffs, including calculating investment net asset values, processing distributions, informing investors of the current state of their investments, and serving as paymaster for the GPB Funds. If it "had not provided investors with false monthly statements containing the purported value of their holdings, the scheme would have failed. The statements were false and misleading because they failed to reduce the respective investors' capital account value by the up to 11% paid 'off the top' (in broker commissions) before investor funds were paid over to GPB [Capital]. Thus, the investors' statements were inflated by at least 11% and materially misrepresented the value of [Plaintiffs'] investments."

The Auditor Defendants "prepared false and misleading audits[;] reviewed, approved and authorized the dissemination of false and misleading financial statements for the [GPB] Funds[;] and

allowed their names and reputations to be used for salesmanship and marketing" of the limited-partnership interests in the GPB Funds. For example, "GPB [Capital] has acknowledged that GPB Holdings II, LP's assets were overstated in the audit that RSM prepared by more than 25%, or hundreds of millions of dollars . . . . Similarly, in June 2019, GPB [Capital] acknowledged that GPB Automotive Portfolio, LP's assets were overstated [in the audit Crowe prepared] by 39% and that GPB [Capital]'s five remaining [GPB] Funds had declined between 25% to 73% in value." Audit opinions from RSM and Crowe have since been withdrawn.

The Valuation Defendants "provided inflated valuations of GPB's assets." The Valuation Defendants knew these valuations were inflated because they "had access to the GPB financials and thus knew that: (1) GPB [Capital] was not generating current returns sufficient to pay the proposed 8% current dividend; (2) as described herein, GPB [Capital] was engaged in large undocumented intercompany loans and undocumented co-investments, whereby one [GPB] Fund paid obligations of other [GPB] Funds, but did not document these financial transactions in the [GPB] Funds' respective books; (3) Ascendant [Capital] and [Jeffry] Schneider were receiving compensation not disclosed in the [Private Placement Memoranda] or otherwise in connection with GPB transactions and were in effect acting as managers of GPB [Capital], not just brokers; (4) GPB [Capital] was routinely abusing its non-public positions; (5) as described [elsewhere in Plaintiffs' Second Amended Complaint], GPB [Capital] was intentionally overpaying for assets with the expectation that some of that overpayment would be kicked back to GPB [Capital] or its principals, or held in 'reserve' for payment of that 8% dividend; and (6) as described [elsewhere in Plaintiffs' Second Amended Complaint], GPB [Capital] was buying assets from Gentile in a conflict ridden fashion without express approval, bringing into question the legitimacy of its entire asset buying

program." Additionally, the valuations at issue "were necessary because most if not all of the assets held by such [GPB] Funds were not publicly traded and had no reported market value." These valuations were therefore relied upon by the GPB Funds and their auditors and their investors.

The Broker Defendants "were, in effect, bribed." They were paid fees "in the range of 16% to 20% of the gross capital investment of limited partners," as well as "grossly excessive commissions (approximately 11%)—more than double the industry average—to look the other way . . . ." The Broker Defendants "knew that this unprecedented fee payout, which was not accurately disclosed in [communications to investors, including Private Placement Memoranda and Forms D], made it impossible for GPB [Capital] to perform as promised."

Additionally, the Broker Defendants were aware of the following red flags: that (1) GPB Capital "was required to but failed to register under [Section] 12(g) of the Securities Exchange Act [of 1934] and to prepare and distribute quarterly and annual financial documents to investors;" (2) "Schneider and Martino were undisclosed 'bad actors' under Rule 506 of the Securities Act [of 1933], so GPB Capital was required to but failed to register the limited-partnership interests; (3) the limited-partnership interests sold to Plaintiffs were "unregistered public offerings;" and (4) these unregistered public offerings contained "excessive compensation, lack of track record, prior poor performance, inter-company conflicts of interest, and commingling of assets among ostensibly separate GPB Funds." Much of "this red-flag information was provided to the Broker Defendants directly through the [due diligence reports from third parties,] which were hidden from the investors" but available to the Broker Defendants. For example, the due-diligence reports revealed that Gentile and Schneider owned a majority interest in Ascendant Alternative Strategies through DJ Partners LLC.

Yet, the Broker Defendants "knowingly distributed materially false [communications] to investors, including the [Private Placement Memoranda and Forms D]." They therefore "perpetuate[d] the scheme by failing to disclose that their clients' investments were being used to pay other investors' distributions, and by failing to disclose the numerous red flags of which they were aware."

## ANALYSIS

The Moving Defendants move to dismiss all counts against them under Rule 12(b)(6), which include claims for aiding and abetting TSA violations as well as claims for substantially assisting in the commission of fraud and the breach of fiduciary duty. FED. R. CIV. P. 12(b)(6). (Doc. 685.)

### I. Group Pleading

Despite choosing to refer to themselves as the "Movants," the Moving Defendants argue that the claims against them must be dismissed because they have been impermissibly grouped together in Plaintiffs' Second Amended Complaint as the "Broker Defendants."

However, Plaintiffs' Second Amended Complaint includes allegations about both the Broker Defendants and each one of the Broker Defendants. Plaintiffs allege that the Broker Defendants engaged in similar conduct and also allege unique facts about each Broker Defendant, such as where each Broker Defendant operated, what GPB Funds each sold, and the general time period the sales occurred.

Furthermore, Plaintiffs do not attempt to invoke the "Group Pleading Doctrine," which allows a court to presume, at the motion-to-dismiss stage, that group-published documents are attributable to all the individuals with involvement in the everyday business of the company. *See, e.g., Owens v. Jastrow*, 789 F.3d 529, 537 (5th Cir. 2015) (rejecting Group Pleading Doctrine);

*DeAngelis v. Corzine*, 17 F. Supp. 3d 270, 281 (S.D.N.Y. 2014) (describing Group Pleading Doctrine). Grouping defendants together under one heading is not the same as invoking the Group Pleading Doctrine; this argument lacks relevance.

## II. Standing

The Moving Defendants' arguments with respect to standing also lack merit. The three "irreducible" elements of standing under Article III of the Constitution are an "injury-in-fact" that is "traceable" to the defendant's conduct and "redressable" by the requested relief. *In re Deepwater Horizon*, 739 F.3d 790, 799 (5th Cir. 2014) (citing *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560–561 (1992)).

Plaintiffs have standing to sue the Moving Defendants here. The injury requirement is easily satisfied where Plaintiffs are defrauded investors seeking damages. *See Broyles v. Commonwealth Advisors, Inc.*, 936 F.3d 324, 326 (5th Cir. 2019) (citing *Lujan*, 504 U.S. at 560–561) ("The investor plaintiffs . . . demonstrat[ed] . . . their injury-in-fact that arose immediately upon their purchase of the falsely overvalued securities[.]"). Such an injury is certainly of the kind that can be redressed by the court through monetary or equitable relief. *See id.* Furthermore, such an injury is traceable to the conduct of the Moving Defendants, who offered the limited-partnership interests in the GPB Funds directly to the Plaintiffs. This is in part because "cessation of the defendant's allegedly illegal activity would 'make an appreciable difference' in bringing about the harm." *Abecassus v. Wyatt*, 704 F. Supp. 2d 623, 637–38, 640 (S.D. Tex. 2010) (internal citation omitted).

10

### III. Choice of Law

The Moving Defendants also state that Plaintiffs' Texas Securities Act and Texas Uniform Fraudulent Transfer Act claims must be dismissed because the choice-of-law clause contained in subscription agreements they signed and the limited partnership agreements preclude application of Texas law. Not so.

The court decides which law governs according to Texas law. *Caton v. Leach Corp.*, 896 F.2d 939, 943 (5th Cir. 1990). In *Caton*, the circuit concluded that the following clause was a "narrow" choice-of-law clause: "[t]his Agreement *shall be construed* under the laws of the state of California." *Id.* at 942; *see also Stier v. Reading & Bates Corp.*, 992 S.W.2d 423, 433 (Tex. 1999) (similarly providing "[t]his agreement *shall be interpreted and enforced* in accordance with the laws of the State of Texas"). The subscription agreement contains a provision stating, "[t]his agreement *will be* enforced, governed, and *construed* in all respects in accordance with the laws of the State of New York, without regard to that state's conflicts of law provisions," and is therefore a narrow choice-of-law clause. Likewise, the limited partnership agreement stating "the rights of the parties hereunder *shall be* governed by, *interpreted and enforced* in accordance with the internal laws (exclusive of the choice of law provisions thereof) of the State of Delaware as to all matters, including matters of validity, construction, effect, performance, and remedies" is a narrow choice-of-law clause.

Under Texas principles for narrow choice-of-law clauses such as these, "the parties may incorporate by reference the laws of a forum to determine issues that could have been resolved by explicit agreement, such as 'rules relating to construction' of an agreement." *Id.* However, narrow choice-of-law clauses do *not* "purport to encompass all disputes between the parties or to encompass

tort claims." *Stier*, 992 S.W.2d at 433; *but see Quicksilver Res., Inc. v. Eagle Drilling, LLC*, 792 F. Supp. 2d 948, 952 (holding choice-of-law clause included tort claims, where clause stated "[t]his agreement shall be construed, governed, interpreted, enforced and litigated, *and the relationship between the parties determined* in accordance with the laws of the County of Cleveland, State of Oklahoma" (emphasis added)).

Thus, while New York or Delaware law may apply to contract-based claims, none are alleged here. Instead, Plaintiffs allege other claims for relief involving "tort dut[ies that] . . . do not arise out of contract." *Id.* Tort-based claims are resolved by application of "the law of the state with the most significant relationship to the particular substantive issue." *Id.* (internal citation omitted to case reversed on other grounds). But "this legal determination involves a factual inquiry" that is inappropriate on a motion to dismiss. *Hughes Wood Prod., Inc. v. Wagner*, 18 S.W.3d 202, 204 (Tex. 2000); *Janvey v. Proskauer Rose LLP*, 2015 WL 11121540, at *3 (N.D. Tex. June 23, 2015).

### IV. Texas Uniform Fraudulent Transfer Act

As a threshold matter, the Moving Defendants argue that the proposed class period is impermissibly broad in violation of the Texas Securities Act and Texas Uniform Fraudulent Transfer Act. However, such arguments are premature at the motion-to-dismiss stage. Plaintiffs have asserted claims in a representative capacity and whether they will be able to assert these claims as a class is a question to be considered during class certification. *See, e.g., In re Deepwater Horizon*, 739 F.3d 790, 800 (5th Cir. 2014) (noting each element of standing must be supported "with the manner and degree of evidence required" at that successive stage of the litigation).

Then, in arguing that Plaintiffs have failed to allege the existence of a fraudulent transfer under Texas Uniform Fraudulent Transfer Act, the Moving Defendants ignore that Plaintiffs have

alleged transfers that are fraudulent *per se*. Transfers from a Ponzi scheme are fraudulent transfers *per se*. *See Janvey v. Alguire*, 647 F.3d 585, 598 (5th Cir. 2011); *Rotstain v. Trustmark Nat'l Bank*, No. 3:09-CV-2384, 2020 WL 1513516, at *2 (N.D. Tex. Mar. 30, 2020) ("In the Fifth Circuit, [a plaintiff] may establish actual intent to defraud by showing that the [defendant's] enterprise operated as a Ponzi scheme."). And Plaintiffs have alleged that "this fee structure [of the GPB Funds, where 16–20% was immediately extracted to pay co-conspirators,] made reasonable investment returns[, including the 8% promised to investors,] impossible." Plaintiffs properly allege that distributions were being made, not from operating profits, but from the investors' own accounts.

## V. Aiding-and-Abetting Claims

Plaintiffs sue the Moving Defendants for aiding-and-abetting violations of the Texas Securities Act. Tex. Rev. Civ. Stat. Ann., art. 581-33(A)(1)–(2). To plead an aiding-and-abetting claim under the Texas Securities Act, Plaintiffs must allege that (1) there was a primary violation of the act, (2) the Moving Defendants had "general awareness" of their role in this violation, (3) the Moving Defendants nevertheless gave "substantial assistance" to the violation, and (4) the Moving Defendants intended to deceive Plaintiffs or acted with "reckless disregard" for the truth or the law. *See In re Enron Corp. Sec., Derivative & ERISA Litig.*, 762 F. Supp. 2d 942, 977 (S.D. Tex. 2010); *Goldstein v. Mortenson*, 113 S.W.3d 769, 776 (Tex. App.–Austin 2003, no pet.). The Moving Defendants incorrectly assert that privity is required to state an aiding-and-abetting claim, and they incorrectly assert that Plaintiffs have not adequately pleaded facts to establish they aided and abetted the Texas Securities Act violations described in the Second Amend Complaint. *See* Tex. Rev. Civ. Stat. Ann., art. 581-33(A)(1) (providing that primary liability requires privity, but "nonprivity defendants may be reached" under aiding-and-abetting statutes premised on secondary liability).

13

Contrary to the Moving Defendants' assertion, Plaintiffs have also alleged facts sufficient to state a "primary violation" of the Texas act. Additionally, Plaintiffs have alleged that the Moving Defendants had a "general awareness" of the alleged Ponzi scheme yet "recklessly disregarded" their role in the scheme, such as the fact that "GPB [Capital] was not generating current returns sufficient to pay the proposed 8% current dividend" to investors. This fact was clear from due-diligence reports that were allegedly provided to the Broker Defendants but concealed from their investors. The Moving Defendants carried on despite knowing that GPB Capital was required to register the limited-partnership interests the Moving Defendants were selling to investors. And, for "sky-high commissions," the Moving Defendants carried on despite knowing the limited-partnership interests contained "excessive compensation, lack of track record, prior poor performance, inter-company conflicts of interest, and commingling of assets among ostensibly separate GPB Funds." If the Moving Defendants had not done so, "the Ponzi scheme would have never gotten off the ground." In other words, the Moving Defendants provided "substantial" assistance be engaging in the Ponzi scheme, not by merely failing to disclose details of the scheme. Therefore, Plaintiffs' have alleged "plausible" aiding-and-abetting violations of the Texas Securities Act sufficient to survive dismissal. *See Iqbal*, 556 U.S. at 679.

## VI. Substantial-Assistance Claims

When pleading a special matter such as fraud or mistake, "a party must state with particularity the circumstances constituting fraud or mistake. Malice, intent, knowledge, and other conditions of a person's mind[, however,] may be alleged generally." FED. R. CIV. P. 9(b). Still, "when the facts relating to the alleged fraud are peculiarly within the perpetrator's knowledge or control or where fraud occurred over an extended period of time and consists of numerous acts, the

specificity requirements of Rule 9(b) are applied less stringently[,]" *U.S. ex rel. King*, 232 F.R.D. 568, 570 (N.D. Tex. 2005), and "fraud may be pled on information and belief under such circumstances . . . ." *United States ex rel. Thompson v. Columbia/HCA Healthcare Corp.*, 125 F.3d 899, 903 (5th Cir.1997) (noting complaint must still set forth factual basis for such belief).

A federal court sitting in diversity applies the substantive law of the state in which it sits. *Erie R.R. Co. v. Tompkins*, 304 U.S. 64, 58 (1938); *Cates v. Sears, Roebuck & Co.*, 928 F.2d 679, 687 (5th Cir. 1991). Texas courts recognize a third-party cause of action for fraud where a party had "knowledge" of and "profited" from the material misrepresentations underlying the fraud. *In re NE 40 Partners, Ltd.*, 411 B.R. 352, 360–361 (Bankr. S.D. Tex. 2009); *see also Frank v. Commonwealth of Ant. & Barb.*, 842 F.3d 362, 366 (5th Cir. 2016) (adjudicating claim for aiding and abetting fraud).[2] Similarly, Texas courts recognize a claim for substantially assisting in the breach of fiduciary duty. *See Darocy v. Abildtrup*, 345 S.W.3d 129, 138 (Tex. App. 2011) (providing elements of claim for substantially assisting breach of fiduciary duty, which are fiduciary duty owed by third party, knowledge of fiduciary relationship by defendant, and awareness defendant's participation was furthering third party's breach of its fiduciary duty).

Here, once again, Plaintiffs not only allege that the Moving Defendants had "knowledge" of the alleged fraud by virtue of its services but also that Moving Defendants "profited" from it. Likewise, Plaintiffs allege Moving Defendants were not only "aware" of the illegal self-dealing described in Plaintiffs' Second Amended Complaint by virtue of their services but also "aware" that

---

[2] Fraud occurs when (1) a material representation; (2) was false when made; (3) a speaker knew the representation was false when made or made it recklessly; (4) the speaker intended the representation be acted upon by another party; (5) the other party acted in reliance upon the representation; and (6) the other party thereby suffered injury. *Ernst Young, LLP v. Pacific Mut. Life Ins. Co.*, 51 S.W. 3d 573, 577 (Tex. 2001).

their services helped to further this self-dealing and conceal it from investors. For example, the Moving Defendants were aware of conflicted and co-mingled transactions, as described above. Plaintiffs have stated plausible substantial-assistance claims that survive dismissal. *See Iqbal*, 556 U.S. at 679.

## CONCLUSION

For the foregoing reasons, the Moving Defendants' motion to dismiss (Doc. 685) is **DENIED**.

SIGNED this 25th day of August, 2021.

_____
LEE YEAKEL
UNITED STATES DISTRICT JUDGE